1
2
3

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

4

KNIFE RIGHTS, INC., et al.,

5

Case No. 4:23-CV-00547-O

                    Plaintiffs,

6

U.S. District Judge Reed O'Connor

7

        v.

8

MERRICK B. GARLAND, Attorney
General of the United States, et al.

9

10

                    Defendants.

11
12
13
14
15
16

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  LEGAL STANDARDS............................................................ 3

III. STATEMENT OF FACTS......................................................... 5

IV.  ARGUMENT ..................................................................... 8

    A. Automatically Opening Knives Are Arms Protected
    By The "Plain Text" Of The Second Amendment........................................ 8

    B. Defendants' Cannot Justify The Federal Knife Ban: Automatically
    Opening Knives Are In Common Use And Not Both Dangerous and
    Unusual ........................................................................ 13

        1. Automatically Opening Knives Are "In Common Use."........................ 17

            (i)   Total Number Establishes Common Use. .................................... 21

            (ii)  Categorical Commonality Is Also Satisfied. ................................ 25

            (iii) Automatically Opening Knives Are Common
                Jurisdictionally .............................................................. 26

V.   THE KNIFE BAN CANNOT BE JUSTIFIED.................................... 27

VI.  CONCLUSION ................................................................... 31

1

2

# TABLE OF AUTHORITIES

3
**Page**

4
**Cites**

5
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................................... 4

6
*Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) ............................................................. 30

7
*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................ 10, 17, 23

8
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 3, 4

9
*City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947

10
    (Ohio Ct. App., 1995) ................................................................................................. 13

11
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................*Passim*

12
*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................. 10

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).................................... 10, 19
13

14
*Griffin v. State*, 47 A.3d 487 (Del. 2012) ...................................................................... 13

15
*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ............... 16

16
*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................................................... 21

17
*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ...................................................... 9

18
*Mackall v. State*, 283 Md. 100, 387 A.2d 762 (1978) ................................................... 11

19
*McDonald v. Chicago*, 561 U. S. 742 (2010) .......................................................... 1, 17

20
*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .................................................. 16, 27

21
*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*

22
    804 F.3d 242 (2d Cir. 2015) ...................................................................................... 9

23
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2021).........................*Passim*

*Nunn v. State,* 1 Ga. 243 (1846) ..................................................................................... 30
24

25
*People v. Yanna*, 297 Mich. App. 137, 824 N. W. 2d 241 (2012) ................................ 17

26
*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455 (5th Cir. 1998)............................. 4

27
*State v. Deciccio* 315 Conn. 79, 105 A.3d 165 (2014) ................................................. 12

28
*State v. Delgado,* 298 Or. 395 (1984)................................................. 11, 12, 19, 25, 28

*State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011
    WL 2083893 (Del Super Ct., May 16, 2011) ...................................................... 12

*State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257 (2015) ........................... 12

*State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017) ................................................ 12

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ................................................ 4, 6, 7, 10, 19

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ...................................... 10

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ......................................... 4, 10

*Caetano*, 136 S. Ct. 1027 (2016) ........................................................................ 17, 18

## Code of Federal Regulations

Title 19, Ch. 1, Part 12, sections 12.95-12.103 ....................................................... 3

## Federal Rules of Civil Procedure

Rule 56 .......................................................................................................................... 3

Rule 56(a) ..................................................................................................................... 3

## Code

15 U.S.C. §§ 1241-1245 .............................................................................................. 1

15 U.S.C. § 1241 .......................................................................................................... 3

15 U.S.C. § 1241(a) ..................................................................................................... 5

15 U.S.C. § 1241(b) .............................................................................................. 1, 2, 5

15 U.S.C. § 1242 ...................................................................................................... 1, 5

15 U.S.C. §§ 1243 ................................................................................................... 2, 5

15 U.S.C. § 1244(1)-(5) ............................................................................................... 6

Section 7 of Title 18 .................................................................................................... 5

Section 1151 of Title 18 .............................................................................................. 5

**U.S. Constitution**

Second Amendment ................................................................................ *Passim*

**Other Authorities**

Federal Switchblade Act, 15 U.S.C. §§ 1241-1245 ............................... 1, 2, 5, 14, 22, 32

**Other**

Dictionary of the English Language 107 (4th ed.) (reprinted 1978) ............................ 6

Malachy Postlethwayt, The Universal Dictionary of Trade and Commerce (4th ed. 1774) ................................................................................ 7

H. Peterson, Daggers and Fighting Knives of the Western World 12 (2001) ............ 11

## I.   INTRODUCTION

Undoubtedly, automatically opening knives are "arms" in common use and protected under the plain text of the Second Amendment. The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2132 (2021) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Indeed, the Supreme Court made clear in *Bruen* that the Second Amendment protects the right to acquire, possess, and carry arms for self-defense and all other lawful purposes — inside *and* outside the home. *Bruen*, 142 S. Ct. 2111.

To be clear, "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S.Ct. at 2156 (quoting *McDonald v. Chicago*, 561 U. S. 742, 780 (2010) [plurality opinion]). "The very enumeration of the [Second Amendment] right takes out of the hands of government"— including Defendants — "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original).

Despite Supreme Court precedent, the Federal Switchblade Act, 15 U.S.C. §§ 1241-1245, enacted in 1958 as Pub. Law 85-623 ("FSA" or "Federal Knife Ban"), prohibits the introduction, manufacture for introduction, transportation, or distribution into interstate commerce any switchblade knife (as defined). 15 U.S.C. §§ 1241(b), 1242; *See also* Appendix in Support of Plaintiffs' Motion for Summary Judgment ("Appendix"), KnifeRights MSJ App., 2-4. The Act also imposes a fine and

possible imprisonment on "[w]hoever … manufactures, sells, or possesses any switchblade knife." *Id.*; 15 U.S.C. §§ 1243. The fine is "not more than $2,000.00, and the imprisonment threat is "not more than five years, or both." *Id.*

The Act defines the term "switchblade knife" to mean "any knife having a blade which opens automatically – (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both." *Id.*; 15 U.S.C. § 1241(b).[1]  In enacting the Federal Knife Ban, Congress used its power to regulate commerce through the Commerce Clause of the U.S. Constitution to limit the sales of so-called switchblades.

Defendants' enforcement of the Federal Knife Ban unconstitutionally infringes on the fundamental rights of Plaintiffs and other similarly situated individuals who reside in Texas and other States within the United States to keep and bear constitutionally protected arms in common use — specifically automatically opening knives or switchblades (as defined) through its restriction on interstate commerce.

There is no dispute that automatically opening folding knives, or switchblades,

---

[1] Defendants, of course, call these automatically opening knives in common use "switchblades" (15 U.S.C. § 1241(b)) to conjure up negative connotations and Hollywood imagery of gangs in the 1950's movies with leather jackets and knives, but the term switchblade is simply Defendants' pejorative term for "automatically opening knives." Automatically opening knives can range from the iconic Italian knives of the postwar era to modern knives using advanced materials and internal mechanisms. Regardless, the defining features always have been the same, and remain the same today: the blade, manufactured to open and be kept under tension in the handle, deploys at the press of a button or handle, or mechanism. *Id.*

are in common use. No dispute exists that automatically opening folding knives are not *both* "dangerous" and "unusual" arms that fall outside of the Second Amendment's protection. Defendants acknowledged these undisputed facts long ago (1958), and they are true today. *Infra* p. 20.

Under the standard established in *Heller* and reaffirmed in *Bruen*, arms cannot be banned unless the government shows the arm in question is *both* dangerous *and* unusual. The legislative history of the Federal Knife Ban, and Defendants' official positions regarding the ban in 1958 concede this fact. As such, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment, invalidate the Federal Knife Ban as unconstitutional under the Second Amendment, and permanently enjoin its enforcement. [2]

## II.    LEGAL STANDARDS

Plaintiffs move for summary judgment under the Federal Rules of Civil Procedure Rule 56.  Summary  judgment  is  appropriate when the pleadings and evidence demonstrate that no genuine issue exists as to any material fact and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be

[2] To be clear, Plaintiffs do not challenge the Federal Knife Ban restrictions regarding importation of "switchblade" knives into the United States. See 15 U.S.C. 1241; Code of Federal Regulations Title 19, Ch. 1, Part 12, sections 12.95-12.103.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

granted. *Id.* at 321–325. Unsubstantiated assertions "'are not competent summary judgment evidence.'" *Celotex,* 477 U.S. at 324. "A party opposing such a summary judgment motion … must set forth and support by evidence specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–257(1986). Summary judgment is not a "disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

Here, the threshold legal question is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. Second, courts ask whether a given arms restriction or prohibition is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The government bears the burden of demonstrating a tradition of firearms regulations supporting the challenged law. *Id.* at 2130. Courts must also hold the government "to its heavy burden." *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023).

Further, the text and history analysis in *Bruen* presents legal questions. See *Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023) (denying request for remand to conduct further factual development because "the historical research required under *Bruen* involves so-called 'legislative facts,' those 'which have relevance to legal reasoning' … rather than adjudicative facts, which are simply the facts of the

particular case; and because the record did "not require further development of adjudicative facts to apply *Bruen's* standard," it did not trigger the need for a remand).

## III.   STATEMENT OF FACTS

As stated above, the Federal Switchblade Act defines a "switchblade knife" to mean any knife having a blade which opens automatically — (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both. Appendix, KnifeRights MSJ App., 2-4; 15 U.S.C. 1241(b). The term "interstate commerce" means "commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof." *Id.*; 15 U.S.C. § 1241(a). Under the challenged Federal Knife Ban, "[w]hoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." *Id.*; 15 U.S.C. § 1242.

Furthermore, "[w]hoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." *Id.*; 15 U.S.C. § 1243. The Federal Knife Ban contains extremely limited exceptions. The ban does not apply to:

(1) any *common carrier or contract carrier*, with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business,

(2) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to *contract with the Armed Forces*,

(3) the *Armed Forces or any member or employee thereof* acting in the performance of his duty,

(4) the possession, and transportation upon his person, of any switchblade knife with a blade three inches or less in length *by any individual who has only one arm*, or

(5) a *knife* that contains a spring, detent, or other mechanism *designed to create a bias toward closure* of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.

See 15 U.S.C. § 1244(1)-(5) (emphasis added).

Thus, the Federal Knife Ban unconstitutionally infringes on the fundamental right to manufacture for sale, sell, transport, distribution, purchase, transfer, possess, and carry any switchblade knife (as defined) between any of the 50 states, Washington D.C., and any U.S. territory, despite that automatically opening knives are in common use and protected by the Second Amendment.

Automatically opening knives are "arms" under the Second Amendment's plain text. *Bruen*, 142 S.Ct. at 2132. In *Heller*, the Supreme Court made clear that "[t]he 18th-century meaning [of the term "arms"] is no different from the meaning today." 554 U.S. at 581. That is to say, the term "arms" generally referred to "'[w]eapons of offence, or armour of defence.'" *Id*. (quoting 1 Dictionary of the English Language 107 (4th ed.) (reprinted 1978)).

Since *Heller*, the Ninth Circuit in *Teter v. Lopez*, 76 F.4th at 948-950, held that

the possession of butterfly knives was protected by the plain text of the Second Amendment. Citing *Heller*, the Ninth Circuit concluded as follows:

> "We similarly conclude that, just as with firearms in *Heller*, *bladed weapons facially constitute 'arms' within the meaning of the Second Amendment.  Like firearms, bladed weapons fit the general definition of 'arms'* as '[w]eapons of offence' that may be 'use[d] in wrath to cast at or strike another.' *Id.* (cleaned up). Moreover, contemporaneous sources confirm that, at the time of the adoption of the Second Amendment, the term 'arms' was understood as generally extending to bladed weapons.  *See* 1 Malachy Postlethwayt, The Universal Dictionary of Trade and Commerce (4th ed. 1774) (including among 'arms' fascines, halberds, javelins, pikes, and swords). Because the plain text of the Second Amendment includes bladed weapons and, by necessity, butterfly knives, the Constitution 'presumptively guarantees' keeping and bearing such instruments 'for self-defense,'" citing *Bruen*, 142 S. Ct. at 2135.

*Id. Teter*, 76 F.4th at 949 (emphasis added) (*and see* footnote 8; at oral argument, Hawaii's counsel "conceded that 'knives, in general, can qualify as arms").

In the factual context of this case, Plaintiffs also desire to keep and bear these arms for self-defense and other lawful purposes. See Appendix, KnifeRights MSJ App., 6-19. (**Exs. B, C**, and **D**). As such, there should be no dispute that switchblade knives facially constitute "arms" under the plain text of the Second Amendment.

Automatically opening knives were first produced in the 1700s. Appendix, KnifeRights MSJ App., 43; *see also* Appendix, KnifeRights MSJ App., 107. By the mid-nineteenth century, factory production of automatically opening knives made them affordable to everyday customers. See Appendix, KnifeRights MSJ App., 139. "George Schrade was one of the most prolific and influential inventors in American cutlery history. In 1892-93, he introduced his Press-Button knife. It was the first switchblade suited to mass production methods, although automatic opening knives

made by hand had been around for more than a century." See Appendix, KnifeRights MSJ App., 112. Thus, as shown below, automatically opening knives are in common use and not *both* "dangerous and unusual." *Infra* p. 18, 22, and 25-26.

Nonetheless, the Federal Knife Ban remains "on the books" with the threat of substantial fines, imprisonment, or both. The law unconstitutionally infringes on the Second Amendment fundamental right to manufacture, sell, trade, possess, distribute, transport, possess, or carry any switchblade knife (as defined) between any of the 50 states, Washington D.C., and any U.S. territory because switchblade knives are in common use and are not *both* dangerous and unusual.

## IV.   ARGUMENT

### A.   Automatically Opening Knives Are Arms Protected By The "Plain Text" Of The Second Amendment.

According to the constitutional framework established in *Heller*, and recently affirmed in *Bruen*, the first step in determining the validity of a Second Amendment challenge to an arms ban is to determine whether the conduct that Plaintiffs wish to vindicate is protected by the Second Amendment's plain text.

The Second Amendment of the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This text controls, and not any interest-balancing policy or means-end scrutiny arguments that may be advanced by Defendants because:

> While judicial deference to legislative interest balancing is understandable — and, elsewhere, appropriate — it is not deference that the Constitution demands here. *The Second Amendment "is the*

1
2

*very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.*

3

*Bruen*, 142 S.Ct. at 2131, emphasis added (citing *Heller*, 554 U.S. at 635).

4
5

Pursuant to *Bruen*, rather than a two-step interest-balancing (means-end

6

approach), courts must "assess whether modern firearms regulations are consistent

7

with the Second Amendment's text and historical understanding." *Bruen, 142 S.Ct.*

8

at 2132. Stated another way, courts must first interpret the Second Amendment's

9
10

text, as informed by history. When the plain text of the Second Amendment covers an

11

individual's conduct, the Constitution presumptively protects that conduct. *Id.* at

12

2129–30. "In other words, it identifies a presumption in favor of Second Amendment

13
14

protection, which the State bears the initial burden of rebutting." *New York State*

15

*Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015). The burden

16

is then placed on the government to "justify its regulation by demonstrating that it is

17

consistent with the Nation's historical tradition of firearms regulation. Only then may

18
19

a court conclude that the individual's conduct falls outside the Second Amendment's

20

'unqualified command.'" *Id.* at 2116, 2130 (quoting *Konigsberg v. State Bar of Cal.*,

21

366 U.S. 36, 50, n.10 (1961)). If the government cannot meet its burden, the law or

22

regulation is unconstitutional — full stop. No interest-balancing, means-end/scrutiny

23

analysis can be conducted. *Id.* at 2127, 2129-2130.

24
25

**First**, Plaintiffs are "ordinary, law-abiding, adult citizen[][s], and are therefore

26

unequivocally part of the people whom the Second Amendment protects." *Bruen*, at

27

2129-30. Appendix, KnifeRights MSJ App., 6-19.

28

---

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1    **Second**, the actions in question — the ability to freely manufacture for sale,

2    sell, distribute, transport, purchase, possess, and carry bladed arms in common use

3    through interstate commerce unquestionably falls within the plain text of the Second

4    Amendment protecting the right to "keep and bear arms." See *Teixeira v. Cnty. of*

5    *Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Among these rights is "the ability to

6    acquire arms." *Id.* at 677-78 (citing to *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th

7    Cir. 2011)).

8

9    **Third**, the knives regulated by the Federal Knife Ban indisputably are a type

10   of "arms" covered by the plain text of the Second Amendment. The Second

11   Amendment extends to all instruments that constitute bearable arms, even those that

12   were not in existence at the time of the founding. *Heller* acknowledged this threshold

13   point. See also *United States v. Daniels*, 77 F.4th at 341-342 (citing *Bruen*, 142 S.Ct.

14   at 2132, and pointing out that "the Constitution can, and must, apply to

15   circumstances beyond those the Founders specifically anticipated"). "[B]earable

16   arms" includes all arms "commonly possessed by law-abiding citizens for lawful

17   purposes." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). And see

18   *Teter*, 76 F.4th at 938 (striking down Hawaii's ban on butterfly knives as

19   unconstitutional under *Bruen*). *See also Caetano v. Massachusetts*, 577 U.S. 411

20   (2016) (unanimously vacating a lower court decision upholding a conviction based on

21   Massachusetts' ban on stun guns).

22

23   Automatically   opening   knives,   or   "switchblades,"   are   categorically

24

25

26

27

28

---

1   "jackknives."[3] In more modern terms, all automatically opening knives are pocket

2   knives. Merriam-Webster dictionary defines "pocketknife" as "a knife that has one or

3   more blades that fold into the handle and that can be carried in the pocket. Appendix,

4   KnifeRights MSJ App., 121.

5

6       In the United States, "knives have played an important role in American life,

7   both as tools and as weapons. The folding pocketknife, in particular, since the early

8   18th Century has been commonly carried in America and used primarily for work,

9   but also for fighting." *State v. Delgado*, 692 P.2d 610, 613-614 (Or. 1984); *see also*

10  Appendix, KnifeRights MSJ App., 175-176. "[T]hey were apparently used by a great

11  majority of soldiers to serve their numerous personal needs." See Appendix,

12  KnifeRights MSJ App., 185.

13

14      Knives in general are indisputably "bearable arms" commonly possessed for

15  "lawful purposes." *See Heller*, 554 U.S. at 625. As such, automatically opening folding

16  knives are necessarily "bearable arms." *Bruen* acknowledges the fact that knives are

17  protected arms noting that "[i]n the medieval period, '[a]lmost everyone carried a

18  knife or a dagger in his belt.'" *Bruen*, 142 S.Ct. at 2140, quoting H. Peterson, Daggers

19  and Fighting Knives of the Western World 12 (2001). "While these knives were used

20  by knights in warfare, '[c]ivilians wore them for self-protection,' among other things."

21  *Bruen*, at 2140. *See also Heller*, 554 U.S. at 590. In early colonial America, "edged

22

23

24

25  _____

26  [3] A "jackknife" is "a knife with the blade pivoted to fold into a recess in the handle."
    https://www.thefree dictionary.com/jackknife. Such a knife is also sometimes referred

27  to as a "penknife," which is simply "any knife with the blade folding into the handle,
    some very large." *Mackall v. State*, 283 Md. 100, 387 A.2d 762, 769 n.13 (1978).

28

weapons were also absolutely necessary." Appendix, KnifeRights MSJ App., 191. At the time of the Second Amendment's ratification, every state required ordinary citizens to own some type of edged weapon as part of the militia service laws. *Id.*, at 156; see also Appendix, KnifeRights MSJ App., 244-245.

Courts have also generally ruled that knives are arms protected by the Second Amendment. See *State v. Deciccio*, 315 Conn. 79, 128, 122, 105 A.3d 165 (2014). (holding dirk knives were "'arms' within the meaning of the second amendment.") ("[T]heir more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment— e.g., handguns —provides strong support for the conclusion that dirk knives also are entitled to protected status.; *State v. Delgado*, 298 Or. 395, 692 P.2d 610, 613-614 (1984) (Oregon Supreme Court held that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms and that a switchblade is constitutionally protected based on historical predecessors); *State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015) (Wisconsin Court of Appeals overturned a conviction for possession of a switchblade as unconstitutional.) ("Whether knives are typically used for self-defense or home security as a general matter is beside the point. In this case, it is undisputed that Herrmann possessed his switchblade inside his home for his protection."); *State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017) (New Jersey Supreme Court held that machete-type knives are protected by the Second Amendment); See also *State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893 (Del Super Ct., May 16, 2011) ("a knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be

utilized for offensive or defensive purposes.") *reversed and remanded on other grounds*, *Griffin v. State*, 47 A.3d 487 (Del. 2012); See *City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947 (Ohio Ct. App., 1995) (holding the "right to keep and bear arms" under the Ohio Constitution extends to knives).

Accordingly, because knives, including automatically opening folding knives, are unquestionably arms protected by the plain text of the Second Amendment; and the actions in question — Plaintiffs and other similarly situated law-abiding citizens seeking to acquire, sell, transfer, possess, and carry these knives through interstate commerce — is also covered by the Second Amendment's plain text. Defendants bear the sole and heavy burden of justifying the Federal Knife Ban as consistent with the Nation's historical tradition of regulating such arms. *Bruen*, 142 S.Ct. at 2126.

**B.    Defendants' Cannot Justify The Federal Knife Ban: Automatically Opening Knives Are In Common Use And Not Both Dangerous and Unusual.**

Defendants cannot meet the heavy burden of justifying the Federal Knife Ban as consistent with the Nation's historical tradition of regulating such arms.  Notably, the decision in *Heller* established the relevant contours of this tradition: Bearable arms are presumptively protected by the Second Amendment and cannot be banned unless they are *both* dangerous *and* unusual. *Bruen*, 142 S.Ct. at 2128. And the Supreme Court spelled out that this was an historical matter. *Id.* For example, when it discussed the State's argument as to colonial-era bans on the offense of affray (carrying of firearms to "terrorize the people"), the Supreme Court in *Bruen* stated:

> At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and

unusual weapons"—a fact we already acknowledged in *Heller*. […] Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." […] Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." […] Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 142 S.Ct. at 2143 (citing *Heller*, 554 U.S. at 627, 629).

Thus, *Bruen* is clear: To prevail under a "historical tradition" analysis, Defendants have the heavy burden to justify the challenged Federal Switchblade Act by offering appropriate historical analogues from the relevant time period, *i.e.*, the Founding era. "Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." 142 S.Ct. at 2132.

In *Bruen*, when considering the appropriate historical analogues from the relevant period, the Court found that respondents in that case offered historical evidence in their attempt to justify their prohibitions on the carrying of firearms in public. Specifically, they offered five categories of historical sources: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." 142 S.Ct. at 2135-36. However, when considering the historical evidence

presented, the *Supreme* Court in *Bruen* made a fundamental distinction regarding what evidence was to be considered.

The Supreme Court also noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791" *Id.*, at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). Thus, the Court cautioned against "giving post enactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted).  In examining the relevant history that was offered, the Supreme Court in *Bruen* noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614).

*Bruen* also made clear that 20th-century historical evidence was not to be considered. *Id.*, at 2154, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.")

In sum, under *Bruen,* some evidence *cannot* be appropriate historical analogues, such as late 19th-century and 20th-century laws or those rooted in racism,

laws that have been overturned (such as total handgun bans), and laws that are *inconsistent* with the original meaning of the constitutional text. *Bruen,* 142 S.Ct at 2137 ("post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.") (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). These sources of evidence must be disregarded.

Given that the Second Amendment's plain text presumptively covers all bearable arms, and since the arms in question are in common use despite the Federal Knife Ban, Defendants cannot justify their ban under the Second Amendment's text and this Nation's history as interpreted in *Heller* and *Bruen. See Bruen*, 142 S.Ct. at 2143 (discounting relevance of colonial laws because "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

Here, however, the Supreme Court in *Heller* has already conducted the historical analysis. *Heller* decided the underlying historical principle: only dangerous *and* unusual arms can be banned. This Court need only apply that historical principle to the facts in this case, just as done in *Heller* and *Bruen*. There is no need for any further historical analysis. Any attempt by Defendants to engage in such analysis would be asking "to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the Second Amendment, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411 at 420. As Justice Alito explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id.* (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up). Notably, the arm does not have to be used for self-defense. When an arm is possessed by thousands for lawful purposes, it is "in common use" and it is protected — full stop. Further, if an arm is in common use, it necessarily cannot be *both* "dangerous and unusual." It also follows that even arms not "in common use," cannot be banned so long as they are no more dangerous than other arms that are in common use.

In any event, even if the question of what types of arms may be banned were an open one, Defendants have not, and cannot, historically support the Federal Knife Ban at issue here.

## 1. Automatically Opening Knives Are "In Common Use."

In *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court struck bans on handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. A detailed examination of their commonality was unnecessary. Nonetheless, here, the Federal Knife Ban on

automatically opening knives is unconstitutional because these knives are "in common use" under any reasonably applied metric.

*Heller* noted that the Second Amendment's protection of arms in common use "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. Indeed, a weapon that is "unusual" is the antithesis of a weapon that is "common" — so an arm "in common use" cannot also be "dangerous and unusual." In short, a "weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring) (emphasis in original). Thus, whether automatically opening knives are "dangerous and unusual" is an element that Defendants bear the burden of proof under the second legal inquiry of the *Bruen* analysis. Defendants cannot meet their heavy burden.

**First**, Defendants cannot credibly assert that automatically folding knives are "dangerous and unusual" or uncommon simply because they prohibited the interstate commerce of these knives since 1958. In other words, the Federal Knife Ban cannot be its own evidence that the knives are not in common use. "The more relevant statistic" is that millions of these knives "have been sold to private citizens" who "may lawfully possess them in 45 States." See *Caetano*, 136 S.Ct. 1027, 1032 (2016).

**Second**, since a folding knife *of any kind* is only functional when fully opened, any argument that one method of opening a knife with one hand somehow increases its "dangerousness" is ludicrous. Appendix, KnifeRights MSJ App., 648; 650-651; 777-778. Whether a folding knife is opened manually or automatically, it is only useful for any purpose once it is fully opened. Thus, bans on knives that open in a convenient

1  way (*e.g.*, switchblades, gravity knives, and butterfly knives) are unconstitutional.

2  Appendix, KnifeRights MSJ App., 132.

3

4  **Third**, the court in *Teter v. Lopez*, 76 F.4th at 949-950, held the record in that

5  case (involving butterfly knives) showed the State of Hawaii had failed to present

6  evidence sufficient to create a genuine factual dispute over whether butterfly knives

7  were "dangerous and unusual." *Id.* at 950. The court noted that in determining

8

9  whether a weapon is both dangerous and unusual, "'we consider whether the weapon

10  has uniquely dangerous propensities and whether the weapon is commonly possessed

11  by law-abiding citizens for lawful purposes." *Teter*, at 950 (citing *Fyock v. Sunnyvale*,

12  779 F.3d 991, 997 (9th Cir. 2015). The court in *Teter* held:

13

14  > The record does not support a conclusion that the butterfly knife has
   > uniquely dangerous propensities. *The butterfly knife is simply a*

15  > *pocketknife with an extra rotating handle.* The ability of an experienced

16  > user to expose the blade with one hand is not the sort of 'astonishing
   > innovation' that 'could not have been within the contemplation of the

17  > constitutional drafters, " citing *Delgado*, 692 P.2d at 614.

18  *Teter*, 76 F.4th at 950 (emphasis added).

19

20  Here, as stated above, like the butterfly knife, the automatically opening knife

21  is simply a variation of the folding pocket knife.[4] Like the butterfly knife, it does not

22  possess any "uniquely dangerous propensities." In fact, in April 12, 1957, William P.

23  Rogers, then Deputy Attorney General, submitted a letter on behalf of the

24
25  Department of Justice stating the Department was "unable to recommend enactment

26

27  ─────────────────

28  [4] Butterfly knives or "balisongs" also fall under the FSA's definition of switchblade.

of this legislation," stating:

> As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is *not inherently dangerous* but requires the introduction of a wrongful human element to make it so. Switchblade knives in the hands of criminals are, of course, *potentially* dangerous weapons. However, *since they serve useful and even essential, purposes* in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

See Appendix, KnifeRights MSJ, app., 558-559 (emphasis added).

The Secretary of Commerce affirmed the Department of Justice's position, adding:

> While this proposed legislation recognizes that *there are legitimate uses that* have need for switchblade knives, the exemptions would appear to assume that the most significant of those uses lie in Government activities. To us, this ignores the needs of those who derive and augment their livelihood from the "outdoor" pursuits of hunting, fishing, trapping, and of the country's sportsmen, and many others. In our opinion, there are sufficient of these that their needs must be considered. Again, we feel that the problem of enforcement posed by the many exemptions would be huge under the proposed legislation. For these reasons, the Department of Commerce feels it cannot support enactment of H. R. 7258.

See Appendix, KnifeRights MSJ, app., 558-559 (emphasis added).

Thus, according to the official position of the Department of Justice in 1958, switchblades are not "inherently dangerous." *Id*. Any claim by the Department of Justice to the contrary *today* would not only be inconsistent, but dubious at best. As such, Defendants cannot meet its burden.

Finally, it is indisputable that handguns (or any firearm) are more dangerous than any knife. The simple fact that a firearm can project lethal force over distance makes them more dangerous than any folding pocket knife. Yet the relative dangerousness of handguns (including significant use by criminals) is *insufficient* to justify any prohibition on these arms *as a matter of law*. *Heller/Bruen*. Folding pocket knives — including automatically opening knives — are a less lethal/dangerous arm, and thus, cannot be held to be uniquely both "dangerous *and* unusual" to justify any kind of ban.

According to binding Supreme Court precedent in *Heller* and *Bruen*, if an arm not *both* dangerous *and* unusual — and thus, is in common use — *it cannot be banned* as a matter of law. Yet federal law prohibits interstate commerce of these common folding knives in violation of the Second Amendment rights of Plaintiffs and other similarly situated citizens.

### (i)      Total Number Establishes Common Use.

In establishing whether an arm is "in common use," "[s]ome courts have taken the view that the total number of a particular weapon is the relevant inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016). Using that metric, the legislative history of the Federal Knife Ban establishes that automatically opening folding knives were in common use when the ban went into effect. Appendix, KnifeRights MSJ App., 331. In fact, the Federal Knife Ban was enacted for the very reason that automatically opening folding knives were in common use. *Id*. According to Senate Report No. 1980, "In the United States, 2 manufacturers have a combined production of *over 1 million*

*switchblade knives a year.*" Appendix, KnifeRights MSJ App., 553; see also KnifeRights MSJ App., 331. Thus, this report concedes that in 1958, *the United States produced more than one million automatically opening knives per year. Id.*

Thus, the question of whether automatically opening folding knives are in common use *has already been answered*; this same report states elsewhere that, "It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 *per year.*" *Id.* (emphasis added); See also Appendix, KnifeRights MSJ App., 587. "In the area of Fort Bliss, Tex., alone, there are more than 20 establishments selling these knives." Appendix, KnifeRights MSJ App., 332. The Senate report acknowledges at the time that just mail-order services and magazines were "sending out about "3,000 or 4,000 of these knives out each month." Appendix, KnifeRights MSJ App., 455.

Thus, the legislative history of the Federal Switchblade Act operates as Defendant's *admission* to the commonality of automatically opening knives. The very purpose of the FSA was to reduce the number of "switchblades" that were in circulation in the United States because, according to the Subcommittee, *they were too common.*

By the 1890s, automatically opening knives were in mass production and "fast becoming the most useful cutting tool one could carry and gaining in popularity and public acceptance." Appendix, KnifeRights MSJ App., 626. "Over a 50-year period from the mid-1890s to the mid-1940s, there had been approximately 20 different companies who had manufactured switchblades knives in this country." *Id.* "There

were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts, and also for Girl Scouts." *Id.* "After World War 2, the popularity of the switchblades exploded. Department stores such as Macy's were selling them. Every kid and young man wanted one if they didn't already have one." Appendix, KnifeRights MSJ App., 632. Since the Federal Act in 1958, "the Italian switchblade stiletto has had a renaissance and is nearly as popular today [in the U.S.] as it first was in the 1950s." *Id.* By comparison, the commonality of automatically opening knives in 1958 dwarfs the number used to establish the commonality of tasers and stun guns in *Caetano*.[5] See *Caetano*, 577 U.S. at 420.

"By the nineteenth century, the design of the knife changed, offering a more pocket-friendly style that gained widespread popularity in Europe. Over time, several variations of the switchblade were created by French, Spanish, Italian, and American Knifemakers, each offering their own unique variations on how the blade would be exposed." Appendix, KnifeRights MSJ App., 199.

"With the arrival of the Industrial Revolution, switchblades began to be mass produced and sold at lower costs, therefore making them more readily available. In the early 1900s, George Schrade, Founder of Geo. Schrade Knife Co., dominated the American switchblade market, with his automatic version of jackknives and

---

[5] The Court in *Caetano* did not draw unnecessary distinctions between stun guns and tasers. Nor is there any constitutionally legitimate reason to separately categorize manually opened folding pocket knives and automatically opening pocket knives. Constitutionally, they are identical.

pocketknives." *Id*. "When the mid-1900s rolled in, these knives were mass produced by various companies worldwide, and advertised as "compact, versatile multi-purpose tools." *Id*.

Today, automatically opening knives are just as popular, if not more popular, than in the early 1900s. They are useful tools for everyday carry, recreation, hunting, utility, and self-defense.  This fact was acknowledged by *both* the Department of Justice and the Secretary of Commerce in 1958. Appendix, KnifeRights MSJ App., 557-559.

Reviewing three of the largest online knife retailers in the U.S. (Bladehq.com, Knifeworks.com, and Knifecenter.com), thousands of different models of automatically opening knives exist for sale for lawful use.[6]

With this standard in mind, the Federal Knife Ban cannot be justified. Automatically opening knives were indisputably in common use at the time of the enactment of the Federal Knife Ban and continue to be in common use today. Indeed, these banned "switchblades" are in common use in all respects: they are in common use by sheer number; they are in common use categorically and functionally; and they are in common use jurisdictionally.

---

[6] See generally, https://www.bladehq.com/cat--Automatic-Knives--40; https://www.bladehq.com/cat--Out-The-Front-Automatics--41; https://knifeworks.com/automatic-knives/;  and https://www.knifecenter.com/shop/automatic-knives.

### (ii)   Categorical Commonality Is Also Satisfied.

An arm "in common use" can also be proven by categorical commonality. *Heller*, 554 U.S. at 624, 627 (emphasis added). Under *Heller*, the arm must be among "the *sorts* of weapons" or "of the *kind*" that are "in common use at the time." *Id.* In other words, if an arm is categorically analogous or similar enough to a protected arm lawful to be sold to and possessed by private citizens in the majority of states, the arm is in common use.

In this instance, automatically opening folding knives have no practical or constitutional distinction from other folding pocket knives in that they have a blade, a handle or grip, and the blade rests within the handle or grip of the knife when closed or collapsed, and when open or extended is "fixed" into a usable position (*e.g.*, assisted opening knives, manually opening knives). These knives are indistinguishable in their function and use.  Appendix, KnifeRights MSJ App., 640-641. They all operate as *pocket knives* that can be opened with one hand. Appendix, KnifeRights MSJ App., 640-641, 646-652; 750; 760-761; 766-767; 771-772; and 777-778; Appendix, KnifeRights MSJ App., 654 (article — "The Toy That Kills" — largely credited for initiating the demonization of "switchblades" in the 1950s, acknowledges that "switchblades" are "a pocketknife."); Appendix, KnifeRights MSJ App., 18; also available at: https://kniferights.org/Folding_Knife_Comparison.   In   fact,   many models of folding knives are available in various versions so the user can choose their preferred method of opening. Appendix, KnifeRights MSJ App., 741; 743-746; *See also State v. Delgado*, 298 Or. 395, 403 (1984) ("The only difference is the presence of the

spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switchblade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters.")

Today, automatically opening knives fall under the category of folding pocket knives — an arm possessed in millions of households in the United States. Appendix, KnifeRights MSJ App., 658-673. According to estimates from American Knife & Tool Institute, as many as 35,695,000 U.S. households own an outdoor or pocket knife. Appendix, KnifeRights MSJ App., 739. Moreover, assisted opening and one-hand opening knives — which are functionally identical to automatically opening knives — are approximately 80% of all knives sold in the United States.[7] *Id.*

Because automatically folding knives are categorically *folding pocket knives;* and folding knives are legal in all 50 states, they are all unquestionably, categorically in common use.

### (iii)   Automatically Opening Knives Are Common Jurisdictionally.

An automatically opening knife cannot be both "dangerous and unusual," if it is lawful to possess and use in a majority of the United States. Again, in the vast

---

[7] The distinction between assisted opening folding knives and automatically opening folding knives is so miniscule, Congress had to amend the FSA in 2009 with a fifth "exception" to make it clear that one-hand opening and assisted opening knives were not considered "switchblades" pursuant to the FSA because United States Customs and Border Protection attempted to regulate these knives as "switchblades." Appendix, KnifeRights MSJ App., 645; 675-737

majority of states, an automatically opening knife is *entirely legal* to manufacture, sell, purchase, transfer, possess, and carry. Appendix, KnifeRights MSJ App., 115-119. Thus, automatically opening knives are also in common use *jurisdictionally*.

Specifically, as of September 2023, at least 45 states allow the sale, purchase, transfer, acquisition, and possession of automatically opening knives that are prohibited by the Federal Knife Ban; and at least 36 states permit the public carry of said knives in some manner. Appendix, KnifeRights MSJ App., 115-119. Moreover, since 2010, nineteen states have repealed bans/restrictions on automatically opening knives. *Id*. Thus, as these knives are in common use jurisdictionally, they cannot be considered "dangerous and usual" justifying the Federal Knife Ban.

## V. THE KNIFE BAN CANNOT BE JUSTIFIED.

The historical analysis has been conducted by the Court in *Heller*. *Heller* decided the underlying historical principle: only dangerous *and* unusual arms can be categorically banned. This Court need only apply that historical principle to the facts in this case, just as done in *Heller* and *Bruen*. There is no need for any further historical analysis. Any attempt by Defendants to engage in such analysis would be asking "to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). In any event, even if the question of what types of arms may be banned were an open one, Defendants cannot historically support the ban at issue here.

In fact, the challenged Federal Knife Ban has *no historical pedigree*, nor justification in this Nation's history and tradition of arms regulation. At the outset,

the Federal Knife Ban goes far beyond any interstate commerce regulation of firearms. Just as the federal government has no authority to prohibit interstate commerce of firearms, they have no power to prohibit interstate commerce of knives.

Indeed, the Federal Knife Ban was the first of its kind and dates only to August 12, 1958. Not only was this significantly past the relevant founding era in which Defendants must provide analogous regulations to justify the ban; it is also many decades after automatically opening knives were introduced into the United States and chosen by the people as a common arm. There is no question that such a ban is well beyond the time period in which this Court may consider when evaluating any relevant historical analogues argued by Defendant.

In contrast, folding knives have long been in common use as "most colonist carried knives for their daily needs — utilizing both fixed and folding blades." Appendix, KnifeRights MSJ App., 184. In the United States, "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th Century has been commonly carried by men in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d 610, 613-614 (Or. 1984); see also Appendix, KnifeRights MSJ App., 134. At the time of the Revolutionary War, they were apparently used by a great majority of soldiers to serve their numerous personal needs." Appendix, KnifeRights MSJ App., 185.

Moreover, American bans on possession or sale to legal adults of particular arms from 1607 through 1899 are exceedingly rare. Appendix, KnifeRights MSJ App.,

932-933.

> There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686.... The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward when East Jersey merged with West Jersey in 1702. That law imposed no restriction on the possession or sale of any arms.

Appendix, KnifeRights MSJ App., 797.

At the time of the founding, the preferred means of addressing the general threat of violence was to *require* law-abiding citizens to be armed. As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons. Colonies required arms carrying to attend church, public assemblies, travel, and work in the field." Appendix, KnifeRights MSJ App., 803. The statutes that required the keeping of arms — by all militia and some non-militia — indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. These mandates regularly included bladed weapons/knives. *Id., at* 804-805.

In fact, firearms *and* cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Yet they were not banned. The historical record up to 1800 provides no support for general prohibitions on any type of arms or armor. Appendix, KnifeRights MSJ App., 827. In fact, during the colonial era, there were *no bans on knives of any kind*.

The first ban on the sale, possession, and carry of any kind of knife was enacted

in 1837. An 1837 Georgia statute made it illegal for anyone "to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere" any: "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols. Appendix, KnifeRights MSJ App., 849. While already beyond the relevant founding era, this ban was also later invalidated as unconstitutional in 1846 by the Georgia Supreme Court with regard to the sales ban, possession ban, and open carry ban, and thus, provides no justification for Defendants in this case. See *Nunn v. State, 1 Ga. 243 (1846);* see also Appendix, KnifeRights MSJ App., 849-850. *Heller* "extolled *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." *Heller*, 554 U.S. at 612; Appendix, KnifeRights MSJ App., 850. As such, it provides no justification for the Federal Knife Ban.

In 1838, Tennessee followed Georgia by enacting a ban on the sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie Knife or any Arkansas tooth pick. Appendix, KnifeRights MSJ App., 871; see also *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840). Notably, this early knife ban did not attempt to prohibit any kind of folding knife or pocket knife. Nor did it prohibit any knife based on the manner in which it is opened or drawn. Both the 1837 Georgia statute and the 1838 Tennessee statute were *outlier* restrictions on large, fixed-blade knives. Other than these two

statutes (one of which was invalidated), bans on the sale or possession of arms for adults were *non-existent* until after the end of the Civil War approximately 30 years later. Appendix, KnifeRights MSJ App., 953.

In fact, the first state to enact any kind of prohibition on automatically opening knives, or "switchblades," occurred in 1954 in New York, merely 4 years before the Federal Knife Ban's enactment. Appendix, KnifeRights MSJ App., 568. From 1954 to 1958, approximately nine states enacted prohibitions on switchblades. *Id.* Any others came after the enactment of the Federal Knife Ban. As such, prohibitions on automatically opening knives, or any knife in general, have no established relevant historical pedigree that could justify the Federal Knife Ban.

Notably, the prohibitory laws for these various knives are fewer than the number of bans on carrying handguns. Appendix, KnifeRights MSJ App., 948-949. In fact, the jurisdictions that entirely banned the carry of Bowie knives, daggers, or other such arms are almost entirely the same as those that banned handgun carry. *Id.* However, *Heller* held that these laws *did not establish* a historical tradition to justify a ban on handguns. *Heller*, 554 U.S. 570. Nor did these restrictions on the mode of carry of certain arms justify a ban on the carry of handguns. *Bruen*, 142 S.Ct. 2111. This same reasoning necessarily shows the unconstitutionality of prohibiting the interstate commerce of other Second Amendment protected arms — in this case, automatically opening knives.

## VI.   CONCLUSION

Based on the foregoing, Plaintiffs request that this Court issue an order finding

the Federal Switchblade Act, 15 U.S.C. §§ 1241-1244, enacted in 1958 as Pub. Law 85-623, unconstitutional.[8] Plaintiffs also request that the challenged aspects of the law be permanently enjoined.

October 6, 2023                          Respectfully submitted,

                                         DILLON LAW GROUP, APC


                                         */s/ John W. Dillon*
                                         John W. Dillon
                                         California State BAR No. 296788
                                         *Pro Hac Vice*
                                         jdillon@dillonlawgp.com
                                         **DILLON LAW GROUP APC**
                                         2647 Gateway Road
                                         Suite 105, No. 255
                                         Carlsbad, California 92009
                                         Phone: (760) 642-7150
                                         Fax: (760) 642-7151

                                         AND

                                         */s/ R. Brent Cooper*
                                         R. Brent Cooper
                                         Texas Bar No. 04783250
                                         brent.cooper@cooperscully.com
                                         Benjamin D. Passey
                                         Texas Bar No. 24125681)
                                         ben.passey@cooperscully.com
                                         **COOPER & SCULLY, P.C.**
                                         900 Jackson Street, Suite 100
                                         Dallas, Texas 75202
                                         Phone: (214) 712-9500
                                         Fax: (214) 712-9540


                                         Attorneys for Plaintiffs

---

[8] Again, Plaintiffs do not challenge any importation restrictions of the FSA, nor request any relief with regard to this aspect of the FSA.