# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

KNIFE RIGHTS, INC.; RUSSELL ARNOLD; JEFFREY FOLLODER; RGA AUCTION SOLUTION d.b.a. FIREARM SOLUTIONS; AND MOD SPECIALTIES,

                Plaintiffs,

    v.

MERRICK B. GARLAND, Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE,

                Defendants.

Case No. 4:23-cv-00547-O

Hon. Judge Reed O'Connor

# APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR

# SUMMARY JUDGMENT PART 2

# EXHIBIT R

KnifeRights MSJ App.000551

Case 4:23-cv-00547-O    Document 20-3    Filed 10/06/23    Page 3 of 462    PageID 676

# Calendar No. 2025

## SWITCHBLADE KNIVES

JULY 28, 1958.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

### [To accompany H. R. 12850]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 12850) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### II. SUMMARY OF THE BILL

Section 1 defines the terms used in the bill.

Section 2 prohibits the manufacture for, or transportation or distribution in, interstate commerce, of switchblade knives or of other concealed-blade knives which open by operation of interia or gravity or both. Section 3 would also prohibit the manufacture, sale, or possession of such knives within any Territory or possession of the United States, within Indian country (as defined in sec. 1151 of title 18 of the United States Code); or within the special maritime or territorial jurisdiction of the United States (as defined in sec. 7 of title 18 of the United States Code). Persons violating these sections would be subject to a fine of not more than $2,000 or to imprisonment for not more than 5 years, or both.

Exceptions to these provisions are made in the following cases:

(1) The transportation of switchblade knives by common and contract carriers in the ordinary course of business;

(2) The manufacture, sale, transportation, distribution, or possession of such knives pursuant to contract with the Armed Forces;

**1**

KnifeRights MSJ App.000552

2                        SWITCHBLADE KNIVES

(3) The handling of switchblades by the Armed Forces or by any member or employee thereof in the performance of his duty; or

(4) The possession of a switchblade knife with a blade 3 inches or less in length by a one-armed person.

Section 5 of the bill amends section 1716 of title 18 of the United States Code to prohibit the mailing of switchblade knives except in connection with Armed Forces or other Government orders.

It should be particularly noted that the proposed legislation does not affect the possession, or manufacture for, or sales in, intrastate commerce of switchblade knives within States which freely permit their use. Nor would the bill interfere with switchblade control measures in those States where their use is subject to statewide or local regulation.

It is also important to add that the bill's exemption relating to the Armed Forces is not intended to sanction surplus sales of switchblade knives to the public.

### III. NEED FOR AND BACKGROUND OF THE LEGISLATION

The problem of the use of switchblade and other quick-opening knives for criminal purposes has become acute during recent years—particularly by juvenile delinquents in large urban areas. During the present Congress a special study of juvenile delinquency was made by a subcommittee of the Committee on the Judiciary of the Senate. In its report (S. Rept. No. 1429, 85th Cong., 2d sess.) the subcommittee pointed up the switchblade menace as follows:

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years

of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

As a result of this study, a bill (S. 2558) to prohibit the manufacture for, or distribution in, interstate commerce of switchblade knives was introduced by Senator Kefauver and referred to your committee. The present measure, which was passed by the House of Representatives on June 27, 1958, is similar to the Senate bill but, unlike the latter, is not aimed specifically at sales to juveniles.

Hearings on the bill were held by your committee on July 23, 1958, with witnesses representing New York State groups concerned with juvenile delinquency and law enforcement problems. A representative of a New York cutlery firm also appeared in support of the bill. Testimony received indicated that 12 States, including New York, have already enacted legislation to prohibit the manufacture, sale, or possession of switchblade and similar knives. It was stressed, however, that so long as the interstate channels of distribution remain open the problem of enforcing the State laws will be extremely difficult.

In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the base, your committee believes that it is in the national interest that these articles be banned from interstate commerce.

## IV. REPORTS OF GOVERNMENT AGENCIES

The reports on this legislation by Government agencies to the House committee are set forth in the appendix of this report.

The Department of Justice did not recommend enactment of this legislation. The Secretary of Commerce recommended against enactment of this legislation. The Bureau of the Budget shared the views of the Department of Justice and the Department of Commerce but had no objection to the enactment of those provisions of the bill dealing with the mailability of such knives. The Secretary of the Army, speaking for the Department of Defense, had no objection to the enactment of the legislation with the included amendment to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation, distribution, or introduction into interstate commerce of switchblade knives by the Armed Forces or members and employees thereof, acting on the performance of their duties. The Post Office Department recommended enactment of the legislation with respect to the mailability of switchblade knives if an appropriate amendment were made giving the Postmaster General the right to request an explanation from the sender, in writing, that the law is being complied with. Such an amendment was adopted by the House committee and is included in the present measure.

KnifeRights MSJ App.000554

**4**                              SWITCHBLADE KNIVES

The appendix also includes copies of reports to your committee from the Interstate Commerce Commission and the Civil Aeronautics Board.

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill are shown as follows (new matter is printed in italic; and existing law in which no change is proposed is shown in roman):

SECTION 1716 OF TITLE 18 OF THE UNITED STATES CODE

§ 1716. Injurious articles as nonmailable.

All kinds of poison, and all articles and compositions containing poison, and all poisonous animals, insects, reptiles, and all explosives, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode, and all disease germs or scabs, and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property, whether or not sealed as first-class matter, are nonmailable matter and shall not be conveyed in the mails or delivered from any post office or station thereof, nor by any letter carrier.

The Postmaster General may permit the transmission in the mails, under such rules and regulations as he shall prescribe as to preparation and packing, of any such articles which are not outwardly or of their own force dangerous or injurious to life, health, or property.

The Postmaster General is authorized and directed to permit the transmission in the mails, under regulations to be prescribed by him, of live scorpions which are to be used for purposes of medical research or for the manufacture of antivenin.   Such regulations shall include such provisions with respect to the packaging of such live scorpions for transmission in the mails as the Postmaster General deems necessary or advisable for the protection of Post Office Department personnel and of the public generally and for ease of handling by such personnel and by any individual connected with such research or manufacture.   Nothing contained in this paragraph shall be construed to authorize the transmission in the mails of live scorpions by means of aircraft engaged in the carriage of passengers for compensation or hire.

The transmission in the mails of poisonous drugs and medicines may be limited by the Postmaster General to shipments of such articles from the manufacturer thereof or dealer therein to licensed physicians, surgeons, dentists, pharmacists, druggists, cosmetologists, barbers, and veterinarians, under such rules and regulations as he shall prescribe.

The transmission in the mails of poisons for scientific use, and which are not outwardly dangerous or of their own force dangerous or injurious to life, health, or property, may be limited by the Postmaster General to shipments of such articles between the manufacturers thereof, dealers therein, bona fide research or experimental scientific laboratories, and such other persons who are employees of the Federal, a State, or local government, whose official duties are comprised, in whole or in part, of the use of such poisons, and who are designated by the head of the agency in which they are employed to receive or

send such articles, under such rules and regulations as the Postmaster General shall prescribe.

All spirituous, vinous, malted, fermented, or other intoxicating liquours of any kind are nonmailable and shall not be deposited in or carried through the mails.

*All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—*

*(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;*

*(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organization;*

*(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and*

*(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3).*

*The Postmaster General may require, as a condition of conveying any such knife in the mails, that any persons proposing to mail such knife explain in writing to the satisfaction of the Postmaster General that the mailing of such knife will not be in violation of this section.*

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon, or at any place at which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section, unless in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon or at any place to which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section, whether or not transmitted in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, with intent to kill or injure another, or injure the mails or other property, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of gulity, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion, shall so order.

# APPENDIX

United States Department of Justice,
Office of the Deputy Attorney General,
*Washington, D. C., May 20, 1957.*

Hon. Oren Harris,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

Dear Mr. Chairman: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 7258) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 12, 1957, the Department of Justice reported to the committee on two similar bills, H. R. 2849 and H. R. 4013. The views expressed in that report, copies of which are enclosed, are equally applicable to the bill now under consideration.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

William P. Rogers,
*Deputy Attorney General.*

APRIL 12, 1957.

Hon. Oren Harris,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

Dear Mr. Chairman: This is in response to your request for the views of the Department of Justice relative to the bill (H. R. 2849 and H. R. 4013) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The bills would prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, of switchblade knives. They would also prohibit the manufacture, sale, or possession of switchblade knives within Indian country as defined in section 1151 of title 18 of the United States Code, or within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18. Violators would be subject to a maximum fine of $2,000 and/or imprisonment for not more than 5 years. Section 4 of H. R. 2849 would exempt from its application common carriers, contract carriers, and freight forwarders with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business. Section 4 of H. R. 4013 would provide a similar exemption, plus two others. It would exempt the manufacture, sale, transportation, distribution, possession, or introduction of switchblade knives into interstate commerce pursuant

6

to contract with the Armed Forces. Also, it would exempt the possession of switchblade knives by members of the Armed Forces to whom such knives were issued by the Federal Government.

The Department of Justice is unable to recommend enactment of this legislation.

The committee may wish to consider whether the problem to which this legislation is addressed is one properly within the police powers of the various States. As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is not inherently dangerous but requires the introduction of a wrongful human element to make it so.

Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

WILLIAM P. ROGERS,
*Deputy Attorney General.*

———

THE SECRETARY OF COMMERCE,
*Washington, D. C., June 25, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated May 8, 1957, for the views of this Department with respect to H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

H. R. 7258 would prohibit and prescribe penalties for the manufacture, sale, or possession of switchblade knives, and their mailing or their introduction into interstate commerce. Exemptions from these prohibitions would include supply or procurement officers and employees of the Federal Government, of the municipal government of the District of Columbia, of the government of any State, Territory, county, city, or other subdivision of a State or Territory; supply and procurement officers (but not the members, it appears) of the National Guard, the militia of a State, Territory, or the District of Columbia, when any of these persons are acting in connection with the activities of such governments and organizations. The Department of Commerce does not recommend enactment of H. R. 7258.

While this proposed legislation recognizes that there are legitimate uses that have need for switchblade knives, the exemptions would appear to assume that the most significant of those uses lie in Government activities. To us, this ignores the needs of those who derive and augment their livelihood from the "outdoor" pursuits of hunting,

**8**                         SWITCHBLADE KNIVES

fishing, trapping, and of the country's sportsmen, and many others. In our opinion, there are sufficient of these that their needs must be considered.

Again, we feel that the problem of enforcement posed by the many exemptions would be huge under the proposed legislation.

For these reasons, the Department of Commerce feels it cannot support enactment of H. R. 7258.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

—————

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., June 13, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, House Office Building,*
*Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in reply to your letter of May 8, 1957, requesting the views of the Bureau of the Budget on H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 1, 1957, in reporting to your committee on two similar bills, H. R. 2849 and H. R. 4013, the Bureau of the Budget pointed out that the Departments of Commerce and Justice had raised serious questions as to whether this problem is more properly a subject for the police powers of the States.

The Bureau of the Budget believes that these questions are equally applicable to H. R. 7258 and has no further comment to offer at this time.

Sincerely yours,

PERCY RAPPAPORT,
*Assistant Director.*

—————

DEPARTMENT OF THE ARMY,
*Washington, D. C., July 16, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 7258, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army on behalf of the Department of Defense would interpose no objection to enactment of the bill, pro-

vided it is amended to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation or distribution of switchblade knives by the Armed Forces or members and employees thereof acting in the performance of their duties, thereby expanding the exemption pertaining to the ordering, procuring, or purchasing of such weapons by those persons which now appears in section 4 (2) of the bill.  This amendment could be accomplished by amending section 4 (2) of the bill to read as follows: "(2) to the Armed Forces or any member or employee thereof acting in the performance of his duty."

It is noted also that section 4 (5) does not extend the exemption to manufacturers of or bona fide dealers in switchblade knives in connection with shipments to persons designated in section 4 (4).

Subject to the foregoing, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 7258, 85th Congress, which is similar to H. R. 4013, 85th Congress, on which this Department submitted a similar report to your committee on April 12, 1957.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

---

POST OFFICE DEPARTMENT,
OFFICE OF THE GENERAL COUNSEL,
*Washington, D. C., April 16, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for a report on H. R. 7258, H. R. 9820, and H. R. 10618, similar bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switch-blade knives, and for other purposes.

The attention of this Department has been directed to advertisements in newspapers and magazines with respect to knives, which, according to the advertisements may be ordered for transmission through the mails collect-on-delivery.  Obviously, weapons advertised in this manner can be purchased by anyone.  The so-called Army surplus stores, hardware and other stores, carry similar weapons. The question of how to prevent their reaching the wrong hands is more than a Federal problem and difficult of solution.  Many States have laws prohibiting concealed carrying of knives with blades over designated lengths.

Although the mailing of firearms is controlled by statute (18 U. S. C. 1715), the mailing of hunting knives, switch-blade knives, and other similar weapons is not so controlled.  Any one of the subject bills would do much to correct this situation.  However, in order to eliminate controversy as to the procedure to be followed in the en-

KnifeRights MSJ App.000560

forcement of this proposed law, it is believed that section 5 of the bill should be supplemented by the addition of the following paragraph:

"The mailability of any such knife may be determined by the Postmaster General by inspection thereof and upon the failure or refusal of the sender to explain satisfactorily to the Postmaster General, in writing, why the postal regulations prescribed in accordance with this act were not complied with."

This Department recommends enactment of the legislation contained in section 5 of the measures, amended as suggested.

In advising this Department with respect to this report the Bureau of the Budget called attention to the fact that it had cleared the reports of the Departments of Commerce and Justice which objected to those portions of the subject bills which would prohibit the introduction of switchblade knives into interstate commerce.

The Department of Justice has raised the question as to whether the amendment suggested by this Department would be broad enough to authorize the inspection of first-class mails without a search warrant. It is the opinion of this Department that the language would not authorize such inspection, nor was such procedure intended.

Sincerely yours,

HERBERT B. WARBURTON,
*Acting General Counsel.*

————

THE SECRETARY OF COMMERCE,
*Washington, D. C., April 21, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated January 9, 1958, for the views of this Department with respect to H. R. 9820, and your request of February 13, 1958, with respect to H. R. 10618, identical bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

These bills differ only slightly from H. R. 7528, which was introduced for the same general purposes during the 1st session of the 85th Congress. In the present bills the definition includes knives which open automatically "by operation of inertia, gravity, or both." Also, the present bills prescribe penalties for the manufacture, sale, or processing of switchblade knives, whereas the earlier bill dealt with manufacture, sale, or possession.

The general intent of these legislative proposals appears to be to improve crime prevention by control of the use of the switchblade knife as a weapon of assault. This approach gives rise to certain objections. One is that, at best, it is an indirect approach which addresses itself to only one of many implements usable by an assailant. This casts doubt upon the resulting effectiveness in the reduction of crime in relation to its enforcement problems. Another objection is that it could lead to the elimination of the legitimate supply of switchblade knives in this country. This would ignore the legitimate needs and uses for these knives on the part of those who derive and augment their livelihood from "outdoor" pursuits, such as hunting, fishing, trapping, etc., as well as those of the country's sportsmen, and many others. We feel that these objections are valid,

In thus expressing our views we do not wish to be construed as taking a light view regarding the widespread use of the switchblade knife as a dangerous and lethal weapon. In view of the apparent relation between the switchblade knife and juvenile delinquency, we would strongly support the enactment and vigorous enforcement of appropriate legislation prohibiting sale of switchblade knives to, and their possession by, juveniles, to the extent such sale and possession can be found to be subject to Federal jurisdiction.

Not being convinced that H. R. 9820 and H. R. 10618 would yield desirable results outweighing their undesirable ones, this Department recommends against enactment of these bills.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

———

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., March 14, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the identical bills (H. R. 9820 and H. R. 10618) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

Except as to section 5 and except for two other minor differences, these bills are identical with H. R. 2849 and H. R. 4013 on which the Department reported to the committee on April 12, 1957. The views expressed in that report, copies of which are enclosed, are equally applicable to the bills under consideration.

As for section 5 of the instant bills, it is noted that section 1716 of title 18, United States Code, which it would amend, deals with the mailability of articles intrinsically dangerous. Section 1715, on the other hand, deals with the mailability of firearms, items more analogous to switchblade knives in that both require the introduction of a wrongful element to make them dangerous. Therefore, if the committee is favorably disposed to recommend the amendment of title 18 with respect to the mailability of switchblade knives, section 1715 would seem to be the more appropriate section for such amendment.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely yours,

LAWRENCE E. WALSH,
*Deputy Attorney General.*

**12**                          SWITCHBLADE KNIVES

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., April 15, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce, House
of Representatives, House Office Building, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This will acknowledge your letters of
January 9, 1958, and February 13, 1958, requesting the views of this
Office with respect to H. R. 9820 and H. R. 10618, bills to prohibit
the introduction, or manufacture for introduction, into interstate
commerce of switchblade knives, and for other purposes.

The Bureau has previously reported to your committee in connec-
tion with H. R. 2849 and H. R. 4013 on April 1, 1957, and H. R. 7258
on June 13, 1957.   On those occasions, we pointed out that the
Departments of Commerce and Justice had raised serious questions as
to whether the problem is not more properly a subject for the police
powers of the various States.   These questions appear to be equally
applicable to those sections of the subject bills controlling the intro-
duction of switchblade knives in interstate commerce.

With respect to section 5 of the bills which would make such knives
nonmailable, the Postmaster General, in the reports which he is making
to your committee, recommends enactment subject to certain pro-
cedural amendments set forth in his report.

While we have doubts as to the effectiveness of such limitation in
controlling the wrongful use of switchblade knives, this Bureau would
have no objection to the enactment of those provisions of the bills
dealing with mailability of switchblade knives if amended as suggested
by the Postmaster General.

Sincerely yours,

PHILLIP S. HUGHES,
*Acting Assistant Director for Legislative Reference.*

---

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the
views of the Department of Defense with respect to H. R. 9820,
85th Congress, a bill to prohibit the introduction, or manufacture for
introduction, into interstate commerce of switchblade knives, and
for other purposes.   The Secretary of Defense has delegated to the
Department of the Army the responsibility for expressing the views
of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of
Defense, would interpose no objection to the above-mentioned bill
provided it is amended to exempt Armed Forces operations from the

KnifeRights MSJ App.000563

Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 15 of 462   PageID 688

prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 9820, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 10618, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above mentioned bill provided it is amended to exempt Armed Forces operations from the prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 10618, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

---

INTERSTATE COMMERCE COMMISSION,
*July 23, 1958.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Interstate and Foreign Commerce,*
*United States Senate, Washington, D. C.*

DEAR CHAIRMAN MAGNUSON: Your letter of July 21, 1958, addressed to the Chairman of the Commission and requesting comments on an act, H. R. 12850, passed by the House of Representatives on June 26, 1958, to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes, has been referred to our Committee on Legislation. After consideration by that Committee, I am authorized to submit the following comments in its behalf:

The broad objective of this proposed legislation, which would prohibit the interstate shipment and the use of the mails for the conveyance of switchblade knives, and the manufacture, use, or sale of switchblade knives within Indian country or the special maritime and territorial jurisdiction of the United States, is not related to the jurisdiction or functions of the Interstate Commerce Commission, and for that reason we are not in a position to express an opinion with respect to its merits.

It is noted, however, that the measure properly provides that sections 2 and 3 thereof shall not apply to "any common carrier or contract carrier, with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;".

Respectfully submitted.

HOWARD FREAS,
*Chairman.*

HOWARD FREAS,
ANTHONY ARPAIA,
ROBERT W. MINOR,
*Committee on Legislation.*

CIVIL AERONAUTICS BOARD,
*Washington, D. C.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Interstate and Foreign Commerce,*
*United States Senate, Washington, D. C.*

DEAR SENATOR MAGNUSON: This is in reply to your letter of July 21, 1958, asking the Board for a report on H. R. 12850, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. In your letter you point out that there is pending before the committee a similar bill, S. 2558, on which the Board has submitted its report. You request that the Board submit its report on H. R. 12850 at the earliest possible date.

As was stated in the Board's report on S. 2558, the proposed legislation does not come within the jurisdiction of the Board. Accordingly, the Board expresses no opinion on this matter and has no recommendation to make in regard to either S. 2558 or H. R. 12850.

Sincerely yours,

JAMES R. DURFEE, *Chairman.*

O

# EXHIBIT S

KnifeRights MSJ App.000567

# Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?

PAUL A. CLARK[†]

## I. INTRODUCTION

In the 1950s, there was a widespread perception that switchblade knives were the tool of thugs and juvenile delinquents. In the late 1950s and early 1960s, switchblades were banned, or severely restricted, in almost every state.[1] New York, for example, banned switchblades in 1954, but allowed exceptions for those who could show they were being used for professional or sporting purposes.[2] Today, possession of a switchblade is a crime in just twenty states.[3] In a few other states, there are such severe restrictions on switchblades so as to be effectively banned. For example, Arkansas and Oklahoma have banned carrying any switchblade on or about the person, whether concealed or not.[4] In most other states, switchblades are illegal to buy, sell, or transfer and are considered deadly weapons. They are illegal to carry concealed, and illegal for felons to possess.[5] In

---

[†] J.D. University of Chicago, 2005; Ph.D. The Catholic University of America, 1995. The author has clerked for the Hon. Robert Eastaugh, Alaska Supreme Court, and the Hon. Consuelo Callahan, Ninth Circuit Court of Appeals. He currently practices law in New Jersey.

[1] The only states that never placed significant restrictions on switchblades are Alabama, Georgia, Kentucky, Idaho, Iowa, North Carolina, South Carolina, South Dakota, Utah and West Virginia, although, even in these states, they were usually illegal to carry concealed. States that banned switchblades in the 1950s include: California, 1957 (People v. Bass, 225 Cal. App. 2d 777, 780 (1963) (although blades less than two inches are legal in California); New York, 1954 (*see infra*, Note 2); Pennsylvania, 1956 (Sale of Switch Blades, 15 Pa. D. & C. 2d 405 (1958)); Texas, 1957 (Curson v. State, 313 S.W.2d 538, 540 (Tex. App. 1958)); Virginia, 1955 (Charles Woltz, Criminal Law, VA. L. R. 42:7 (1956)); Wisconsin, 1959 (Wis. Stat. 941.24); Michigan, 1961 (People v. Crow, 13 Mich. App. 594 (1968)); and Illinois, 1967 (People v. Sullivan, 46 Ill.2d 399 (1970)).

[2] Act of Mar. 26, 1954, ch. 268, 1954 N.Y. Laws; New York Penal Law 265.20(6) (West 2013). This was apparently a concession to sportsmen who opposed the ban. *See infra* Sec. III.

[3] In addition to the states listed in note 1, switchblades are currently banned in Colorado (COL. REV. STAT. § 18-12-102), Connecticut (illegal over 1.5 inches (CONN. GEN. STAT. § 53-206)), Hawaii (HAW. REV. STAT. § 134-51), Kansas (KAN. STAT. ANN. § 21-4201), Louisiana (LA. REV. STAT. § 14:95), Maine (ME. REV. STAT. § 43-1055), Massachusetts (illegal over 1.5 inches (MASS. GEN. LAW Ch. 269 § 10)), Minnesota (MINN. STAT. § 609.02 (6)), Montana (MONT. CODE ANN. § 45-8-331), Nevada (NEV. STAT. § 202.355), New Jersey (N.J. REV. STAT. § 2C:39-3e), New Mexico (N.M. STAT. ANN. 30-1-12), and Washington (WASH. REV. CODE § 9.41.250). There are narrow exceptions in some of these states. For example, in New York, it is an affirmative defense that a knife was possessed while physically engaged in hunting or fishing. New York Penal Law 265.20(6) (West 2013).

[4] ARK. CODE ANN. § 5-73-120 (2005); OKLA. STAT. ANN. §21-1272 (West 2002) ("It shall be unlawful for any person to carry upon or about his or her person . . . any . . . switchblade knife . . . whether such weapon be concealed or unconcealed.").

[5] *See, e.g.*, OHIO REV. CODE ANN. §§ 2923.13, 2923.20(1), (3) (LexisNexis 2010); *see also, e.g.*, MD. CODE ANN., § 27-339 (LexisNexis 2010); *see also, e.g.*, MD. CODE ANN., CRIM. LAW § 4-101,

1958, Congress enacted the federal Anti-Switchblade Act, which banned interstate sale of switchblades, and outlawed them in federal territories or on federal waters. Because few states had domestic switchblade factories at that time, the federal act made it illegal to purchase switchblades in most states.

In recent years, however, several states and the federal government have liberalized these restrictions. Oregon legalized switchblades in 1984, Florida in 2003, New Hampshire in 2010, and Missouri in 2012. In 2010, Arizona legalized the carrying of deadly weapons, including switchblades, which had been legal to own but not to carry.[6] In 2010, Georgia repealed its law against carrying concealed knives, and now any knife with a blade of five inches or less (including a switchblade) may be legally carried.[7] In 2013, five states—Alaska, Indiana, Kansas, Tennessee, and Texas—repealed laws banning switchblades.[8] Moreover, in 2009, the United States Congress amended the federal Anti-Switchblade Act to clarify that pocketknives which could be opened with one hand are not switchblades.[9]

Critics of switchblade bans have three basic criticisms. First, they argue that such laws, even assuming they made sense once, are outdated and no longer serve any useful purpose. As one wag said, "I think that the people of New Hampshire can safely lower their guard now that the youngest members of the Sharks and the Jets are in their 80s."[10] As one story on the Indiana repeal explained:

> "It was an obsolete law," said state Sen. Jim Tomes, a Republican from Posey County who supported the change. His argument: There is very little difference between the illegal spring-loaded switchblade of the past and the one-handed, spring-assisted handheld knives that are legally on

---

105 (LexisNexis 2012); DEL. CODE ANN., §11- 222 (2007). Delaware, like many states, also makes it a felony to carry a concealed switchblade. DEL. CODE ANN. § 11-1457(b)(1) (2007).

   [6] Marc Lacey, *Pushing a Right to Bear Arms, The Sharp Kind*, N.Y. TIMES, Dec. 5, 2010, at 1 *available at* http://perma.cc/CP5D-Q72W.

   [7] GA. CODE ANN. § 16-11-125.1 (West 2012). *See also* Ed Stone, *GA Bills: SB 308 The Common Sense Lawful Carry Act*, EXAMINER.COM, http://perma.cc/3UKG-JCPP (last visited Feb. 4, 2014).

   [8] Maureen Hayden, *Indiana to Lift Decades-Old Ban on Switchblades*, NEWS AND TRIBUNE, Jun. 5, 2013. There appears to have been little opposition to these repeals even from law enforcement. One article quotes an Indiana sheriff as saying "Switchblades get sensationalized in movies a lot, but they are no more dangerous than any other knife." Elkhart, *Switchblades now Popping up as Ban in State Nears End*, ASSOCIATED PRESS, Jun. 16, 2013, 3:00AM, *available at* http://perma.cc/M9X3-Y496. *See also* Dion Lefler, *Bill Legalizing Switchblades Passes Senate*, THE WICHITA EAGLE, Apr. 3, 2013, http://perma.cc/UP8Q-84FA (noting the bill passed the Senate unanimously but was opposed by at least one house member).

   [9] *See infra*, note 34.

   [10] Evan F. Nappen, *Miracle in New Hampshire*, KNIVES 2013, 174, 174–75 *available at* http://perma.cc/Z6G-SSYD (last visited Feb. 10, 2014).

the market and widely sold today.[11]

Second, opponents argue that many knife laws are so vague as to what is legal or illegal that innocent people commit crimes without knowing. For example, the Alaska statute passed in 2013 legalized switchblades and gravity knives for anyone sixteen or over.[12]  Sponsors explained that the legislation was for "clarifying that hunting, fishing and utility knives which are easily opened with one hand do not qualify as a switchblade . . . [and] protect Alaskans who carry one of these knives from running afoul of local laws."[13]  Third, opponents of the bans also argue that such laws are selectively enforced.[14]

Supporters of knife bans counter that knives are dangerous weapons and getting them off the street can only make society safer.  As one critic states: "[T]hese knives are, I would say inherently dangerous, they have only one purpose.  They are just deadly."[15]  They also argue that possession of a switchblade indicates a propensity towards violence and lawlessness.[16]  Another argument is that allowing citizens to carry concealed switchblades may result in criminals carrying more deadly weapons—setting off a kind of arms race between citizens and criminals.

The movement towards liberalizing knife laws appears to have been jumpstarted by the expansion of gun rights.  In Georgia, for example, the concealed weapons law was "criticized for permitting the arrest of any Georgian carrying a concealed knife, even if that person has a Georgia firearms license and is carrying a firearm."[17]  Knife advocates may have been encouraged by recent court cases which have held that the Second Amendment to the United States Constitution guarantees the right of private citizens to bear arms.  Whether the Second Amendment protects knife ownership is an interesting question, but not one this Article will address.[18]  What this Article hopes to accomplish is to analyze the historical record (with particular focus on Oregon and Florida, where

---

[11] Hayden, *supra* note 8.

[12] *See* AK HB33 *available at* http://perma.cc/HQ6T-QMWE.

[13] Will Gandergriff, *House Passes Knife Rights Act*, THE ALASKA HOUSE MAJORITY, http://perma.cc/F48W-T6G7 (last visited Mar. 5, 2014).  *See generally* Statement of Rep. Mark Neuman (R) House Judiciary Committee Hearing, Feb. 27, 2013, 2:06:30–49PM *available at* http://perma.cc/UB5B-8K5V.

[14] Dan Tuohy, *Switchblade Knives Now Legal in New Hampshire*, N.H. UNION LEADER, May 20, 2010, at A1, A10, *available at* http://perma.cc/4ED2-N4KV.

[15] Hearing before the Committee on Interstate and Foreign Commerce on H.R. 12850 and S. 2558, 85th Cong. 2d session (1958), at 24.

[16] *Id.* at 22; *see also infra* Sec. IV.

[17] Stone, *supra* note 7.

[18] *See generally* David B. Kopel et al., *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 167, 167–215 (2013).  This appears to be one of the very few scholarly articles addressing knife laws.  The article also argues that knife laws are often vague and lead to prosecution of innocent people.

switchblades were legalized some time ago) to examine the potential dangers associated with ownership and prohibition of switchblades.[19]

There does not appear to have ever been any academic study of how frequently switchblades or pocketknives are used in crime. One article in the *British Medical Journal* estimated that at least half of all assaults with edged weapons in Britain involved ordinary kitchen knives.[20] While there have occasionally been articles in the popular press about switchblades, these are frequently misleading. For example, one oft-cited article in the *Wall Street Journal* in 2000 reported:

> While the U.S. crime rate is falling, the use of knives in murders is rising slightly as a percentage of overall killings. Federal Bureau of Investigation figures show that knives were used in 13.3% of the nation's 14,088 murders in 1998, the most recent year for which weapons statistics are complete, compared with 12.7% of 22,084 killings in 1994.[21]

This article was, at best, misleading. In fact, the use of knives in murders generally fell throughout the 1990s. From 1991 through 1997 the average rate of knife use in murder was 13.64%, and picking out one year when the rate was at its lowest gives a false impression that knife use in murder was on the rise.[22] Moreover, the article clearly implies that the availability of switchblades and similar knives may be responsible for this alleged rise in knife crime—but fails to provide any evidence of this.

Given the trend towards liberalizing switchblade laws in the United States, it is time for a more systematic examination of how legalization and criminalization may affect violent crime. The Uniform Crime Reports published each year by the FBI contain a fair amount of data on the use of edged weapons in crime, including a state-by-state breakdown. Hopefully, an examination of this data will help to determine whether switchblade

---

[19] Although the Internet seems full of discussion of switchblades and a number of popular publications discuss them, there has been almost no scholarly research on use of switchblades in crime, or even on the use of knives in crime generally. As the March 2006 FBI Law Enforcement Bulletin dealing with the issue in 2006 noted, "[a]lmost all the research on edged weapon assaults has come from Great Britain." *Id.* at 14.

[20] "Unfortunately, no data seem to have been collected to indicate how often kitchen knives are used in stabbings, but our own experience and that of police officers and pathologists we have spoken to indicates that they are used in at least half of all cases." Emma Hern, *Reducing Knife Crime*, 330 BRITISH MED. J. 1221, 1221 (2005). Such is the lack of hard statistics about the use of different types of knives in crime.

[21] *See* Robert Johnson, *Sales of Switchblades in U.S. Get a Boost From Internet*, W. ST. J., Mar. 7, 2000, *available at* http://perma.cc/J9T3-TVSL.

[22] *See infra* Table 1 showing the rate of knife-use in murder.

**KnifeRights MSJ App.000571**
**KnifeRights MSJ App.000571**

legislation has had any effect on the use of knives in violent crime. Of course, given the large number of states to legalize switchblades in the last three years, in another few years we should have a fairly large amount of data to examine; in the meantime, we have data from a few states.

## II. What is a "Switchblade"?

The problem of defining terms has plagued philosophers and legislators for millennia. There is a famous story that Plato once defined "human" as a "featherless biped," so Diogenese the Cynic plucked a chicken and carried it around mocking Plato by showing people "Plato's man."[23]

One may think that the difference between a legal pocketknife and an illegal switchblade is as obvious as the difference between a human and a chicken, but police, prosecutors, and courts have frequently had trouble differentiating. Traditionally, a "switchblade" is a knife that has a spring loaded blade that snaps open when a button is pressed; however, 15 U.S.C. § 1241(b) provides:

> The term "switchblade knife" means any knife having a blade which opens automatically—
> (1) by hand pressure applied to a button or other device in the handle of the knife, or
> (2) by operation of inertia, gravity, or both.[24]

Under the federal definition of switchblade, there is no mention of a spring. In fact, a blade which opens with a spring is not a "switchblade" as long as there is no button in the handle. In fact, there are a wide range of spring-assisted opening knives which open by pressing on the blade, not the handle.[25]

The word "automatically" suggests that the knife must have some sort of internal mechanism, but "automatically" is not defined in the statute, and subsection 2 includes knives that open automatically "by operation of inertia," which seems to be a contradiction.[26] For example, an opinion of the Pennsylvania Attorney General on the 1956 Pennsylvania statute banning knives that opened "automatically" opined that a knife whose

---

[23] Joseph Cropsey, Plato's World: Man's Place in the Cosmos 116 (1995).

[24] *See also* 19 C.F.R. § 12.95 (containing a slightly expanded definition including listing specific types of knives and as switchblades).

[25] Many web sites advertise these types of knives. *See, e.g., Black Carbon Fiber Handle & Black Blade Assisted Opening Pocket Knife Milano Godfather Style*, http://perma.cc/TZ9G-VST2. This knife is virtually indistinguishable from a traditional switchblade, except it is legal under federal law (unless it can be opened by inertia).

[26] 19 C.F.R. § 12.95.

**KnifeRights MSJ App.000572**
KnifeRights MSJ App.000572

"blade, either by gravity or by motion given to it by the flip of the wrist, 'automatically' extends to an open position" is a switchblade.[27]   In any event, the definition includes knives which can be opened "by inertia," that is, by a flick of the wrist.  Most, if not all, pocketknives can be opened by inertia.  An estimated 80% of pocketknives sold in the United States are designed to be opened one handed, usually by using the thumb to open the blade while the fingers of the same hand hold the handle.[28]   Virtually all of these knives could be considered a switchblade.

Knives which open by inertia or gravity are also referred to as gravity knives.  Many states classify switchblades and gravity knives as different types of knives.  In New York, for example, the definition of gravity knife is almost the same as 15 U.S.C. § 1241(b)(2), while a switchblade is the same as section (b)(1).[29]   For purposes of this paper, the term "switchblade" will be used in the federal definition to apply to both gravity knives and classic spring-loaded blades as switchblades.  Different states may define switchblades differently, and some states do not provide any definition at all.[30]

To illustrate this ambiguity, consider the story of John Irizzary:

> On March 9, 2007, at approximately 11:55 a.m., New York City Police Department (NYPD) officer Brendan R. McCabe, a 16-year veteran of the force, was on foot patrol in uniform at the Broadway Junction subway station in Brooklyn, New York.  He observed defendant walk past him in the station with an instrument jutting out of his right front pocket.   Officer McCabe testified that he recognized the instrument to be a cutting tool in the form of a gravity knife.  He stopped defendant and said, "You know you're not allowed to carry that knife."   The defendant immediately informed the officer that he was employed at a U-Haul facility and that he used the

---

[27] Sale of Switch-blades, 15 Pa. D. & C. 2d 405 (1958).

[28]   Chris Strohm, *Knife Fight*, CONGRESSDAILY, Jul. 17, 2009, *available at* http://perma.cc/A2AM-WUFV.  A Wall Street Journal article noted that "the trend in the industry is to make exposing the blade quickly easier in manual folding knives." Johnson, *infra* note 118.

[29]   The federal statute was actually modeled on the New York statute although there are some minor differences.  New York, Penal Law § 265.00 (5) states: "Gravity knife means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device."  (Internal quotes omitted.)

[30]   *See, e.g.*, State v. Weaver, 736 P.2d 781, 782 (Alaska 1987) (noting that "[n]either 'switchblade' nor 'gravity knife' is defined in the criminal law statutes" but judicially defining a gravity knife as "operating automatically or semi-automatically.").   Some states also use Webster's Dictionary to define "switchblade."  *See* McMillan v. Commonwealth, 686 S.E.2d 525, 528 (Va. App. 2009); Brock v. State, 424 S.W.2d 436 (Tex. App. 1968).

**KnifeRights MSJ App.000573**
**KnifeRights MSJ App.000573**

*CRIMINAL USE OF SWITCHBLADES*

> instrument for cutting sheet rock as directed by his employer . . . He had not altered the instrument in any way. The instrument was a Husky Sure-Grip Folding Knife ("Husky"), described on its packaging as a "Folding Lock-Back Utility Knife." The instrument is colored silver, about three and one half inches long when in its closed position, and about 6 inches in its open position, with a one inch cutting edge.[31]

It might seem obvious that a utility knife with a one-inch cutting blade designed for cutting sheet rock is not a switchblade, but that is far from obvious. In fact, as the Court went on to explain:

> Defendant's Husky is capable of being opened by an adept person with the use of sufficient centrifugal force. Officer McCabe demonstrated this after three strenuous attempts to open the Husky using one hand and centrifugal force.[32]

In other words, the knife could be snapped open with a flick of the wrist.

So Officer McCabe, the 16-year veteran of the force who arrested Mr. Irizzary, looks to have been on firm ground in his belief that the Husky, which could be opened by inertia, was an illegal weapon.[33] Irizarry's Husky clearly met the definition of an illegal knife under either New York or federal law as it was in 2007.

In 2009, however, the Department of Homeland Security proposed banning the importation of any folding knife that could be opened with one hand because they were being classified as illegal switchblades.[34] This proposal caused a public outcry, and prompted Congress to add an exception providing that penalties for possession of a switchblade under federal law will not apply to "a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife."[35] Because one would not want a pocket knife flopping open in one's pocket, most pocket

---

[31] U.S. v. Irizarry, 509 F. Supp. 2d 198, 199–200 (2007) (internal references omitted). After Irizarry was arrested he was found to have a gun, but luckily for him he was prosecuted in federal court which held that the stop was unconstitutional.

[32] *Id.* at 204.

[33] *Id.* at 200.

[34] Shawn Zeller, *A Cutting Edge Debate Over Switchblades*, CQ ROLL CALL., Jun. 29, 2009, at 1503, *available at* http://perma.cc/T56X-QZQ6; *see also* David Alan Coia, *Is Your Utility Pocket Knife A Homeland Security Threat?*, HUMAN EVENTS, Jul. 14, 2009, 3:01AM, *available at* http://perma.cc/6MRF-7L9E.

[35] 15 U.S.C. § 1243 (1958).

knives have some sort of mechanism designed to keep the knife closed. This 2009 amendment was designed to ensure that ordinary pocket knives were not illegal.  While the intent of Congress seems clear, the statute is poorly drafted. When read literally, it does not apply to any knife that does not "require[] exertion applied to the blade by hand . . . to assist in opening the knife."[36]  Thus, read literally, any knife that can be snapped open by inertia is still illegal.[37]

In fact, in many jurisdictions, people have been prosecuted for possession of what the owners reasonably regarded as ordinary pocketknives.  In a recent California case, Gilbert R. was convicted in juvenile court of possession of a switchblade.[38]  A police officer stopped and frisked Gilbert, finding a pocketknife on him.[39]  The officer "discovered she could open it with a flick of her wrist."[40]  Gilbert was arrested and ultimately convicted of illegal possession.[41]

The California Court of Appeal in 2012 overturned the conviction based on an exception in the statute virtually identical to the federal exception.[42]  The Court explained:

> The legislative history for Senate Bill No. 274 reflects its purpose was to "narrow[]" existing statutory "language to only allow knives to fall under the exemption from the switchblade law if that one-handed opening knife contains a detent or other mechanism.  Such mechanisms ensure there is a measure of resistance (no matter how slight) that prevents the knife from being easily opened with a flick of the wrist. Moreover, a detent or similar mechanism is prudent and a matter of public safety as it will ensure that a blade will not inadvertently come open.  Although some one-handed opening knives can be opened with a strong flick of the wrist, so long as they contain a detent or similar mechanism that provides some resistance to

---

[36] *Id.*

[37] The California Court of Appeal interpreting a virtually identical state provision reasoned: "[F]or the amendment exemption to apply, the knife must be one that 'opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade' *and* has the detent or resistance mechanism.  The knife in question was not of that type: It opened by merely a flick of the wrist, not with pressure on the blade or thumb stud." *In re* Angel R., 163 Cal. App. 4th 905, 912 (2008).  This holding was recently called into question by *In re* Gilbert R., 211 Cal. App. 4th 514 (2012), which appears to have held that so long as the detent mechanism is functioning in the least degree the exception applies.

[38] In re *Gilbert R.*, 211 Cal. App. 4th at 516

[39] *Id.*

[40] *Id.*

[41] *Id.* at 517.

[42] *Id.* at 520.

opening the knife, then the exemption is triggered.  These knives serve an important utility to many knife users, as well as firefighters, EMT personnel, hunters, fishermen, and others."[43]

The Court of Appeal's decision provided a further explanation of the purpose of this exception:

> Sam Martin of Plaza Cutlery at South Coast Plaza testified as a knife and cutlery expert called by the defense.  He explained that while military or law enforcement personnel and others trained in the use of knives might be able to open the knife with relative ease by a flick of the wrist, lay users generally would not be able to do so, at least at first.  But with practice, "[t]hose who have it in their hand a good number of hours a day would learn a dexterity that could indeed flip the blade like this open."  Martin demonstrated that the knife did not easily open because it had a "positive detent, . . . a mechanism which holds the blade in the closed position and you have to provide enough resistance to overcome that for the blade to swing open." Martin held the knife upside down and shook it, but the blade did not descend despite the shaking. Martin explained the detent operated as "a positive retention device" to keep the blade closed. The detent feature was held in place by a "set screw," which had become "a little bit wobbly," reducing the detent pressure by approximately 15 percent according to Martin, but he explained it remained "well within" the manufacturer's parameters, "functioning in all [sic] fashion."[44]

This case reveals one of the potential problems with switchblade statutes: the statutes are frequently so convoluted that an ordinary person (not to mention the police officer, prosecuting attorney, and trial judge) could not tell the difference between a legal knife and an illegal knife.  In fact, the California Court of Appeal decisions themselves are inconsistent, as prior to *Gilbert R.*, the Court has repeatedly interpreted the statute to prohibit any knife that could be opened with a flick of the wrist.[45]

---

[43] *Id. citing* ASSEMBLY COMM. ON PUBLIC SAFETY, ANALYSIS OF SENATE BILL 274, 2001 – 2002 Reg. Sess. 1–2 (Cal. 2001).

[44] *In re* Gilbert R., 211 Cal. App. 4th 514, 516−17 (2012).

[45] People v. Recinos, No. B206800, 2009 WL 2939688 (Cal. App. Sept. 15, 2009); In re *Angel R.*, 163 Cal. App. 4th at 907.

Most pocket knives are designed to be opened manually (usually by using the thumb of the hand holding the knife). As the knife expert in the Gilbert case explained, a spring can weaken over time, through use or corrosion, and knives that could not be flicked open when new may be able to be flicked open once they are broken in. In other words, virtually every pocketknife in existence is potentially a switchblade.[46] Thus the California Court of Appeal held that when a pocket knife is "accidentally damaged so that the resistance mechanism did not function," the knife becomes illegal.[47] Thus, a knife that was legal when purchased may at some point become an illegal switchblade.

Furthermore, some jurisdictions do not have the exception found in both federal and California law. In Ohio, for example, "gravity knives" are not defined by statute, but the Ohio Court of Appeals has held that any knife that can be opened with a flick of the wrist is a gravity knife.[48] In New York, any pocket knife that can be opened by a flick of the wrist and locks open is an illegal "gravity knife."[49] The State need only prove that the defendant knew she had a knife, and she need not be aware that it has the characteristics that make it an illegal gravity knife.[50] In New York City alone, there appear to be thousands of arrests each year for possession of a gravity knife.[51]

While New York courts have repeatedly upheld convictions for "gravity knives" that can be opened with centrifugal force, the federal

---

[46] In fact, nothing in the federal definition of switchblade states that the knife must be held by the handle. Even knives that cannot be flipped open by holding the handle can always be flipped open by holding the knife blade and using the inertia of the handle when the handle is heavier than the blade.

[47] In re *Angel R.*, 163 Cal. App. 4th at 908.

[48] State v. Cattledge, No. 10AP-105, 2010 WL 3972574, at *4, *6 (Ohio Ct. App. Oct. 12, 2010). The court also outlined several characteristics that aid in finding whether a folding knife is a deadly weapon:

> the following characteristics may, but not always, support a finding that a folding knife is a deadly weapon within the definition of R.C. 2923.11(A): (1) a blade that can easily be opened with one hand, such as a knife with a switch, a spring-loaded blade, or a gravity blade capable of instant one-handed operation; (2) a blade that locks into position and cannot close without triggering the lock; (3) a blade that is serrated; (4) a blade tip that is sharp; (5) an additional design element on the blade, such as a hole, that aids in unfolding the knife with one hand; (6) does not resemble an "ordinary" pocket knife.

*Id.; see also In re* Gochneaur, No. 2007–A–0089, 2008 WL 3126172, at *3 (Ohio Ct. App. Jul. 25, 2008) (holding that "knives opening easily with one hand may be considered (for obvious reasons), as being designed or adapted for use as weapons").

[49] *See* N.Y. PENAL LAW § 265.00 (McKinney 2013).

[50] *See, e.g.*, People v. Herbin, 86 A.D.3d 446, 447 (N.Y. 2011).

[51] In one case the arresting officer testified "he had been an officer for 4 1/2 years and had made approximately ten arrests of his own for possession of a gravity knife and participated in two dozen other arrests for the same crime." People v. Brannon, 16 N.Y.3d 596, 600 (2011). From the number of reported cases it appears that New York has more prosecutions for possession of switchblades and gravity knives than all other states combined.

**KnifeRights MSJ App.000577**
**KnifeRights MSJ App.000577**

district court in New York examined the legislative history of the state and declared that "[t]he legislature's plan in making items such as gravity knives 'per se' weapons under New York law was to ban only those items that are manufactured as weapons, not to criminalize the carrying of utility cutting instruments which are widely and lawfully sold."[52]   Thus the federal court held that possession of knives that can be opened with a flick of the wrist "was not a crime" in New York.[53]   Senior Judge Weinstein pointed out that holding it a crime to possess an "instrument supplied by his employer for cutting and installing sheet rock" would effectively "transform thousands of honest mechanics into criminals, subject to arrest at the whim of any police officer."[54]     Judge Weinstein was not exaggerating; he noted that "[i]n fiscal year 2006 Home Depot alone sold over 67,000 Huskies in the State of New York."[55]

Recorded cases across the country are full of examples of courts trying to figure out what is or is not an "ordinary" pocket knife and what is a switchblade.   In California, for example, it is illegal to carry any concealed knife except for "the types of hunting and folding knives designed primarily for use in various outdoor recreational activities."[56]   In a case from Alaska, the Court of Appeals stated that "the statutory definition of 'deadly weapon' is ambiguous" and therefore "[t]o resolve this ambiguity in the meaning of deadly weapon, we look to the legislative history of the statutes at issue."[57]     Apparently, in Alaska, to know what is or is not a legal weapon to carry, the average citizen was expected to research legislative history.   The New Jersey Supreme Court has gone so far as to hold: "In using general language, the legislature intended to allow juries and judges to define, through the use of their own community standards and through an evaluation of the relevant facts and circumstances, what constitutes manifestly inappropriate possession of an object in each individual case."[58]     Both these cases would appear to run afoul of the Supreme Court's holding in *Bouie v. City of Columbia* that "a criminal statute must give fair warning of the conduct that it makes a crime."[59]

---

[52] U.S. v. Irizarry, 509 F. Supp. 2d 198, 209 (2007).

[53] *Id.*

[54] *Id.* at 199.

[55] *Id.* at 209.

[56] *In re* George W., 80 Cal. Rptr. 2d 868, 870 (Cal. Ct. App. 1998).  *See also* ALASKA STAT. § 11.61.220 (West 2013); FLA. STAT. ANN. § 790.01(13) (West 2013); KAN. STAT. ANN. § 500-080 (West 2013); N.C. GEN. STAT. § 14-269(a) (West 2013).

[57] Liddicoat v. State, 268 P.3d 355, 360 (Alaska Ct. App. 2011) (holding that based on legislative history a steak knife could be regarded as a deadly weapon).

[58] State v. Kelly, 118 N.J. 370, 372 (1990) (upholding conviction for possession of carpet cutter when woman armed herself in response to threat from a man who "on many occasions he had beaten her severely.").

[59] Bouie v. City of Columbia, 378 U.S. 347, 350 (1964).  The danger is that the difference between a legal object and an illegal object may be so subtle that one cannot tell what is legal or illegal.

**KnifeRights MSJ App.000578**
**KnifeRights MSJ App.000578**

In *D.J. v. State*,[60] the trial court held that the pocket knife carried by the defendant was not an ordinary pocket knife "because it was larger and heavier than a common pocketknife, snaps out in a smooth action and locks into place, and the blade has serrations, is very sharp, and very pointy."[61]  The Court of Appeals overturned, noting that "[i]n this case, the three-inch knife carried by D.J. lacks any of the weapon-like characteristics we noted in *T.S.W.*, and includes features we have previously held to not distinguish a knife from a common pocketknife."[62]  The idea that a knife could become illegal because it is too sharp would be laughable if people were not going to jail for these offenses.[63]

Virginia Code § 18.2-311 prohibits possession of any "switchblade knife, ballistic knife, or like weapons."  Virginia Code § 18.2-308(A) further prohibits the concealed carry of various weapons, including "any dirk, bowie knife, switchblade knife, ballistic knife . . . [or] any weapon of like kind as those enumerated" in the statute.[64]  The Virginia Court of Appeals has explained that "a 'weapon of like kind' includes a knife that, while not possessing the exact physical properties of the enumerated knives, has the characteristics of a fighting knife just the same."[65]  One defendant was convicted of possession of an illegal weapon in part because "Ohin's knife blade also locks securely when opened, much like a switchblade or a butterfly knife, and can be retracted only when unlocked."[66]  The Court also went on to say that "Ohin's knife . . . has a fixed blade, sharp point, and single-sharpened edge affording it unquestionable utility as a stabbing weapon."[67]  This case suggests that any pocket knife which is sharp, pointy, and locks in place is an illegal weapon, yet in a concurring opinion in 2009, two judges of the Virginia Court of Appeals accused Virginia courts of lacking any coherent rules defining illegal knives:

---

[60] D.J. v. State, 83 So. 3d 857 (Fla. Dist. Ct. App. 2011).

[61] *Id.* at 858; In re *George W.*, 80 Cal. Rptr. 2d at 858.

[62] In re *George W.*,  80 Cal. Rptr. 2d at 858; *see also* C.R. v. State, 73 So. 3d 825, 827 (Fla. Dist. Ct. App. 2011) (reversing the trial court which held that a pocket knife was not "ordinary" because it had "a clip to attach to a belt, a knob that makes the blade easy to open, a locking mechanism, and a textured handle").

[63] State v. Manning, No. 18347, 2001 WL 127860 at *1 (Ohio Ct. App. 2001) (the court found the knife in question to be a deadly weapon; the blade was less than two inches in length but was "pointed and sharp" and could be opened "using only one hand.").

[64] VA. CODE ANN. § 18.2–308(A).

[65] Ohin v. Commonwealth, 622 S.E.2d 784, 786 (Va. Ct. App. 2005).

[66] *Id.* at 787.  A feature to lock the blade in the open position prevents the blade from collapsing on the fingers of the user and has become a regular feature on most pocket knives today.

[67] *Id.* (*quoting* Delcid v. Commonwealth, 526 S.E.2d 273, 275 (Va. Ct. App. 2000) and *citing* Richards v. Commonwealth, 443 S.E.2d 177, 179 (Va. Ct. App. 1994) (noting that a "retractable blade that can be locked into place" gives a knife a weapon-like quality)) (internal quotation marks and citation omitted).

**KnifeRights MSJ App.000579**
**KnifeRights MSJ App.000579**

> A review of these [illegal knife] cases demonstrates the perplexity that exists among law enforcement officers, prosecutors, trial judges, and appellate judges over the scope of this statute.  In an attempt to define its terms, we have resorted to embracing the "I know it when I see it" logic of Justice Stewart, *see Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J. concurring), by including a picture of the offending knife in our opinion.[68]

A common criticism of laws such as the knife laws of New York, Ohio, and Virginia is that they give enormous discretion to police, leading to arbitrary enforcement.  As we saw in the Irizarry case, the Court held that the statute was interpreted so broadly that it subjected citizens "to arrest at the whim of any police officer."[69]  In Virginia and New York, virtually any pocket knife is potentially an illegal weapon and police can arrest the owner.  In reality, police do not arrest everyone who carries a pocket knife, but the statute allows police to arrest those people they believe are really criminals.[70]  So, for example, an elderly white man in a suit carrying a pocketknife will not be arrested but a young black man in a t-shirt will be arrested for the exact same knife.  Murkus D. Dubber, for example, argues that as courts have struck down vagrancy and loitering statutes as vague and giving police too much discretion, police are now using possession offenses to do essentially the same thing, targeting undesirable elements of the community.[71]  Police can always cite a "suspicious bulge" to initiate a stop and frequently can use possession of drugs (including alcohol or tobacco), burglary tools, or weapons to make an arrest.[72]

Moreover, there is substantial evidence that such knife laws are a

---

[68] McMillan v. Commonwealth, 686 S.E.2d 525, 531 (Va. Ct. App. 2009) (en banc) (Petty, J. concurring) (overturning conviction for felon in possession of concealed weapon).

[69] United States v. Irizarry, 509 F. Supp. 2d 198, 199 (E.D.N.Y. 2007).

[70] The author of this article resides in the New York area, asked NYPD officers about the pocketknife law, and was told by more than one officer that as long as a person is not doing something he should not be doing, he does not to worry about carrying a pocketknife.

[71] Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law*, 91 J. OF CRIM. L. AND CRIMINOLOGY 4, 829, 856–57, 910–11 (2001).  Courts have also acknowledged the need for sufficiently precise weapons definitions in preventing "arbitrary and discriminatory application of our concealed weapons statute."  A.P.E. v. People, 20 P.3d 1179, 1184 (Col. 2001) (en banc) (reversing conviction for possession of knife which was determined to be a deadly weapon because it was "ugly").

[72] In New York City, for example, between 2004 and 2009 police conducted over 2.8 million stops of suspects and in 10.4% of all stops "suspicious bulge" was given as the reason for the stop; yet guns were found in only 0.15% of cases.  Floyd, v. City of New York, 08 Civ. 1034, Decision and Order, (S.D.N.Y May 16, 2012).

**KnifeRights MSJ App.000580**
**KnifeRights MSJ App.000580**

pretext for arresting suspicious characters..  The *Irizarry* case showed that Home Depot sold 67,341 Huskies in 2006.[73]  Despite selling these apparently illegal gravity knives by the hundreds of thousands, the state of New York has made no attempt to actually prevent their sale by Home Depot or anyone else.  The fact that the New York Police Department does not seem to take any action to prevent "gravity knives" from being sold strongly suggests that the real intent of the law is to give police a basis for arresting selected suspects.

Of course, a case could also be made that the *Irizarry* case was a perfect example of the usefulness of such laws.  After all, Irizarry had a concealed gun.  So when the officer saw he had a pocket knife, he immediately had probable cause to arrest him for possession of a gravity knife.  Had the officer not found a gun, the cop may well have let him off with a warning or a citation.  Perhaps Irizarry was planning to commit a robbery or other crime with the gun, and the alertness of the officer prevented a serious crime.  We will never know.

With the above caveat that there is substantial disagreement between jurisdictions as to what qualifies as a "switchblade," this Article will follow the federal definition and use the term to refer to any folding knife that can be opened by means of a spring mechanism or by inertia.  Of course, when we turn to looking at individual states that have legalized switchblades, those states may have their own definitions.

### III. WHY NOT BAN SWITCHBLADES?

In 1958, Senator Estes Kefauver (D-TN), a sponsor of legislation to ban switchblades, framed the issue as thus:

> A value judgment must be exercised in determining whether a ban should be imposed on the transportation and distribution of an article.  In the case of the switchblade knife, the question resolves itself into whether the antisocial, negative and criminal uses this knife is put to sufficiently outweigh the occasional constructive uses that can be made of the knife to justify the prohibition contained in the legislation.[74]

---

[73] *Irizarry*, 509 F. Supp. 2d at 209.

[74] *An Act to Prohibit the Introduction, or Manufacture for Introduction, into Interstate Commerce of Switchblade Knives, and for other Purposes and a Bill to Amend Title 18 of The United States Code in Order to Prohibit the Sale to Juveniles of Switchblade Knives which have been Transported or Distributed in Interstate Commerce, and for other Purposes: Hearing on H.R. 12850 and S. 2558 Before the Comm. on Interstate and Foreign Commerce*, 85th Cong. 4 (1958) [hereinafter *Hearings on H.R. 12850 and S. 2558*] at 4.

Senator Kefauver's statement seems reasonable, and more than fifty years later, we are in a good position to try to answer this question. First, let us examine the "occasional constructive uses . . . of the knife"[75] and then turn to negative aspects; in particular, by looking at the arguments put forth by advocates of banning these knives.

There is no question that a knife which can be opened with one hand is useful in a wide variety of situations, as both courts and legislatures have acknowledged. Examples of situations in which one hand is needed to open a knife are numerous. A fisherman might get a hook through his hand and need to use the other hand to cut the fishing line. A person attacked by a dog or wild animal may have her hand or arm caught in the jaws of an animal. A person attacked by an assailant may have her hand restrained by the assailant. A medical provider may need to use one hand to push pressure on a wound and need to use the other hand to cut away clothing or restraints. Representative Jennifer Coffey, who sponsored legislation legalizing switchblades in New Hampshire, for example, is an emergency medical technician who emphasized the use of such knives by first responders.[76] As the New Hampshire Union Leader reported:

> The bill took shape after Coffey, the vice president of the Andover Rescue Squad, was looking for a new tool for her job an emergency medical technician. She was looking for an all-in-one tool with an automatic mechanism, a knife that would free up use of one hand. As she shopped around, Coffey said she discovered what she wanted she could not legally buy in the state. And though state law provided an exemption for EMTs, along with law enforcement, hunters and others, she found the exemption would not apply when she was off-duty.[77]

There have certainly been people who have carried switchblades for protection who were not juvenile delinquents or violent criminals. For example, in one story from the 1960s, entitled "Coeds in Michigan Carrying Weapons in the Wake of Series of Five Slayings," reported:

> "My boyfriend gave me this switchblade," said Roni Freidman, of Portland, Maine, a pretty 19-year-old Blonde nursing student at the University of Michigan. "And I

---

[75] *Id.*

[76] Lacey, *supra* note 6, at 1.

[77] Tuohy, *supra* note 14, at A1, A10. The article also noted that "[t]he bipartisan bill sailed through the New Hampshire legislature, with committees hearing support for the change from law enforcement officers, wildlife groups and outdoors people."

**KnifeRights MSJ App.000582**
**KnifeRights MSJ App.000582**

carry it everywhere," she said.  "When you are scared you do these things."[78]

The usefulness of a one-hand opening knife is not seriously in dispute, but the vast majority of pocket knives can be opened by one hand, so who needs a spring-loaded switchblade?[79]   In other words, setting aside the problem that most pocketknives could be considered switchblades, is there a legitimate use for spring opening automatic knives?   Under ordinary circumstances, one can open a pocket knife with one's thumb in less than a second.[80]   Of course, there will be people who, through medical problems like arthritis or nerve damage, may have trouble opening a pocket knife one handed; one of the reasons given for ending the switchblade ban in Indiana is precisely this reason.[81]  The primary reason given for utility of a switchblade over a normal pocketknife is that when one is in an emergency situation (for example, a wild animal is chewing on your hand, or a medic is attempting to apply pressure to a bleeding wound), one's fine motor skills will deteriorate greatly, and in a life threatening situation one cannot afford to be fidgeting around trying to get a knife open.   Yet, despite admitting that there may be extreme situations in which an automatically opening knife might be useful, surely these situations are rare.

Ultimately, then, we must balance the dangers of switchblades against their utility.  Of course, there are dangers associated with both legalization and prohibition of switchblades.  Because there is very little difference between a switchblade and an ordinary pocket knife, innocent owners of pocket knives may find themselves under arrest and with a criminal record for possession of objects they reasonably believed were legal.[82]

Another potential problem is that when someone does commit a crime, the presence of an "illegal weapon" or "deadly weapon" can turn a minor offense into a felony, or subject the offender to enhanced penalties.  The

---

[78] Karl Mantyla, *Coeds in Michigan Carrying Weapons in the Wake of Series of Five Slayings*, NASHUA TELEGRAPH, Apr. 18, 1969, at 3.

[79] There are some critics of one-hand opening knives.  *See, e.g.*, Mark Fritz, *How New, Deadly Pocketknives Became a $1 Billion Business*, WALL ST. J., Jul. 25, 2006, at B1, *available at* http://perma.cc/7PFL-GFXG (noting, for example, that many pocket knives can be "flicked open with one finger faster than the widely outlawed switchblade.").  Nonetheless, there is no jurisdiction which has outlawed one-handed opening knives per se.  When DHS threatened to ban their import, Congress overwhelmingly rejected the idea.

[80] *See id.*

[81] *Indiana Panel Advances Bill Legalizing Switchblades*, NEWS-SENTINEL, Jan. 16, 2013, http://perma.cc/V6ZW-VY5Z.

[82] But surely there must be a way for the law to distinguish "good" pocket knives from "bad" switchblades.  The only way states seem to be able to give clear guidance as to what is legal or illegal is a restriction on blade length, that is, any folding knife with a blade length of over a certain length is illegal regardless of any other features.  This type of statute gives clear guidance to citizens and enforcers as to what is legal and illegal.

problem is that two offenders with essentially identical crimes may receive very different sentences based on minor differences making one knife legal and another a deadly weapon.[83]  This is true for almost every state in the country, because even most states that permit possession of switchblades classify them as deadly weapons.

Another danger that must be considered with every criminal statute is that some people will be falsely accused, arrested, and convicted.  A witness may mistakenly believe an object is a switchblade when it is not, or it may simply be a case of arresting the wrong person.  Furthermore, not every case will have the object available for examination by police.[84]  For serious crimes like murder and robbery, the fact that innocent people will be wrongly convicted is not much of an argument, but for marginal crimes when the harm to society is small, the danger of false conviction is a reasonable concern.

Finally, there are always associated costs to any criminal law.  With marginal offenses, enforcement costs such as time and expense of policing and prosecuting the offense may not be worth the benefit to society.  Even keeping firearms out of the hands of criminals is notoriously difficult, so keeping knives out of the hands of criminals may not be possible.

There are also unintended consequences of banning some weapons.  In some states, such as in the case of the Virginia statute cited above, the penalties for carrying a concealed weapon or being a felon in possession of a weapon are the same for a knife or a gun.  Although a full exploration of alternatives to switchblades is beyond the scope of this paper, heightened penalties for the use or possession of knives might lead some would-be criminals to conclude that they may as well carry a gun.[85]

If the above are the practical and legal concerns with banning

---

[83] *See, e.g.*, State v. Gotcher, 759 P.2d 1216, 1220 (Wash. Ct. App. 1988) (reversing defendant's conviction for committing burglary with a deadly weapon when he possessed a switchblade).

[84] For example, there is the novelty "switchblade comb" which looks like a switchblade when closed but has a comb instead of a knife blade.  *Switchblade Comb*, ARCHIE MCPHEE, http://perma.cc/ZGJ4-2UVC (last visited Feb. 26, 2014).  Under federal law this is considered an illegal switchblade and may not be imported. Letter from John Durant, Dir., Commercial Rulings Division, to John Kelly, Gen'l Mgr, Allied Import Corp. (Oct. 3, 1989) *available at* http://perma.cc/7PVF-VKGX. The reasoning provided was that the comb could easily be replaced by a knife blade, and therefore, the mechanism operated as a sham to import knife parts. *Id.* at 2–3.

[85] This is common criticism of banning one type of weapon that is easily replaceable.  For example, Gary Kleck has argued that banning all handguns would likely result in their substitution by more deadly shotguns and rifles.  *See generally* Gary Kleck, *Handgun-Only Gun Control: A Policy Disaster in the Making, in* FIREARMS AND VIOLENCE: ISSUES OF PUBLIC POLICY, 167, 186–94 (Don B. Kates, Jr. ed., 1984); *see also* David B. Kopel, *Peril or Protection: The Risks and Benefits of Handgun Prohibition*, 12 ST. LOUIS U. PUB. L. REV. 285, 329 (1993) (arguing the same).  As in the case of knives, the substitution for guns in many circumstances is probable, but the overall impact is more debatable.  At least in the case of armed robbery use of a firearm means the victim is less likely to resist, so while a firearm is more deadly than a knife it is less likely to be actually used to injure a victim.

**KnifeRights MSJ App.000584**
KnifeRights MSJ App.000584

236        *CONNECTICUT PUBLIC INTEREST LAW JOURNAL*        [Vol. 13.2

switchblades, what are the arguments for banning them?  To answer this, this Article will go back to the federal legislation enacted in the 1950s and examine how these bans began.

## IV. The History of Switchblade Legislation: Why Were They Banned?

Some of the most famous movies of the 1950s prominently featured switchblades, including Stalag 17 (1953), From Here to Eternity (1953), Blackboard Jungle (1955), Oklahoma (1955), Rebel Without A Cause (1955), Twelve Angry Men (1957), and High School Confidential (1958).[86]  Although "West Side Story" was not made a movie until 1961, it debuted on Broadway in 1957.[87]  Switchblades came to be associated with crime, and especially juvenile delinquency in New York.  Whether this perception was correct or not, we may never know, but there is no question that switchblades were quite popular in the 1950s.  A Senate judiciary report published in 1958 estimated that more than 1.2 million switchblades were purchased in the United States each year.[88]

One of the first attempts to ban switchblades was introduced in the New York legislature in 1953, but failed to pass.[89]  In 1954, Governor Dewey supported a weaker plan to ban the sale, but not the possession, of switchblades in New York.[90]  A legislative report on that bill explained:

> This bill prohibits the sale of switchblade knives in this State.  It also makes possession of such knives unlawful except for persons who require their use in a business, trade or profession or for sportsmen holding hunting, trapping and fishing licenses under the Conservation Law.  Last year there were 4,420 felonious assaults and 99 homicides reported in New York City in which knives were used.  Analysis indicates that over one-third of these crimes involved the use of switchblade knives.[91]

Within a few years, about ten states had banned the sale or possession

---

[86] For a longer list of movies from this period featuring switchblades, *see Switchblades in the Movies (1920-1969)*, Assisted Knife.com, http://perma.cc/YSE9-98Q9 (last visited Feb. 26, 2014).
[87] West Side Story (Mirisch Pictures, Inc. and Seven Arts Prods. 1961); Jack Gottlieb, *West Side Story Fact Sheet*, West Side Story, http://perma.cc/364G-CVHB (last visited Feb. 18, 2014).
[88] S. Rep. No. 1429, at 6 (1958).
[89] J.F. Wilkinson, Jr., *Plan Letter Drive on Switchblades*, Brooklyn Eagle, Jan. 5, 1954, at 1.
[90] *Id.*
[91] Memorandum of Governor Thomas E. Dewey, *reprinted in* 1954 Legis. Ann. 385 (New York, 1954).

**KnifeRights MSJ App.000585**

of switchblades.[92]  In 1957, several bills were introduced in Congress to ban switchblades or to prevent them from being mailed across state lines.

The Eisenhower Administration opposed banning switchblades.  When asked for the opinion of the Department of Justice, Deputy Attorney General William Rogers wrote the Commerce Committee:

> The Department of Justice is unable to recommend enactment of this legislation. . . . Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons.  However, since they serve useful and even essential purposes in the hands of persons such as sportsmen, shipping clerks and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the federal level.[93]

The Secretary of Commerce, Sinclair Weeks, expressed similar views stating that the proposed bill ignored the needs of many legitimate users of switchblades.[94]  The administration did not oppose a ban on mailing switchblades, although the Administration expressed "doubts as to the effectiveness of such limitations in controlling the wrongful use of switchblades."[95]  The broader ban on possession also ran into trouble as many legislators did not believe that the federal government had constitutional authority to prohibit possession of switchblades and regarded that as a state or local matter.[96]

While some witnesses acknowledged that a switchblade might have some usefulness, Pino testified:

> Actually, these knives are, I would say inherently dangerous, they have only one purpose.  They are just deadly.  They are lethal weapons and they are suited for crime, that is all they are suited for.  So the sportsmen really have nothing substantial to complain about.  But

---

[92] S. Rep. No. 1429, at 7, 27.

[93] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 11–12 (letter from of William Rogers, Deputy Att'y Gen.).

[94] *Id.* at 12 (letter from Sinclair Weeks, Sec'y of Commerce).

[95] *Id.* at 15 (letter from Phillip S. Hughes, Acting Dir. for Legis. Reference, Exec. Office of the President).

[96] For example, Senator Butler commented, "We have no business to legislate on possession, that is a state and local matter."  The Chairman of the committee, Senator Warren Magnuson, expressed similar reservations, as did Senator Thurmond (S.C.), a noted advocate of states' rights.  *Id.* at 22, 25. This opposition to a general ban meant that a ban would be enacted only in federal territories.

they do complain.[97]

Similarly, John E. Cone, a local New York judge who headed a movement to ban switchblades in New York, testified: "You see, the possession of these knives are [sic] only for three purposes, mainly: murder, assault, robbery, possibly even rape."[98] He later added: "I think you will find this type of knife only in the hands of juveniles and in the hands of footpads around our city. . . . Footpads, highwaymen, thugs."[99]

Fortunately, the claims of Cone and Pino are empirically verifiable to some extent. According to manufacturers' numbers provided to the committee, there were at least 1.2 million switchblades sold in the United States each year.[100] We also know that for the years 1957 and 1958, there were an average of 8,145 homicides, 71,210 robberies, and 112,235 aggravated assaults.[101] Even assuming that half of all these crimes used knives, and further assuming that every knife used was a switchblade, there would have been 95,795 violent crimes involving switchblades.[102] Even using these extremely cautious presuppositions, and further assuming that 95,795 different switchblades were used for crimes, with six million switchblades in circulation, it would mean that only 1.6% of switchblades were used in murder, assault, or robbery. In fact, the use rate is almost certainly well under 1%.[103] Given that 99% of switchblades were never used for any illegal purpose, the assertion that they are only used for or suited for murder, assault, and robbery is demonstrably false.

As to how such knives cause crime, Cone told a story of how possession of switchblades led to criminal activity.[104] He explained how one young person accidentally hit another young boy with a stick, and then:

---

[97] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 24.

[98] *Id.* at 7.

[99] *Id.* at 22.

[100] S. Rep. No. 1429, at 6 (1958).

[101] Fed. Bureau of Investigation, Uniform Crime Reports for the United States 5 (1960).

[102] These are obviously extremely liberal estimates. The first classification of murder weapons in the UCR is from 1960, and this shows less than 20% use of knives in murder, the UCR from 1965 shows that knives were used in one-third of all aggravated assaults, and no weapon was used in 42% of robberies in 1965. To err on the side of caution, the author assumed a use rate of one-half, although one-third of robberies and assaults utilizing knives is probably a more accurate estimate. *Id.* at 59. *See infra* Table 1.

[103] In reality there were probably far more than 6 million traditional switchblades in circulation, since that was only the number sold in the previous five years, and it is highly unlikely that every knife used in a crime was a switchblade. Moreover, those criminals who used a switchblade for a crime likely used the same weapon repeatedly. Thus, a more realistic estimate is that less than 1/10 of one percent of switchblades in circulation were used in crime.

[104] *Hearings on H.R. 12850 and S. 2558, supra,* note 74, at 23.

**KnifeRights MSJ App.000587**
KnifeRights MSJ App.000587

> He, as youngsters are prone to do, yelled some angry words to the lad who hit [him with] the stick, who in turn yelled back more angry words. They rushed together quickly, and unfortunately the boy who hit the stick had a switchblade in his pocket. I say to you, before he had time to think of the consequences of his act, or the other lad to think of it, the knife was out, in a twinkling of an instant it was buried in his chest and he was dead. Had he had a Boy Scout knife, the other kid would have had warning, the tragedy would not have occurred. But with this deadly thing there could be only one result.[105]

One thing to bear in mind is that the typical Boy Scout knife, or jackknife, in the 1950s was designed to be opened with two hands. The one-handed opening knives described above have come to dominate the market since the ban of switchblades. With that point in mind, we see two distinct arguments made by Cone. The argument typically made is that because switchblades open so quickly, an assailant can surprise a victim who does not know the other person has a switchblade, and thus it is harder to defend oneself. Similarly, the Alaska Court of Appeals explained the danger from switchblades was that they are "easily concealed and quickly brought to bear."[106]

The second argument made by Cone is that the assailant will have more time to think about what he is doing. However, while an extra two to three seconds to deploy a knife might give a victim enough time to run away, it seems unlikely that a boy angry enough to stab another will cool off in two to three seconds.

Senator Cotton expressed his opinion that "those knives are exactly the things that fascinate a perfectly good boy."[107] The Senator did not elaborate, but he seems to have been arguing that many boys would carry switchblades who would not carry other types of pocketknives, simply because they are so fascinating, and presumably they will be more inclined to use such knives.

Thus, there were five distinct arguments against switchblades used by advocates of the legislation: (1) they have no legitimate use; (2) someone found with one is likely a criminal (i.e. the proxy theory); (3) they are attractive to otherwise good boys who will misuse them; (4) their ease of use makes it more likely a person will use them in anger; and (5) their quickness and concealability makes them harder to defend against than

---

[105] *Id.*
[106] State v. Weaver, 736 P. 2d 781, 783 (Alaska 1987).
[107] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 27.

other knives commonly carried.

Pino confidently predicted that fewer switchblades would mean less crime:

> We don't expect that by passing a bill like this we will completely solve the problem. But the fewer of these weapons we have around the less is going to be the incidence of crimes.[108]

The Senate Committee had surprisingly little hard data on the use of switchblades.[109] Senator Thurmond asked Cone if more wounds were caused by switchblades or other types of pocketknives, and Cone responded: "The jackknife is no problem. We have no objection to them at all. They serve a legitimate purpose."[110] Although the Committee Report lists a number of figures on the volume of switchblades confiscated, it gave almost no numbers on how often they were used in crime. One of the very few statistics was that "[i]n Kansas City 15 switchblades were used in assaults and robberies in 1956."[111] Given that there were 269 armed robberies and 175 aggravated assaults in Kansas City, Missouri in 1956, fifteen switchblades out of 444 assaults and robberies (about 3.3%) does not appear to be a very large number.[112]

The Congressional Committee sent questionnaires to municipal and military police across the country and collected a wide assortment of anecdotes. Although these anecdotes confirm the prevalence of switchblades, they provide little solid information on how often they were used in crime. In one section, the report explains that military regulations forbade switchblades on post, and further notes:

> During 1956 at Fort Bragg, N.C., it was necessary for the military police to confiscate from military personnel 161

---

[108] *Id.*

[109] As the Oregon Supreme Court stated, the congressional report "offers no more than impressionistic observations on the criminal use of switch-blades." State v. Delgado, 692 P. 2d 610, 612 (Or. 1984).

[110] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 24 (1958). Indeed, one is almost surprised at the attitude of some witnesses towards other knives. Senator Thurmond went on to ask Cone about carrying a combat knife with an eight-inch blade, and Cone said as long as it was carried openly it was not a problem to carry it in public. *Id.*

[111] *Id.* at 3.

[112] FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97. This number does not include assaults or robberies from Kansas City, Kansas where there were 143 armed robberies and ninety-eight aggravated assaults in 1956. These numbers were provided by W.E. Parker acting head of the Kansas City, Missouri PD. *See The Kansas City Trouble*, TIME, Jan. 27, 1958, *available at* http://perma.cc/RD6G-Z4BD (detailing efforts to keep switchblades and razor blades out of Kansas City, Missouri public schools).

**KnifeRights MSJ App.000589**
KnifeRights MSJ App.000589

> switchblade knives, an average of 3 a week.  At Fort Sill, Okla., in 1956, 75 of these knives were confiscated as a result of aggravated assault.[113]

Given these types of numbers from just two posts in one year, it seems likely that tens of thousands of switchblades were in the hands of military personnel.

## V. PROVISIONS AND ENFORCEMENT OF THE FEDERAL ANTI-SWITCHBLADE ACT

Congress did not believe it had constitutional authority to ban the possession of switchblades in the states, but the legislation did place some significant restrictions on switchblades.  15 U.S.C. § 1242 bans the "transport[ation] or distribut[ion] in interstate commerce" of switchblades, which means that a manufacturer or distributor cannot sell across state lines.[114]  Violation of the Act is a felony and the offender may be sentenced to up to five years in jail.  The Act does not restrict individuals from purchasing a switchblade where they are legal and bringing it back to her home state, but presumably this statute would greatly restrict access to switchblades in many states where there was or is no domestic manufacturer.  While there are numerous local manufacturers in states such as Oregon and Florida, lack of competition from foreign manufacturers undoubtedly increases the price of switchblades, making them more expensive than their non-switchblade equivalent.[115]

The other major provision of the federal Anti-Switchblade Act is that it is a felony to possess a switchblade "within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18)."[116]  This provision is actually fairly broad, as the special maritime jurisdiction includes all navigable waters of the United States not within the jurisdiction of any state, as well

---

[113] *Hearings on H.R. 12850 and S. 2558, supra* note 74 at 3 (Statement by Senator Estes Kefauver).  Notably this does not say that 75 switchblades were used in assaults, and it is not clear how many of these knives were used for an illegal purpose.  FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97.

[114] 15 U.S.C. § 1242 (2012).

[115] For example, Benchmade Knife Company has a factory in Clackamas, Oregon and appears to be a major seller of switchblades in Oregon.  BENCHMADE KNIFE COMPANY, http://perma.cc/LP7G-W8FQ (last visited Feb. 26, 2014).  A review of their products shows that their switchblades frequently cost well over $100.  Similarly, The Knife Factory in Saint Augustine, Florida advertises "a full line of automatics."  KNIFE FACTORY, http://perma.cc/8UJB-HN4H (last visited Feb. 26, 2014); as does Arizona Custom Knives, also in Saint Augustine.  ARIZONA CUSTOM KNIVES, http://perma.cc/D89L-UXWL (last visited Feb. 26, 2014).

[116] 15 U.S.C. § 1245 (2012).

**KnifeRights MSJ App.000590**
KnifeRights MSJ App.000590

as any U.S. flagged vessel.  It is therefore illegal for a fisherman in Alaska, California, Oregon, or Florida to take a switchblade on a fishing boat outside her home state.

The main point of the law was to support states that did ban switchblades.  Congressional witnesses expressed to the Committee that "in your own State you can manufacture them, if they are going to be permitted, and there would be no problem."[117]  Senator Thurmond also acknowledged this and asked "Have we gained anything?"[118]  It seems clear that with millions of switchblades in circulation and with them remaining legal in most states at that time, expectations were low for any immediate effect.

As to enforcement of the Act, it does not appear that the Act has ever been enforced very vigorously with respect to interstate transport. Although the federal government has actively stopped importation of knives believed to be illegal, the number of criminal prosecutions for selling or purchasing knives across state lines appears to be very small. There are only a handful of recorded prosecutions, despite reports of widespread distribution.[119]  In fact, when one considers that prior to the 2009 amendment to the Anti-Switchblade Act, the vast majority of pocketknives were illegal, it is fair to say the Act was violated with impunity, at least with regard to knives that could be opened by force of inertia.

As we saw, the Eisenhower administration was opposed to a switchblade ban, and while the President did not veto the Act, the administration probably did not make enforcement a priority.  There are also two important exceptions to the Act.  Interstate distributors are permitted to sell to individuals with one arm and "the Armed Forces or any member or employee thereof acting in the performance of his duty."[120] Yet, in addition to these two exceptions, the U.S. Post Office has adopted regulations permitting switchblades to be mailed interstate to "[s]upply to procurement officers or employees of the municipal government of the District of Columbia, or of the government of any state or territory, or of any county, city, or other political subdivision of a state or territory."[121] This provision goes back at least to 1971.[122]  While the provision was

---

[117] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 26 (Statement by Senator Estes Kefauver).
[118] *Id.*
[119] Robert Johnson, *Sales of Switchblades in U.S. Get a Boost from Internet*, WALL ST. J., Mar. 7, 2000, http://perma.cc/Z5LQ-MZBB (last visited Feb. 26, 2014).
[120] 15 U.S.C. § 1244 (2012).
[121] U.S. POSTAL SERV., PUB. NO. 52, MAILING STANDARDS OF THE UNITED STATES POSTAL SERVICE PUBLICATION 52, HAZARDOUS, RESTRICTED, AND PERISHABLE MAIL, § 442 *available at* http://perma.cc/5R3G-TP6N (last visited Feb. 26, 2014).
[122] 39 C.F.R. § 124.6 (1971).

**KnifeRights MSJ App.000591**
**KnifeRights MSJ App.000591**

clearly intended to ensure that state and local governments would not be affected by the ban, the provision is worded quite broadly. Manufacturers and distributors have taken advantage of this provision and will ship switchblades interstate to anyone who certifies that he or she is an employee of a state or local government.[123]

One criticism of the Anti-Switchblade Act is simply that it has not been enforced effectively, and federal regulations create exceptions which allow millions of people to purchase them legally, not to mention people who falsely claim to be a state or local employee. If these criticisms are correct, naturally, the Anti-Switchblade Act will have had little or no effect on crime.

While the above criticisms of the Act are valid, anecdotal evidence suggests that the Act has significantly reduced the possession of traditional spring-loaded switchblades. This author spent six years in the Marine Corps from 1986 to 1992, and virtually every marine carried a pocket knife—it was simply basic equipment. Yet in this author's six years in the Marine Corps, he never once saw a Marine with a traditional switchblade. It follows that traditional switchblades are far less prevalent today than they were in the 1950s (with the exception of a few states like Oregon, where they are legal and common).

Thus, the criticism of lack of enforcement is not persuasive, at least as it relates to traditional, spring-loaded switchblades. The criticism is more forceful with respect to other types of pocketknives. Although any knife that could be snapped open by inertia was theoretically illegal, the sponsors of the Act made clear that they were not banning ordinary pocketknives. The Act was never enforced to include non-traditional switchblades, and when the administration suggested banning the importation of pocketknives, Congress overwhelmingly rejected the proposal. So while the Anti-Switchblade Act seems to have been successful in significantly reducing the number of spring-loaded switchblades, these knives appear to have been replaced by other types of pocketknives that are identical for almost all practical purposes. If this last criticism is valid, one would not expect to see any effect on crime as a result of the Anti-Switchblade Act.

## VI. THEORIES AND METHODOLOGY

As we have just seen, advocates of banning switchblades argued that switchblades are uniquely suited for criminal purposes and predicted that the ban would reduce crime in general, and knife crime in particular. If these knives are so valuable for criminal purposes, then we would expect murders, robberies, and especially assaults to increase as more of such

---

[123] The author has a sample form used by a distributor on file, which requires the purchaser to affirm he or she is an employee of a state or local government.

knives are introduced into a community.  Because murders and robberies are far more likely to use a firearm than a knife, the presence of more switchblades might not affect these numbers very much, even if they are heavily used in crime.  We would expect to see the greatest effect on aggravated assault.

First, the sheer volume of aggravated assault is much larger than murder or robbery.[124]  The larger number of assaults than murder or robbery is explained by the fact that assaults are much more likely to be unplanned and spontaneous,[125] such as the incident described by Judge Cone's testimony.  Second, knives are much more common in assaults than murder or robbery.[126]  The presence of deadly weapons means that verbal arguments are far more likely to escalate into aggravated assault.

The alternative hypothesis is that switchblade knives are not different from other pocketknives in any significant respect, and so long as other pocketknives are widely available, the ban or introduction of switchblades will have no discernible effect on crime.

Of course, given that there were millions of switchblades in circulation when states began to ban them, it could take years before the ban had any real impact on crime.  Conversely, when a state legalizes switchblades after a long period of prohibition, we would expect the supply to grow rapidly among the criminal element if these knives are uniquely useful for criminal purposes by footpads, highwaymen, and thugs.  Because switchblades cannot be sold interstate, one might expect that it would take some time before they become widely available.  At least in recent years, however, the market has shown a remarkable ability to provide switchblades soon after legalization.  Soon after legalization in Missouri, an article in the St. Louis Post Dispatch, reported:  "After the state law change, customers flocked to stores to shop for switchblades, which had been banned for years."[127]  Although sale of switchblades across state lines is theoretically illegal, there have been reports of widespread internet sales.[128]

A second theory worth exploring is the proxy theory; that is, even if switchblades are no more dangerous than any other knife, people who use switchblades are likely to be violent criminals.[129]  If the proxy theory is

---

[124]  In 2012, there were 14,827 murders in the U.S., 354,520 robberies, and 760,739 aggravated assaults. FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97 (Table 1).

[125]  As one court put it: "Assaults and batteries are frequently the result of transient ebullitions of passion." Gillman v. State, 51 So. 722, 723 (Ala. 1910).

[126]  *See infra* Tables 2–4.

[127]  Michael D. Sorkin, *Pocket Knife Sales Soar on Renewed Popularity*, ST. LOUIS POST-DISPATCH, Dec. 30, 2012, http://perma.cc/5RSM-8DNP (last visited Feb. 26, 2014).

[128]  *See generally* Johnson, *supra* note 111.

[129]  One author has described the use of proxies for law enforcement as "taking an innocent characteristic, believing it to be correlated with a real or potential threat, and using that characteristic to

**KnifeRights MSJ App.000593**
**KnifeRights MSJ App.000593**

correct, switchblade laws are an excellent tool used by police to identify and arrest potentially violent criminals. There is an obvious logic here. If switchblades are criminalized, then only criminals will have switchblades. Law-abiding citizens will carry other types of pocketknives which are legal. Thus, if switchblades are illegal, we would expect them to be an excellent proxy for other criminal behavior.

There are two potential flaws with this proxy theory. First, if the definition of switchblade is unclear, many otherwise law-abiding citizens may end up arrested for possession of knives they honestly believed were legal. Because possession offenses are typically strict liability offenses, the state need not prove that the defendant had any intent to break the law.[130] Second, the proxy theory assumes that violent criminals are more likely to break switchblade laws than other citizens, but that may not be true. Again, if the utility between a switchblade and ordinary knife is minimal, violent criminals may well have no trouble complying with the ban. In fact, as many of these statutes are obscure and complicated, professional criminals are likely to be the ones who are most familiar with these statutes. Hence, it is entirely possible that most people who violate switchblade statutes are just ordinary citizens who are ignorant that their pocket knife is illegal. If this is true, then the proxy theory is the exact opposite, and innocent citizens are more likely to possess illegal knives than professional criminals.[131]

Yet, if the proxy theory is correct, then we would expect laws against switchblades to reduce crime even if switchblades are harmless, because it will lead to more violent criminals being arrested and imprisoned. Accordingly, we should again see a reduction in crime when switchblades are outlawed and an increase in crime when they are legalized.

Of course, there will be other factors that might affect the use of switchblades, regardless of their legal status. The main factor one would expect to affect use of knives is the prevalence of firearms. There is an old saying "Don't bring a knife to a gun fight."[132] Knife wielders are unlikely

---

enforce the law." Lindsey B. Lawrence, *The Money-Laundering Conundrum: Mugging Privacy in the Assault on Crime? In* THE FUTURE OF FINANCIAL PRIVACY, 165 (Washington: Competitive Enter. Inst., 2000).

[130] *See, e.g.*, People v. Voltaire, 852 N.Y.S.2d 649, 652 (Crim. Ct. 2007) *quoting* People v. Visarities, 220 A.D. 657 (N.Y. 1927) ("mere possession of per se weapon, if knowing and voluntary, constitutes the offense") (sic).

[131] Because a person can be in constructive possession of an object, such as a switchblade in one's vehicle which is unknown to the driver, a person can be convicted of a possession offense effectively without *mens rea* or *actus reus*. *See* Dubber, *supra* note 71, at 916–17.

[132] This expression was made popular in the movie "The Untouchables" (1987) in which Sean Connery's character, armed with a shotgun, tells the knife wielding assassin sent to kill him: "Just like a Wop to bring a knife to a gunfight!" The particular knife in the movie, not surprisingly, was a switchblade. The expression has entered the English language as a kind of proverb. *See* USINGENGLISH.COM, http://perma.cc/9BAH-JERA (last visited Mar. 5, 2014).

to attack those who they think may have guns.  For example, among aggravated assaults on the general public, knives and guns are used in about equal numbers, whereas in aggravated assaults on police officers, an aggressor is twice as likely to use a gun as a knife.[133]

Secondly, if a potential criminal has access to guns as well as knives, the criminal seems likely to opt for the more powerful weapon.  Some researchers have challenged the assumption that criminals will substitute knives for guns when guns are not available.[134]  Nevertheless, statistics on the use of guns and knives in crime have consistently shown that when gun use in crime goes up, knife use goes down.  This is consistent with the theory that knife control may be counterproductive, as the weapon substituted for a knife may be a gun.  If the penalty for possession of a knife and gun are the same, then presumably criminals would opt for a gun.

In fact, if we look at the use of knives in crime, there is a steady increase in the use of knives in murder, aggravated assault, and armed robbery throughout the 1960s and 1970s.  Across the country as a whole, violent crime doubled between 1958 and 1967.[135]  Although we can never know what might have happened otherwise, there is no indication that the federal Anti-Switchblade Act (in conjunction with state bans) had any significant effect on violent crime across the country.  Violent crime involving knives also increased dramatically in the 1960s and 1970s.[136]

Table 1 shows the U.S. homicide rate per 100,000 from 1951 through 2000, followed by (when available) the homicide rate using knives (or other cutting instruments), the U.S. robbery rate, the robbery rate using knives, the aggravated assault rate, and the assault rate using knives.  Note that all of the crime data is for knives and other "cutting instruments"; for ease of reference, this entire category is referred to simply as knives.  Note, also, that the first year the UCR classified robbery by weapon used was 1974; thus, these numbers have been supplemented by including the rate of armed robbery from 1964 to 1980.

---

[133] In 2010, there were 137,857 aggravated assaults using firearms and 127,509 using knives. *Uniform Crime Reports 2012, Table 19*, FBI, *available at* http://perma.cc/P36J-FZ5C (last visited Mar. 12, 2014).  However, in assaults on police officers, there were 1,831 assaults with firearms and 884 with knives. *Uniform Crime Reports 2012, Table 70*, FBI, *available at* http://perma.cc/4X28-92SX (last visited Mar. 12, 2014).  884 seems like a high figure, although many of these may have been on undercover officers or attacks by mentally unstable suspects.  In any event, it is clear that when attacking a person who has a gun, an assailant is more likely to use a gun than a knife.

[134] *See generally* Lisa Stolzenberg & Stewart J. D'Alessio, *Gun Availability and Violent Crime: New Evidence from the National Incident-Based Reporting System*, 78 SOC. FORCES 1461 (2000).

[135] *See infra* Table 1.

[136] *Id.*

TABLE 1: U.S. VIOLENT CRIME RATE PER 100,000 INHABITANTS 1951–2000[137]

| Year | Homicide Rate | w/ Knives | Robbery | % Armed Robbery | w/ Knives | Ag. Assault | w/ Knives |
|------|------|------|------|------|------|------|------|
| 1951 | 4.4 | | | | | | |
| 1952 | 4.6 | | | | | | |
| 1953 | 4.5 | | | | | | |
| 1954 | 4.2 | | | | | | |
| 1955 | 4.1 | | | | | | |
| 1956 | 4.1 | | | | | | |
| 1957 | 4.0 | | | | | | |
| 1958 | 4.8 | | | | | | |
| 1959 | 4.9 | | 40.3 | | | 67.3 | |
| 1960 | 5.1 | | 60.1 | | | 86.1 | |
| 1961 | 4.8 | 1.16 | 58.3 | | | 85.7 | |
| 1962 | 4.6 | 1.11 | 59.7 | | | 88.6 | |
| 1963 | 4.6 | 1.05 | 61.8 | | | 92.4 | |
| 1964 | 4.9 | 1.18 | 68.2 | 57% | | 106.2 | |
| 1965 | 5.1 | 1.17 | 71.7 | 57.6% | | 111.3 | |
| 1966 | 5.6 | 1.25 | 80.8 | 58.3% | | 120.3 | 40.42 |
| 1967 | 6.2 | 1.24 | 102.8 | 57.8% | | 130.2 | 42.71 |
| 1968 | 6.9 | 1.29 | 131.8 | 60.3% | | 141.3 | 43.80 |
| 1969 | 7.3 | 1.49 | 148.4 | 61.5% | | 154.5 | 46.04 |
| 1970 | 7.9 | 1.70 | 172.1 | 63.3% | | 164.8 | 46.14 |
| 1971 | 8.6 | 1.71 | 188.0 | N/A | | 178.8 | 50.06 |
| 1972 | 9.0 | 1.71 | 180.7 | 66.1% | | 188.8 | 49.65 |
| 1973 | 9.4 | 1.67 | 183.1 | 65.9% | | 200.5 | 49.32 |
| 1974 | 9.8 | 1.72 | 209.3 | 65.9% | 27.42 | 215.8 | 52.22 |
| 1975 | 9.6 | 1.70 | 220.8 | 65.0% | 27.38 | 231.1 | 54.31 |
| 1976 | 8.8 | 1.57 | 199.3 | 63.5% | 25.91 | 233.2 | 54.80 |
| 1977 | 8.8 | 1.68 | 190.7 | 63.3% | 25.17 | 247.0 | 57.30 |
| 1978 | 9.0 | 1.69 | 195.8 | 62.5% | 24.87 | 262.1 | 59.23 |
| 1979 | 9.7 | 1.86 | 218.4 | 62.3% | 28.83 | 286.0 | 64.35 |
| 1980 | 10.2 | 1.97 | 251.1 | 62.2% | 32.40 | 298.5 | 67.16 |
| 1981 | 9.8 | 1.90 | 258.4 | | 33.85 | 289.3 | 63.65 |
| 1982 | 9.1 | 1.90 | 238.8 | | 32.48 | 289 | 67.05 |
| 1983 | 8.3 | 1.81 | 216.7 | | 29.47 | 279.4 | 66.78 |
| 1984 | 7.9 | 1.67 | 205.7 | | 27.56 | 290.6 | 67.42 |
| 1985 | 8 | 1.69 | 209.3 | | 27.84 | 304 | 69.01 |
| 1986 | 8.6 | 1.77 | 226 | | 30.51 | 347.4 | 76.43 |
| 1987 | 8.3 | 1.68 | 213.7 | | 28.85 | 352.9 | 75.52 |
| 1988 | 8.5 | 1.62 | 222.1 | | 30.21 | 372.2 | 76.30 |
| 1989 | 8.7 | 1.58 | 234.3 | | 31.40 | 385.6 | 75.52 |
| 1990 | 9.4 | 1.65 | 256.3 | | 30.76 | 422.9 | 82.47 |
| 1991 | 9.8 | 1.59 | 272.7 | | 30.0 | 433.4 | 79.75 |
| 1992 | 9.3 | 1.35 | 263.7 | | 27.95 | 441.9 | 80.43 |
| 1993 | 9.5 | 1.21 | 256 | | 25.60 | 440.5 | 77.53 |
| 1994 | 9 | 1.143 | 237.8 | | 22.59 | 427.6 | 76.11 |
| 1995 | 8.2 | 1.07 | 220.9 | | 20.10 | 418.3 | 76.55 |
| 1996 | 7.4 | 1.00 | 201.9 | | 18.17 | 391 | 70.77 |

[137] For ease, the author used the UCR "Data tool" for crime rate data when available (that is, crime rates going back to 1960); otherwise, the author used the printed volumes of UCR data prior to 1960 and for weapon specific data. *Id.*

KnifeRights MSJ App.000596
KnifeRights MSJ App.000596

| 1997 | 6.8 | 0.87 | 186.2 | | 15.83 | 382.1 | 68.40 |
| 1998 | 6.3 | 0.84 | 165.5 | | 14.56 | 361.4 | 66.50 |
| 1999 | 5.7 | 0.75 | 150.1 | | 12.61 | 334.3 | 59.51 |
| 2000 | 5.5 | 0.74 | 145 | | 12.18 | 324 | 58.32 |

Thus, as we see from the above chart, the murder rate with knives almost doubled between 1960 and 1980, the rate of aggravated assaults with a knife doubled between 1965 and 1990, and the rate of knife use in armed robbery remained relatively constant (although the rate of robberies using a weapon increased significantly between 1964 and 1975). Moreover, the effect on crime overall appears to be even more dismal. After 1958, violent crime of all types skyrocketed. The reasons for this are complicated and still debated by criminologists, but it is difficult to look at the huge increases in violent crime and conclude that the switchblade laws had much success in reducing crime.

Strictly speaking, of course, the above numbers do not prove anything, especially because we have nothing with which to compare these numbers. Nevertheless, these numbers provide us with a starting point and a point of comparison for individual state crime statistics. These numbers also should be viewed in conjunction with the rate at which guns were used in crime. While the assault and murder rates with knives increased throughout the 1960s and '70s, the use of guns in crime increased even faster. This is shown in Table 2.

TABLE 2: PERCENTAGE OF GUNS AND KNIVES USED IN MURDER IN U.S. 1961–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1961 | 52.5 | 24.1 | 1987 | 59.1 | 20.3 |
| 1962 | 54.2 | 24.2 | 1988 | 60.7 | 19.1 |
| 1963 | 56.0 | 22.8 | 1989 | 62.4 | 18.2 |
| 1964 | 55 | 24 | 1990 | 64.1 | 17.5 |
| 1965 | 57.2 | 23.0 | 1991 | 65.4 | 16.2 |
| 1966 | 59.3 | 22.3 | 1992 | 68.1 | 14.5 |
| 1967 | 63.6 | 20.0 | 1993 | 69.6 | 12.8 |
| 1968 | 65.4 | 18.7 | 1994 | 70.0 | 12.7 |
| 1969 | 64.5 | 19.9 | 1995 | 68.0 | 13.0 |
| 1970 | 65.4 | 18.9 | 1996 | 67.8 | 13.5 |
| 1971 | 65.1 | 19.8 | 1997 | 67.8 | 12.8 |
| 1972 | 66.2 | 19.0 | 1998 | 64.9 | 13.3 |
| 1973 | 67.0 | 17.8 | 1999 | 65.2 | 13.2 |
| 1974 | 67.9 | 17.6 | 2000 | 65.6 | 13.5 |
| 1975 | 65.8 | 17.7 | 2001 | 63.4 | 13.1 |
| 1976 | 63.8 | 17.8 | 2002 | 66.7 | 12.6 |
| 1977 | 62.5 | 19.1 | 2003 | 66.9 | 12.6 |
| 1978 | 63.6 | 18.8 | 2004 | 66.0 | 13.2 |
| 1979 | 63.3 | 19.2 | 2005 | 68.0 | 12.9 |
| 1980 | 62.4 | 19.3 | 2006 | 67.9 | 12.2 |
| 1981 | 62.4 | 19.4 | 2007 | 68.0 | 12.1 |
| 1982 | 60.2 | 20.9 | 2008 | 66.9 | 13.4 |
| 1983 | 58.3 | 21.8 | 2009 | 67.1 | 13.4 |

| 1984 | 58.4 | 21.2 | 2010 | 67.5 | 13.1 |
|------|------|------|------|------|------|
| 1985 | 58.7 | 21.1 | 2011 | 67.7 | 13.4 |
| 1986 | 59.1 | 20.5 | 2012 | 69.3 | 12.4 |

Between 1961 and 2012, the percentage of guns used in murder increased from one year to the next thirty-one times, and in those thirty-one years, the percentage of knives used in murder decreased twenty-four times. Similarly, the percentage of guns used in murder decreased from one year to the next eighteen times, and in those eighteen years when gun usage decreased as a percent of murder, knife usage increased fifteen times. In the three years when gun use in murder was unchanged (1981, 1987 and 1997), the change in knife usage was either .2 or less. Thus, there is a strong statistical correlation between use of guns and knives in murder: when gun use goes up, knife use usually falls, and vice versa. It is not a precise 1:1 correlation. During the late 1960s and early 1970s, gun violence was increasing even faster than knife violence. Even so, the combined total percent of knives and guns used in murder has been remarkably consistent at around 80%, with the lowest combined total at 76.5% and the highest at 85.5%.

In 1961, the U.S. murder rate was 4.8 per 100,000; the rate peaked in 1980 at 10.2. So while knife use in murder decreased from 24% to 19% by weapon used, the murder rate with knives increased from 1.16 in 1961 to 1.97 in 1980 (see Table 1).

So in looking at knife violence, we need to look at knife crime in conjunction with gun crime. If we only looked at the percentage of knives used in murder, we might conclude that knife control is working because between 1961 and 2011, knife murders as a percentage fell almost in half, from 24% to 13%. However, the knife numbers only look good because there has been such a huge increase in gun violence. Moreover, insofar as knife laws may have deterred possession of dangerous knives, these laws may have encouraged criminals to turn to guns (as opposed to even less dangerous weapons, or no weapon at all).

TABLE 3: PERCENT OF GUNS AND KNIVES USED IN AGGRAVATED
ASSAULT IN THE U.S. 1965–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1965 | N/A | N/A | 1989 | 21.5 | 19.9 |
| 1966 | 18.8 | 33.6 | 1990 | 23.1 | 19.5 |
| 1967 | 20.9 | 32.8 | 1991 | 23.6 | 18.4 |
| 1968 | 23.1 | 31.0 | 1992 | 24.7 | 18.2 |
| 1969 | 23.8 | 29.8 | 1993 | 25.1 | 17.6 |
| 1970 | 24.3 | 28.0 | 1994 | 24.0 | 17.8 |
| 1971 | 25.1 | 27.0 | 1995 | 22.9 | 18.3 |
| 1972 | 25.3 | 26.3 | 1996 | 22.0 | 18.1 |
| 1973 | 25.7 | 24.6 | 1997 | 20.0 | 17.9 |
| 1974 | 25.4 | 24.2 | 1998 | 18.8 | 18.4 |
| 1975 | 24.9 | 23.5 | 1999 | 18.0 | 17.8 |

| 1976 | 23.6 | 23.5 | 2000 | 18.1 | 18.0 |
|------|------|------|------|------|------|
| 1977 | 23.2 | 23.2 | 2001 | 18.3 | 17.8 |
| 1978 | 22.4 | 22.6 | 2002 | 19.0 | 17.8 |
| 1979 | 23.0 | 22.5 | 2003 | 19.1 | 18.2 |
| 1980 | 23.9 | 22.0 | 2004 | 19.3 | 18.6 |
| 1981 | 23.6 | 22.0 | 2005 | 21.0 | 18.9 |
| 1982 | 22.4 | 23.2 | 2006 | 21.9 | 18.7 |
| 1983 | 21.2 | 23.9 | 2007 | 21.4 | 18.8 |
| 1984 | 21.1 | 23.2 | 2008 | 21.4 | 18.9 |
| 1985 | 21.3 | 22.7 | 2009 | 20.9 | 18.7 |
| 1986 | 21.3 | 22.0 | 2010 | 20.6 | 19.0 |
| 1987 | 21.4 | 21.4 | 2011 | 21.2 | 19.1 |
| 1988 | 21.1 | 20.5 | 2012 | 21.7 | 18.7 |

TABLE 4: PERCENT OF GUNS AND KNIVES USED IN ROBBERY IN THE U.S. 1973–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1973 | N/A | N/A | 1993 | 42.4 | 10.0 |
| 1974 | 44.7 | 13.1 | 1994 | 41.6 | 9.5 |
| 1975 | 44.8 | 12.4 | 1995 | 41.0 | 9.1 |
| 1976 | 42.7 | 13.0 | 1996 | 40.7 | 9.0 |
| 1977 | 41.6 | 13.2 | 1997 | 39.7 | 8.5 |
| 1978 | 40.8 | 12.7 | 1998 | 38.2 | 8.8 |
| 1979 | 39.7 | 13.2 | 1999 | 39.9 | 8.4 |
| 1980 | 40.3 | 12.9 | 2000 | 40.9 | 8.4 |
| 1981 | 40.1 | 13.1 | 2001 | 42.0 | 8.7 |
| 1982 | 39.9 | 13.6 | 2002 | 42.1 | 8.7 |
| 1983 | 36.7 | 13.6 | 2003 | 41.8 | 8.9 |
| 1984 | 35.8 | 13.4 | 2004 | 40.6 | 8.9 |
| 1985 | 35.3 | 13.3 | 2005 | 42.1 | 8.8 |
| 1986 | 34.3 | 13.5 | 2006 | 42.2 | 8.6 |
| 1987 | 33.0 | 13.5 | 2007 | 42.8 | 8.3 |
| 1988 | 33.4 | 13.6 | 2008 | 43.5 | 7.7 |
| 1989 | 33.2 | 13.4 | 2009 | 42.6 | 7.7 |
| 1990 | 36.6 | 12.0 | 2010 | 41.4 | 7.9 |
| 1991 | 39.9 | 11.0 | 2011 | 41.3 | 7.8 |
| 1992 | 40.3 | 10.6 | 2012 | 41.0 | 7.8 |

We see that the use of knives or cutting instruments in armed robbery is fairly low. Between 1974 and 1989, knives were used relatively consistently in about 13% of robberies. Of course, the robbery rate increased substantially during this time, so the actual numbers of robberies with knives increased. Nevertheless, given the relatively small percent of knives used in robbery, knife legislation is unlikely to have a serious effect on robbery.

There is a noticeable drop in the rate of knife use in robbery beginning in 1990, and during this period the rate of robbery overall also decreased substantially. There were no significant knife laws passed anywhere in the late 1980s or early 90s that would have affected knife use, so the apparent reason for the decline was the increased use of firearms. During the 1980s the percent of robberies with guns was consistently in the low to mid 30%

range. This percentage of gun robberies increased substantially after 1990. This again suggests that the availability of guns is the single greatest factor affecting use of knives in crime.[138]  The conclusion to be drawn from this data is that unless the government can effectively keep guns out of the hands of criminals, reducing the availability of knives is unlikely to be effective.

## VII. INDIVIDUAL CASE STUDIES: OREGON, FLORIDA, AND NEW HAMPSHIRE

### A. Oregon

Oregon banned the possession of switchblades in 1957, making it one of the first states to do so.[139]  Switchblades remained illegal until the Oregon Supreme Court, on December 28, 1984, declared the ban to be an unconstitutional infringement on the constitutional right to bear arms as guaranteed in the Oregon Constitution.[140]

At the same time, the Oregon Court of Appeals was considering a related provision which made it illegal to carry any knife concealed, other than an "ordinary pocket knife."[141]  The court held that "ordinary" was not a meaningful distinction, and therefore all pocketknives were covered by this exception.[142]  The court further held that because a switchblade is a type of pocketknife, it was not illegal to carry a concealed switchblade.[143]  Within a few months, however, the legislature amended the statute, making it illegal to carry a switchblade concealed, and this restriction was upheld by the courts.[144]  Since 1985, it has been legal in Oregon to carry a switchblade or other knife if it is not completely concealed.[145]  The knife is not considered "concealed" so long as enough is visible that it is "readily identifiable as a weapon," even if most of the knife is not visible.[146]  Many

---

[138] The correlation between knives and guns in robbery, though still significant, is less with respect to homicide and assault, primarily because from the mid-1970s through the 1980s, the percentage of gun-use fell substantially, while knife-use remained constant. Thomas B. Marvell & Carlisle E. Moody, *Specification Problems, Police Levels, and Crime Rates*, 34 CRIMINOLOGY, NO. 4. 609 (1996).

[139] State v. Delgado, 692 P.2d at 614 n.7.

[140] *Id.* at 614.

[141] State v. Pruett, 586 P.2d 800, 801 (1978*).*

[142] *Id.* (noting that it is not "reasonable to uphold a statute by determining as a matter of Law that a particular knife is as a matter of Fact "an ordinary pocket knife." . . . [because] [t]hat leaves the statute even less certain of meaning").

[143] State v. Ramer, 671 P.2d 723, 724 (Or. Ct. App. 1983).

[144] State v. Smoot, 775 P.2d 344, 345 (Or. Ct. App. 1989) (upholding statute banning concealed carry of switchblades).

[145] State v. Johnson, 772 P.2d 426 (Or. Ct. App. 1989)

[146] State v. Turner, 191 P.3d 697, 701 (Or. Ct. App. 2008). This seems to differ from the statutes of other states that consider switchblades *per se* dangerous weapons. Even states where switchblades

switchblades and other pocketknives are now designed with a pocket/belt clip to allow them to be carried so that they are open to view. Thus, a switchblade could be carried with a pocket clip so that just the top of the knife is visible, so it would be impossible to tell that it was a switchblade.

Whether the open carry requirement has any effect on crime is arguable. In theory, if a knife is carried openly, then potential victims, or police, know about the threat and can protect themselves better. It might be true that some people who do not want to display a knife will choose to carry an "ordinary" pocketknife which they can legally carry concealed. While the open carry requirement might deter some people from carrying switchblades, if these knives are so valuable to criminals as opponents claim, it is hard to imagine that a ban on concealed carry will dissuade many would-be criminals.

There are a surprisingly large number of knife manufacturers in Oregon. Benchmade Knives is one of the largest domestic producers of switchblades. Benchmade started operations in California but set up a factory in Oregon in 1990, apparently to take advantage of the growing market for switchblades there.[147] Kershaw Knives, founded in Tualatin, Oregon in 1974, advertises a wide variety of switchblades.[148] Although it is unclear how quickly knife manufacturers were able to flood the Oregon market, certainly by the late 1980s switchblades were quite common in Oregon.

If we look at the overall rate of violent crime in Oregon, the state has long had an admirably low rate of violent crime. Violent crime in Oregon peaked in the mid-1980s and has declined dramatically ever since. Aggravated assault as a percent of the national average peaked in 1985, although it increased only 3% from the previous year. Murder as a percent of the national average peaked in 1986, and armed robbery in 1987. Table 5 shows the rate of aggravated assault, robbery, and homicide in Oregon from 1971 to 2000.

TABLE 5: RATE OF AGGRAVATED ASSAULT, ROBBERY, AND HOMICIDE IN OREGON 1971–2000

| Year | Agr. Assault Rate | Agr. Assault % of National | Robbery Rate | Robbery % of National | Homicide Rate | Homicide % of National |
|------|-------------------|----------------------------|--------------|-----------------------|---------------|------------------------|
| 1971 | 157.7 | 89.20% | 110.4 | 58.72% | 3.2 | 37.65% |

are not banned entirely, but are considered dangerous weapons, it appears to be illegal to carry them in any way that disguises the fact that they are switchblades. For example, the West Virginia statute provides, "A deadly weapon is concealed when it is carried on or about the person in such a manner that another person in the ordinary course of events would not be placed on notice that the deadly weapon was being carried." W.VA. CODE § 61-7-2 (2010).

[147] *See* BENCHMADE KNIFE COMPANY, *supra* note 115.

[148] *See* KERSHAW STORE, http://perma.cc/S7RE-3FDF (last visited Feb. 26, 2014).

**KnifeRights MSJ App.000601**
KnifeRights MSJ App.000601

2014]                    *CRIMINAL USE OF SWITCHBLADES*                    253

| 1972 | 143.1 | 76.69% | 109.5 | 60.60% | 5.5 | 61.80% |
|------|-------|--------|-------|--------|-----|--------|
| 1973 | 159 | 80.14% | 99.4 | 54.29% | 4.9 | 52.69% |
| 1974 | 198.7 | 92.76% | 130.8 | 62.49% | 5.6 | 57.73% |
| 1975 | 269.4 | 116.57% | 130.3 | 59.02% | 6.2 | 64.58% |
| 1976 | 285 | 122.21% | 132.7 | 66.58% | 4.2 | 47.73% |
| 1977 | 286.9 | 116.15% | 124.1 | 65.08% | 5.1 | 57.95% |
| 1978 | 325 | 123.00% | 131.1 | 66.96% | 5 | 55.56% |
| 1979 | 366.2 | 128.04% | 130.6 | 66.70% | 4.2 | 43.30% |
| 1980 | 291.4 | 97.62% | 152.4 | 69.78% | 5.1 | 50.00% |
| 1981 | 251.9 | 86.84% | 180.6 | 69.90% | 4.4 | 44.90% |
| 1982 | 260.6 | 90.11% | 167.3 | 70.06% | 5.1 | 56.04% |
| 1983 | 273 | 97.78% | 170.3 | 75.12% | 4.1 | 49.40% |
| 1984 | 287.8 | 99.17% | 168.6 | 81.96% | 4.8 | 60.76% |
| **1985** | **310.1** | **102.38%** | **185.6** | **88.68%** | **4.7** | **58.75%** |
| 1986 | 286.1 | 82.35% | 205.9 | 91.10% | 6.6 | 76.74% |
| 1987 | 292.2 | 83.18% | 196 | 91.89% | 5.6 | 67.50% |
| 1988 | 307.2 | 82.98% | 193 | 86.90% | 5.1 | 60.00% |
| 1989 | 315.4 | 82.27% | 151.8 | 64.79% | 4.8 | 55.17% |
| 1990 | 311.8 | 73.52% | 144.3 | 56.30% | 3.8 | 40.43% |
| 1991 | 301.5 | 69.58% | 150.1 | 55.04% | 4.6 | 46.94% |
| 1992 | 313.5 | 70.96% | 151.4 | 57.41% | 4.7 | 50.54% |
| 1993 | 323.7 | 73.52% | 129.6 | 50.63% | 4.6 | 48.42% |
| 1994 | 337.2 | 78.86% | 138.2 | 58.12% | 4.9 | 54.44% |
| 1995 | 355.8 | 85.06% | 137.9 | 62.43% | 4.1 | 50.00% |
| 1996 | 318.6 | 81.50% | 122.2 | 60.53% | 4 | 54.05% |
| 1997 | 295.1 | 77.23% | 117.5 | 63.10% | 2.9 | 42.65% |
| 1998 | 268.5 | 74.48% | 105.2 | 63.56% | 3.8 | 60.03% |
| 1999 | 252.6 | 75.56% | 86.2 | 57.43% | 2.7 | 47.37% |
| 2000 | 229.9 | 70.96% | 84.4 | 58.21% | 2 | 36.36% |

TABLE 5A: AGGRAVATED ASSAULT AND ROBBERY IN OREGON AS A
PERCENT OF NATIONAL AVERAGE RATE 1971–2000



### 1. Aggravated Assault

From 1975 through 1983, the rate of aggravated assault in Oregon was 289.9 per 100,000 inhabitants. From 1985 through 1990, the rate of aggravated assault rose 4.8% to 303.8 per 100,000. However, during this same period, the national rate of aggravated assault rose 35.3% (from 268.4 from 1975 through 1983, to 363.2 for 1985 through 1990). In the five years prior to the legalization of switchblades in Oregon, the assault rate was 94.3% of the national average, and in the five years following legalization, it declined to 86.6% of the national average. The ten year trends are even more striking. In the ten years following legalization, the aggravated assault rate in Oregon dropped to 79.96% of the national average, and continued to fall. In the ten years prior to legalization, the aggravated assault rate in Oregon was 107.75% of the national average. Thus, we see a significant decline in the Oregon aggravated assault rate in the decade following legalization, and this trend has continued ever since.

### 2. Robbery

The numbers for robbery tell a slightly different story, and are not as clear cut as the assault numbers. In the five years prior to legalization, the robbery rate in Oregon was 73.36% of the national average, and in the ten years prior to legalization, the rate was 69.12% of the national average. In the five years after legalization, the Oregon robbery rate increased to 84.67% of the national average, which is clearly a significant increase. However, in the following years, the robbery rate plummeted, and in the ten years following legalization the robbery rate was 70.09% of the national average. Thus, while there was a short term rise in robberies in the four years from 1985 through 1988, robberies fell hugely in 1989 and have remained well below the national average ever since. Moreover, looking at the robbery numbers for the 1980s, we see a clear trend. From 1979 through 1984, Oregon robberies rose each year from 67% to 82% of the national average. This trend continued through 1987 when it peaked at 92% of the national average, and then began to decline rapidly. Thus, the increase in the years immediately following legalization can be explained as part of a trend that preexisted the 1984 legalization decision. More convincing, however, is the long term trend which has seen almost thirty years of robbery rates well below the national average.

### 3. Homicide

In the five years prior to legalization, the Oregon murder rate was 52.22% of the national average. In the five years following, the murder rate increased to 63.63%; however, in the next five years, the murder rate fell to 48.15% of the national average.

**KnifeRights MSJ App.000603**
**KnifeRights MSJ App.000603**

Following within a year or two of the legalization of switchblades in Oregon, there was a substantial decrease in the rate of violent crime. Whether this decrease can be traced to legalization is questionable, but it certainly is not the result we would expect if switchblades contribute to violent crime. Because the legalization of switchblades should not affect non-violent crime, the rise or fall of non-violent crime should be independent of knife crimes. If non-violent crime were falling or remaining even during a period of time that violent crime was increasing, then this would suggest something other than just a general increase in criminal activity is responsible for the rise in violent crime. On the other hand, if non-violent crime rises and falls proportionately to violent crime, this suggests that both categories of crime are being influenced by the same factors. In other words, factors such as incarceration rates would be expected to influence both the violent and non-violent crime rates, while weapons laws should only affect the violent crime rate.

In fact, if we look at the non-violent crime rate in Oregon, we see that non-violent crime was low in the early 1980s, followed by a peak in 1988, and falling off sharply thereafter. See Table 6.

TABLE 6: RATE OF PROPERTY CRIME IN OREGON (PER 100,000) 1971–2000



Thus, the story for property crime as well as violent crime tells a consistent story. Property crime peaked in 1988, aggravated assault as a percent of the national average peaked in 1985, and the armed robbery and murder rates in Oregon in absolute terms (not as a percent of the national average) both peaked in 1986. Thus, both property and violent crime began to fall in the late 1980s, although it is significant for our study that

violent crime began to decline before property crime, again a surprising result if switchblades contribute to violent crime.

Of course, to put these declines in proper perspective, we need to see if there are other factors that explain Oregon's reduction in crime in the late 1980s. Crime across the country declined dramatically beginning in the early 1990s, for reasons which are still hotly debated by criminologists.[149] The reduction in crime in Oregon appears to have presaged a reduction across the country, but it began several years earlier in Oregon. Unfortunately, there is no clear reason why this occurred. Of the various reasons suggested for reduction in crime nationally, none of them seem to apply in Oregon. Marvel and Moody, for example, have argued that having more police prevents crime.[150] But the number of police compared to the population in Oregon remained constant from 1986 to 1994, at 1.6 per 1000 residents.[151] Another factor suggested by criminologists is the incarceration rate.[152] Yet while the incarceration rate in Oregon increased rapidly in 1990 and following years, the incarceration rate was relatively constant through the 1980s, meaning this is not a plausible explanation for the sudden decrease in the mid 1980s.[153] Donohue and Levitt have argued that abortion rates have affected crime by reducing the highest criminal cohorts, pointing out that the five states that legalized abortion in 1969 or 1970 saw declines before the declines in crime began nationally.[154] But Oregon was not one of the five states to legalize abortion early, and by Donohue and Levitt's own terms, this should not have affected the crime rate in Oregon. Lott and Mustard have argued that liberalization of concealed carry laws in Oregon helped reduce crime, but the shall-issue laws in Oregon came into effect in 1990, several years after the decline began.[155]

Finally, some writers have suggested a link between crime and the

---

[149] Stephen D. Levitt, *Understanding Why Crime Fell in the 1990s: Four Factors that Explain the Decline and Six that Do Not*, 18 J. OF ECON. PERSP., NO. 1, 163–90 (Winter 2004).

[150] Thomas B. Marvell & Carlise E. Moody, *supra* note 140, at 609–46.

[151] Criminal Justice Comm'n, *Public Safety Plan* 17 (Mar. 2001), *available at* http://perma.cc/L92G-W9CN; Oregon Annual Crime Report, 1995 at 7–3, http://perma.cc/3GY3-BH8N.

[152] *See* Steven D. Levitt, *The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation*, 111 THE Q. J. OF ECON. NO. 2 (1996).

[153] *Public Safety Plan*, supra note 151, at 37–38. Oregon adopted sentencing reform in November 1989 that caused incarceration rates to rise thereafter.

[154] John J. Donohue & Steven D. Levitt, *The Impact of Legalized Abortion on Crime*, 116 THE Q. J. OF ECON. NO. 2, 379, 395 (2001). The five early legalization states were Alaska, California, Hawaii, New York and Washington. Moreover, Oregon had both a lower abortion rate and a greater reduction in crime from 1985 to 1997 than either of its neighbors California and Washington. *Id.* at 398.

[155] John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LEGAL STUD. 1 (1997).

**KnifeRights MSJ App.000605**
**KnifeRights MSJ App.000605**

economy.[156]  If we look at Oregon unemployment rates, the unemployment rate peaked in Oregon in the winter of 1982 to 1983 at 21.1%.  As crime continued to increase from 1982 through 1986 as the unemployment rate was falling, there appears to be no correlation between unemployment and crime in Oregon.[157]  Accordingly, the reason for the decrease in crime in Oregon in the mid 1980s appears to be even more of a mystery than the nationwide decrease in crime.  In fact, the Oregon Supreme Court's rulings on knives appear to be one of the few important changes in Oregon law in the mid 1980s.  Obviously, this does not prove that the introduction of switchblades caused the reduction in crime, but we see no major changes in Oregon that would compensate for the introduction of switchblades, assuming such introduction was a problem.

In addition to the overall crime rates, we also have statistics on the rate at which knives were used in violent crime in Oregon.  The rate of knife use in assault and robbery in Oregon follows the same pattern noted for the overall crime rate.  The rate of knife assault in Oregon peaked in 1985 at 58.3, while the rate of robbery using a knife peaked in 1986 at 29.1.  As a percent of the national average, knife robbery peaked a year later in 1987.  In the following years, the rate of knife use in assault declined slightly, while the rate of knife use in robbery declined markedly.  The rate of knife use in assault and robbery is shown in Table 7.

TABLE 7: AGGRAVATED ASSAULT AND ROBBERY USING FIREARMS AND KNIVES IN OREGON 1975–1993

| Year | % Agr Assault w/ Firearm | % Agr Assault w/ Knife | Rate of Assault w/ Knife | Knife Rate as % of National | % Robbery w/ Firearm | % Robbery w/ Knife | Rate of Robbery w/ Knife | Knife Rate as % of National |
|---|---|---|---|---|---|---|---|---|
| 1975 | 15.98% | 14.55% | 39.1 | 71.99% | 43.00% | 9.53% | 12.4 | 45.29% |
| 1976 | 16.32% | 13.08% | 37.0 | 67.52% | 41.86% | 11.43% | 15.2 | 58.66% |
| 1977 | 16.32% | 13.08% | 38.0 | 66.32% | 39.43% | 11.61% | 14.3 | 56.81% |
| 1978 | 15.61% | 13.61% | 43.9 | 74.12% | 39.35% | 13.32% | 17.4 | 69.96% |
| 1979 | 15.37% | 13.21% | 48.0 | 74.59% | 40.22% | 12.86% | 16.8 | 58.27% |
| 1980 | 19.08% | 14.23% | 41.0 | 61.05% | 40.44% | 12.16% | 18.5 | 57.10% |
| 1981 | 21.24% | 17.61% | 44.4 | 69.76% | 36.97% | 11.88% | 21.5 | 63.52% |
| 1982 | 20.09% | 17.85% | 46.5 | 69.35% | 36.10% | 12.02% | 20.1 | 61.88% |
| 1983 | 18.98% | 16.75% | 46.0 | 68.88% | 33.62% | 11.02% | 18.9 | 64.13% |
| 1984 | 18.72% | 18.37% | 52.9 | 78.46% | 30.95% | 11.87% | 20.1 | 72.93% |
| **1985** | 20.26% | 18.70% | 58.3 | 84.48% | 30.64% | 13.20% | 24.6 | 88.36% |
| 1986 | 19.20% | 19.54% | 55.6 | 72.75% | 32.34% | 14.16% | 29.1 | 95.38% |
| 1987 | 19.18% | 17.81% | 51.8 | 68.59% | 34.42% | 14.30% | 28.2 | 97.75% |
| 1988 | 22.04% | 17.29% | 52.9 | 69.33% | 34.37% | 14.21% | 27.4 | 90.70% |
| 1989 | 22.57% | 17.81% | 57.3 | 75.87% | 31.24% | 14.30% | 22.1 | 70.38% |
| 1990 | 20.52% | 17.50% | 54.5 | 66.08% | 28.64% | 13.45% | 19.5 | 63.39% |

[156] *See* Levitt, *supra* note 150, at 163.

[157] *See Historical State Unemployment Rates Since 1976*, http://perma.cc/N7PR-2YDJ (last visited Feb. 26, 2014).

| 1991 | 20.67% | 18.31% | 50.1 | 62.82% | 28.96% | 12.70% | 17.2 | 57.33% |
| 1992 | 22.32% | 17.62% | 52.1 | 64.78% | 30.47% | 13.30% | 19.9 | 71.20% |
| 1993 | 24.01% | 16.28% | 55.1 | 71.07% | 32.49% | 11.84% | 16.8 | 65.63% |

TABLE 7A: AGGRAVATED ASSAULT AND ROBBERY USING FIREARMS AND
KNIVES IN OREGON 1975–1993



The rate of knife use in armed robbery is particularly striking. The use of knives in armed robbery increased quite dramatically, in the late 1970s and early 1980s, remaining high until 1988 when the knife-involved robbery rate fell sharply. So the rate of knife robbery and the percentage of robberies committed with knives was significantly higher in the four years following legalization of switchblades. In itself, this would suggest that legalization may have led to greater use of knives in robbery. However, the large declines in the rate of knife robbery in the following years suggests that legalization did not have such an effect, as it is hard to imagine why the effect of legalization would be only temporary.

Once again, we see a general correlation between use of knives and guns in armed robbery.[158] The rate of gun use in robbery declined from

---

[158] For nineteen years, from 1975 through 1994, in twelve of those years, the percentage of knives and guns used in armed robbery were inversely correlated (i.e. one moved down when the other moved up). In five years (1981, 1983, 1987, 1988, and 1990) both declined, while in 1986 and 1992 both went up. It is reasonable to assume that the substitution effect is stronger with respect to robbery than for assault, because robberies are more likely to be planned.

KnifeRights MSJ App.000607

about 40% in the 1970s to about 30% in the mid 1980s and early 1990s Accordingly, part of the reason for the increase in knife use in the mid 1980s is the reduction in the use of firearms and their replacement with knives.  What is most surprising is that in the late 1980s and early 1990s, the use of knives in robbery decreased, while the use of guns in robbery did not increase.  So, for example, from 1975 through 1980 the rate of armed robbery using either a knife or a gun was always above 50% (averaging about 52%), while in the 1990s the rate of robbery with a knife or gun had declined to about 43%.  Assuming there is a substitution factor between knives and guns, the temporary increase in the rate of knife use in robbery might be explainable if criminals in Oregon were having trouble obtaining firearms.  Even if we assume the substitution effect was that fewer criminals used guns because switchblades were more readily available, that is not necessarily a bad effect, as most people consider guns to be more dangerous than knives.

If we look at the numbers for aggravated assault, in the four years preceding the legalization of switchblades, knives were used in 17.65% of aggravated assaults.  In the four years following legalization, the rate of knife use in assault rose slightly to 18.34% of assaults.  Not only is the increase very modest, but it is consistent with the ten year trend which showed a rise in knife use.

As a percentage of the national average, the rate of assault with knives in the ten years prior to 1985 was 70.2%, while in the following nine years the average very slightly increased to 70.64%.  The assault rate with knives was 71.61% of the national average in the four years prior to 1985 and 73.79% of the national average in the four years following legalization. This is a small increase, but this is entirely attributable to one year, 1985, in which the rate peaked as a percent of the national average at 84.48%.  In fact, both 1984 and 1985 saw significant increases in the rate of knife use in assault, which suggests that the increase in 1985 was part of a trend unrelated to legalization.  It seems likely that the supply of switchblades in Oregon in 1985 was fairly low.  With the exception of a slight two-year blip in 1984 and 1985, the rate of knife assault as a percent of the national average was consistently around 70% from 1975 through 1993.

It is also interesting to compare the rate of knife and gun use in assaults.  We see less of a replacement correlation with assault than we saw with other crimes.  This makes sense because many assaults will be spontaneous and unplanned using whatever weapon happens to be available.  The numbers from Oregon show a steady increase in the rate of assault with both guns and knives between 1975 and 1986.  From 1987 through 1993, the knife rate decreased slightly while the gun rate for assault increased slightly.  One way to explain the increase in the rate of gun use in assaults is that more criminals carry guns in response to more law abiding citizens carrying switchblades.  We could imagine a kind of

personal arms race: if switchblades are legal, perhaps more criminals will resort to firearms. While this is a theory to be examined for other states, in Oregon, the data provides minimal support for this theory. What the trends in Oregon seem to show is that there was a general increase in the use of both guns and knives for many years prior to 1985. Moreover, 1986 and 1987 actually show a slight decrease in the rate that firearms were used in crime. Thus, we see no correlation between legalization of switchblades and the increase in gun use in assault.

The Oregon data suggests that the legalization of switchblades did not cause an increase in violent crime. The data is somewhat mixed for the first couple of years following legalization, but by the late 1980s and early 1990s, we see a clear decrease in violent crime overall, and a clear decrease in the rate of knife use in violent crime. Thus, the Oregon experiment indicates that the legalization of switchblades did not cause an increase in violent crime.

### B. Florida

In 1985, the Florida legislature passed a statute providing as follows:

> It is unlawful for any person to manufacture, display, sell, own, possess, or use a ballistic self-propelled knife which is a device that propels a knifelike blade as a projectile and which physically separates the blade from the device by means of a coil spring, elastic material, or compressed gas.[159]

On its face, this does not appear to describe or apply to switchblades, but rather ballistic knives; that is, an object that shoots a knifelike blade. Indeed, according to the chief sponsor of this legislation in 1985, it was intended to cover objects that shot knife blades up to 35 feet.[160] Switchblades do not usually use a "coil spring," certainly not "elastic material," nor "compressed gas," from which the statute seems clearly to be referring to a spear-gun-like mechanism.[161]

---

[159] FLA. STAT. § 790.225 (1985).

[160] *See* House of Representatives Staff Analysis of HB 1227 at 2, *available at* http://perma.cc/5UMX-8MWN 9 (last visited Feb. 26, 2014).

[161] *See generally* State v. Darynani, 774 So. 2d 855 (Fla. Dist. Ct. App. 2000). Although the Florida Court of Appeals in *Darynani* asserted that "It is common knowledge that a switchblade operates on a coil spring or other device that springs the blade out from the handle or casing," in fact, most switchblades use a leaf spring, not a coil spring. *See Switchblade Knife LEAF SPRINGS,* http://perma.cc/AC39-57F4 (last visited Feb. 26, 2014). However, some traditional switchblades do not use a coil spring. *Switchblade Knife COIL SPRINGS,* http://perma.cc/YAF5-SRBZ (last visited Feb. 26, 2014). Ballistic knives, however, use a coil spring or sometimes compressed gas. *Ballistic*

It is not entirely clear when the state began using this statute to prosecute people for possession of switchblades, but in 2000 Pariya Darynani was prosecuted for selling switchblades at a flea market.[162] Darynani argued that the statute did not cover switchblades.[163] The trial court ruled that they did not know exactly what the statute covered so any prosecution under the statute was unconstitutional because it did not give owners of switchblades fair notice that such objects are illegal.[164] The Court of Appeals in a unanimous, per curiam decision, reversed the trial court, declaring that "it seems apparent the Legislature intended to distinguish switchblade knives from folding-type knives that require manual and deliberate removal of the knife blade from the handle or casing."[165] As a result, the court interpreted the statute to ban all switchblades, including knives equipped with a leaf spring, and the court's language could even be interpreted to ban gravity knives, although there are no reported cases of prosecution for gravity knives in Florida.

In 2003, the Florida legislature amended the statute to clarify that the projectile in question must physically separate from the knife, thereby legalizing switchblades.[166] The bill was passed unanimously by both houses of the legislature and signed by the governor in June of 2003.[167] The statute now reads: "This section shall not apply to: (a) Any device from which a knifelike blade opens, where such blade remains physically integrated with the device when open."[168]

Aside from once again illustrating that courts and citizens do not know what to make of such statutes, the benefit of this story for a researcher is that we have a clear date at which switchblades were legalized. Although it is unclear how many prosecutions there were under this statute or when they began precisely, spring-operated switchblades were clearly illegal between the time the Court of Appeals ruled in 2000 and the legislature changed the law in 2003. Other than apparently not being able to carry a concealed switchblade, there are no other restrictions on adults owning or

---

*Knife*, WIKIPEDIA, Feb. 12, 2014 5:45PM, http://perma.cc/S6MJ-3EB6. There is no indication that the knife in the *Darynani* case had a coil spring.

[162] *Darynan,i* at 857–58 (Fla. Dist. Ct. App. 2000).

[163] *Id.*

[164] *Id.* at 857. In legal terms, he argued that the statute was unconstitutionally vague.

[165] *Id.* at 858. The Court did not look at legislative history which might have resolved this issue. A per curiam opinion (literally "by the court") means the opinion was unsigned and usually means the court did not take the argument very seriously and could dismiss it without much discussion. Had they checked the legislative history the meaning of the statute would have been clear.

[166] *House of the Rep. Staff Analysis of HB 1227, available at* http://perma.cc/QDU4-U5QK (last visited Feb. 26, 2014).

[167] *Id.*

[168] FL. STAT. § 790.225 (2013).

KnifeRights MSJ App.000610
KnifeRights MSJ App.000610

carrying switchblades in Florida.[169]   There are a number of Florida switchblade manufacturers, making them common in that region.[170]

Of course, one could argue that the 2003 legalization might not be expected to do very much—the statute never covered "gravity knives." Without including gravity knives, a switchblade ban might be ineffective.

In any event, Florida showed a clear decline in knife use in both armed robbery and assault following the legalization of traditional switchblades in 2003.  The rates from 1995 to 2011 are shown in Table 8 below.

TABLE 8: FLORIDA CRIME RATE 1995–2011

| Year | Ag Assault | Ag As as % national ave. | Robbery | Rob. as % national ave. | Homicide | Homicide as % national ave. |
|---|---|---|---|---|---|---|
| 1995 | 715.1 | 170.95% | 299.9 | 135.76% | 7.3 | 89.02% |
| 1996 | 702.2 | 179.59% | 289.2 | 143.24% | 7.5 | 101.35% |
| 1997 | 688.7 | 180.24% | 276.1 | 148.28% | 6.9 | 101.47% |
| 1998 | 639.9 | 177.06% | 242.7 | 146.65% | 6.5 | 103.17% |
| 1999 | 590.5 | 176.64% | 211.6 | 140.97% | 5.7 | 100.00% |
| 2000 | 563.2 | 173.83% | 199.0 | 137.24% | 5.6 | 101.82% |
| 2001 | 551.7 | 173.16% | 200.7 | 135.15% | 5.3 | 94.64% |
| 2002 | 530.1 | 171.28% | 195.2 | 133.61% | 5.5 | 98.21% |
| **2003** | **500.6** | **169.47%** | **185.4** | **130.11%** | **5.4** | **94.74%** |
| 2004 | 495.8 | 171.79% | 172.5 | 126.19% | 5.4 | 98.18% |
| 2005 | 497.2 | 170.98% | 169.6 | 120.45% | 5.0 | 89.29% |
| 2006 | 485.6 | 168.90% | 188.8 | 126.37% | 6.2 | 108.77% |
| 2007 | 473.2 | 166.74% | 209.1 | 141.67% | 6.6 | 117.86% |
| 2008 | 449.7 | 162.52% | 196.9 | 135.14% | 6.3 | 116.67% |
| 2009 | 410.6 | 155.12% | 166.7 | 125.24% | 5.5 | 110.00% |
| 2010 | 369.8 | 146.57% | 138.7 | 116.46% | 5.2 | 108.33% |
| 2011 | 348.0 | 142.92% | 134.4 | 114.77% | 5.2 | 107.50% |

Violent crime was declining throughout this period both in Florida and nationally.  However, in the years 1995 through 2003, the decline in violent crime in Florida basically kept pace with the national decline, and in the years 2004 through 2011, there was a clear decrease in both aggravated assault and robbery as a percent of the national average.  Interestingly, there was an increase in the murder rate of about 8% compared to the national average, which was about the same rate of decrease for aggravated assault and robbery.

---

[169] Other than what the statute calls a "common pocketknife," all other knives are treated equally. FL. STAT. 790.001 (2013).  Unlike many states where switchblades are *per se* "deadly weapons" they are not treated as such in Florida.

[170] Microtech Knives was established in 1994 in Vero Beach, Florida and advertises a wide variety of military style switchblades.  *History*, MICROTECH, http://perma.cc/3DV2-E4PX (last visited Mar. 1, 2014).

TABLE 9: VIOLENT CRIME IN FLORIDA AS A PERCENT OF NATIONAL AVERAGE

|  | Aggravated assault | Robbery | Homicide |
|---|---|---|---|
| 1995-2002 average | 175.34% | 140.11% | 98.71% |
| 2004-2011 average | 160.69% | 125.79% | 107.08% |

TABLE 10: RATE OF PROPERTY CRIME IN FLORIDA (PER 100,000) 1995–2011



TABLE 11: FLORIDA AGGRAVATED ASSAULT USE OF FIREARMS AND KNIVES BY PERCENTAGE 1995–2011

| Year | Ag Assault w/ Firearm | Ag Assault w/ Knife | Ag Assault w/ Knife as % of National | Robbery w/ Firearm | Robbery w/ Knife | Rob. w/ Knife as % of National |
|---|---|---|---|---|---|---|
| 1995 | 21.9 | 19.4 | 106.01% | 38.9 | 6.6 | 72.53% |
| 1996 | 23.8 | 19.1 | 105.52% | 40.8 | 8.2 | 91.11% |
| 1997 | 20.7 | 18.3 | 102.23% | 40.8 | 7.3 | 85.88% |
| 1998 | 17.4 | 18.4 | 100.00% | 39.5 | 6.8 | 77.27% |
| 1999 | 15.3 | 18.5 | 103.93% | 38.0 | 6.9 | 82.14% |
| 2000 | 14.0 | 18.6 | 103.33% | 37.5 | 7.1 | 84.52% |
| 2001 | 14.1 | 18.3 | 102.81% | 39.0 | 7.3 | 83.91% |
| 2002 | 14.7 | 17.8 | 100.00% | 39.0 | 7.3 | 83.91% |
| **2003** | **15.1** | **18.0** | 98.90% | **39.0** | **7.0** | 78.65% |
| 2004 | 15.7 | 17.8 | 95.70% | 38.3 | 7.5 | 84.27% |
| 2005 | 17.1 | 17.8 | 94.18% | 39.7 | 7.4 | 84.09% |
| 2006 | 18.3 | 17.7 | 94.65% | 42.0 | 6.9 | 80.23% |
| 2007 | 20.2 | 17.9 | 95.21% | 46.9 | 6.7 | 80.72% |
| 2008 | 20.2 | 17.7 | 93.65% | 46.7 | 6.3 | 81.82% |
| 2009 | 19.8 | 17.0 | 90.91% | 44.2 | 6.3 | 81.82% |
| 2010 | 19.2 | 17.8 | 93.68% | 42.6 | 6.6 | 83.54% |
| 2011 | 19.8 | 17.5 | 91.62% | 42.0 | 6.2 | 79.49% |

TABLE 11A: AGGRAVATED ASSAULT AND ROBBERY IN FLORIDA AS A
PERCENT OF NATIONAL AVERAGE 1995–2011



 Florida shows a clear decline in knife use for armed robbery and assault, both in the rate per 100,000 and as a percent of the national average.

 With respect to aggravated assault, in the eight years prior to 2003 the average rate of knife use was 18.55%, and in the eight years after it was 17.64% (a decline of 4.9%). With respect to robbery, in the eight years prior to 2003 the rate of knife use was 7.19%, and in the eight years after it was 6.74% (a decline of 6.3%).[171] These decreases are not huge, to be sure, and they are accompanied by an increase in the use of firearms. One explanation for the decrease in knife use as a percentage of crime is that criminals had wider access to firearms and preferred firearms to knives, switchblade or not. Certainly the numbers indicate that wider availability of switchblades in Florida did not lead to wider use of knives in violent crime.

 Moreover, the percentage at which knives were used in robbery and assaults in Florida is well below the national average. The national average of cutting instruments used in aggravated assaults was 18.84% between 2004 through 2011, while in Florida it was 17.64%. Between 1995 and 2002, on average knives in the United States were used in

---

[171] If we used 2001 through 2003 as the comparison years (because of uncertainty regarding how strenuously the law was enforced prior to 2000), the numbers would be virtually identical and show a slight decline.

18.01% of aggravated assaults. The 4.9% drop in knife usage in Florida in the eight years following legalization is all the more dramatic when noting that nationally, knife use in aggravated assaults actually increased by about 5%. To put this in further perspective, it should be noted that gun use in aggravated assaults in Florida rose from 17.74% in the eight years before legalization to 18.9% in the years following, although this rise was almost identical to the rise seen on the national level over the same period (which rose from 19.64% to 20.7%). Thus, when compared to the national average, we see the rate of gun usage in aggravated assault remaining about the same but a significant decrease in use of knives. This is surely not the result one would expect if switchblades were heavily used in violent crime.

The national average for use of cutting instruments in robbery between 2004 and 2011 was 8.21%, while in Florida the rate was only 6.74%. In contrast, the rate of gun usage in Florida is only slightly higher than in the United States as a whole, 42.8% compared to 42.06% between 2004 and 2011. Although it should be noted that the rate of knife-involved robbery in Florida has been constantly lower than the national average, which has also been declining. The national rate of knife usage in robbery between 1995 and 2003 averaged 8.72%. Thus, the national average declined 5.8% while Florida declined 6.3%, just barely beating the national average. Using the national average as a comparison, the decline in use of knives in Florida robberies suggests that the legalization of switchblades had little effect on the use of knives in robbery.

*C. New Hampshire*

Although New Hampshire legalized switchblades only in May of 2010,[172] it presents something of a unique case that makes it worthwhile to examine, despite limited data. For one thing, the Northeast consistently has higher rates of knife use in violent crime than other parts of the country.[173] While the reasons for this are not entirely clear, two factors are clearly relevant. Most states in the Northeast have strict gun control, and these laws may have made it more difficult for criminals to acquire guns, and therefore they turn to knives as an alternative. Conversely, the lower overall ownership of firearms in the northeast means that victims of crime are less likely to be armed with a gun, and therefore criminals may not

---

[172] H.B. 1665-FN, (N.H. 2010), *available at* http://perma.cc/7YZ-AL5Y.

[173] In 2012, for example, the Northeast region, as defined by the FBI Uniform Crime Reports, showed that knives were used in 15.4% of homicides; in 22.7% assaults; and in 10.1% robberies. All three categories were higher than the other three regions (South, Midwest, and West). *See Uniform Crime Reports (2012)*, FBI, *available at* http://perma.cc/6UAQ-8FDV (last visited Mar. 6, 2014). Prior year UCR report similar results. *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/3F3E-G4GK (last visited Mar. 6, 2014).

**KnifeRights MSJ App.000614**
**KnifeRights MSJ App.000614**

think they need more powerful weapons.  The second factor is that there appears to be a long culture of knife use in northeastern cities such as New York, Boston, and Philadelphia.

New Hampshire, like other northeastern states, has knife crime rates that are much higher than the national average.  Thus, in many ways, New Hampshire is the polar opposite of Oregon.  Oregon never seems to have had a serious problem with knife crime, and so legalization of switchblades in Oregon may be expected to have little effect on crime.  In the northeast, where knife use is more prevalent, we would expect to see a greater effect on crime rates from legalization.

The New Hampshire Act became effective May 18, 2010.[174]  The new statute not only repealed the provision prohibiting possession of a switchblade, but also removed any restriction on carrying concealed knives.[175]  It should also be noted that in 2011, the legislature passed a further provision which prevented any local government from restricting knives.[176]  There are a number of companies in New Hampshire that are advertising switchblades for sale.[177]

In the short time since the legalization of switchblades and the end of all restrictions on knife carry, knife violence in New Hampshire has shown a marked decline, although violent crime and property crime have risen.

Table 12 shows the crime rate in New Hampshire from 2001 through 2012.  Tables 14 and 15 show the rate of knife violence in assaults and robberies from 2005 through 2012.

TABLE 12: NEW HAMPSHIRE ASSAULT AND ROBBERY RATES 2001–2012

| Year | Ag Assault | Ag Assault as % of National | Robbery | Robbery as % of National |
|------|-----------|-----------------------------|---------|--------------------------|
| 2001 | 97.2 | 30.51% | 35.3 | 23.77% |
| 2002 | 93.0 | 30.05% | 32.4 | 22.18% |
| 2003 | 77.8 | 26.34% | 37.2 | 26.11% |
| 2004 | 93.8 | 32.50% | 38.5 | 28.16% |
| 2005 | 74.3 | 25.55% | 27.9 | 19.82% |
| 2006 | 93.9 | 32.66% | 34.7 | 23.23% |
| 2007 | 82.8 | 29.18% | 33.4 | 22.63% |
| 2008 | 97.5 | 35.24% | 32.1 | 22.03% |
| 2009 | 95.2 | 35.97% | 34.3 | 25.77% |
| 2010 | 100.4 | 39.79% | 34.3 | 28.80% |
| 2011 | 118.2 | 49.03% | 36.0 | 31.66% |
| 2012 | 118.7 | 48.15% | 38.9 | 33.45% |

---

[174] H.B. 1665-FN, (N.H. 2010), *available at* http://perma.cc/7YZ-AL5Y.

[175] Felons are still prohibited from carrying any concealed weapon, however.

[176] H.B. 544 (N.H. 2011), *available at* http://perma.cc/99AK-MH8D.

[177]   White Mountain Knives, in Barrington, advertises a small selection of switchblades. WHITE MOUNTAIN KNIVES, http://perma.cc/D6TA-S9W3 (last visited Feb. 19, 2014).  Highlander Arms in Spofford advertises it is a distributor of Benchmade knives. HIGHLANDER ARMS, http://perma.cc/5X3C-V3MY (last visited Feb. 19, 2014).

**KnifeRights MSJ App.000615**
**KnifeRights MSJ App.000615**

TABLE 13: NEW HAMPSHIRE PROPERTY CRIME RATE PER 100,000 2005–2011



We see a small but steady increase in property crime in New Hampshire between 2005 and 2011. This suggests that part of the increase in violent crime is explained by the same causes of the increase in property crime. While the robbery rate increase is consistent with the increase in property crime, the rate of increase in aggravated assaults for 2011 is substantially higher than the increase in property crime.

TABLE 14: NEW HAMPSHIRE USE OF KNIVES OR CUTTING INSTRUMENTS IN AGGRAVATED ASSAULT 2005–2012

| Year | Total Ag Assaults in NH | Ag Assaults w/ Gun | Ag Assaults w/ Knife | % of Ag Assaults w/ Knife | % of National |
|------|------|------|------|------|------|
| 2005 | 825 | 112 | 286 | 34.7% | 183.60% |
| 2006 | 884 | 140 | 309 | 35% | 187.17% |
| 2007 | 713 | 130 | 233 | 32.7% | 173.94% |
| 2008 | 1,023 | 167 | 343 | 33.6% | 177.78% |
| 2009 | 1,151 | 191 | 392 | 34% | 181.82% |
| **2010** | **1,220** | **202** | **401** | **32.9%** | **173.16%** |
| 2011 | 1,435 | 171 | 409 | 28.6% | 149.74% |
| 2012 | 1,386 | 177 | 406 | 29.3% | 156.35% |

Admittedly, two full years of data is of limited value statistically, but the first year of switchblade legalization in New Hampshire (2010) saw a decline in the rate of knife use in aggravated assaults. In the two following years, there was a dramatic decline in the rate at which knives were used in assaults. Between 2005 and 2009, knives or cutting instruments were used

**KnifeRights MSJ App.000616**
KnifeRights MSJ App.000616

in 34% of assaults. There was a slight decline in 2010, but in 2011 and 2012 the percentage was 28.95%, which is a drop of 15% in the rate at which knives were used in assaults over the prior five-year period. Surprisingly, there was also a significant decline in the use of firearms in assault in 2011 and 2012. The rate of knife use compared to the national average declined from 180.62% to 153.05% of the national average in the five years prior to 2011 and 2012. A decrease in the rate of both knives and guns in aggravated assaults in the two and a half years following legalization and concealed carry of all types of knives is certainly not what we would expect if switchblades were a serious criminal problem.

The New Hampshire numbers are particularly interesting because the overall assault rate in these years increased (actually doubling from 2007 to 2011), but the rate of knife assault has declined. On the one hand, it could be argued that if the overall assault rate increased, the experiment with legalizing switchblades was a failure, as the obvious goal is not just to reduce knife crime but to reduce all crime. In this instance, however, we can see that the crime rate was trending up prior to legalization, and nonviolent crime also rose, suggesting that legalization was probably not responsible for the increase of assaults. What is more interesting is that despite the fact that switchblades and other concealed knives were more prevalent on the streets of New Hampshire, this did not result in these knives being used more frequently in assault.

TABLE 15: NEW HAMPSHIRE USE OF KNIVES OR CUTTING INSTRUMENTS IN ROBBERY 2005–2012

| Year | Total Robbery in NH | Rob. w/ Guns | Rob. w/ Knife | % of Rob. w/ Knife | % of National |
|------|---------------------|--------------|---------------|--------------------|---------------|
| 2005 | 332 | 75 | 44 | 13.25% | 150.57% |
| 2006 | 380 | 75 | 72 | 18.95% | 220.35% |
| 2007 | 174 | 44 | 24 | 13.79% | 166.14% |
| 2008 | 353 | 76 | 48 | 13.60% | 176.62% |
| 2009 | 431 | 85 | 72 | 16.71% | 217.01% |
| 2010 | 427 | 94 | 50 | 11.71% | 148.10% |
| 2011 | 450 | 111 | 57 | 12.67% | 162.44% |
| 2012 | 454 | 104 | 65 | 14.32% | 184.06% |

With respect to armed robbery, we have a small sample size, and while the numbers are not as dramatic as for assault, there is a significant decrease in the rate of knife use in robberies. From 2005 through 2009, an average 15.26% of robberies used knives in New Hampshire. Obviously there was a huge decrease in 2010, but even 2011 and 2012 averaged 13.5%. As a percent of the national rate, New Hampshire averaged 186.14% from 2005 to 2009, and there is a clear decline in the use of knives in armed robbery following legalization.

**KnifeRights MSJ App.000617**
**KnifeRights MSJ App.000617**

TABLE 15A: NEW HAMPSHIRE KNIFE USE IN AGGRAVATED ASSAULT AND
ROBBERY AS A PERCENT OF NATIONAL AVERAGE 2005–2011



Again, with the caveat that two and half years is not a very large sample size, we see a clear decline in the rate of knife use in robbery and assault. Yet, at this same time there was a significant increase in overall crime as well as an uptick in the use of firearms used in robbery in 2010 and 2011. From 2005 through 2009, firearms were used 21.77% of robberies, and this percentage increased to 22.01% in 2010 and 24.67% in 2011. Although long-term trends remain unknown, this uptick in the use of firearms could be a result of the legalization of the possession and concealed carry of knives. If robbers are concerned that victims may be armed with knives, robbers may be arming themselves with guns in response. It is harder to explain the increase in crime as a reaction to the legalization of knives and concealed carry of knives. If the rate of knife usage declines, even if they are replaced by guns, there is no apparent reason that should increase in the total number of crimes.

Of course, it is entirely possible that the increase in crime in 2010 through 2012 is simply unrelated to the legalization of knives. This theory is supported by the fact that there was a trend of increasing assault and robbery in New Hampshire in the three years preceding the legalization, and there is a clear trend of increasing property crime during these years.

With respect to homicide, the number of murders each year in New Hampshire is so small that the statistics are not very useful. However, the reader may be interested to know that on average from 2005 through 2009 there were 12.2 homicides per year in New Hampshire and a knife was used in 31.15% of the cases. In 2010, the rate of knife use in murder in

New Hampshire increased to 38.46%, and in 2011 fell to 25.0%, and 21.4% in 2012.[178]

### D. Missouri

Missouri legalized switchblades in July 2012, but news accounts suggest people began purchasing switchblades in large numbers that year.[179]  We obviously have extremely limited data for Missouri, and while statistically these numbers are not worth much weight, the following table shows the crime rate for knife use in the Show-Me State for 2012 compared to earlier years.

TABLE 16: MISSOURI USE OF KNIVES OR CUTTING INSTRUMENTS IN CRIME[180]

|  | Ag Assault w/ Knife | Robbery w/ Knife | Murder w/ Knife |
|---|---|---|---|
| 2012 | 13.13% | 5.81% | 7.46% |
| Prior 5 years | 13.40% | 5.60% | 9.04% |

Again the reader is cautioned not to put much weight on these numbers, especially as one would not expect a partial year of legalization to have much effect.  Despite this, there is very little change in the knife use in assault or robbery, and while the rate of use in homicide is significant, there were only 29 knife murders in Missouri in 2012.

### E. Arizona

Before concluding this article, a brief comment on Arizona is in order. As noted earlier, Arizona legalized carrying any concealed weapon, either a firearm or anything else, without a permit.[181]  Although switchblades had been legal, this law made them easier to carry.  Therefore, this general concealed carry law only incidentally affected knife owners.[182]  Moreover, the effect on knife use seems likely to be overshadowed by the more significant change in permitting concealed carry of firearms without a permit.  Presumably, if a would-be criminal can legally carry a knife or a

---

[178] *Uniform Crime Reports 2012, Table 20*, FBI, *available at* http://perma.cc/CN9Y-U3Y5 (last visited Mar. 6, 2014).  While there was a decrease in the rate of knife use in homicide, the samples are so small, the author would not wish to place any emphasis on the murder rate.

[179] Michael D. Sorkin, *Pocket knife sales soar on renewed popularity*, ST. LOUIS POST DISPATCH, Dec. 30, 2012, *available at* http://perma.cc/5RSM-8DNP.

[180] Based on data from the Uniform Crime Reports, 2007–2012.  *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/V769-RLRM (last visited Mar. 1, 2014).

[181] Lacey, *supra* note 6, at 1; *see also* S.B. 1153 (Ariz. 2010), *available at* http://perma.cc/76LB-A8MP.

[182] *See* Kevin Kiley, *Arizona's concealed-weapon law takes effect*, ARIZ. REPUBLIC, Jul. 29, 2010, *available at* http://perma.cc/X3P8-PX2X.

**KnifeRights MSJ App.000619**
**KnifeRights MSJ App.000619**

gun, then he or she would choose the gun.  We would typically expect that if guns are more prevalent, then knife crime would tend to decrease anyway, so a decrease in knife crime may have more to do with an increase in gun carrying.  However, some people may be far more comfortable carrying a pocketknife—even a switchblade—than carrying a gun.  Thus, the law might have more effect on a knife-user than one would initially suspect.  At the end of the day, however, Arizona data is difficult to interpret given the context of the law change, which might have a very small effect on knife use.

That said, I present here limited data on Arizona crime comparing knife use in crime since 2010 with the prior five years, as shown in the table below.

TABLE 17: ARIZONA USE OF KNIVES OR CUTTING INSTRUMENTS IN CRIME[183]

|              | Ag Assault w/ Knife | Robbery w/ Knife | Murder w/ Knife |
|--------------|---------------------|------------------|-----------------|
| 2010-12      | 17.20%              | 9.94%            | 13.86%          |
| Prior 5 years| 17.06%              | 10.25%           | 11.72%          |

As can be seen, the effect on knife crime of the concealed weapons law on assault and on armed robbery appears quite small, with a very slight increase in knife use in assaults, and a small decrease in use of knives in robbery.  These numbers suggest the new law had little effect on knife use in crime, but this is somewhat surprising given the liberalization of firearm carrying laws.  One would expect to see a far larger decrease in armed robbery using knives if robbers are concerned about encountering armed citizens.  Even more surprising is the increase in knife use for murder after the new law.  One might have thought that the Arizona law would lead to an "arms race" where citizens and criminals become more heavily armed, but preliminary data suggests the law has not had that effect.

## VIII. CONCLUSIONS

It should be emphasized that conclusions at this point are preliminary and based on limited data.  As more data becomes available for New Hampshire and other states that have recently legalized switchblades, hopefully more definitive conclusions can be reached.  Proponents of banning switchblades predicted that the ban would reduce crime.[184]  Based

---

[183] Based on data from the Uniform Crime Reports, 2005–2012.  *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/73FQ-TFM7 (last visited Mar. 6, 2014).

[184] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 27 (statement by Mr. Pino, New York state senator).

on existing data there is no evidence that switchblade bans have had any significant effect either on crime overall, or on the use of knives in crime. After the widespread banning of switchblades in the United States in the late 1950s, violent crime skyrocketed.  After switchblades were legalized in Oregon and Florida, violent crime also fell.  This is particularly true with respect to aggravated assault where knives are far more common than in other types of violent crime.  The New Hampshire data is even more striking, because the use of knives in crime dropped significantly after legalization in a culture where knife use in crime was common, although the overall crime rate (both violent and non-violent) rose.

With respect to the rate at which knives have been used in violent crime, following the bans in the 1950s the use of knives in crime continued to increase, but the use of guns in crime increased even faster. Accordingly the decrease in the *percentage* of crimes committed with knives appears to be due to the increase in availability and use of firearms. Given the lack of solid data on the use of knives in crime during the 1950s, it is possible that the widespread criminalization of switchblades may have encouraged criminals to switch to guns.  That is, while the juvenile delinquent of the 1950s carried a switchblade, the juvenile delinquents of the 1960s and '70s were more likely to carry guns.

In all three states that legalized switchblades (Oregon, Florida, and New Hampshire), there was an overall decrease in the percentage of crimes committed with knives.  There are two theories with respect to these declines.  First, there may simply be no relationship between legalization and decreased rate of knife use in crime.  Under this theory, switchblade laws simply have no effect on criminal behavior.  An alternative theory however, is that if knives are more prevalent, would-be criminals will turn to guns in order to be more heavily armed than law-abiding citizens who now may arm themselves with knives.  The data from New Hampshire is consistent with this theory, although not conclusive given the limited data. In any event, there is no data showing that legalization of switchblades has caused any significant increase in the rate of knife use in crime.

The data is consistent with the observation of critics of bans that there is no practical difference between switchblades and other pocket knives.  If these knives have only cosmetic differences, it makes sense that banning them or legalizing them will have little to no effect on crime.[185] Furthermore, there is no evidence of any proxy effect or utility in crime fighting that might make cosmetic differences relevant.  That is to say, even cosmetic difference (like gang colors) might be a useful law

---

[185] Although strictly beyond the scope of this paper, this data suggest that whenever the government bans something which has readily available alternatives, or merely induces cosmetic changes to a product that there is unlikely to be any significant effect on human conduct.

**KnifeRights MSJ App.000621**
**KnifeRights MSJ App.000621**

enforcement tool for identifying criminals and ultimately fighting crime. Such circumstances would be difficult to document statistically. There is no doubt anecdotal evidence from law enforcement that have utilized switchblade laws to arrest suspects they "just knew were up to no good." But there is no evidence from the data on the states surveyed here that such laws have any significant effect on crime.

# EXHIBIT T

KnifeRights MSJ App.000623



# Antique American
# Switchblades

## Mark Erickson

## Identification & Value Guide

KnifeRights MSJ App.000624

# Contents

Introduction.......................................................... 6

Parts Terminology ............................................ 10

Styles, Shapes & Trade Names of Blades...... 11

Grading Switchblade Knives ........................... 12

Blade Chart ....................................................... 17

Handle Chart .................................................... 19

Function Chart .................................................. 20

Measuring Wiggle, Droop and Wobble.......... 21

Grading List ..................................................... 21

George Schrade 1860-1940 ............................. 22

Manufacture Timeline ..................................... 24

**KNIVES**

Aerial Cutlery Manufacturing Co. ................... 25

Aerial & Olsen Knife Co. Knives..................... 28

Automatic Knife Company............................... 30

Bowie Knife Co. ............................................... 32

Buffalo Cutlery Company................................ 33

Camillus Cutlery Co......................................... 34

CASE W.R. Case & Sons .................................. 36

Cattaraugus Cutlery Company........................ 39

Challenge Cutlery Corporation ...................... 40

Colonial Knife Company ................................. 42

Crandall Cutlery Company ............................. 49

Cutino Cutlery Company ................................ 50

Edgemaster....................................................... 51

E. Weck & Son................................................... 57

Flylock Knife Company ................................... 59

George Schrade Knife Co. ............................... 64

Hatch Cutlery Company................................... 70

JCN Co. .............................................................. 80

KA-BAR ............................................................. 81

Keen Kutter....................................................... 84

Keenwell Brown Mfg Co. ................................. 87

Korn's–Patent George W. Korn ....................... 89

L.L. Bean Inc. .................................................... 91

Norvell–Shapleigh Hardware Co. ................... 92

Press Button Knife ........................................... 94

PRESTO ........................................................... 101

Queen Cutlery Company................................ 109

R.C. Kruschke .................................................. 111

Remington....................................................... 113

Russell Automatic Knife Co. ......................... 115

Schrade Cutlery Company............................. 116

Schrade Walden Cutlery Corp. .................... 131

Schrado ........................................................... 137

Shapleigh Hdw Co. ......................................... 138

Union Cutlery Company................................ 141

Utica Cutlery Company .................................. 142

Wade & Butcher .............................................. 143

Blade Illustration Guide ................................ 144

Celluloid .......................................................... 155

Patterns, Nicknames and
Misc. Terminology .......................................... 156

Miscellaneous Switchblade
Tang Stamps ................................................... 158

Trademarks, Etches &
Marketing Names............................................ 159

Switchblade Manufacturers........................... 160

Bibliography.................................................... 160

KnifeRights MSJ App.000625

# Introduction

What do you think of when you hear the word switchblade? Do images of gangs from the 1950s come to mind? Maybe you think of large, intimidating Italian stilettos in the hands of dangerous criminals? Those are the images that were thrust in front of the American public by sensationalistic and narrow-minded media and politicians during the 1950s. Certain members of Congress took it upon themselves to convince everyone that these knives were to blame for much of the crime in this country. They were trying to find a way to outlaw switchblade knives in the United States. They painted images of switchblade knives as the "weapon of choice" for gang members and dangerous criminals. They wanted the public to believe that these "evil knives" were relatively new to this country and that their only possible use was as a dangerous weapon. They never mentioned the fact that switchblade knives were a useful tool appreciated by hunters, fishermen, trappers, store clerks, farmers, mechanics, firemen and many others in this country. Switchblades were very popular with women, especially in the early 1900s. Not only did having a switchblade in the purse save many broken fingernails, switchblades were also very handy tools to have in the sewing kit. They often still turn up in old sewing machine drawers. Switchblade knives were extremely handy for the fisherman and there was a time when most tackle boxes were not complete without a switchblade knife inside. They were also very popular watch fobs and many gentlemen put them on the end of their watch chains.

Somehow the Congressmen who were feverishly trying to outlaw these knives, and gain attention for themselves, overlooked all of these facts. They didn't bother to mention that the majority of the switchblades manufactured in the United States prior to 1958 measured from 2 ¼ inches to 4 inches closed and could be comfortably carried in the pocket or coin purse. It also escaped their attention that many were designed to put on a chain with your keys. Does this sound like a group of dangerous weapons, with no other purpose than to maim or kill? It saddens me to realize that we had a Congress that could be manipulated into outlawing interstate commerce of one of the most useful and beloved tools in the history of our country. Maybe they should have outlawed hammers while they were at it. They are certainly dangerous weapons in the hands of a criminal.

## History

Would it surprise you to know that switchblade knives had actually been in this country for over 75 years when these public figures were busy telling congress how switchblades were new to this country? The manufacture of switchblades in the United States began in the 1880s, shortly after the first switchblade patents were granted in this country. They were in mass production by the mid 1890s and fast becoming the most useful cutting tool one could carry and gaining in popularity and public acceptance. Over a 50-year period from the mid 1890s to the mid 1940s there had been approximately 20 different companies who had manufactured switchblade knives in this country. There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts and also for Girl Scouts. How's that for a list of dangerous criminals? They were also a very popular advertising giveaway and can be found with advertising from around the country, both on the handles and etched on the side of the blades.

The origins of the switchblade knife go back much farther than one might imagine. I know that they were being manufactured in England in the mid 1800s and France and Italy were making them well before that. I am very confident that they were brought to this country from Europe by the mid 1800s, and quite possibly before that.

## As a Collectible

Fortunately knives are appreciated and sought after by collectors from around the world, so the value of knives, especially antique collectible knives, seems to be on a steady rise. Collectors the world over are constantly hunting for knives to add to their collections and the demand for antique knives is very high. Collector fever is very catchy and can make people do strange things. The hunt for a particular knife can be extremely challenging and exciting. The price that a collector is willing to pay for a knife can depend upon many things and the harder it is to find, usually the higher the price a collector is willing to pay. This behavior quite often leads to exorbitant prices being paid for very rare knives and surprisingly you don't often hear of buyer's remorse when it comes to rare antique knives. You do, on the other hand, hear a lot of "oohs" and "ahhs" whenever these knives are brought out for other collectors to appreciate.

If you ask most collectors why they collect knives you'll most likely hear something like "for the joy of collecting", or "I've loved knives since I was a boy", or possibly "I love the hunt." I have yet to have someone tell me "as an investment", and yet there is obviously

KnifeRights MSJ App.000626

# EXHIBIT U

KnifeRights MSJ App.000627



About Us    Contact Us    USD

0



A BRIEF HISTORY OF

LATAMA CUTLERY

THE LEGEND CONTINUES

LATAMA is a name that all switchblade enthusiasts are familiar with. No other manufacturer has never equaled the overall quality and variety of switchblade designs that LATAMA has produced.

LATAMA's history has been argued to extend as far back as before World War 2. But, LATAMA's initial switchblade collection spanned less than ten years, and those were prior to the enactment of the 1958 Federal Switchblade Act.

Almost all of LATAMA's production has imported into the U.S. extending back to out origins. Americans have always been the principal consumers of LATAMA switchblades. Prior to the Federal Switchblade Act, LATAMA dominated retailers across America, providing all major outlets with cutlery.

After World War 2, the demand for steel, brass, and nickel was high, and the resources in Europe were exhausted from the war. Seeing this, LATAMA drew from skilled artisans in Maniago, Italy. They were able to establish switchblade manufacturing as a "cottage industry" there. Individual artisans were financed and supplied from America with the raw materials for manufacturing knives. This decentralized approach towards the manufacturing of LATAMA switchblades makes up the wide variety of designs produced.

One of the rare LATAMA designs is the 'square' button models produced in very limited quantities. They were created as samples or prototypes but did not appeal to the retailers who wanted to stay with the traditional button and sliding safety models. The button is positioned where the front bolster meets the scale, almost touching the bolster. Most square button models have a very novel safety feature; a small piece of brass pivots under the button to prevent it from being depressed. The safety is released by pivoting the top, front bolster, and then a small extension on the bottom end of the bolster catches the brass safety and pivots it from under the button.

Another unique characteristic of the square-button is the way it locks up the blade in the closed position. Unlike the lock-up with the traditional button, these required a cut-out in the blade. The button tops a post with a distinct lathed or shape to it. The post bisects the inside of the knife, extending through both liners. When the blade is closing, the shape of the button post connects with the cut-out, and the button is pulled down and pops back up as it is seated in the blade.

One of the things that has always separated LATAMA from other switchblades is attention to detail. The fit and finish LATAMA switchblade is superior to its era.

KnifeRights MSJ App.000629

Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 81 of 462   PageID 754

Walt tells us the recent story about Latama and his passion for this historic Italian switch blade

## A Timeline of the Switchblade

When you hear the mention of Italian switchblade stiletto, you can instantly conjure up a picture in your head. While the word is most often associated with an Italian switchblade, its origins date back to fixed blade daggers from the 1400s.

**The Early Years (the 1400s to the 1800s)**

KnifeRights MSJ App.000630

The English and Italian word 'stiletto' is derived from the Latin word 'stilus.' This refers to a knife with a long thin blade designed primarily for thrusting. Initially used by knights to penetrate chainmail armor, the stiletto evolved to become the weapon of choice for mercenaries and assassins from the 1500s through the 1800s.

Three cities in Italy were primarily producing switchblade knives: Frosolone, Scarperia, and Maniago. The classic 'S' guard stiletto types were made in Maniago and most recognizable among Americans.

The earliest known Italian catalog shows different spring-fired examples, dating back to 1896. These first models and the switchblades made in Maniago were made entirely by hand up until World War 2.

## Pre-World War 2

Before the war, production numbers were small for these knives and were made mainly by individual knife makers belonging to cooperatives. The purpose of these was to help the makers increase their buying power of materials and the selling and distributing of their knives.

Most switchblades that are found from that era are stamped with "Maniago" on the blade or "S. Coop" (for Societa Cooperativa). A maker's name may have been stamped on the blade as well, but those were few and far between.

The traditional "S" guard type was the most common Maniago stiletto style early on, and they are still seen in today's modern version. While these were the more popular style, other variations did exist, including the knives with the Maltese-style handguards. The most common blade type was the bayonet shape, but dagger and kris shapes were also used.

The earliest stiletto switchblades featured genuine stag handles, but soon horn became the material most often used. Very few early examples have been found with wood, mother-of-pearl, and ivory handles.

Another trait shared by these pre-war models was they were primarily "pick-lock" type. The back spring had a rounded tab that stuck out over the top bolsters on the side. The tab is pushed away from the bolster to unlock and manually close the blade.

## World War 2 (1939-1945)

Nearly all switchblade examples from the beginning of World War 2 were fired by traditional oval or round firing buttons set in the front handle. These same models also each had small sliding safety buttons, which, when sliding forward towards the

KnifeRights MSJ App.000631

Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 83 of 462   PageID 756

firing button, would prevent the firing button from being pushed. GIs returning home from the war brought back the Italian switchblade, which would soon become a hit in America.

## The 1950s

After World War 2 the popularity of the switchblades exploded. Department stores such as Macy's were selling them. Every kid and young man wanted one if they didn't already have one. Box office movies like "Rebel Without a Cause" and "West Side Story" portrayed the switchblade as both the defender of justice and a tool of fear.

Partially driven by the developments of the war, but also the demand for products, switchblades from Maniago stepped into the modern age following the war. Previously, all knives were made by hand and assembled one at a time. After the war, many makers started to stamp out or manufacture parts in groups and produced the knives into batches instead of individually. The faster mechanization of knives led to greater productivity of all things world-wide, which impacted many companies, from General Motors in the U.S. to an individual knife maker in Maniago. The demand became so great in the U.S. during the 1950s that men, women, and even children were assembling knives in Maniago and could barely keep up with production.

But the early 1950s brought forward some negativity to the switchblade. Senator Estes Kefauver of Tennessee said that a ban on switchblades would significantly decrease gangs and violence. In 1958, the federal ban was enacted in the United States, making the manufacturing, distribution, and ownership of switchblades a federal crime. The law was written with the word 'territory' and not 'state,' which meant that individual states began interpreting and enforcing their own laws. This could range from siding with the federal government to offering no laws against the production or ownership of switchblade knives.

Even though America had been Italy's largest import market, they were not their only customers. While it was a massive loss for Maniago, they continued to make switchblades on a smaller scale for other customers worldwide.

KnifeRights MSJ App.000632

Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 84 of 462   PageID 757



### The Second Half of the 20th Century

The second half of the twentieth century saw small knife shops in Maniago continue to produce switchblades as laws started to lighten in America. Around 1980, switchblades from Maniago began finding their way back to the U.S. despite the federal import laws. Since the federal act, the Italian switchblade stiletto has had a renaissance and is nearly as popular today as it first was in the 1950s.

KnifeRights MSJ App.000633

**The 21st Century**

Most states in America have overturned the ban on switchblades, and only about half a dozen states still consider switchblades illegal. But, many of these states have various requirements or restrictions on them. The federal ban on transporting switchblades across state lines is still in effect, but it is rarely enforced.



Subscribe

Sign up to get the latest on sales, new releases and more …

Enter your email address…

Sign Up

## Quick Links

Search

Privacy Policy

Return Policy

Terms and Conditions

## Additional Services

Premium Horn

Knife Restoration

## Company Info

About Us

Contact Us

## Get In Touch

Call Us: 631.668.5995

Email: pick@latama.net

         

© 2023 LATAMA.

# EXHIBIT V

KnifeRights MSJ App.000636

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

| | |
|---|---|
| KNIFE RIGHTS, INC.; RUSSELL ARNOLD; JEFFREY FOLLODER; RGA AUCTION SOLUTION d.b.a. FIREARM SOLUTIONS; AND MOD SPECIALTIES,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendants. | Case No. 4:23-cv-00547-O<br><br>Hon. Judge Reed O'Connor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF KEN ONION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### DECLARATION OF KEN ONION

I, Ken Onion, declare as follows:

1.    I am over 18 years of age and not a party to this action. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

2.    I have been asked to render an opinion on the differences and similarities between various forms of folding pocket knives — specifically automatically opening knives, assisted opening knives, and manual folding knives.

3.    This declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

4.    I am an American custom knifemaker, designer, and inventor living in Kaneohe, Hawaii. I have been designing, inventing, and making various forms of knives for 32 years.

5.    I have roughly 56 patents on various items including knife locks, gadgetry, mechanisms, safeties, and designs, as well as several trademarks.

6.    During my 33-year career as a knife designer and manufacturer, I have had hundreds of models of knives enter into production and distributed throughout the United States and worldwide.

7.    The vast majority of the knives I have designed and entered into production were various models of folding pocket knives with different mechanisms of opening with one hand.

8.    In 1997, I started employment with Kershaw Knives as their Premier Knife Designer. As the Premier Knife Designer, my duties included working closely with the company to design the most successful line of knives ever produced by the

**KnifeRights MSJ App.000638**
**KnifeRights MSJ App.000638**

company, helping them develop the manufacturing expertise to produce these knives in their own factory, advising them on marketing and sales, and representing the company in the United States and abroad.

9.      Additionally, as part of my duties as in this position, I traveled on behalf of Kershaw to perform lectures and classes where I instructed sales teams and retail cutlery stores about the differences in types of knives, their operation, and their application. I also instructed these sales teams and cutlery stores to enhance their general knowledge about knives so that they could accurately answer customers' questions and guide them in making knowledgeable decisions in a non-biased manner.

10.      During my time working for Kershaw, the business grew substantially. In just the first 5 years after I started working with Kershaw, it grew from a handful of employees with knives manufactured by others to over 100 employees, including the manufacturing of several types of knives in a new U.S. Kershaw factory. As a result of my designs and efforts, Kershaw is now a major manufacture of knives in the U.S. and worldwide.

11.      I have taught knifemaking, including the making of folding knives, at my home/shop to over 100 new and experienced knife makers.

12.      I also teach these same classes throughout the United States and abroad.  As a part of this instruction, I teach students regarding knife design, business theory, and business strategy classes.

13.      I have won dozens of awards for my custom knives and knife designs at every major cutlery exhibition and show in the United States.

14.      My custom knives have sold for upwards of $30,000.00 each.

15.      In 2008, I became the 45th and youngest inductee ever into the Blade Magazine Hall of Fame. In the knife industry, this is the highest distinction one can

receive. I am widely recognized as one of the most innovative and successful knife designers of all time, and oftentimes referred to as "legendary."

16.     I am currently working with Columbia River Knife & Tool, another major manufacturer of knives in the United States and worldwide, as their Premier Knife Designer.   In that capacity, my duties include working closely with the company to design knives, helping them with manufacturing to produce these knives, advising them on marketing and sales, and representing the company in the United States and abroad.

17.     In addition, I have designed knives produced by Spyderco, United Cutlery, Amway, Snap-On, Sears, and Carbon. I have also designed knives and a knife sharpener for WorkSharp.

18.     I have earned in excess of $40,000,000 licensing my designs for knife locks, gadgetry, mechanisms, safeties, and designs.

19.     I have been retained as an expert witness by Plaintiffs in this case to render my professional expert opinion on the internal mechanisms of various folding knives including manual, assisted-opening, and automatically opening folding knives; and the categorization and commonality of folding pocket knives and automatic knives, also known as switchblades, in the United States. I am not charging for my services in this case.

## SUMMARY OF OPINIONS

20.     While there are fundamental and critical differences in the *internal mechanics* between the many varieties of one-hand opening knives including, specifically, assisted opening folding knives and what are commonly referred to as

"switchblade knives,"[1] that distinguish each knife type under present legal definitions; fundamentally and practically, manual one-hand opening, assisted opening, and automatically opening knives (switchblades) are, in fact, merely different forms of common folding pocket knives that are essentially the same.

21.    As explained in detail below, manual one-hand opening knives, assisted opening knives, and "switchblade" knives are nothing more than the evolution of a traditional folding pocket knife, like the early Jack Knife or classic Swiss Army Knife. These opening mechanisms are just examples of many variations of common folding knives, which allow the user to more easily and rapidly open their folding knife with a one hand.

22.    The ability for the user to open a knife with one hand is a very desirable trait from both a practical and safety standpoint — which explains why these knives are so popular and represent the vast majority of knives sold and used today throughout the United States.

## FEDERAL SWITCHBLADE ACT

21.    Under the Federal Switchblade Act (Title 15, Chapter 29, §1241, Definitions), a "switchblade" is defined as the following:

  (b) The term "switchblade knife" means any knife having a blade which opens automatically –

    (1) by hand pressure applied to a button or other device in the handle of the knife, or

  (2) by operation of inertia, gravity, or both.

22.    The Federal Switchblade Act uses the terminology "switchblade" to designate automatically opening knives, a term that, over the years, has come to have a pejorative meaning for many as a result of these type knives being demonized in

---

[1] Automatically opening knives are also referred to statutorily as "switchblades," "switchblade knives," "automatic knives," "spring blade knives," and "switch knives."

KnifeRights MSJ App.000641
KnifeRights MSJ App.000641

the 1950s in popular culture. Attached hereto as **Exhibit A** is a true and correct copy of *THE TOY THAT KILLS* published in the Woman's Home Companion, November 1950, that initiated the campaign vilifying and demonizing these knives.

23.     Within the knife industry and in marketing today, the more common terms for these same knives are "automatic knives," "automatically opening knives," or often shortened to simply, "autos." Attached hereto as **Exhibit B** are true and correct copies of magazines articles and advertisements depicting "automatic knives" in description.

## DESIGN/DEVELOPMENT OF ASSISTED OPENING FOLDING KNIVES

24.     In 1996, while recovering from back surgery, I decided to try to design a folder that was easy to manipulate and open, but which did not fit within the legal definition of knives defined as "switchblades" under the Federal Switchblade Act. The goal of this design was to produce a folding knife that could easily and quickly be opened with one hand, like the "switchblade" knife, but did not fall under the technical legal definition of a "switchblade" knife.

25.     Soon thereafter, I created the first commercially successful assisted opening mechanism for folding knives.[2]  This is one of my better-known inventions, which had a significant impact in the knife industry and was trademarked as the "SpeedSafe" assisted opening mechanism. In 1998, the Kershaw Random Task was released as the first Kershaw to use the SpeedSafe mechanism. It won Blade Magazine's American Made Knife of the Year Award that year. The Mini Random Task, a slightly smaller version, was the first SpeedSafe knife produced in quantity.

26.     In 1998, I was granted a patent (US6338431B1) for the assisted opening

---

[2] This mechanism also sometimes referred to as "spring assisted."

knife, and with its successful commercial introduction by Kershaw Knives, created a unique evolution of the common folding knife that proved wildly popular.

27.     The Patent background is described as follows:

"This invention relates to a mechanism in a folding knife that urges the blade to move to an open and alternatively to a closed position. Generally, in the present invention, the blade must be moved manually a certain distance whereupon the mechanism serves to complete the movement of the blade without the application of further outside force by the user. In the folding knife and cutlery industry, there typically is provided a folding knife having a housing or handle for supporting the blade in the open position and for receiving the blade in the closed position. It is also generally known to cause the blade of the knife to be locked when in the open position. An example of such locking mechanism is found in Neely U.S. Pat. No. 5,060,379 and Wiethoff U.S. Pat. No. 4,404,748.

The mechanism of the present invention overcomes the various deficiencies of the folding knives and opening and closing mechanisms presently in the knife and cutlery industry by providing positive opening and closing assistance while enabling such opening and closing to be performed or carried out with only a single hand of the user, to the advantage of the general public but especially to persons who experience difficulty in using two hands to open a knife, whether such difficulty is caused by physical, mental or safety reasons."

28.     I licensed this mechanism to Kershaw Knives in 1996. While my design was the first commercially successful assisted opening design, today many other mechanisms have been designed and patented to accomplish similar spring assisted opening of folding knives, which are widely marketed and sold in the United States and worldwide. These knife designs are so popular, there are countless numbers in circulation within the United States. There is no question that the number of these knives owned and in circulation is conservatively in the several millions.

29.     As stated previously, I designed the "SpeedSafe" mechanism as a way to

allow for fast, single hand (one-hand) opening folding knives that did not meet the legal definition of a "switchblade" while still providing the wide appeal of automatically opening knives.

30.     Beyond the practical and quick, easy-opening aspect shared with all one-hand opening knives, consumers are attracted to, and delight in, the dramatic, flashy and eye-catching spring-powered opening of an automatically opening knife, even though it adds nothing to utility or speed of opening the knife compared to other one-hand opening mechanisms. The same Hollywood movies of the 1950s that helped demonize "switchblades," also served to create a certain cachet and desire by consumers to possess and carry them that exists to this day.

31.     The assisted opener provides a similar attraction to the sensations of opening an automatically opening knife without falling within the statutory definition of a "switchblade." However, from a user-experience perspective, they are virtually interchangeable — hence, the broad popularity of the assisted opener.

32.     In designing the "SpeedSafe" assisted opener, I made sure that to open the knife, no hand pressure was applied to a button or other device in the handle of the knife. As my knives applied pressure to the blade of the knife and not to anything within the handle of the knife, the assisted openers did not meet the definition of a "switchblade" under federal law.

33.     While I, and the entire knife industry, understood this distinction to be straightforward, in 2009, U.S. Customs and Border Protection suddenly developed difficulty in identifying the distinguishing mechanical features between automatically opening knives and other one-hand opening knives, and in particular, assisted opening knives.

34.     For years, the U.S. Customs and Border Protection considered assisted openers and "switchblade" knives to be *two distinct knives*, issuing rulings that the one was legal and the other illegal under the Federal Switchblade Act. This allowed

1  importation of assisted opening knives, while "switchblades" remained illegal to
2  import into the United States.

3  　　　35.　　However, in 2009, the U.S. Customs and Border Protection attempted to
4  reverse its prior rulings that assisted opening knives were not legally defined as
5  switchblade knives pursuant to section 1241. Attached hereto as **Exhibit C** is a true
6  and correct copy of 19 CFR Part 177 "Proposed Revocation of Ruling Letters and
7  Revocation of Treatment Relating to the Admissibility of Certain Knives With Spring-
8  Assisted Opening Mechanisms" published by the U.S. Customs and Border
9  Protection, Department of Homeland Security.

10  　　　36.　　Essentially, in 2009, the U.S. Customs and Border Protection was
11  unilaterally revising its longstanding interpretation of prohibited "switchblades" to
12  include *any* one-hand opening knife, which at the time, represented approximately
13  80% of the folding knives sold in the United States.[3] Attached hereto as **Exhibit D** is
14  a true and correct copy of The American Knife and Tool Institute "Knife Industry
15  Statistics" detailing the widespread prevalence of one-hand opening knives — which
16  includes automatically opening knives.

17  　　　37.　　After both the knife industry and knife owners across the country
18  expressed extreme opposition to this attempted re-interpretation, to clarify this issue,
19  in 2009, Congress passed a fifth exception to the Federal Switchblade Act, which
20  states:

22  　　　Sections 1242 and 1243 of this title shall not apply to – (5) a knife that
23  　　　contains a spring, detent, or other mechanism designed to create a bias
24  　　　toward closure of the blade and that requires exertion applied to the

_____

[3] Based on my experience in the knife industry, today this estimate, excluding kitchen
knives, remains accurate and likely is now a higher percentage of sales in the United
States.

**KnifeRights MSJ App.000645**
KnifeRights MSJ App.000645

1    blade by hand, wrist or arm to overcome the bias toward closure to assist

2    in opening the knife.

3    38.    As I explain below, "bias toward closure" is a critical mechanical aspect

4    used to legally differentiate "switchblades" from all other knives that do not

5    automatically open. However, this legal distinction is purely legalese. Functionally,

6    there is little to no difference in the various forms of one-hand opening knives.

7    39.    Even with this amendment to the Federal Switchblade Act

8    distinguishing between assisted opening knives and automatically opening knives,

9    some law enforcement officers still confuse the two. For example, the infamous arrest

10   of Freddie Gray in Baltimore was due to the officers' improper identification of his

11   legal assisted-opening knife. Additionally, some courts have ruled that assisted

12   opening knives fall under the definitions of a "switchblade" due to their *functional*

13   similarities.

14   40.    Even with the clear *mechanical differences* between assisted opening

15   and automatically opening knives designed expressly to avoid illegality, their

16   *functional* similarities continue to cause confusion for state and local governments

17   and law enforcement agencies when it comes to prohibitions on "switchblades."

18   41.    However, categorically speaking, there is no real difference between

19   assisted opening knives and automatically opening knives — they are mere variations

20   of common folding pocket knives that open easily with one hand. That they are

21   confused so often only emphasizes the fact that, while different mechanically, they

22   are essentially just two different forms of common folding knives.

23

24

25   **INTERNAL MECHANICS OF MANUAL ONE-HAND OPENERS,**
     **ASSISTED OPENERS AND SWITCHBLADES**

26

27   42.    An automatically opening knife ("switchblade") has a folding or sliding

28   blade contained in the handle, which is opened "automatically," by a spring, when a

---

9

button, switch or other device in the handle of the knife is actuated.

43.    The blade of a switchblade blade must be locked (also technically referred to as "latched") in the closed position because it is spring-loaded to open. In other words, the blade has a "bias toward opening" that is counteracted with a lock/latch. Without being latched in the closed position, the blade cannot stay closed and will open. When the button, switch, or other device in the handle is actuated, the latch is released and a compressed or tensioned spring moves the blade "automatically" to the fully opened position.

44.    In contrast, mechanically speaking, assisted opening knives are not "switchblades" when considered in the context of the technical statutory definition of what constitutes a "switchblade."

45.    Assisted opening knives do not open "automatically."  As opposed to a switchblade, the blade is "biased toward closure" when inside the handle *via* "a spring, detent, or other mechanism." The user must apply "manual force" *to the blade* to overcome the bias toward closure for it to open. This is in contrast to a "switchblade," where the user applies manual force to a button, switch, or other device in the handle to release the latch which releases the blade and the user does not apply force to the blade of the knife.

46.    Assisted opening knives have no button, switch, or other device in the handle, which releases the blade, because there is no need for one as compared to a switchblade, which requires a latch to keep the blade from opening because the blade is biased toward opening.

47.    Instead, manual one-hand opening and assisted opening knives use thumb studs, thumb holes, tabs, nail notches, nail mark grooves, textured surfaces, and more to allow leverage on the blade of the knife to move it from the folded or closed position where it is biased toward closure to the open position using a single digit of the hand. Typically, these studs, holes, tabs, grooves, etc. are part of, or fixed

to, the blade itself, but in any case, simply move with the blade when manual force is applied to these elements.

48.     In an assisted opening knife, upon applying force to the above elements to start rotating the blade out of the handle, at some point, typically after 5-20 degrees +/- of movement, a spring assists the blade to open fully. Thus, we get the terminology "assisted opener." It does not open "automatically" "by hand pressure applied to a button or other device *in the handle of the knife*." While mechanically distinguishable, in the end, manual one-hand opening, assisted opener, and automatic opening knives require the user to put minimal manual force on either the blade itself or on a button on the handle, after which, the blade opens fully. In the case of an assisted opener and a "switchblade," the spring mechanism within the knife is part and parcel of the opening, but how it is engaged distinguishes one from the other in terms of their legal definitions.

49.     However, categorically speaking, manual one-hand opening knives, assisted opening knives, and automatically opening knives are merely variations of folding pocket knives, in which the blades fold into the handle of the knife and is only useful when fully opened. The reality is that neither assisted opening knife nor automatically opening knife designs or mechanisms opens faster than the other. Nor is any one design any more "dangerous" than the other in any respect.

50.     Traditional pocket knives like the early Jack Knife or the classic Swiss Army Knife (known in the industry as Slip Joints – having no locking mechanism), are in fact of very similar design to assisted openers.  For example, the classic Swiss Army Knife, just like the assisted opener, also has a blade, which must be manually opened by the user applying force to the blade itself to rotate the blade out of the handle, and then when the blade is partially out of the handle a spring assists to bring the blade to the fully open position.

51.     Upon applying force to manually rotate the blade out of the handle, at

KnifeRights MSJ App.000648
KnifeRights MSJ App.000648

1  some point, typically approximately 15-20 degrees from being fully open, the back

2  spring assists the blade to open fully. A manual one-hand opener may have a similar

3  slip joint construction with a spring, but by design can be opened using the single

4  digit on one-hand, as noted previously.

5      52.    An assisted opening knife does the same thing, only sooner in the arc of

6  the manual opening of the knife.

7      53.    In comparison, in an automatically opening knife, the spring within the

8  knife opens the blade from the moment the latch is released with the push of the

9  button. In other words, the automatically opening knife is just a further progression

10  in when the mechanics/spring within the knife takes over in opening the blade.

11      54.    As with every folding knife, all of these variations are comprised of a

12  handle and a blade, two entirely distinct and separate parts of the knife. Most

13  notably, traditional pocket knives, some manual one-hand openers, assisted openers,

14  and automatically opening knives all have a spring mechanism within the knife that

15  takes part in opening the blade. The only difference being at which point the spring

16  starts this process.

17      55.    Functionally speaking, there is virtually no difference between modern

18  manual one-hand opening knives, assisted opening knives, and automatically

19  opening knives. All of these knife designs can be opened with one hand; all these knife

20  designs require a minimal amount of force from the user's finger (either on the blade

21  of the knife or on a button on the handle of the knife) to open the knives; and all these

22  knives open equally fast.

23  

24      56.    While the mechanical differences between manual one-hand opening

25  knives, assisted opening knives, and automatically opening knives have allowed for

26  a technical legal distinction between the knives based on statutory definitions;

27  functionally and practically speaking, each of these knife designs are all common

28  folding pocket knives with a variation on the manner of opening easily and rapidly

KnifeRights MSJ App.000649
KnifeRights MSJ App.000649

with one hand.

57.     Another example of the variations of folding knives are "dual action" folding knives. These folding knives incorporate two opening mechanisms that can be used alternatively to either open the blade manually using force applied to the blade *via* thumb stud, thumb hole, etc., or the same blade may be opened "automatically" *via* hand pressure applied to a button or other device in the handle. For the manual opening mechanism, there is a bias toward closure. For the automatic opening mechanism, there is bias toward opening. Attached hereto as **Exhibit E** is a true and correct copy of depictions of "dual action" folding knives. For both options to open the knife, the blade opens with the same speed.

58.     Many models of common folding pocket knives are also produced and sold with options using various opening mechanisms. In other words, a knife design will be available for sale as both a manually opening folding knife and an automatically opening folding knife. This fact alone underscores the fact that all of these opening mechanisms are common variations of folding pocket knives. In these instances, the knives are virtually identical other than the opening mechanism. One version may open manually or be assisted opening, while another version of the same model opens automatically. Attached hereto as **Exhibit F** are true and correct copies of pictures of various folding knife models that are offered in two or more options of opening mechanisms. Again, even with these different opening mechanisms, the knives still open with the same speed.

59.     Notably, based on my experience as a knife designer and knifemaker, even with different opening mechanisms, no folding pocket knife is any more "dangerous" than any other folding pocket knife. When considering the utility of any folding knife (or its dangerousness/lethality), it is only useful when the knife is *completely opened*. Quite simply, no one can be cut or stabbed with a folding knife when the blade is folded within the handle. This is true regardless of the manner in

**KnifeRights MSJ App.000650**
**KnifeRights MSJ App.000650**

which the blade can be unfolded. It is only after the blade is opened fully that the knife can be used for any purpose. Thus, the different manner in which a folding knife is opened, whether it be manually, assisted, or automatically, has no bearing on the knife's utility or dangerousness/lethality.

60.     Further, based on my experience as a knife designer and knifemaker, considering the fact that there is no significant difference in the speed in which the various forms of one-hand opening knives — including manual one hand opening, assisted openers and automatically opening knives — open into a locked position, none of these designs is any more or less useful or dangerous than the other, even if one assumes, incorrectly, that speed of opening equates with "dangerousness" or "lethality." And no folding knife opens more quickly than a fixed blade knife that by design is already "open" and able to be used for any purpose instantly. It is my understanding that there are no federal regulations prohibiting the manufacture, sale, or interstate commerce of fixed blade knives or other bladed weapons.

61.     Based on my research and experience in the knife industry, excluding kitchen knives, folding knives are some of the most widely owned and used knives in the United States and have been for over a hundred years. The number in circulation within the United States is conservatively in the tens of millions. Any attempt to distinguish between these various forms of folding knives as "more dangerous" than the other due to the manner in which they open merely showcases inexperience or ignorance of how knives are designed and function.

62.     Relatedly, there is also no distinction in "concealability" between the various forms of folding knife designs as each knife is only as large or small as the blade that must be folded into the handle of the knife. For example, an automatically opening knife with a 3" blade is no more or less "concealable" than an assisted opening knife with a 3" blade or a manual one hand opening knife with a 3" blade. In each instance, the handle must only be large enough to contain the blade and almost all

1  folding knives are designed to have as small a handle as is functionally practical to
2  make the most compact total package as possible.

3      63.    The only somewhat common exception to this fact is that some
4  automatically opening knives install a shorter blade than usual into a handle
5  normally used for a slightly longer blade in order to be considered legal in a
6  jurisdiction that limits blade length of automatically opening knives. However, these
7  designs were specifically designed to comply with states with prohibitive laws. Based
8  on my experience as a knife designer and knifemaker, in my professional opinion,
9  these odd variations would not be on the market but for the need for "complaint
10  variations" in these restrictive states.

11      64.    As a long-time designer of many different knife designs, most every
12  folding knife, regardless of the manner in which it opens, can be carried in the pocket.
13  Again, reenforcing the fact that there is no functional difference between each form
14  of folding knife — as they are all just slightly different variations of common pocket
15  knives that have been used in the many millions for generations. As such,
16  automatically folding knives are unquestionably designed and manufactured as a
17  variation of folding pocket knife.

19  I declare under penalty of perjury under the laws of the United States that the
20  foregoing is true and correct and that I executed my declaration in the United States
21  on September 19, 2023.

Ken Onion

# KEN ONION EXHIBIT A

KnifeRights MSJ App.000653

# THE TOY THAT

**D**O YOU remember the days when firecrackers used to kill, burn and maim scores of youngsters every year? Aroused parents finally put a stop to it. They banded together all over the country to force the passage of local ordinances governing the sale and use of fireworks—and now a firecracker casualty is a rarity.

Today we are confronted with a new toy that kills. It's not yet so widespread as the firecracker menace once was. The toll up to now is relatively small—a few dozen children killed, somewhat more wounded. But the point is, all these unnecessary tragedies are increasing. Fireworks threatened only a few days a year; the new toy threatens every day of the three hundred and sixty-five. Fortunately this new menace can be controlled just as effectively as fireworks have been—if parents will just step in and do it.

This new threat to our children's safety is a pocket-knife called a switchblade. Never heard of it? Ask your boy, or your neighbor's boy. Thousands of thoughtless youngsters are carrying them.

Police officials, judges, teachers and social workers all over the country are disturbed about the increasing number of juvenile accidents in which switchblades figure. Now these authorities are not alarmists or bluenoses. They don't want to deny boys their pocket-knives. They know that a knife to a growing boy is as important as a lipstick to a young lady.

But they also know that a switchblade, which is fast replacing the old-fashioned pocketknife, is another story. Its chief purpose—as any crook can tell you—is for committing violence.

Have you ever seen one? Few women realize what a deadly weapon it can be. It isn't for practical use as is the Boy Scout or standard army knife with their two thick blades, can opener and combination bottle opener and screw driver.

No, a switchblade knife isn't as useful—but it's a lot *faster*. To open it, you merely press a button and instantly the blade darts out like a snake's tongue and locks firmly in that position. Any child can operate it easily with *one* hand. An ordinary penknife takes two hands and doesn't have a dagger-tip point.

What does this mean? Here is how one of the nation's top law-enforcement officers sums it up: "In a person's pocket, a switchblade knife is a deadly concealed weapon—as dangerous as a dagger and at close quarters as lethal as a loaded revolver." But unlike a revolver, you don't need a permit to carry it!

This is the wicked weapon which teen-agers in many communities are taking up as a fad!

The president of the International Association of Chiefs of Police, John M. Gleason, told me, "Many otherwise well-informed parents—especially mothers—don't realize how vicious a switchblade can be."

I had no idea myself until I saw a youth stabbed with one on a Philadelphia street. Two young men were fighting with their fists. Suddenly one of them reached into his pocket. A second later his hand held an open knife. He jabbed the gleaming blade into his opponent's chest. As the blood flowed, women onlookers screamed.

While I watched the police take over, I could not help wondering if that stabbing really had to happen. How many hot-headed adolescents buy a switchblade just for show and then, in a moment of overwhelming anger, use it as a weapon?

Recently—in more innocent spirits—two teen-age boys at a high school dance in a Newark, New Jersey, suburb were playfully showing off with a three-inch switchblade. Accidentally one was shoved against the tip of the knife, which pierced his heart.

"You punctured me, Jim, please take me to a drug-store," the wounded youth moaned and collapsed.

PHOTOGRAPHS FROM PIX

## THERE'S NOTHING ILLEGAL ABOUT MANUFACTURING OR SELLING THE KNIVES DISPLAYED



**WASHINGTON, D. C.**

A perilous prize for these young men but easy to buy in the nation's capital



**NEW YORK**

Easy in New York City too, although a boy may have to lie about his age



**MINNEAPOLIS**

The choice in Minneapolis is good. Watch for the toll in the tabloids

# KILLS

A boy's ordinary pocketknife isn't too dangerous.

But a switchblade knife—ever seen one? Do you know how many

youngsters carry them and what police officials think about

this wicked new plaything?    BY JACK HARRISON POLLACK

His seventeen-year-old companion was aghast. But his sorrow couldn't bring his best friend back to life.

When another Newark high school boy was stabbed several days later, Public Safety Director John B. Keenan observed, "A mother who would be horrified if her son carried a pistol in his pocket thinks nothing of his having an equally dangerous knife."

"There is no excuse for *anybody* carrying a switchblade," declares Essex County Prosecutor D. E. Minard. "The sooner their manufacture and sale are banned, the better off we all will be," adds Newark Magistrate LeRoy D'Aloia. Boston Police Superintendent Edward W. Fallon warns, "No youngster should carry an automatic knife unless he's looking for trouble."

Every expert with whom I talked—including the nation's leading sportsmen—agreed that switchblade knives have no legitimate use in civilian life.

Yet I was amazed—and shocked—to find that nearly everywhere in America you, I or any youngster could walk into a store and [*continued on page 88*]

[continued on page 88]

- None of us knows what the international situation will be tomorrow. Naturally, as long as American boys are fighting abroad that is of paramount concern to all of us.
- But even in wartime we must not lose sight of situations on the home front which need correction.
- As Jack Harrison Pollack's factual survey reveals, teen-agers are being killed needlessly by a gadget which should be brought under greater control. The WOMAN'S HOME COMPANION deserves thanks for publicizing such a problem.
- As spokesman for the nation's chiefs of police, I recommend this constructive article to thoughtful American women. By following its suggestions they can help immeasurably in protecting their communities from a new threat to the safety of many children.

*John M. Gleason*
JOHN M. GLEASON
*President, International Association of Chiefs of Police*

## HERE. BUT LOOK FOR TROUBLE WHEN A SWITCHBLADE GETS INTO A YOUNGSTER'S HAND



CHICAGO

Chicago police deplore switchblade menace; youngsters get them anyway



LOS ANGELES

Of course these aren't meant for boys but Los Angeles boys will carry them



SEATTLE

And so the story goes—push-button knives aplenty all across the country

Woman's Home Companion    39

Case 4:23-cv-00547-O Document 20-3 Filed 10/06/23 Page 107 of 462 PageID 780

# The Toy That Kills

*from page 39*

buy a switchblade over the counter—no questions asked. True, some places have laws against selling "dangerous knives" to minors. But let's see how these laws work.

In New York a state law forbids the sale or giving of any pushbutton knife with a blade over two and a half inches long to anyone under sixteen. But in New York City a thirteen-year-old boy recently gazed admiringly at a shiny window display of switchblade knives, daggers and stilettos. He strolled into the highly respectable cutlery store and asked to see a four-inch switchblade, its point sharp as a rapier, its blade well honed.

"That's two dollars and ninety-five cents," the salesman said.

After ringing up the sale he casually remarked, "You're sixteen, aren't you?"

The thirteen-year-older—who was average size for his age—nodded and walked out with his perilous prize.

That same day in the same city another youngster critically stabbed a playmate with a switchblade. Was he any more to blame than his indifferent elders who sanctioned the murderous knickknack?

In Washington, D. C.—only a few knife-throws from the Department of Justice building—a fifteen-year-old boy recently told a storekeeper meaningfully, "I want a switch knife—the longest you got. I don't care about the price just so it's sharp."

The merchant nodded understandingly and sold him his knife.

The price and the patter may vary but you can make the same transaction in nearly any fair-sized community in America. Sample surveys show that it is as easy for a youth to buy a switch knife as a package of cigarettes. I chaperoned youngsters who purchased them for me—while I waited outside the store—in many communities—and none had any difficulty. In some towns they're known as "spring-blades," "snap knives" or "swingback knives." Whatever the name, the article is the same.

"What do you use them for?" salesmen were asked.

"Sharpen pencils, cut string, anything," they replied.

"Why are they better than ordinary pen-knives?"

"You don't break your fingernails opening them."

IN MY home town switchblades have been advertised as "Safety Push-button Knives." Push-button, yes. But safety? Even a salesman warned me to be sure and keep the knife locked when not in use because his own switch-blade had accidentally snapped open in his pocket and gashed his right hip.

Once while looking at switchblades in a Connecticut store, I feigned innocence, asking, "Do you think this is an appropriate gift for my twelve-year-old nephew?"

"It's ideal; you couldn't get a boy that age a nicer present," I was assured.

Later I watched my neighbor's tow-headed twelve-year-old son empty his pockets of the familiar boyhood miscellany: pennies, a ball, some nails, gum, a magnifying glass—and yes, a three-inch switchblade. When I expressed concern at his carrying such a weapon, he proudly showed me how to use it, jabbing at an imaginary enemy.

I couldn't help thinking of the twelve-year-old lad who was switch-knifed in the back last year outside his public school by an angry schoolmate to whom he refused to lend a dime.

Teachers in some areas take switch knives from pupils before allowing them to come to class. Nevertheless some boys I talked to told me they avoid detection by slipping their knives into their shoes.

Why are these switchblades so popular with youngsters? One reason is that many sources of their entertainment have glamorized them, charges Edward J. Kelly, former superintendent of Rhode Island State Police.

But one fourteen-year-old New Jersey boy got the idea elsewhere. Last spring when a twelve-year-old classmate accidentally bumped into him in school, he whipped out a handy switchblade, and as witnesses put it, "cut a

hole in the other boy." The victim later said, "I never even saw the knife—I only felt it."

"Why did you carry a switchblade knife to school?" the youthful stabber was asked.

"For protection!" he defiantly replied. "A couple of kids jabbed me with a switch knife last week and took thirty-three cents from me! So the next day I took sixty-seven cents out of my sister's penny bank and bought me a switchblade."

Violence begets violence.

No wonder a juvenile court judge told me, "It's only a short step from carrying a switch-blade to gang warfare."

Can anything be said in defense of allowing youngsters to have these weapons? I interviewed manufacturers and spokesmen for the industry. This is their argument: "If you don't let kids have push-button knives, they'll only find other weapons to commit their crimes with—ice picks, baseball bats, even hatpins. The sale of knives isn't to blame. It is the education of these unfortunate youngsters."

Authorities consider this false reasoning. Of course people will always manage to get hold of weapons to commit *premeditated* crimes. But it is the *unintentional* stabbings committed with this too handy pocketknife that could be avoided by outlawing its manufacture. "Countless crimes would *never* be committed if switchblades were banned," Assistant United States Attorney J. Warren Wilson assured me in Washington.

It may surprise you, but crime statistics everywhere reveal that knives cause far more trouble than guns. The ratio is as high as five to one in some communities. In examining police records I was stunned to find how many crimes of violence revolve around a switchblade. Most newspapers merely report a "knife stabbing," neglecting to tell you a switchblade was the culprit.

CLEVELAND recognizes the switchblade menace. Listen to Captain David Kerr of the Homicide Detail: "Last year we had one hundred and sixty-nine stabbings, one hundred and forty of them with switchblade knives. During the same period switchblades were responsible for one fourth of our homicides. Half of the killers were under twenty-three."

Chicago—especially on the South Side—has been harassed by switchblades. "Many cuttings result from trivial disputes," reveals Virgil W. Peterson, director of the Chicago Crime Commission. "If the courts would enforce laws making it illegal to carry dangerous knives, crime would be greatly reduced."

Detroit's former Police Commissioner John H. Witherspoon tried to outlaw switchblades several years ago—but the city council failed to approve the ban. Last year Boston Police Captain Louis DiSessa asked a legislative committee to make possession of switchblade knives a criminal offense, but nothing was done.

In all my investigations I could find no good reason why anybody—youngster or adult—should be legally allowed to carry a switch-blade. It's hardly a "perfect Father's Day gift," as one overzealous merchant claimed.

Psychiatrists warn that a switchblade in the irresponsible hands of alcoholics and psychopathic personalities can spell murder. Recently in Hempstead, New York, a young war-hero—who had survived three battle wounds—was quietly getting off a bus with his girl friend. Suddenly, without warning of reason, another passenger—a drunken forty-five-year-old stranger—grabbed the young man and plunged a four-inch switchblade into his chest, killing him almost instantly. Who was the killer? A man with a long police record for drunkenness and assault. He couldn't carry a gun without a permit. Why was it so *easy* for him to roam the streets with a switch-blade knife?

At almost the same time, in Newark, New Jersey, a thirty-five-year-old woman accused her husband of being unfaithful. Before he had a chance to explain, she angrily yanked a switchblade from her stocking and stabbed her husband in the heart. The next day he died.

"If she had only hit her husband with a dish or a rolling pin instead!" mused a police

[*continued on page 109*]

# The Toy That Kills

*from page 88*

official. "A switchblade isn't something for anybody with a temper to have."

Newark has now declared all-out war against switchblades.

City and county law-enforcement officers are co-operating to battle the problem. Judges are handing out stiffer sentences to carriers of dangerous knives. Merchants have been ordered to remove them from their windows and threatened with stiff prison terms for selling them to minors.

The schools help too. In an unprecedented directive, Newark School Superintendent John S. Herron instructed principals and teachers to suspend—even expel—students bringing "oversized pocketknives" to school. "I have not had a single complaint since then," Dr. Herron told me.

Because the term "dangerous knife" is vague in New Jersey—as in most state laws—a down-to-earth woman legislator, Grace M. Freeman, expects soon to introduce a bill to clarify it. Under her proposal, registration of all knives over a certain length would be required. Switchblades would be outlawed flatly. And New Jersey's law on the sale and possession of other dangerous knives would be greatly tightened.

"Why put temptation in people's hands by making it so easy to buy a switchblade?" said legislator Freeman, a former schoolteacher.

BECAUSE of the growing number of knife assaults in Washington, D. C., Congress will soon be asked by the United States Attorney's office to pass a local ordinance requiring people buying switchblades to secure permits. "We want to make it as hard to buy a switch-blade as a gun," Assistant United States Attorney Wilson reveals.

What the District of Columbia and Newark are doing, other places all over America should be doing.

Why aren't they?

Simply because of public apathy.

On your behalf, I have asked the authorities what women can do *now*. Here are their answers:

1. Make sure that your children don't carry switchblades or other dangerous knives.

2. If your son has a pocketknife for scouting or fishing, discourage his taking it to school, the movies or other public places. Don't let him be smart-alecky about it. Deglamorize knife-carrying to him.

3. See to it that your local storekeepers don't have flagrant window displays of dangerous knives. Help prosecute dealers who sell them to minors. Through your local woman's club or PTA you can conduct educational campaigns against switchblades and award posters to co-operating merchants which say:

This Store Has Stopped Selling
Switchblades and Other Dangerous
Knives to Help Cut Down Juvenile
Delinquency and Crime

4. Help your local law-enforcement agencies round up dangerous knives.

5. Work for passage of a state law which bans switchblades and controls other dangerous knives. To be effective, laws must be statewide because children can cross city limits to secure the forbidden weapons. Naturally, these laws must be *strictly* enforced. In one state it's against the law to carry a concealed switchblade all right, but many stores go right on selling them.

In coming days, more and more state legislatures will ponder the dangerous knife problem. They can greatly benefit from the pressure of aroused far-sighted women interested in protecting their communities.

Human nature being what it is, when a switchblade tragedy occurs too many of us deplore the incident—and then forget all about it. But as Newark Safety Director Keenan reminds us, "If we can make America safe from firecrackers, we can from knives too."

Don't be unduly alarmed.

But don't wait, either, until a youngster—it could be yours—is murdered with a "toy" pocketknife.                           [THE END]

KnifeRights.MNJ App 000656

# KEN ONION EXHIBIT B

KnifeRights MSJ App.000657

**Automatic Spring Blade Knives**
**with locking device and safety catch**

#10   Exact miniature replica of standard
      spring-blade, no safety. Has shackle,
      genuine horn handle, brass lined, brass
      riveted, mirror finish blade, polished
      decorative guard and bolster, blade
      1-1/8" long, handle 1-5/8.

#14   Standard spring blade with push button
      release and lock, other features same
      as above.  Also with simulated mother
      of pearl scales.  Blade 1-7/8" long,
      handle 2-5/8.

#18   Same as above, blade 2-3/4" long, handle
      3-3/4.

#20   Same as #14, Blade 3-3/4" long, handle
      4-1/2.

#22   Same as #14, Blade 4" long, handle 5.

#28   Same as #14, Blade 5" long, handle 6.

N.B.  These knives are called stilletoes.
      They do not have sharp edges.  The
      steel will take and hold a sharp edge
      if desired.



Latama Imported Cutlery catalog circa 1948

KnifeRights MSJ App.000658



KnifeRights MSJ App.000659





KnifeRights MSJ App.000660



## SHUR-SNAP AUTOMATIC

One blade **automatic push** button knife.

Blade can be locked in open or closed position.

High carbon steel, automatically hardened and tempered.

Unbreakable plastic handles.

Length closed, 4 inches.

One doz on **three-color** counter display card.

**No. C3-1800C**—Wt doz 2 lbs ____
One card in carton.

**Per Doz**
**$25 20**

KnifeRights MSJ App.000661



KnifeRights MSJ App.000662

## Instructions for Operating PRESTO Automatic Safety Knife
—o—

OPENING - Move safety slide away from button. Press the button opening the blade.

CLOSING - Press the button. Close blade. Move safety slide towards button. This locks blade so it will not open in the pocket. Blade locks open and locks closed.

### KEEP YOUR KNIFE IN PROPER CONDITION

Do not sharpen blade on grind stone. Sharpen blade on oil stone by holding blade at a slight angle so that it will have a short bevel. Do not lay blade flat on stone when sharpening.

**Oil joints of knife occasionally so that blade will open and close smoothly.**

George Schrade Knife Company, Inc.

46 Seymour Street                    Bridgeport, Conn.

KnifeRights MSJ App.000663



Instructions For Operating
"PULL-BALL" Automatic Knife

TO OPEN: Pull Ball.
TO CLOSE: Simply press blade down until blade snaps
into lock position.

Keep Your Knife In Proper Condition

Do not sharpen blade on grind stone. Sharpen blade on
oil stone by holding blade at a slight angle so that it will
have a short bevel. Do not lay blade flat on stone when
sharpening.

Oil joints of knife occasionally so that blade will
open and close smoothly.

The OSBORNE COMPANY
Clifton, N. J., U. S. A.

Schrade Patents
11-9-37  10-10-44

"LEST YOU FORGET"
LUDWIG MILK CO.

KnifeRights MSJ App.000664

# BARGEON

**#767 "French Automatic"** 9" open, this is an
unusual example of an out-the-front type;
features two-piece construction complete-
ly held together by screws through the frame.
Strong, crisp action. Black plastic knurled grips; chrome-plated metal
bolsters top and bottom. Oversize 4" blade; beautifully polished. Factory boxed: $70.00





**#743 "BARGEON Mini-Pushbutton"** Very unusual item. 5½" open
Features black plastic checkered handles, full brass
liners with milled edges. Has the superbly polished stain-
less steel blade characteristic of all of the "BARGEON" knives. We've never seen finer
finish and polish in any manufacturers items, regardless of price. Factory boxed: $60.00

**#752 "BARGEON Stiletto"** Avail. in two
sizes: 7½" open, and 8½" open.(8½"sz.
pictured) Both sizes feature handle slabs of
imit. Stag. 7½" sz. has full brass liners w/milled edges, and
button-locking of the blade; 8½" sz. has full steel liners, and lock-back blade release, as
shown. Extremely powerfully sprung. Both sz. exhibit the superb blade finish mentioned
above. New, in interesting factory boxes: 7½" $75.00; 8½" $85.00





**#788 "Le Superoto"** Another example of
the french version of the out-the-front
type, this knife features very strong
action, a wrap-around type of frame, and
(8½" open)                                       black checkered handles. The item is screwed together through the frame. It appears to have
a "safety" switch also, but we can't read the instruction sheet which is included with each
piece, in order to get it to operate correctly. Parlay Vous French? Factory New: $60.00

**#755 "BARGEON Guilloche Stiletto"** 7½" open;
This is truly a beautiful piece; features all-
metal handles with tasteful "engine turned" design, full brass liners
with milled edges and the same beautiful fit and finish that we keep raving about.
New in factory box: $80.00



**#759 "BARGEON Black Beauty"** Avail.
in three sizes:: 7½", 8½", or 9½".
This model features black checkered
grips, and is identical to the #752
described above, <u>but</u> the 9½" size is a
real handful! All are extremely powerfully sprung. If you get the idea that we are quite
taken with these new French additions to our
list, you're correct! 7½": $75.00, 8½":
$85.00, 9½": $95.00



# ⊛BARGEON⊛

# ÉNÉE & PEYLAIRE

**#444 "French Automatic FLASH"** 9" open
has smooth textured black plastic handles
and oversize 4" blade. Strong, crisp action.
Very rarely seen type, with large top chromed bolster/guard.
Factory new: $65.00



**#465 "PEYLAIRE Pistol Knife"** We had never seen
one of these before, but there was one shown in the
movie: "The Man Who Wasn't There". Well, now you
can add one of these to your collection. Black metal frame.
blade folds into the top of the "barrel"; pull the trigger and
"BANG"! Opens like a "shot", if you'll pardon the pun.
Factory boxed: $75.00

KnifeRights MSJ App.000665

Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 117 of 462   PageID 790

The



UTOMATIC



NIFE

Resource          Guide

and

NEWSLETTER

KnifeRights MSJ App.000666







The author made the crude blade to [show]
how futile anti-knife laws are. Below is
an Italian-made automatic knife.

Undoubtedly, someone will read these
numbers and decide the answer lies in
banning all pocket, folding and kitchen
knives over a certain blade length. To
prove just how futile this would be, I ran
the following test. I selected a length of
flat steel rod from a pile of scrap metal
on our ranch by a former resident, and
hacksawing off a short section, I easily



Shawn Vallotte's Damascus Western.
Shawn, along with father Butch and
brother Reiny, makes automatic knives in
Oregon, where it is legal to make them.

## Oregon's Switchblade Law

In Oregon it is legal to make,
sell, buy or own switchblade
knives. However, it is illegal
to carry a switchblade knife, a
gravity knife, a dagger, or a dirk
concealed on one's person, or
for a convicted felon to possess
a switchblade or gravity knife.
Most other states have banned
switchblade knives. Under
federal law it is illegal to mail,
carry or ship a switchblade or
gravity knife across state lines.

guard and filed the scrap into a highly
effective, 4 1/2-inch double-edge blade.
Wrapping the base with a little duct tape
provided a handle. Total time from scrap
pile to weapon: about an hour. Steel type
and carbon content? Heck if I know! Heat
treatment and Rockwell hardness? Who
cares! This homemade dagger will cut and
stab as well as most knives and it's both
stronger and larger than the majority of
switchblades I've handled. Use it and throw
it away, it was practically free anyway.

One-hand opening knives have many
legitimate work and sporting applications.
Carpenters, electricians, ranchers,
gardeners and farmers all are presented
with situations when only one hand is
available to open a folding knife. The old
sailing motto of "one hand for the ship and
one hand for yourself" still applies to
modern boaters. Canoers, kayakers and
rafters would be equally well served by an
auto-opener for emergency use, as would
rock climbers and sport parachutists. No
doubt most fishermen and hunters can
remember a situation where a one-hand
folding knife would have been a
tremendous advantage. On the other hand,
banning auto-opening folders has not
reduced crime to any measurable degree.
Having had over 30 years to experiment
with this law and finding it ineffective, isn't
it time we considered correcting the
mistake? —

are over three times more likely to be used
for murder than pocketknives. Short of
forcing everyone to eat pre-prepared
microwave meals, the law cannot deny
criminals access to household cutlery. Plus, if
we forced criminals to substitute kitchen
knives for switchblades, we would probably
increase the murder rate as the average
butcher knife is far larger than the alternative.

Starting with Oregon's 1981 Annual
Crime Report, an average of 22 percent of
homicides and 18 percent of aggravated
assaults were committed with cutting
instruments each year through 1984.
Contrary to national trends, knife assaults
were lower than murders (it's possible
Oregon defines the crime somewhat
differently than other areas). From 1985
(the year switchblades were legalized)
through 1992, 20 percent of murders and
17.7 percent of assaults were committed

with cutting instruments (nationally, the
edged-weapon murder rate averaged
around 19.5 percent for the same years).
While legalizing push-button folders may
not prevent crime, murder and assault
rates did average lower.

One of the primary reasons given for
switchblades being so dangerous is that
their ease of opening makes it more likely
that someone will impulsively strike out in
the heat of anger. From Oregon's crime
rates, this does not seem to have resulted
in a measurable increase in assaults, in any
case. Kitchen knives, screwdrivers, ice
picks, hunting knives and scissors can all
be used with even less effort.

(Above) Examples of some modern
automatic knives legally employed
mainly by military and law enforcement
officials are by, from top: Chuck Oehs,
Benchmade/Al Mar GPA and an Italian-
made folding hunter. (Dick photo)

KnifeRights MSJ App.000668







FLYLOCK AUTOMATIC SAFETY OUTDOOR KNIFE
No. 11004
(WITH FOLDING GUARD)
The ideal knife for all outdoors and sport use. Dependable in any emergency. Insure yourself against knife accidents. One hand only required to open or close, leaving the other free to retain grip on rod, gun or any other object. Crocus polished blade forged from extra heavy gauge crucible cutlery steel, with strong, durable, keen cutting edge Brass linings.
Flylock
Automatically Locks When Opened
Automatically Locks When Closed
$2.50 Post Paid
Blade 3¾"
Handle 5"
Press and slide the button—blade and guard flies open into position. Send for catalog.
Money refunded if not satisfied, on receipt
Showing Folding Guard, Closing
FLYLOCK KNIFE CO., INC. N-106 Lafayette Street New York
—DEALERS INQUIRIES INVITED—

# FLYLOCK
## Automatic
## Safety
## Knives

The Flylock Knife Company, Inc.
106-110 Lafayette Street
New York

KnifeRights MSJ App.000671

*Flylock*

# Flylock Automatic Safety Knives

IN presenting this modest catalog of FLYLOCK Automatic Safety Knives, we have made no effort to make of it an elaborate example of the printer's art. By the use of good paper and first class full size wood cuts, we have illustrated FLYLOCK Knives in a way which we believe will enable our customers to make intelligent selections when samples are not available.

The blades of FLYLOCK Automatic Safety Knives are automatically opened and locked—and when closed are locked automatically. They are opened with one hand, even a gloved hand. The action is easy, direct and positive. The mechanism is simple, strong and of precision accuracy—there is nothing to get out of order.

The automatic action precludes the possibility of broken finger nails or liability of accidental opening in the pocket.

Blades are forged from the best obtainable crucible cutlery and stainless steels and every blade in a FLYLOCK Knife possesses a strong, durable, keen cutting edge.

Every FLYLOCK Knife is guaranteed to give satisfactory service, but there is no guarantee against abuse or misuse. It is our desire that every individual user of a FLYLOCK Knife shall receive the extreme in quality, value and satisfaction. If for any reason a knife proves defective in either workmanship or material, we are only too glad of an opportunity to make good.

Net price lists printed in plain figures will be mailed promptly upon request.

*The Flylock Knife Company, Inc.*



CATALOGUE NO. C15

# FLYLOCK *Automatic Safety Knives*

Automatically
lock when <u>opened</u>

Automatically
lock when <u>closed</u>

Just <u>one</u> operation
with <u>one</u> hand

No fingernails are broken
opening Flylock Knives



*Safe ~ Always*

*Practical*

*Convenient*

# The Flylock Knife Company, Inc.
### 106-110 Lafayette Street, New York

KnifeRights MSJ App.000673

**KEN ONION EXHIBIT C**

KnifeRights MSJ App.000674

DEPARTMENT OF HOMELAND SECURITY,
OFFICE OF THE COMMISSIONER OF CUSTOMS.
*Washington, DC, May 6, 2009*

The following documents of U.S. Customs and Border Protection ("CBP"), Office of Regulations and Rulings, have been determined to be of sufficient interest to the public and CBP field offices to merit publication in the CUSTOMS BULLETIN.

SANDRA L. BELL,
*Executive Director,*
*Regulations and Rulings,*
*Office of International Trade.*

───────

**19 CFR PART 177**

**PROPOSED REVOCATION OF RULING LETTERS AND REVOCATION OF TREATMENT RELATING TO THE ADMISSIBILTY OF CERTAIN KNIVES WITH SPRING-ASSISTED OPENING MECHANISMS**

AGENCY: U.S. Customs and Border Protection, Department of Homeland Security.

ACTION: Notice of proposed revocation of four ruling letters and revocation of treatment relating to the admissibility of certain knives with spring-assisted opening mechanisms.

SUMMARY: Pursuant to section 625(c), Tariff Act of 1930 (19 U.S.C. §1625(c)), as amended by section 623 of Title VI (Customs Modernization) of the North American Free Trade Agreement Implementation Act (Pub. L. 103–182,107 Stat. 2057), this notice advises interested parties that U.S. Customs and Border Protection (CBP) intends to revoke four ruling letters relating to the admissibility, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 (and the CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103) of certain knives with spring-assisted opening mechanisms. Similarly, CBP proposes to revoke any treatment previously accorded by it to substantially identical transactions. Comments are invited on the correctness of the intended actions.

DATE: Comments must be received on or before June 21, 2009.

ADDRESS: Written comments are to be addressed to U.S. Customs and Border Protection, Office of International Trade, Regulations

KnifeRights MSJ App.000675

and Rulings, Attention: Intellectual Property and Restricted Merchandise Branch, Mint Annex, 799 9th Street, N.W., Washington, D.C. 20229. Submitted comments may be inspected at U.S. Customs and Border Protection, 799 9th Street, N.W., Washington, D.C., during regular business hours. Arrangements to inspect submitted comments should be made in advance by calling Joseph Clark, Trade and Commercial Regulations Branch, at (202) 325–0089.

FOR FURTHER INFORMATION CONTACT: Andrew M. Langreich, Intellectual Property and Restricted Merchandise Branch, at (202) 325–0089.

SUPPLEMENTARY INFORMATION:

## BACKGROUND

On December 8, 1993, Title VI (Customs Modernization) of the North American Free Trade Agreement Implementation Act (Pub. L. 103–182, 107 Stat. 2057) (hereinafter "Title VI") became effective. Title VI amended many sections of the Tariff Act of 1930, as amended, and related laws. Two new concepts which emerged from the law are **informed compliance** and **shared responsibility**. These concepts are premised on the idea that in order to maximize voluntary compliance with customs laws and regulations, the trade community needs to be clearly and completely informed of its legal obligations. Accordingly, the law imposes a greater obligation on CBP to provide the public with improved information concerning the trade community's responsibilities and rights under the customs and related laws. In addition, both the trade and CBP share responsibility in carrying out import requirements. For example, under section 484 of the Tariff Act of 1930 (19 U.S.C. §1484), as amended, the importer of record is responsible for using reasonable care to enter, classify and value imported merchandise, and provide any other information necessary to enable CBP to properly assess duties, collect accurate statistics and determine whether any other applicable legal requirement is met.

Pursuant to section 625(c)(1), Tariff Act of 1930 (19 U.S.C. §1625(c)(1)), as amended by section 623 of Title VI, this notice advises interested parties that CBP intends to revoke four ruling letters concerning to the admissibility of certain knives with spring-assisted opening mechanisms. Although in this notice CBP is specifically referring to the revocation of Headquarters Ruling Letters (HQ) 116315, dated March 1, 2005 (Attachment A); HQ W116730, dated November 7, 2006 (Attachment B); HQ H016666, dated December 12, 2007 (Attachment C) and HQ H032255, dated August 12, 2008 (Attachment D), this notice covers any rulings on the admissibility of such merchandise which may exist but have not been specifically identified. CBP has undertaken reasonable efforts to search existing databases for rulings in addition to those identi-

**KnifeRights MSJ App.000676**

fied. No further rulings have been found. Any party who has received an interpretive ruling or decision (*i.e.*, ruling letter, internal advice memorandum or decision or protest review decision) on the admissibility of merchandise subject to this notice should advise CBP during this notice period.

Similarly, pursuant to section 625(c)(2), Tariff Act of 1930 (19 U.S.C. § 1625 (c)(2)), as amended by section 623 of Title VI, CBP intends to revoke any treatment previously accorded by CBP to substantially identical transactions. Any person involved with substantially identical transactions should advise CBP during this notice period. An importer's failure to advise CBP of substantially identical transactions or of a specific ruling not identified in this notice, may raise issues of reasonable care on the part of the importer or its agents for importations of merchandise subsequent to the effective date of the final decision on this notice.

In HQ 116315, HQ W116730, HQ H016666, and HQ H032255, CBP determined that certain knives with spring- or release-assisted opening mechanisms were admissible pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the CBP Regulations promulgated pursuant thereto and set forth in 19 CFR §§ 12.95– 12.103. Based on our recent review and reconsideration of HQ 116315, HQ W116730, HQ H016666, and HQ H032255, and reexamination of several of the knives therein at issue, we have determined that the admissibility determination in the aforementioned rulings is incorrect. It is now CBP's position that knives incorporating spring- and release-assisted opening mechanisms are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245.

Pursuant to 19 U.S.C. § 1625(c)(1), CBP intends to revoke HQ 116315, HQ W116730, HQ H016666, and HQ H032255, and any other ruling not specifically identified that is contrary to the determination set forth in this notice to reflect the proper admissibility determination pursuant to the analysis set forth in proposed Headquarters Ruling Letters (HQs) H043122 (Attachment E), H043124 (Attachment F) H043126 (Attachment G) and H043127 (Attachment H) . Additionally, pursuant to 19 U.S.C. §1625(c)(2), CBP intends to revoke any treatment previously accorded by CBP to substantially identical transactions that are contrary to the determination set forth in this notice. Before taking this action, consideration will be given to any written comments timely received.

DATED: May 1, 2009

JEREMY BASKIN,
*Director,*
*Border Security & Trade Compliance Division*

Attachments

[ATTACHMENT A]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
**HQ 116315**
March 1, 2005
**RES–2–23 RR:IT:EC** 116315 GOB
**CATEGORY:** Restricted Merchandise

THOMAS M. KEATING, ESQ.
HODES, KEATING & PILON
*39 South LaSalle Street Suite 1020*
*Chicago, IL 60603–1731*

**RE:** HQ 116229 Modified; Knives; Switchblade Knives; 15 U.S.C. §§ 1241–
1245; 19 CFR §§ 12.95–12.97

DEAR MR. KEATING:

This letter is in reply to your letter of September 17, 2004 on behalf of
Fiskars Brands, Inc. ("Fiskars"), requesting reconsideration of HQ 116229,
dated July 8, 2004. You made an additional submission of December 14,
2004 and participated in a telephone conference on October 29, 2004. We
have reviewed HQ 116229 and have determined that it should be modified.

Pursuant to section 625(c), Tariff Act of 1930 (19 U.S.C. 1625(c)), as
amended by section 623 of Title VI (Customs Modernization) of the North
American Free Trade Agreement Implementation Act, Pub. L. 103–182, 107
Stat. 2057, 2186 (1993), notice of the proposed modification of HQ 116229, as
described below, was published in the Customs Bulletin on January 26,
2005. No comments were received in response to the notice. One request for
reconsideration of another ruling was received. That request will be consid-
ered separately from the subject notice.

**FACTS:**

You request reconsideration of HQ 116229, wherein we determined that the
knives at issue were switchblades and therefore prohibited entry into the
United States pursuant to the Switchblade Knife Act (15 U.S.C. §§ 1241–
1245).

You describe the knives as follows:

The subject merchandise are release assisted knives designed to be pri-
marily used as a "general carry." The knife's features, such as the belt
clip and serrated edge, are characteristic of a jackknife or pocket knife,
rather than a weapon. There are two versions of the knives at issue.
Part number 22–0761 [07161] is a serrated blade version (previously at-
tached as Sample A) and part number 22–07162 is a fine edged version
(previously attached as Sample B) [Footnote omitted.]

. . . part number 22–07161 (Exhibit A) is a folding blade knife made in
Taiwan. The knife is made of metal and includes a pocket clip on the
side of the handle. The knife has the visual appearance of a jackknife or
pocketknife. The knife measures 4 ¼ inches long when closed. When ex-
tended, the blade of the knife measures 3 inches total. The blade has a
serrated section measuring 1 ¼ inches. The overall length of the knife,
when extended, is 7 ¼ inches. There is a 3/16 inch thumb stud on each

**KnifeRights MSJ App.000678**

side of the unsharpened edge near the base of the blade used for pulling the blade open. The blade has a single edge and can be locked into an open position by the use of a safety device. The same safety device is used to lock the knife in the closed position. This device does not act to open or close the knife – its sole function is to keep the knife locked in the knife's then-existing position. The knife also has a lock mechanism that must be released to close the knife once the knife is open. This mechanism is not engaged in any way to open the knife. Release assisted knife, part number 22–07162 (Exhibit B), is identical in description to part number 22–07161 (Exhibit A), except that it has a fine edge, not a serrated blade.

**ISSUE:**

Whether the subject knives are prohibited entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245.

**LAW AND ANALYSIS:**

<u>Statutory and Regulatory Background</u>

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Customs and Border Protection ("CBP") Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. In this regard we note the following definitions:

**§ 12.95  Definitions.**

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a) *Switchblade knife*. . . . any imported knife, . . . including "Bali-song", "butterfly" . . . knives, which has one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof.

. . .

   (c) *Utilitarian use.* "Utilitarian use" includes but is not necessarily
   limited to use:

   (1) For a customary household purpose;

   (2) For usual personal convenience, including grooming;

   (3) In the practice of a profession, trade, or commercial or employ-
   ment activity;

   (4) In the performance of a craft or hobby;

   (5) In the course of such outdoor pursuits as hunting and fishing;
   and

   (6) In scouting activities.

Other pertinent regulations are as follows:

### § 12.96  Imports unrestricted under the Act.

   (a) *Common and special purpose knives.* Imported knives with a blade
   style designed for a primary utilitarian use, as defined in § 12.95(c),
   shall be admitted to unrestricted entry provided that in condition as
   entered the imported knife is not a switchblade knife as defined in
   § 12.95(a)(1). . . .

### § 12.97  Importations contrary to law.

   Importations of switchblade knives, except as permitted by 15 U.S.C.
   1244, are importations contrary to law and are subject to forfeiture un-
   der 19 U.S.C. 1595a(c).

HQ 116229

In HQ 116229, dated July 8, 2004, this office ruled that the subject knives
were switchblades within the meaning of 19 CFR 12.95(a)(4) and were
therefore prohibited entry into the U.S. pursuant to the Switchblade Knife
Act. HQ 116229 did not address whether the knives were switchblades
within the meaning of 19 CFR 12.95(a)(1) or whether they had a utilitarian
use pursuant to 19 CFR 12.95(c).

Your Claims

In your submission of December 14, 2004, you made the following claims:

(1) The subject knives are not switchblade knives within the meaning of 19
CFR 12.95(a)(1).

(2) In HQ 114990 CBP found that knives similar to the subject knives had
blades designed for utilitarian uses within the meaning of 19 CFR 12.95(c).

(3) Marketing and promotional materials with respect to the subject knives
are not yet available as Fiskars has not begun commercially importing the
knives. You submitted various marketing materials with respect to other
Fiskars' products, some of which are similar to the subject knives. Such
similar knives, which are within the same class of lightweight folding knives
as the subject knives, are the "E-Z-Out," "Gator" and "L.S.T." knives. Promo-
tional materials for the Gator knives provide that they are "used by a wide
assortment of people including fishing and hunting enthusiasts, electricians
and repairmen and many more." Materials for the E-Z-Out knives provide:
"A hard working electrician, repairman, policeman or home repair person
seldom has both hands free to retrieve a knife. With the E-Z-Out

BUREAU OF CUSTOMS AND BORDER PROTECTION 11

they need only one hand to reach down, grab the knife, open it, use it and put it away." Materials for the L.S.T. knives refer to them as "the perfect pocket knives." They are "light enough to be carried everywhere, strong enough for everyday activities, and tough enough to do anything."

You therefore contend that the subject knives should be admitted to unrestricted entry pursuant to 19 CFR 12.96(a).

Our Analysis and Determination

As indicated above, in HQ 116229 this office found that the subject knives are switchblades within the meaning of 19 CFR 12.95(a)(4). Upon further review, however, we have now determined that the subject knives are not switchblades within the meaning of 19 CFR 12.95(a)(1) because they do not meet the criteria therein, *i.e.*, they do not open automatically by hand pressure applied to a button or device in the handle, nor do they open automatically by operation of inertia, gravity, or both. We find additionally that the subject knives have a blade style designed for a primary utilitarian use within the meaning of 19 CFR 12.95(c).

Accordingly, we conclude that the requirements of 19 CFR 12.96(a) are satisfied, *i.e.*, the subject knives have a blade style designed for a primary utilitarian use as defined in 19 CFR 12.95(c) and they are not switchblades within the meaning of 19 CFR 12.95(a)(1). Therefore, pursuant to 19 CFR 12.96(a), the subject knives (part nos. 22–07161 and 22–07162) are permitted unrestricted entry into the United States.

**HOLDING:**

The subject knives (part nos. 22–07161 and 22–07162) are permitted unrestricted entry into the United States pursuant to 19 CFR 12.96(a).

**EFFECT ON OTHER RULINGS:**

HQ 116229 is modified. In accordance with 19 U.S.C. 1625(c), this ruling will become effective 60 days after publication in the Customs Bulletin.

CHARLES D. RESSIN,
*Acting Director,*
*International Trade Compliance Division.*

[ATTACHMENT B]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
**HQ W116730**
November 7, 2006
**RES–2–23 RR:BSTC:CCI** W116730 GOB
**CATEGORY:** Restricted Merchandise

MATTHEW K. NAKACHI, ESQ.
SANDLER, TRAVIS & ROSENBERG AND GLAD & FERGUSON, P.C.
*One Sutter Street 10th Floor*
*San Francisco, CA 94104*

**RE:** Knives; Switchblade Knives; 15 U.S.C. §§ 1241–1245; 19 CFR §§ 12.95–12.97

DEAR MR. NAKACHI:

This letter is in reply to your letter of May 31, 2006 on behalf of Columbia

KnifeRights MSJ App.000681

River Knife and Tool ("CRKT"), requesting a ruling with respect to the admissibility of certain knives described below. Your ruling request was transferred to this branch for response on October 11, 2006. Our ruling is set forth below.

**FACTS:**

You describe the knives as follows:

> The Outburst mechanism operates via a *slight* spring action, which assists in the opening of the knife by application of the finger or thumb pressure on a thumb stud or disc which protrudes from the side of the blade, allowing the blade to be more easily pushed to an open and locked position. The interior of the blade is engineered such that the spring actually provides resistance, which prevents the knife from opening, until the blade is opened to approximately a 30-degree angle.

> Hence, when incorporated into knives, the Outburst mechanism only *assists* in the opening of the knife when the blade is opened to approximately 30-degrees. The user is unable to modify this restriction since at angles less than 30-degrees, the spring exerts back-pressure which holds the blade closed. . . . This back-pressure arises from the engineering of the tempered blade shape and not from the mere tightening of a blade screw.

> Since the Outburst mechanism holds the blade closed, it renders the tightness of the blade screw **irrelevant** for purposes of review under the Switchblade Knife Act. . . . As a secondary level of protection, *even if the main spring of the Outburst mechanism is removed*, the locking arm of the knife itself contains a ball-detent bias against the blade which prevents the knife from being flicked open by inertia or gravity. The ball-detent bias is also not readily accessible to modification by the user.

> The knife models subject to this ruling are as follows:

> 1. The *Koji Hara Ichi* consists of a drop-point, pen-knife blade, in black or silver. The body of the knife is built on an open frame with Zytel scale inserts and fasteners and a removable clip. . . .

> 2. The *My Tighe* consists of a stainless-steel, utilitarian blade with optional serrations. The knife includes black Zytel inserts, black hardware and a black Teflon-plated, removable clip. . . .

> 3. The *Kommer Full Throttle* consists of a stainless-steel, straight blade with optional serrations. The knife is built on an open frame with a flat handle profile. . . .

> All of the blades are readily identifiable as being designed for personal, utilitarian use. . . .

> . . .

> . . . Such single-handed opening is greatly beneficial to craftsmen, outdoorsmen and workers, who are engaged in a particular task when the need to simultaneously make a cut arises. For example, a fisherman could be holding a fish caught on a fishing line with one hand, while both drawing and opening an Outburst assisted-opening knife with the other hand.

> [All emphasis in original.]

You have submitted samples of the following knives, as identified on their packages: 1080 Full Throttle; 1081 Full Throttle; 1070 Ichi; 1070KSC Ichi; 1070R Red Ichi Asist.; 1090 My Tighe; 1091 My Tighe; and 1091K My Tighe Black. It is these eight knives which are the subject of this ruling. In the closed position, these knives range in length from four and one-half inches to three and one-quarter inches. The blades range in length from three and one-half inches to two and three-eighths inches.

**ISSUE:**

Whether the subject knives are prohibited entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Customs and Border Protection ("CBP") Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. In this regard we note the following definitions:

**§ 12.95  Definitions.**

Terms as used in §§12.96 through 12.103 of this part are defined as follows:

(a) *Switchblade knife.* . . . any imported knife, . . . including "Balisong", "butterfly" . . . knives, which has one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof.

(c) *Utilitarian use.* "Utilitarian use" includes but is not necessarily limited to use:

(1) For a customary household purpose;

(2) For usual personal convenience, including grooming;

**14**    CUSTOMS BULLETIN AND DECISIONS, VOL. 43, NO. 21, MAY 22, 2009

> (3) In the practice of a profession, trade, or commercial or employ-ment activity;
>
> (4) In the performance of a craft or hobby;
>
> (5) In the course of such outdoor pursuits as hunting and fishing; and
>
> (6) In scouting activities.

Other pertinent regulations are as follows:

> **§ 12.96  Imports unrestricted under the Act.**
>
> (a)  *Common and special purpose knives.* Imported knives with a blade style designed for a primary utilitarian use, as defined in §  12.95(c), shall be admitted to unrestricted entry provided that in condition as entered the imported knife is not a switchblade knife as defined in §  12.95(a)(1). . . .
>
> **§ 12.97  Importations contrary to law.**
>
> Importations of switchblade knives, except as permitted by 15 U.S.C. 1244, are importations contrary to law and are subject to forfeiture un-der 19 U.S.C. 1595a(c).

In HQ 116315, dated March 1, 2005, we stated as follows:

> . . . we have now determined that the subject knives are not switchblades within the meaning of 19 CFR 12.95(a)(1) because they do not meet the criteria therein, *i.e.*, they do not open automatically by hand pressure applied to a button or device in the handle, nor do they open automatically by operation of inertia, gravity, or both. We find additionally that the subject knives have a blade style designed for a pri-mary utilitarian use within the meaning of 19 CFR 12.95(c).
>
> Accordingly, we conclude that the requirements of 19 CFR 12.96(a) are satisfied, *i.e.*, the subject knives have a blade style designed for a pri-mary utilitarian use as defined in 19 CFR 12.95(c) and they are not switchblades within the meaning of 19 CFR 12.95(a)(1). Therefore, pur-suant to 19 CFR 12.96(a), the subject knives (part nos. 22–07161 and 22–07162) are permitted unrestricted entry into the United States.

We have carefully examined the eight knives which you have submitted. These knives are substantially similar in operation to the knives in HQ 116315. We find that the subject knives are not switchblade knives within the meaning of 19 CFR § 12.96(a)(1) in that the blades do not open auto-matically by hand pressure applied to a button or device in the handle of the knife (there is no opening device on the handle), nor do the knives open au-tomatically by operation of inertia or gravity. We further find that the knives have a blade style designed for a primary utilitarian use within the meaning of 19 CFR § 12.95(c).

  Based upon these findings, we conclude that the requirements of 19 CFR 12.96(a) are satisfied, *i.e.*, the subject knives have a blade style designed for a primary utilitarian use as defined in 19 CFR 12.95(c) and they are not switchblades within the meaning of 19 CFR 12.95(a)(1). Therefore, pursuant to 19 CFR 12.96(a), the subject knives (1080 Full Throttle; 1081 Full Throttle; 1070 Ichi; 1070KSC Ichi; 1070R Red Ichi Asist.; 1090 My Tighe;

BUREAU OF CUSTOMS AND BORDER PROTECTION          15

1091 My Tighe; and 1091K My Tighe Black) are permitted unrestricted entry into the United States.

**HOLDING:**

The subject knives are permitted unrestricted entry into the United States pursuant to 19 CFR 12.96(a).

GLEN E. VEREB
*Chief,*
*Cargo Security, Carriers, and Immigration Branch.*

◆

[ATTACHMENT C]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H016666
December 12, 2007
ENF–4–02–OT:RR:BSTC:IPR H016666 AML
CATEGORY: Restricted Merchandise

MS. LARA A. AUSTRINS
MR. THOMAS J. O'DONNELL
RODRIGUEZ, O'DONNELL ROSS
*8430 W. Bryn Mawr Ave., Suite 525*
*Chicago, Illinois 60631*

RE:  Request for Ruling Regarding the Admissibility of Knives

DEAR MS. AUSTRINS AND MR. O'DONNELL:

This is in reply to your letters dated July 17, and August 2, 2007, to the National Commodity Specialist Division, New York, in which you requested a ruling regarding the admissibility of certain knives described below. As you are aware, your ruling request was transferred to this branch for response. A sample was provided for our consideration.

**FACTS:**

You describe the knife at issue, marketed as the "Tailwind" (model number HD0071), as a single edged, release assisted, folding knife. The knife has a "false edge grind" on the topside of the 3 ½ inch blade and measures 4 ½ inches when closed. When extended, the overall length of the knife is 7¾ inches. The knife weighs 4.2 ounces.

The Tailwind name is derived from the patented opening mechanism. The opening mechanism, subject of U.S. Patent number 7,051,441, is equipped "with an assist spring, which assists in the opening of the knife only after the knife has been manually opened to approximately thirty degrees." The blade must be opened manually until the blade reaches approximately thirty degrees at which point the mechanism engages and the blade springs open to its extended and locked. The knife is refolded by depressing a manual release.

**KnifeRights MSJ App.000685**

**16**   CUSTOMS BULLETIN AND DECISIONS, VOL. 43, NO. 21, MAY 22, 2009

Images of the Tailwind:



**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the Customs and Border Protection ("CBP") Regulations promulgated pursuant to the Switchblade Knife Act set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Headquarters Ruling Letters (HQ) W116730, dated November 7, 2006 and 116315, dated March 1, 2005 (copies enclosed), address CBP's position on the admissibility of knives with spring assisted mechanisms substantially similar to the ones under consideration. In HQ W116730, we determined that the "Outburst" knife "with a mechanism [that] only assists in the opening of the knife when the blade is opened to approximately 30-degrees" was admissible under the Switchblade Knife Act. Similarly, in HQ 116315, we determined that a "Release assisted knife, part number 22–07162" are permitted unrestricted entry into the United States pursuant to 19 CFR 12.96(a).

Accordingly, we incorporate the LAW AND ANALYSIS section of the aforementioned rulings in this decision, as they are dispositive of the issue you have raised.

**HOLDING:**

The subject knife (the "Tailwind" (model number HD0071)) has a blade style designed for a primary utilitarian use as defined in 19 CFR 12.95(c) and it is not a switchblade within the meaning of 19 CFR 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and 19

KnifeRights MSJ App.000686

BUREAU OF CUSTOMS AND BORDER PROTECTION          17

CFR 12.96(a), the subject knives are permitted unrestricted entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights Branch Enclosures*

◄──────►

[ATTACHMENT D]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H032255
August 12, 2008
ENF–4–02–OT:RR:BSTC:IPR H032255 AML
CATEGORY: Restricted Merchandise

MR. MATTHRE K. NAKACHI
SANDLER, TRAVIS & ROSENBERG, P.A.
*1300 Pennsylvania Avenue Suite 400*
*Washington, DC 20004*
RE:  Request for Ruling Regarding the Admissibility of Knives
DEAR MR. NAKACHI:

This is in reply to your letter dated July 1, 2008, in which you requested a ruling regarding the admissibility of a knife, set forth in images and described below, pursuant to the Switchblade Knife Act, 15 U.S.C. § 1241, *et seq.* A sample was provided for our consideration.

**FACTS:**

You describe the knife at issue, tentatively planned by your client to be called the "VanHoy Assist," as a knife "of new design." The prototype is of standard knife construction with a single-edged, utilitarian blade. You state that "the unique nature of the knife is that the assisted-opening mechanism operates by thumb or hand pressure downward on the blade/thumbscrew (rather than the traditional upward pressure)." You further indicate that "the downward pressure releases the locking mechanism and then a slight spring action assists the opening of the blade to the fully locked position." The knife has a 3 inch blade and measures approximately 4 ⅝ inches when closed. When extended, the overall length of the knife is approximately 7 ⅝ inches. The knife is refolded by depressing a manual release.

You contend that there are prior rulings which determined that knives with similar spring-assisted opening mechanisms are admissible pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the implementing Customs and Border Protection ("CBP") Regulations set forth at 19 CFR §§ 12.95–12.103. You cite New York Ruling Letter ("NY") I86378, dated October 1, 2002, in which CBP determined that a knife that was opened by pressing a thumb knob on the surface of the blade was admissible under the Switchblade Knife Act. Similarly, you cite Headquarters Ruling Letter ("HQ") 116315, dated March 1, 2005, which modified HQ 116229, dated July 8, 2004, and held that release assisted knives were admissible pursuant to the Switchblade Knife Act.

You contend that the VanHoy Assist is similar to the knife in HQ 116229 in that the assisted-opening mechanism holds the blade within the knife body and does not have a button in the handle to "trigger the blade to open." Thus you contend that the knife should not be considered to be a switchblade knife under the relevant statute and regulations.

**KnifeRights MSJ App.000687**

Images of the VanHoy Assist:



Side view



Top view



Side view, blade extended



Top view, blade extended

**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

**KnifeRights MSJ App.000688**

The Customs and Border Protection ("CBP") Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. In this regard we note the following definitions:

### § 12.95  Definitions.

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a) *Switchblade knife.* . . . any imported knife, . . . including "Balisong", "butterfly" . . . knives, which ha[ve] one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof.

(c) *Utilitarian use.* "Utilitarian use" includes but is not necessarily limited to use:

(1) For a customary household purpose;

(2) For usual personal convenience, including grooming;

(3) In the practice of a profession, trade, or commercial or employment activity;

(4) In the performance of a craft or hobby;

(5) In the course of such outdoor pursuits as hunting and fishing; and

(6) In scouting activities.

Other pertinent regulations are as follows:

### § 12.96  Imports unrestricted under the Act.

(a) *Common and special purpose knives.* Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1). . . .

### § 12.97 Importations contrary to law.

Importations of switchblade knives, except as permitted by 15 U.S.C. § 1244, are importations contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c).

Headquarters Ruling Letters (HQ) W116730, dated November 7, 2006 and HQ 116315, dated March 1, 2005, address CBP's position on the admissibility of knives with spring-assisted mechanisms substantially similar to those under consideration. In HQ W116730, we determined that the "Outburst" knife "with a mechanism [that] only assists in the opening of the knife when the blade is opened to approximately 30-degrees" was admissible under the Switchblade Knife Act. Similarly, in HQ 116315, we determined that a "Release assisted knife, part number 22–07162" is permitted unrestricted entry into the United States pursuant to 19 CFR Part 12.96(a).

We examined the sample knife considered in HQ 116315 and compared it to the VanHoy Assist. Although the VanHoy Assist has a button on the blade (rather than "thumb studs" on the knife in HQ 116315) which must be depressed in order to unlock and open the knife, the spring assist mechanisms are the same.

In turning to the VanHoy Assist, application of the regulatory criteria set forth above reveals that the subject knives are not switchblades within the meaning of 19 CFR Part 12.95(a)(1) because they do not meet the criteria enumerated therein, *i.e.*, they neither open automatically by hand pressure applied to a button or device in the handle, nor do they open automatically by operation of inertia, gravity, or both. We find additionally that the subject knives have a blade style designed for a primary utilitarian use within the meaning of 19 CFR Part 12.95(c).

Accordingly, we conclude that the requirements of 19 CFR 12.96(a) are satisfied, *i.e.*, the subject knives have a blade style designed for a primary utilitarian use as defined in 19 CFR 12.95(c) and the knives are not switchblades within the meaning of 19 CFR Part 12.95(a)(1). Therefore, pursuant to 19 CFR 12.96(a), the subject knives are permitted unrestricted entry into the United States.

**HOLDING:**

The subject knife (the "VanHoy Assist") has a blade style designed for a primary utilitarian use as defined in 19 CFR 12.95(c) and it is not a switchblade within the meaning of 19 CFR 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and 19 CFR 12.96(a), the subject knives are permitted unrestricted entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights Branch.*

[ATTACHMENT E]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H043122
April 30, 2009
ENF–4–02–OT:RR:BSTC:IPR H043122 AML
CATEGORY: Restricted Merchandise

THOMAS M. KEATING, ESQ.
HODES, KEATING & PILON
134 North LaSalle Street
Suite 1300
Chicago, Illinois 60602

RE: Revocation of HQ 116315; Admissibility of Knives; Switchblade Knife Act, 15 U.S.C. §§ 1241–1245; 19 CFR Parts 12.95–12.103

DEAR MR. KEATING:

This is in reference to Headquarters Ruling Letter ("HQ") 116315, dated March 5, 2005, and issued to you on behalf of Fiskars Brands, Inc., which concerned the admissibility of the "release-assisted " knives described below, pursuant to the Switchblade Knife Act, 15 U.S.C. § 1241, *et seq.* In the referenced ruling, the U.S. Customs Service (hereinafter "CBP")[1] determined that the knives at issue were admissible into the United States pursuant to the Switchblade Knife Act. We have reconsidered the rationale of, and the admissibility determination made in HQ 116315 and found both to be in error. For the reasons set forth below, we hereby revoke HQ 116315.

**FACTS:**

CBP paraphrased your description of the knives at issue in HQ 116315 as follows:

The subject merchandise are release assisted knives designed to be primarily used as a "general carry." The knife's features, such as the belt clip and serrated edge, are characteristic of a jackknife or pocket knife, rather than a weapon. There are two versions of the knives at issue. Part number 22–0761 [07161] is a serrated blade version (previously attached as Sample A) and part number 22–07162 is a fine edged version (previously attached as Sample B) [Footnote omitted.]

. . . part number 22–07161 (Exhibit A) is a folding blade knife made in Taiwan.

The knife is made of metal and includes a pocket clip on the side of the handle.

The knife has the visual appearance of a jackknife or pocketknife. The knife measures 4¼ inches long when closed. When extended, the blade of the knife measures 3 inches total. The blade has a serrated section measuring 1¼ inches. The overall length of the knife, when extended, is

——————————

[1] Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. See Homeland Security Act of 2002, Pub. L. No. 107–296 § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 08–32, at 4 (2003).

7¼ inches. There is a ³⁄₁₆ inch thumb stud on each side of the unsharpened edge near the base of the blade used for pulling the blade open. The blade has a single edge and can be locked into an open position by the use of a safety device. The same safety device is used to lock the knife in the closed position. This device does not act to open or close the knife – its sole function is to keep the knife locked in the knife's then-existing position. The knife also has a lock mechanism that must be released to close the knife once the knife is open. This mechanism is not engaged in any way to open the knife. Release assisted knife, part number 22–07162 (Exhibit B), is identical in description to part number 22–07161 (Exhibit A), except that it has a fine edge, not a serrated blade.

The sample from HQ 116315 bears the word "Gerber" on its blade. A search of that word, in combination with the part numbers recited in the "Facts" section above, produced results (see *http://www.gerberknivesdirect. com/ product/07162*; last visited on January 13, 2009) that describe the opening mechanism as follows: "The FAST Draw relies on our proprietary new blade opening concept—Forward Action Spring Technology—that's so lightning-quick, so pleasingly easy to open with just one hand, it's already drawing a lot of attention among knife folks everywhere . . . Should you choose, you can open the FAST Draw in the traditional way, using the thumb stud. Or, if speed is the order of the day, you can simply trigger the blade's sudden release with your index finger."

**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Switchblade Knife Act defines "interstate commerce" at 15 U.S.C. § 1241(a):

The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

The Switchblade Knife Act defines "switchblade knife" at 15 U.S.C. § 1241(b):

The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both[.]

The CBP Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. We note the following definitions:

**KnifeRights MSJ App.000692**

§ 12.95  Definitions.

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a)  Switchblade knife. "Switchblade knife" means any imported knife, or components thereof, or any class of imported knife, including "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives, which has one or more of the following characteristics or identities:

(1)  A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2)  Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3)  Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4)  Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof[.]

(b)  Insignificant preliminary preparation. "Insignificant preliminary preparation" means preparation with the use of ordinarily available tools, instruments, devices, and materials by one having no special manual training or skill for the purpose of modifying blade heels, relieving binding parts, altering spring restraints, or making similar minor alterations which can be accomplished in a relatively short period of time.

Other pertinent regulations are as follows:

§ 12.96  Imports unrestricted under the Act.

(a)  Common and special purpose knives. Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .

§ 12.97  Importations contrary to law.

Importations of switchblade knives, except as permitted by 15 U.S.C. § 1244, are importations contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c).

The plain language of the Switchblade Knife Act and relevant CBP regulations prohibit, *inter alia*, the importation of knives which are for use as weapons while explicitly permitting the importation of "common and special purpose" knives (see 19 CFR 12.95(c) "Utilitarian Use" and 12.96(a) ("Unrestricted Imports")). Several courts have addressed the breadth of the prohibition set forth in the statute. See, *e.g., Precise Imports Corp. v. Kelly*, 378

F.2d 1014, 1017 (2d Cir. 1967), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967), in which the Court of Appeals for the Second Circuit stated that:

> The report of the Senate Committee on Interstate and Foreign Commerce which recommended passage of the Switchblade Knife Act stated that the enforcement of state laws banning switchblade knives would be extremely difficult as long as such knives could be freely obtained in interstate commerce, and added:

>> "In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce." S.Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 2 U.S. Code Cong. & Ad. News 1958, at 3435–37.

> The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate commerce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion.

> . . . We hold, therefore, that a knife may be found to be a switchblade knife within the meaning of the Switchblade Knife Act if it is found that it can be made to open automatically by hand pressure, inertia, or gravity after insignificant alterations, and that one of its primary purposes is for use as a weapon.

In *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988) the court, in describing a Balisong knife, stated that:

> [T]he district court described a Balisong knife as "basically a folding knife with a split handle." It went on to set out its prime use: while the exotic knife has some utilitarian use, it is most often associated with the martial arts and with combat . . . [and is] potentially dangerous, lethal. . . ." Citing another district court decision involving the same issue, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014 (2d Cir.), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967) (upholding a seizure of certain knives with no legitimate purpose), the district court described it as of "minimal value" and distinguished another "seminal case interpreting the Act", *United States v. 1,044 Balisong Knives*, No. 70–110 (D. Ore. Sept. 28, 1970) (refusing to support seizure). The district court concluded that "congress intended to prohibit knives that opened automatically, ready for instant use . . . [and] was not concerned with whether the knife's blade would merely be exposed by gravity", . . . [it] intended 'open' to mean 'ready for use.' " *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988).

KnifeRights MSJ App.000694

BUREAU OF CUSTOMS AND BORDER PROTECTION                25

See also *Taylor v. McManus*, 661 F. Supp. 11, 14–15 (E.D. Tenn. 1986), in which the Court of Appeals for the Eastern District of Tennessee observed:

> In examining the congressional record, it seems obvious that congress intended to prohibit knives which opened automatically, ready for instant use. Rep. Kelly, for example, described the switchblade "as a weapon (which) springs out at the slightest touch and is ready for instant violence." *Switchblade Knives: Hearings Before a Subcommittee of the Committee on Interstate and Foreign Commerce*, House of Rep., 85th Cong., 2d Sess. 13, 29 (1958). She also noted that the prohibited gravity knife opens and "anchors in place automatically. Every bit as fast as the switchblade, it has proved to be as effective a killer." *Id.* at 29. Similarly, Rep. Delaney described the prohibited gravity knives as "knives (which) open and lock automatically at a quick flick of the wrist." 104 CONG. REC., 85th Cong., 2nd Sess. 12398 (June 26, 1958). (Emphasis supplied). Apparently, then, Congress was not concerned with whether the knife's blade would merely be exposed by gravity. Instead, they intended "open" to mean "ready for use", as exhibited in Rep. Kelley's testimony that the switchblade opened "ready for instant violence" and her and Rep. Delaney's comments that the gravity knife opened and locked automatically. While the Court does not intend to read into the Statute a requirement that the blades "lock" automatically, it does seem apparent that Congress intended "open" to mean "ready for use". Obviously a knife that has not locked into an open position is not ready for use. Since the Balisong knives cannot be used until the second handle is manually folded back and clasped, the Court finds that they do not open automatically by force of gravity or inertia.[2]

Based primarily on 15 U.S.C. § 1241(b)(1) (see also the first clause of 19 CFR Part 12.95(a)(1)) which defines a switchblade knife as being a knife having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, as well as reliance upon the exception set forth at 19 CFR Part 12.95(c) regarding knives with a blade style designed for a primary utilitarian use, CBP decided in several rulings, including HQ 116315, that knives with spring-assisted opening mechanisms are not switchblades as contemplated by the Switchblade Knife Act and implementing regulations.

Notwithstanding, because of the intrinsic health and public safety concerns underlying the statute and regulations, it is necessary to reassess our position regarding knives with spring-assisted opening mechanisms as 1) there are no judicial decisions interpreting, other than in the context of balisong knives, 15 U.S.C. § 1241(b)(2) and the second clause of 19 CFR Part 12.95(a) (discussed below) and 2) CBP has issued inconsistent rulings,

---

[2] The conclusion regarding Balisong knives was reversed by *Taylor v. United States*, 848 F.2d 715, 1988 U.S. App. LEXIS 7761 (6th Cir. Tenn. 1988): "There is sufficient indication in the legislative history that the intent was to exclude these martial arts weapons, which even the district court admitted 'can be opened very rapidly, perhaps in less than 5 seconds . . . [and] are potentially dangerous, lethal weapons." *Id.* at 720. Further, Balisongs were added to the list of prohibited knives when the regulations were amended in 1990. See the discussion of the regulatory amendments in HQ H030606, dated August 12, 2008, page 4.

KnifeRights MSJ App.000695

of which HQ 116315 is one, regarding the issue of whether knives with spring-assisted opening mechanisms are admissible or prohibited from importation into the United States.

In *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. Alaska 2005), the Court of Appeals for the 9th Circuit stated, with regard to the interpretation of agency regulations that:

> "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988)) (alteration in original). When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage. *Compare F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). An agency's interpretation of a regulation must "conform with the wording and purpose of the regulation." *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th Cir. 2003).

Because of the existence of conflicting rulings (*i.e.*, rulings which have determined that knives with spring-assisted opening mechanisms are switchblades as defined in the statute and others which have made the opposite conclusion), we have reexamined the definition of the word "switchblade knife" set forth at 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1) and have determined that the definition set forth therein captures and proscribes, in addition to "traditional" switchblades, the importation of knives with spring-assisted opening mechanisms, often equipped with thumb studs or protrusions affixed to the base of the blade (rather than in the handle of the knives as set forth in the first clause of 19 CFR Part 12.95(a)(1)). The relevant regulatory language identifies and defines "switchblade knives" by exemplars (" "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives") and by definition ("or any class of imported knife . . . which has one or more of the following characteristics or identities: (1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, *or any knife with a blade which opens automatically by operation of inertia, gravity or both*[.]")

In reconsidering what types of knives are contemplated by the statute, we interpret the controlling terms according to their common meanings[3]. The term "automatically" is defined at *http://www.merriam-webster.com/ dictionary/ automatically* as:

> 1 a: largely or wholly involuntary ; especially : reflex 5 <automatic blinking of the eyelids> b: acting or done spontaneously or unconsciously c: done or produced as if by machine : mechanical <the answers

---

[3] A fundamental canon of statutory construction requires that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979); see also 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:01 (6th ed. 2000). *United States v. Lehman*, 225 F.3d 426, 429 (4th Cir. S.C. 2000).

were automatic> 2: having a self-acting or self-regulating mechanism <an automatic transmission> 3 of a firearm : firing repeatedly until the trigger is released.

The term "inertia" is defined at *http://www.merriam-webster.com/ dictionary/inertia* as:

1 a: a property of matter by which it remains at rest or in uniform motion in the same straight line unless acted upon by some external force b: an analogous property of other physical quantities (as electricity).

See also, *http://physics.about.com/od/glossary/g/inertia.htm:* Definition: Inertia is the name for the tendency of an object in motion to remain in motion, or an object at rest to remain at rest, unless acted upon by a force. This concept was quantified in Newton's First Law of Motion; and *http://dictionary.reference.com/browse/ inertia:* 2. Physics. a. the property of matter by which it retains its state of rest or its velocity along a straight line so long as it is not acted upon by an external force.

In *Taylor v. United States,* 848 F.2d 715, 720 (6th Cir. Tenn. 1988), the United States Court of Appeals for the Sixth Circuit, in analyzing the terms of the statute and regulations at issue stated that:

"Automatically" as used in the statute does not necessarily mean simply by operation of some inanimate connected force such as the spring in a literal switchblade. For example, the type of gravity or "flick" knife which is indisputably within the statute requires some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic."

Knives equipped with spring- and release-assisted opening are knives which "require[ ] some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic." " See *Taylor, supra.* The fact that they differ in design (most if not all are equipped with thumb studs affixed to the base of the blunt side of the blade) from a traditional switchblade (in which the button that activates the spring mechanism is located in the handle of the knife), the spring-assisted mechanisms cause, via inertia, the blades of such knives to open fully for instant use, potentially as a weapon. Such knives are prohibited by the Switchblade Knife Act.

Our interpretation of 15 U.S.C. § 1241(b) and 19 CFR 12.95(a)(1) is supported by case law. In *Demko v. United States,* 44 Fed. Cl. 83, 88–89 (Fed. Cl. 1999), the Court of Federal Claims, in analyzing a regulation regarding the grandfathered sale of "street sweeper" shotguns, recited the following interpretations of the word "or" as used in statutes and regulations:

"Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS,* 22 Cl. Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but disconnect[s] their meaning, the meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, <u>A Grammar of the English Language,</u> Syntax 166 (1986)); see *Quindlen v. Prudential Ins. Co.,* 482 F.2d 876, 878 (5th Cir. 1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not ad-

hered strictly to such rules of statutory construction. See *Ruben*, 22 Cl. Ct. at 266. For instance, "it is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States*, 719 F.2d 608, 612 (2d Cir. 1983); see *Ruben*, 22 Cl. Ct. at 266 (quoting same); see also *DeSylva v. Ballentine*, 351 U.S. 570, 573, 100 L. Ed. 1415, 76 S. Ct. 974 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States*, 73 U.S. 759, 764, 18 L. Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively. . . . This construction impairs no rights of the parties . . . and carries into effect the true intention of Congress. . . .").

In analyzing the language of 15 U.S.C. § 1241(b) and the relevant regulation, we conclude that the word "or" is used conjunctively yet distinguishes the paradigm switchblade knife (paraphrased: spring action blade released by depression of a button in the handle) from other knives which function similarly to the paradigm switchblade but do not have the "traditional" configuration or function. Given its legislative and judicial history, the Switchblade Knife Act is intended to proscribe the importation of any knife that opens automatically by hand pressure applied to a button or device in the handle of the knife *and* any knife with a blade which opens automatically by operation of inertia, gravity or both.

The knives at issue open via inertia – once pressure is applied to the thumb stud (or protrusion at the base of the blade), the blade continues in inertial motion (caused by the combined effect of manual and spring-assisted pressure) until it is stopped by the locking mechanism of the knife. Such knives open instantly for potential use as a weapon. We therefore conclude, in consideration of the authorities and sources Switchblade Knife Act and implementing regulations, that the knives with spring and release- assisted opening mechanisms, that such knives are described and prohibited by 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1).

We also have reconsidered our interpretation of the term "utilitarian use", as we have in several rulings found knives with spring-assisted opening mechanisms to be admissible because they were equipped with blades for utilitarian use. The regulation defines, albeit by exemplar, the types of knives (subject to the condition precedent set forth in 19 CFR 12.96: Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .) that are considered to be "utilitarian" for purposes of the statute. See 19 CFR 12.95(c):

(c)  Utilitarian use. "Utilitarian use" includes but is not necessarily limited to use:

(1)  For a customary household purpose;

(2)  For usual personal convenience, including grooming;

(3)  In the practice of a profession, trade, or commercial or employment activity;

(4)  In the performance of a craft or hobby;

BUREAU OF CUSTOMS AND BORDER PROTECTION          29

(5)  In the course of such outdoor pursuits as hunting and fishing; and

(6)  In scouting activities.

As we stated in HQ H030606, dated August 12, 2008, with regard to the regulations implementing the Switchblade Knife Act:

> The relevant CBP regulations were implemented in 1971, following notice and comment, via Treasury Decision ("T.D.") 71–243, and the Final Rule was published in the Federal Register on September 13, 1971. See Final Rule, 36 FR 18859, Sept. 23, 1971. HQ H030606 at page 3.

The notice of proposed rulemaking, published in the Federal Register on October 24, 1970, set forth "[t]he proposed regulations . . . in tentative form as follows":

> (a)  Definitions. As used in this section the term "switchblade knife" means any imported knife-
>
> (1)  Having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or
>
> (2)  Having a handle over 3 inches in length with a stiletto or other blade style which is designed for purposes that include a primary use as a weapon, *as contrasted with blade styles designed for a primary utilitarian use*, when, by insignificant preliminary preparation a Customs officer can alter or convert such stiletto or other weapon to open automatically as described in subparagraph (1) of this paragraph, under the principle of the decision in the case of "Precise Imports Corporation and Others v. Joseph P. Kelly, Collector of Customs, and Others" (378 F. 2d 1014). *The term "utilitarian use" means use for any customary household purpose; use for any usual personal convenience; use in the practice of a profession, trade, or commercial or employment activity; use in the performance of a craft or hobby; use, in the course of such outdoor pursuits as hunting and fishing; use related to scouting activities; and use for grooming, as demonstrated by jack-knives and similar standard pocket knives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle* [italicized emphasis added]. 35 FR 16594.

The introductory language to the Final Rule made the following prefatory declarations:

> On October 24, 1970, notice was published in the Federal Register (35 FR 16594) of a proposal to prescribe regulations to govern the importation of articles subject to the so-called Switchblade Knife Act, sections 1 – 4, 72 Stat. 562 (15 U.S.C. 1241 – 1244).
>
> Importers or other interested persons were given the opportunity to participate in the rule making through submission of relevant comments, suggestions or objections. No comments were received from importers or other persons. 36 FR 18859.

CBP announced its proposed intention to amend the regulations via Federal Register notice on August 18, 1989. See 54 FR 34186 of the same date. In the introductory "Background" in the proposed rule, CBP (then "Customs") emphasized the characteristics that would be considered in making

determinations regarding the types of blades knives bore which would be proscribed by the Switchblade Knife Act and implementing regulations, stating that:

> To implement the law, Customs adopted regulations which followed the legislative language extremely closely (19 CFR 12.95–12.103). Those regulations also specifically referred to the court decision of *Precise Imports Corp. and Others v. Joseph P. Kelly, Collector of Customs, and Others* (378 F. 2d 1014). *Because of this reference, the existing regulations appear to imply that one of the principal considerations in determining the legality of a knife is the type of blade style the weapon possesses. While style is relevant, it is not of overriding importance. Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state are much more important. The Customs position, which has been supported by court decisions, is that Congressional intent was to address the problem of the importation, subsequent sale, and use of a class of quick-opening, easily concealed knives most frequently used for criminal purposes.* The deletion of the reference to the *Precise Imports* case does not imply that customs does not consider the principles contained in that case important, or that they are in any way no longer relevant. Rather, the principles in the *Precise Imports* case could not be considered too limiting [italicized emphasis added]. 54 FR 34186

There is no reference in the statutory language of the Switchblade Knife Act to the term "utilitarian use"; the only references appear in the CBP regulations. Similarly, the term has received only passing reference judicially ("The government indicated that had the knives been "designed with a single-edge blade and were primarily used for utilitarian purposes" rather than "double-edged stiletto-style blades" they would have been admitted." *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988)) and in the Federal Register notices cited above. Therefore, against the explanatory language from the Federal Register notices set forth above, we consider the ordinary meaning of the words employed:

The term "utilitarian" is defined at *http://dictionary.reference.com/search?q =utilitarian* as:

1. pertaining to or consisting in utility.

2. having regard to utility or usefulness rather than beauty, ornamentation, etc.

And at the same site:

1. having a useful function; "utilitarian steel tables".

2. having utility often to the exclusion of values; "plain utilitarian kitchenware".

The term "utility" is defined at *http://www.merriam-webster.com/dictionary/utility* as:

1: fitness for some purpose or worth to some end.

2: something useful or designed for use.

From the exemplars set forth in 19 CFR Part 12.95(c)[4] and definitions set forth above, we conclude that knives with a primary (constructively or practically vs. tactically, lethally or primarily as a weapon) utilitarian design and purpose that are not captured by the definition of switchblades are admissible pursuant to the Switchblade Knife Act. Thus, for example, pocket-knives, tradesman's knives and other folding knives for a certain specific use remain generally admissible, with such determinations being made, by necessity, on a case-by-case basis. Further, the opening mechanisms of imported knives must be considered and those that open instantly subjected to strict scrutiny in order to determine admissibility. As we found in HQs W479898, dated June 29, 2007 and H017909 dated December 26, 2007, that "*all*" knives can potentially be used as weapons"; likewise the blades of all knives have some utility. Therefore, consideration of the characteristics of the knives should be made, focused on those emphasized ("Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state . . .") in the Federal Register notice amending the regulations at issue. Thus, given the clear purpose enunciated during the notice and comment rulemaking process which amended the relevant regulation, we conclude that the type of opening mechanism is "much more important" than blade style in making admissibility determinations under the Switchblade Knife Act (see 54 FR 34186, *supra*).

We therefore find that knives with spring-assisted opening mechanisms that require minimal "human manipulation" in order to instantly spring the blades to the fully open and locked position cannot be considered to have a primary utilitarian purpose; such articles function as prohibited switchblade knives as defined by the relevant statute and regulations.

In reaching this conclusion, we reexamined the sample provided. We note that other than a bald assertion that the knives at issue are for a primary utilitarian purpose (you characterize the knife as "general carry"), no evidence substantiating that claim was presented. The knife at issue can be instantly opened into the fully locked and ready position with one hand, simply by pushing on either of the thumb tabs. Although the knife is marketed as a "release-assist" model, it nevertheless opens via human manipulation and inertia. See *Taylor, supra*, at footnote 1 on page 5. Further, it is possible to "lock" the safety of the knife, adjust the blade (by pushing it "against" the safety button) and to instantly deploy it by depressing the "safety" button in a manner indiscernible from a "traditional" switchblade (and in a manner which can be considered to be insignificant preliminary preparation; see 19 CFR Part 12.95(b), above). It is based upon the foregoing analysis and these factual observations that we conclude that the knife at issue is a switchblade prohibited from importation into the United States.

This decision is necessary to reconcile CBP's position regarding the admissibility of such knives and comports with the conclusions made in the following rulings:

_____

[4] See also 19 CFR Part 12.96(a): Among admissible common and special purpose knives are jackknives and similar standard pocketknives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle.

KnifeRights MSJ App.000701

In New York Ruling Letter ("NY") G83213, dated October 13, 2000, CBP determined that "a folding knife with a spring-loaded blade [which could] be easily opened by light pressure on a thumb knob located at the base of the blade, or by a flick of the wrist" was an "inertia-operated knife" that "is prohibited under the Switchblade Act and subject to seizure." See 19 C.F.R. § 12.95 (a)(1).

In NY H81084, dated May 23, 2001, CBP determined that 18 models of knives "may be opened with a simple flick of the wrist, and therefore are prohibited as inertial operated knives."

In HQ 115725, dated July 22, 2002, CBP determined that a "dual-blade folding knife" in which the "non-serrated blade is spring-assisted [and] is opened fully by the action of the spring after the user has pushed the thumb-knob protruding from the base of the blade near the handle to approximately 45 degrees from the handle" "is clearly a switchblade as defined in § 12.95(a)(4) (Knives with a detachable blade that is propelled by a spring-operated mechanism and components thereof.)"

In HQ 115713, dated July 29, 2002, CBP determined that four styles of knives, three of which could "be opened by the application of finger or thumb pressure against one of the aforementioned studs that protrudes from the side of the blade which activates a spring mechanism automatically propelling the blade into a fully open and locked position[,]" and the fourth which "opened by depressing a bar-like release on the handle which, when pushed, releases the blade which is then partially opened by a spring mechanism" were switchblades pursuant to the Switchblade Knife Act and pertinent regulations, prohibited from entry into the United States.

In H040319, dated November 26, 2008, we held that knives with spring-assisted opening mechanisms are "switchblades" within the meaning of 19 CFR Part 12.95(a)(1) and are therefore prohibited entry into the United States pursuant to the Switchblade Knife Act (15 U.S.C. §§ 1241–1245).

In turning to the knives at issue in HQ 116315, examination of the sample provided and application of the regulatory criteria set forth above reveals that the subject knives are switchblades within the meaning of 19 CFR Part 12.95(a)(1) because they meet the criteria enumerated therein, *i.e.*, they open automatically by operation of inertia, gravity, or both. Accordingly, we conclude that knives with spring-assisted opening mechanisms are switchblades within the meaning of 19 CFR Part 12.95(a)(1) and are prohibited from importation into the United States.

**HOLDING:**

HQ 116315 is hereby revoked.

The subject knife is a switchblade within the meaning of 19 CFR 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245, the subject knives are prohibited from entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights and Restricted Merchandise Branch.*

BUREAU OF CUSTOMS AND BORDER PROTECTION                    33

[ATTACHMENT F]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H043124
April 30, 2009
ENF–4–02–OT:RR:BSTC:IPR H043124 AML
CATEGORY:  Restricted Merchandise

MATTHEW K. NAKACHI, ESQ.
SANDLER, TRAVIS & ROSENBERG, P.A.
505 Sansome Street
Suite 1475
San Francisco, California 94111

RE:  Revocation of HQ W116730; Admissibility of Knives; Switchblade Knife Act, 15 U.S.C. §§  1241–1245; 19 CFR Parts 12.95–12.103

DEAR MR. NAKACHI:

   This is in reference to Headquarters Ruling Letter ("HQ") W116730, dated November 7, 2006, issued to you on behalf of Columbia River Knife and Tool ("CRKT"), and concerned the admissibility of the "Outburst" line of "release-assisted " knives described below, pursuant to the Switchblade Knife Act, 15 U.S.C. § 1241, *et seq.* In the referenced ruling, U.S. Customs and Border Protection (hereinafter "CBP") determined that the knives at issue were admissible into the United States pursuant to the Switchblade Knife Act. We have reconsidered the rationale of, and the admissibility determination made in HQ W116730 and found both to be in error. For the reasons set forth below, we hereby revoke HQ W116730.

**FACTS:**

   CBP paraphrased your description of the knives at issue in HQ W116730 as follows:

   The Outburst mechanism operates via a slight spring action, which assists in the opening of the knife by application of the finger or thumb pressure on a thumb stud or disc which protrudes from the side of the blade, allowing the blade to be more easily pushed to an open and locked position. The interior of the blade is engineered such that the spring actually provides resistance, which prevents the knife from opening, until the blade is opened to approximately a 30-degree angle. Hence, when incorporated into knives, the Outburst mechanism only assists in the opening of the knife when the blade is opened to approximately 30-degrees. The user is unable to modify this restriction since at angles less than 30-degrees, the spring exerts back-pressure which holds the blade closed. . . . This back-pressure arises from the engineering of the tempered blade shape and not from the mere tightening of a blade screw.

   Since the Outburst mechanism holds the blade closed, it renders the tightness of the blade screw irrelevant for purposes of review under the Switchblade Knife Act. . . . As a secondary level of protection, even if the main spring of the Outburst mechanism is removed, the locking arm of the knife itself contains a ball-detent bias against the blade which prevents the knife from being flicked open by inertia or gravity. The ball-detent bias is also not readily accessible to modification by the user.

KnifeRights MSJ App.000703

The knife models subject to this ruling are as follows:

1. The Koji Hara Ichi consists of a drop-point, pen-knife blade, in black or silver. The body of the knife is built on an open frame with Zytel scale inserts and fasteners and a removable clip[.]

2. The My Tighe consists of a stainless-steel, utilitarian blade with optional serrations. The knife includes black Zytel inserts, black hardware and a black Teflon-plated, removable clip[.]

3. The Kommer Full Throttle consists of a stainless-steel, straight blade with optional serrations. The knife is built on an open frame with a flat handle profile[.]

All of the blades are readily identifiable as being designed for personal, utilitarian use[.]

. . . Such single-handed opening is greatly beneficial to craftsmen, outdoorsmen and workers, who are engaged in a particular task when the need to simultaneously make a cut arises. For example, a fisherman could be holding a fish caught on a fishing line with one hand, while both drawing and opening an Outburst assisted-opening knife with the other hand.

A search of the CRKT website (last visited on January 13, 2009) reveals the following information regarding the "Outburst" mechanism and each of the models described above: the Koji Hara Ichi is equipped with "an ambidextrous thumb disk allows easy one-hand opening," and "is available in conventional non-assisted opening models, or with our patented OutBurst$^{TM}$ assisted opening mechanism, which instantly springs the blade fully open after you have opened the blade approximately 30 degrees." Descriptions of the "My Tighe" and "Kommer Full Throttle" models repeat the "springs the blade to fully open" statement *verbatim*.

**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Switchblade Knife Act defines "interstate commerce" at 15 U.S.C. § 1241(a):

The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

The Switchblade Knife Act defines "switchblade knife" at 15 U.S.C. § 1241(b):

The term "switchblade knife" means any knife having a blade which opens automatically--

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both[.]

The CBP Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. We note the following definitions:

§ 12.95  Definitions.

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a) Switchblade knife. "Switchblade knife" means any imported knife, or components thereof, or any class of imported knife, including "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives, which has one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof[.]

(b) Insignificant preliminary preparation. "Insignificant preliminary preparation" means preparation with the use of ordinarily available tools, instruments, devices, and materials by one having no special manual training or skill for the purpose of modifying blade heels, relieving binding parts, altering spring restraints, or making similar minor alterations which can be accomplished in a relatively short period of time.

Other pertinent regulations are as follows:

§ 12.96 Imports unrestricted under the Act.

(a) Common and special purpose knives. Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .

§ 12.97 Importations contrary to law.

Importations of switchblade knives, except as permitted by 15 U.S.C. § 1244, are importations contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c).

The plain language of the Switchblade Knife Act and relevant CBP regulations prohibit, *inter alia*, the importation of knives which are for use as weapons while explicitly permitting the importation of "common and special purpose" knives (see 19 CFR 12.95(c) "Utilitarian Use" and 12.96(a) ("Unrestricted Imports")). Several courts have addressed the breadth of the prohibition set forth in the statute. See, *e.g.*, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014, 1017 (2d Cir. 1967), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967), in which the Court of Appeals for the Second Circuit stated that:

> The report of the Senate Committee on Interstate and Foreign Commerce which recommended passage of the Switchblade Knife Act stated that the enforcement of state laws banning switchblade knives would be extremely difficult as long as such knives could be freely obtained in interstate commerce, and added:

> > "In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce." S.Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 2 U.S. Code Cong. & Ad. News 1958, at 3435–37.

> The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate commerce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion.

> . . . We hold, therefore, that a knife may be found to be a switchblade knife within the meaning of the Switchblade Knife Act if it is found that it can be made to open automatically by hand pressure, inertia, or gravity after insignificant alterations, and that one of its primary purposes is for use as a weapon.

In *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988) the court, in describing a Balisong knife stated that:

> [T]he district court described a Balisong knife as "basically a folding knife with a split handle." It went on to set out its prime use: while the exotic knife has some utilitarian use, it is most often associated with the martial arts and with combat . . . [and is] potentially dangerous, lethal . . . ." Citing another district court decision involving the same issue, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014 (2d Cir.), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967) (upholding a seizure of certain knives with no legitimate purpose), the district court described it as of "minimal value" and distinguished another "seminal case interpreting the Act", *United States v. 1,044 Balisong Knives*, No. 70–

BUREAU OF CUSTOMS AND BORDER PROTECTION                37

110 (D. Ore. Sept. 28, 1970) (refusing to support seizure). The district court concluded that "congress intended to prohibit knives that opened automatically, ready for instant use . . . [and] was not concerned with whether the knife's blade would merely be exposed by gravity", . . . [it] intended 'open' to mean 'ready for use.' " *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988).

See also *Taylor v. McManus*, 661 F. Supp. 11, 14–15 (E.D. Tenn. 1986), in which the Court of Appeals for the Eastern District of Tennessee observed:

> In examining the congressional record, it seems obvious that congress intended to prohibit knives which opened automatically, ready for instant use. Rep. Kelly, for example, described the switchblade "as a weapon (which) springs out at the slightest touch and is ready for instant violence." *Switchblade Knives: Hearings Before a Subcommittee of the Committee on Interstate and Foreign Commerce*, House of Rep., 85th Cong., 2d Sess. 13, 29 (1958). She also noted that the prohibited gravity knife opens and "anchors in place automatically. Every bit as fast as the switchblade, it has proved to be as effective a killer." *Id.* at 29. Similarly, Rep. Delaney described the prohibited gravity knives as "knives (which) open and lock automatically at a quick flick of the wrist." 104 CONG. REC., 85th Cong., 2nd Sess. 12398 (June 26, 1958). (emphasis supplied). Apparently, then, Congress was not concerned with whether the knife's blade would merely be exposed by gravity. Instead, they intended "open" to mean "ready for use", as exhibited in Rep. Kelley's testimony that the switchblade opened "ready for instant violence" and her and Rep. Delaney's comments that the gravity knife opened and locked automatically. While the Court does not intend to read into the Statute a requirement that the blades "lock" automatically, it does seem apparent that Congress intended "open" to mean "ready for use". Obviously a knife that has not locked into an open position is not ready for use. Since the Balisong knives cannot be used until the second handle is manually folded back and clasped, the Court finds that they do not open automatically by force of gravity or inertia.[5]

Based primarily on 15 U.S.C. § 1241(b)(1) (see also the first clause of 19 CFR Part 12.95(a)(1)) which defines a switchblade knife as being a knife having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, as well as reliance upon the exception set forth at 19 CFR Part 12.95(c) regarding knives with a blade style designed for a primary utilitarian use, CBP decided in several rulings, including HQ W116730, that knives with spring-assisted opening mechanisms were not switchblades as contemplated by the Switchblade Knife Act and implementing regulations.

---

[5] The conclusion regarding Balisong knives was reversed by *Taylor v. United States*, 848 F.2d 715, 1988 U.S. App. LEXIS 7761 (6th Cir. Tenn. 1988): "There is sufficient indication in the legislative history that the intent was to exclude these martial arts weapons, which even the district court admitted "can be opened very rapidly, perhaps in less than 5 seconds . . . [and] are potentially dangerous, lethal weapons." *Id.* at 720. Further, Balisongs were added to the list of prohibited knives when the regulations were amended in 1990. See the discussion of the regulatory amendments in HQ H030606, dated August 12, 2008, page 4.

KnifeRights MSJ App.000707

**38**    CUSTOMS BULLETIN AND DECISIONS, VOL. 43, NO. 21, MAY 22, 2009

Notwithstanding, because of the intrinsic health and public safety concerns underlying the statute and regulations, it is necessary to reassess our position regarding knives with spring-assisted opening mechanisms as 1) there are no judicial decisions interpreting, other than in the context of balisong knives (discussed above), 15 U.S.C. § 1241(b)(2) and the second clause of 19 Part CFR 12.95(a) (discussed below) and 2) CBP has issued inconsistent rulings, of which HQ W116730 is one, regarding the issue of whether knives with spring-assisted opening mechanisms are admissible or prohibited from importation into the United States.

In *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. Alaska 2005), the Court of Appeals for the 9th Circuit stated, with regard to the interpretation of agency regulations that:

> "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988)) (alteration in original). When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage. *Compare F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). An agency's interpretation of a regulation must "conform with the wording and purpose of the regulation." *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th Cir. 2003).

Because of the existence of conflicting rulings (*i.e.*, rulings which have determined that knives with spring-assisted opening mechanisms are switchblades as defined in the statute and others which have made the opposite conclusion), we have reexamined the definition of the word "switchblade knife" set forth at 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1) and have determined that the definition set forth therein captures and proscribes, in addition to "traditional" switchblades, the importation of knives with spring-assisted opening mechanisms, often equipped with thumb studs or protrusions affixed to the base of the blade (rather than in the handle of the knives as set forth in the first clause of 19 CFR Part 12.95(a)(1)). The relevant regulatory language identifies and defines "switchblade knives" by exemplars (" "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives") and by definition ("or any class of imported knife . . . which has one or more of the following characteristics or identities: (1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, *or any knife with a blade which opens automatically by operation of inertia, gravity or both*[.]")

In reconsidering what types of knives are contemplated by the statute, we interpret the controlling terms according to their common meanings[6]. The

─────────────

[6] A fundamental canon of statutory construction requires that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979); see also 2A Norman J. Singer, Sutherland Statutory Construction § 46:01 (6th ed. 2000). *United States v. Lehman*, 225 F.3d 426, 429 (4th Cir. S.C. 2000).

term "automatically" is defined at *http://www.merriam-webster.com/ dictionary/ automatically* as:

> 1 a: largely or wholly involuntary ; especially : reflex 5 <automatic blinking of the eyelids> b: acting or done spontaneously or unconsciously c: done or produced as if by machine : mechanical <the answers were automatic> 2: having a self-acting or self-regulating mechanism <an automatic transmission> 3 of a firearm : firing repeatedly until the trigger is released.

The term "inertia" is defined at *http://www.merriam-webster.com/ dictionary/inertia* as:

> 1 a: a property of matter by which it remains at rest or in uniform motion in the same straight line unless acted upon by some external force b: an analogous property of other physical quantities (as electricity).

> See also, *http://physics.about.com/od/glossary/g/inertia.htm:* Definition: Inertia is the name for the tendency of an object in motion to remain in motion, or an object at rest to remain at rest, unless acted upon by a force. This concept was quantified in Newton's First Law of Motion; and *http://dictionary.reference.com/browse/inertia:* 2. Physics. a. the property of matter by which it retains its state of rest or its velocity along a straight line so long as it is not acted upon by an external force.

In *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988), the United States Court of Appeals for the Sixth Circuit, in analyzing the terms of the statute and regulations at issue stated that:

> "Automatically" as used in the statute does not necessarily mean simply by operation of some inanimate connected force such as the spring in a literal switchblade. For example, the type of gravity or "flick" knife which is indisputably within the statute requires some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic."

Knives equipped with spring- and release-assisted opening mechanisms are knives which "require[ ] some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic." " See *Taylor, supra.* Despite the fact that they differ in design (most if not all are equipped with thumb studs affixed to the base of the blunt side of the blade) from a traditional switchblade (in which the button that activates the spring mechanism is located in the handle of the knife), the spring-assisted mechanisms cause the knives to open fully for instant use, potentially as a weapon. Such knives are prohibited by the Switchblade Knife Act.

Our interpretation of 15 U.S.C. § 1241(b) and 19 CFR 12.95(a)(1) is supported by case law. In *Demko v. United States*, 44 Fed. Cl. 83, 88–89 (Fed. Cl. 1999), the Court of Federal Claims, in analyzing a regulation regarding the grandfathered sale of "street sweeper" shotguns, recited the following interpretations of the word "or" as used in statutes and regulations:

> "Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS*, 22 Cl. Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but discon-

nect[s] their meaning, the meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, A Grammar of the English Language, Syntax 166 (1986)); see *Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir. 1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not adhered strictly to such rules of statutory construction. See *Ruben*, 22 Cl. Ct. at 266. For instance, "it is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States*, 719 F.2d 608, 612 (2d Cir. 1983); see *Ruben*, 22 Cl. Ct. at 266 (quoting same); see also *DeSylva v. Ballentine*, 351 U.S. 570, 573, 100 L. Ed. 1415, 76 S. Ct. 974 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States*, 73 U.S. 759, 764, 18 L. Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively. . . . This construction impairs no rights of the parties . . . and carries into effect the true intention of Congress. . . .").

In analyzing the language of 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1), we conclude that the word "or" is used conjunctively yet distinguishes the paradigm switchblade knife (paraphrased: spring action blade with a button in the handle) from other knives which function similarly to the paradigm switchblade but do not have the "traditional" configuration or function. Given its legislative and judicial history, the Switchblade Knife Act is intended to proscribe the importation of any knife that opens automatically by hand pressure applied to a button or device in the handle of the knife and *any* knife with a blade which opens automatically by operation of inertia, gravity or both.

The knives at issue open via inertia – once pressure is applied to the thumb stud (or protrusion at the base of the blade), the blade continues in inertial motion (caused by the combined effect of manual and spring-assisted pressure) until it is stopped by the locking mechanism of the knife. Such knives open instantly for potential use as a weapon. We therefore conclude, in consideration of the authorities and sources Switchblade Knife Act and implementing regulations, that the knives with spring-and release- assisted opening mechanisms, that such knives are described and prohibited by 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1).

We also have reconsidered our interpretation of the terms "utilitarian use", as we have in several rulings found knives with spring-assisted opening mechanisms to be admissible because they were equipped with blades for "utilitarian use". The regulation defines, albeit by exemplar, the types of knife (subject to the condition precedent set forth in 19 CFR 12.96: Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .) that are considered to be "utilitarian" for purposes of the statute. See 19 CFR 12.95(c):

(c) Utilitarian use. "Utilitarian use" includes but is not necessarily limited to use:

(1) For a customary household purpose;

(2) For usual personal convenience, including grooming;

BUREAU OF CUSTOMS AND BORDER PROTECTION          41

(3)  In the practice of a profession, trade, or commercial or employment activity;

(4)  In the performance of a craft or hobby;

(5)  In the course of such outdoor pursuits as hunting and fishing; and

(6)  In scouting activities.

As we stated in HQ H030606, dated August 12, 2008, with regard to the regulations implementing the Switchblade Knife Act:

The relevant CBP regulations were implemented in 1971, following notice and comment, via Treasury Decision ("T.D.") 71–243, and the Final Rule was published in the Federal Register on September 13, 1971. See Final Rule, 36 FR 18859, Sept. 23, 1971. HQ H030606 at page 3.

The notice of proposed rulemaking, published in the Federal Register on October 24, 1970, set forth "[t]he proposed regulations . . . in tentative form as follows":

(a)  Definitions. As used in this section the term "switchblade knife" means any imported knife-

(1)  Having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(2)  Having a handle over 3 inches in length with a stiletto or other blade style which is designed for purposes that include a primary use as a weapon, *as contrasted with blade styles designed for a primary utilitarian use,* when, by insignificant preliminary preparation a Customs officer can alter or convert such stiletto or other weapon to open automatically as described in subparagraph (1) of this paragraph, under the principle of the decision in the case of "Precise Imports Corporation and Others v. Joseph P. Kelly, Collector of Customs, and Others" (378 F. 2d 1014). *The term "utilitarian use" means use for any customary household purpose; use for any usual personal convenience; use in the practice of a profession, trade, or commercial or employment activity; use in the performance of a craft or hobby; use, in the course of such outdoor pursuits as hunting and fishing; use related to scouting activities; and use for grooming, as demonstrated by jack-knives and similar standard pocket knives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle* [italicized emphasis added]. 35 FR 16594.

The introductory language to the Final Rule made the following prefatory declarations:

On October 24, 1970, notice was published in the Federal Register (35 FR 16594) of a proposal to prescribe regulations to govern the importation of articles subject to the so-called Switchblade Knife Act, sections 1 – 4, 72 Stat. 562 (15 U.S.C. 1241 – 1244).

Importers or other interested persons were given the opportunity to participate in the rule making through submission of relevant comments, suggestions or objections. No comments were received from importers or other persons. 36 FR 18859.

CBP announced its proposed intention to amend the regulations via Federal Register notice on August 18, 1989. See 54 FR 34186 of the same date. In the introductory "Background" in the proposed rule, CBP (then "Customs") emphasized the characteristics that would be considered in making determinations regarding the types of blades knives bore which would be proscribed by the Switchblade Knife Act and implementing regulations, stating that:

> To implement the law, Customs adopted regulations which followed the legislative language extremely closely (19 CFR 12.95–12.103). Those regulations also specifically referred to the court decision of *Precise Imports Corp. and Others v. Joseph P. Kelly, Collector of Customs, and Others* (378 F. 2d 1014). *Because of this reference, the existing regulations appear to imply that one of the principal considerations in determining the legality of a knife is the type of blade style the weapon possesses. While style is relevant, it is not of overriding importance. Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state are much more important. The Customs position, which has been supported by court decisions, is that Congressional intent was to address the problem of the importation, subsequent sale, and use of a class of quick-opening, easily concealed knives most frequently used for criminal purposes.* The deletion of the reference to the *Precise Imports* case does not imply that customs does not consider the principles contained in that case important, or that they are in any way no longer relevant. Rather, the principles in the Precise Imports case could not be considered too limiting [italicized emphasis added]. 54 FR 34186

There is no reference in the statutory language of the Switchblade Knife Act to the term "utilitarian use"; the only references appear in the CBP regulations. Similarly, the term has received only passing reference judicially ("The government indicated that had the knives been "designed with a single-edge blade and were primarily used for utilitarian purposes" rather than "double-edged stiletto-style blades" they would have been admitted." *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988)) and in the Federal Register notices cited above. Therefore, against the explanatory language from the Federal Register notices set forth above, we consider the ordinary meaning of the words employed:

The term "utilitarian" is defined at *http://dictionary.reference.com/ search?q =utilitarian* as:

1. pertaining to or consisting in utility.

2. having regard to utility or usefulness rather than beauty, ornamentation, etc.

And at the same site:

1. having a useful function; "utilitarian steel tables".

2. having utility often to the exclusion of values; "plain utilitarian kitchenware".

The term "utility" is defined at *http://www.merriam-webster.com/ dictionary/utility* as:

1: fitness for some purpose or worth to some end.

BUREAU OF CUSTOMS AND BORDER PROTECTION                    43

2:  something useful or designed for use.

From the exemplars set forth in 19 CFR Part 12.95(c)[7], and definitions set forth above we conclude that knives with a primary (constructively or practically vs. tactically, lethally or primarily as a weapon) utilitarian design and purpose that are not captured by the definition of switchblades are admissible pursuant to the Switchblade Knife Act. Thus, for example, pocketknives, tradesman's knives and other folding knives for a certain specific use remain generally admissible, with such determinations being made, by necessity, on a case-by-case basis. Further, the opening mechanisms of imported knives must be considered and those that open instantly subjected to strict scrutiny in order to determine admissibility. As we found in HQs W479898, dated June 29, 2007 and H017909 dated December 26, 2007, that "*all*" knives can potentially be used as weapons"; likewise the blades of all knives have some utility. Therefore, consideration of the characteristics of the knives should be made, focused on those emphasized ("Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state . . . ") in the Federal Register notice amending the regulations at issue. Thus, given the clear purpose enunciated during the notice and comment rulemaking process which amended the relevant regulation, we conclude that the type of opening mechanism is "much more important" than blade style in making admissibility determinations under the Switchblade Knife Act (see 54 FR 34186, *supra*).

We therefore find that knives with spring-assisted opening mechanisms that require minimal "human manipulation" in order to instantly spring the blades to the fully open and locked position cannot be considered to have a primary utilitarian purpose; such articles function as prohibited switchblade knives as defined by the relevant statute and regulations.

In reaching this conclusion, we reexamined the sample provided. We note that other than a bald assertion that the knives at issue are for a primary utilitarian purpose (you state that "[a]ll of the blades are readily identifiable as being designed for personal, utilitarian use[.]"), no evidence substantiating that claim was presented. The knife at issue can be instantly opened into the fully locked and ready position with one hand[8], simply by pushing on either of the thumb tabs. Although the knife is marketed as a "release-assist" model, it nevertheless opens via human manipulation and inertia. See *Taylor, supra* at footnote 1 on page 6. Further, it is possible to "lock" the safety of the knife, adjust the blade (by pushing it "against" the safety button) and to instantly deploy it in a manner indiscernible from a "traditional" switchblade (and in a manner which can be considered to be insignificant preliminary preparation; see 19 CFR 12.95(b), above). It is based upon this analysis and these factual observations that we conclude that the knife at issue is a switchblade prohibited from importation into the United States.

This decision is necessary to reconcile CBP's position regarding the admis-

—————————

[7]See also 19 CFR Part 12.96(a): Among admissible common and special purpose knives are jackknives and similar standard pocketknives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle.

[8]See the marketing statements from the CRKT website in the "FACTS" section above.

sibility of such knives and comports with the conclusions made in the following rulings:

In New York Ruling Letter ("NY") G83213, dated October 13, 2000, CBP determined that "a folding knife with a spring-loaded blade [which could] be easily opened by light pressure on a thumb knob located at the base of the blade, or by a flick of the wrist" was an "inertia-operated knife" that "is prohibited under the Switchblade Act and subject to seizure. See 19 C.F.R. §12.95 (a)(1)."

In NY H81084, dated May 23, 2001, CBP determined that 18 models of knives "may be opened with a simple flick of the wrist, and therefore are prohibited as inertial operated knives."

In HQ 115725, dated July 22, 2002, CBP determined that a "dual-blade folding knife" in which the "non-serrated blade is spring-assisted [and] is opened fully by the action of the spring after the user has pushed the thumb-knob protruding from the base of the blade near the handle to approximately 45 degrees from the handle" "is clearly a switchblade as defined in § 12.95(a)(4) (Knives with a detachable blade that is propelled by a spring-operated mechanism and components thereof.)"

In HQ 115713, dated July 29, 2002, CBP determined that four styles of knives, three of which could "be opened by the application of finger or thumb pressure against one of the aforementioned studs that protrudes from the side of the blade which activates a spring mechanism automatically propelling the blade into a fully open and locked position[,]" and the fourth which "opened by depressing a bar-like release on the handle which, when pushed, releases the blade which is then partially opened by a spring mechanism" were switchblades pursuant to the Switchblade Knife Act and pertinent regulations, prohibited from entry into the United States.

In H040319, dated November 26, 2008, we held that knives with spring-assisted opening mechanisms are "switchblades" within the meaning of 19 CFR Part 12.95(a)(1) and are therefore prohibited entry into the United States pursuant to the Switchblade Knife Act (15 U.S.C. §§ 1241–1245).

In turning to the knives at issue in HQ W116730, examination of the description of the "OutBurst" release mechanism and application of the regulatory criteria set forth above reveals that the subject knives are switchblades within the meaning of 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1) because they meet the criteria enumerated therein, *i.e.*, they open automatically by operation of inertia, gravity, or both.

**HOLDING:**

HQ W116730 is hereby revoked.

The subject knives, equipped with the "OutBurst" release-assist mechanism, are switchblade knives within the meaning of 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245, the subject knives are prohibited from entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights and,*
*Restricted Merchandise Branch.*

BUREAU OF CUSTOMS AND BORDER PROTECTION          45

[ATTACHMENT G]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H043126
April 30, 2009
ENF–4–02–OT:RR:BSTC:IPR H043126 AML
CATEGORY:  Restricted Merchandise

MS. LARA A. AUSTRINS
MR. THOMAS J. O'DONNELL
RODRIGUEZ, O'DONNELL ROSS
*8430 W. Bryn Mawr Ave., Suite 525*
*Chicago, Illinois 60631*

RE:  Revocation of HQ H016666; Admissibility of Knives; Switchblade Knife
Act, 15 U.S.C. §§  1241–1245; 19 CFR Parts 12.95–12.103

DEAR MS. AUSTRINS AND MR. O'DONNELL:

  This is in reference to Headquarters Ruling Letter ("HQ") H016666, dated
December 12, 2007, which concerned the admissibility of the "Tailwind", a
"release-assisted " knife described below, pursuant to the Switchblade Knife
Act, 15 U.S.C. § 1241, *et seq.* In the referenced ruling, U.S. Customs and
Border Protection (hereinafter "CBP") determined that the knives at issue
were admissible into the United States pursuant to the Switchblade Knife
Act. We have reconsidered HQ H016666 and the rulings upon which it relied
and found it and them to be in error. For the reasons set forth below, we
hereby revoke HQ H016666.

**FACTS:**

  CBP paraphrased your description of the knives at issue in HQ
H016666 as follows:

  [T]he knife at issue, marketed as the "Tailwind" (model number
  HD0071), as a single edged, release assisted, folding knife. The knife
  has a "false edge grind" on the topside of the 3 ½ inch blade and mea-
  sures 4 ½ inches when closed. When extended, the overall length of the
  knife is 7 ¾ inches. The knife weighs 4.2 ounces.

  The Tailwind name is derived from the patented opening mechanism.
  The opening mechanism, subject of U.S. Patent number 7,051,441, is
  equipped "with an assist spring, which assists in the opening of the
  knife only after the knife has been manually opened to approximately
  thirty degrees." The blade must be opened manually until the blade
  reaches approximately thirty degrees at which point the mechanism en-
  gages and the blade springs open to its extended and locked position.
  The knife is refolded by depressing a manual release.

  With regard to the blade of the knife, you indicated that:

  The knife's blade is such that it is designed for a primary utilitarian use
  and the intended customer base for the knife is wide and varied.

**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and the CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Switchblade Knife Act defines "interstate commerce" at 15 U.S.C. § 1241(a):

The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

The Switchblade Knife Act defines "switchblade knife" at 15 U.S.C. § 1241(b):

The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both[.]

The CBP Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. We note the following definitions:

§ 12.95   Definitions.

Terms as used in §§12.96 through 12.103 of this part are defined as follows:

(a) Switchblade knife. "Switchblade knife" means any imported knife, or components thereof, or any class of imported knife, including "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives, which has one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof[.]

(b) Insignificant preliminary preparation. "Insignificant preliminary preparation" means preparation with the use of ordinarily available tools, instruments, devices, and materials by one having no special manual training or skill for the purpose of modifying blade heels, relieving binding parts, altering spring restraints, or making similar minor alterations which can be accomplished in a relatively short period of time.

Other pertinent regulations are as follows:

§ 12.96 Imports unrestricted under the Act.

(a) Common and special purpose knives. Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .

§ 12.97  Importations contrary to law.

Importations of switchblade knives, except as permitted by 15 U.S.C. § 1244, are importations contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c).

The plain language of the Switchblade Knife Act and relevant CBP regulations prohibit, *inter alia*, the importation of knives which are for use as weapons while explicitly permitting the importation of "common and special purpose" knives (see 19 CFR 12.95(c) "Utilitarian Use" and 12.96(a) ("unrestricted imports")). Several courts have addressed the breadth of the prohibition set forth in the statute. See, *e.g.*, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014, 1017 (2d Cir. 1967), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967), in which the Court of Appeals for the Second Circuit stated that:

The report of the Senate Committee on Interstate and Foreign Commerce which recommended passage of the Switchblade Knife Act stated that the enforcement of state laws banning switchblade knives would be extremely difficult as long as such knives could be freely obtained in interstate commerce, and added:

"In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce." S.Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 2 U.S. Code Cong. & Ad. News 1958, at 3435–37.

The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate com-

merce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion.

. . . We hold, therefore, that a knife may be found to be a switchblade knife within the meaning of the Switchblade Knife Act if it is found that it can be made to open automatically by hand pressure, inertia, or gravity after insignificant alterations, and that one of its primary purposes is for use as a weapon.

In *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988) the court, in describing a Balisong knife stated that:

[T]he district court described a Balisong knife as "basically a folding knife with a split handle." It went on to set out its prime use: while the exotic knife has some utilitarian use, it is most often associated with the martial arts and with combat . . . [and is] potentially dangerous, lethal. . . ." Citing another district court decision involving the same issue, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014 (2d Cir.), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967) (upholding a seizure of certain knives with no legitimate purpose), the district court described it as of "minimal value" and distinguished another "seminal case interpreting the Act", *United States v. 1,044 Balisong Knives*, No. 70–110 (D. Ore. Sept. 28, 1970) (refusing to support seizure). The district court concluded that "congress intended to prohibit knives that opened automatically, ready for instant use . . . [and] was not concerned with whether the knife's blade would merely be exposed by gravity", . . . [it] intended 'open' to mean 'ready for use.' " *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988).

See also *Taylor v. McManus*, 661 F. Supp. 11, 14–15 (E.D. Tenn. 1986), in which the Court of Appeals for the Eastern District of Tennessee observed:

In examining the congressional record, it seems obvious that congress intended to prohibit knives which opened automatically, ready for instant use. Rep. Kelly, for example, described the switchblade "as a weapon (which) springs out at the slightest touch and is ready for instant violence." *Switchblade Knives: Hearings Before a Subcommittee of the Committee on Interstate and Foreign Commerce*, House of Rep., 85th Cong., 2d Sess. 13, 29 (1958). She also noted that the prohibited gravity knife opens and "anchors in place automatically. Every bit as fast as the switchblade, it has proved to be as effective a killer." *Id.* at 29. Similarly, Rep. Delaney described the prohibited gravity knives as "knives (which) open and lock automatically at a quick flick of the wrist." 104 CONG. REC., 85th Cong., 2nd Sess. 12398 (June 26, 1958). (emphasis supplied). Apparently, then, Congress was not concerned with whether the knife's blade would merely be exposed by gravity. Instead, they intended "open" to mean "ready for use", as exhibited in Rep. Kelley's testimony that the switchblade opened "ready for instant violence" and her and Rep. Delaney's comments that the gravity knife opened and locked automatically. While the Court does not intend to read into the Statute a requirement that the blades "lock" automatically, it does seem apparent that Congress intended "open" to mean "ready for use". Obviously a knife that has not locked into an open position is not ready for use.

BUREAU OF CUSTOMS AND BORDER PROTECTION                49

Since the Balisong knives cannot be used until the second handle is manually folded back and clasped, the Court finds that they do not open automatically by force of gravity or inertia.[9]

Based primarily on 15 U.S.C. § 1241(b)(1) (see also the first clause of 19 CFR Part 12.95(a)(1)) which defines a switchblade knife as being a knife having a blade which opens automatically by hand pressure applied to a button or device in the handle, as well as reliance upon the exception set forth at 19 CFR Part 12.95(c) regarding knives with a blade style designed for a primary utilitarian use, CBP decided in several rulings, including HQ H016666, that knives with spring- and release-assisted opening mechanisms are not switchblades as contemplated by the Switchblade Knife Act and implementing regulations.

Notwithstanding, because of the intrinsic health and public safety concerns underlying the statute and regulations, it is necessary to reassess our position regarding knives with spring-assisted opening mechanisms as 1) there are no judicial decisions interpreting, other than in the context of balisong knives (discussed above), 15 U.S.C. § 1241(b)(2) and the second clause of 19 Part CFR 12.95(a) (discussed below) and 2) CBP has issued inconsistent rulings, of which HQ H016666 is one, regarding the issue of whether knives with spring-assisted opening mechanisms are admissible or prohibited from importation into the United States.

In *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. Alaska 2005), the Court of Appeals for the 9th Circuit stated, with regard to the interpretation of agency regulations that:

"In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988)) (alteration in original). When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage. *Compare F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."). An agency's interpretation of a regulation must "conform with the wording and purpose of the regulation." *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th Cir. 2003).

Because of the existence of conflicting rulings (*i.e.*, rulings which have determined that knives with spring-assisted opening mechanisms are switchblades as defined in the statute and others which have made the opposite conclusion), we have reexamined the definition of the word "switchblade knife" set forth at 15 U.S.C. § 1241(b) and 19 CFR Part

---

[9]The conclusion regarding Balisong knives was reversed by *Taylor v. United States*, 848 F.2d 715, 1988 U.S. App. LEXIS 7761 (6th Cir. Tenn. 1988): "There is sufficient indication in the legislative history that the intent was to exclude these martial arts weapons, which even the district court admitted "can be opened very rapidly, perhaps in less than 5 seconds . . . [and] are potentially dangerous, lethal weapons." *Id.* at 720. Further, Balisongs were added to the list of prohibited knives when the regulations were amended in 1990. See the discussion of the regulatory amendments in HQ H030606, dated August 12, 2008, page 4.

12.95(a)(1) and have determined that the definition set forth therein captures and proscribes, in addition to "traditional" switchblades, the importation of knives with spring-assisted opening mechanisms, often equipped with thumb studs or protrusions affixed to the base of the blade (rather than in the handle of the knives as set forth in the first clause of 19 CFR Part 12.95(a)(1)). The relevant regulatory language identifies and defines "switchblade knives" by exemplars (" "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives) and by definition ("or any class of imported knife . . . which has one or more of the following characteristics or identities: (1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, *or any knife with a blade which opens automatically by operation of inertia, gravity or both*[.]")

In reconsidering what types of knives are contemplated by the statute, we interpret the controlling terms according to their common meanings[10]. The term "automatically" is defined at *http://www.merriam-webster.com/ dictionary/ automatically* as:

> 1 a: largely or wholly involuntary ; especially : reflex 5 <automatic blinking of the eyelids> b: acting or done spontaneously or unconsciously c: done or produced as if by machine : mechanical <the answers were automatic> 2: having a self-acting or self-regulating mechanism <an automatic transmission> 3of a firearm : firing repeatedly until the trigger is released.

The term "inertia" is defined at *http://www.merriam-webster.com/ dictionary/inertia* as:

> 1 a: a property of matter by which it remains at rest or in uniform motion in the same straight line unless acted upon by some external force b: an analogous property of other physical quantities (as electricity).

> See also, *http://physics.about.com/od/glossary/g/inertia.htm:* Definition: Inertia is the name for the tendency of an object in motion to remain in motion, or an object at rest to remain at rest, unless acted upon by a force. This concept was quantified in Newton's First Law of Motion; and *http://dictionary.reference.com/browse/ inertia:* 2. Physics. a. the property of matter by which it retains its state of rest or its velocity along a straight line so long as it is not acted upon by an external force.

In *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988), the United States Court of Appeals for the Sixth Circuit, in analyzing the terms of the statute and regulations at issue stated that:

> "Automatically" as used in the statute does not necessarily mean simply by operation of some inanimate connected force such as the spring in a literal switchblade. For example, the type of gravity or "flick" knife which is indisputably within the statute requires some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic."

---

[10] A fundamental canon of statutory construction requires that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979); see also 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:01 (6th ed. 2000). *United States v. Lehman*, 225 F.3d 426, 429 (4th Cir. S.C. 2000).

Knives equipped with spring- and release-assisted opening mechanisms are knives which "require[ ] some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic." " See *Taylor, supra*. Despite the fact that they differ in design (most if not all are equipped with thumb studs affixed to the base of the blunt side of the blade) from a traditional switchblade (in which the button that activates the spring mechanism is located in the handle of the knife), the spring-assisted mechanisms cause, via inertia, the knives to open fully for instant use, potentially as a weapon. Such knives are prohibited by the Switchblade Knife Act.

Our interpretation of 15 U.S.C. § 1241(b) and 19 CFR 12.95(a)(1) is supported by case law. In *Demko v. United States*, 44 Fed. Cl. 83, 88–89 (Fed. Cl. 1999), the Court of Federal Claims, in analyzing a regulation regarding the grandfathered sale of "street sweeper" shotguns, recited the following interpretations of the word "or" as used in statutes and regulations:

> "Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS*, 22 Cl. Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but disconnect[s] their meaning, the meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, A Grammar of the English Language, Syntax 166 (1986)); see *Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir. 1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not adhered strictly to such rules of statutory construction. See *Ruben*, 22 Cl. Ct. at 266. For instance, "it is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States*, 719 F.2d 608, 612 (2d Cir. 1983); see *Ruben*, 22 Cl. Ct. at 266 (quoting same); see also *DeSylva v. Ballentine*, 351 U.S. 570, 573, 100 L. Ed. 1415, 76 S. Ct. 974 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States*, 73 U.S. 759, 764, 18 L. Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively. . . . This construction impairs no rights of the parties . . . and carries into effect the true intention of Congress. . . .").

In analyzing the language of 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1), we conclude that the word "or" is used conjunctively yet distinguishes the paradigm switchblade knife (paraphrased: spring action blade with a button in the handle) from other knives which function similarly to the paradigm switchblade but do not have the "traditional" configuration or function. Given its legislative and judicial history, the Switchblade Knife Act is intended to proscribe the importation of any knife that opens automatically by hand pressure applied to a button or device in the handle of the knife *and* any knife with a blade which opens automatically by operation of inertia, gravity or both.

The knives at issue open via inertia – once pressure is applied to the thumb stud (or protrusion at the base of the blade), the blade continues in inertial motion (caused by the combined effect of manual and spring-

assisted pressure) until it is stopped by the locking mechanism of the knife. Such knives open instantly for potential use as a weapon. We therefore conclude, in consideration of the authorities and sources Switchblade Knife Act and implementing regulations, that the knives with spring-and-release- assisted opening mechanisms, that such knives are described and prohibited by 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1).

We also have reconsidered our interpretation of the terms "utilitarian use", as we have in several rulings found knives with spring-assisted opening mechanisms to be admissible because they were equipped with blades for utilitarian use. The regulation defines, albeit by exemplar, the types of knife (subject to the condition precedent set forth in 19 CFR 12.96: Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .) that are considered to be "utilitarian" for purposes of the statute. See 19 CFR 12.95(c):

> (c) Utilitarian use. "Utilitarian use" includes but is not necessarily limited to use:
>
> (1) For a customary household purpose;
>
> (2) For usual personal convenience, including grooming;
>
> (3) In the practice of a profession, trade, or commercial or employment activity;
>
> (4) In the performance of a craft or hobby;
>
> (5) In the course of such outdoor pursuits as hunting and fishing; and
>
> (6) In scouting activities.

As we stated in HQ H030606, dated August 12, 2008, with regard to the regulations implementing the Switchblade Knife Act:

> The relevant CBP regulations were implemented in 1971, following notice and comment, via Treasury Decision ("T.D.") 71–243, and the Final Rule was published in the Federal Register on September 13, 1971. See Final Rule, 36 FR 18859, Sept. 23, 1971. HQ H030606 at page 3.

The notice of proposed rulemaking, published in the Federal Register on October 24, 1970, set forth "[t]he proposed regulations . . . in tentative form as follows":

> (a) Definitions. As used in this section the term "switchblade knife" means any imported knife-
>
> (1) Having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or
>
> (2) Having a handle over 3 inches in length with a stiletto or other blade style which is designed for purposes that include a primary use as a weapon, *as contrasted with blade styles designed for a primary utilitarian use*, when, by insignificant preliminary preparation a Customs officer can alter or convert such stiletto or other weapon to open automatically as described in subparagraph (1) of this paragraph, under the principle of the decision in the case of "Precise Imports Corporation and Others v. Joseph P. Kelly, Collector of Customs, and Others" (378 F. 2d

1014). *The term "utilitarian use" means use for any customary household purpose; use for any usual personal convenience; use in the practice of a profession, trade, or commercial or employment activity; use in the performance of a craft or hobby; use, in the course of such outdoor pursuits as hunting and fishing; use related to scouting activities; and use for grooming, as demonstrated by jack-knives and similar standard pocket knives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle* [italicized emphasis added]. 35 FR 16594.

The introductory language to the Final Rule made the following prefatory declarations:

On October 24, 1970, notice was published in the Federal Register (35 FR 16594) of a proposal to prescribe regulations to govern the importation of articles subject to the so-called Switchblade Knife Act, sections 1 – 4, 72 Stat. 562 (15 U.S.C. 1241 – 1244).

Importers or other interested persons were given the opportunity to participate in the rule making through submission of relevant comments, suggestions or objections. No comments were received from importers or other persons. 36 FR 18859.

CBP announced its proposed intention to amend the regulations via Federal Register notice on August 18, 1989. See 54 FR 34186 of the same date. In the introductory "Background" in the proposed rule, CBP (then "Customs") emphasized the characteristics that would be considered in making determinations regarding the types of blades knives bore which would be proscribed by the Switchblade Knife Act and implementing regulations, stating that:

To implement the law, Customs adopted regulations which followed the legislative language extremely closely (19 CFR 12.95–12.103). Those regulations also specifically referred to the court decision of *Precise Imports Corp. and Others v. Joseph P. Kelly, Collector of Customs, and Others* (378 F. 2d 1014). *Because of this reference, the existing regulations appear to imply that one of the principal considerations in determining the legality of a knife is the type of blade style the weapon possesses. While style is relevant, it is not of overriding importance. Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state are much more important. The Customs position, which has been supported by court decisions, is that Congressional intent was to address the problem of the importation, subsequent sale, and use of a class of quick-opening, easily concealed knives most frequently used for criminal purposes.* The deletion of the reference to the *Precise Imports* case does not imply that customs does not consider the principles contained in that case important, or that they are in any way no longer relevant. Rather, the principles in the *Precise Imports* case could not be considered too limiting [italicized emphasis added]. 54 FR 34186

There is no reference in the statutory language of the Switchblade Knife Act to the term "utilitarian use"; the only references appear in the CBP regulations. Similarly, the term has received only passing reference judicially ("The government indicated that had the knives been "designed with a

single-edge blade and were primarily used for utilitarian purposes" rather than "double-edged stiletto-style blades" they would have been admitted." *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988)) and in the Federal Register notices cited above. Therefore, against the explanatory language from the Federal Register notices set forth above, we consider the ordinary meaning of the words employed:

> The term "utilitarian" is defined at *http://dictionary.reference.com/ search?q=utilitarian* as:

> 1. ertaining to or consisting in utility.

> 2. having regard to utility or usefulness rather than beauty, ornamentation, etc.

> And at the same site:

> 1. having a useful function; "utilitarian steel tables".

> 2. having utility often to the exclusion of values; "plain utilitarian kitchenware".

> The term "utility" is defined at *http://www.merriam-webster.com/ dictionary/utility* as:

> 1: fitness for some purpose or worth to some end.

> 2: something useful or designed for use.

From the exemplars set forth in 19 CFR 12.95(c), and definitions set forth above, we conclude that knives with a primary (constructively or practically vs. tactically, lethally or primarily as a weapon) utilitarian design and purpose that are not captured by the definition of switchblades are admissible pursuant to the Switchblade Knife Act. Thus, for example, pocketknives, tradesman's knives and other folding knives for a certain specific use remain generally admissible, with such determinations being made, by necessity, on a case-by-case basis. Further, the opening mechanisms of imported knives must be considered and those that open instantly subjected to strict scrutiny in order to determine admissibility. As we found in HQs W479898, dated June 29, 2007 and H017909 dated December 26, 2007, that "*all* knives can potentially be used as weapons"; likewise the blades of all knives have some utility. Therefore, consideration of the characteristics of the knives should be made, focused on those emphasized ("Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition to an "operational" or "open" state . . .") in the Federal Register notice amending the regulations at issue. Thus, given the clear purpose enunciated during the notice and comment rulemaking process which amended the relevant regulation, we conclude that the type of opening mechanism is "much more important" than blade style in making admissibility determinations under the Switchblade Knife Act (see 54 FR 34186, *supra*).

We therefore find that knives with spring-assisted opening mechanisms that require minimal "human manipulation" in order to instantly spring the blades to the fully open and locked position cannot be considered to have a primary utilitarian purpose; such articles function as prohibited switchblade knives as defined by the relevant statute and regulations.

In reaching this conclusion, we reexamined the sample provided. We note that other than a bald assertion that the knives at issue are for a "primary

**KnifeRights MSJ App.000724**

utilitarian purpose", no evidence substantiating that claim was presented. The knife at issue can be instantly opened into the fully locked and ready position with one hand, simply by pushing/applying thumb pressure on either of the thumb tabs. Although the knife is marketed as a "release assist" model, it nevertheless opens via human manipulation and inertia. See *Taylor, supra.* It is based upon this analysis and these factual observations that we conclude that the knife at issue is a switchblade prohibited from importation into the United States.

This decision is necessary to reconcile CBP's position regarding the admissibility of such knives and comports with the conclusions made in the following rulings:

In New York Ruling Letter ("NY") G83213, dated October 13, 2000, CBP determined that "a folding knife with a spring-loaded blade [which could] be easily opened by light pressure on a thumb knob located at the base of the blade, or by a flick of the wrist" was an "inertia-operated knife" that "is prohibited under the Switchblade Act and subject to seizure. See 19 C.F.R. §12.95 (a)(1)."

In NY H81084, dated May 23, 2001, CBP determined that 18 models of knives "may be opened with a simple flick of the wrist, and therefore are prohibited as inertial operated knives."

In HQ 115725, dated July 22, 2002, CBP determined that a "dual-blade folding knife" in which the "non-serrated blade is spring-assisted [and] is opened fully by the action of the spring after the user has pushed the thumb-knob protruding from the base of the blade near the handle to approximately 45 degrees from the handle" "is clearly a switchblade as defined in § 12.95(a)(4) (Knives with a detachable blade that is propelled by a spring-operated mechanism and components thereof.)"

In HQ 115713, dated July 29, 2002, CBP determined that four styles of knives, three of which could "be opened by the application of finger or thumb pressure against one of the aforementioned studs that protrudes from the side of the blade which activates a spring mechanism automatically propelling the blade into a fully open and locked position[,]" and the fourth which "opened by depressing a bar-like release on the handle which, when pushed, releases the blade which is then partially opened by a spring mechanism" were switchblades pursuant to the Switchblade Knife Act and pertinent regulations, prohibited from entry into the United States.

In H040319, dated November 26, 2008, we held that knives with spring-assisted opening mechanisms are "switchblades" within the meaning of 19 CFR Part 12.95(a)(1) and are therefore prohibited entry into the United States pursuant to the Switchblade Knife Act (15 U.S.C. §§ 1241–1245).

In turning to the knives at issue in HQ H016666, examination of and the description of the Tailwind assisted release mechanism and application of the regulatory criteria set forth above reveals that the subject knives are switchblades within the meaning of 19 CFR Part 12.95(a)(1) because they meet the criteria enumerated therein, *i.e.*, they open automatically by operation of inertia, gravity, or both.

**HOLDING:**

HQ H016666 is revoked.

The subject knives equipped with the Tailwind release assist mechanism are switchblade knives within the meaning of 15 U.S.C. § 1241(b)(2) and 19

56    CUSTOMS BULLETIN AND DECISIONS, VOL. 43, NO. 21, MAY 22, 2009

CFR Part 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245, the subject knives are prohibited from entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights and,*
*Restricted Merchandise Branch.*

───────

[ATTACHMENT H]

DEPARTMENT OF HOMELAND SECURITY.
U.S. CUSTOMS AND BORDER PROTECTION,
HQ H043127
April 30, 2009
ENF–4–02–OT:RR:BSTC:IPR H043127 AML
CATEGORY:  Restricted Merchandise

MR. MATTHEW K. NAKACHI
SANDLER, TRAVIS & ROSENBERG, P.A.
*505 Sansome Street*
*Suite 1475*
*San Francisco, California 94111*

RE:  Revocation of HQ H032255; Admissibility of Knives; Switchblade Knife Act, 15 U.S.C. §§ 1241–1245; 19 CFR Parts 12.95–12.103

DEAR MR. NAKACHI:

This is in reference to Headquarters Ruling Letter ("HQ") H032255, dated August 12, 2008, which concerned the admissibility of the "VanHoy Assist", a "release-assisted" knife described below, pursuant to the Switchblade Knife Act, 15 U.S.C. § 1241, *et seq.* In the referenced ruling, U.S. Customs and Border Protection (hereinafter "CBP") determined that the knives at issue were admissible into the United States pursuant to the Switchblade Knife Act. We have reconsidered the rationale of, and the admissibility determination made in HQ H032255 and found both to be in error. For the reasons set forth below, we hereby revoke HQ H032255.

**FACTS:**

CBP paraphrased your description of the knives at issue in HQ H032255[11] as follows:

[T]he knife at issue, tentatively planned by your client to be called the "VanHoy Assist," is a knife "of new design." The prototype is of standard knife construction with a single-edged, utilitarian blade. You state that "the unique nature of the knife is that the assisted-opening mechanism operates by thumb or hand pressure downward on the blade/thumbscrew (rather than the traditional upward pressure)." You further

─────────

[11] In the ruling request, you indicated that the "VanHoy Assist" was similar to the knife at issue in New York Ruling Letter ("NY") I86378, dated October 1, 2002. Other than the similarity of the thumb stud on the base of the blade, there is no indication that the knife at issue in NY I86378 bore a spring-assisted opening mechanism.

**KnifeRights MSJ App.000726**

indicate that "the downward pressure releases the locking mechanism and then a slight spring action assists the opening of the blade to the fully locked position." The knife has a 3 inch blade and measures approximately 4⅝ inches when closed. When extended, the overall length of the knife is approximately 7⅝ inches. The knife is refolded by depressing a manual release.

**ISSUE:**

Whether the subject knives are prohibited from entry into the United States pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245 and CBP Regulations promulgated pursuant thereto set forth in 19 CFR §§ 12.95–12.103.

**LAW AND ANALYSIS:**

Pursuant to the Act of August 12, 1958 (Pub. L. 85–623, codified at 15 U.S.C. §§ 1241–1245, otherwise known as the "Switchblade Knife Act"), whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined or imprisoned, or both.

The Switchblade Knife Act defines "interstate commerce" at 15 U.S.C. § 1241(a):

The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

The Switchblade Knife Act defines "switchblade knife" at 15 U.S.C. § 1241(b):

The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both[.]

The CBP Regulations promulgated pursuant to the Switchblade Knife Act are set forth in 19 CFR §§ 12.95–12.103. We note the following definitions:

§ 12.95  Definitions.

Terms as used in §§ 12.96 through 12.103 of this part are defined as follows:

(a) Switchblade knife. "Switchblade knife" means any imported knife, or components thereof, or any class of imported knife, including "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives, which has one or more of the following characteristics or identities:

(1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, or any knife with a blade which opens automatically by operation of inertia, gravity, or both;

(2) Knives which, by insignificant preliminary preparation, as described in paragraph (b) of this section, can be altered or converted so as to open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both;

(3) Unassembled knife kits or knife handles without blades which, when fully assembled with added blades, springs, or other parts, are knives which open automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(4) Knives with a detachable blade that is propelled by a spring-operated mechanism, and components thereof[.]

(b) Insignificant preliminary preparation. "Insignificant preliminary preparation" means preparation with the use of ordinarily available tools, instruments, devices, and materials by one having no special manual training or skill for the purpose of modifying blade heels, relieving binding parts, altering spring restraints, or making similar minor alterations which can be accomplished in a relatively short period of time.

Other pertinent regulations are as follows:

§ 12.96  Imports unrestricted under the Act.

(a) Common and special purpose knives. Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .

§ 12.97  Importations contrary to law.

Importations of switchblade knives, except as permitted by 15 U.S.C. § 1244, are importations contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c).

The plain language of the Switchblade Knife Act and relevant CBP regulations prohibit, *inter alia*, the importation of knives which are for use as weapons while explicitly permitting the importation of "common and special purpose" knives (see 19 CFR 12.95(c) "Utilitarian Use" and 12.96(a) ("Unrestricted Imports")). Several courts have addressed the breadth of the prohibition set forth in the statute. See, *e.g.*, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014, 1017 (2d Cir. 1967), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967), in which the Court of Appeals for the Second Circuit stated that:

The report of the Senate Committee on Interstate and Foreign Commerce which recommended passage of the Switchblade Knife Act stated that the enforcement of state laws banning switchblade knives would be extremely difficult as long as such knives could be freely obtained in interstate commerce, and added:

"In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better

suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce." S.Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 2 U.S. Code Cong. & Ad. News 1958, at 3435–37.

The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate commerce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion.

. . . We hold, therefore, that a knife may be found to be a switchblade knife within the meaning of the Switchblade Knife Act if it is found that it can be made to open automatically by hand pressure, inertia, or gravity after insignificant alterations, and that one of its primary purposes is for use as a weapon.

In *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988) the court, in describing a Balisong knife stated that:

[T]he district court described a Balisong knife as "basically a folding knife with a split handle." It went on to set out its prime use: while the exotic knife has some utilitarian use, it is most often associated with the martial arts and with combat . . . [and is] potentially dangerous, lethal. . . ." Citing another district court decision involving the same issue, *Precise Imports Corp. v. Kelly*, 378 F.2d 1014 (2d Cir.), *cert. denied*, 389 U.S. 973, 19 L. Ed. 2d 465, 88 S. Ct. 472 (1967) (upholding a seizure of certain knives with no legitimate purpose), the district court described it as of "minimal value" and distinguished another "seminal case interpreting the Act", *United States v. 1,044 Balisong Knives*, No. 70–110 (D. Ore. Sept. 28, 1970) (refusing to support seizure). The district court concluded that "congress intended to prohibit knives that opened automatically, ready for instant use . . . [and] was not concerned with whether the knife's blade would merely be exposed by gravity", . . . [it] intended 'open' to mean 'ready for use.' " *Taylor v. United States*, 848 F.2d 715, 717 (6th Cir. 1988).

See also *Taylor v. McManus*, 661 F. Supp. 11, 14–15 (E.D. Tenn. 1986), in which the Court of Appeals for the Eastern District of Tennessee observed:

In examining the congressional record, it seems obvious that congress intended to prohibit knives which opened automatically, ready for instant use. Rep. Kelly, for example, described the switchblade "as a weapon (which) springs out at the slightest touch and is ready for instant violence." *Switchblade Knives: Hearings Before a Subcommittee of the Committee on Interstate and Foreign Commerce*, House of Rep., 85th Cong., 2d Sess. 13, 29 (1958). She also noted that the prohibited gravity knife opens and "anchors in place automatically. Every bit as fast as the switchblade, it has proved to be as effective a killer." *Id.* at 29. Similarly, Rep. Delaney described the prohibited gravity knives as "knives (which) open and lock automatically at a quick flick of the wrist." 104 CONG. REC., 85th Cong., 2nd Sess. 12398 (June 26, 1958). (Emphasis supplied). Apparently, then, Congress was not concerned with whether the

knife's blade would merely be exposed by gravity. Instead, they intended "open" to mean "ready for use", as exhibited in Rep. Kelley's testimony that the switchblade opened "ready for instant violence" and her and Rep. Delaney's comments that the gravity knife opened and locked automatically. While the Court does not intend to read into the Statute a requirement that the blades "lock" automatically, it does seem apparent that Congress intended "open" to mean "ready for use". Obviously a knife that has not locked into an open position is not ready for use. Since the Balisong knives cannot be used until the second handle is manually folded back and clasped, the Court finds that they do not open automatically by force of gravity or inertia.[12]

Based primarily on 15 U.S.C. § 1241(b)(1) (see also the first clause of 19 CFR Part 12.95(a)(1)) which defines a switchblade knife as being a knife having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, as well as reliance upon the exception set forth at 19 CFR Part 12.95(c) regarding knives with a blade style designed for a primary utilitarian use, CBP decided in several rulings, including HQ H032255, that knives with spring- or release-assisted opening mechanisms are not switchblades as contemplated by the Switchblade Knife Act and implementing regulations.

Notwithstanding, because of the intrinsic health and public safety concerns underlying the statute and regulations, it is necessary to reassess our position regarding knives with spring-assisted opening mechanisms as 1) there are no judicial decisions interpreting, other than in the context of Balisong knives (discussed above), 15 U.S.C. § 1241(b)(2) and the second clause of 19 Part CFR 12.95(a) (discussed below) and 2) CBP has issued inconsistent rulings, of which HQ H032255 is one, regarding the issue of whether knives with spring-assisted opening mechanisms are admissible or prohibited from importation into the United States.

In *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 628 (9th Cir. Alaska 2005), the Court of Appeals for the 9th Circuit stated, with regard to the interpretation of agency regulations that:

"In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988)) (alteration in original). When a statute or regulation defines a term, that definition controls, and the court need not look to the dictionary or common usage. *Compare F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994) ("In the absence of such a definition, we construe a statutory term in accordance with its ordinary

_____

[12] The conclusion regarding Balisong knives was reversed by *Taylor v. United States*, 848 F.2d 715 (6th Cir. Tenn. 1988): "There is sufficient indication in the legislative history that the intent was to exclude these martial arts weapons, which even the district court admitted "can be opened very rapidly, perhaps in less than 5 seconds . . . [and] are potentially dangerous, lethal weapons." *Id.* at 720. Further, Balisongs were added to the list of prohibited knives when the regulations were amended in 1990. See the discussion of the regulatory amendments in HQ H030606, dated August 12, 2008, page 4.

BUREAU OF CUSTOMS AND BORDER PROTECTION 61

or natural meaning."). An agency's interpretation of a regulation must "conform with the wording and purpose of the regulation." *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th Cir. 2003).

Because of the existence of conflicting rulings (*i.e.*, rulings which have determined that knives with spring-assisted opening mechanisms are switchblades as defined in the statute and others which have made the opposite conclusion), we have reexamined the definition of the word "switchblade knife" set forth at 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1) and have determined that the definition captures and proscribes, in addition to "traditional" switchblades, the importation of knives with spring-assisted opening mechanisms, often equipped with thumb studs or protrusions affixed to the base of the blade (rather than in the handle of the knives as set forth in the first clause of 19 CFR Part 12.95(a)(1)). The relevant regulatory language identifies and defines "switchblade knives" by exemplars (" "switchblade", "Balisong", "butterfly", "gravity" or "ballistic" knives") and by definition ("or any class of imported knife . . . which has one or more of the following characteristics or identities: (1) A blade which opens automatically by hand pressure applied to a button or device in the handle of the knife, *or any knife with a blade which opens automatically by operation of inertia, gravity or both*[.]")

In reconsidering what types of knives are contemplated by the statute, we interpret the controlling terms according to their common meanings[13]. The term "automatically" is defined at *http://www.merriam-webster.com/dictionary/automatically* as:

1 a: largely or wholly involuntary; especially: reflex 5 <automatic blinking of the eyelids> b: acting or done spontaneously or unconsciously c: done or produced as if by machine: mechanical <the answers were automatic> 2: having a self-acting or self-regulating mechanism <an automatic transmission> 3of a firearm: firing repeatedly until the trigger is released.

The term "inertia" is defined at *http://www.merriam-webster.com/dictionary/inertia* as:

1 a: a property of matter by which it remains at rest or in uniform motion in the same straight line unless acted upon by some external force b: an analogous property of other physical quantities (as electricity).

See also, *http://physics.about.com/od/glossary/g/inertia.htm*: Definition: Inertia is the name for the tendency of an object in motion to remain in motion, or an object at rest to remain at rest, unless acted upon by a force. This concept was quantified in Newton's First Law of Motion; and *http://dictionary.reference.com/browse/inertia*: 2. Physics. a. the property of matter by which it retains its state of rest or its velocity

---

[13] A fundamental canon of statutory construction requires that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1979); see also 2A Norman J. Singer, *Sutherland Statutory Construction* § 46:01 (6th ed. 2000). *United States v. Lehman*, 225 F.3d 426, 429 (4th Cir. S.C. 2000).

KnifeRights MSJ App.000731

along a straight line so long as it is not acted upon by an external force.

In *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988), the United States Court of Appeals for the Sixth Circuit, in analyzing the terms of the statute and regulations at issue stated that:

> "Automatically" as used in the statute does not necessarily mean simply by operation of some inanimate connected force such as the spring in a literal switchblade. For example, the type of gravity or "flick" knife which is indisputably within the statute requires some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic."

Knives equipped with spring- and release-assisted opening mechanisms are knives which "require[ ] some human manipulation in order to create or unleash the force of "gravity" or "inertia" which makes the opening "automatic." " See *Taylor, supra.* Despite the fact that they differ in design (most if not all are equipped with thumb studs affixed to the base of the blunt side of the blade; the VanHoy Assist a "button" on the blade) from a traditional switchblade (in which the button that activates the spring mechanism is located in the handle of the knife), the spring- and release-assisted mechanisms cause the knives to open fully for instant use, potentially as a weapon. Such knives are prohibited by the Switchblade Knife Act.

Our interpretation of 15 U.S.C. § 1241(b) and 19 CFR 12.95(a)(1) is supported by case law. In *Demko v. United States*, 44 Fed. Cl. 83, 88–89 (Fed. Cl. 1999), the Court of Federal Claims, in analyzing a regulation regarding the grandfathered sale of "street sweeper" shotguns, recited the following interpretations of the word "or" as used in statutes and regulations:

> "Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS*, 22 Cl. Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but disconnect[s] their meaning, the meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, A Grammar of the English Language, Syntax 166 (1986)); see *Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir. 1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not adhered strictly to such rules of statutory construction. See *Ruben*, 22 Cl. Ct. at 266. For instance, "it is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States*, 719 F.2d 608, 612 (2d Cir. 1983); see *Ruben*, 22 Cl. Ct. at 266 (quoting same); see also *DeSylva v. Ballentine*, 351 U.S. 570, 573, 100 L. Ed. 1415, 76 S. Ct. 974 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States*, 73 U.S. 759, 764, 18 L. Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively. . . . This construction impairs no rights of the parties . . . and carries into effect the true intention of Congress. . . .").

KnifeRights MSJ App.000732

In analyzing the language of 15 U.S.C. § 1241(b) and 19 CFR Part 12.95(a)(1), we conclude that the word "or" is used conjunctively yet distinguishes the paradigm switchblade knife (paraphrased: spring action blade with a button in the handle) from other knives which function similarly to the paradigm switchblade but do not have the "traditional" configuration or function. Given its legislative and judicial history, the Switchblade Knife Act is intended to proscribe the importation of any knife that opens automatically by hand pressure applied to a button or device in the handle of the knife *and* any knife with a blade which opens automatically by operation of inertia, gravity or both.

The knives at issue open via inertia – once pressure is applied to the thumb stud (or button on the base of the blade), the blade continues in inertial motion (caused by the combined effect of manual and spring-assisted pressure) until it is stopped by the locking mechanism of the knife. Such knives open instantly for potential use as a weapon. We therefore conclude, in consideration of the authorities and sources Switchblade Knife Act and implementing regulations, that the knives with spring-and release- assisted opening mechanisms, that such knives are described and prohibited by 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1).

We also have reconsidered our interpretation of the terms "utilitarian use", as we have in several rulings found knives with spring-assisted opening mechanisms to be admissible because they were equipped with blades for utilitarian use. The regulation defines, albeit by exemplar, the types of knife (subject to the condition precedent set forth in 19 CFR 12.96: Imported knives with a blade style designed for a primary utilitarian use, as defined in § 12.95(c), shall be admitted to unrestricted entry *provided that in condition as entered the imported knife is not a switchblade knife as defined in § 12.95(a)(1)* [italicized emphasis added] . . .) that are considered to be "utilitarian" for purposes of the statute. See 19 CFR 12.95(c):

(c)  Utilitarian use. "Utilitarian use" includes but is not necessarily limited to use:

(1)  For a customary household purpose;

(2)  For usual personal convenience, including grooming;

(3)  In the practice of a profession, trade, or commercial or employment activity;

(4)  In the performance of a craft or hobby;

(5)  In the course of such outdoor pursuits as hunting and fishing; and

(6)  In scouting activities.

As we stated in HQ H030606, dated August 12, 2008, with regard to the regulations implementing the Switchblade Knife Act:

The relevant CBP regulations were implemented in 1971, following notice and comment, via Treasury Decision ("T.D.") 71–243, and the Final Rule was published in the Federal Register on September 13, 1971. See Final Rule, 36 FR 18859, Sept. 23, 1971. HQ H030606 at page 3.

The notice of proposed rulemaking, published in the Federal Register on October 24, 1970, set forth "[t]he proposed regulations . . . in tentative form as follows":

**64**     CUSTOMS BULLETIN AND DECISIONS, VOL. 43, NO. 21, MAY 22, 2009

(a)  Definitions. As used in this section the term "switchblade knife" means any imported knife-

(1)  Having a blade which opens automatically by hand pressure applied to a button or device in the handle of the knife or by operation of inertia, gravity, or both; or

(2)  Having a handle over 3 inches in length with a stiletto or other blade style which is designed for purposes that include a primary use as a weapon, *as contrasted with blade styles designed for a primary utilitarian use*, when, by insignificant preliminary preparation a Customs officer can alter or convert such stiletto or other weapon to open automatically as described in subparagraph (1) of this paragraph, under the principle of the decision in the case of "Precise Imports Corporation and Others v. Joseph P. Kelly, Collector of Customs, and Others" (378 F. 2d 1014). *The term "utilitarian use" means use for any customary household purpose; use for any usual personal convenience; use in the practice of a profession, trade, or commercial or employment activity; use in the performance of a craft or hobby; use, in the course of such outdoor pursuits as hunting and fishing; use related to scouting activities; and use for grooming, as demonstrated by jack-knives and similar standard pocket knives, special purpose knives, scout knives, and other knives equipped with one or more blades of such single edge nonweapon styles as clip, skinner, pruner, sheep foot, spey, coping, razor, pen, and cuticle* [italicized emphasis added]. 35 FR 16594.

The introductory language to the Final Rule made the following prefatory declarations:

On October 24, 1970, notice was published in the Federal Register (35 FR 16594) of a proposal to prescribe regulations to govern the importation of articles subject to the so-called Switchblade Knife Act, sections 1 – 4, 72 Stat. 562 (15 U.S.C. 1241 – 1244).

Importers or other interested persons were given the opportunity to participate in the rule making through submission of relevant comments, suggestions or objections. No comments were received from importers or other persons. 36 FR 18859.

CBP announced its proposed intention to amend the regulations via Federal Register notice on August 18, 1989. See 54 FR 34186 of the same date. In the introductory "Background" in the proposed rule, CBP (then "Customs") emphasized the characteristics that would be considered in making determinations regarding the types of blades knives bore which would be proscribed by the Switchblade Knife Act and implementing regulations, stating that:

To implement the law, Customs adopted regulations which followed the legislative language extremely closely (19 CFR 12.95–12.103). Those regulations also specifically referred to the court decision of *Precise Imports Corp. and Others v. Joseph P. Kelly, Collector of Customs, and Others (378 F. 2d 1014). Because of this reference, the existing regulations appear to imply that one of the principal considerations in determining the legality of a knife is the type of blade style the weapon possesses. While style is relevant, it is not of overriding importance. Concealability, and the ease with which the knife can be transformed from a "safe" or*

*"closed" condition to an "operational" or "open" state are much more important. The Customs position, which has been supported by court decisions, is that Congressional intent was to address the problem of the importation, subsequent sale, and use of a class of quick-opening, easily concealed knives most frequently used for criminal purposes.* The deletion of the reference to the *Precise Imports* case does not imply that customs does not consider the principles contained in that case important, or that they are in any way no longer relevant. Rather, the principles in the *Precise Imports* case could not be considered too limiting [italicized emphasis added]. 54 FR 34186

There is no reference in the statutory language of the Switchblade Knife Act to the term "utilitarian use"; the only references appear in the CBP regulations. Similarly, the term has received only passing reference judicially ("The government indicated that had the knives been "designed with a single-edge blade and were primarily used for utilitarian purposes" rather than "double-edged stiletto-style blades" they would have been admitted." *Taylor v. United States*, 848 F.2d 715, 720 (6th Cir. Tenn. 1988)) and in the Federal Register notices cited above. Therefore, against the explanatory language from the Federal Register notices set forth above, we consider the ordinary meaning of the words employed:

The term "utilitarian" is defined at *http://dictionary.reference.com/ search?q =utilitarian* as:

1. pertaining to or consisting in utility.

2. having regard to utility or usefulness rather than beauty, ornamentation, etc.

And at the same site:

1. having a useful function; "utilitarian steel tables".

2. having utility often to the exclusion of values; "plain utilitarian kitchenware".

The term "utility" is defined at *http://www.merriam-webster.com/ dictionary/utility* as:

1: fitness for some purpose or worth to some end.

2: something useful or designed for use.

From the exemplars set forth in 19 CFR 12.95(c), and definitions set forth above, we conclude that knives with a primary (constructively or practically vs. tactically, lethally or primarily as a weapon) utilitarian design and purpose that are not captured by the definition of switchblades are admissible pursuant to the Switchblade Knife Act. Thus, for example, pocketknives, tradesman's knives and other folding knives for a certain specific use remain generally admissible, with such determinations being made, by necessity, on a case-by-case basis. Further, the opening mechanisms of imported knives must be considered and those that open instantly subjected to strict scrutiny in order to determine admissibility. As we found in HQs W479898, dated June 29, 2007 and H017909 dated December 26, 2007, that "*all* knives can potentially be used as weapons"; likewise the blades of all knives have some utility. Therefore, consideration of the characteristics of the knives should be made, focused on those emphasized ("Concealability, and the ease with which the knife can be transformed from a "safe" or "closed" condition

to an "operational" or "open" state . . .") in the Federal Register notice amending the regulations at issue. Thus, given the clear purpose enunciated during the notice and comment rulemaking process which amended the relevant regulation, we conclude that the type of opening mechanism is "much more important" than blade style in making admissibility determinations under the Switchblade Knife Act (see 54 FR 34186, *supra*).

We therefore find that knives with spring-assisted opening mechanisms that require minimal "human manipulation" in order to instantly spring the blades to the fully open and locked position cannot be considered to have a primary utilitarian purpose; such articles function as prohibited switchblade knives as defined by the relevant statute and regulations.

We note that other than a bald assertion that the knives at issue are for a primary utilitarian purpose (you stated that the knife is of standard construction and has a single-edged, utilitarian blade"), no evidence substantiating that claim was presented. The knife at issue can be instantly opened into the fully locked and ready position with one hand, simply by pushing on the thumb tab on the blade. Although the knife is marketed as a "release assist" model, it nevertheless opens via human manipulation and inertia. See *Taylor, supra*. It is based upon this analysis and these factual observations that we conclude that the knife at issue is a switchblade prohibited from importation into the United States.

This decision is necessary to reconcile CBP's position regarding the admissibility of such knives and comports with the conclusions made in the following rulings:

In New York Ruling Letter ("NY") G83213, dated October 13, 2000, CBP determined that "a folding knife with a spring-loaded blade [which could] be easily opened by light pressure on a thumb knob located at the base of the blade, or by a flick of the wrist" was an "inertia-operated knife" that "is prohibited under the Switchblade Act and subject to seizure. See 19 C.F.R. §12.95 (a)(1)."

In NY H81084, dated May 23, 2001, CBP determined that 18 models of knives "may be opened with a simple flick of the wrist, and therefore are prohibited as inertial operated knives."

In HQ 115725, dated July 22, 2002, CBP determined that a "dual-blade folding knife" in which the "non-serrated blade is spring-assisted [and] is opened fully by the action of the spring after the user has pushed the thumb-knob protruding from the base of the blade near the handle to approximately 45 degrees from the handle" "is clearly a switchblade as defined in § 12.95(a)(4) (Knives with a detachable blade that is propelled by a spring-operated mechanism and components thereof.)"

In HQ 115713, dated July 29, 2002, CBP determined that four styles of knives, three of which could "be opened by the application of finger or thumb pressure against one of the aforementioned studs that protrudes from the side of the blade which activates a spring mechanism automatically propelling the blade into a fully open and locked position[,]" and the fourth which "opened by depressing a bar-like release on the handle which, when pushed, releases the blade which is then partially opened by a spring mechanism" were switchblades pursuant to the Switchblade Knife Act and pertinent regulations, prohibited from entry into the United States.

In H040319, dated November 26, 1008, we held that knives with spring-assisted opening mechanisms are "switchblades" within the meaning of 19

CFR Part 12.95(a)(1) and are therefore prohibited entry into the United States pursuant to the Switchblade Knife Act (15 U.S.C. §§ 1241–1245).

In turning to the knives in HQ H032255, reconsideration of the "VanHoy Assist" and its assisted-release mechanism and application of the regulatory criteria set forth above reveals that the subject knives are switchblades within the meaning of 19 CFR Part 12.95(a)(1) because they meet the criteria enumerated therein, *i.e.*, they open automatically by operation of inertia, gravity, or both.

**HOLDING:**

HQ H032255 is hereby revoked.

The subject knives equipped with the Tailwind release assist mechanism are switchblade knives within the meaning of 15 U.S.C. § 1241(b)(2) and 19 CFR Part 12.95(a)(1). Therefore, pursuant to the Switchblade Knife Act, 15 U.S.C. §§ 1241–1245, the subject knives are prohibited from entry into the United States.

GEORGE FREDERICK MCCRAY,
*Chief,*
*Intellectual Property Rights and,*
*Restricted Merchandise Branch.*

---

## REVOCATION OF A RULING LETTER AND REVOCATION OF TREATMENT RELATING TO THE TARIFF CLASSIFICATION OF WALL BANNERS AND PENNANTS

**AGENCY:** Bureau of Customs and Border Protection; Department of Homeland Security.

**ACTION:** Notice of revocation of a tariff classification ruling letter and revocation of treatment relating to the classification of wall banners and pennants

**SUMMARY:** Pursuant to section 625(c), Tariff Act of 1930, as by section 623 of Title VI (Customs Modernization) of the North American Free Trade Agreement Implementation Act (Pub. L. 103–182, 107 Stat. 2057), this notice advises interested parties that Customs and Border Protection (CBP) is revoking a ruling letter relating to the tariff classification of certain wall banners and pennants, under the Harmonized Tariff Schedule of the United States Annotated (HTSUSA). CBP is also revoking any treatment previously accorded by it to substantially identical transactions. Notice of the proposed revocation was published on March 19, 2009, in the Customs Bulletin, Volume 43, Number 12. No comments were received in response to the proposed revocation.

**EFFECTIVE DATE:** This action is effective for merchandise entered or withdrawn from warehouse for consumption on or after July 21, 2009.

**KEN ONION EXHIBIT D**

KnifeRights MSJ App.000738

# Sporting Knives and Tools in America:
## Essential to Daily Life

## Sporting Knives and Tools

Throughout the U.S. people use knives and edged tools daily:

- At work, from construction worker to florist
- During normal activities, from opening packages to cutting apples
- In recreational activities, from camping to fishing and hunting.
- In life-saving situations by EMTs, firefighters, law enforcement and the military.

They are an essential, fundamental tool for work and play in American lives.[1]

## U.S. Sporting Knife & Tool Industry - $5.722 Billion Economic Impact[2]

- 4,704 direct U.S. Employees at 81 Companies
- 23,520 Ancillary Support Jobs in Other Industries and Services
- $953.7 Million Gross Revenues at Manufacturer/Importer Level
- $5.722 Billion Total Economic Impact on U.S. Economy



## Millions of Americans Use Knives Daily

- 34 Million hunters and anglers carry knives[3]
- 3.2 Million law enforcement officers, EMT's, firefighters, security guards carry valuable tools every hour of the day[4]
- 2.2 Million active and reserve military forces carry knives[5]
- 5.2 Million construction workers rely on knives and multi-tools[4]
- Nearly 1 Million adult volunteers in local councils throughout the U.S. and its territories help Boy Scouts of America with 2.4 Million youth members to Be Prepared[6]
- Nearly half of all Americans - 48.4% - participated in at least one outdoor activity in 2014. This equates to 141.4 Million people involved in activities where knives are often carried and used.[7]

## Majority of Knives Designed to Open Easily with One Hand[8]

- Knife users prefer easy to open, folding knives called pocket knives, one-hand opening or assisted opening and automatics, and multi-tools with one or more knife blades.
- The majority of activities using a knife require one hand free for holding something.
- Automatic knives currently are legal in approximately 34 states.
- Courts in California, llinois and Michigan have expressly ruled that assisted-openers are not illegal switchblades.
- The Federal Switchblade Act (1958) was amended in 2009 to clarify that these knives which have a bias toward closure are not illegal switchblades in interstate commerce.

## Billions of Dollars Benefit the U.S. Economy

- Hunters and anglers are a $76 Billion economic force annually.[3]
- Outdoor recreation including camping, backpacking, kayaking, climbing, etc. generates $646 billion in consumer spending.[9]

[1]See http://www.akti.org/resources/people-use-knives for a partial list of knife users
[2]State of the Sporting Knife & Tool Industry, American Knife & Tool Institute (published 2015; data 2014)
[3]Hunting and Fishing: Bright Stars of the American Economy, Congressional Sportsmen's Foundation, 2013
[4]U.S. Department of Labor, Occupational Employment Statistics, May 2015
[5]Wikipedia.org
[6]2014 BSA Report to the Nation
[7]Outdoor Recreation Participation Topline Report 2015, Outdoor Foundation
[8]State of the Sporting Knife & Tool Industry Survey, American Knife & Tool Institute, 2015
[9]Outdoor Industry Association.org/research



12/2015

KnifeRights MSJ App.000739

**KEN ONION EXHIBIT E**

KnifeRights MSJ App.000740



**Terrain 365 P38-AT Manual**



**Terrain 365 P38-DA Dual-Action Auto**

**KEN ONION EXHBIT F**

KnifeRights MSJ App.000742



**Benchmade Adamas AXIS Manual**



**Benchmade Adamas AXIS Auto**



**Buck 110 Manual
(Original 2-Hand Opener)**

**Buck 110 Manual
(1-Hand Opener)**

**Buck 110 Auto**

KnifeRights MSJ App.000744



**Hogue EX-01 Manual**



**Hogue EX-A01 Auto**

KnifeRights MSJ App.000745



**Pro-Tech TR-5 SA.1 Spring Assisted**



**Pro-Tech TR-5 T501 Auto**

**KnifeRights MSJ App.000746**

# EXHIBIT W

KnifeRights MSJ App.000747

1  
2  
3  
4  

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

KNIFE RIGHTS, INC.; RUSSELL ARNOLD; JEFFREY FOLLODER; RGA AUCTION SOLUTION d.b.a. FIREARM SOLUTIONS; AND MOD SPECIALTIES,

          Plaintiffs,

    v.

MERRICK B. GARLAND, Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE,

          Defendants.

Case No. 4:23-cv-00547-O

Hon. Judge Reed O'Connor

## DECLARATION OF J. BRUCE VOYLES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1

## <u>DECLARATION OF J. BRUCE VOYLES</u>

2

I, J. Bruce Voyles, declare as follows:

3

4        1.       I am not a party in the above-titled action, am over the age of 18, have

personal knowledge of the facts in this declaration, and am competent to testify to

5

the matters stated below. My declaration is executed in support of Plaintiffs' motion

6

for summary judgment.

7

## BACKGROUND AND QUALIFICATIONS

8

9        2.       I live in Murphy, North Carolina, and have been involved in the knife

industry as a journalist, editor, author, knife show owner, and buyer and seller of

10

knives for more than 47 years.

11

12        3.       I am the owner of J. Bruce Voyles, Auctioneers (specializing in knives)

and have been operating the business from 1996 to the present.

13

14        4.       I am also the owner of Voyles Cutlery and Heritage Antique Knives

15

covering vintage and collectible knives and Bowie knives and have operated the

16

business from 1973 to the present.

17

18        5.       Further, I am the founder/owner of the Spirit of Steel Knife Show/Knife

Roadshow from 2001 to the present.

19

20        6.       I am an Editor-at-Large for Knife Magazine from 2015 to the present.

21        7.       I was elected to the Blade Magazine Cutlery Hall of Fame in 1983, the

22

first-ever member inducted by unanimous acclamation of the membership. This is

23

the highest distinction one can receive in the knife industry.

24        8.       I founded the internationally acclaimed Blade Show and International

25

Cutlery Fair in 1982 and ran the show until 1994.

26

27        9.       I have owned, published, edited, or written for 10 knife-related

publications since 1976. I am the author or co-author of nine knife-related books.

28

---

1      10.    I have assembled one of the most extensive cutlery reference libraries
2  in the world.

3      11.    Attached hereto as **Exhibit A** and incorporated by reference is a true
4  and correct copy of my full Curricula Vitae setting forth my qualifications.

5      12.    I have been retained as an expert witness by Plaintiffs in this case to
6  render my professional expert opinion on the categorization and commonality of
7  folding pocket knives and automatic knives, also known as switchblades, in the
8  United States. I am not charging for my services in this case.

9
10                           **OPINIONS**

11      13.    Based on my over 47 years of experience in the knife industry, it is my
12  professional opinion that automatic knives ("switchblades") are simply a variation of
13  common folding pocket knives.

14      14.    Based on my over 47 years of experience in the knife industry,
15  excluding kitchen knives, common folding pocket knives are the most common
16  knives manufactured and sold in the U.S. market and have been for over 100 years.

17      15.    Additionally, based on my over 47 years of experience in the knife
18  industry, automatic knives, or "switchblades," — being a variation of folding pocket
19  knife — are also in common use within the United States.

20
21

22  I declare under penalty of perjury under the laws of the United States that the
23  foregoing is true and correct, and that my declaration was executed on September
24  19, 2023 in Murphy, North Carolina.

25
26                                             **J. Bruce Voyles**
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

| J. Bruce Voyles Exhibit A |
|---|

# J. BRUCE VOYLES

P. O. Box 22007                48 Sycamore St.

Chattanooga, TN 37422        Murphy, NC 28906

423-667-3582                bruce@jbrucevoyles.com

**Current Employment:**

Owner               J. Bruce Voyles, Auctioneers (knife auctioneers) 1996-present

Editor-at-Large     Knife Magazine 2015-present

**Knife-Related Positions Held:**

Executive Director   National Knife Museum (2013-2014)

Editor               Knives Illustrated Magazine (Becket Media) 2000-2013

Editor               National Knife Collectors Association Newsletter 1976-77

Founding Editor      National Knife Collector Magazine 1977-1981

Editor/Publisher     Blade Magazine 1981-1994

Founding Ed/Pub      Edges 1981-1994

Founding Ed/Pub      Blade Trade 1984-1994

Publisher            "Combat Knives" and "Bowies" (Special newsstand issues)

Author               "Knife" section of the World Book Encyclopedia

Editor/Publisher     Knives Digest I (1999)

**Knife Books:**

Co-Author            The Official Price Guide to Knives, Collectible Knives, etc. Volume 1-8
                     (1976-84)

Co-Author            The Official Price Guide to Knives Pocket Guide (Vols. 1-3)

Author               The ABCA Price Guide to Antique Knives (1990)

Author               The IBCA Price Guide to Antique Knives (1995)

| | |
|---|---|
| Author | The IBCA Price Guide to Commemorative Knives (1996) |
| Author/Photographer | The Antique Bowie Knife Book (1992) |
| Editor | Today's Knifemakers |
| Editor | The Knifemakers Guild Directory Third Edition |
| Author/Photographer | The Joseph Rodgers Exhibition Knives |

**Other:**

Founded and developed the Blade Show and International Cutlery Fair (1982-1994)

Manager of the Knifemakers' Guild Show three years in the 2000's.

Founded knife sales show on shopping networks on Shop-At-Home Television Network, Knoxville, TN (1990-1993), America's Collectibles Network (1993-1994) Greenville, TN, Panda Television (1995) Los Angeles, CA, and Gem Shopping Channel (1995) Atlanta, GA.

Recognized as expert witness on knives in U. S. District Court, Greenville, TN., and in New York County (Manhattan), New York.

Knife appraisals for items donated to the Smithsonian Institution, and for the National Firearms Museum (NRA).

Owner of Voyles Cutlery and Heritage Antique Knives (1973-present) dealing in vintage and collectible knives and Bowies.

Retail knife shop owner (1975-1977)

Editor of the Case Knife Collectors Club Newsletter (1990-91)

Founder/Owner Spirit of Steel Knife Show/Knife Roadshow-2001-present.

Knifemaking and Forging Class completed at the American Bladesmith School (1993)

Speaker at Alabama Forge Council Knifemaking Seminar, Bowie Knife Symposiums in Winston-Salem, N. C. and Atlanta. Guadalupe Hammer-In and the Georgia Knifemakers Association Annual Meeting. and have spoken on knives at knife clubs in Oregon, Indiana, Georgia, Alabama, Tennessee and at various local civic groups.

Introductions written for Jim Weyer's Knives: Points of Interest (2 editions), Joseph Rodgers and Sons Knives by Samuel Setain, Sheffield Exhibition Knives by Bill Claussen et.al.

Cutlery/Advertising/Direct Mail consultants to: Parker Cutlery, W. R. Case & Sons Cutlery Co., American Blade Cutlery Co.

Interviewed and quoted on knives in USA Today.


**Cutlery Centers and Factories Visited**

Sheffield, England: Kellam Island, Weston Park Museum, Several historical factory locations in the area.

Solingen, Germany: Boker, Klingen Museum, Various historical sites

Seki City, Japan: Factories: Mitsuboshi, Kenward, Gerber/Sakai, Parker/Imai, Noda, and Seki City Cutlery Fair, Nagoya Castle Museum.

London, England: Wallace Collection, Portobello Road Antique Market

Walden, NY Area: Orange County Museum, Schrade Cutlery, Ulster Cutlery.

Bradford, PA Area: W. R. Case Cutlery, Kabar, Cattaraugus site

Jacksonville, AL: Parker-Edwards Cutlery, Edwards Iron Works, Alabama Damascus

Portland, OR: Al Mar, Gerber, Kershaw, Benchmade

San Diego, CA: Buck Knives

San Antonio, TX, The Alamo

Jackson, Miss., Mississippi State Museum


**Knife Related Honors and Positions**

Cutlery Hall of Fame Member (first person picked by unanimous declaration of the 20+ existing members of the Hall of Fame).

Nate Posner Award from the Knifemakers Guild

Don Hastings Award from the American Bladesmith Society

Honorary Life Member Texas Knife Collectors Association

Publishers Award from Blade Magazine 1995 and 2020.

Secretary of the Cutlery Collectors Legislative Committee (1983-1996)

Former Board of Director Member of the Antique Bowie Knife Collectors Assoc.

1

2   **<u>Personal</u>:**

3      BA in Journalism: Georgia State University-1975

4      Stanford Publishing Course, Stanford University 1981

5      Stanford Refresher Course, Stanford University 1983

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT X

KnifeRights MSJ App.000756

1

2

3

4

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

5

6

7

8

9

10

11

12

13

14

15

16

KNIFE RIGHTS, INC.; RUSSELL
ARNOLD; JEFFREY FOLLODER;
RGA AUCTION SOLUTION d.b.a.
FIREARM SOLUTIONS; AND MOD
SPECIALTIES,

Plaintiffs,

v.

MERRICK B. GARLAND, Attorney
General of the United States; UNITED
STATES DEPARTMENT OF
JUSTICE,

Defendants.

Case No. 4:23-cv-00547-O

Hon. Judge Reed O'Connor

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF LEROI PRICE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## DECLARATION OF LEROI PRICE

I, LeRoi Price, declare as follows:

1.      I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

## BACKGROUND AND QUALIFICATIONS

2.      I live in Saint Cloud, Florida, and have been an internal medicine doctor and cardiologist for 33 years.

3.      I am also a knife designer, knife maker, and author of two books on knife mechanisms.

4.      In 1966, I completed a one-year basic electronics fundamentals and advanced RADAR repair, at Keesler Air Force Base, Biloxi MS.

5.      I obtained a four-year degree BA Biology in 1974 from Rutgers University Camden, NJ. I obtained my Doctor of Medicine degree in 1980 from the University of Medicine of New Jersey, Newark, NJ.  I conducted my Internal Medicine residency at Long Branch Hospital, NJ from 1980-1983. My Cardiology Fellowship was at the the University of Kansas, Kansas City, KS.

6.      I have taken many courses regarding knife design and knife making including (i) Texarcana College, Slip Joint folders, by Jerry Fisk, in 1995; (ii) Texarcana College, Liner Lock and push button switchblades, by Mel Pardue, in 1997; (iii) Montgomery Community College, Assisted Opening knives, by Ed Van Hoy, in 1999; (iv) New England School of Metalwork, Folding Knives, by Dellana Warren, in 2017.

7.      I have been an attendee of the Florida Artists Blacksmith Association yearly conference since 1993. This is a 3-day conference of demonstrations on

blacksmithing and knifemaking with some hands-on classes.

8.    I have been an attendee of the Tannehill Knifemaking symposium hosted by Jim Batson since 1966. This is a 3-day conference of demonstrations on knifemaking with some hands-on classes.

9.    I have two book publications regarding knife mechanisms.

- Knife Mechanisms just for the fun of it 2014, 272 pages

- Knife Mechanisms Book Two 2018, 394 pages

10.    In conducting research for my books, I have conducted extensive information gathering, photography, video, networking, hands-on observation of knife designs, and conducted many personal interviews with knife designer and knife maker experts in the field of modern and antique knives.

11.    I have authored several articles in Blade Magazine and Knives Illustrated Magazine which are the foremost knife magazines.

12.    I was the editor of the Florida Artists Blacksmith Association monthly newsletter for two years.

13.    I have 320 knife related videos on YouTube dating from 2014 to the present.

14.    I have two knife patents: (i) 11766790 Pivoting lockbar in a folding knife mechanism; (ii) 10603781 Segmented Ergonomic Implement handle System.

15.    At Blade Show 2023, I was chosen to be an expert judge for nomination of "The best factory produced folding knife of the year award." This category includes "switchblade", automatic knives.

16.    I have been retained as an expert witness by Plaintiffs in this case to render my professional expert opinion on knife mechanisms, and the categorization and commonality of folding pocket knives and automatic knives, also known as

switchblades, in the United States. I am charging $100.00 per hour for my services.

## OPINIONS

17.     I am the author of Knife Mechanisms: Just for the Fun of It Volume One and Knife Mechanisms: Volume Two.

18.     In each book, I discuss in detail hundreds of different knife mechanisms and their function. This includes but is not limited to 1,200 knife design illustrations, 133 knife patents in volume one alone. Many of the knife designs that I cover in my books fall under the definition of an automatically opening knife or "switchblade." As such, I am intimately familiar with the designs and function of automatically opening knives.

19.     Based on my research and experience in knife designs and knife mechanisms, automatically opening folding knives have been widely distributed throughout the United States since the mid-to-late 1800s and early 1900s.

20.     I would estimate that the number of automatically opening knives owned and used in the United States is in the millions based on the mass production of these knives in the early 1900s and present-day production methods.

21.     Since the 1900s, automatically opening folding knives have had many uses as a general utility knife. In fact, many of the early automatically opening knives in the early 1900s were smaller pocket knives explicitly designed and advertised as knives that allowed for easy opening so the user did not break or damage their nails. As such, these knives were popular in office and secretarial positions. The positive benefits of this kind of knife were so useful and popular, they were often included in sewing kits.

22.     The ability to open a knife with one hand is incredibly useful in any number of circumstances including hunting, camping, fishing, construction, self-defense, and every day basic utility. In other words, automatically opening folding

KnifeRights MSJ App.000760
KnifeRights MSJ App.000760

KnifeRights MSJ App.000761

knives are incredibly useful in any task where one of the user's hands is occupied and one-handed opening of a knife is needed. Indeed, some of the earliest patents on automatically opening knives were described as "a good knife for a carpenter."

23.     While there are internal mechanical differences between a manually opening, assisted opening, and automatically opening knife, there is no *functional* difference between these kinds of knives. Each open with minimal pressure applied by the user's finger to either the blade of the knife or a button on the handle of the knife.

24.     Additionally, with modern technology and manufacturing processes, both assisted-opening knives and automatically opening knives open at similar speeds.

25.     Based on my expertise in knife mechanisms, it is my professional opinion that automatic knives ("switchblades") are simply a variation of a common folding pocket knife.

26.     Excluding kitchen knives, folding pocket knives are the most common knives manufactured and sold in the U.S. market and have been for over 100 years.

27.     Additionally, it is my opinion that automatic knives ("switchblades") are in common use within the United States.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on September 19, 2023 in Saint Cloud, Florida.

_____
LeRoi Price

# EXHIBIT Y

KnifeRights MSJ App.000762

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

|  |  |
|---|---|
| KNIFE RIGHTS, INC.; RUSSELL ARNOLD; JEFFREY FOLLODER; RGA AUCTION SOLUTION d.b.a. FIREARM SOLUTIONS; AND MOD SPECIALTIES,<br><br>          Plaintiffs,<br><br>     v.<br><br>MERRICK B. GARLAND, Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE,<br><br>          Defendants. | Case No. 4:23-cv-00547-O<br><br>Hon. Judge Reed O'Connor |

### DECLARATION OF MARK D. ZALESKY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### DECLARATION OF MARK D. ZALESKY

I, Mark D. Zalesky, declare as follows:

1. I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. My declaration is executed in support of Plaintiffs' motion for summary judgment.

### BACKGROUND AND QUALIFICATIONS

2. I live in Knoxville, Tennessee, United States and have been involved in the knife industry as a journalist, editor, author and publisher for 33 years. I have been a collector, buyer, and seller of knives since the age of 5, with my father. By the time I was in high school, I had made buying and selling knives into an income stream.

3. I have been the Publisher and Editor of *KNIFE Magazine* since 2015 and prior to that was Editor of *Knife World* magazine (predecessor of *KNIFE Magazine*) from 1997 to 2015.

4. I have edited over a thousand articles on knives for *Knife World* and *Knife Magazine* since 1997.

5. I have owned thousands of knives and handled many more including folding knives from antiques to the latest production folders over my lifetime.

6. I have co-authored or edited seven books and price guides on knives.

7. I have authored hundreds of articles and columns written for *Knife World* and *KNIFE Magazine*, as well as occasional articles for other knife books and periodicals.

8. My personal collection of knives currently numbers approximately 300 knives.

9.     I have performed knife and razor evaluations and appraisals for many individuals and institutions since the 2000s, including Morphy Auctions (Denver, PA), and Heritage Auctions (Dallas, TX).

10.    Since 1998 I have made presentations at a wide array of knife shows, knife-related events, hammer-ins and the like. Generally, these presentations are on antique knives and their features, design and evolution.

11.    I have appeared on a number of TV Shows and video channels including the History Channel's "Man vs History," "Zac in the Wild" and the "Antique Bowie Knife Channel."

12.    I have been a member of the American Bladesmith Society Board of Directors since 2011.

13.    I have been a member of the Antique Bowie Knife Association Board of Directors since 2009.

14.    In the 2000s I was a member of the National Knife Museum Advisory Committee.

15.    I have received the following awards and honors:

- 2019 The Knifemakers' Guild Nate Posner Memorial Award for "Outstanding Service to the Handmade Knife Industry" (organization's highest honor for non-knifemaker)

- 2014 American Bladesmith Society's Don Hastings Memorial Award for "Untiring Efforts on Behalf of Bladesmithing" (organization's highest honor for non-knifemaker)

- 2014 Blade Magazine Publisher's Award (for "A Sure Defense" museum exhibit)

- 2005 Blade Magazine Publisher's Award (for campaign to gather and deliver knives to American soldiers overseas)

KnifeRights MSJ App.000765
KnifeRights MSJ App.000765

- 2003 American Bladesmith Society, Chairman's Award for Outstanding Service

16.     I have twice been nominated for the Blade Magazine Cutlery Hall of Fame.

17.     I have twice been nominated for the American Bladesmith Society Hall of Fame.

18.     I have been retained as an expert witness by Plaintiffs in this case to render my professional expert opinion on the categorization and commonality of folding pocket knives and automatic knives, also known as switchblades, in the United States. I am not charging for my services in this case.

## OPINIONS

19.     Based on my over 33 years of experience in the knife industry, it is my professional opinion that automatic knives ("switchblades") are simply a variation of a common folding pocket knife.

20.     Excluding kitchen knives, folding pocket knives are the most common knives manufactured and sold in the U.S. market and have been for over 100 years.

21.     Based on my 33 years of experience in the knife industry and decades of performing appraisals and valuations of antique knives and antique knife collections, automatic knives ("switchblades") are a common knife that I see and there is a large following collecting automatic knives ("switchblades") throughout the U.S.

22.     Additionally, based on my over 33 years of experience in the knife industry, automatic knives ("switchblades") — being a variation of folding pocket knife — are also in common use within the United States.

23.     Based on my experience in the knife industry, there are over 22 knife manufacturers making automatic knives ("switchblades") throughout the U.S,

1  today, many more than the handful of manufacturers manufacturing these knives
2  in the 1950s when Schrade patents limited the number of manufacturers. Yet even
3  then, there were millions of automatic knives ("switchblades") being sold every year
4  based on historical data. Based on the innovations of mass production of knives that
5  have occurred since the 1950s, and the large increase in manufacturers that make
6  automatically opening knives, it would be a conservative estimate that the number
7  of automatically opening knives owned and possessed throughout the United States
8  today is in the many millions of knives.

    I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct, and this declaration was executed on September
19, 2023 in Knoxville, Tennessee.


                                          Mark Zalesky

# EXHIBIT Z

KnifeRights MSJ App.000768

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION**

| | |
|---|---|
| KNIFE RIGHTS, INC.; RUSSELL ARNOLD; JEFFREY FOLLODER; RGA AUCTION SOLUTION d.b.a. FIREARM SOLUTIONS; AND MOD SPECIALTIES, | Case No. 4:23-cv-00547-O |
| | Hon. Judge Reed O'Connor |
| Plaintiffs, | |
| v. | |
| MERRICK B. GARLAND, Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendants. | |

**DECLARATION OF ROBERT TERZUOLA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## DECLARATION OF ROBERT TERZUOLA

I, Robert Terzuola, declare as follows:

1.     I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

### BACKGROUND AND QUALIFICATIONS

2.     I live in San Marcos, California, and have been a knifemaker and knife designer for over 43 years.

3.     I am known as the "God Father of the Tactical Knife" because of a tactical folding linerlock knife I designed in 1987.

4.     I have designed scores of knives in my career.

5.     My custom knives have sold for upwards of $7,500.00.

6.     My knife designs have been produced by Spyderco, Strider Knives, Microtech Knives, Pro-Tech Knives, Civivi and MKM (Maniago Knife Makers), Boker, Fox Knives and LionSTEEL.

7.     I am the author of *The Tactical Folding Knife: a Study of the Anatomy and Construction of the Liner Locked Folder* first published in 2000. An updated and expanded version was published in 2019.

8.     I have authored numerous magazine articles for Blade Magazine and Soldier of Fortune Magazine.

9.     Blade Magazine described me as "one of the four living Mount Rushmore Legends of modern knifemaking."

10.     I have won 22 "Best of" awards and four Best Collaboration awards from Blade Show, as well two Best of Show awards from Munich International Knife

Show.

11.     In June of 2023, I was inducted into the Cutlery Hall of Fame. This recognition is described as "the highest honor on the planet for individuals who demonstrate exceptional contributions to the world of knives."

12.     I have been retained as an expert witness by Plaintiffs in this case to render my professional expert opinion on the categorization and commonality of folding pocket knives and automatic knives, also known as switchblades, in the United States. I am not charging for my services in this case.

## OPINIONS

13.     As stated in my qualifications, I have designed scores of different knife designs throughout my career. I continue to design knives to this day. As a knife designer, I develop knife designs that meet the expectations and demands of the average knife consumer in the United States.

14.     For many years now, one-handed opening knives have been in high demand in the knife industry. This demand includes manually opening knives, assisted opening knives, and automatically opening folding knives.

15.     Based on my over 43 years as a knifemaker and knife designer, this feature, regardless of opening mechanism used, is essential for any person to deploy this tool quickly for all lawful purposes, no matter the circumstances in which they find themselves.

16.     As such, 99% of the folding knife designs I currently make today and have licensed for production are one-hand openers.

17.     The ability to open a knife with one hand is incredibly useful in any number of circumstances including hunting, camping, fishing, construction, self-defense, and every day basic utility. Regardless of the mechanism in which it opens, based on my 43 years of experience as a knife designer and knifemaker, the U.S.

knife consumer seeks a fast, one-hand opening, folding knife. This demand is satisfied by countless designs of manual, assisted-opening, and automatically opening knives manufactured and sold in the United States.

18.    There is no functional difference between assisted-opening knives and automatically opening knives. Each open with minimal pressure applied by the user's finger to either the blade of the knife or a button on the handle of the knife. Both assisted-opening knives and automatically opening knives also open at similar speeds.

19.    Based on my over 43 years as a knife designer and knife maker, it is my professional opinion that automatic knives ("switchblades") are simply a variation of a common folding pocket knife.

20.    Excluding kitchen knives, folding pocket knives are the most common knives manufactured and sold in the U.S. market and have been for over 100 years.

21.    Additionally, based on my over 43 years as a knife designer and knife maker, automatic knives ("switchblades") are in common use within the United States.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on September 19, 2023 in Murphy, North Carolina.

Robert Terzuola

# EXHIBIT AA

KnifeRights MSJ App.000773

1
2
3
4

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS, FORT WORTH DIVISION

5
6
7
8

KNIFE RIGHTS, INC.; RUSSELL
ARNOLD; JEFFREY FOLLODER;
RGA AUCTION SOLUTION d.b.a.
FIREARM SOLUTIONS; AND MOD
SPECIALTIES,

9
10

               Plaintiffs,

11

    v.

12
13
14

MERRICK B. GARLAND, Attorney
General of the United States; UNITED
STATES DEPARTMENT OF
JUSTICE,

15
16

               Defendants.

Case No. 4:23-cv-00547-O

Hon. Judge Reed O'Connor

17
18
19
20

## DECLARATION OF ERNEST R. EMERSON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

21
22
23
24
25
26
27
28

### DECLARATION OF ERNEST R. EMERSON

I, Ernest R. Emerson, declare as follows:

1.     I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

### BACKGROUND AND QUALIFICATIONS

2.     I live in Rolling Hills Estate, California, United States, and have been a knife designer and knifemaker for over 45 years.

3.     I am a member of The United States Martial Arts Hall of Fame and the United States Black Belt Hall of Fame

4.     I have designed over 1,000 knives, the majority of which are common folding pocket knives. I have handled thousands of folding knives during my lifetime.

5.     My custom knives have sold for upwards of $15,000.00.

6.     My knife designs have been produced by Timberline, Benchmade, Gerber, Pro-Tech, Kershaw, Blue Ridge, Surefire, Blackhawk and Reed Knight Armaments

7.     I have also designed folding knives for United States Navy SEAL Teams, United States Navy Rescue Swimmers, United States Special Boat Units and United States Navy Search and Rescue along with members of all United States military forces, law enforcement and other federal agencies.

8.     I have authored nine books on surviving the worst scenarios encountered by members of the military and law enforcement.

9.     I have been featured in over 300 articles including in the Wall Street Journal, New York Times, Forbes and Los Angeles Times. I have also appeared on

and been interviewed on many radio broadcasts throughout the U.S. and by the BBC regarding knives.

10.     In 2000, the Japanese government hired me as an advisor to the Japanese Cutlery Industry.

11.     I was hired by the U.K. government to train Prime Minister Tony Blair's personal security guards.

12.     My SPECWAR knife, produced by Timberline for a military contract competition, was exhibited at the Metropolitans Museum of Art and the Smithsonian Institution.

13.     In 1999, NASA contracted with me to build a folding knife for use on Space Shuttle missions and the International Space Station. This knife is only made for NASA and is not available to the general public.

14.     In 1997, I patented (US5878500A) the "Wave-shaped Opening Feature" or "Wave Opening Feature" or "Wave Feature," commonly referred to in the knife community as "Emerson Opener."

15.     In 1996, I formed Emerson Knives, Inc. to produce my knife designs as production knives.

16.     My knives have won many awards at Blade Show, the world's largest knife show, as well numerous other knife shows throughout the U.S.

17.     I have been retained as an expert witness by Plaintiffs in this case to render my professional expert opinion on the (i) mechanical and functional distinctions of the various forms of folding pocket knives; (ii) the speed of opening regarding manually opening, assisted opening, and automatically opening folding knives; and (iii) the categorization and commonality of folding pocket knives and automatic knives, also known as switchblades, in the United States. I am not charging for my services in this case.

## OPINIONS

18.     As stated above, I have designed over a thousand different knives, the majority of them being folding pocket knives. As such, I am intimately familiar with the mechanics and function of manual opening, assisted opening, and automatically folding pocket knives.

19.     In 1997, I patented (US5878500A) the "Wave-shaped Opening Feature" or "Wave Opening Feature" or "Wave Feature," commonly referred to in the knife community as "Emerson Opener." This is one of my most well-known designs.

20.     The "Wave Shaped Feature" was trademarked in 2016 (4,879,356). Besides incorporating the Wave Shaped Feature into my own knives, I have licensed its use to Spyderco, Southern Grind, Zero-Tolerance and Kershaw.

21.     The "Wave Shaped Feature" has a hook on the spine of the blade which, when snagged on the edge of the pocket or sheath, causes the knife blade to open as it is drawn from the pocket. This feature provides essentially automatic deployment of the blade to the open and locked position as the knife is pulled from the pocket, providing deployment into a useable handhold at the same speed as a fixed blade knife and faster than any other folding or retractable knife, including automatically opening knives.

22.     All of my folding knife designs I currently make today and have licensed for production are one-hand opening knives. Based on my over 45 years as a knifemaker, knife designer and tactical instructor, the one-handed opening feature on knives, regardless of opening mechanism used, is essential for any person to deploy this tool quickly for all lawful purposes, no matter the circumstances in which they find themselves.

23.     In my opinion, one-hand opening knives are not only well-suited, but preferred, for self-defense. These knives are also well-suited and preferred for

countless other uses beyond self-defense which including hunting, camping, fishing, boating/sailing, construction, first responders, law enforcement, and general everyday use. Automatically opening knives, being a variation of a one-handed folding knife are also well-suited for these purposes.

24.     The majority of folders I currently make today and have licensed for production that are not automatic ("switchblade") knives incorporate my "wave-shaped opening feature." I incorporate this feature on most of my non-automatic opening knives because this feature allows for even faster deployment of the one-hand opening knife and allows it to be used instantaneously for all lawful purposes, no matter the circumstances in which the user find themselves.

25.     Despite the common mistaken belief, automatically opening knives do not open significantly faster than other one-handed opening knives including manually opening knives and assisted opening knives. In fact, manually opening folding knives that incorporate my "wave shaped opening feature" open faster than automatic knives.

26.     Based on my over 45 years as a knifemaker and knife designer, it is my professional opinion that automatic knives ("switchblades") are simply a variation of a common folding pocket knife.

27.     Excluding kitchen knives, folding pocket knives are by far the most common knives manufactured and sold in the U.S. market and have been for over 100 years.

28.     Additionally, based on my over 45 years as a knifemaker and knife designer, automatic knives ("switchblades") are commonly owned and possessed throughout the United States and are used for many lawful purposes. In my opinion, based on my experience in the knife industry and as a knife designer and knife maker, there are millions of automatically opening knives owned and possessed

1    throughout the United States.

2

3        I declare under penalty of perjury under the laws of the United States that

4    the foregoing is true and correct, and this declaration was executed on September

5    19, 2023 in Rolling Hills Estate, California.

6

7                                    Ernest R. Emerson

8                                    Ernest R. Emerson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KnifeRights MSJ App.000779

# EXHIBIT AB

KnifeRights MSJ App.000780

# The History of Bans on Types of Arms Before 1900

DAVID B. KOPEL*
JOSEPH G.S. GREENLEE**

## TABLE OF CONTENTS

Introduction ................................................................................3

I. English history ..........................................................................6
A. Arms Bans in England ..................................................... 6
B. Repeating Firearms in England...................................... 10
     1. The Kalthoff Repeating Rifle ............................ 12
     2. The Lorenzoni repeating handguns and rifles . 13

II. The Colonial Period and Early Republic .....................................14
A. The English Colonies ...................................................... 15
B. New Sweden.................................................................... 17
C. New Netherland.............................................................. 18
D. Arms Mandates in Colonial America.............................. 21
     1. Who was required to keep or bear arms? ........ 21
     2. Types of mandatory arms................................. 24
E. Repeating Arms .............................................................. 37
F. Cannons.......................................................................... 40
G. Overview ........................................................................ 44

III. Nineteenth Century Advances in Arms ....................................47
A. James Madison and James Monroe, .................................
the founding fathers of modern firearms ........................... 48
B. The American system of manufacture ............................ 48
C. The revolution in ammunition ....................................... 51

   * Adjunct Professor Constitutional Law, University of Denver, Sturm College of Law; Senior Fellow, University of Wyoming College of Law, Firearms Research Center; Research Director, Independence Institute, Denver, Colorado; Adjunct Scholar, Cato Institute, Washington, D.C. http://davekopel.org.
   ** Director of Constitutional Studies, FPC Action Foundation, Las Vegas, Nevada; Policy Advisor for Legal Affairs, Heartland Institute, Arlington Heights, Illinois; http://josephgreenlee.org. The authors would like to thank Connor Cheadle for research assistance.

1

D. Advances in repeating arms...............................................54
E. Continuing advances in firearms were well-known to the Founders   63
F. Perspective .....................................................................66

IV. Firearms bans in the 19th Century...........................................69
A. Georgia ban on handguns, Bowie knives, and other arms69
B. Tennessee ban on many handguns ................................70
C. Arkansas ban on many handguns, and Bowie knives....71
D. Florida licensing law for repeating rifles and handguns72

V. Bowie Knives..............................................................76
A. The history of Bowie knives and Arkansas toothpicks ..78
    1. What is a Bowie knife?......................................78
    2. What is an Arkansas toothpick? ......................80
    3. The crime in the Arkansas legislature ............80
B. Survey of Bowie knife statutes........................................82

VI. Other weapons............................................................116
A. Daggers, dirks, and other sharp weapons ...................117
    1. Daggers and dirks...........................................117
    2. Sword canes ...................................................121
    3. Spears...........................................................123
    4. Razors...........................................................124
    5. Butcher knives...............................................125
    6. Swords...........................................................125
B. Slungshots and other flexible impact weapons ...........126
    1. Slungshots and colts.......................................129
    2. Slingshots......................................................139
    3. Sand Clubs ....................................................141
    4. Blackjacks .....................................................142
    5. Billies vs. Billy clubs ....................................143
C. Rigid impact weapons ...............................................144
    1. Knuckles .......................................................144
    2. Loaded Canes.................................................148
D. Cannons ..................................................................148

VII. Doctrinal Analysis ........................................................151
A. Summary of possession or sales bans.....................152
B. The constitutional and racial background of possession or sales bans
    ........................................................................154
C. Modern doctrines ......................................................157

**KnifeRights MSJ App.000782**

    1. "Dangerous and unusual" versus "not typically possessed by
law-abiding citizens": The distinction applied to slungshots
and brass knuckles. ....................................... 157

    2. How many jurisdictions make a tradition? .... 160

D. Application of history and modern doctrine .......................
to particular types of laws.................................. 164

    1. Sales prohibitions on slungshots and knucles 164

    2. Modern semiautomatic firearms and magazines165

    3. Minors ............................................. 169

    4. Penalties for criminal misuse ........................ 170

Conclusion.................................................................173

## INTRODUCTION

This Article describes the history of bans on particular types of arms in America, through 1899. It also describes arms bans in England until the time of American independence. Arms encompassed in this article include firearms, knives, swords, blunt weapons, and many others. While arms advanced considerably from medieval England through the nineteenth-century United States, bans on particular types of arms were rare.

The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* instructed lower courts to decide Second Amendment cases "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."[1] *Bruen* examined the legal history of restrictions on the right to bear arms through 1899.[2] This Article focuses on one aspect of the legal history of the right to *keep* arms: prohibitions on particular types of arms.

Part I describes prohibitions on possession of firearms and other arms in England. The launcegay, a type of light lance for horsemen, was banned, as

---

[1] N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2126–27 (2022) (discussing District of Columbia v. Heller, 554 U.S. 570 (2008)).

[2] The further from the Founding, the less useful the legal history. While the Court did address some laws from the late nineteenth century, laws after 1900 were pointedly not examined: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

were small handguns, although the handgun ban was widely ignored. A class-based handgun licensing law was apparently little enforced. While most firearms were single-shot, repeating firearms existed for centuries in England, with no special restrictions.

Part II covers America from the colonial period through the Early Republic. No colonial law banned any particular arm. The Dutch colony New Netherland came the closest when it limited the number of flintlocks colonists could bring into the colony, in an effort to quash the trading of flintlocks to Indians. In the British colonies, there were many laws requiring most people, including many women, to possess particular types of arms. This Article is the first to provide a complete, item-by-item list of every mandated arm. Some private individuals owned repeating (multi-shot) firearms and cannons, but such arms were far too expensive for a government to mandate individual possession.

As summarized in Part III, the nineteenth century was the greatest century before or since for firearms technology and affordability. When the century began, an average person could afford a single-shot flintlock musket or rifle. By the end of the century, an average person could afford the same types of firearms that are available today, such as repeaters with semiautomatic action, slide action, lever action, or revolver action. Ammunition had improved even more.

The rest of the article describes nineteenth century laws forbidding particular types of arms. Part IV examines the four prohibitory laws on particular types of firearms: Georgia (most handguns), Tennessee and Arkansas (allowing only "Army & Navy" type handguns, *i.e.* large revolvers), and Florida (race-based licensing system for Winchesters and other repeating rifles).

Part V turns in depth to the most controversial arm of nineteenth-century America: the Bowie knife. Sales were banned in a few states, and possession was punitively taxed in a few others. The mainstream approach, adopted in most states that regulated Bowies, was to ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse. As Part V explains, Bowie knife laws usually applied to various other weapons too.

Part VI summarizes the nineteenth century laws about the various other weapons. These include other sharp weapons (such as dirks, daggers, and sword canes), flexible impact arms (such as slungshots and blackjacks), rigid impact arms (such as brass knuckles), and cannons. Possession bans were rare, whereas laws on concealed carry, sales to minors, or extra punishment for misuse were more common.

Part VII applies modern Second Amendment doctrine to the legal history presented in the Article. It suggests that some arms prohibitions and regulations may be valid, but bans on modern semiautomatic rifles and magazines are not.

If this Article described only possession bans for adults, it would be very short. Besides outright bans on possession, the Article also describes laws that forbade sales or manufacture. These are similar to possession bans, at least for future would-be owners.[3] Even with sales or manufacture bans included, this Article would still be very short. So for all arms *except* firearms, the Article provides a comprehensive list of nonprohibitory regulations, such as concealed

---

[3] A sales ban that allows existing owners to continue possession is not as intrusive as a ban on all possession. But because a sales ban is a ban on new possession, it should be analyzed as a similar to a prohibition, rather than a regulation, as the Ninth Circuit explained in *Jones v. Bonta*:

> [E]ven though this is a commercial regulation, the district court's historical analysis focused not on the history of commercial regulations specifically but on the history of young adults' right to keep and bear arms generally. *See* [*Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325–29 (S.D. Cal. 2020)]. The district court was asking the right question.

> "Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017). We have assumed without deciding that the "right to possess a firearm includes the right to purchase one." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017). And we have already applied a similar concept to other facets of the Second Amendment. For example, "[t]he Second Amendment protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." [*Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)]. Still, because "without bullets, the right to bear arms would be meaningless," we held that "the right to possess firearms for protection implies a corresponding right" to obtain the bullets necessary to use them. *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

> Similarly, without the right to obtain arms, the right to keep and bear arms would be meaningless. *Cf. Jackson*, 746 F.3d at 967 (right to obtain bullets). "There comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097, 194 L. Ed. 2d 256 (Thomas, J., concurring in the judgment) (quoting *Hill v. Colorado*, 530 U.S. 703, 745, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000) (Scalia, J., dissenting)). For this reason, the right to keep and bear arms includes the right to purchase them. And thus laws that burden the ability to purchase arms burden Second Amendment rights.

*Jones v. Bonta*, 34 F.4th 704, 715–16 (9th Cir. 2022).

carry bans, limits on sales to minors, and extra punishment for use in a crime. This Article is the first to provide a full list of all colonial, state, and territorial restrictions on these arms. We also list some local restrictions, such as by a county or municipality, but we have not attempted a comprehensive survey of the thousands of local governments. To be sure, however, the nonprohibitory regulations were not as severe as arms prohibitions. They still allowed peaceable adults to keep and bear the regulated arms. Laws that forbade a particular arm to be kept or carried were historical rarities.

## I.  ENGLISH HISTORY

According to *Bruen*, old English practices that ended long before American independence are of little relevance.[4] The only applicable English precedents are those that were adopted in America and continued up through the Founding Era.[5] For prohibition of particular types of arms, there are no such English precedents. Section A describes what prohibitions did exist at some point in England. Section B describes the availability of repeating arms, which were expensive, in England and the Continent.

### A. Arms Bans in England

In 1181, King Henry II enacted the Assize of Arms, which required all his free subjects to be armed, except for Jews, who were forbidden to have armor.[6] The Assize grouped people into wealth categories. Every male in a particular category had to have certain quantities of particular types of arms and armor—

---

[4]

> English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. . . . Sometimes, in interpreting our own Constitution, 'it is better not to go too far back into antiquity for the best securities of our liberties,' *Funk* v. *United States*, 290 U. S. 371, 382, 54 S. Ct. 212, 78 L. Ed. 369 (1933), unless evidence shows that medieval law survived to become our Founders' law.

*Bruen*, 142 S. Ct. at 2136 (brackets omitted).

[5] "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136.

[6] 27 Henry II, art. 3 (1181).

no more and no less.[7] The Assize was prohibitory in that a person could own only the specified arms and armor for his particular income group. But the Assize was more concerned with armor than with weapons, and was not prescriptive about ownership of swords, knives, bows, or blunt weapons.[8]

The Assize of Arms was replaced in 1285 by the Statute of Winchester, under Edward I.[9] It required all males in certain income groups to have *at least* particular quantities of arms and armor.[10] The Statute of Winchester created

---

[7]

> Let every holder of a knight's fee have a hauberk, a helmet, a shield and a lance. And let every knight have as many hauberks, helmets, shields and lances, as he has knight's fees in his demesne.
>
> Also, let every free layman, who holds chattels or rent to the value of 16 marks, have a hauberk, a helmet, a shield and a lance. Also, let every layman who holds chattels or rent worth 10 marks an "aubergel" and a headpiece of iron, and a lance.
>
> Also, let all burgesses and the whole body of freemen have quilted doublets and a headpiece of iron, and a lance.
>
> . . .
>
> Any burgess who has more arms than he ought to have by this assize shall sell them or give them away, or in some way alienate them to such a man as will keep them for the service of the lord king of England. And none of them shall keep more arms than he ought to have by this assize.
>
> Item, no Jew shall keep in his possession a shirt of mail or a hauberk, but he shall sell it or give it away or alienate it in some other way so that it shall remain in the king's service.
>
> . . .
>
> Item, the justices shall have proclamation made in the counties through which they are to go that, concerning those who do not have such arms as have been specified above, the lord king will take vengeance, not merely on their lands or chattels, but their limbs.

27 Henry II, art. 3 (1181), *in* ENGLISH HISTORICAL DOCUMENTS 448 (David Douglas & G.W. Greenaway eds., 2d ed. 1981).

[8] We use the distinct terms "arms" and "armor" in the modern sense; a knife is an "arm" and a Kevlar vest is "armor." In medieval England, and early nineteenth century America, the two terms were not so different; the one often included the other.

[9] 13 Edward I, ch. 6 (1285), *in* 1 STATUTES OF THE REALM 97–98 (1800).

[10]

> It is commanded, That every Man have in his house Harness for to keep the Peace after the antient Assise; that is to say, Every Man between fifteen years of age, and sixty years, shall be assessed and sworn to Armor according to the quantity of their Lands and Goods; that is to wit, [from] Fifteen Pounds Lands,

*Journal of Legislation*

only mandatory minima for arms, not maxima.[11] Persons could own whatever quantity they chose above the minima, and they could also own arms that were not mandatory for their income group.

In 1383, King Richard II outlawed the possession of "launcegays."[12] The ban was restated the following decade after its lack of enforcement led to a "great Clamour."[13] Launcegays were a type of light spears, "occasionally used as a dart," and considered "offensive weapons."[14] The heavier war lance was not prohibited.

---

and Goods Forty Marks, an Hauberke, [a Breast-plate] of Iron, a Sword, a Knife, and an Horse; and [from] Ten Pounds of Lands, and Twenty Marks Goods, an Hauberke, [a Breast-plate of Iron,] a Sword, and a Knife; and [from] Five Pound Lands, [a Doublet,] [a Breast-plate] of Iron, a Sword, and a Knife; and from Forty Shillings Land and more, unto One hundred Shillings of Land, a Sword, a Bow and Arrows, and a Knife; and he that hath less than Forty Shillings yearly, shall be sworn to [keep Gis-armes,] Knives, and other [less Weapons]; and he that hath less than Twenty Marks in Goods, shall have Swords, Knives, and other [less Weapons]; and all other that may, shall have Bows and Arrows out of the Forest, and in the Forest Bows and [Boults.]

*Id.* (Brackets in original of *English Historical Documents*).

[11] *Id.*

[12]

It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King[.]

7 Richard II, ch. 13 (1383), *in* 2 STATUTES OF THE REALM 35 (1816).

[13]

Our Lord the King, considering the great Clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King.

20 Richard II, ch. 1 (1396–97), *in* 2 STATUTES OF THE REALM 93 (1816).

[14] GEORGE CAMERON STONE, A GLOSSARY OF THE CONSTRUCTION, DECORATION AND USE OF ARMS AND ARMOR IN ALL COUNTRIES AND IN ALL TIMES 410 (1999) ("LANCE-AGUE, LANCEGAYE. A light lance, occasionally used as a dart. It was carried in place of the war lance in the 14th century; the latter, at the time, was about fourteen feet long and very heavy."); NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY BEING ALSO AN INTERPRETER OF HARD WORDS (2d ed. 1724) ("LAUNCEGAYS, Offensive Weapons prohibited and disused.").

There were many English laws based on class rule. For example, a 1388 statute from the notorious Richard II forbade servants and laborers from carrying swords and daggers, except when accompanying their masters.[15] During the late seventeenth century, until the Glorious Revolution of 1688, laws against hunting by commoners were interpreted so as to make firearms possession illegal for most of the population; the bans were often evaded.[16]

A 1541 statute from King Henry VIII outlawed handguns less than one yard in length and arquebuses and demihakes (types of shoulder guns) less than three-fourths of a yard in length. Additionally, people with an annual income below 100 pounds were prohibited from possessing any handgun, crossbow, arquebus, or demihake without a license.[17] Licenses were granted at discretion, as a reward from one's superiors.[18]

No license was needed by inhabitants of market towns or boroughs, anyone with a house more than two furlongs (440 yards) outside of town, persons who lived within five miles of the coasts, within 12 miles of the Scottish border, or

---

[15] 12 Richard II ch. 6 (1388).

[16] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, E. GREGORY WALLACE, & DONALD E. KILMER, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 2136–38 (Aspen Publishers, 3d ed. 2021).

[17]

> [T]hat noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeffe to his or their owne uses or any other to the use of any suche pson or psons, have landes tente fees annuyties or Office to the yerely value of one hundred pounde, from or after the laste daye of June next comynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ys hereafter in this Present Acte declared. . . .
>
> [N]o pson or psons, of what estate or degree soever he or they be, from or after the saide laste daye of June shall shote in carye kepe use or have in his house or els where any handgune other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde. . .

33 Henry VIII, ch. 6, § 1 (1541), *in* 3 STATUTES OF THE REALM 832 (1817).

Hackbut is an archaic spelling of arquebus, a type of long gun. A demihake was a short hackbut. JOHNSON ET AL., *supra* note 16, at 2116–17.

[18] The Tudor monarchs handed out many licenses—including to commoners whom the king wanted to reward, and to nobles to allow their servants to be able to use the arms outside the home. LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 65–73 (2016).

on various small islands.[19] The Henrican 1541 statute "[g]radually . . . fell into disuse. . . . Soon, only the £ 100 qualification was enforced. . . ."[20] The law was obviously contrary to *Heller* and is no precedent for today.[21]

In 1616, King James I outlawed dags—a type of small handgun.[22] As he noted, they were already technically illegal (due to the minimum barrel length rule from Henry VIII), but the law was being disregarded.[23] So was James's new order against dags.[24]

We are unaware of any evidence that launcegays were ever an issue in colonial America. We are likewise unaware of any American source recognizing the Henry VIII or James I handgun laws at all, let alone their application in America.

## B. Repeating Firearms in England

In the words of Harold Peterson, Curator for the National Park Service, and one of the twentieth century's greatest experts on historic arms, "The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century."[25]

The first known repeating firearms were 10-shot matchlock arquebuses that date to between 1490 and 1530.[26] "The cylinder was manually rotated around a central axis pin."[27] While it "failed to . . . become a popular martial or utilitarian firearm" due to its complicated and expensive design,[28] King Henry VIII (reigned 1509–1547) owned a similar gun.[29]

Henry VIII also owned a multi-shot combination weapon called the Holy Water Sprinkler. "It is a mace with four seperate steel barrels, each 9" long.

---

[19] Henry VIII, ch. 6 (1541).

[20] ROBERT HELD, THE AGE OF FIREARMS: A PICTORIAL HISTORY 65 (1956).

[21] *Bruen*, 142 S. Ct. at 2141 n.10 (noting that the last attempted prosecutions, which failed, were in 1693).

[22] A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616).

[23] *Id.*

[24] SCHWOERER, *supra* note 18, at 182.

[25] HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526–1783, at 215 (1956).

[26] M.L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792, at 50 (1980).

[27] *Id.*

[28] *Id.* at 50–51.

[29] W.W. GREENER, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

These barrels are formed into a wooden cylinder held with four iron bands, two of which have six spikes each."[30] Although made in Germany, these were sometimes referred to as "Henry VIII's walking staff,"[31] because "with it, he is represented to have traversed the streets at night, to see that the city-watch kept good order."[32]

The first known repeater capable of firing more than 10 shots was invented by a German gunsmith in the sixteenth century.[33] It could fire 16 superimposed rounds in Roman candle fashion[34]—meaning that one load was stacked on top of another and the user "could not stop the firing once he had started it."[35]

Charles Cardiff seemingly had something similar in mind with this 1682 patent, which protected "an Expedient with Security to make Musketts, Carbines, Pistols, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing."[36] While his firearms have been lost to time, they apparently contained "two fixed locks, with a separate touch hole for each, the forward one

---

[30] Lewis Winant, Firearms Curiosa 14 (1955).

[31] 3 The London Magazine, Jan.–June, 1829, at 46 (3d ser., 1829). It was sometimes called by the similar name, "Henry VIII's walking-stick." *See* 2 William Howitt, John Cassell's Illustrated History of England 610 (1858).

[32] 3 The London Magazine, Jan.–June 1829, at 46 (3d ser., 1829). According to one popular anecdote, Henry VIII was arrested while making his rounds in disguise one winter night for carrying his Holy Water Sprinkler. When his jailer discovered his true identity the next morning, those responsible feared execution, but instead received a raise for fulfilling their duties. *See id.*

[33] *16-Shot Wheel Lock*, America's 1st Freedom, May 10, 2014, http://bit.ly/2tngSDD.

[34] "[T]his oval-bore .67-caliber rifle . . . was designed to fire 16 stacked charges of powder and ball in a rapid 'Roman candle' fashion. One mid-barrel wheel lock mechanism ignited a fuse to discharge the upper 10 charges, and another rearward wheel lock then fired the remaining six lower charges." *Id.* There was some variety in the way such firearms functioned, as demonstrated by firearms historian Lewis Winant's description of another 16-shot German repeater from the 16th or 17th century: "The gun may be used as a single-shot, employing the rear lock only, or it may be charged with sixteen superposed loads so that the first pull of the trigger will release the wheel on the forward lock and fire nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot." Winant, Firearms Curiosa, *supra* note __, at 168–70.

[35] Winant, Firearms Curiosa, *supra* note __, at 166.

[36] *Id.* at 167.

to fire a Roman candle series of charges, and the rear one to fire one or more charges after the series of explosion started by the forward lock."[37]

By the time of Cardiff's patent, however, more effective repeating arms had existed for several decades. "Successful systems" of repeating arms "definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow."[38] "[T]he two principal magazine repeaters of the era" were "the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success."[39]

### 1. The Kalthoff Repeating Rifle

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens that survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[40] "[T]he number of charges in the magazines ran all the way from six or seven to thirty."[41]

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675–1679."[42]

Kalthoff-type repeaters "spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost."[43] There were nineteen known gunsmiths, and perhaps others, who "made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg."[44]

---

[37] *Id.*

[38] HAROLD L. PETERSON, THE TREASURY OF THE GUN 229 (1962).

[39] *Id.*

[40] *Id.* The wheellock was invented by Leonardo da Vinci in the late 16th century. Vernard Foley, *Leonardo and the Invention of the Wheellock*, SCIENTIFIC AM., Jan. 1998, at 96. "When a wound-up steel wheel was released, the serrated wheel struck a piece of iron pyrite. A shower of sparks would ignite the powder in the pan. The wheellock mechanism is similar to the ignition for today's disposable cigarette lighters." JOHNSON ET AL., *supra* note 16, at 2151. The wheel-lock was superior to its predecessor, the matchlock, because it could be kept always ready for sudden use and was more reliable, albeit much more expensive. *Id.*

[41] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 230.

[42] *Id.*

[43] *Id.*

[44] *Id.*

## 2. The Lorenzoni repeating handguns and rifles

"The Lorenzoni also was developed during the first half of the Seventeenth Century."[45] It was a magazine-fed Italian repeating pistol that "used gravity to self-reload."[46] In being able to self-reload, Lorenzonis are similar to semiautomatic firearms. The Lorenzonis' ammunition capacity was typically around seven shots. The gun's repeating mechanism quickly spread throughout Europe and to the American colonies, and the mechanism was soon applied to rifles as well.[47]

On July 3, 1662, famed London diarist Samuel Pepys wrote about seeing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[48] Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[49] The following day, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty."[50] It is believed that Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[51] and perhaps he also was in his 1662 entry.

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades."[52] Most notably, famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century."[53]

"The Kalthoff and Lorenzoni actions . . . were probably the first and certainly the most popular of the early magazine repeaters. But there were many others. Another version, also attributed to the Lorenzoni family, boasted brass tubular magazin1es beneath the forestock . . . Guns of this type seem to

---

[45] *Id*

[46] Martin Dougherty, Small Arms Visual Encyclopedia 34 (2011)

[47] Peterson, The Treasury of the Gun, *supra* note 38, at 232.

[48] 4 The Diary of Samuel Pepys 258 (Henry B. Wheatley ed., 1893).

[49] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun. . . ." Clifford Walton, History of the British Standing Army. A.D. 1660 to 1700, at 337 (1894).

[50] 7 Pepys, *supra* note 48, at 61.

[51] Peterson, The Treasury of the Gun, *supra* note 38, at 232.

[52] *Id*.

[53] Peterson, Arms and Armor in Colonial America, *supra* note 25, at 215.

have been made in several parts of Europe during the Eighteenth Century and apparently functioned well."[54] Repeaters were expensive in seventeenth and eighteenth centuries, and so were presumably owned almost entirely by economic elite. By around the middle of the nineteenth century, they would become broadly affordable. No English law before 1776, or, for that matter, in the following two hundred years, made any distinction regarding repeating firearms.[55]

## II. THE COLONIAL PERIOD AND EARLY REPUBLIC

This Part describes the arms rights, arms mandates, and most common arms in the American colonies and Early Republic. According to *Bruen*, colonial laws are relevant to the extent that they show a wide tradition that existed when the Second Amendment was ratified.[56]

Sections A–C describe the arms prohibitions of the British, Dutch, and Swedish colonies within the future thirteen original United States. As with English traditions that did not survive American independence, Dutch and Swedish traditions not practiced in America's Founding Era are of little relevance—especially those that the British did not accept upon assuming control of the colonies.[57]

Section D lists the types of arms that were so common in America that colonial governments could mandate their ownership. Arms possession mandates applied to militiamen, to some women, and to some men who were exempted from militia duty.

Sections E and F describe the prevalence of repeating arms and cannons, which were far too expensive for mandatory general ownership. There were no laws against private ownership of such arms. Section G summarizes the situation in the United States at the time of the ratification of the Second Amendment.

---

[54] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 233.

[55] In 1871 an annual tax was imposed for persons who wanted to carry handguns in public, and in 1920 a licensing system for handgun and rifle possession was introduced. Neither law distinguished single-shot guns from repeaters. JOHNSON ET AL., *supra* note 16, at 2168–69.

[56] *Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original).

[57] *See id.* at 2136 (It is dubious "to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies.'") (quoting Dimick v. Schiedt, 293 U.S. 474, 477 (1935)).

## A. The English Colonies

The 105 colonists who set sail on December 20, 1606, to establish the first permanent English settlement in North America, embarked with express and perpetual rights granted by the Royal Charter of King James I. Among the perpetual rights was to bring "sufficient Shipping, and Furniture of Armour, Weapons, Ordinance, Powder, Victual, and other things necessary for the said Plantations and for their Use and Defence there."[58] There were no restrictions on the types of arms they could bring or import.

The arms rights had been granted to the Virginia Company in perpetuity by the 1606 charter issued by King James I, and reiterated in a 1609 charter. The rights applied to all settlers of the Virginia Colony. The Virginia Charter was the first written arms rights guarantee for Englishmen; back in England, the first written guarantee would not come until the 1689 English Bill of Rights.[59]

The 1620 Charter of New England gave the inhabitants the same rights, including arms rights, as the Virginia colony.[60] Like the Virginia Charter, the Charter of New England contained no restrictions on the types of arms.

The 1606 Virginia Charter covered such a vast territory that it is a founding legal document of all the original 13 states, plus West Virginia, Kentucky, and

---

[58] 7 Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3783, 3786 (Francis Newton Thorpe ed., 1909); Richard Middleton, Colonial America: A History, 1565–1776, at 48 (3d. ed. 2002) (2003 reprint).

The 105 colonists included "some 35 gentlemen, an Anglican minister, a doctor, 40 soldiers, and a variety of artisans and laborers." *Id.*

A previous attempt in 1585 to establish a colony at Roanoke Island, North Carolina, had failed.

[59] 1 Wm. & Mary, sess. 2, ch. 2 (1689).

[60] The New England Charter declared that it was lawful for
> our loving Subjects, or any other Strangers who become our loving Subjects," to "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there.

3 Federal and State Constitutions Colonial Charters, *supra* note 58, at 1834–35. For the New England and Virginia colonies, such imports and exports were untaxed for the first seven years. *Id.* at 1835, 3787–88.

Maine.[61] Similarly, the 1620 Charter of New England is a founding legal document of the New England states (except Vermont), Pennsylvania, New York, and New Jersey.[62]

To encourage immigration to America, all emigrants from England "and every of their children" born in America were guaranteed "all Liberties, Franchises and Immunities . . . as if they had been abiding and born, within this our Realm of *England*, or any other of our said Dominions."[63] Subsequent colonial charters often declared that American colonists had the rights of Englishmen.[64] So in addition to the express arms guarantees in the early colonial charters, the colonists were protected by the 1689 English Bill of Rights, which secured the right of "the subjects which are Protestants [to] have arms for their defence."[65]

All colonies except Pennsylvania required that arms be kept in most homes.[66] In addition to militia statutes, which typically covered males ages 16 to 60, many people not in the militia had to have the same arms as militiamen. As described *infra*, the nonmilitia mandates applied to men exempt from militia duties because of occupation (*e.g.*, doctors), infirmity, or advanced age.

---

[61] Before becoming separate states, West Virginia and Kentucky were part of Virginia, and Maine part of Massachusetts.

[62] 1 *id.* at iv–xiii.

[63] 7 *id.* at 3788 (Virginia, 1606); 3 *id.* at 1839 (New England, 1620) (slight differences in phrasing and spelling).

The colonists who sailed to establish the New England colony, unlike their Virginia predecessors, included many families, and thus women and children. MIDDLETON, *supra* note 58, at 70. In New England, where "[m]ost couples . . . raised large families, with between five and seven children commonly surviving to adulthood," providing the population growth that made the colonies viable. *Id.* at 89. "Twenty thousand people came to New England in the 1630s; thereafter the flow slowed to a trickle. The natural population increase, however, caused the number of towns in Massachusetts to grow from twenty-one in 1641 to thirty-three by 1647." *Id.*

[64] *See* 1 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, *supra* note 58, at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at 1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

[65] English Bill of Rights, 1 William & Mary, sess. 2, ch. 2 (1689) ("The subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law.")

[66] Pennsylvania did not have a militia mandate until the adoption of the 1776 state constitution following Independence. PA. CONST. of 1776, § 5; 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801, at 77 (1903) (enacted 1777). During the French & Indian War, in 1755, the colonial legislature had enacted a statute for voluntary militia companies. 5 *Id.* at 197 (1898).

Arms possession mandates sometimes applied to heads of households, including women. Besides that, arms carrying was often mandatory, and to comply with a carry mandate, a person at least had to have access to arms.

There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686.[67]

Today's New Jersey was once part of New Netherland. New Netherland was not subdivided into different colonies. After the English seized New Netherland from the Dutch in 1664, East Jersey, West Jersey, and New York were created as separate colonies. The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward when East Jersey merged with West Jersey in 1702.[68] That law imposed no restriction on the possession or sale of any arms.

## B. New Sweden

New Sweden existed from 1638 to 1655. It included parts of the future states of Delaware, New Jersey, Maryland, and Pennsylvania. Its core was the region around the lower Delaware River and the Delaware Valley. The area

---

[67] The East Jersey law forbade the concealed carry of "any Pocket Pistol, Skeines [Irish-Scottish dagger], Stilladoes [stilettos], Daggers or Dirks, or other unusual or unlawful Weapons." Further, no "Planter" (frontiersman) could "Ride or go Armed with Sword, Pistol, or Dagger," except when in government service or if "Strangers" (*i.e.* travelers). 23 THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 289–90 (1758).

[68]

> By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them. [An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 341 (2d ed. 1881)]. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.

*Bruen*, 142 S. Ct. at 2144.

*Journal of Legislation*

abounded in excellent locations for trade with Indians. In the course of trading, the colonists often sold firearms and cannons to Indians.

At the time, the Swedish Empire ruled Finland, and Finns constituted a large portion of New Sweden's settlers. A substantial subpopulation of the Finnish settlers were the Savo-Karelians, who, unlike many newcomers to North America, already had extensive experience inhabiting wooded frontiers and trading with indigenous peoples, namely the Lapps. In the New World, the Savo-Karelian Finns learned more woodcraft from the Delaware Indians. "On no other part of the colonial American frontier was such rapid and comprehensive acceptance of Indian expertise in hunting and gathering achieved."[69] The Finns hunted with flintlock rifles and shotguns, and many settlers were capable of manufacturing and repairing their own arms.[70]

We are aware of no law in New Sweden against the possession of any type of arm, ammunition, or accessory. Rather, the New Swedes used modern firearms (flintlocks) and cannons. Having friendly relations with nearby Indians, they traded these arms freely with them.

The Dutch Republic conquered New Sweden in 1655, assimilating it into New Netherland. The Dutch hoped the Swedes would continue to immigrate because "the Swedish people are more conversant with, and understand better than any other nation . . . hunting and fowling."[71] When the English gained control of the region a decade later, they too acknowledged the Finns' unique and welcome backwoods expertise.[72]

### C. New Netherland

New Netherland stretched from Cape Henlopen (on the south side of the Delaware Bay) north to Albany, New York, and eastward to Cape Cod (in far southeastern Massachusetts). The colony included parts of present-day New York, New Jersey, Connecticut, and Delaware, in addition to small outposts that the colony claimed in Rhode Island and Pennsylvania.[73] New Netherland was part of the Dutch Republic, an industrial powerhouse that led the world

---

[69] TERRY G. JORDAN & MATTI E. KAUPS, THE AMERICAN BACKWOODS FRONTIER: AN ETHICAL AND ECOLOGICAL INTERPRETATION 232 (1988).

[70] *See id.* at 222–24.

[71] 2 JOHN R. BRODHEAD, DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW-YORK PROCURED IN HOLLAND, ENGLAND, AND FRANCE 242 (E. B. O'Callaghan ed., 1858).

[72] JORDAN & KAUPS, *supra* note 69, at 150.

[73] CHARLES MCLEAN ANDREWS, COLONIAL SELF-GOVERNMENT: 1652–1689, at 74 (1904).

in arms manufacturing. Dutch arms earned a reputation for reliability and affordability, and often made their way to America.[74]

The West India Company—a Dutch chartered company of merchants—founded New Netherland in 1624 and ruled it autocratically. The founding of New Netherland being motivated by commerce, the colonists soon began trading firearms.[75] This caused a problem that would last as long as the colony itself because their customers were often Indians who threatened the colony's existence.[76]

In 1639, "the Director General and Council of New Netherland hav[ing] observed that many persons . . . presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief," made it "most expressly forbidden to sell any Guns, Powder or Lead to the Indians, on pain of being punished by Death."[77] In 1645, having been "informed with certainty, that our enemies [the Indians] are better provided with Powder than we," New Netherland reaffirmed the death penalty for "all persons . . . daring to trade any munitions of War with the Indians," and required vessels to obtain permission to travel with munitions, to ensure that they were not secretly engaging in such trade.[78] This prohibition was renewed in 1648.[79]

New Netherland continued to wrestle with the problem of colonists providing arms to Indians in the 1650s. A 1652 ordinance established another ban on the trading of firearms from "[p]rivate persons" to Indians.[80] But the ordinance "is not among the Records, and seems, indeed, not to have been very strictly enforced."[81] Indeed, in 1653, New Netherland's Directors noted that the colony's Director General had "been obliged . . . to connive somewhat in

---

[74] *See* DAVID J. SILVERMAN, THUNDERSTICKS: FIREARMS AND VIOLENT TRANSFORMATION OF NATIVE AMERICA 25 (2016); H. Ph. Vogel, *The Republic as an Arms Exporter 1600-1650*, *in* THE ARSENAL OF THE WORLD: THE DUTCH ARMS TRADE IN THE SEVENTEENTH CENTURY 13–21 (Jan Peit Puype & Macro van der Hoeven eds., B.J. Martens, G. de Vries & Jan Peit Puype trans., 1996) (Dutch edition 1993).

[75] SILVERMAN, *supra* note 74, at 96–98.

[76] *See generally* Shaun Sayres, *"A Dangerous Liberty": Mohawk-Dutch Relations and the Colonial Gunpowder Trade, 1534–1665*, Master's Thesis in History, U. of N.H. (2018), https://scholars.unh.edu/cgi/viewcontent.cgi?article=2173&context=thesis.

[77] LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674, at 18–19 (E. B. O'Callaghan ed., 1868).

[78] *Id.* at 47.

[79] *Id.* at 101.

[80] *Id.* at 128.

[81] *Id.*

regard to the" trading ban; they instructed him "to deal herein with a sparing hand, and take good care that through this winking no more ammunition be sold to the Indians than each one has need of for the protection of his house and for obtaining the necessaries of life, so that this cruel and barbarous Nation may not be able, at any time, to turn and employ their weapons against ourselves there."[82] The Director General and his Council did not deal sparingly enough; instead, as a 1656 law pointed out, they personally profited from the Indian arms trade.[83]

Consequently, previous restrictions were "revive[d] and renew[ed]," with "the following amplification":

> That henceforth no person, of what nation or quality soever he may be, shall be at liberty to bring into the Country for his own or ship's use any sort of Snaphance or Gunbarrels, finished or unfinished, not even on the Company's permit, save only, according to order, one Carbine, being a firelock of three to three and a half feet barrel and no longer.[84]

In addition to limiting the number of flintlocks colonists could bring into the colony, the law targeted the smuggling of arms by requiring all private ships to submit to searches "both on their arrival and departure."[85]

In 1664, after the Duke of York's English forces conquered New Netherland with ease, New Netherland became the British colony of New York.[86]

---

[82] *Id.*

[83]

> [T]he Director General and Council of New Netherland are to their regret informed and told of the censure and blame under which they are lying among Inhabitants and Neighbors on account of the non-execution of their previously enacted and frequently renewed Edicts . . . some not only presuming that the Director General and Council connive with the violators, but even publicly declaring that the Director General and Council aforesaid have made free the importation and trade in Contraband which, for that reason, is carried on with uncommon licentiousness and freedom.

*Id.* at 236–37.

[84] *Id.* Another 1656 law "forb[ade] the admission of any Indians with a gun or other weapon, either in this City or in the Flatland, into the Villages and Hamlets, or into any Houses or any places." *Id.* at 235.

[85] *Id.* at 237–38.

[86] CARL P. RUSSELL, GUNS ON THE EARLY FRONTIERS 10 (1957).

**KnifeRights MSJ App.000800**

The one-flintlock law of 1656 is the only a restriction on a particular type of arm in what would become the original thirteen American states. It was enacted out of desperation at the end of a futile decades-long attempt to restrict gun sales to adversaries who threatened the colony's survival. The law did not ban any colonist from possessing flintlocks or limit how many they could own; it limited the number they could bring into the colony. No English colony enacted a similar restriction. The one-flintlock import limit vanished upon the British takeover of New Netherland.

### D. Arms Mandates in Colonial America

Subsection 1 describes who was required to possess or carry arms. Subsection 2 lists the various types of arms whose possession was mandatory. In colonial America, "the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole."[87]

### 1. Who was required to keep or bear arms?

The most common age for militia service in the colonies was 16 to 60 years of age. Typical militia statutes required militia-eligible males to own at least one cutting weapon (such as a sword or bayonet) and at least one firearm.[88]

Many colonies also required ownership by people who were *not* in the militia. These included males with occupational exemptions from the militia and males who were too old for militia service.[89] No state authorized female

---

[87] 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 1 (1910).

[88] *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495, 533–89 (2019).

[89] For example, Delaware exempted certain occupations from routine militia service, but still ordered them to be armed and ready to serve in an emergency:

[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm [an attack on the locality]: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm

service in the militia, but several—Massachusetts, Maryland, Virginia, New Hampshire, Vermont, and Connecticut—at least sometimes required females to have the same arms as militiamen.[90] Like males who were militia-exempt because of age or occupation, armed females were part of their communities' emergency defense. Whenever a small town was attacked, everybody who was able would fight as needed, including women, children, and the elderly.[91]

---

happen, then all those, who by this Act are obliged to keep Arms as aforesaid . . . shall join the General Militia. LAWS OF THE GOVERNMENT OF NEW-CASTLE, KENT AND SUSSEX UPON DELAWARE 176–77 (1741).

[90] In order of enactment:

Maryland: "every housekeeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within *his her or their house* able to bear armes one Serviceable fixed gunne of bastard muskett boare," plus, a pound of gunpowder, four pounds of shot, and firearms ignition accessories. 1 ARCHIVES OF MARYLAND 77 (enacted 1639) (William Hand Browne ed., 1885) (emphasis added).

Virginia: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council." WILLIAM WALLER HENING, 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 226 (1823) (enacted 1639).

Massachusetts: "all inhabitants." 2 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 134 (Nathaniel B. Shurtleff ed. 1853) (enacted 1645). *Cf. id.* at 99 (requiring arms training for children of both sexes, ages 10–16).

Rhode Island: "that every Inhabitant of the Island above sixteen or under sixty years of age, shall always be provided with a Musket," a pound of gunpowder, twenty bullets, a sword, and other accessories. *Acts and Orders of 1647, in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 183–84 (Donald S. Lutz ed., 1998).

Connecticut: "all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms . . . ; and every male person within this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band." 1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 542–43 (J. Hammond Trumbull ed., 1850) (enacted 1650).

New Hampshire: every "Householder" to have musket, bandoliers, cartridge box, bullets, powder, cleaning tools, and a sword. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD 285 (Albert Stillman Batchellor ed., 1904) (enacted 1718).

Vermont: "every listed soldier and other householder" must have a firearm, a blade weapon, gunpowder, bullets, and cleaning equipment. VERMONT STATE PAPERS, BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT; TOGETHER WITH THE JOURNAL OF THE COUNCIL OF SAFETY, THE FIRST CONSTITUTION, THE EARLY JOURNALS OF THE GENERAL ASSEMBLY, AND THE LAWS FROM THE YEAR 1779 TO 1786, INCLUSIVE 307 (1823).

[91] *See* STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28–29 (2011).

As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons."[92] Colonies required arms carrying to attend church,[93] public assemblies,[94] travel,[95] and work in the field.[96]

The carry mandates referred to a "man" or "he," except in Massachusetts, which mandated carry by any "person."[97] They did not require that the individual carry of a specific type of firearm, and sometimes allowed a sword instead of a firearm. Nor did they require that the carrier personally own the firearm; the statutes presumed that a person engaged in the listed activities would have ready access to a firearm.

---

[92] *Heller*, 554 U.S. at 601.

[93] Proceedings of the Virginia Assembly, 1619, in LYON GARDINER TYLER, NARRATIVES OF EARLY VIRGINIA, 1606-25, at 273 (1907) (enacted 1619); 1 HENING, *supra* note 90, at 198 (1632); VIRGINIA LAWS 1661-1676, at 37 (1676) (enacted 1665); THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (William Brigham ed., 1836) (enacted 1656) (Apr. 1 through Nov. 30, militiamen only); *id.* at 115 (1658) (changing Apr. 1 to Mar. 1); *id.* at 176 (1675) (year-round); 3 ARCHIVES OF MARYLAND, *supra* note 90, at 103 (1642); 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95–96 (J. Hammond Trumbull ed. 1850) (enacted 1643); RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649, at 131–32 (Charles J. Hoadly ed., 1857) (enacted 1644) (New Haven was a separate colony from Connecticut until 1662); DAVID J. MCCORD, 7 STATUTES AT LARGE OF SOUTH CAROLINA 417–19 (1840) (enacted 1740, re-enacted 1743) (militiamen only); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA, Part 1, at 137–40 (Allen D. Candler ed., 1904) (enacted 1770, militiamen only).

[94] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (Nathaniel B. Shurtleff ed., 1853) (enacted 1637); 2 *id.* at 38 (1638 repeal of 1637 law; replaced in 1643 with instruction for each town's militia head to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting."); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) (enacted 1639) ("none shall come to any public Meeting without his weapon").

[95] 1 HENING, *supra* note 90, at 127 (Virginia, 1623); *id.* at 173 (1632); 1 MASS. BAY RECS. at 85 (1631, travel to Plymouth); *id.* at 190 (1636) ("travel above one mile from his dwelling house, except in places wheare other houses are neare together"); 1 RECORDS OF THE COLONY OF RHODE ISLAND at 94 (1639) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword"); 3 ARCHIVES OF MARYLAND at 103 (1642) ("any considerable distance from home").

[96] 1 HENING, *supra* note 90, at 127 (Virginia, 1624); *id.* at 173 (1632).

[97] 1 Mass. Bay Recs. at 190 (1637, meetings), repealed the next year, 1 Mass. Bay Recs. at 190; 1 *id.* at 85 (travelers, 1631), 1 *id.* at 190 (travelers, 1636).

### 2. *Types of mandatory arms*

The statutes that required the keeping of arms—by all militia and some nonmilitia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. Collectively, the colonial statutes mandated ownership of a wide range of arms.

We will list the different types of mandated arms, starting with cutting weapons.

*Knives, swords, and hatchets*

- *Backsword.*[98] "A kind of sabre. A sword having a straight, or very slightly curved, single-edged blade."[99]
- *Bayonet.*[100] A knife attached to the muzzle of a gun.[101]
- *Broad Sword.*[102] "A sword with a straight, wide, single-edged blade. It was the military sword of the 17th century" and "also the usual weapon of the common people."[103]

---

[98] 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 2, at 14 (Arthur Vollmer ed., 1947) (Connecticut 1650).

[99] STONE, *supra* note 14, at 84 ("Back Sword").

[100] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 176, 177 (1775), 205 (1775), 256 (1784); Part 3 (Delaware), at 28 (1785); Part 4 (Georgia), at 7 (1755, 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 102 (1756); Part 6 (Massachusetts), at 200 (1758), 223 (1776); 231 (1776-7); 246 (1781); Part 7 (New Hampshire), at 82 (1776), 104, 105 (1780), 116 (1780); Part 8 (New Jersey), at 12 (1713), 16 (1722), 20 (1730), 25, 26, 27 (1746), 33, 34, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 267 (1778), 271 (1778), 311 (1782), 326 (1783); Part 12 (Rhode Island), at 37 (1705), 39 (1718), 90 (1767), 99 (1774), 184 (1781), 197 (1781), 201 (1781), 203 (1781), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 24 (1721), 40 (1747), 67 (1778); Part 14 (Virginia), at 78 (1723), 105 (1738), 146, 150 (1755), 206, 210 (1757), 258, 274, 277 (1775), 306 (1775), 322, 323 (1777).

[101] *See* STONE, *supra* note 14, at 107 ("Bayonet").

[102] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 8 (New Jersey), at 81 (1781); Part 9 (New York), at 311 (1782); Part 10 (North Carolina, at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774).

[103] STONE, *supra* note 14, at 150–51.

- *Cutlas, Cutlass, Cutlace.*[104] "A broad curving sword; a hanger; used by soldiers in the cavalry, by seamen, etc."[105]
- *Cutting-Sword.*[106] A category of "short, single-edged" swords, which included cutlasses and hangers.[107]
- *Hanger.*[108] "A short broad sword, incurvated towards the point."[109]
- *Hatchet.*[110] "A small ax with a short handle, to be used with one hand."[111] A popular substitute for a sword.[112]
- *Jack-knife.*[113] A folding pocket-knife, with blades ranging from three to twelve inches.[114]
- *Rapier.*[115] "A sword especially designed for thrusting and provided with a more or less elaborate guard."[116]

---

[104] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 131 (1741); Part 8 (New Jersey), at 41, 45 (1777); Part 10 (North Carolina), at 11 (1746), 39 (1766), 49 (1774); Part 13 (South Carolina), at 68 (1778).

[105] 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) ("Cutlas"); *see also* STONE, *supra* note 14, at 198 ("a family of backswords.")

[106] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 14 (Virginia), 78 (1723), 105 (1738), 145, 146 (1755), 150, 151 (1755), 211 (1757).

[107] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 79–80.

[108] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 122 (1778); Part 5 (Maryland), at 91 (1756); Part 7 (Maryland), at 105 (1780); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 1775); Part 10 (North Carolina), at 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 12 (Rhode Island), at 204, 206 (1793), 217 (1798).

[109] 1 WEBSTER, *supra* note 105, (unpaginated).

[110] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 7, 35 (1755), 69 (1765), 80, 109 (1773), 122 (1778); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 223 (1776), 231 (1776-7); Part 7 (New Hampshire), 31 (1692), 82 (1776), 117 (1780); Part 8 (New Jersey), at 10 (1693); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40, 52 (1747).

[111] 1 WEBSTER, *supra* note 105, (unpaginated).

[112] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 87–88.

[113] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776); Part 7 (New Hampshire), at 82 (1776).

[114] GEORGE G. NEUMANN, SWORDS & BLADES OF THE AMERICAN REVOLUTION 231 (3d ed. 1991).

[115] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702).

[116] STONE, *supra* note 14, at 524–26.

- *Scabbards.*[117] "The sheath of a sword."[118]
- *Scimeter, scymiter, simeter, semeter, cimeter.*[119] "The strongly curved Oriental sabre."[120]
- *Sword.*[121] "An offensive weapon worn at the side, and used by hand either for thrusting or cutting."[122]
- *Tomahawk.*[123] "An Indian hatchet."[124]

---

[117] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachuetts), at 200 (1758), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 82 (1776), 104 (1780).

[118] 2 WEBSTER, *supra* note 105, (unpaginated).

[119] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 59 (1701).

[120] STONE, *supra* note 14, at 545 ("Scymiter, Scimeter"). "Guard" means a handguard, a barrier between the handle and the blade.

[121] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1658), 28 (1673), 30 (1673), 44 (1677), 46 (1687), 60, 61, 63 (1702), 92, 94, 95 (1715), 123, 124, 129 (1741), 131, 138 (1741), 150, 151, 156 (1754), 256 (1784); Part 4 (Georgia), at 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 6 (1638), 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 21 (1643), 25 (1643), 29 (1645), 39 (1647), 59 (1649), 68 (1658), 86, 91 (1671), 100, 105 (1672), 129 (1685), 133 (1689), 139 (1693); Part 7 (New Hampshire), at 12, 13 (1687), 31 (1692), 52 (1718), 82 (1776), 105 (1780); Part 8 (New Jersey), at 5 (1675); 8 (1682), 12 (1713), 16 (1722), 20 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702), 80 (1721), 89, 90 (1724), 116 (1739), 118 (1739), 134 (1743), 148, 150 (1744), 164, 165 (1746), 188 (1755), 227, 229 (1764), 243, 245 (1772), 252, 255 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 7 (1715), 10, 13 (1746), 19 (1754), 26 (1760), 32 (1764), 39 (1766), 49 (1774), 123 (1781); Part 11 (Pennsylvania), at 10, 14 (1676), 16 (1676); Part 12 (Rhode Island), at 3 (1647), 26 (1701), 34, 37 (1705), 42 (1718), 90, 95 (1767), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24, 31 (1721), 40 (1747); Part 14 (Virginia), at 48 (1684), 50 (1684), 65, 66 (1705), 211 (1757), 277 (1775), 322 (1777), 424 (1784).

[122] 2 WEBSTER, *supra* note 105, (unpaginated).

[123] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 7 (New Hampshire), at 82 (1776); Part 8 (New Jersey), at 41 (1777), 70 (1781); 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 274 (1775), 322 (1777).

[124] 2 WEBSTER, *supra* note 105, (unpaginated).

*Pole arms*

- *Halberd, Halbard, Halbart.*[125] "[A] polearm bearing an axehead balanced by a break or fluke and surmounted by a sharp point."[126]
- *Half-Pike.*[127] "A small pike carried by officers."[128]
- *Lance.*[129] "A spear, an offensive weapon in form of a half pike, used by the ancients and thrown by the hand. It consisted of the shaft or handle, the wings and the dart."[130]
- *Partisan.*[131] "A broad-bladed pole arm usually having short, curved branches at the base of the blade."[132]
- *Pike.*[133] "A military weapon consisting of a long wooden shaft or staff, with a flat steel head pointed; called the spear."[134]
- *Spontoon, Espontoon.*[135] A six-foot-long pole arm.[136] Sometimes "spontoon" was used interchangeably with "half-pike," but "spontoon" sometimes described a more decorative type.[137]

---

[125] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 151 (1755), 211 (1757). Some towns and counties were required to provide halberds. *See e.g.*, BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 3 (Delaware), at 5 (1741), 14 (1756), 22 (1757); Part 6 (Massachusetts), at 49 (1653), 68 (1658), 80 (1669), 88 (1671), 102 (1672), 130 (1685), 135 (1690), 143 (1693), 168 (1738), 170 (1742), 201 (1758); Part 7 (New Hampshire), at 57 (1718); Part 11 (Pennsylvania), at 12 (1676); Part 14 (Virginia), at 277 (1775).

[126] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 93; *see also* STONE, *supra* note 14, at 275 ("Halbard, Halbart, Halberd").

[127] THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, FROM 1665 TO 1678, at 208 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 7 (New Hampshire), at 105 (1780).

[128] 1 WEBSTER, *supra* note 105, (unpaginated).

[129] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52 (1702).

[130] 2 WEBSTER, *supra* note 105, (unpaginated).

[131] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 151 (1755).

[132] STONE, *supra* note 14, at 484 ("Partizan").

[133] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 25 (1666), 46 (1687); Part 6 (Massachusetts), at 22 (1643), 86 (1671), 100 (1672); Part 9 (New York), at 4 (1694), 16 (1691), 53 (1702).

[134] 2 WEBSTER, *supra* note 105, (unpaginated).

[135] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 7 (New Hampshire), at 105 (1780); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 424 (1784).

[136] *See* NEUMANN, *supra* note 114, at 191.

[137] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 286–87.

*Firearms*

- Bastard muskets[138] "In military affairs, bastard is applied to pieces of artillery which are of an unusual make or proportion."[139] Bastard muskets were shorter and lighter than typical muskets.
- *Caliver*.[140] "A kind of handgun, musket or arquebuse."[141]
- *Carbine*.[142] "A short gun or fire arm, carrying a ball of 24 to the pound, borne by light horsemen, and hanging by a belt over the left shoulder. The barrel is two feet and a half long, and sometimes furrowed."[143]
- Case of pistols.[144] Handguns were often sold in matched pairs. A "case of pistols"—sometimes called a "brace of pistols"—is such a pair.[145]

---

[138] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 30 (1673), 60 (1702); 92 (1715); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 41 (1647), 45 (1647), 56 (1660), 86 (1671), 129 (1685), 139 (1693); Part 7 (New Hampshire), at 52 (1718).

[139] 1 WEBSTER, *supra* note 105, (unpaginated).

[140] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 30 (1673); Part 6 (Massachusetts), at 124 (1677).

[141] 2 WEBSTER, *supra* note 105, (unpaginated).

[142] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 28 (1673), 30 (1673), 46 (1687), 57 (1696), 60 (1702), 92 (1715), 124 (1741), 131 (1741), 151 (1754), 202 (1775); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 59 (1660), 91 (1671), 105 (1672), 116 (1675), 132 (1685), 139 (1693); Part 7 (New Hampshire), at 13 (1688), 52 (1718); Part 8 (New Jersey), at 30 (1746), 45 (1777); Part 9 (New York), at 5 (1694), 16 (1691), 47 (1710), 53 (1702), 80 (1721), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 11 (Pennsylvania), at 14, 16 (1676); Part 12 (Rhode Island), at 29 (1701), 45 (1730), 95 (1767); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 50 (1684), 65, 66 (1705), 78 (1723), 105 (1738), 145 (1755).

[143] 1 WEBSTER, *supra* note 105, (unpaginated).

[144] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687), 92 (1715), 131 (1741), 151 (1754), 256 (1784); Part 6 (Massachusetts), at 139 (1693); Part 8 (New Jersey), at 30 (1746); 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 13 (1746), 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 12 (Rhode Island), at 45 (1730); Part 14 (Virginia)), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[145] Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 709, 719 (2008).

- *Firelock.*[146] "A musket, or other gun, with a lock, which is discharged by striking fire with flint and steel."[147] Today, commonly called a flintlock. As of the late eighteenth century, all modern firearms were flintlocks.
- *Fowling piece.*[148] "A light gun for shooting fowls."[149]
- *Fusee, fuse, fuze, fuzee, fusil.*[150] "[A] light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon."[151]
- *Matchlock.*[152] "[T]he lock of a musket which was fired by a match."[153] The standard firearm of the early seventeenth century. During the century Americans shifted from matchlocks to flintlocks (a/k/a firelocks), which were more reliable and faster to reload.

---

[146] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123, 129 (1741), 131, 138 (1741), 150, 156 (1754), 236 (1780); Part 3 (Delaware), at 2, 3 (1741), 28 (1785); Part 5 (Maryland), at 6 (1638), 102 (1756); Part 6 (Massachusetts), at 25 (1643), 124 (1677), 139 (1693), 255 (1781); Part 7 (New Hampshire), at 52 (1718), 116 (1780); Part 8 (New Jersey), at 5 (1675), 8 (1682); Part 9 (New York), at 267 (1778), 271 (1778), 282 (1779), 287 (1780), 310 (1782), 326 (1783); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 146, 150 (1755), 206, 211 (1757), 274 (1775), 322 (1777).

[147] 1 WEBSTER, *supra* note 105 (unpaginated).

[148] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 146 (1784).

[149] 1 WEBSTER, *supra* note 105 (unpaginated).

[150] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 3 (Delaware), at 11 (1756), 17 (1757); Part 4 (Georgia), at 146 (1784); Part 7 (New Hampshire), at 105 (1780); Part 8 (New Jersey), at 12 (1713), 16, 18 (1722), 20 (1730), 25, 26, 27 (1746), 33, 35, 37 (1757); Part 9 (New York), at 16 (1691), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 118 (1739), 136 (1743), 150 (1744), 164 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775); Part 10 (North Carolina), at 13 (1746); Part 12 (Rhode Island), at 42 (1718), 90 (1767), 99 (1744), 206 (1793), 219 (1798); Part 13 (South Carolina), at 30, 32 (1721); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738).

[151] GEORGE C. NEUMANN, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 19 (2011).

[152] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 8 (1638), 14 (1650), 18, 19 (1656), 30 (1673); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 25 (1643), 29 (1645), 34 (1645), 39 (1647), 86 (1671); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 3 (1647).

[153] 2 WEBSTER, *supra* note 105 (unpaginated).

- *Musket*.[154] "The term 'musket' has always referred to a heavy military gun. In the 16th an 17th century it was a matchlock."[155] "Later the name came to signify any kind of a gun used by regular infantry."[156]
- *Pistol*.[157] "A small fire-arm, or the smallest fire-arm used, differing from a musket chiefly in size. Pistols are of different lengths, and borne by horsemen in cases at the saddle bow, or by a girdle. Small pistols are carried in the pocket."[158]
- *Rifle*.[159] "A gun about the usual length and size of a musket, the inside of whose barrel is rifled, that is, grooved, or formed with spiral channels."[160]

---

[154] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 28 (1673), 30 (1673), 46 (1687), 60 (1702), 92 (1715), 256 (1784); Part 3 (Delaware), at 2 (1741), 3 (1741), 11 (1756), 17 (1757); Part 4 (Georgia), at 6 (1755), 80 (1773), 146 (1784); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 10 (1643), 25 (1643), 29 (1645), 39 (1646), 45 (1647), 56 (1660), 86 (1671), 116 (1675-6), 124 (1677), 129, 131 (1685), 139 (1693); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 104 (1780); Part 8 (New Jersey), at 25, 27 (1746), 12 (1713), 18 (1722), 20, 23 (1730), 33, 35, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 16 (1691), 4 (1694), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 117 (1739), 136 (1743), 150 (1744), 164 (1746), 180 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775), 271, 273 (1778), 282 (1779), 233 (1780), 310, 311 (1782), 326 (1783); Part 12 (Rhode Island), at 3 (1647), 22 (1677), 26 (1701), 42 (1718), 147 (1779), 184 (1781), 204 (1793), 217 (1798); Part 13 (South Carolina), at 40 (1747), 67 (1778); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738), 258 (1775), 306 (1775), 312 (1775), 424 (1784).

[155] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 14.

[156] STONE, *supra* note 14, at 461 ("Musquet, Musket"). Stone notes that the musket was originally "a matchlock gun too heavy to be fired without a rest, therefore the smallest of cannon. As many cannon were given the names of birds and animals, this was called a musket, the falconer's name for the male sparrow hawk, the smallest of hawks." *Id.*

[157] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 57 (1696); Part 4 (Georgia), at 74 (1766); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 91 (1671), 105 (1672), 132 (1685); Part 8 (New York), at 81 (1781); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702); Part 10 (North Carolina), at 123 (1781); Part 11 (Pennsylvania), at 14, 16 (1676); Part 12 (Rhode Island), at 29 (1701), 95 (1676), 206 (1793), 219 (1798); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 59 (1701), 150 (1755), 419 (1782).

[158] 2 WEBSTER, *supra* note 105, (unpaginated).

[159] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 146 (Georgia 1784); Part 8 (New Jersey), at 41 (1777), 70 (1784); Part 9 (New York), at 310 (1782); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 258 (1775), 274 (1775), 306 (1775), 322 (1777), 425 (1784).

[160] 2 WEBSTER, *supra* note 105, (unpaginated).

- *Snaphaunce.*[161] "During the 17th century, *snaphaunce* commonly referred to any flintlock system."[162]

## Armor

In the usage of the time, "arms" included missile weapons (*e.g.*, guns, bows, cannons), cutting weapons (*e.g.*, knives, swords, bayonets), and blunt impact weapons (*e.g.*, clubs, slungshots, canes). As *Heller* explained, "arms" also included armor: "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[163] Also cited in *Heller*, Samuel Johnson's and Thomas Sheridan's dictionaries defined "arms" as "weapons of offence, or armour of defence."[164] Also cited was the first dictionary of *American* English, by Noah Webster, defining "arms" as "Weapons of offense, or armor for defense and protection of the body."[165]

As described in Part 1.A., England's 1181 Assize of Arms mandated ownership of certain armor and also restricted types of armor by economic class. No armor restrictions existed in America.

---

[161] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 124 (1677).

[162] NEUMANN, *supra* note 114, at 8; *see also* RICHARD M. LEDERER, JR., COLONIAL AMERICAN ENGLISH 216 (1985) ("snaphance (*n.*) A flintlock.").

[163] *Heller*, 554 U.S. at 581 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)).

[164] 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 107 (4th ed.); T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796) (slightly different capitalization in Sheridan).

[165] 1 WEBSTER, *supra* note 105, (unpaginated).

The *Heller* Court relied on Johnson, Sheridan, and Webster in its analysis of the Second Amendment's text. For Johnson, *see Heller*, 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 (defining "bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

- *Breastplate*.[166] "A plate, or set of plates, covering the front of the body from the neck to a little below the waist."[167]
- *Buff coat*.[168] "A heavy leather coat . . . . originally made of buffalo leather."[169] "It was a long skirted coat, frequently without a collar."[170]
- *Corslet*.[171] "Originally it meant leather armor . . . . [l]ater its meaning was strictly plate armor for the body only."[172]
- *Cotton coat*.[173] "A thick cotton coat which covered part of the arms and thighs, made in one piece," which protected against arrows.[174]

---

[166] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), 29 (1760), 35 (1764), 41–42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[167] STONE, *supra* note 14, at 143.

[168] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[169] STONE, *supra* note 14, at 152.

[170] *Id.*

[171] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 29 (1646), 56 (1660), 86 (1671), 100 (1672); THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 14 (J. Hammond Trumbull ed., 1850) (1637, "Harteford 21 Coslets, Windsor 12, Weathersfeild 10, Agawam 7"); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2, at 7–8 (Connecticut, 1638, "corseletts or cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3); *id.* at 13–14 (Connecticut, 1650, "cotton coates or corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3).

[172] STONE, *supra* note 14, at 192 ("Corselet, Corslet").

[173] A 1638 act required Connecticut towns to keep "corseletts" or "cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 7–8. A 1642 act ordered 90 coats "basted with cotton wooll and made defensive against Indean arrowes; Hartford 40, Wyndsor 30, Wethersfield 20." *Id.* at 10. A 1650 act required Connecticut towns to keep "cotton coates" or "corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). *Id.* at 13–14.

[174] Walter Hough, *Primitive American Armor*, *in* ANNUAL REPORT OF THE BOARD OF REGENTS THE SMITHSONIAN INSTITUTION 647 (1895).

- *Crupper.*[175] "The armor for the hind quarters of a horse."[176]
- *Helmet.*[177] "Generally any headpiece, specifically the open headpiece of the time of the Norman conquest."[178]
- *Pectoral.*[179] "A covering for the breast, either defensive or ornamental."[180]
- *Quilted coat.*[181] "Armor made of several thicknesses of linen, or other cloth, quilted or pour-pointed together."[182]

### *Ammunition*

Of course ammunition and gunpowder were mandatory. While many laws required owning certain quantities of gunpowder and ammunition, some required specific types of ammunition.

- *Buck shot.*[183] Multiple large pellets often used for deer hunting.[184]

---

[175] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 29 (1760), 35 (1764), 42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[176] STONE, *supra* note 14, at 195 ("Crupper, Croupiere Bacul").

[177] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 256 (1784); Part 6 (Massachusetts), at 29 (1646) ("head peeces"), 56 (1660) ("head peece"), 86 (1671) ("head piece"), 100 (1672) ("head-piece").

[178] STONE, *supra* note 14, at 289.

[179] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 60 (1702).

[180] STONE, *supra* note 14, at 492.

[181] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[182] STONE, *supra* note 14, at 520 ("Quilted Armor").

[183] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223, 228 (1776); Part 7 (New Hampshire), at 82 (1776).

[184] R.A. STEINDLER, THE FIREARMS DICTIONARY 250 (1970) (the largest shotgun pellets are "small & large buck shot").

- *Swan shot, Goose shot.*[185] "Large shot, but smaller than buckshot, used for hunting large fowl, small game, and occasionally used in battle."[186]

*Equipment*

Mandatory equipment included tools for carrying or loading ammunition, and for cleaning or repairing firearms.

- *Bandoleer.*[187] "A large leathern belt, thrown over the right shoulder, and hanging under the left arm; worn by ancient musketeers for sustaining their fire arms, and their musket charges, which being put into little wooden cases, and coated with leather, were hung, to the number of twelve, to each bandoleer."[188]
- *Worm.*[189] A corkscrew-shaped device attached to the end of a ramrod that is used for cleaning and for extracting unfired bullets and other ammunition components from firearms.[190]

---

[185] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 10 (North Carolina), at 8 (1715), 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 13 (South Carolina), 68 (1778); Part 14 (Virginia), at 59 (1701).

[186] MARK M. BOATNER III, ENCYCLOPEDIA OF THE AMERICA REVOLUTION 1085 (3d ed. 1994) ("Swan Shot").

[187] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1650).

[188] 1 WEBSTER, *supra* note 105, (unpaginated) ("Bandoleers").

[189] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1714), 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 11 (1756), 17, 18 (1757); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), at 25 (1643), 41 (1645), 45 (1647), 56 (1649), 86 (1671), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1758), 8 (1758), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[190] GEORGE C. NEUMANN & FRANK J. KRAVIC, COLLECTOR'S ILLUSTRATED ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 264 (1975); STEINDLER, *supra* note __, at 278; LEDERER, JR., *supra* note __, at 246 ("wormer").

- *Horn, Powderhorn*.[191] "A horn in which gunpowder is carried by sportsmen."[192] Most horns came from cattle, rams, or similar animals.[193]
- *Rest*.[194] "A staff with a forked head to rest the musket on when fired, having a sharp iron ferule at bottom to secure its hold in the ground."[195]
- *Shot bag*.[196] This term may refer to a charger or to a bag for carrying bullets.[197]
- *Scourer*.[198] A ramrod.[199]

---

[191] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 6 (1755), 57, 69 (1765), 80, 109 (1773), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 229 (1776), 250 (1781); Part 7 (New Hampshire), at 31 (1692); Part 8 (New Jersey), at 5 (1758), 8 (1682), 12 (1713), 16, 18 (1722), 20, 23 (1730), 25, 27 (1746), 33, 34, 37 (1757); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747), 52 (1747); Part 14 (Virginia), at 323 (1777).

[192] 1 WEBSTER, *supra* note 105, (unpaginated).

[193] RAY RILING, THE POWDER FLASK BOOK 13 (1953).

[194] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1656); Part 6 (Massachusetts), at 25 (1643), 29 (1645), 86 (1671); Part 5 (Maryland), at 6 (1638); Part 12 (Rhode Island), at 3 (1647).

[195] 2 F. W. FAIRHOLT, COSTUME IN ENGLAND: A HISTORY OF DRESS TO THE END OF THE EIGHTEENTH CENTURY 293 (H. A. Dillon ed., 4th ed. 1910) ("Musket-Rest"); *see also* STEPHEN BULL, ENCYCLOPEDIA OF MILITARY TECHNOLOGY AND INNOVATION 184 (2004) ("[A] forked pole about four feet in length").

[196] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 69 (1765), 80 (1773); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747); Part 14 (Virginia), at 258, 274 (1775), 306 (1775), 323 (1777).

[197] RILING, *supra* note __, at 256–57, 430–31; JIM MULLINS, OF SORTS FOR PROVINCIALS: AMERICAN WEAPONS OF THE FRENCH AND INDIAN WAR 43–44 (2008).

[198] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656); Part 6 (Massachusetts), at 41 (1645), 45 (1647), 86 (1671), 100 (1672); Part 11 (Pennsylvania), at 10 (1676).

[199] CHARLES JAMES, AN UNIVERSAL MILITARY DICTIONARY 791 (4th ed. 1816).

**KnifeRights MSJ App.000815**

- *Charger.*[200] A bulb-shaped flask for carrying powder, attached to metal components that release a premeasured quantity of the powder.[201]
- *Priming wire, Picker.*[202] Used to clean the flashpan and the touch hole (the small hole where the fire from the priming pan connected with the main powder charge).[203]
- *Cartridge Box.*[204] A box for storing and carrying cartridges.[205]

In America, unlike England, militiamen were never required to own bows and arrows. By the time that immigration to America began, the age of the bow was passing away. Only Massachusetts, which always valued education highly, required girls and boys to be taught archery. A 1645 statute ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen

---

[200] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656); Part 7 (New Hampshire), at 31 (1692); Part 11 (Pennsylvania), at 10 (1676).

[201] STONE, *supra* note 14, at 563.

[202] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123 (1741), 131 (1741), 150 (1754), 256 (1784); Part 3 (Delaware), at 11 (1756), 17, 18 (1757), 28 (1785); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), 41 (1645), 86 (1671), 100 (1672), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1675), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781), 211 (1793), 230 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[203] NEUMANN & KRAVIC, *supra* note __, at 264.

[204] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 2, 3 (1741), 11 (1756), 17 (1757), 28 (1785); Part 4 (Georgia), at 6 (1755), 57 (1765), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 131 (1685), 133 (1689), 139 (1693), 223 (1776), 231 (1776), 246 (1781), 255 (1781), 263 (1789); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 82 (1776), 104 1780), 116 (1780); Part 8 (New Jersey), at 8 (1682), 12 (1713), 16, 18 (1722), 20, 22 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 52, 53 (1702), 80 (1721), 90, 91 (1724), 118 (1739), 136 (1743), 150 (1744), 154 (1746), 164 (1746), 180 (1746), 188 (1755), 230 (1764), 245 (1772), 252, 255 (1775), 267 (1778), 271, 273 (1778), 282 (1779), 310, 311 (1782), 326 (1783); Part 10 (North Carolina), at 11 (1746), 19, 21 (1756), 39 (1766), 49 (1774), 101, 108 (1781); Part 12 (Rhode Island), at 206 (1793), 219, 230 (1798); Part 13 (South Carolina), at 9 (1703), 16 (1707), 24 (1721), 40 (1747); Part 14 (Virginia), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 146, 150 (1755), 206, 210 (1757), 274 (1775), 322, 323 (1777), 425 (1784).

[205] RILING, *supra* note __, at 483. "Cartouche" is the French word for "cartridge." Cartouche boxes were used for carrying paper cartridges; these contained the bullet and a measured quantity of gunpowder, wrapped in paper. *Id.*

years, shall be instructed . . . in the exercise of arms," including "small guns, half-pikes, bows and arrows &c."[206]

## E. Repeating Arms

Repeating arms were far too expensive to mandate. Some did end up in North America.[207] These included mid-1600s repeaters using a revolving cylinder that was rotated by hand.[208] An English Cookson repeater with a 10-round magazine is "believed to have found its way into Maryland with one of the early English colonists." It later became "perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[209] "Beginning about 1710 commerce brought wealth to some of the merchants in the northern Colonies, and with other luxuries fancy firearms began to be in demand."[210]

In 1722 Boston's John Pim demonstrated a gun he had built. According to an observer, the gun "loaded but once" "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance."[211] Another Boston gunsmith, Samuel Miller, advertised a 20-shot repeater, which he would demonstrate for a fee.[212]

However, there are no presently known records, such as newspaper advertisements, of an American before the Revolution manufacturing repeaters for sale as a business.[213]

With the Revolution underway in 1777, Joseph Belton of Philadelphia demonstrated a musket that shot 16 rounds all at once. The observers included top military leaders General Horatio Gates and Major General Benedict Arnold

---

[206] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 26, 31 (1645).

[207] "A few repeating arms were made use of in a military way in America." 1 SAWYER, *supra* note 87, at 28–29. For example, there is "record that [Louis de Buade de] Frontenac in 1690 astonished the Iroquois with his three and five shot repeaters." *Id.* at 29.

[208] *See, e.g.*, 2 *id.* at 5 (six-shot flintlock); CHARLES EDWARD CHAPEL, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

[209] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917).

[210] 1 SAWYER, *supra* note 87, at 31.

[211] Samuel Niles, A Summary Historical Narrative of the Wars in New England, *in* 5 MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837).

[212] NEW-ENGLAND WEEKLY JOURNAL, Mar. 2, 1730.

[213]

and one of America's greatest scientists, David Rittenhouse.[214] At their recommendation, the Continental Congress ordered one hundred Belton guns, but wanted them to fire 8 shots, not 16.[215] (Gunpowder availability was very tight.) However, Belton demanded what the Congress deemed "an extraordinary allowance," which the Continental Congress could not afford. [216]

The U.S. Congress that in 1789 sent the Second Amendment to the States for ratification included men who had served in the Continental Congress, and who were therefore well aware that 16-shot repeaters were possible, albeit very expensive.[217]

---

[214] Letter from Joseph Belton to the Continental Congress (Jul. 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, *supra* note **Error! Bookmark not defined.**, at 139.

> Philadelphia July 10th 1777
>
> Having Carefully examined M. Beltons New Constructed Musket from which He discharged Sixteen Balls loaded at one time, we are fully of Opinion that Muskets of his Construction with some small alterations, or improvements might be Rendered, of great Service, in the Defense of lives, Redoubts, Ships &c, & even in the Field, and that for his Ingenuity, & improvement he is Intitled to a hansome reward from the Publick.
>
> Dav. Rittenhouse  B Arnold  Charles Wm Seale  Horatio Gates  G Nash  Th F Proctor J W Strickland

[215] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (Worthington Chauncey Ford ed., 1907).

> Resolved, That John Belton be authorized and appointed to superintend, and direct, the making or altering of one hundred muskets, on the construction exhibited by him, and called 'the new improved gun,' which will discharge eight rounds with once loading; and that he receive a reasonable compensation for his trouble, and be allowed all just and necessary expences.

[216] Report of the Continental Congress (May 15, 1777), in 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, *supra* note 215, at 361.

[217] Delegates who served in the Second Continental Congress in 1777 include Roger Sherman, Lyman Hall, both Charles Carroll(s), future Supreme Court Justice Samuel Chase, John Adams, Samuel Adams, Elbridge Gerry, John Hancock, John Witherspoon, future first U.S. Supreme Court Chief Justice John Jay, future Supreme Court Justice James Wilson, Benjamin Harrison (father and grandfather of two future Presidents), Richard Henry Lee, and Francis Lightfoot Lee. *List of delegates to the Continental Congress*, Wikipedia, https://en.wikipedia.org/wiki/List_of_delegates_to_the_Continental_Congress.

After the war, Belton moved to England, where he made 7-shot repeaters for the British East India Company.[218] During the war, some British forces used the breechloading single-shot Ferguson Rifle, which "fired six shots in one minute" in a government test on June 1, 1776.[219] The Royal Navy's 1779 Nock volley gun had seven barrels (six outer barrels around a center barrel) that fired simultaneously.

When the Second Amendment was ratified, the state-of-the-art repeater was the Girardoni air rifle. It could consecutively shoot 21 or 22 rounds in .46 or .49 caliber, utilizing a tubular spring-loaded magazine.[220] Although an air gun, the Girardoni was ballistically equal to a powder gun.[221] It could take an elk with one shot.[222] The tubular magazine was quick to reload with speedloading tubes. A Girardoni could fire 40 times before the air bladder needed to be pumped up again.[223]

At the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons."[224] The Girardoni was invented for the Austrian army around 1779; 1,500 were issued to sharpshooters and remained in service for 25 years,

---

[218] It could be reloaded by switching in a preloaded metal magazine. *See* Jonathan Ferguson, *"Flintlock Repeating – 1786"* youtube.com/watch?v=-wOmUM40G2U.

[219] Roger Lamb, An Original and Authentic Journal of Occurrences During the Late American War 309 (1809). Because the Ferguson was loaded from the breech, not the muzzle, reloading was much faster. Paul Lockhart, Firepower: How Weapons Shaped Warfare 173 (2021).

[220] James B. Garry, Weapons of the Lewis and Clark Expedition 100–01 (2012).

[221] John Plaster, The History of Sniping and Sharpshooting 69–70 (2008).

[222] Jim Supica, et al., Treasures of the NRA National Firearms Museum 31 (2013).

[223] Pumping was not fast. It took about 1,500 strokes to completely fill the air reservoir. A modern writer called the Girardoni "a stone cold killer at up to 100 yards." He reported from test firing that the muzzle velocity of the .46 caliber bullet was 900 foot-pounds per second—comparable to a 21st century 45 ACP handgun. But the Girardoni could be too delicate. "The rudimentary fabrication methods of the day engineered weak threading on the [air] reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort." John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com, Mar. 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[224] Garry, *supra* note 220, at 91.

including in the Napoleonic Wars.[225] Isaiah Lukens of Pennsylvania manufactured Girardoni rifles,[226] as did "many makers in Austria, Russia, Switzerland, England, and various German principalities."[227]

Meriwether Lewis is believed to have acquired from Lukens the Girardoni rifle that he famously carried on the Lewis and Clark Expedition.[228] Lewis mentioned it in his journal at least twenty-two times. Sixteen times, Lewis was demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them,[229] and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[230]

### F. Cannons

Cannons were manufactured and privately owned in colonial America. When the Quaker-dominated Pennsylvania legislature would not fund a militia in 1747, Benjamin Franklin and some friends arranged a lottery to purchase some cannons and borrowed other cannons from New York.[231] During the French and Indian War, Georgia's legislature authorized militia officers to impress privately owned cannons for use by the militia.[232]

On the frontiers, cannons were kept to defend fortified buildings against attacks by Indians, the French, or Spanish. In a seaport, the greatest concern might be resistance to bombardment by an enemy fleet.

---

[225] GERALD PRENDERGHAST, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); GARRY, *supra* note 220, at 91–94.

As a testament to the rifle's effectiveness, "[t]here are stories that Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." *Id.* at 92.

[226] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[227] GARRY, *supra* note 220, at 99.

[228] *Id.*

[229] *See e.g.*, 6 MERIWETHER LEWIS & WILLIAM CLARK, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION at 233 (Gary Moulton ed. 1983) (Jan. 24, 1806, entry) ("My Air-gun also astonishes them very much, they cannot comprehend it's shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

[230] *See generally id.* (13 vols.).

[231] 1 JAMES PARTON, LIFE AND TIMES OF BENJAMIN FRANKLIN 267 (1864). The authors thank Clayton Cramer for bringing this example to our attention.

[232] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 24 (1755).

In December 1774, when tensions with Great Britain were rising towards war, a meeting of "Freeholders and other Inhabitants of the Town," chaired by revolutionary firebrand Samuel Adams, complained that "a Number of Cannon, the Property of a respectable Merchant in this Town were seized & carried off by force" by the British.[233]

As during the French & Indian war, private contributions of cannons to the common cause were necessary. In New Jersey in September 1777, Brigadier-General Forman lent the state militia his personal "three Pieces of Field Artillery." These would establish a militia artillery company.[234]

A Pennsylvania law to disarm "disaffected" persons authorized militia officers to "take from every such person" various weapons. The weapons listed were apparently common enough that some members of the public possessed them: "any cannon, mortar, or other piece of ordinance, or any blunderbuss, wall piece, musket, fusee, carbine or pistols, or other fire arms, or any hand gun; and any sword, cutlass, bayonet, pike or other warlike weapon."[235]

In 1783, Boston passed a fire-prevention law forbidding citizens who kept cannons in their home or outbuildings from keeping them loaded with gunpowder.[236] Any "cannon, swivels, mortars, howitzers, cohorns, fire-arms, bombs, grenades, and iron shells of any kind" that were stored loaded with gunpowder could be confiscated and "sold at public auction" back to private individuals.[237]

At sea, privately owned cannons were especially important. As long as there had been American vessels, some merchant or other civil ships carried cannons for protection against pirates.

---

[233] BOSTON GAZETTE, Jan. 2, 1775.

[234] 1776-1777 N.J. Acts 107, ch. 47.

[235] 1779 Pa. Laws 193, sec. 5.

[236] 1783 Mass. Acts 218, ch. 13.

The law also applied to firearms. According to *Heller*, "That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case)." 554 U.S. at 631–32.

[237] *Id.*

Under longstanding international law, governments during wartime issued letters of marque and reprisal.[238] The letters authorized privately owned ships, *privateers*, to attack and capture the military or commercial ships of the enemy.[239] The captured property (*prizes*) would be divided among the privateer's crew and owners, according to contract. Typically, prizes were put up for auction in a friendly port. A captured ship might be kept by the privateers, or sold.

Naval combat at the time used cannon fire, so anyone issued a letter of marque or reprisal would have to buy a significant number of cannons to turn his civil vessel into a warship for offensive use.

In the American Revolution, the Massachusetts Bay Colony was the first to issue letters of marque and reprisal, in November 1775.[240] The Continental Congress followed suit later that month.[241]

During the war, the number of American privateers far exceeded the combined number of warships of the Continental Navy and the State naval militias. Every privateer, by definition, was armed at private expense.[242]

Operating up and down the Atlantic seaboard, in the British West Indies, and even off the West African coast, American privateers were rarely strong enough to engage a British navy warship. Instead, they massively damaged

---

[238] To be precise, a letter of marque authorizes the holder to enter enemy territory. A letter of reprisal authorizes the holder to transport a captured prize to the holder's nation.

Cases on letters of marque and reprisal include Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1800); Bas v. Tingy, 4 U.S. (4 Dall.) 37 (1800) (Quasi-War with France); Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116 (1812); The Thomas Gibbons, 12 U.S. (8 Cranch) 421 (1814) (War of 1812); Prize Cases, 7 U.S. (2 Black) 635 (1862) (Civil War).

For legal history, a leading survey is Theodore M. Cooperstein, *Letters Of Marque And Reprisal: The Constitutional Law And Practice Of Privateering*, 40 J. MAR. L. & COM. 221 (2009) (including a thorough bibliography of authorities).

[239] *See* ERIC J. DOLIN, REBELS AT SEA: PRIVATEERING IN THE AMERICAN REVOLUTION (2022). Capturing a military ship happened only rarely. A privateer had a much better chance of outgunning an enemy merchant ship.

[240] An Act & Resolve for Encouraging the Fixing out of Armed Vessels, Mass. Gen. Ct., Nov. 1, 1775; DOLIN at 11.

[241] 3 J. Cont. Cong. 373 (Nov. 25, 1775); 4 J. Cont. Cong. 229-30 (Mar. 23. 1776).

[242] Acquiring at private expense was achieved by purchase in the United States, often with shareholder financing, or by seizure from enemy vessels.

Privateers frequently sought investors for outfitting a ship, in exchange for a share of the prize. Among such investors were George Washington and Robert Morris. *See* FORREST MCDONALD, WE THE PEOPLE 38, 43 (1968) (Washington); Francis R. Stark, *The Abolition of Privateering and the Declaration of Paris*, in 8 STUDS. IN HIST., ECON. & PUB. L. 343 (1897) (Morris).

British commercial shipping. The captured prizes—including gunpowder, firearms, and silver—were crucial to the American war effort.[243] The privateers did not win the war by themselves; the war could not have been won without them.[244]

The U.S. Constitution grants Congress the powers to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water."[245] The congressional power is predicated on the existence of ships that can be outfitted with privately-purchased cannon, and of small arms for seamen, such as firearms and swords.

Wartime privateering aside, cannons were outfitted on commercial ships for protection against pirates. A peacetime 1789 advertisement in Philadelphia touted a store "where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice."[246] The ad was published again in 1799.[247] In 1787, Paul Revere, already famous as a silversmith, opened an iron and brass foundry and copper mill that soon went into the business of casting bells and cannons.[248]

---

[243] DOLIN at xix.

[244] In the words of Secretary of the Navy John Lehman (1981–87):

> From the beginning of the American Revolution until the end of the War of 1812, America's real naval advantage lay in its privateers. It has been said that the battles of the American Revolution were fought on land, and independence was won at sea. For this we have the enormous success of the American privateers to thank even more than the continental Navy.

JOHN LEHMAN, ON SEAS OF GLORY, HEROIC MEN, GREAT SHIPS, AND EPIC BATTLES OF THE AMERICAN NAVY 41–42 (New York: The Free Press, 2001).

[245] U.S. CONST., art. I, § 8. Pursuant to the text, the power to grant such letters lies in the federal legislative branch, not the executive, although the former may delegate to the latter. *See* William Young, *A Check on Faint-Hearted Presidents: Letters of Marque and Reprisal*, 66 WASH. & LEE L. REV. 895, 905–06 (2009).

A unified national approach to international war being necessary, the Constitution restricts State international warfare, including issuing letters of marque and reprisal. U.S. CONST., art. I, § 10.

[246] Edward Pole, *Military laboratory, at No. 34, Dock street near the Drawbridge, Philadelphia: where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice, with every species of military store*. Phil., 1789, https://www.loc.gov/item/rbpe.1470090a/.

[247] GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY ADVERTISER, July 1, 1799, p.2, https://chroniclingamerica.loc.gov/lccn/sn83025881/1799-07-01/ed-1/seq-2/.

[248] *See Revere's Foundry & Copper Mill*, The Paul Revere House, https://www.paulreverehouse.org/reveres-foundry-copper-mill/.

The freedom Americans always enjoyed to possess the arms of one's choosing was reflected in Ira Allen's defense when he was seized by British forces in 1796 while transporting 20,000 muskets and 24 "field pieces" (cannons and other artillery) from France to America. Allen said the arms were for Vermont's militia, whereas the British suspected he planning to arm a Canadian revolt against the British. He was prosecuted in Britain's Court of Admiralty. At trial, the idea of one individual possessing 20,000 arms was received with skepticism. Allen retorted that in America, "[a]rms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[249] The arms were restored to Allen.[250]

## G. Overview

The Revolution had started when Americans resisted with arms the Redcoats' attempt to confiscate arms at Lexington and Concord on April 19, 1775. Before that, to effectively disarm the Americans, the British had banned the import of firearms and gunpowder into the colonies,[251] prevented Americans from accessing arms stored in town magazines,[252] and confiscated

---

[249] IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403–04 (1798).

[250] *Id.*

[251] King George III imposed an embargo on arms and gunpowder imports on October 19, 1774. 5 ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES, A.D. 1766-1783, at 401 (Burlington, Can.: TannerRitchie Pub., 2005) (James Munro & Almeric Fitzroy eds., 1912). Secretary of State Lord Dartmouth sent a letter that day "to the Governors in America," announcing "His Majesty's Command that [the governors] do take the most effectual measures for arresting, detaining, and securing any Gunpowder, or any sort of arms and ammunition, which may be attempted to be imported into the Province under your Government. . . ." Letter from Earl of Dartmouth to the Governors in America, Oct. 19, 1774, *in* 8 DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 309 (1857). The order, initially set to expire after six months, was "repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783." David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297 (2012).

[252] For example, Massachusetts's Royal Governor Thomas Gage "order'd the Keeper of the Province's Magazine not to deliver a kernel of powder (without his express order) of either public or private property. . . ." JOHN ANDREWS, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON 19–20 (Winthrop Sargent ed., 1866); *id.* at 39 ("a Guard of soldiers is set upon the Powder house at the back of ye. Common, so that people are debar'd from selling their own property.");

arms and ammunition.[253] During the Revolution the British government devised a plan for the permanent disarmament of the Americans after an American surrender.[254]

Naturally, after facing the threat of disarmament and thus certain destruction, America's Founders were extremely protective of the right to arms. Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787.[255] Instead, the discussions about arms during the

---

Letter from Thomas Gage to Earl of Dartmouth, Nov. 2, 1774, *in* 1 AMERICAN ARCHIVES, 4th ser., at 951 (Peter Force ed., 1843) (Gage stating that he issued "an order to the Storekeeper not to deliver out any Powder from the Magazine, where the Merchants deposit it.").

[253] *See* O.W. Stephenson, *The Supply of Gunpowder in 1776 in* 30 THE AMERICAN HISTORICAL REVIEW 272 (J. Franklin Jameson ed., 1925) ("Within a few hours of the time when the minute-men faced the redcoats on Lexington green and at Concord bridge, Governor Dunmore, down in Virginia, laid hold of the principal supplies in the Old Dominion."); Brown, *supra*, at 298 ("the American Revolution was nearly precipitated in Virginia on the night of April 20–21 [1775], for in Williamsburg Gov. Dunmore had ordered the Royal Marines to remove the colony gunpowder supply from the magazine. As in Massachusetts the plan was discovered and the militia called to arms. . . . Lord Dunmore . . . placated the irate populace by making immediate restitution for the powder."). The British had wanted to confiscate arms door-to-door, but Governor Gage deemed it too dangerous a proposition. Extract of a Letter from Governor Gage to the Earl of Dartmouth, Dec. 15, 1774, *in* 1 AMERICAN ARCHIVES, *supra* note 252, 4th. Ser., at 1046 ("Your Lordship's idea of disarming certain Provinces, would doubtless be consistent with prudence and safety; but it neither is or has been practicable, without having recourse to force, and being master of the Country.").

[254] Colonial Under Secretary of State William Knox presented the plan to disarm Americans:

> The Militia Laws should be repealed and none suffered to be re-enacted, & the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence.

William Knox, *Considerations on the Great Question, What Is Fit to be Done with America, Memorandum to the Earl of Shelburne, in* 1 SOURCES OF AMERICAN INDEPENDENCE: MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 176 (Howard Peckham ed., 1978).

[255] As far as we know, only one person has ever claimed the contrary. That person is President Joseph Biden, who has repeatedly stated that when the Second Amendment was ratified, people could not possess cannons. He has repeated the claim despite repeated debunking by factcheckers. *See* Glenn Kessler, *Biden's False Claim that the 2nd Amendment*

ratification of the Constitution and the Bill of Rights centered on ensuring that the people had enough firepower to resist a tyrannical government. There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.

Americans' hostility to any limit on their ability to resist a tyrannical government was demonstrated by their response to a Pennsylvania order—issued while the States were debating the Constitution—directing lieutenants of the militia "to collect all the public arms" to "have them repaired" and then reissued.[256] "Public arms" were firearms owned by a government and given to militiamen who could not afford to purchase a firearm themselves.[257]

Pennsylvanians fiercely opposed the recall. Even though militiamen were free to acquire whatever personal arms they could afford, they denounced the order as "a temporary disarming of the people."[258] They suggested that "our Militia . . . may soon be called to defend our sacred rights and privileges, against the despots and monarchy-men" who supported the order.[259]

Because "the people were determined not to part with" and "refused to deliver up the arms," the Pennsylvania government "cancelled the order."[260] If the people threatened armed resistance to the government's attempt to temporarily recover its own arms, an attempt to ban any privately owned arms would have been met with even greater opposition. [261]

---

*Bans Cannon Ownership*, WASHINGTON POST, June 28, 2021; D'Angelo Gore, *Biden Repeats False Claims at Gun Violence Meeting*, FACTCHECK.ORG, Feb. 7, 2022, https://www.factcheck.org/2022/02/biden-repeats-false-claims-at-gun-violence-meeting/; Louis Jacobson, *Joe Biden's dubious claim about Revolutionary War cannon ownership*, POLITIFACT, June 29, 2020, https://www.politifact.com/factchecks/2020/jun/29/joe-biden/joe-bidens-dubious-claim-about-revolutionary-war-c/.

[256] 33 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 739 (John Kaminski et al. eds., 2019).

[257] David B. Kopel & Stephen P. Halbrook, *Tench Coxe and the Right to Keep and Bear Arms in the Early Republic*, 7 WM. & MARY BILL RTS J. 347 (1999) (describing public arms programs of the Jefferson and Madison administrations).

[258] An Old Militia Officer of 1776, PHILADELPHIA INDEPENDENT GAZETTEER, Jan. 18, 1788, *in* 33 DOCUMENTARY HISTORY, *supra* note 256, at 740.

[259] PHILADELPHIA FREEMAN'S JOURNAL, Jan. 23, 1788, *in* 33 DOCUMENTARY HISTORY, *supra* note 256, at 741.

[260] PHILADELPHIA INDEPENDENT GAZETTEER, Apr. 30, 1788, *in* 34 DOCUMENTARY HISTORY, *supra* note 256, at 1266.

[261] Pennsylvania's experience is relevant to modern-day confiscation laws. According to *Bruen*, "if some jurisdictions actually attempted to enact analogous regulations during this

Firearms and cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Repeating arms and cannons were freely owned by those who could afford them. The historical record up to 1800 provides no support for general prohibitions on any type of arms or armor.

## III. Nineteenth Century Advances in Arms

This Part describes how the nineteenth century brought the greatest advances in firearms before or since. The century began with the single-shot muzzleloading blackpowder muskets and ended with semiautomatic pistols employing detachable magazines and centerfire ammunition with modern smokeless powder. Then Part IV will examine the very small lawmaking response to the immense technological changes.

Here in Part III the technological changes are summarized. Many of the advances detailed below had already been invented long before 1791, as described in Parts I.B. and II.D. But firearms incorporating these advances were quite expensive. Compared to single-shot firearms, repeating firearms require closer fitting of their more intricate parts. As of 1750, firearms manufacture was a craft industry.[262] Firearms were built one at time by a lone craftsman or perhaps in a workshop.[263] The labor cost of building an advanced firearm was vastly higher than for a one-shot musket, rifle, or handgun.[264]

Advanced firearms were made possible by the American industrial revolution. That revolution created machine tools—tools that can make uniform parts and other tools.[265] Thanks to machine tools, the number of

---

timeframe [the eighteenth century], but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality. 142 S. Ct. at 2131.

[262] Johnson et al., *supra* note 16, at 2210. Some of this Part is based on *The Evolution of Firearms Technology from the Sixteenth Century to the Twenty-first Century*, which is Chapter 23 in Johnson et al., *supra* note 16. Much more detail about the technological developments described in this Part is presented in that chapter, available online at http://firearmsregulation.org/www/FRRP3d_CH23.pdf.

[263] *Id.*

[264] *Id.* at 2199.

[265] *Id.* at 2208–14.

human labor hours to manufacture advanced firearms plunged, while machinists prospered.[266]

### A. James Madison and James Monroe, the founding fathers of modern firearms

U.S. Representative James Madison is well-known as the author of the Second Amendment and the rest of the Bill of Rights. What is not well-known is how his presidency put the United States on the path to mass production of high-quality affordable firearms.

Because of weapons procurement problems during the War of 1812, President Madison's Secretary of War James Monroe, who would succeed Madison as President, proposed a program for advanced weapons research and production at the federal armories, which were located in Springfield, Massachusetts, and Harpers Ferry, Virginia. The Madison-Monroe program was to subsidize technological innovation.[267] It was enthusiastically adopted with the support of both the major parties in Congress: the Madison-Monroe Democratic-Republicans, and the opposition Federalists.[268] Generous federal arms procurement contracts had long lead times and made much of the payment up-front, so that manufacturers could spend several years setting up and perfecting their factories.[269] The program succeeded beyond expectations, and helped to create the American industrial revolution.

### B. The American system of manufacture

The initial objective was interchangeability, so that firearms parts damaged in combat could be replaced by functional spare parts.[270] If there are

---

[266] *See* Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870, at 217 app'x A, tbl. 1 (1948) (from 1850 to 1940, average annual wages in the arms industry always exceeded wages in overall U.S. industry, sometimes by large margins).

[267] Ross Thomson, Structures of Change in the Mechanical Age: Technological Innovation in the United States 1790-1865, at 54-59 (2009).

[268] Johnson et al., *supra* note 16, at 2209.

[269] *Id.*

[270] Thomas Jefferson had previously attempted to bring interchangeable gun parts to America after meeting with French inventor Honoré Blanc, who was developing such a system, While ambassador to France in 1785, Jefferson wrote to U.S. Secretary of Foreign Affairs (under the Confederation government) John Jay about the meeting:

two damaged firearms found after a battle, and their parts could be combined into one functional firearm, that was the first step. After that would come higher rates of factory production. And after that, it was hoped, production at lower cost than artisanal production. Achieving these objectives for the more intricate and closer-fitting parts of repeating firearms would be even more difficult.

To carry out the federal program, the inventors associated with the federal armories first had to invent machine tools. Consider for example, the wooden stock of a long gun. The back of the stock is held against the user's shoulder. The middle of the stock is where the action is attached. (The action is the part of the gun containing the moving parts that fire the ammunition.) For many guns, the forward part of the stock would contain a groove to hold the barrel.

---

> An improvement is made here in the construction of muskets, which it may be interesting to Congress to know. . . . It consists in the making every part of them so exactly alike, that what belongs to any one, may be used for every other musket in the magazine. . . . Supposing it might be useful to the United States, I went to the workman; he presented me the parts of fifty locks taken to pieces, and arranged in compartments. I put several together myself, taking pieces at hazard as they came to hand, and they fitted in the most perfect manner. The advantages of this, when arms need repair, are evident.

Letter from Thomas Jefferson to John Jay, Aug. 30, 1785, *in* 1 MEMOIRS, CORRESPONDENCE, AND PRIVATE PAPERS, OF THOMAS JEFFERSON 299 (Thomas Jefferson Randolph ed., 1829). Jefferson also wrote to Patrick Henry and Henry Knox about Blanc. 8 THE PAPERS OF THOMAS JEFFERSON 455 (Julian P. Boyd ed., 1953) (1990 3d printing); 9 *id.* at 214; 15 *id.* at 421–43, 454–55. In 1801, President Jefferson recounted his experience with Blanc to James Monroe, while expressing hope for Eli Whitney's plan for interchangeable gun parts:

> mr Whitney . . . has invented moulds & machines for making all the peices of his locks so exactly equal, that take 100 locks to peices & mingle their parts, and the hundred locks may be put together as well by taking the first peices which come to hand. this is of importance in repairing, because out of 10. locks e.g. disabled for the want of different peices, 9 good locks may be put together without employing a smith. Leblanc in France had invented a similar process in 1788. & had extended it to the barrel, mounting & stock. I endeavored to get the US. to bring him over, which he was ready for on moderate terms. I failed & I do not know what became of him.

Letter from Thomas Jefferson to James Monroe, Nov. 14, 1801, *in* 35 THE PAPERS OF THOMAS JEFFERSON 662 (Barbara B. Oberg ed., 2008).

Making a stock requires many different cuts of wood, few of them straight. The artisanal gunmaker would cut with hand tools such as saws and chisels. Necessarily, one artisanal stock would not be precisely the same size as another.

To make stocks faster and more uniformly, Thomas Blanchard invented fourteen different machine tools. Each machine would be set up for one particular cut. As the stock was cut, it would be moved from machine to machine. By mounting the stock to the machine tools with jigs and fixtures, a manufacturer could ensure that each stock would be placed in precisely the same position in the machine as the previous stock. The mounting was in relation to a bearing — a particular place on the stock that was used as a reference point. To check that the various parts of the firearm, and the machine tools themselves, were consistent, many new gauges were invented.[271] What Blanchard did for stocks, John H. Hall, of the Harpers Ferry Armory, did for other firearms parts.

Hall shipped some of his machine tools to Simeon North, in Connecticut. In 1834, Hall and North made interchangeable firearms. This was the first time that geographically separate factories had made interchangeable parts.[272]

Because Hall "established the efficacy" of machine tools, he "bolstered the confidence among arms makers that one day they would achieve in a larger, more efficient manner, what he had done on a limited scale. In this sense, Hall's work represented an important extension of the industrial revolution in America, a mechanical synthesis so different in degree as to constitute a difference in kind."[273]

The technological advances from the federal armories were widely shared among American manufacturers. The Springfield Armory built up a large network of cooperating private entrepreneurs and insisted that advances in manufacturing techniques be widely shared. By mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally known as "the American system of manufacture"—a system that encompassed sewing machines, and, eventually typewriters, bicycles, and automobiles.[274]

---

[271] DEYRUP, *supra* note 266, at 97–98; THOMSON, *supra* note 267, at 56–57.

[272] THOMSON, *supra* note 267, at 58; MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 212 (1977).

[273] SMITH, *supra* note 272, at 249.

[274] *See, e.g.*, DAVID R. MEYER, NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA 81–84, 252–62, 279–80 (2006).

KnifeRights MSJ App.000830

Springfield, in western Massachusetts on the Connecticut River, had been chosen for the federal armory in part because of its abundance of waterpower and for the nearby iron ore mines. Many private entrepreneurs, including Colt and Smith & Wesson, made the same choice. The Connecticut River Valley became known as the Gun Valley. It was the Silicon Valley of its times, the center of industrial revolution.[275]

### C. The revolution in ammunition

The gunpowder charge in a gun's firing chamber must be ignited by a primer. Before 1800, the primer was a small quantity of gunpowder in the gun's firing pan. The gunpowder in the firing pan was connected to the main powder charge in the firing chamber via a small opening, the touch-hole. In a flintlock, the priming powder in the firing pan is ignited by a shower of sparks from flint striking steel. In the older matchlock guns, the powder charge was ignited by the lowering of a slow-burning hemp cord to touch the firing pan. In either system, the user pressed the trigger to start the process.

Then in the 1810s, the percussion cap began to spread.[276] It used a primer made of chemical compounds, known as fulminate. The percussion cap sat on a nipple next to the firing chamber. When the user pressed the trigger, a hammer would strike the fulminate. The explosion would then ignite the gunpowder charge. Percussion ignition was faster and far more reliable than priming pan ignition.[277] Percussion cap guns "shot harder and still faster than the best flintlock ever known."[278]

Retrofitting flintlocks to convert them to percussion ignition was easy.[279] So starting in the 1810s, anyone's old flintlock from 1791 could suddenly became more powerful than any firearm that had existed in 1791.

---

[275] *Id.* at 73–103, 229–80.

[276] "[T]he percussion cap was developed as a result of Reverend Alexander Forsyth's bringing out in 1807 his detonator lock—the most important development in guns since gunpowder." 23 LEWIS WINANT, FIREARMS CURIOSA 23 (Odysseus 1996) (1955); *see* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 72 (2023). There were other systems of percussion ignition. For example, Washington, D.C., dentist Edward Maynard invented the tape primer; similar to the tapes still used today in toy cap guns. The percussion cap proved to be the best system. *See* JOHNSON ET AL. at 2215–16.

[277] J.F.C. FULLER, ARMAMENT AND HISTORY 113 (Da Capo Pr. 1998) (1945).

[278] HELD, *supra* note 20, at 171.

[279] LOCKHART at 167.

The bullets of 1791 were spheres. That is why a unit of ammunition today is still called "a round." In the early nineteenth century, conoidal bullets were invented. These are essentially the same type of bullets used today. The shape is far more aerodynamically stable, allowing longer shots with much better accuracy. The back of the bullet helped to prevent the expanding gas of the gunpowder explosion from exiting the barrel before the bullet did. As the result, the gas gave the bullet a stronger push, imparting more energy and making the bullet more powerful.[280]

In 1846, modern metallic cartridge ammunition was invented. Instead of the bullet, gunpowder, and primer being three separate items to insert into a firearm one at a time, ammunition was now a single unit, the cartridge. The bullet, gunpowder, and primer were all contained in a metal case.[281]

An initial result of the cartridge was to make breechloading firearms become very common.[282] Instead of loading from the front of the barrel (the *muzzle*), a firearm could be loaded from the back of the barrel (the *breech*), near

---

[280] JOHNSON ET AL., *supra* note 16, at 2127. For example, in the Minié ball, the base of the bullet was hollowed out. Therefore, the gunpowder explosion would force the rim to the base to expand outward to the size of the rifle bore. LOCKHART, at 178–80.

[281] GREENER, *supra* note 29, at 773; DEYRUP, *supra* note 266, at 28; HELD, *supra* note 20, at 183–84.

[282] Breechloaders had always existed, and their inherent advantage in faster reloading was obvious. The great firearms designer John M. Hall patented a breechloader in 1811 that was adopted by the U.S. Army in 1819. About 50,000 Hall Rifles were produced through the 1840s. ROY THEODORE HUNTINGTON, HALL'S BREECHLOADERS (1972). It could shoot as far as a thousand yards, at a rate of 8 or 9 shots per minute. However, before the invention of the metallic cartridge, all breechloaders, including the British Ferguson Rifle of the American War of Independence, shared a basic problem. In a muzzleloader, the opening at bottom of the barrel, near the trigger, is sealed shut by a breechblock. The barrel is open only at the muzzle. When the gunpowder charge in the barrel explodes, the breechblock at the base of the muzzle prevents gas from blowing back to the user. For a breechloader, the breechblock must be movable. The user moves the breechblock, inserts the bullet and ammunition into the empty barrel bore at the base of the muzzle, and then moves the breechblock back into place. If all goes well, the breechblock prevents any expanding gas from escaping the breech. However, the breechblock's fit on the barrel must be absolutely tight and perfect. Over time, wear and tear on a movable breechblock would weaken the seal. As a result, some gunpowder gas would escape and blow back towards the user. This could make shooting much less comfortable. The metallic cartridge solves the problem. The base of the metal shell has a wide rim that seals the bottom of the barrel. PAUL LOCKHART, FIREPOWER: HOW WEAPONS SHAPED WARFARE 173–75 (2021). The first metallic cartridge had been invented in 1812, but not until 1846 was a metallic cartridge invented that would seal (*obturate*) the breech. *Id.* at 256–57.

the trigger. Even a novice could quickly learn to shoot nine shots a minute from the single-shot breechloading Sharps' rifle, brought to market in 1850.[283]

The combination of the modern cartridge and breechloading ammunition greatly facilitated the development of repeating firearms, as will be described in the next section.

In 1866 the centerfire metallic cartridge was invented. In a rimfire (the metallic cartridge created in 1846), the primer is contained in the base of the cartridge, next to the cartridge wall. In a centerfire, the primer is contained in a small cup at the center of the base of the cartridge. The centerfire is more reliable and easier to manufacture.[284] Today, most firearms use centerfire ammunition, while the venerable rimfire is still widely used for .22 caliber or smaller guns.

A stupendous development in ammunition was the invention of a new type of gunpowder in 1884. Previously, all gunpowder had been "blackpowder," the same product the Chinese had first formulated in the 900s.[285] In the West ever since the 1400s, blackpowder had always been improving, with changes in the ratio of ingredients and refinements in the shapes of individual grains of powder.[286] Then in 1884 came white powder (a/k/a smokeless powder), with an entirely different formulation.[287] Smokeless powder burned far more efficiently, imparting much more power to bullets.[288] Firearms now shot further and with a flatter trajectory than ever before.[289] White, smokeless powder is still the gunpowder in use today, with continuing refinements.

Because lead bullets are relatively soft, they abrade from friction when being spun by the rifling as they travel down the barrel. Built-up lead residue makes the gun barrel less accurate. That problem was solved in 1882 with the invention of the jacketed bullet. A thin coating of copper or nickel on the lead bullet would keep it intact during its movement through the barrel.[290]

---

[283] *Sharps' Breech-loading Patent Rifle*, SCIENTIFIC AMERICAN, Mar. 9, 1850.

[284] *See* LOCKHART at 264.

[285] The ingredients of blackpowder are sulfur, charcoal, and saltpeter. JOHNSON ET AL., *supra* note 16, at 2126, 2225.

[286] *See, e.g.*, ARTHUR PINE VAN GELDER & HUGO SCHLATTER, HISTORY OF THE EXPLOSIVES INDUSTRY IN AMERICA (Ayer 2004) (1927).

[287] Insoluble nitrocellulose, soluble nitrocellulose, and paraffin. JOHNSON ET AL., *supra* note 16, at 2225.

[288] GREENER, *supra* note 29, at 560.

[289] *See* LOCKHART at 271–72.

[290] *See* LOCKHART at 273.

With blackpowder, the muzzle velocity of a good firearm was around 1,000 feet per second.[291] Smokeless powder promptly doubled that to about 2,000 fps. The change increased range and stopping power.[292]

### D. Advances in repeating arms

During the nineteenth century, repeating arms became some of America's most popular arms. "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[293] It was the invention of the percussion cap that made it possible for repeating firearms to become widely adopted.

The first American military contract for repeating firearms was the U.S. Navy's 1813 purchase of 200 repeating muskets and 100 repeating pistols from Joseph Chambers, who also sold firearms to the State of Pennsylvania.[294]

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."[295] "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from two to twelve times."[296] "About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle."[297] However, neither of the New York repeaters became major commercial successes.

---

[291] As a bullet travels downrange, air friction reduces velocity.

[292] The muzzle velocities of modern handguns are around 1,000 fps; modern rifles are around 2,000 to 3,000 fps.

[293] CARL P. RUSSELL, GUNS ON THE EARLY FRONTIER 91 (1957).

[294] PETERSON, TREASURY OF THE GUN, at 197.

[295] *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 ALEXANDER TILLOCH, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467 (Richard Taylor ed., 1822).

[296] *Id.* The writer added:

> As a sporting or hunting gun, its advantages are not less important. It enables the sportsman to meet a flock with twice the advantage of a double barrel gun, without any of its incumbrances, and it enables the hunter to meet his game in any emergency. The gun has been shown to many different officers of our army and navy, and has been highly approved of, and indeed no one who has seen a fair trial of its powers has ever been able to find an objection to it.

*Id.* at 468.

[297] WINANT, FIREARMS CURIOSA, *supra* note __, at 174.

**KnifeRights MSJ App.000834**

Pepperbox handguns had been around for a long time and became a mass market product starting in the 1830s.[298] These pistols had multiple barrels that could fire sequentially; four to eight barrels were most common.[299] Starting in 1847, the leading American manufacturer was Ethan Allen.[300]

"Ethan Allen was a pioneer in the transition from handmade to machine-made and interchangeable parts."[301] "The Allen pepperbox was the first American double-action pepperbox and it was a big success. . . . As quickly as the trigger could be pulled fully back, the hammer was released and the gun fired."[302] "For a dozen years and more after the Colt revolver was first made, sales of Allen's far outstripped those of Colt's."[303] "The Allens were very popular with the Forty Niners," who headed to California in 1849 for the Gold Rush.[304] "The pepperbox was the fastest shooting handgun of its day. Many were bought by soldiers and for use by state militia. Some saw service in the Seminole Wars and the War with Mexico, and more than a few were carried in the Civil War."[305] Their last use in a major engagement by the U.S. Cavalry was in an 1857 battle with the Cheyenne.[306]

The first American patent for a revolver was issued to Samuel Colt in 1836. Like pepperboxes, revolvers fire repeating rounds, but revolvers use a rotating cylinder that lines up each firing chamber, in sequence, behind a single barrel. The difference improves the balance of the gun, by reducing the front weight. The Colt revolvers were the best firearms of their time and priced accordingly.

Colt's first notable sales were to the Navy of the Republic of Texas (1839) and then to the Texas Rangers. For rapidity of fire, the ordinary single-shot

---

[298] The first pepperboxes were made with matchlock ignition. Around 1790, Henry Nock invented the "first commonly produced flintlock pepperbox, a six-barreled long gun. A Closer Look at Pepperbox Pistols, TheFirearmBlog.com, Dec. 8, 2021, https://www.thefirearmblog.com/blog/2021/12/08/wheelgun-wednesday-pepperbox-pistols/.

[299] Jack Dunlap, American British & Continental Pepperbox Firearms 148–49, 167 (1964); Lewis Winant, Pepperbox Firearms 7 (1952). An American-made 10-shot model was patented in 1849. Winant at 58. The manufacturer, Pecare & Smith, was one of five American firearms manufacturers exhibiting at the famous 1851 Crystal Palace Exhibition in London. *Id.* at 62 (So was Samuel Colt, who won a prize.)

[300] Winant at 27. He was not the same person as the Revolutionary War Vermont patriot. He was the ancestor of the twenty-first century furniture maker.

[301] Winant at 28.

[302] Winant at 28.

[303] Winant at 28.

[304] Winant at 30.

[305] Winant at 30.

[306] Winant at 30.

firearm had always been far outmatched by the ordinary bow. The 1841 Battle of Bandera Pass was a turning point in the Texas-Indian wars. A Texan with two five-shot Colt revolvers could keep up with the Comanche rate of bow fire.[307]

Colt's first big success was the Colt Navy Revolver. With one modification by the user, the Colt could be quickly reloaded by swapping out an empty cylinder for a fresh, preloaded cylinder.[308]

Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s in Europe, but pinfires had only modest sales in America.[309] The American-made Walch 12-Shot Navy Revolver had six chambers holding two rounds that fired separately. It was used in the Civil War and made its way to

---

[307] Like other Indians, the Comanche also had firearms and were highly proficient users. Like the Englishmen of 1500, the Indians were also highly proficient with the bow, which Americans were not. The heyday of English archery had ended long before the 1607 establishment of the Virginia Colony at Jamestown. An Indian raid might commence with firearms, and then transition to rapid fire from bows.

The Comanche controlled a very large area, from eastern New Mexico to East Texas. As a regional power, they were the equals and sometimes the superiors of the Spanish, Mexicans, French, English, Americans, and Texans, all of whose expansion they bottled up for many years. The Comanche economy was based on the trade of slaves (people of any race, but mainly people of other Indian tribes, who were captured in war or raids) and horses (also captured from enemies) to adjacent powers for other goods, including firearms. *See* PEKKA HÄMÄLÄINEN, THE COMANCHE EMPIRE (2008). Like the economy of other tribes, such as the Utes, who were highly successful in capturing people for trade, the Comanche economy was based on predation of humans. *See* ANDRÉS RESÉNDEZ, THE OTHER SLAVERY: THE UNCOVERED STORY OF INDIAN ENSLAVEMENT IN AMERICA (2016).

[308] The Colt Navy was a cap and ball revolver. It was loaded from the front of the cylinder. The user would pour premeasured gunpowder into a chamber from a cup. Then the user would insert the bullet and wad. The wad is a small greased cloth; it fills the empty space around the bullet, and prevents expanding gunpowder gas from escaping the muzzle before the bullet does. The powder, bullet, and the wad surrounding the bullet would be rammed into place by a hinged ramrod underneath the barrel. Next, the user would insert a percussion cap on a nipple on the back of the just-loaded cylinder chamber. Finally, the user would rotate the cylinder, to bring the next chamber into loading position. So although a cap and ball revolver could quickly fire five or six shots, reloading took a while.

As a result, users developed an expedient. In the Colt Navy, the barrel is attached to the frame of the gun by a single pin. Users would file the pin so that it was easy to remove. Then, the user could speedily detach the barrel, replace the empty cylinder with a fresh preloaded cylinder, and then put the barrel back into place and reinsert the pin. The process was slower than swapping detachable magazines today, but it allowed continuous fire with only a short pause to reload.

[309] SUPICA ET AL., supra note 202, at 48–49; WINANT, PEPPERBOX FIREARMS, *supra* note 299, at 67–70.

the western frontier, although not in large numbers.[310] In 1866, the 20-round Josselyn belt-fed chain pistol debuted. Some later chain pistols had greater capacities.[311] These models never came close to challenging conventional revolvers or pepperboxes for popularity.

The 1857 expiration of Colt's patent for its cap and ball revolvers brought new companies into the revolver business. During the Civil War, combatants used revolvers from 37 different companies.[312] In a cap and ball revolver, the bullet, gunpowder, and percussion cap must be inserted one at a time into each of the five or six firing chambers.

Smith and Wesson brought out a revolver entirely different from the Colt patent. The 1857 Smith & Wesson Model 1 was a breechloader using metallic cartridges.[313] Now, when reloading an empty firing chamber, the user only had to insert one item, not three. Smith & Wesson invented a special cartridge for the revolver: the .22 Short Rimfire. It is still in use today.[314] "The S&W factory in Springfield, Massachusetts, couldn't keep up with the demand—the new revolver and its unique cartridge were such a hit with the American public that they flew off store shelves nationwide."[315]

While repeating handguns were widely available before the Civil War, repeating long guns were not. As with most advances in technologies, the early stages saw inventions that advanced the state of knowledge but did not win commercial success. In the 1830s, the Bennett and Haviland Rifle used a chain-drive system with 12 rectangular chambers—each loaded with powder and ball—to fire 12-rounds consecutively.[316] Alexander Hall's rifle with a 15-round rotating cylinder (like a revolver) was introduced in the 1850s.[317] In 1851, Parry Porter created a rifle with a 9-shot canister magazine; it was said to be

---

[310] CHAPEL, *supra* note 208, at 188–89.

[311] WINANT, FIREARMS CURIOSA, *supra* note 297, at 204, 206.

[312] JOHN F. GRAF, STANDARD CATALOGUE OF CIVIL WAR FIREARMS 187–233 (2008) (20 models from Colt, plus 73 models from 36 other manufacturers).

[313] The design had been patented in 1855 by Rollin White, who licensed it to Smith & Wesson. Patent No. 12,648, *Improvement in Repeating Fire-Arms* (Apr. 3, 1855).

[314] Reloading was one round at a time. The cylinder would be rotated to a loading gate on the bottom or side of the frame. The gate would be opened, and one cartridge inserted. Then the user would rotate the cylinder so that the next chamber could be loaded.

[315] LOCKHART at 257.

[316] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

[317] FLAYDERMAN, *supra* note 317, at 713, 716.

able to fire 60 shots in 60 seconds.[318] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[319]

An 1855 alliance between Daniel Wesson (later, of Smith & Wesson) and Oliver Winchester led to a series of famous lever-action repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be fired 30 times within a minute.[320] But like the previous repeating rifles, it did not sell well.

Then came the 16-shot Henry Rifle in 1861, a much-improved version of the Volcanic. Tested at the Washington Navy Yard in 1862:

> 187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds . . . hits were made from as far away as 348 feet, at an 18-inch-square target. . . . It is manifest from the above experiment that this gun may be fired with great rapidity.[321]

"Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards."[322]

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862."[323] Indeed, the most famous testimonial for the Henry came from Captain James M. Wilson of the 12th Kentucky Cavalry, who used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it [the Henry rifle] to be particularly useful not only in regard to its fatal precision, but also in the number of shots

---

[318] *A New Gun Patent*, Athens (Tenn.) Post, Feb. 25, 1853, http://bit.ly/2tmWUbS (reprinted from N.Y. Post); 2 Sawyer, *supra* note 87, at 147.

[319] Winant, Firearms Curiosa, *supra* note 297, at 208.

Before the invention of the metallic cartridge, every repeating firearm had a risk of chain fire. The gunpowder fire might leak to another primer and set it off. In the worst case, every round would be ignited. The result could destroy the gun and injure the user. *See* Lockhart at 258. The buyers of repeating firearms before the metallic were balancing risks: the risk of a chain fire versus the risk of not having a second, third, or additional shot available in an emergency.

[320] Harold F. Williamson, Winchester: The Gun that Won the West 26–27 (1952).

[321] R.L. Wilson, Winchester: An American Legend 11–12 (1991).

[322] Peterson, The Treasury of the Gun, *supra* note 38, at 240.

[323] *Id.* at 11.

held in reserve for immediate action in case of an overwhelming force."[324] Soon after, Wilson's entire command was armed with Henry rifles.[325]

About 14,000 Henrys were produced, by the Henry factory operating as fast as it could.[326] Building a rifle that complicated took extra time. Over 8,000 were purchased by Union soldiers for personal use. The War Department bought about 1,700.

Deployed in far larger numbers during the war—over 100,000—was the 7-shot Spencer repeating rifle.[327] The internal magazine was located in the rifle's buttstock, and was fast to reload with patented tubes that poured in 7 fresh rounds of ammunition.[328] The most common use of Spencers was by cavalrymen, who had always been first in line for repeating firearms. President Lincoln, a gun enthusiast, test-fired a Spencer on the White House lawn and was impressed. A Spencer could fire 20 aimed shots per minute.[329]

The Union's repeating rifles were supplied by private businesses operating at maximal capacity. If the U.S. government's own factories had been able to produce repeaters like the Henry or Spencer for the entire infantry, the war would have been much shorter. But the federal factories did not have the capacity for mass production of repeaters. They were struggling just to produce the necessary huge quantities of the infantry rifle that had been the state of the art in the late 1840s: the single-shot muzzleloading rifled musket. It was not until two years into the war when all the infantry were supplied with that arm. As for the Confederacy, none of its armories had the capability of producing anything as complex as a Spencer or Henry.[330]

After the Confederacy surrendered at Appomattox, the defeated Confederates were allowed to take their firearms home. As with the Union forces, some of the Confederates' arms had been brought to service by individual soldiers, and some had been supplied by their armies' ordnance

---

[324] H.W.S. Cleveland, HINTS TO RIFLEMEN 181 (1864).

[325] Andrew L. Bresnan, *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml.

[326] GRAF, at 101.

[327] JOHN F. GRAF, STANDARD CATALOGUE OF CIVIL WAR FIREARMS 112, 171–72 (2008).

[328]    *See     Blakeslee     cartridge     box,*     CivilWar@Smithsonian, https://civilwar.si.edu/weapons_blakeslee.html (patent no. 45,469, Dec. 20, 1864).

[329] LOCKHART at 259.

[330] LOCKHART at 260–62. "The limitations of the factory economy, and not some kind of stodgy, conservative resistance to new technology, were what would delay the large-scale use of repeating rifles in combat." *Id.* at 262.

departments. The Union soldiers of course took home the guns that they had bought; as for the arms that had been issued by the government, Union soldiers were allowed to buy them for an eight-dollar deduction from their monthly pay.

Shortly after the Civil War, the Henry evolved into the 18-shot Winchester Model 1866, which was touted as having a capacity of "eighteen charges, which can be fired in nine seconds."[331] Another advertisement contained pictures of Model 1866 rifles underneath the heading, "Two shots a second."[332] "[T]he Model 1866 was widely used in opening the West and, in company with the Model 1873, is the most deserving of Winchesters to claim the legend 'The Gun That Won the West.'"[333] Over 170,000 Model 1866s were produced, many of them sold to foreign militaries who recognized the firearm as a game-changer. Then came the Winchester Model 1873, whose magazine ranged from 6 to 25.[334] Over 720,000 Model 1873s were produced by 1919.[335]

Separate from the Winchester and Henry patents was the 1873 Evans Repeating Rifle. With an innovative rotary helical magazine, it held 34 rounds. The Evans had some commercial success—about 12,000 made—although far from the level of the Winchesters.[336] All of the Winchesters and Henrys are still made today.[337]

The Henry rifle had appeared during the Civil War, and its improved version, the 1866 Winchester, during Reconstruction, in the same year that Congress sent the Fourteenth Amendment to the States for ratification. During Reconstruction, no government in the United States attempted to prohibit the possession of any particular type of firearm. Rather, the major gun control controversy of the time was efforts to prevent the freedmen in the former Confederate states from having firearms at all, or only having them

---

[331] LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866-1894, at 128 (1985). The Winchester 1866 was made in a variety of calibers. Only the smallest caliber could hold 18 rounds.

[332] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 234–35.

[333] *Id.* at 22. The gun was a particularly strong seller in the West. R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND 34 (1991).

[334] ARTHUR PIRKLE, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876, at 107 (2010).

[335] FLAYDERMAN, *supra* note 317, at 306–09.

[336] DWIGHT DEMERITT, MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997); FLAYDERMAN, *supra* note 317, at 694.

[337] The Henry is made by Henry Repeating Arms, in Wisconsin. The Winchesters are made by Uberti, an Italian company that specializes in reproductions of historic guns. The modern Henrys and Ubertis are built for modern ammunition and calibers.

with a special license.[338] These restrictions were rebuffed by the Second Freedmen's Bureau Act, the Civil Rights Act, and then the Fourteenth Amendment.[339]

The final quarter of the nineteenth century saw more iconic Winchesters, namely the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John Wayne.[340] These arms had a capacity of 15 rounds.[341] Over a million were produced from 1892 to 1941.[342]

The first commercially successful repeating long guns, the Henrys and Winchesters, had been lever actions. After firing one round, the user moves a lever down and then up to eject the empty metal case and reload a fresh cartridge into the firing chamber. Pump action guns came next; to eject and reload, the user pulls and then pushes the sliding fore-end of the gun, located underneath the barrel. The most famous pump-action rifle of the nineteenth century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[343]

In bolt action guns, discussed below, the user moves the bolt's handle in four short movements: up, back, forward, down. For semiautomatic rifles, no manual steps are needed to eject the empty shell and reload the next cartridge. The semiautomatic can be fired as fast as the user can press the trigger. Each press of the trigger fires one new shot. The Girardoni rifle of the Founding Era had a similar capability, although its internal mechanics were not the same as a semiautomatic.[344]

Meanwhile, revolvers kept getting better. The double-action revolver allows the user to shoot as fast as he or she can press the trigger. In the earlier, single-action revolvers, the user first had to cock the hammer with the thumb.[345] The first double-action revolver was invented in England in 1851, but it was expensive and did not make much impact in America.[346] Double-action

---

[338] *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2008).

[339] *Id.* at 773–75.

[340] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN.

[341] *Id.*

[342] FLAYDERMAN, *supra* note 317, at 307–12.

[343] *Id.* at 122. Pump action guns are also called slide action.

[344] For the Girardoni, the user had to tip the rifle slightly to roll a new bullet into place.

[345] The most common American pepperboxes, by Ethan Allen, had been double-action. *See* text at note __.

[346] *Revolver: Double Action Revolver*, FIREARMS HISTORY, TECHNOLOGY & DEVELOPMENT, July 1, 2010, http://firearmshistory.blogspot.com/2010/07/revolver-double-action-revolver.html.

revolvers in America took off with the 1877 introduction of three models by Colt.

The other improvement was fast reloading. As described above, in the early revolvers the five or six chambers in a cylinder had to be reloaded one chamber at a time. For the Colt Navy revolver, there was a work-around that allowed quickly removing an empty cylinder and replacing it with a preloaded one.[347]

More straightforward were revolver improvements that allowed the user to access the entire back side of the cylinder at once. The first top-break revolver was the 1870 Smith & Wesson Model 3. Releasing a hinge made the cylinder and barrel fall forward, so that all chambers were exposed for reloading. Just as fast to reload, and sturdier, was the 1889 Colt Navy with its swing-out cylinder. Virtually all modern revolvers are swing-out. The user presses a knob that releases the cylinder to swing out from the revolver (usually to the left of the frame), so that all six chambers are exposed at once.

In the early revolvers, the user had to rotate the cylinder before adding each round. With a top-break or the swing-out, the user could quickly drop in one round after another.

With a simple accessory, users could drop in all six rounds at once. The first speedloader for a revolver was patented in 1879. A revolver speedloader holds all 6 (or 5) fresh cartridges in precise position so that they can be dropped into an empty cylinder all at once. With practice, the speedloader is a fast reload, although not as fast as swapping detachable magazines.

As described above, rifles with tubular magazines—such as 22-shot Girardoni or the 7-shot Spencer—had their own speedloaders; the rifle speedloaders were precisely-sized tubes to pour in a new load of ammunition.

As for detachable box magazines, the first one was invented in 1862,[348] but they did not catch on until the advent of semiautomatic firearms, beginning in the last fifteen years of the nineteenth century.

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[349] Mannlicher introduced new models in 1891, 1893, and 1895.[350] Semiautomatic handguns before the turn of the century included

---

[347] *See* text at note ___.

[348] The 1862 model was the 10-round Jarre harmonica pistol. WINANT, CURIOUSA, at 244–45. As the name implied, the magazine stuck out horizontally from the side of the firing chamber, making the handgun awkward to carry. SUPICA ET AL., at 33.

[349] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[350] JOHN WALTER, RIFLES OF THE WORLD 568–69 (3rd ed. 2006).

KnifeRights MSJ App.000842

the Mauser C96,[351] Bergmann Simplex,[352] Borchardt M1894,[353] Borchardt C-93,[354] Fabrique Nationale M1899,[355] Mannlicher M1896 and M1897,[356] Luger M1898 and M1899,[357] Roth-Theodorovic M1895, M1897, and M1898,[358] and the Schwarzlose M1898.[359] The ones that became major commercial successes were the Mauser and the Luger, both of which would sell millions in the following decades, to militaries and civilians. The Luger used a detachable magazine; the original Mauser's internal magazine was reloaded with stripper clips.

American-made semi-automatic handguns, rifles, and shotguns were just around the corner, to be introduced in the early years of the twentieth century.[360]

### E. Continuing advances in firearms were well-known to the Founders

While the Founders could not foresee all the specific advances that would take place in the nineteenth century, the Founders were well aware that firearms were getting better and better.

Tremendous improvements in firearms had always been part of the American experience. The first European settlers in America had mainly owned matchlocks. When the trigger is pressed, a smoldering hemp cord is lowered to the firing pan; the powder in the pan then ignites the main gunpowder charge in the barrel.[361]

---

[351] DOUGHERTY, *supra* note 46, at 84.

[352] *Id.* at 85.

[353] *Springfield Armory Museum – Collection Record*, REDISCOV.COM, http://ww2.rediscov.com/spring/VFPCGI.exe?IDCFile=/spring/DETAILS.IDC,SPECIFIC=9707,DATABASE=objects.

[354] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018.

[355] *Id.*

[356] *Id.*

[357] *Id.*

[358] *Id.*

[359] *Id.*

[360] Many of the first American semiautomatics were invented by John Moses Browning, the greatest of all American firearms inventors. The semiautomatics of the twenty-first century are refinements of the work of Browning, Borchaldt, Mauser, and the other great inventors of their time.

[361] *See* text at notes ___.

*Journal of Legislation*

As described *infra*, the first firearm more reliable than the matchlock was the wheel lock, invented by Leonardo da Vinci.[362] In a wheel lock, the powder in the firing pan is ignited when a serrated wheel strikes a piece of iron pyrite.[363] The wheel lock was the first firearm that could be kept loaded and ready for use in a sudden emergency. Although matchlock pistols had existed, the wheel lock made pistols far more practical and common.[364] The wheel lock was the "preferred firearm for cavalry" in the sixteenth and seventeenth centuries.[365] The proliferation of wheel locks in Europe in the sixteenth century coincided with the homicide rate falling by half.[366]

However, wheel locks cost much more than a matchlock. Moreover, their moving parts were far more complicated than the matchlocks'. Under conditions of hard use in North America, wheel locks were too delicate and too difficult to repair. The path of technological advancement often involves expensive inventions eventually leading to products that are affordable to average consumers and are even better than the original invention. That has been the story of firearms in America.

The gun that was even better than the wheel lock, but simpler and less expensive, was the flintlock. The earliest versions of flintlocks had appeared in the mid-sixteenth century. But not until the end of the seventeenth century did most European armies replace their matchlocks with flintlocks. Americans, individually, made the transition much sooner.[367]

Indian warfare in the thick woods of the Atlantic seaboard was based on ambush, quick raids, and fast individual decision-making in combat—the opposite of the more orderly battles and sieges of European warfare. In America, the flintlock became a necessity.

Unlike matchlocks, flintlocks can be kept always ready.[368] There is no smoldering hemp cord to give away the location of the user. Flintlocks are more reliable than matchlocks—all the more so in adverse weather, although still

---

[362] *See* text at notes ___.

[363] *See* text at notes ___.

[364] *See* LOCKHART at 80.

[365] *See* LOCKHART at 80.

[366] *See* Carlisle E. Moody, *Firearms and the Decline of Violence in Europe: 1200-2010*, 9 REV. EUR. STUD. 53 (2017)

[367] *See* LOCKHART at 106.

[368] With the caveat that gunpowder is hygroscopic, and too much water could ruin the gunpowder. Hence the practice of storing a firearm on the mantel above the fireplace.

far from impervious to rain and moisture. Flintlocks are also simpler and faster to reload than matchlocks.[369]

Initially, the flintlock could not shoot further or more accurately than a matchlock.[370] But it could shoot much more rapidly. A matchlock more than a minute to reload once.[371] In experienced hands, a flintlock could be fired and reloaded five times in a minute, although under the stress of combat, three times a minute was a more typical rate.[372] Compared to a matchlock, a flintlock was more likely to ignite the gunpowder charge instantaneously, rather than with a delay of some seconds.[373] "The flintlock gave infantry the ability to generate an overwhelmingly higher level of firepower."[374]

The Theoretical Lethality Index (TLI), which will be discussed further in the next section, is a measure of a weapon's effectiveness in military combat. The TLI of a seventeenth century musket is 19 and the TLI of an eighteenth century flintlock is 43.[375] So the transition of firearm type in the American colonies more than doubled the TLI. There is no reason to believe that the American Founders were ignorant of how much better their own firearms were compared to those of the early colonists.

As described in Part II.E, founders who had served in the Continental Congress knew of Joseph Belton's 16-shot firearm.[376] Likewise, the 22-shot Girardoni rifle famously carried by Lewis & Clark was no secret, and it had been invented in 1779. As of 1785, South Carolina gunsmith James Ransier of Charleston, South Carolina, was advertising four-shot repeaters for sale.[377]

The founding generation was especially aware of one of the most common firearms of their time, the Pennsylvania-Kentucky rifle. The rifle was invented by German and Swiss immigrants in the early eighteenth century. It was

---

[369] JOHNSON ET AL., *supra* note 16, at 2189–90; GREENER, *supra* note 29, at 66–67; CHARLES C. CARLTON, THIS SEAT OF MARS: WAR AND THE BRITISH ISLES 1585-1746, at 171–73 (2011).

[370] *See* LOCKHART at 105.

[371] *See* LOCKHART at 107.

[372] *See* LOCKHART at 107–08.

[373] *See* LOCKHART at 104.

[374] LOCKHART at 107.

[375] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1984).

[376] Delegates to the 1777 Continental Congress included the two Charles Carrolls from Maryland, future Supreme Court Chief Justice Samuel Chase, John Adams, Samuel Adams, Francis Dana, Elbridge Gerry, John Hancock, John Witherspoon (President of Princeton, the great American college for free thought), Benjamin Harrison (father and grandfather of two Presidents). Francis Lightfoot Lee, a d Richard Henry Lee (hero of the *1776* musical).

[377] COLUMBIAN HERALD (Charleston), Oct. 26, 1785.

created initially for the needs of frontiersmen who might spend months on a hunting expedition in the dense American woods. "What Americans demanded of their gunsmiths seemed impossible": a rifle that weighed ten pounds or less, for which a month of ammunition would weigh one to three pounds, "with proportionately small quantities of powder, be easy to load," and "with such velocity and flat trajectories that one fixed rear sight would serve as well at fifty yards as at three hundred, the necessary but slight difference in elevation being supplied by the user's experience."[378] "By about 1735 the impossible had taken shape" with the creation of the iconic Pennsylvania-Kentucky rifle.[379]

As for the most common American firearm, the smoothbore (nonrifled) flintlock musket, there had also been great advances. To a casual observer, a basic flintlock musket of 1790 looks very similar to flintlock musket of 1690. However, improvements in small parts, many of them internal, had made the best flintlocks far superior to their ancestors. For example, thanks to English gunsmith Henry Nock's 1787 patented flintlock breech, "the gun shot so hard and so fast that the very possibility of such performance had hitherto not even been imaginable."[380]

The Founders were well aware that what had been impossible or unimaginable to one generation could become commonplace in the next. With the federal armories advanced research and development program that began in the Madison administration, the U.S. government did its best to make the impossible possible.

## F. Perspective

In the early nineteenth century, the finest maker of flintlock shotguns was Old Joe Manton of London. A "strong, plain gun" from Manton cost hundreds of dollars. By 1910, a modern shotgun, "incomparably superior, especially in fit, balance, and artistic appearance" to Manton's cost about ten dollars.[381]

Military historian Trevor Dupuy created a "Theoretical Lethality Index" (TLI) to compare the effectiveness of battlefield weapons from ancient times through the twentieth century.[382] While the TLI was never intended describe weapon utility in civilian defense situations, such as against home invaders, it

---

[378] HELD, *supra* note 20, at 142.

[379] *Id.*

[380] *Id.* at 137.

[381] CHARLES ASKINS, THE AMERICAN SHOTGUN 21–22 (1910). Ten dollars in 1913 is approximately equal to $250 today. Three hundred dollars in 1913 would be over $7,000 today.

[382] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE (1984).

is a usable rough estimate for community defense situations, such as militia use. According to Dupuy, the TLI of an 18th century flintlock (the common service arm of the American Revolution) was 43.[383] The TLI of the standard service arm 112 years after the Second Amendment was ratified—the 1903 Springfield bolt-action magazine-fed rifle—is 495.[384] Dupuy did not calculate a TLI for late twentieth century firearms. Using Dupuy's formula, Kopel calculated the TLI for two modern firearms: an AR semiautomatic rifle is 640, and a 9mm semiautomatic handgun is 295.[385]

Again, the TLI has nothing to do with personal defense. An AR rifle is not always twice as good as a 9mm pistol for defense against a rapist or home invader. The modern rifle might be better or worse than the modern handgun, depending on other circumstances.

For militia utility, the 11-fold advance from the single-shot flintlock to the magazine-fed bolt action rifle of 1903 is enormous. The founding generation did not precisely predict the Springfield bolt action or its 11-fold improvement over the long guns of the founding period. The Founders did do all they could to make that improvement take place.

---

[383] *Id.* at 92.

[384] *Id.* The previous U.S. military standard rifle was the 1892 bolt action Krag–Jørgensen. Its underperformance in the 1898 Spanish-American War led the War Department to start looking for something better. *See* LOCKHART at 279–80.

The British had adopted the bolt action magazine-fed Lee-Metford rifle in 1888, and the Germans the Mauser Gewehr 98 in 1898. The 1903 Springfield was essentially a modified Mauser, for which the U.S. government had to pay damages to settle a patent suit. The Springfield 1903 stayed in service through the Vietnam War, although it lost is role as the standard rifle during World War II to the semiautomatic M1 Garand. A huge number of twentieth and twenty-first century American hunting rifles are variants of the Springfield; many use the Springfield's famous .30-'06 cartridge. It is "the most flexible, useful, all-around big game cartridge available to the American hunter." CARTRIDGES OF THE WORLD ___ (17th ed. 2022).

[385] David Kopel, *The Theoretical Lethality Index is useful for military history but not for gun control policy*, REASON.COM/VOLOKH CONSPIRACY, Nov. 1, 2022.

A modern mid-power handgun, such as 9mm, is far superior to a flintlock long gun of the late 1700s in reliability and rate of fire. But handguns have much shorter barrels than long guns. As a result handguns, even the best modern ones, have lesser range than rifles. While the difference usually does not matter for personal defense, longer range is often very important in military combat, such as militia use. Hence the modern handgun's rating far below modern rifles in the combat-oriented TLI.

As firearms historian Robert Held wrote in 1957, "the *history* of firearms" came to an end in the late nineteenth century.[386] Although manufacturing quality has always been improving, design refinements continue, and ergonomics are the better than ever, in the twentieth century there were no major innovations in firearms. For the average citizen, the nineteenth century brought in the revolver action, the lever action, the pump action, and the semiautomatic action. Those are still the types of firearms that are most common today.[387] The firearms you can own today are better-manufactured and more affordable versions of types that were introduced before 1900.

The big exception is for optics, thanks to lasers (now broadly affordable), high-power scopes, and handheld computers integrated with scopes, for long range hunting.

During the nineteenth century, bans on particular types of firearms were rare. As will be described in the next Part, there were four state statutes that aimed at particular firearms. Three of them covered handguns, old and new; one of them aimed at repeating rifles.

---

[386] HELD, *supra* note 20, at 186 ("Although the age of firearms today thrives with ten thousand species in the fullest heat of summer, the *history* of firearms ended between seventy and eighty years ago. There has been nothing new since, and almost certainly nothing will come hereafter."). According to Held, any modern bolt-action is "essentially" an updated version of the Mauser bolt-actions of the 1890s or the Mannlicher bolt-actions of the 1880s. "All lever-action rifles are at heart Henrys of the early 1860s," and all semi-automatics "descend from" the models of the 1880s. *Id.* at 185.

[387] Also still common today are firearms that were typical in the eighteenth century and before: single-shot and double-barrel (2-shot) guns.

The automatic firearm—what is commonly called a machine gun—was invented by Hiram Maxim in 1884. During the nineteenth century, it had strong sales to militaries, except in the United States. There, the military was mainly a "frontier constabulary." Unlike France, Germany, and other European states, the United States was not engaged in a arms race with nearby rivals that might invade. Maxim contacted American firearms manufacturers with offers to license his machine gun system for their models. He was universally rebuffed, sometimes with colorful language. The first and only machine gun marketed to American consumers was the Thompson submachinegun, starting in 1920. In the consumer market, it was a failure. The gun was popular with criminals, especially bootleggers, and had some sales to law enforcement. The National Firearms Act of 1934 followed the lead of several state laws starting in the mid-1920s, and imposed a stiff tax and registration system on machine guns. *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN (1986),

The Thompson finally found a constructive role in World War II, where it was widely issued to American and British special forces, such as paratroopers.

## IV. FIREARMS BANS IN THE 19TH CENTURY

This Part describes bans on particular types of firearms in the nineteenth century. The discussion also notes some Bowie knife legislation that was enacted along with some of the handgun laws. Bowie knives will be discussed in much more detail in Part V.

### A. Georgia ban on handguns, Bowie knives, and other arms

Between 1791 and the beginning of the Civil War in 1861, there was one law enacted against acquiring particular types of firearms. An 1837 Georgia statute made it illegal for anyone "to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere" any:

> Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks,[388] sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.[389]

Horse pistols were the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional.[390] The court explained that the Second Amendment stated an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to

---

[388] A fighting knife originally created in Scotland. HAROLD L. PETERSON, DAGGERS & FIGHTING KNIVES OF THE WESTERN WORLD 60 (1968).

[389] 1837 Ga. Laws 90, sec. 1. Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

[390] Nunn v. State, 1 Ga. 243 (1846).

violate the right.[391] For all the weapons, including handguns, the ban on concealed carry was upheld, while the sales ban, possession ban, and open carry ban were held unconstitutional.[392] The U.S. Supreme Court's 2008 *District of Columbia v. Heller* extolled *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause."[393] *Nunn* was a leader among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement.[394]

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, cavalrymen, etc. These big and well-made guns were already possessed in quantity by many former Confederate soldiers. The big handguns were more expensive than smaller pistols. Although some ordinary Confederate infantrymen did have handguns, many infantrymen had only long guns.

Because officers and cavalrymen tended to come from the upper strata of society, the effect of the 1879 Tennessee law was to make new handguns unaffordable to poor people of all races. The vast majority of the former slaves were poor, and so were many whites. While some Jim Crow era laws had a focused racial impact, the Tennessee statute was one of many Jim Crow laws that disadvantaged black people *and* poor whites, both of whom were viewed with suspicion by the ruling classes.

The ban on sales of small handguns was upheld under the Tennessee state constitution because it would help reduce the concealed carrying of handguns.[395]

---

[391] *Id.* at 250–51.

[392] *Id.* at 251.

[393] *Heller*, 554 U.S. at 612.

[394] *See* Jason Mazzone, *The Bill of Rights in Early State Courts*, 92 MINN. L. REV. 1 (2007); AKHIL REED AMAR, THE BILL OF RIGHTS 145–56 (1998) (discussing "the Barron contrarians").

[395] State v. Burgoyne, 75 Tenn. (7 Lea) 173 (1881).

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), and metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare."[396]

The 1868 Arkansas Constitution's right to arms, still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."[397] Similarly, the right to arms provision of the Tennessee Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime."[398]

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal.[399]

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is for only military-type arms. Dick

---

[396] Dabbs v. State, 39 Ark. 353, 357 (1885).

[397] ARK. CONST. of 1868, art. I, § 5 (retained in 1874 Ark. Const.).

[398] TENN. CONST. of 1870, art. I, § 26.

[399] Senate Journal, 1st Cong., 1st Sess. 77 (Sept. 9, 1789).

Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.[400]

### D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to twenty-first century bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners.[401] In 1901 the law was extended to also include handguns.[402] As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.[403]

The county commissioners could issue a two-year license only if the applicant posted a bond of $100.[404] The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same."[405] The bond of $100 was exorbitant. It was equivalent to over $3,400 today.[406]

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license.[407] Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did

---

[400] Dick Heller's particular handgun, a single action Buntline revolver manufactured by High Standard, is identified at Plaintiffs' Motion for Summary Judgment, Exhibit A, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004), https://web.archive.org/web/20111117110734/http://www.gurapossessky.com/news/parker/documents/SJExhibitA.pdf.

[401] 1893 Fla. Laws 71, ch. 4147.

[402] 1901 Fla. Laws 57, ch. 4928.

[403] *Id.* Codified at REVISED GENERAL LAWS OF FLORIDA, §§ 7202–03 (1927).

[404] *Id.*

[405] *Id.*

[406] Fed. Reserve Bank of Minneapolis, Consumer Price Index 1800, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800-. 2022=884.6. 1893=27. 1901= 25. Avg. = 26.

[407] State v. Parker, 57 Fla. 170, 49 So. 124 (1909).

not think the applicant needed to carry a handgun.[408] Russo argued that the licensing statute was unconstitutional.[409]

The Florida Supreme Court denied Russo's petition for a writ of mandamus.[410] According to the court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute.[411] Either way, Russo was not entitled to a writ of mandamus.[412] Pursuant to the doctrine of constitutional avoidance, the court declined to opine on the statute's constitutionality.[413]

Decades later, a case arose as to whether a handgun in an automobile glovebox fit within the statutory language, "on his person or in his manual possession."[414] By 5–2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile.[415] A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.[416] Automobile travelers "should be recognized and accorded the full rights of free and independent American citizens," said the majority.[417]

Justice Rivers H. Buford concurred with the majority.[418] His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected

---

[408] *Id.* at 171–72.

[409] *Id.*

[410] *Id.* at 173.

[411] *Id.*

[412] *Id.*

[413] *Id.* at 172–73.

[414] Watson v. Stone, 148 Fla. 516, 518 (1941).

[415] *Id.* at 522–23.

[416] *Id.* at 517–23.

[417] *Id.* at 522–23.

[418] *Id.* at 523–24.

state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925.[419] As of 1923, "His principal diversion is hunting."[420]

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."[421]

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

> I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.
>
> Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]
>
> The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.[422]

He explained the history of the exorbitant licensing laws of 1893 and 1901:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas

---

[419] 3 HISTORY OF FLORIDA: PAST AND PRESENT 156 (1923); *Justice Rivers Henderson Buford*, FLORIDA SUPREME COURT, https://supremecourt.flcourts.gov/Justices/Former-Justices/Justice-Rivers-Henderson-Buford.

[420] 3 HISTORY OF FLORIDA, *supra* note 419, at 156.

[421] Fla. Const. of 1885, art. I, § 20.

[422] *Watson*, 148 Fla. at 523–24.

a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.[423]

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades.[424] By the 1880s, manufacturing improvements had made such rifles affordable even for some poor people. Blacks were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky and Jacksonville, Florida.[425]

In sum, the nineteenth century history of firearms bans is not helpful for justifying prohibitions today on semiautomatic firearms. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is dubious. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*. Accordingly, renewed

---

[423] *Id.* at 524.

[424] *See* text at notes 320–343.

[425] In Jacksonville,

[W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

REPORT OF THE ADJUTANT-GENERAL FOR THE BIENNIAL PERIOD ENDING DECEMBER 31, 1892, at 18, *in* [Florida] *Journal of the Senate* (1893); NICHOLAS J. JOHNSON, NEGROES AND GUN: THE BLACK TRADITION OF ARMS 110–12 (2014).

*Journal of Legislation*

attention is being given to precedents involving Bowie knives, which we will examine next.

## V. Bowie Knives

Starting in 1837, many states enacted legislation about Bowie knives. Defending Maryland's ban on many modern rifles, state Attorney General Brian Frosh argues that nineteenth century laws about Bowie knives provide a historical analogy to justify the present ban.[426] Prohibitory laws for adults, however, were exceptional. As with firearms, sales bans or bans on all manner of carrying existed, but were rare.

Section A explains the definition and history of Bowie knives, and of a related knife, the Arkansas toothpick. Part B is a state-by-state survey of all Bowie knife legislation in the United States before 1900.

Among the 221 state or territorial statutes with the words "Bowie knife" or "Bowie knives," only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other knives that were well-suited for fighting against humans and animals—namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98 percent of statutes on "Bowie knives" treated them the same as various other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many other knives were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade *concealed* carry. In the nineteenth century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the U.S. Supreme Court affirmed in *Bruen*.[427]

---

[426] Supplemental Brief for Appellees, *Bianchi v. Frosh* (No. 21-1255) (4th Cir.),

[427] *Bruen*, 142 S. Ct. 2150 ("The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 221 state or territorial statutes cited in this article, 115 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

Before delving into the Bowie knife laws, here is a glossary of the arms types that often appear in the same statutes as Bowie knives:

*Bowie knife.* This was the marketing and newspaper term for old or new models of knives suitable for fighting, hunting, and utility. There was no common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length.[428]

*Arkansas toothpick.* A loose term for some Bowie knives popular in Arkansas.[429]

*Dagger.* A straight knife with two cutting edges and a handguard.

*Dirk.* Small stabbing weapons, with either one or two sharpened edges.[430] Originally, a Scottish fighting knife with one cutting edge.[431] Many nineteenth century laws forbade concealed carry of "dirks" and/or "daggers." The statutory formula of "bowie knife + (dirk and/or dagger)" covered many knives well-suited for defense or offense. The category does not include pocket knives.

*Sword-cane.* A sword concealed in a walking stick. Necessarily with a slender blade.

*Slungshot.* The original slungshot was a nautical tool, a rope looped on both ends, with a lead weight or other small, dense item at one end.[432] It helps sailors accurately cast mooring lines and other ropes.[433] A slungshot rope that is shortened to forearm length and spun rapidly is an effective blunt force

---

[428] *See* text at notes __.

[429] *See* text at notes __.

[430] "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Mark Zalesky, publisher of *Knife Magazine*, email to David Kopel, Nov. 19, 2022.

[431] Peterson, Daggers & Fighting Knives of the Western World, *supra* note 388, at 60.

[432] *See* text at notes __.

[433] *See* text at notes __.

weapon.[434] As will be detailed in Part VI.B.1, many slungshots were made of leather instead of rope, intended for use as weapons, and very easily concealed.

*Colt*. Similar to a slungshot.[435]

*Knucks, knuckles*. Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon. Laws about knuckles are also detailed in part VI.

*Revolver*. A handgun in which the ammunition is held in a rotating cylinder.

*Pistol*. Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

### A. The history of Bowie knives and Arkansas toothpicks

#### 1. What is a Bowie knife?

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi, on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved."[436] Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate.[437] As "Bowie knife" entered the American vocabulary, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" was more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The difference is that true "Coke" products, manufactured by the Coca-Cola Company, do exist; there never was a true "Bowie knife," other than the one used at the Sandbar Fight.) Manufacturers slapped the "Bowie knife"

---

[434] *See* text at notes __.

[435] 1 SHORTER OXFORD ENGLISH DICTIONARY 444 ("4. A short piece of weighted rope used as a weapon").

[436] R.P. Bowie, *Letter to the Editor*, PLANTER'S ADVOCATE, Aug. 24, 1838, *reprinted in* MARRYAT, 1 A DIARY IN AMERICA, WITH REMARKS ON ITS INSTITUTIONS 291 (1839).

[437] *See id.* at 289–91.

**KnifeRights MSJ App.000858**

label on a wide variety of large knives that were well-suited for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife."[438]

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick. . . ."[439]

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife.[440] One said it was too small and slim to be a Bowie knife and would properly be called a "Mexican pirate-knife."[441] The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife."[442] Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife."[443] A strict application of the letter of the law could result in injustices, "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick."[444] The court affirmed the conviction, held that the statute must be construed "within the spirit and meaning of the law," and relied on the judge and jury to make the decision as a matter of fact.[445]

---

[438] NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING AN AMERICAN LEGEND 490 (2004).

[439] 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

[440] Haynes v. State, 24 Tenn. (5 Hum.) 120, 120–21 (1844).

[441] *Id*. at 121.

[442] *Id*.

[443] *Id*. at 122.

[444] *Id*.

[445] *Id*. at 122–23.

Similarly, a North Carolina law prohibited carrying "concealed about his person any pistol, bowie knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or razor, or other deadly weapon of like kind." Defendant argued that his butcher's knife was not encompassed by the statute. He argued that the statute applied to weapons "used only for purposes offensive and defensive." The North Carolina Supreme Court disagreed, for such an interpretation would allow concealed carry of "deadly weapons of a very fatal type; as for example, a butcher's knife, a shoe knife, a carving knife, a hammer, a hatchet, and the like." Defendant had argued that a broad interpretation would

## 2. What is an Arkansas toothpick?

As for "Arkansas Toothpick," Flayderman says that it was mainly another marketing term for "Bowie knife."[446] But he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."[447]

Mark Zalesky, publisher of *Knife Magazine*, explains:

> The idea of the "Arkansas toothpick" being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years.[448]

But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas." [449]

## 3. The crime in the Arkansas legislature

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835

---

embrace small and large pocket knives, and like useful practical things that men constantly carry in their pockets and about their persons, and are more or less deadly instruments in their character. The answer to this is, that these things are not ordinarily carried and used as deadly weapons, but for practical purposes, and the ordinary pocket knife cannot be reckoned as per se a deadly weapon; but it would be indictable to so carry them for such unlawful purpose if deadly in their type and nature. If one should carry a pocket knife, deadly in its character, as a weapon of assault and defense, he would be indictable, just as he would be if he carried a dirk or dagger.

State v. Erwin, 91 N.C. 545, 546–48 (1884).

[446] FLAYDERMAN, THE BOWIE KNIFE, *supra* note at __, at 265–74.

[447] *Id.*

[448] Mark Zelesky, email to David Kopel, Nov. 10, 2022.

[449] Mark Zelesky, email to David Kopel, Nov. 19, 2022.

and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."[450]

The first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, may have been a response to a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. Historian Clayton Cramer explains:

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J.J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.

> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."[451] "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted."[452] While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State."[453]

---

[450] *Id.*

[451] Quoting WILLIAM F. POPE, EARLY DAYS IN ARKANSAS 225 (Dunbar H. Pope ed., 1895); *The Murder in Arkansas*, 54 NILES' NATIONAL REGISTER 258 (June 23, 1838).

[452] RAYMOND W. THORP, BOWIE KNIFE 4 (1991).

[453] Clayton Cramer, email to David Kopel, Nov. 2022, quoting and citing POPE, *supra* note __, at 225–26; THORP, *supra* note __, at 1–5; *General Assembly*, ARKANSAS STATE GAZETTE, Dec. 12, 1837, at 2 (expulsion two days later); *The trial of John Wilson . . .* , SOUTHERN RECORDER (Milledgeville, Ga.), Mar. 6, 1838; *The Murder in Arkansas*, NILES' NATIONAL REGISTER, *supra.*

### B. Survey of Bowie knife statutes

Section B surveys every Bowie knife statute enacted by any American state or territory in the nineteenth century. Jurisdictions are discussed chronologically, by date of first enactment.

In the footnotes, a cite to an enacted statute also includes a string cite of re-enactments of the same statute, such as part of a recodification of the criminal code.

*Mississippi* (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."[454]

It was forbidden to use such arms in a fight in a city, town, or other public place.[455] It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence."[456] Finally, if one of the arms were used in a duel and caused a death, the duelist would be liable for the debts owed by the deceased.[457] All these provisions would later be enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols."[458] Similar language appeared in the incorporation of towns in 1839 and 1840.[459]

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife."[460] The tax was cut to fifty cents in 1850.[461] But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane,

---

[454] 1837 Miss. L. pp. 291–92.

[455] *Id.*

[456] *Id.*

[457] *Id.*

[458] 1837 Miss. Laws 294.

[459] 1839 Miss. Laws 385, ch. 168, p. 385 (Emery); 1840 Miss. Laws 181, ch. 111 (Hernando).

[460] 1841 Miss. Laws 52, ch. 1; 1844 Miss. Laws 58, ch. 1.

[461] 1850 Miss. Laws 43, ch. 1.

**KnifeRights MSJ App.000862**

duelling or pocket pistol."[462] In the next legislature, pocket pistols were removed from the tax.[463]

When the Civil War came, the legislature prohibited "any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword cane, or dirk-knife, and that hereafter the owner of any howie-knife, sword-cane or dirk-knife shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property."[464] That was a change for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.[465]

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

> [N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.[466]

As detailed in Justice Alito's opinion and Justice Thomas's concurrence in *McDonald v. Chicago*, laws such as Mississippi's prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen.[467]

---

[462] 1854 Miss. Laws 50, ch. 1.

[463] 1856–57 Miss. Laws 36, ch. 1 ("each bowie knife, dirk knife, or sword cane").

[464] 1861–62 Miss. Laws 134, ch. 125 (Dec. 19, 1861).

[465] Alabama's system of confiscating arms for unpaid taxes and then selling them at public auction is described *infra*.

[466] 1865 Miss. L. ch. 23, pp. 165-66.

[467] 561 U.S. 742 (2010).

After the war, the Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."[468]

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description."[469] There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack."[470] Also excepted were travelers, but not "a tramp."[471] Sales to minors or to intoxicated persons were outlawed.[472] A father who permitted a son under 16 to carry concealed was criminally liable.[473] Students at "any university, college, or school" could not carry concealed.[474]

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description."[475] Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine.[476]

*Alabama* (1837).

The legislature imposed a $100 per knife tax on the sale, transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today.[477]

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought."[478]

---

[468] 1871 Miss. Laws 819–20; 1876 Miss. Laws 131, 134, ch. 104; 1878 Miss. Laws 27, 29, ch. 3; 1880 Miss. Laws 21, ch. 6; 1892 Miss. Laws 194, 198, ch. 74; 1894 Miss. Laws 27, ch. 32; 1897 Miss. Laws 10, ch. 10.

[469] 1878 Miss. Laws 175–76, ch. 46.

[470] *Id.*

[471] *Id.*

[472] *Id.*

[473] *Id.*

[474] *Id.*

[475] 1896 Miss. Laws 109–10, ch. 104.

[476] 1898 Miss. Laws 86, ch. 68.

[477] Fed. Reserve Bank of Minneapolis, *supra* note __ (2022=884.6. 1837 = 34).

[478] Acts Passed at the Called Session of the General Assembly of the State of Alabama 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon."[479] An 1856 statute prohibited giving a male minor a handgun or bowie knife.[480]

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry.[481]

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol."[482] Even that amount was hefty for a poor person. As the defense counsel in an 1859 Texas case examined *infra* had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for no more than 50 cents.[483] As described next, the cost of manufacturing a high-quality Bowie knife was a little less than $3, which approximately implies a retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. The cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was under-armed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

---

[479] ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA 67–68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

[480] ACTS OF THE FIFTH BIENNIAL SESSION OF THE GENERAL ASSEMBLY OF ALABAMA, HELD IN THE CITY OF MONTGOMERY, COMMENCING ON THE SECOND MONDAY IN NOVEMBER, 1855, at 17 (1856).

[481] *Bruen*, 142 S. Ct. at 2150.

[482] 1851-52 Ala. Laws 3, ch. 1.

[483] Cockrum v. State, 24 Tex. 394, 395–96 (1859) ("A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.").

> Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore
>
> . . . [S]ix thousand dollars . . . is hereby appropriated . . . to purchase one thousand Bowie-knife shaped pikes [similar to a spear], and one thousand Bowie knives for the use of the 48th regiment, Alabama militia.[484]

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops."[485]

If Alabama legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives and pikes. This works out to $3 manufacturing cost per knife or pike.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes, harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives."[486]

After Reconstruction ended, an 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun."[487] "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."[488]

Throughout the nineteenth century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address

---

[484] 1861 Ala. Laws 214-15, ch. 22 (Nov. 27, 1861).

[485] *Id.*

[486] 1862 Ala. Laws 8, ch. 1.

[487] 1880–81 Ala. Laws 38–39, ch. 44.

[488] *Id.*

the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment."[489] To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.).[490]

Shortly after the end of the Civil War, the unreconstructed white supremacist legislature had enacted a harsh property tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale."[491] For "all bowie-knives, or knives of the like description," the tax was $3.[492] If the tax were not paid, the county assessor could seize the arms.[493] To recover the arms, the owner had to pay the tax plus a 50% penalty.[494] After 10 days, the assessor could sell the arms at auction.[495]

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars."[496]

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ."[497] The tax rate was 3/4 of 1% of the value.[498]

---

[489] *Id.*
[490] *Id.*
[491] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[492] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[493] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[494] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[495] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[496] 1874-75 Ala. Laws 6, ch. 1.
[497] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.
[498] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.

The tax was cut in 1882 to 55 cents per hundred dollars of value.[499] Then raised to 60 cents for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats."[500]

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars."[501] Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100.[502] Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more.[503] The wholesale license also authorized retail sales.[504]

State legislative revisions to municipal charters gave a municipality the power "to license dealers in pistols, bowie-knives and dirk-knives."[505]

---

[499] For "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats."1882 Ala. Laws 71, ch. 61.

[500] 1884 Ala. Laws 6, ch. 1.

[501] 1874 Ala. Laws 41, ch. 1. *See also* 1875-76 Ala. Laws 82, ch. 1 ($50); 1886 Ala. Laws 36, ch. 4 (adding "pistol cartridges"); 1892 Ala. Laws 183, ch. 95 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section").

[502] 1898 Ala. Laws 190, ch. 9036.

[503] *Id.*

[504] *Id.*

[505] 1878 Ala. Laws 437, ch. 314 (Uniontown); 1884 Ala. Laws 552, ch. 314 (Uniontown) (adding dealer in "brass knuckles"; "the sums charged for such licenses" may "not exceed the sums established by the revenue laws of the State. . . ."); 1884-85 Ala. Laws 323, ch. 197 (Tuscaloosa) ("to license and regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. Laws 965, ch. 550 (Faunsdale); 1890 Ala. Laws 764, ch. 357 (Uniontown); 1890 Ala. Laws 1317, ch. 573 (Decatur) (to license dealers in "pistols, or pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $100.00."); 1892 Ala. Laws 292, ch. 140 (Demopolis) (same as Decatur); 1894 Ala. Laws 616, ch. 345 (Columbia) (same); 1894-95 Ala. Laws 1081, ch. 521, p. 1081 (Tuskaloosa) (to license and collect an annual tax on "gun shops or gun repair shops" and "dealers in pistols or pistol cartridges or bowie knives or dirk knives."); 1896 Ala. Laws 71, ch. 62 (Uniontown) ("to license . . . dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. Laws 1046,

*Georgia* (1837).

As discussed *supra*, the legislature in 1837 forbade the sale, possession, or carry of Bowie and similar knives, pistols (except horseman's pistols), dirks, sword-canes, and spears.[506]

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry.[507]

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence."[508] The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer."[509]

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters.[510]

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for a "horsemen's pistol."[511] Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense."[512] Any "kind of metal knucks" was added in 1898.[513]

---

ch. 549 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. Laws 1102, ch. 566 (Uniontown) (same as previous Uniontown charter); 1898 Ala. Laws 1457, ch. 704 (Uniontown) (same).

[506] ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837, at 90–91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

[507] *Nunn*, 1 Ga. 243.

[508] 1860 Ga. Laws 56–57, ch. 64.

[509] *Id.*

[510] 1870 Ga. Laws 421, ch. 285; 1879 Ga. Laws 64, ch. 266 (creating law enforcement officer exception).

[511] 1882-83 Ga. Laws 48-49, ch. 93.

[512] *Id.*

[513] 1898 Ga. Laws 60, ch. 106.

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876.[514]

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives."[515] The tax was later raised to $100, adding dealers of "pistol or revolver cartridges."[516] Then the tax was reduced to $25.[517] But raised back to $100 in 1890.[518] In 1892, "metal knucks" were added, and the ammunition expanded to "shooting cartridges."[519] The tax was cut to $25 in 1894.[520]

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie-knives and such articles?"[521] The same question was included in the municipal charter for the town of Jessup.[522] And in the new charter for Cedartown.[523]

*South Carolina* (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee.[524]

The legislature did not enact any law with the words "bowie knife" in 1838, or in the nineteenth century.

---

[514] 1876 Ga. Laws 112, ch. 128 (O. no. 63).

[515] 1882-83 Ga. Laws 37, ch. 18.

[516] 1884-85 Ga. Laws 23, ch. 52; 1886 Ga. Laws 17, ch. 54.

[517] 1888 Ga. Laws 22, ch. 123.

[518] 1890 Ga. Laws 38, ch. 131.

[519] 1892 Ga. Laws 25, ch. 133.

[520] 1894 Ga. Laws 21, ch. 151; 1896 Ga. Laws 25, ch. 132; 1898 Ga. Laws 25, ch. 150 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

[521] 1884 Ga. Laws 30, ch. 457; 1886 Ga. Laws 26, 28, ch. 101; 1888 Ga. Laws 261, ch. 103; 1889 Ga. Laws 993, ch. 640.

[522] 1888 Ga. Laws 261, ch. 103.

[523] 1889 Ga. Laws 993, ch. 640.

[524] 1838 S.C. Acts (Journal to the Proceedings) 29, 31.

*Tennessee* (1838).

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after the nationally infamous December crime on the floor of the Arkansas House of Representatives.

In January 1838, the Tennessee legislature statute forbade sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick."[525]

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony.[526] Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony."[527] Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant.[528]

The concealed carry ban was upheld against a state constitution challenge.[529] The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia.[530]

In *Day v. State*, the 1838 law against drawing a Bowie knife was applied against a victim who had drawn in immediate self-defense.[531] Upholding the

---

[525] ACTS PASSED AT THE FIRST SESSION OF THE TWENTY-SECOND GENERAL ASSEMBLY OF THE STATE OF TENNESSEE: 1837-8, 200–01 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

[526] *Id.*

[527] *Id.*

[528] *Id.*

[529] Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

[530] *Id.* at 158 ("These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.").

[531] Day v. State, 37 Tenn. (5 Sneed.) 496 (1857).
It seems that during an altercation between the defendant and Bacon, at the house of the latter, the defendant was ordered by Bacon to leave the house, which he did, Bacon following him to the door, with a large bottle in his hand. While Bacon was standing upon the door-step, the defendant approached him and, laying his left hand upon Bacon's shoulder, told him not to rush upon him,

conviction the Tennessee Supreme Court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns."[532] Likewise, a post-Reconstruction statute, allowed carrying only of Army or Navy type pistols.[533] When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the victim carried a concealed pistol that was not an Army or Navy type.[534] The conviction was upheld, citing *Day v. State*.[535]

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife."[536] The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting."[537]

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war.[538]

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people."[539]

*Virginia* (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind."[540] If a habitual concealed carrier were prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact.[541] Even if the defendant were acquitted or discharged,

---

at the same time drawing a large knife from beneath his vest, which he held in his right hand behind him, but made no effort to use.

*Id*. at 496–97.

[532] *Id*. at 499.

[533] Text at notes __.

[534] *Coffee v. State*, 72 Tenn. (4 Lea.) 245, 246 (1880).

[535] *Id*.

[536] 1855-56 Tenn. Pub. Acts 92, ch. 81.

[537] *Id*.

[538] 1861 Tenn. Pub. Acts 16–17, ch. 23.

[539] 1869-70 Tenn. Pub. Acts 23-24, ch. 22.

[540] ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838, at 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

[541] *Id*.

he could be prosecuted within a year for the unlawful carry.[542] Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor.[543]

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same."[544]

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind."[545]

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869.[546] So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause."[547]

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind."[548] There was an exception for arms issued by the state "to members of volunteer companies."[549]

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives."[550]

---

[542] *Id.*

[543] *Id.*

[544] 1847 Va. Acts 110; 1870 Va. Acts 510, ch. 349.

[545] 1881 Va. Acts 233, ch. 219; 1883-84 Va. Acts 180, ch. 144 (1884); 1896 Va. Acts 826, ch. 745 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

[546] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[547] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[548] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[549] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[550] 1889-90 Va. Acts 118, ch. 152; 1893-94 Va. Acts 425-26, ch. 366.

*Florida* (1838).

Two months after the Arkansas homicide, the Florida legislature supplemented an 1835 statute against concealed carry in general. The new statute provided that any person who wants to "vend dirks, pocket pistols, sword canes, or bowie knives" must pay an annual $200 tax.[551] Any individual who wants to carry one openly must pay a $10 tax.[552] The county treasurer must give the individual a receipt showing that the open carry tax has been paid.[553]

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county."[554] The applicant needed "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant."[555] A person who informed about a violation could keep the arms.[556] Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury."[557]

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors.[558] The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives."[559] Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."[560] The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives."[561]

---

[551] 1838 Fla. Laws 36, ch. 24 (Feb. 10, 1838).

[552] *Id.*

[553] *Id.*

[554] 1865 Fla. Laws 25, ch. 1466.

[555] *Id.*

[556] *Id.*

[557] *Id.*

[558] 1 DIGEST OF THE LAWS OF THE STATE OF FLORIDA, FROM THE YEAR ONE THOUSAND EIGHT HUNDRED AND TWENTY-TWO, TO THE ELEVENTH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND EIGHTY-ONE INCLUSIVE 873 (James F. McClellan, comp.) (1881) (Fla. ch. 174, § 24, item 14).

[559] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[560] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[561] 1893 Fla. Laws 18, ch. 4115 (4th regular sess.); 1895 Fla. Laws 14, ch. 4322 (5th regular sess.).

*North Carolina* (1840).

In 1840, North Carolina prohibited "any free Negro, Mulatto, or free Person of Colour" to "wear or carry about his or her person, or keep in his or her house, any Shot-gun, Musket, Rifle, Pistol, Sword, Dagger or Bowie-knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions."[562] An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting."[563] There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager."[564]

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for Sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner. . . .[565]

In the arms licensing law for free people of color, the Black Code continued to treat Bowie knives like firearms. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had been issued a one-year license from the court of pleas and quarter-sessions.[566] When the Civil War drew near, the legislature repealed the licensing law, and

---

[562] 1840 N.C. Sess. Laws 61, ch. 30–31.

[563] 1846 N.C. Sess. Laws 107, ch. 42.

[564] *Id.*

[565] 1850 N.C. Sess. Laws 243, ch. 121. *See also* 1856-57 N.C. Sess. Laws 34, ch. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. Sess. Laws 33–34, ch. 21, § 11 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

[566] 1856 N.C. Sess. Laws 577, ch. 107, § 66.

forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot."[567]

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879.[568] The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slungshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like kind," "except when upon his own premises."[569]

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot."[570] A loaded cane had a hollowed section filled with lead.[571] It is a powerful impact weapon.[572]

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maxima.[573]

---

[567] 1860–61 N.C. Sess. Laws 68, ch. 34 (Feb. 23, 1861).

[568] 1877 N.C. Sess. Laws 162–63, ch. 104.

[569] 1879 N.C. Sess. Laws 231, ch. 127.

[570] 1893 N.C. Sess. Laws 468–69, ch. 514.

[571] *See* Part VI.C.2.

[572] *Id.*

[573] In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. Sess. Laws 219–20, ch. 180. Charlotte: $50 on "every pistol, bowie-knife, dirk, sword-cane, or other deadly weapons worn upon the person, except a pocket knife, without special permission of the board of aldermen." 1866 N.C. Sess. Laws 63, ch. 7, § 19. Salisbury: "on all pistols, except when part of stock in trade, a tax not exceeding one dollar; on all dirks, bowie-knives and sword canes, if worn about the person at any time during the year, a tax not exceeding ten dollars." 1868 N.C. Sess. Laws 202, ch. 123. Lincolnton: $5 for worn weapons. 1870 N.C. Sess. Laws 73, ch. 32. Lumberton: Can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. Sess. Laws 279, ch. 7; 1883 N.C. Sess. Laws 808, ch. 89 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. Sess. Laws 872, ch. 111. Waynesville: like Ashville, but $40. 1885 N.C. Sess. Laws 1097, ch. 127. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. Sess. Laws 885, ch. 58, § 50. Rockingham: to tax pistols, dirks, bowie knives, or sword canes. 1887 N.C. Sess. Laws 988, ch. 101. Hickory: $50 on sellers; "sling-shots" replaces "slung shot." 1889 N.C. Sess. Laws 956, ch. 238. Marion: $25 on every "pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except carried by officers in discharge of their duties." 1889 N.C. Sess. Laws 836, ch. 183, § 27. Mount Airy: $10 on open carry of "a pistol, bowie-knife, dirk, sword-cane or other deadly

*Washington territory* (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ."[574]

*California* (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts.[575] The duelist would also be liable to the decedent's family for liquidated damages.[576]

*Louisiana* (1855).

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon."[577]

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days.[578]

---

weapon, except guns, shot-guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. Sess. Laws 705, ch. 26. Columbus: same. 1891 N.C. Sess. Laws 902, ch. 101. Buncombe: same. 1891 N.C. Sess. Laws 1423, ch. 327. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. Sess. Laws 611, ch. 352. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. Sess. Laws 115–16, ch. 71. Lilesville: same. 1897 N.C. Sess. Laws 237, ch. 130. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. Sess. Laws 154, ch. 90. Salisbury: same $500 as Asheville. 1899 N.C. Sess. Laws 503, ch. 186. Monroe: Same, but $100. 1899 N.C. Sess. Laws 968, ch. 352. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. Sess. Laws 766, ch. 260.

[574] 1854 Wash. Sess. Laws 80, ch. 2; 1859 Wash. Sess. Laws 109, ch. 2; 1862 Wash. Sess. Laws 284, ch. 2; 1869 Wash. Sess. Laws 203–04, ch. 2; 1873 Wash. Sess. Laws 186, ch. 2.

[575] 1855 Cal. Stat. 152–53, ch. 127.

[576] *Id.*

[577] 1855 La. Acts 148, ch. 120; 1898 La. Acts. 159, ch. 112 (same).

[578] 1870 La. Acts 159–60, ch. 100; 1873 La. Acts. 27, ch. 98.

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden.[579]

*New Hampshire* (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas."[580] Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

> Next comes the Remedy of Folly . . . from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no

---

[579] 1890 La. Acts 39, ch. 46.

[580] SPEECH OF HON. CHARLES SUMNER, IN THE SENATE OF THE UNITED STATES, 19TH AND 20TH, MAY 1856.

**KnifeRights MSJ App.000878**

> impediment. Sir, the senator is venerable . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.[581]

That wasn't even close to the worst that Sumner said about Brooks that day. Most notably, he compared Butler to Don Quixote:

> The senator from South Carolina has read many books of chivalry, and believes himself a chivalrous knight, with sentiments of honor and courage. Of course he has chosen a mistress to whom he has made his vows, and who, though ugly to others, is always lovely to him; though polluted in the sight of the world, is chaste in his sight; — I mean the harlot Slavery.[582]

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane.[583] He nearly killed Sumner, who was not able to resume his Senate duties for two and a half years.[584] The assault was widely applauded in the South.[585] The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest it inspire slave revolt.[586] Even in free states, abolitionist speakers were attacked by mobs.[587]

---

[581] *Id.* at 64–65.

[582] *Id.* at 9.

[583] *See* Gregg M. McCormick, Note, *Personal Conflict, Sectional Reaction: The Role of Free Speech in the Caning cf Charles Sumner*, 85 Tex. L. Rev. 1519, 1526–27 (2007).

[584] *See id.* at 1527.

[585] *See id.* at 1529–33.

[586] *See id.* at 1519–20 ("Prior to the Sumner-Brooks affair, the suppression of abolitionist mailings, the Congressional Gag Rule, the murder of Reverend Lovejoy, and suppression of antislavery speech in the Kansas Territory served as concrete examples of slavery's threat to Northern rights.").

[587] *See, e.g., McDonald*, 561 U.S. at 846 (Thomas, J., concurring) ("Mob violence in many Northern cities presented dangers as well."); Michael Kent Curtis, *The Fraying Fabric of Freedom: Crisis and Criminal Law in Struggles for Democracy and Freedom of Expression*, 44 Tex. Tech. L. Rev. 89, 102 (2011) ("In the North, mobs disrupted abolitionist meetings and destroyed the presses of anti-slavery newspapers.").

KnifeRights MSJ App.000879

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital."[588] As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense:

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall not be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.[589]

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

*Texas* (1856).

Bowie knives were omnipresent in Texas. The Texan had won their independence from Mexico at the April 21, 1836, Battle of San Jacinto. Outnumbered, they had routed the Mexican army, in part thanks to their deadly Bowie knives.[590]

Many Texans carried a Bowie knife. Texans were described as "desperate whittlers of sticks," who would start whittling whenever a conversation began.[591] But the Texans were not carrying Bowie knives because they were whittling addicts. As a visiting British diplomat reported, murder and other crime was rampant, and "the Perpetrators escape with the greatest impunity .

---

[588] 1856 N.H. Laws 1781–82, ch. 1870.

[589] *Id.*

[590] *See* CHARLES EDWARDS LESTER, SAM HOUSTON AND HIS REPUBLIC 97 (1846).

[591] *See* JOSEPH WILLIAM SCHMITZ, TEXAS CULTURE 1836-1846, at 22 (1960); N. DORAN MAILLARD, HISTORY OF THE REPUBLIC OF TEXAS FROM THE DISCOVERY OF THE COUNTRY TO THE PRESIDENT TIME 213 (1842).

. . It is considered unsafe to walk through the Streets of the principal Towns without being armed. The Bowie Knife is the weapon most in vogue."[592]

After a decade as an independent republic, Texas joined the United States on December 29, 1845. An 1856 statute provided that if a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife."[593]

The Texas Supreme Court upheld the law in *Cockrum v. State*.[594] Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted."[595] However, extra punishment for a crime with a Bowie knife did not violate the right to arms.[596]

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open.[597]

Then came one of the most repressive anti-carry laws enacted by an American state in the nineteenth century. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."[598] Both open and concealed carry were

---

[592] Francis Sheridan, letter to Garraway, July 12, 1840, 15 BRITISH CORRESPONDENCE Q. 221; SCHMITZ at 80.

[593] Tex. Penal Code arts. 611–12 (enacted Aug. 28, 1856), *in* 1 A DIGEST OF THE GENERAL STATUTE LAWS OF THE STATE OF TEXAS: TO WHICH ARE SUBJOINED THE REPEALED LAWS OF THE REPUBLIC AND STATE OF TEXAS (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger"); 1871 Tex. Gen. Laws 20, ch. 26 (doubling penalty for perpetrator "in disguise").

[594] 24 Tex. 394 (1859).

[595] *Id*. at 402.

[596] *Id*. at 403. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." *Id*.

[597] 1870 Tex. Gen. Laws 139, ch. 73.

[598] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

forbidden.[599] The exceptions were "immediate and pressing" self-defense, or in a person's home or business, or travelers with arms in their baggage.[600] Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering."[601] The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians."[602]

The Texas Supreme Court upheld the handgun carry ban in 1872.[603] According to the court, the statutory exceptions to the carry ban (travelers, or in response to a specific threat, or in militia service) sufficiently allowed the exercise of the right to bear arms.

The court stated that the Texas right to arms protected only arms that "are used for purposes of war," such as "musket and bayonet . . . the sabre, holster pistols and carbine . . . the field piece, siege gun, and mortar, with side arms [military handguns]."[604] In contrast, the Constitution did not cover arms "employed in quarrels and broils, and fights between maddened individuals," such as "dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives."[605]

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons.[606] The statute did not apply to long guns.[607]

*New Mexico* (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of

---

[599] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[600] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[601] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[602] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[603] English v. State, 35 Tex. 473 (1872).

[604] *Id.* at 476.

[605] *Id.* at 475. The Texas court was plainly wrong that Bowie knives are not used in warfare. *See* text at notes __.

[606] 1887 Tex. Gen. Laws 221–22, ch. 155.

[607] *Id.*

deadly weapon of offence, or any ammunition of any kind suitable for fire arms."[608] Slavery in New Mexico was usually in the form of peonage.[609] The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races.[610]

Concealed and open carry were prohibited in 1859. The scope was expansive:

> any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called . . .[611]

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms.[612] It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed

---

[608] 1856 N.M. Laws 68, ch. 26.

[609] *See* ANDRÉS RESÉNDEZ, THE OTHER SLAVERY: THE UNCOVERED STORY OF INDIAN ENSLAVEMENT IN AMERICA (2016).

[610] *See id.*

[611] 1859 N.M. Laws 94–96; 1864-65 N.M. Laws 406–10, ch. 61.

Territorial statues were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) [*s.i.c.* cuchillo, lit., belt knife] Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortifera de cualesquiera clase ó descripcion."

[612] 1886-87 N.M. Laws 55–58, ch. 30.

> canes: as also slung shots, bludgeons or any other deadly weapons
> with which dangerous wounds can be inflicted . . .[613]

A person carrying a deadly weapon was not allowed to "insult or assault another."[614] Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."[615]

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory."[616] The statute defined a "settlement" as anyplace within 300 yards of any inhabited house.[617] The exceptions to the carry ban were:

> in his or her residence, or on his or her landed estate, and in the
> lawful defense of his or her person, family, or property, the same
> being then and there threatened with danger . . .[618]

Travelers could ride armed through a settlement.[619] If they stopped, they had to disarm within 15 minutes, and not resume until the eve of departure.[620] Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.[621]

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . . ."[622]

*Ohio* (1859).

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon."[623] The jury must acquit if it were proven that the defendant was "engaged in pursuit of any

---

[613] *Id.*
[614] *Id.*
[615] *Id.*
[616] *Id.*
[617] *Id.*
[618] *Id.*
[619] *Id.*
[620] *Id.*
[621] *Id.*
[622] *Id.*
[623] 1859 Ohio Laws 56–57.

**KnifeRights MSJ App.000884**

lawful business, calling, or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family…"[624]

*Kentucky* (1859).

"If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars."[625]

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50.[626]

*Indiana* (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon."[627] Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man."[628]

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person."[629] Or to give such person pistol ammunition.[630]

*Nevada* (1861).

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree.[631]

---

[624] *Id.*

[625] 1859 Ky. Acts 245, ch. 33.

[626] 1885 Ky. Acts 154, ch. 1233; 1891 Ky. Acts 346, ch. 103 (Nov. 11, 1892); 1891-92 Ky. Acts 1001, ch. 217 (June 9, 1893).

[627] 1859 Ind. Acts 129, ch. 78; 1881 Ind. Acts 191, ch. 37.

[628] *Id.*

[629] 1875 Ind. Acts 59, ch. 40.

[630] *Id.*

[631] 1861 Nev. Stat. 61.

*Idaho territory* (1863).

   Like Nevada.[632]

*Montana territory* (1864).

   No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon."[633] Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder.[634]

*Colorado territory* (1867).

   No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon."[635]

*Arizona territory* (1867).

   Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime.[636] So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel."[637]

   Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache and Graham, over the age of ten years."[638] The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind."[639]

   Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or

---

[632] 1863 Ida. Sess. Laws 441, ch. 3; 1864 Ida. Sess. Laws 303–04, ch. 3.

[633] 1864-65 Mont. Laws 355.

[634] 1879 Mont. Laws 359, ch. 4; 1887 Mont. Laws 505, ch. 4.

[635] 1867 Colo. Sess. Laws 229, ch. 22; 1876 Colo. Sess. Laws 304, ch. 24; 1881 Colo. Sess. Laws 74 (post-statehood); 1885 Colo. Sess. Laws 170; 1891 Colo. Sess. Laws 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").

[636] 1867 Ariz. Sess. Laws 21; 1875 Ariz. Sess. Laws 101.

[637] *Id.*

[638] 1883 Ariz. Sess. Laws 21–22, ch. 19.

[639] *Id.*

town.[640] Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887.[641] And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense."[642]

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense."[643] Arriving travelers could carry for the first half hour, or on the way out of town.[644] Hotels had to post notices about the no carry rule.[645] Carry was also forbidden at public events, and even at some private social gatherings.[646]

*Illinois* (1867).

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon."[647]

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character."[648]

*Kansas* (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the

---

[640] 1883 Ariz. Sess. Laws 65–66, ch. 36.
[641] 1887 Ariz. Sess. Laws 726, ch. 11.
[642] 1893 Ariz. Sess. Laws 3, ch. 2.
[643] 1889 Ariz. Sess. Laws 30–31, ch. 13.
[644] *Id.*
[645] *Id.*
[646] *Id.*
[647] 1867 Ill. Laws 650.
[648] 1881 Ill. Laws 73.

influence of intoxicating drink, and any person who has ever borne arms against the government of the United States."[649]

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind"[650] "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor."[651]

*West Virginia* (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind."[652] Justices of the Peace had a duty to enforce the statute.[653]

Then in 1882, West Virginia adopted a law similar to the Texas carry ban of 1871.[654] Without restricting carry of long guns, it broadly outlawed carrying pistols, Bowie knives, and numerous other arms.[655] Among the exceptions were that the person had "good cause to believe he was in danger of death or great bodily harm."[656] Additionally, there was a prohibition on selling or furnishing such arms to a person under 21.[657]

The West Virginia Supreme Court of Appeals in *State v. Workman* upheld the statute, because the arms protected by the Second Amendment:

> must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the State and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and

---

[649] 1868 Kan. Sess. Laws 378, ch/ 31.

[650] 1883 Kan. Sess. Laws 159, ch. 55.

[651] *Id.*

[652] Code of West Virginia Comprising Legislation to the Year 1870, ch. 148, p. 692.

[653] 1872-73 W.V. Acts 709, ch. 226, *in* CONSTITUTION AND SCHEDULE ADOPTED IN CONVENTION AT CHARLESTON, APRIL 9TH, 1872 (Charleston, W.V.: John W. Gentry, 1874).

[654] 1882 W.V. Acts 421–22, ch. 135.

[655] *Id.*

[656] *Id.*

[657] *Id.*

desperadoes, to the terror of the community and the injury of the State.[658]

*Maryland* (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars.[659]

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon."[660]

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)."[661]

*District of Columbia* (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles."[662]

In 1892, Congress enacted a similar statute for D.C., with additional provisions.[663] It prohibited concealed carry of the same weapons as 1871, plus "blackjacks."[664] A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.[665]

---

[658] State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).

[659] 1870 Md. Laws 892, ch. 473. Reenactments, changes in the fine amount: 1874 Md. Laws 243–44, ch. 178; 1884 Md. Laws 249–50, ch. 187; 1890 Md. Laws 606–07, ch. 534; 1898 Md. Laws 533, ch. 123.

[660] 1872 Md. Laws 56–57, ch. 42.

[661] 1886 Md. Laws 602, ch. 375.

[662] 1 THE COMPILED STATUTES IN FORCE IN THE DISTRICT OF COLUMBIA, INCLUDING THE ACTS OF THE SECOND SESSION OF THE FIFTIETH CONGRESS, 1887–89 (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871).

[663] 27 Stat. 116–17, ch. 159 (July 13, 1892).

[664] *Id.*

[665] *Id.*

Open carry was lawful, except "with intent to unlawfully use."[666] The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.[667]

Giving a deadly weapon to a minor was forbidden.[668] Vendors had to be licensed by Commissioners of the District of Columbia.[669] The license itself was "without fee," but the licensee could be required to post a bond.[670] Sellers had to keep a written list of purchasers, which was subject to police inspection.[671] Weekly sales reports to the police were required.[672]

*Nebraska* (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon."[673] As in Ohio, there was a "prudent man" defense.[674]

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind."[675] The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him."[676]

*Missouri* (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about

---

[666] *Id.*
[667] *Id.*
[668] *Id.*
[669] *Id.*
[670] *Id.*
[671] *Id.*
[672] *Id.*
[673] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.
[674] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.
[675] 1895 Neb. Laws 209–10.
[676] *Id.*

> his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon…[677]

This was similar to the 1871 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property."[678]

The exhibiting statute and the concealed carry statute were combined in 1885.[679] The new law also forbade carrying the listed weapons when intoxicated or under the influence.[680] Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed.[681]

*Arkansas* (1874).

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The 1874 election was the first in which the voting rights of former Arkansas Confederates were fully restored.[682] They elected Democratic majorities and ended Reconstruction.[683] In 1875, the new state legislature banned the open or concealed carry of "any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon."[684]

The next year, the state Supreme Court heard a case of a man who had been convicted of carrying a pocket revolver.[685] In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered,

---

[677] 1874 Mo. Laws 43; 1875 Mo. Laws 50–51.

[678] 1877 Mo. Laws 240.

[679] 1885 Mo. Laws 140.

[680] *Id.*

[681] *Id.*

[682] *Civil War through Reconstruction, 1861 through 1874*, THE ENCYCLOPEDIA OF ARKANSAS HISTORY & CULTURE, http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?entryID=388.

[683] *Id.*

[684] 1874-75 Ark. Acts 156–57 (Feb. 16, 1875).

[685] Fife v. State, 31 Ark. 455, 455–56 (1876).

> Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.[686]

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane."[687] The pocket pistol not being a war arm, the defendant's conviction was upheld.[688] Needless to say, *Fife*'s protection of "the rifle of all descriptions" makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed:[689]

> [T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."[690]

The legislature responded in 1881 with a new statute against the sale or disposition of "any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as

---

[686] *Id.* at 460.
[687] *Id.*
[688] *Id.* at 461.
[689] Wilson v. State, 33 Ark. 557, 560 (1878).
[690] *Id.*

are used in the army or navy."[691] As discussed *supra*, the 1881 Arkansas statute might have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.[692]

*Wisconsin* (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon."[693]

*Wyoming* (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property."[694]

---

[691] 1881 Ark. Acts 191–92, ch. 96 § 3. The carry ban in section 1 was phrased slightly differently from the quoted sales ban in section 3. The section 1 carry ban applied to "or a sword, or a spear in a cane." The section 1 carry ban could, in isolation, be read as a banning all sword carry. Whereas section 3 is only about concealed swords—that is swords/spears in a cane.

The best reading of the statute as whole is application to sword canes, and not to ordinary swords. A ban on sword sales or open carry would have directly defied the Arkansas Supreme Court's recent *Wilson* decision. Such defiance seems unlikely, since the legislature was adjusting the law (by allowing open carry of Army & Navy handguns) to comply with the Arkansas Supreme Court ruling.

[692] Text at notes __.

[693] 1874 Wis. Sess. Laws 334 (Milwaukee); 1875 Wis. Sess. Laws 471, ch. 262 (Green Bay); 1876 Wis. Sess. Laws 218, ch. 103 (Platteville); 1876 Wis. Sess. Laws 737, ch. 313 (Racine); 1877 Wis. Sess. Laws 367, ch. 162 (New London); 1878 Wis. Sess. Laws 119–20, ch. 112 (Beaver Dam); 1882 Wis. Sess. Laws 309, ch. 92 (Lancaster); 1882 Wis. Sess. Laws 524, ch. 169 (Green Bay); 1883 Wis. Sess. Laws 713, ch. 183 (Oshkosh); 1883 Wis. Sess. Laws 990, ch. 341 Sturgeon Bay); 1883 Wis. Sess. Laws 1034, ch. 351 (Nicolet); 1885 Wis. Sess. Laws 26, ch. 37 (Kaukauna); 1885 Wis. Sess. Laws 753, ch. 159 (Shawano); 1885 Wis. Sess. Laws 1109, ch. 227 (Whitewater); 1887 Wis. Sess. Laws 336, ch. 124 (Sheboygan); 1887 Wis. Sess. Laws 1308, ch. 161 (Clintonville); 1887 Wis. Sess. Laws 754, ch. 162 (La Crosse); 1887 Wis. Sess. Laws 1308, ch. 409 (Berlin); 1891 Wis. Sess. Laws 699, ch. 123 (Menasha); 1891 Wis. Sess. Laws 61, ch. 23 (Sparta); 1891 Wis. Sess. Laws 186, ch. 40 (Racine).

[694] 1882 Wyo. Sess. Laws 174, ch. 81; 1884 Wyo. Sess. Laws 114, ch. 67.

*Oklahoma territory* (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense."[695] Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns.[696] Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[697] Unlike section 1, section 2 applied to carry in general, not just concealed carry.[698] Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was "any other offensive or defensive weapon."[699] What the difference was is unclear. Section 3 banned sales of the aforesaid items to minors.[700] The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair.[701]

*Iowa* (1887).

There was no state legislation on Bowie knives in the nineteenth century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887."[702]

---

[695] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[696] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[697] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[698] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[699] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[700] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[701] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[702] Defendant's Supplemental Brief in Response to the Court's Order of September 26, 2022, *Duncan v. Bonta*, at 41–42 (Case No. 17-cv-1017-BEN-JLB) (S.D. Cal. Nov. 10, 2022). The brief's cite is Declaration of Robert Spitzer, p. 24, electronic page no. 163 of 230, available at https://michellawyers.com/wp-content/uploads/2022/11/2022-11-10-Dec-of-Robert-Spitzer-ISO-Defendants-Supp-Brief-re-Bruen.pdf. The Declaration reproduces without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms" and many other weapons, including Bowie knives. The California Attorney General reads "or found in his possession" as a ban on possession in the home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

*Michigan* (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon."[703]

*Vermont* (1891).

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon."[704]

*Rhode Island* (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description."[705]

*Local ordinances on Bowie knives.*

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the Declaration of Robert Spitzer as an expert supporting a California arms prohibition statute.[706] The cities are in alphabetical order by state. The year is often the year of publication of the municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield,

---

[703] 1891 Mich. Pub. Acts 409, ch. 257; 1897 Mich. Pub. Acts 1030, ch. 465. Sand bags are discussed in Part VI.B.3, knuckles in Part VI.C.1.

[704] 1891 Vt. Acts & Resolves 95, ch. 85.

[705] 1893 R.I. Pub. Laws 231, ch. 1180.

[706] Spitzer, *supra* note ___,

Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of "any sword in a cane, or air-gun"); Memphis, Tennessee (1863).[707]

No carrying: Nashville, Tennessee (1881); Provo City, Utah territory (1877).[708]

Against hostile display: Independence, Kansas (1887).[709]

Against carry with intent to do bodily harm: Syracuse, New York (1885).[710]

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871);[711] Denver, Colorado (1886).[712]

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).[713]

## VI. OTHER WEAPONS

This Part covers restrictions on arms other than firearms or Bowie knives. Most of these restrictions were enacted in statutes that also covered Bowie knives, so the statutes were quoted in Part V. Here in Part VI, we will repeat or cross-reference the citations, but rarely quote at length.

The arms covered in this Article are in two broad classes. *Missile weapons* send a projectile downrange. Firearms, bows, and cannons are missile weapons. *Impact weapons* strike an adversary while being held by the user. Knives and swords are impact weapons, as are clubs, blackjacks, and slungshots.[714]

Section A covers sharp weapons that are not Bowie knives. The main categories are "daggers and dirks." Also included in Section A are sword canes, spears, swords, butcher knives, razors, and swords.

Section B addresses flexible impact weapons. That is, handheld weapons with a heavy tip and a flexible body, meant to be swung. The most important of these, in terms of number of laws enacted, is the slungshot. Section B also

---

[707] *Id.* at 10, 19, 21, 23–25, 35–36, 43, 45, 66.

[708] *Id.* at 68, 70.

[709] *Id.* at 26–27.

[710] *Id.* at 51.

[711] *Id.* at 7.

[712] *Id.* at 7, 13.

[713] *Id.* at 10.

[714] Some weapons can cross over from one category to another. A firearm can be used as a club, and a knife can be thrown as a missile. A spear can be thrown as a missile or held while striking in close combat.

**KnifeRights MSJ App.000896**

covers colts, blackjacks, sand clubs, sand bags, and billies. Additionally, Section B addresses slingshots; although they are missile weapons, they are sometimes confused with slungshots, including perhaps in statutes.

Section C covers rigid impact weapons. These are brass knuckles, knuckles made from other materials, and loaded canes (hollow canes filled with lead).

Section D deals with cannons.

<div align="center">A. Daggers, dirks, and other sharp weapons</div>

*1. Daggers and dirks*

Dirks are fighting knives. They can come in a variety of sizes and shapes. We start with a list of every Bowie knife statute that also included dirks. If daggers were included in a statute, along with Bowie knives and dirks, a parenthetical so notes.

As previously described, an 1837 Georgia ban on sale and open carry of dirks was held to violate the Second Amendment, whereas a ban on concealed carry was upheld.[715] But a similar law was enacted in Arkansas in 1881.[716] Other laws were:

No possession by "any slave." North Carolina (1846);[717] New Mexico Terr. (1858).[718]

No possession by black people; licenses for black people. Mississippi (1865);[719] Florida (1865).[720]

Extra punishment for misuse or carrying with malign intent. Mississippi (1837);[721] California (1855);[722] Indiana (1859);[723] Nevada (1861);[724] Idaho

---

[715] Nunn v. State, *supra.*

[716] *See* text at note ___, *supra.*

[717] *See* text at note ___, *supra.*

[718] *See* text at note ___, *supra.*

[719] *See* text at note ___, *supra.*

[720] *See* text at note ___, *supra.*

[721] *See* text at note ___, *supra.*

[722] *See* text at note ___, *supra.*

[723] *See* text at note ___, *supra.*

[724] *See* text at note ___, *supra.*

(1863);[725] Montana (1864);[726] Arizona Terr. (1867);[727] Missouri (1873) (also daggers);[728] Wyoming Terr. (1882) (also daggers);[729] Maryland (1883);[730] D.C. (1892).[731]

No concealed carry. Alabama (1838);[732] Virginia (1838) (if "habitually") (1881);[733] Louisiana (1855, 1898);[734] Ohio (1856);[735] Indiana (1859) (also daggers);[736] West Virginia (1868) ("habitually");[737] Montana (1864) (in towns);[738] Maryland 1872 (for Annapolis);[739] D.C. (1871, 1892) (also daggers);[740] Georgia (1873);[741] Nebraska (1873);[742] Missouri (1873) (certain locations) (also daggers);[743] North Carolina (1877) (for one county), 1879 (statewide) (both also for daggers), (1884);[744] Arizona (1883, by persons 10–16 in towns) (1887) (everyone in towns), 1893 (generally, adding daggers);[745] Rhode Island (1893) (also daggers);[746] Mississippi (1896).[747]

No open or concealed carry in certain locations. Tennessee (1869) (horse races);[748] Georgia (1870) (churches, court houses);[749] Louisiana (1870, 1873) (polling places);[750] Vermont (1891) (schools) (also daggers).[751]

---

[725] *See* text at note ___, *supra.*
[726] *See* text at note ___, *supra.*
[727] *See* text at note ___, *supra.*
[728] *See* text at note ___, *supra.*
[729] *See* text at note ___, *supra.*
[730] *See* text at note ___, *supra.*
[731] *See* text at note ___, *supra.*
[732] *See* text at note ___, *supra.*
[733] *See* text at note ___, *supra.*
[734] *See* text at note ___, *supra.*
[735] *See* text at note ___, *supra.*
[736] *See* text at note ___, *supra.*
[737] *See* text at note ___, *supra.*
[738] *See* text at note ___, *supra.*
[739] *See* text at note ___, *supra.*
[740] *See* text at note ___, *supra.*
[741] *See* text at note ___, *supra.*
[742] *See* text at note ___, *supra.*
[743] *See* text at note ___, *supra.*
[744] 1883-1884 Va. Acts 180, ch. 143.
[745] *See* text at note ___, *supra.*
[746] *See* text at note ___, *supra.*
[747] *See* text at note ___, *supra.*
[748] *See* text at note ___, *supra.*
[749] *See* text at note ___, *supra.*
[750] *See* text at note ___, *supra.*
[751] *See* text at note ___, *supra.*

No carry while intoxicated. Missouri (1873).[752]

No carry, with a few exceptions. Texas (1871) (daggers);[753] Arkansas (1874, 1881);[754] West Virginia (1882);[755] N.M. Terr. (1887) (also "all kinds of daggers" plus "poinards," which are a type of small, slim dagger;[756] Ariz. Terr. (1889) (in towns) (also daggers);[757] Oklahoma Terr. (1890) (also daggers).[758]

Specific property or vendor taxes. Florida (1835, 1881, 1889, 1893);[759] North Carolina 1850, 1856–57, 1866);[760] Alabama (1865–66, 1866–67, 1875-76, 1877–78, 1882, 1884, 1898);[761] Mississippi (1871, 1876, 1878, 1880, 1892, 1894, 1897);[762] Virginia (1874, 1875, 1881, 1883, 1889, 1893); Georgia (1882, 1884, 1886, 1888, 1892);[763] Kentucky (1891).[764]

Authorizing certain municipalities to license and tax vendors. North Carolina (1860–99);[765] Illinois (1867) (also daggers);[766] Wisconsin (1874–91) (allowing concealed carry bans) (also daggers);[767] Alabama (1878–98).[768]

Exemption from seizure for unpaid property taxes. Mississippi (1861).[769]

Restricting sales to minors. Tennessee (1856);[770] Indiana (1875);[771] Illinois 1881 (transfers only by father, guardian, employer);[772] West Virginia (1882);[773] Kansas (1882) (also banning possession by minors);[774] Missouri (1885)

---

[752] *See* text at note ___, *supra.*
[753] *See* text at note ___, *supra.*
[754] *See* text at note ___, *supra.*
[755] *See* text at note ___, *supra.*
[756] *See* text at note ___, *supra.*
[757] *See* text at note ___, *supra.*
[758] *See* text at note ___, *supra.*
[759] *See* text at note ___, *supra.*
[760] *See* text at note ___, *supra.*
[761] *See* text at note ___, *supra.*
[762] *See* text at note ___, *supra.*
[763] *See* text at note ___, *supra.*
[764] *See* text at note ___, *supra.*
[765] *See* text at note ___, *supra.*
[766] *See* text at note ___, *supra.*
[767] *See* text at note ___, *supra.*
[768] *See* text at note ___, *supra.*
[769] *See* text at note ___, *supra.*
[770] *See* text at note ___, *supra.*
[771] *See* text at note ___, *supra.*
[772] *See* text at note ___, *supra.*
[773] *See* text at note ___, *supra.*
[774] *See* text at note ___, *supra.*

(parental consent);[775] Florida (1889);[776] Texas (1889) (parental permission) (also daggers);[777] Oklahoma (1890) (also daggers);[778] Virginia (1890);[779] Louisiana (1890);[780] D.C. (1892);[781] North Carolina (1893).[782]

The next list is Bowie knife statutes that also included daggers, but not dirks:

Free blacks need a license to carry or possess. N.C. (1856).[783]

Free blacks may not carry or possess. N.C. (1861).[784]

Extra punishment for misuse. Texas (1856).[785]

No concealed carry. Montana Terr. (1864);[786] Colorado Terr. (1867) (state reenactments in 1876, 1885, 1891).[787]

No open or concealed carry in certain locations. Virginia (1869) (religious meetings).[788]

No open or concealed carry generally, with a few exceptions. N.M. Terr. (1859) ("Spanish dagger").[789]

The following laws about dirks or daggers were enacted in statutes that did not mention Bowie knives:

No carry. Harrisburg, Pennsylvania (1873) ("dirk-knife").[790]

No concealed carry. Wisconsin (unless with reasonable cause) (1872) (dirk or dagger);[791] South Carolina (1880) (dirk or dagger);[792] (1897) (dirk or

---

[775] *See* text at note ___, *supra.*
[776] *See* text at note ___, *supra.*
[777] *See* text at note ___, *supra.*
[778] *See* text at note ___, *supra.*
[779] *See* text at note ___, *supra.*
[780] *See* text at note ___, *supra.*
[781] *See* text at note ___, *supra.*
[782] *See* text at note ___, *supra.*
[783] *See* text at note ___, *supra.*
[784] *See* text at note ___, *supra.*
[785] *See* text at note ___, *supra.*
[786] *See* text at note ___, *supra.*
[787] *See* text at note ___, *supra.*
[788] *See* text at note ___, *supra.*
[789] *See* text at note ___, *supra.*
[790] 1873 Pa. Laws 735–36.
[791] 1872 Wis. Sess. Laws 17, ch.7.
[792] 1880 S.C. Acts 447–48, no. 362.

dagger);[793] Oregon (1885) (dirk or dagger);[794] Michigan (1887) (dirk or dagger).[795]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866) ("dirk or dagger (not contained as a blade of a pocket knife)").[796]

Sureties could be required for carry if the carrier had previously threatened to breach the peace. Oregon (1853) (dirk or dagger);[797] Wisconsin (1878) (dirk or dagger).[798]

On the whole, whatever combination of "bowie knives," "dirks," and "daggers" that a statute mentioned by name may not have been of great practical importance. Statutes that mentioned at least two of the three often had a catchall that included other "dangerous weapons." So if a statute said "Bowie knives, dirks, and other dangerous weapons," the statute might be applied to carrying a dagger.

This possibility would be less likely in property tax or vendor tax statutes, which did not typically include catchalls. Thus, a person who owned a dagger might not be liable for a property tax applicable to "bowie-knives and dirks."

### 2. Sword canes

Except as noted, all these sword cane laws also applied to Bowie knives.

Sales ban. Georgia (1837).[799] Held to violate the Second Amendment. Arkansas (1881).[800]

No giving to "any slave." N.M. Terr. (1859).[801]

No giving to "any slave or free person of color." Georgia (1860).[802]

---

[793] 1897 S.C. Acts 423, no. 251.

[794] 1885 Or. Laws 33.

[795] 1887 Mich. Pub. Acts 144, No. 129.

[796] 1866 N.Y. Laws 1523, ch. 716.

[797] 1853 Or. Laws 220, ch. 17.

[798] Revised Statutes of the State of Wisconsin, Passed at the Extra Session of the Legislature Commencing June 4, 1878, and Approved June 7, 1878, at 1121, ch. 196, sec. 4834 (1878).

[799] *See* text at note ___, *supra*.

[800] 1881 Ark. Acts 191, ch. 96. See note ___ for why we read the statute as a ban on spear canes and sword canes, not swords in general.

[801] *See* text at note ___, *supra*.

[802] 1860 Ga. Laws 56, No. 64.

No possession or carry by "any free negro." North Carolina (1861).[803]

No concealed carry. Georgia (1852);[804] D.C. (1871, 1892);[805] Ariz. Terr. (1891);[806] Oklahoma (1890,[807] 1893[808]); R.I. (1893).[809]

No concealed carry except for travelers. Kentucky (1813, Bowies not included);[810] Indiana (1820,[811] 1831,[812] 1843,[813] 1859,[814] 1881,[815] Bowies added in 1881); Arkansas (1837, 1881);[816] Georgia (1852,[817] 1883,[818] 1898[819]) (Bowies in 1883 and 1898); California (1863,[820] 1864[821]) (Bowies in neither); Nevada (1867).[822]

No carry in most circumstances. Tennessee (1821,[823] 1870,[824] 1879 ("sword cane" or "loaded cane");[825] Texas (1871,[826] 1887,[827] 1889[828]) (1887 and 1889 including bowies); Arkansas (1875,[829] 1881[830]); N.M. Terr. 1887; [831] Ariz. Terr.

---

[803] 1860-1861 N.C. Sess. Laws 68, ch. 34.

[804] 1851-1852 Ga. Laws 269, no. 165.

[805] *See* text at note ___, *supra*.

[806] 1893 Ariz. Terr. Laws 3, no. 2.

[807] 1890 Okla. Sess. Laws 495, art. 47, sec. 1.

[808] 1893 Okla. Terr. Laws 503, art. 45, sec. 3.

[809] 1893 R.I. Laws 231–32, ch. 1180.

[810] 1812 Ky. Acts 100, ch. 89.

[811] 1819 Ind. Acts 39, ch. 23.

[812] 1831 Ind. Acts 192, ch. 26, sec. 58.

[813] 1843 Ind. Acts 982, ch. 53, sec. 107.

[814] 1859 Ind. Acts 129, ch. 78, sec. 1.

[815] 1881 Ind. Acts 191, ch. 37, sec. 82.

[816] *See* text at note ___, *supra*.

[817] 1851–1852 Ga. Laws 269, No. 165.

[818] 1882–1883 Ga. Laws 49, No. 93.

[819] 1898 Ga. Laws 60, No. 106.

[820] 1863 Cal. Stat. 748.

[821] 1864 Cal. Stat. 115, ch. 128.

[822] 1867 Nev. Stat. 66, ch. 30.

[823] 1821 Tenn. Laws 15, ch. 13.

[824] 1870 Tenn. Laws 55, ch. 41.

[825] 1879 Tenn. Laws 231, ch. 86.

[826] 1871 Tex. Gen. Laws 25, ch. 34, sec. 1–2

[827] 1887 Tex. Gen. Laws 7.

[828] 1889 Tex. Gen. Laws 33, ch. 37.

[829] 1874–75 Ark. Acts 156.

[830] 1881 Ark. Acts 191, ch. 96.

[831] *See* text at note ___, *supra*.

(1889) ("within any settlement, town, village or city") (including Bowies);[832] Idaho (1889) ("any city, town or village").[833]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866).[834]

No transfer to minors. Georgia (1876) (including Bowies);[835] Oklahoma (1890,[836] 1893[837]); Texas (1897) (parental permission, including Bowies).[838]

Special taxation. Mississippi (1854,[839] 1856–57,[840] 1865 (including bowies),[841] 1871, 1876, 1878, 1880, 1892, 1894, 1897;[842] N.C. (1858–59,[843] 1866,[844] 1887,[845] 1889,[846] 1898,[847] including Bowies).

Authorizing municipal regulation: N.C. (1860–99) (various laws allowing taxes on sales, carrying, or possession).[848]

*3. Spears*

Sales and concealed carry ban. Georgia (1837).[849] Sales ban held to violate the Second Amendment, concealed carry ban upheld.[850]

No carry. Texas (1871) (unless carried openly with reasonable cause);[851] Arkansas ("spear in a cane") (1881).[852]

---

[832] 1889 Ariz. Terr. Laws 30, No. 13, sec. 1.

[833] 1888 Ida. Laws 23, sec. 1.

[834] 1866 N.Y. Laws 1523, ch. 716.

[835] 1876 Ga. Laws 112 ch. 128.

[836] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[837] 1893 Okla. Terr. Laws 503, art. 45, sec. 3.

[838] 1897 Tex. Gen. Laws 221, ch. 155.

[839] 1854 Mich. Pub. Acts 50, ch. 1.

[840] 1856-1857 Mich. Pub. Acts 36.

[841] 1867 Miss. Laws 412, ch. 317.

[842] *See* text at note ___, *supra*.

[843] 1858-1859 N.C. Sess. Laws 35–36, ch. 25.

[844] 1866-1867 N.C. Sess. Laws 63.

[845] 1887 N.C. Sess. Laws 885, ch. 58.

[846] 1889 N.C. Sess. Laws 836, ch. 183.

[847] 1897 N.C. Sess. Laws 154, ch. 90.

[848] *See* text at note ___, *supra*.

[849] *See* text at note ___, *supra*.

[850] *See* text at note ___, *supra*.

[851] 1871 Tex. Gen. Laws 25, ch. 34.

[852] 1881 Ark. Acts 191. No. 96.

No concealed carry. Georgia (1852);[853] Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause),[854] (1893);[855] Oklahoma Terr. (1890).[856]

No transfer to minors. Oklahoma Terr. (1890).[857]

*4. Razors*

During the nineteenth century, men shaved with straight-edge razors. These consisted of a single straight blade, sharpened on one edge. Often, the blade could fold into the handle, like a pocket-knife.

No concealed carry. D.C. (1871, 1892) ("razors, razor-blades");[858] Maryland (1872) (Annapolis), (1886, 1890);[859] Tennessee (1879);[860] South Carolina (1880, 1887, 1897);[861] Virginia (1881, 1884,[862] 1896); Illinois (1881);[863] North Carolina (1883);[864] Michigan (1887);[865] Colorado (1891);[866] Rhode Island (1893).[867]

No carry in most circumstances. Arkansas (1875, 1881);[868] West Virginia (1882) (exception for peaceable citizen with good cause).[869]

Carry limited to self-defense. Maryland (1894).[870]

West Virginia in the late nineteenth century prohibited carrying handguns and many other weapons (but not long guns) in public in most circumstances. In a case where a train passenger sued a railroad for facilitating his arrest for carrying a razor, the state supreme court explained:

---

[853] 1851-52 Ga. Laws 269, No. 165.

[854] 1889 Ariz. Terr. Laws 30.

[855] 1893 Ariz. Terr. Laws 3, No. 2, sec.1.

[856] 1890 Okla. Terr. Laws 495, art. 47, sec. 1.

[857] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[858] *See* text at note ___, *supra*.

[859] *See* text at note ___, *supra*.

[860] *See* text at note ___, *supra*.

[861] *See* text at note ___, *supra*.

[862] 1883-1884 Va. Acts 180, ch. 143.

[863] 1881 Ill. Laws 74.

[864] *See* text at note ___, *supra*.

[865] *See* text at note ___, *supra*.

[866] *See* text at note ___, *supra*.

[867] *See* text at note ___, *supra*.

[868] *See* text at note ___, *supra*.

[869] *See* text at note ___, *supra*.

[870] An 1874 Maryland law forbade the carry of "any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon" in Kent, Queen Anne's, or Montgomery counties. 1874 Md. Laws 366.

The razor was undoubtedly added to this section on account of the proneness of the Americanized African to carry and use the same as a deadly weapon. To such the razor is what the machete is to the Cuban. It is his implement of livelihood in time of peace, and his weapon of destruction in time of war. This is matter of common report. . . . The excuse given by the plaintiff, that he was carrying such razor to shave himself while in the country, is not a legal one. Such an excuse might be given by every person thus carrying a razor, and, if allowed as sufficient, would render the law of no affect.[871]

### 5. Butcher knives

No concealed carry. Mississippi (1888,[872] 1898);[873] Rhode Island (1893).[874]

No carry in most circumstances. Arkansas (1837,[875] 1875);[876] N.M. Terr. (1887).[877]

No carry to public assemblies or gatherings. Texas (1870).[878]

### 6. Swords

Banning carry. Idaho (1889) ("any city, town or village").[879]

Extra punishment for use in a crime. California (1855) ("small-sword, back-sword" used in a duel);[880] Nevada (1861) (same as California);[881] Mont. Terr. (1864) (a homicide in a duel with a "small sword, back-sword" is murder).[882]

---

[871] Claiborne v. Chesapeake & O. Ry. Co., 46 W.Va. 363, 370–71 (1899).

[872] 6 THE LAWS OF TEXAS 1822-1897, at 63 (H. P. N. Gammel ed., 1898).

[873] 1896 Miss. Laws 109, ch. 104.

[874] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[875] REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A. D. 1837, at 280 (William Mck. Ball & Sam C. Roane ed., 1838).

[876] 1875 Ark. Acts 156.

[877] *See* text at note ___, *supra*.

[878] *See* text at note ___, *supra*.

[879] 1888 Ida. Laws 23, sec. 1.

[880] *See* text at note ___, *supra*.

[881] *See* text at note ___, *supra*.

[882] *See* text at note ___, *supra*.

## B. Slungshots and other flexible impact weapons

This section describes a variety of weapons that are obscure to the twenty-first century reader. Although there are many books describing the history of firearms and knives, there is only one book on the history of flexible impact weapons, Robert Escobar's *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons*.[883] "At their most basic, they are all small, concealable, flexible and weighted bludgeons," he explains.[884]

It is extremely easy to make such a weapon at home. For example, take a sock and put some pocket change or a few tablespoons of sand or dirt in the toe.[885] Grasp the sock by the other end. You now have a flexible impact weapon. You can swing it and strike whoever is attacking you.

---

[883] ROBERT ESCOBAR, SAPS, BLACKJACKS AND SLUNGSHOTS: A HISTORY OF FORGOTTEN WEAPONS (2018). "[T]ry to find a group of weapons used as broadly as our was or for as long while having as little written about it." *Id.* at 241.

Proper techniques of defensive use are detailed in MASSAD AYOOB, FUNDAMENTAL OF MODERN POLICE IMPACT WEAPONS (1996).

[884] ESCOBAR, *supra* note __, at 9.

[885] Should you be alone in the outdoors and decide that you need a weapon, you can turn "your socks, or wrapped up shirt, into an impromptu sand-club" by adding dirt. "Throw in a rock or two if they are handy and you're even more prepared." *Id.* at 21.

Some examples of improvised flexible impact weapons, for good or ill:

During the 1863 anti-draft riots in New York City, two criminals, apparently taking advantage of the fact that the police were busy trying to suppress the riots, ordered two women to vacate their home within a day, or else the criminals would burn it. In defense, the women "tied stout cords to heavy lead fishing sinkers . . . What these amounted to, ironically, were crude versions of the slung-shot so highly favored by the New York thugs themselves." JAMES MCCAGUE, THE SECOND REBELLION: THE STORY OF THE NEW YORK CITY DRAFT RIOTS OF 1863, at 155 (1968).

In 1861, an English sailor fashioned a "slung shot" from "four revolver bullets" with "some paper round them" and attached to "a lanyard." Adolphus Manton, in PROCEEDINGS OF THE CENTRAL CRIMINAL COURT, 25th November 1861, at 78, reprinted at ref. no. t18611125-55 (Cent. Crim. Ct., London, Nov. 25, 1861), *in* The Proceedings of the Old Bailey, 1674-1913, www.oldbaileyonline.org.

During the eighteenth century, English criminals often used a "stocking filled with sand or lead shot." Rictor Norton, *St. Giles's Footpads & James Dalton's Gang: Footpads & Street Robbers*, *in* The Georgian Underworld: A Study of Criminal Subcultures in Eighteenth-Century England (website), http://rictornorton.co.uk/gu09.htm.

A leader of a women's auxiliary during the 1936–37 auto workers strike in Flint, Michigan, recalled, "we all carried a hard-milled bar of soap in one pocket and a sock in the other. That way, we couldn't be charged with carrying a weapon. But if somebody was creating trouble on the picket line, we'd slip that bar of soap into the sock and swing that sock very fast and sharp."

KnifeRights MSJ App.000906

With these weapons, a blow to the head could be fatal, but usually not. A blow anywhere else on the body was unlikely to be lethal.[886] As Escobar explains:

> these objects were not designed to inflict maximum damage. You do not put a soft or semi-soft covering on a weapon to increase its destructive capabilities nor do you make its striking surface smooth when it could be angular. You also don't use loads like lead powder, shot or sand instead of solid metal . . . [T]he lead pod inside most saps and jacks is about the size of a spoon head so there is little margin for errors if you want to maximize the impact.[887]

The vagueness of the term "Bowie knife"—which does not consistently describe any particular type of knife—was discussed in Part V.A. Definitions of categories of flexible impact weapons are even more confusing.[888] The meaning "depends on the year, who you ask(ed); and what country or part of the country you occupy when asked."[889] The "deliciously sloppy usages of the

---

It was as good as a blackjack." STRIKING FLINT: GENORA (JOHNSON) DOLLINGER REMEMBERS THE 1936-37 GENERAL MOTORS SIT-DOWN STRIKE AS TOLD TO SUSAN ROSENTHAL (1995), web reprint available at
https://www.marxists.org/history/etol/newspape/amersocialist/genora.htm#women.

In 2018, organized crime leader Whitey Bulger was transferred to the general prison population, and within hours was murdered by another inmate with "a lock in a sock." Bulger v. Hurwitz, 2023 WL 2335958 at *2 (4th Cir. Mar. 3, 2023).

[886] "Many police departments allowed head shots only in cases where deadly force was deemed necessary." ESCOBAR, *supra* note __, at 232.

[887] *Id.* at 237.

[888] "Perhaps because they thrived outside of polite society, their names are colorful, sometimes comical, and never really used consistently." *Id.* at 11. Various names were "slungshot, blackjack, jack, jacksap, billyjack, slapjack, flat sap, spoon sap, slap-stick, slapper, zapper, slock, sand-club, sandbag, billet, billie, convoy, cosh, life-preserver, persuader, starter, bum starter, priest, fish priest, Shanghai tool, monkey fist, Sweet William, joggerhead, beavertail." *Id.*

[889] *Id.* at 12. Changes in usage are nothing new. As of the eighteenth and early nineteenth centuries, a "gun" meant a long gun; handguns were called "pistols." Later, "gun" came to encompass everything that fired a bullet. Today, and in the twentieth century, "pistol" is sometimes used as a synonym for handgun, although the more precise meaning is a semiautomatic handgun, as distinct from a revolver.

past" make it difficult to determine what particular type of flexible impact weapon is being discussed in historical sources.[890]

Escobar's book provides an appendix of definitions, which he calls "more art than science," an effort to put "a sensible framework over the whole mess."[891] According to Escobar, "[s]aps and jacks" were shorthands "for everything except slungshots."[892]

Whatever the term used for a particular flexible impact weapon, the class as a whole has the following characteristics:

- Non-lethal except for a blow to the head. Even then, less likely to be lethal than a firearm or knife strike to the head.
- Exceptionally compact and easy to conceal, because they are flexible.[893] Unlike firearms or knives, which are rigid.
- Silent, like blade arms, and unlike firearms.
- Unlikely to cause surface bleeding, unlike firearms or blades.

We now turn to the flexible impact weapon that led to the most legislation in the nineteenth century, the slungshot.

---

[890] *Id.* at 17.

[891]

> If you're thinking everything mentioned in this appendix must have made research a complete nightmare, you are correct. It was difficult enough to find references to any of our terms and the fun only began then. . . . I was not . . . interested in proposing a codified way of this for book but instead wanted to put a sensible framework over the whole mess that goes with the modern meanings of the terms while still honoring the past. In short, it's more art than science . . .

*Id.* at 226–27.

[892] *Id.* at 11.

[893] "Saps and jacks remain half hidden even when openly brandished." *Id.* at 11. A sap has the stopping power of a billy club, "but in a much smaller package. [For a law enforcement officer] This made it an ideal backup in case you lost your bafa ton in a scuffle or while running." *Id.* at 73.

### 1. Slungshots and colts

The "slungshot was a tool turned weapon."[894] In the original slungshot, one end of the rope is wound around a lead weight, or other small, dense item.[895] Sailors use slungshots to cast mooring lines and other ropes over water. Resources on a ship at sea are very finite, and slungshots are easy to construct.[896] Definitionally, "slungshot" has been more stable than its flexible weapon cousins.[897]

The term slungshot, however, was applied to many items that had nothing to do with nautical affairs or ropes. Many slungshots were manufactured from leather and hardly looked like sailors' tools.

Compared to other flexible impact weapons, "slungshots are the clear champion in terms of pure impact. One strike to the head, without regard to particular target, usually results in the immediate cessation of hostility in the opponent or defense in the victim. Whether or not full unconsciousness does mercifully come, the person is usually incapacitated and in for unpleasant long

---

[894] *Id.* at 39.

[895] "A weight, usually hard loaded, tied to the end of a rope or similar material which swings freely. The end was often a sling, presumably indicating a common linguistic link between it, the ancient sling and the slingshot." *Id.* at 14. "[A]t heart just a small round weight surrounded by a clever knot", "It was tied so that one or two ends of the rope trail away from the ball shaped knot, providing material for the handle. A common additional feature once weaponized was a loop at the opposite end of the load so the entire contraption could be secured to the wrist. The original purpose" "was to allow one to cast a line across open water." *Id.* at 41.

[896] One could be made with a "bit of rope, cloth, sand, fishing weights and more." *Id.* at 44.

[897] "Slungshots are always called slungshots and clubs . . . generally called clubs." *Id.* at 133.

"The term appears common in the mid-19th century and *usually* describes the right weapon or at least something close to it." *Id.* at 226.

> Still you can unsurprisingly encounter instances where it is used to describe our entire subject matter and more (like brass knuckles). The most important note on slungshot as a term is that once into modernity but prior to the late 19th century it is written about very often while our other terms are almost non-existent. That's good in that eytmologists say that sap and blackjack only started later, it's bad in that we don't know if that means any kind of sap would have been called a slungshot back then or that the slungshot configuration was simply much more popular in those days.

*Id.*

term effects. So it hits harder. . . ."[898] "One reason is simply the length. Both saps and blackjacks are normally less than 10 inches long."[899] A slungshot could be 22 inches.[900] The slungshot "provided the reach of a substantial club while fitting easily inside a pocket. Unlike a club, knife or brass knuckles, it could be held in a closed hand completely unseen while being ready to instantly lash out. This was very likely a factor in the slungshot's later popularity with street criminals."[901] Compared to other impact weapons, "The slungshot was even more suited for a sneak attack. With its long coiled shaft/handle and small load taking up little space in a pocket, it could be quickly unleashed and strike a man from a much greater distance than a sap or jack."[902]

A variety of slungshot, known as a "life-preserver" was popular with burglars in Victorian England. Besides the advantage of concealability, the life-preservers were "less lethal for dealing with interruptions; murder only being a way of increasing police attention after the fact."[903]

Slungshots were popular with criminals for obvious reasons, but they were also carried at least sometimes by the law-abiding. An 1863 cartoon from the English humor magazine *Punch*, titled "Going Out to Tea in the Suburbs," shows a "society outing" of men and women "armed to the teeth," with "the life-preserver" as "the most common choice in the arsenal."[904] The cartoon, subtitled "A Pretty State of Things for 1862," portrays in exaggerated fashion the public response to the garroting scare of 1862.[905]

According to a historian of New Orleans life during Reconstruction, the "people fairly bristled with lethal weaponry: revolvers, pepperbox pistols,

---

[898] *Id.* at 45.

[899] *Id.*

[900] Clifford W. Ashley, The Ashley Book of Knots (1944)

[901] Escobar, *supra* note __, at 44.

[902] *Id.* at 233.

[903] *Id.* at 76.

Attorney Abraham Lincoln's most famous case was the Almanac Trial of 1858. According to the charges, one evening around midnight Duff Armstrong fatally hit James Metzger in the head with a "slung-shot," made of "a copper ball covered with lead, sewn into a leather bag and attached to a strap." A witness who had been about 150 feet away claimed he could clearly identify Armstrong as the perpetrator because the moon was full that night. Lincoln won an acquittal by producing an almanac showing that the moon was at quarter phase, and about to set. John Evangelist Walsh, Moonlight: Abraham Lincoln and the Almanac Trial (2000).

[904] Escobar, *supra* note __, at 78.

[905] "Going Out to Tea in the Suburbs," Punch's Almanack for 1863 (Jan.-June); Andy Croll, *Who's afraid of the Victorian underworld?* The Historian 30, 34 (Winter 2004).

dirks, bowie knives and slung-shots—a private arsenal concealed in the pockets and waist bands of respectable gentlemen and proletarian thugs alike."[906]

According to Escobar, "Court records of the 1800's have many cases of civilians (e.g. neither professional criminal nor cop) using slungshots, etc."[907] But "[a]t least in the incidents combed for this book, a man bringing one out after being threatened comes up rarely. As a reminder, the slungshot is particularly well suited to the sneak attack as it is not seen until it hits and does so from a surprising distance."[908] A "man avenging himself for a perceived slight to his honor via a possibly deadly sucker punch with these comes up quite a bit."[909]

In sum, "It's clear they were often carried by criminals with ill intent but also by men who just wanted to be ready to defend (or I guess avenge) themselves. Granted, it looks like men with short fuses who were more prone to break the law via assault than your average Joe."[910]

Slungshot laws are different from the laws on other arms that have been discussed above. Starting in 1849, eight states and one territory outlawed sales and manufacture. Vermont (1849);[911] New York (1849),[912] (1881),[913] (1884),[914] (1889);[915] Massachusetts (1850),[916] (1882);[917] Kentucky (1855);[918] Florida

---

[906] Dennis C. Rousey, *Black Policemen in New Orleans During Reconstruction* in A QUESTION OF MANHOOD: A READER IN U.S. BLACK MEN'S HISTORY AND MASCULINITY, vol. 2 THE 19TH CENTURY: FROM EMANCIPATION TO JIM CROW 85, 89 (Darlene Clark Hine & Earnestine Jenkins eds., 2001).

[907] ESCOBAR, *supra* note __, at 131.

[908] *Id.* at 74.

[909] *Id.*

[910] *Id.* at 75.

[911] 1849 Vt. Acts & Resolves 26.

[912] 1849 NY Laws 403, ch. 278.

[913] 1881 N.Y. Laws 102.

[914] 3 THE REVISED STATUTES, CODE AND GENERAL LAWS OF THE STATE OF NEW YORK 3330 (Clarence F. Birdseye ed., 1890).

[915] 1889 N.Y. Laws 167, ch. 140.

[916] 1850 Mass. Acts 401, ch. 194, sec. 2.

[917] THE PUBLIC STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS, ENACTED NOVEMBER 19, 1881; TO TAKE EFFECT FEBRUARY 1, 1882, at 1163 (1886).

[918] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

(1868),[919] (1893);[920] Dakota Terr. (1877),[921] (1883);[922] Illinois (1881);[923] Minnesota (1886);[924] Pennsylvania (1889).[925]

Illinois also prohibited possession. Vermont prohibited possession for interpersonal use, and Maryland did the same for carrying. The laws still allowed use as tool, such as for nautical purposes.[926] The Kentucky sales ban was repealed later in the century.[927]

The nine jurisdictions with slungshot sales bans were the most for any weapon in America in the nineteenth century. Only metallic knuckles, discussed in Part VI.C.1, came close.

Most jurisdictions did not ban slungshot sales. The majority approach was similar to Bowie knives:

No giving to "any slave or free person of color," except by "the owner." Georgia (1860).[928]

---

[919] DIGEST OF THE LAWS OF THE STATE OF FLORIDA, FROM THE YEAR ONE THOUSAND EIGHT HUNDRED AND TWENTY-TWO, TO THE ELEVENTH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND EIGHTY-ONE, INCLUSIVE 403 (James F. McClellan ed., 1881).

[920] 1893 Fla. Laws 52.

[921] 1877 N.D. Laws 794, ch. 38, sec. 455.

[922] 1883 Dakota Terr. Laws 1211, sec. 456.

[923]

> That whoever shall have in his possession, or sell, give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this state, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdmeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).

1881 Ill. Laws 73.

[924] THE PENAL CODE OF THE STATE OF MINNESOTA TO TAKE EFFECT JANUARY 1, A. D. 1886, at 127 (1885).

[925]

[926] The first section of the Vermont statute made it a misdemeanor to manufacture or transfer a slungshot. The second section made it a felony to "carry, or be found in the possession of, use or attempt to use, as against any other person, any instrument, or weapon, of the kind usually known as a slung shot."1849 Vt. Acts & Resolves 26. The felony punishment for violating the second section suggests that it referred to possessing or carrying the slungshot for the purpose of using it against another person.

The Maryland law forbade concealed carry of slungshots and open carry if done "with the intent or purpose of injuring any person." 1886 Md. Laws ch. 395.

The Vermont and Maryland laws apparently intended to outlaw all use of slungshots in fighting, while still allowing use as a nautical tool and for similar purposes.

[927] Text at notes *infra*.

[928] *See* text at note ___, *supra*.

No concealed carry. California (1864);[929] Nevada (1867);[930] Wisconsin (1872);[931] Alabama (1873);[932] Illinois (1881);[933] North Carolina (1877, Alleghany County; 1879 statewide);[934] Dakota Terr. (1877);[935] Mississippi (1878);[936] South Carolina (1880);[937] Virginia (1884);[938] Missouri (1885);[939] Arizona Terr. (1887) (in towns) (1893) (in general); Oregon (1885);[940] Arizona (1887);[941], Michigan (1887);[942] Rhode Island (1893);[943] Maryland (1894) (unless reasonable cause);[944] District of Columbia (1899).[945]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866),[946] (1884);[947] Minnesota (1891).[948]

No open or concealed carry in most circumstances. N.M. Terr. (1859, 1887);[949] California (1863);[950] Texas (1871) (without reasonable cause);[951]

---

[929] 1864 Cal. Stat. 115, ch. 128.

[930] 1867 Nev. Stat. 66, ch. 30.

[931] 1872 Wis. Sess. Laws 17, ch. 7.

[932] 1873 Ala. Laws 130–31, no. 87.

[933] 1881 Ill. Laws 73.

[934] *See* text at note ___, *supra*.

[935] 1877 N.D. Laws 794, ch. 38, sec. 456.

[936] *See* text at note ___, *supra*.

[937] THE GENERAL STATUTES AND THE CODE OF CIVIL PROCEDURE OF THE STATE OF SOUTH CAROLINA, ADOPTED BY THE GENERAL ASSEMBLY OF 1881–82, at 699 (1882).

[938] 1883-1884 Va. Laws 180, ch. 143.

[939] 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 854 (1889).

[940] 1 THE CODES AND GENERAL LAWS OF OREGON 977 (William Lair Hill ed., 1887).

[941] REVISED STATUTES OF ARIZONA 726 (1887).

[942] 3 THE GENERAL STATUTES OF THE STATE OF MICHIGAN 3800 (Andrew Howell ed., 1890).

[943] 1893 R.I. Laws 231–32, ch. 1180.

[944] 1894 Md. Laws 834.

[945] 1899 U.S. Stat. 1270, ch. 429, sec. 117.

[946] 1866 N.Y. Laws 1523, ch. 716.

[947] 3 THE REVISED STATUTES, CODE AND GENERAL LAWS OF THE STATE OF NEW YORK 3330 (Clarence F. Birdseye ed., 1890).

[948] 2 GENERAL STATUTES OF THE STATE OF MINNESOTA, IN FORCE JANUARY 1891, at 517 (1891).

[949] *See* text at note ___, *supra*.

[950] 1863 Cal. Stat. 115–16, ch. 128.

[951] 1871 Tex. Gen. Laws 25.

Harrisburg, Pennsylvania (1873);[952] Tennessee (1879);[953] West Virginia (1882);[954] Dakota Terr. (1883);[955] Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause).[956]

No carry to public assemblies or gatherings. Texas (1871);[957] Missouri (1885).[958]

Ban on carry with intent to injure. Maryland (1882).[959]

Sales to minors. Kentucky (1859) (parental permission);[960] Indiana (1875);[961] West Virginia (1882);[962] Kansas (1882) (also banning possession by minors);[963] Missouri (1885) (under 21);[964] New York (1889) (18, unless police magistrate consents);[965] Oklahoma (1890) (under 21);[966] Texas (1897, parental consent).[967]

Limiting carry by young people. Nevada (1881) (under 18),[968] (1885) (under 21);[969] Ariz. Terr. (1883, ages 10-16, in towns).[970]

Specific taxation. Kentucky (1891) (occupational tax for vendors).[971]

Authorizing municipalities to regulate. Illinois (1867) (Bloomington, concealed carry, "colt, or slung-shot");[972] Wisconsin (1874–91) (concealed carry, "colt, or slung shot");[973] Michigan (1891) (Saginaw, concealed carry).[974]

---

[952] 1873 Pa. Laws 735–36.

[953] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[954] *See* text at note ___, *supra*.

[955] 1883 Dakota Terr. 1211, sec. 456.

[956] 1889 Ariz. Terr. Laws 30.

[957] 2 A Digest of the Laws of Texas: Containing the Laws in Force, and the Repealed Laws on which Rights Rest, From 1754 to 1874, at 1323 (George W. Paschal ed., 4th ed. 1874).

[958] 1 The Revised Statutes of the State of Missouri 854 (1889).

[959] *See* text at note ___, *supra*.

[960] *See* text at note ___, *supra*.

[961] *See* text at note ___, *supra*.

[962] *See* text at note ___, *supra*.

[963] *See* text at note ___, *supra*.

[964] *Id.*

[965] 1899 N.Y. Laws 1341, ch. 603.

[966] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[967] *See* text at note ___, *supra*.

[968] 1881 Nev. Stat. 143.

[969] 1885 Nev. Stat. 51.

[970] *See* text at note ___, *supra*.

[971] *See* text at note ___, *supra*.

[972] *See* text at note ___, *supra*.

[973] *See* text at note ___, *supra*.

[974] *See* text at note ___, *supra*.

No possession. Illinois (1881).[975]

In the nineteenth century, "colt" seems to have been an alternative term for "slungshot." The Shorter Oxford English Dictionary defines a "colt" as "4. A short piece of weighted rope used as a weapon, *spec. (Naut.)* a similar instrument used for corporal punishment, *slang*, M18."[976]

An 1855 Kentucky prohibiting slungshot sales also applied to two other types of arms:

> That any person or persons who may hereafter be found guilty of vending, buying, selling, or doling in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor, shall forfeit or pay 25 dollars.[977]

The Kentucky ban on sale of "colts," stayed on the books for several decades, and was eventually replaced with a ban only on sales to minors, plus a tort cause of action for anyone injured with the listed weapons as a result of an illegal sale.[978]

---

[975] 1881 Ill. Laws 73.

[976] 1 SHORTER OXFORD ENGLISH DICTIONARY 444.

[977] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

[978] One might guess that "colts" referred to the revolvers produced by Colt's Manufacturing Co., in New Haven, Conn. The first models of Samuel Colt's revolver handguns were introduced in the late 1830s, and by 1855 they were a huge commercial success. Protected by a patent that did not expire until 1857, they faced no competition in the category of high-quality modern revolver.

The theory that the Kentucky legislature was taking aim at the Colt's revolvers is buttressed by the late nineteenth century version of the statute, which changed the spelling to "Colt's."

By the time Kentucky's revised statute changed "colts" to "Colt's," and banned sales only to minors, the Colt's Manufacturing revolver patent was expired; there were many companies selling high-quality modern revolvers at affordable prices. At that point, a sales restriction on Colt's revolvers only would have made no sense, although perhaps similar revolvers could be said to be covered by "or any imitation of substitute therefor."

Even so, in the latter nineteenth century a Kentucky ban on revolvers "similar" to Colt's would be the opposite of gun control efforts of the time in other states. As discussed in Part IV.B. & C., those were bans on the most concealable handguns, and they exempted large handguns ("Army and Navy" models) like the Colt's.

In short, the laws for slungshots/colts are the most restrictive of any of the weapons examined in this article. Most jurisdictions that chose to regulate followed the typical course for other weapons—such as concealed carry bans or limits on sales to minors. As for bans on carry in general, there are of course the usual suspects, namely some of the jurisdictions that also banned open handgun carry, and likewise banned carrying most other weapons, while still allowing long gun open carry. However, the Dakota Territory banned slungshot carry, and Dakota was not among the jurisdictions that banned handgun carry.

More importantly, there were nine states or territories that at some point banned manufacture or sale, and two of them banned possession. This is substantially more than the number that imposed such restrictions on any other arm in the nineteenth century.

We reviewed every pre-1900 case on Westlaw with the words "slungshot," "slung shot," or "slung-shot." Few of them are instructive on right to arms law. Some involve some other weapon, such as a gun or knife, and simply quote a statute that also mentions slungshots.[979] Many involve homicides or assaults; a defendant of course could not raise the right to arms.[980] A few asked whether

---

We suggest that the 1855 Kentucky statute was not about handguns. If the successor statutes were, they were anomalous to the extent that they singled out large handguns for stricter regulations than small handguns.

[979] *See, e.g.*, State v. Seal, 47 Mo. App. 603 (1892) (defendant convicted of "exhibiting a gun in a rude, angry and threatening manner"; statute also applied to slungshots); People v. Izzo, 60 Hun. 583, 39 N.Y. St. Rep. 166, 14 N.Y.S. 906 (1st Dept. 1891) (conviction for carrying a concealed dagger with intent to use in a crime reversed because of improper testimony; statute also applied to slungshots).

[980] *See, e.g.,* State v. Marshall, 35 Or. 265, 57 P. 902 (1899) (insanity defense for assault with a slungshot); People v. Turner, 118 Cal. 324. 50 P. 537 (1897) (cross-examination of victim who identified defendant as perpetrator of assault with a slungshot); People v. Wyman, 15 Cal. 70 (1860) (upholding conviction of manslaughter for stabbing victim in the ribs; victim's nose had been broken, and a physician testified that the break was not caused by a knife, and "might have been made a slungshot, a round stick, or possibly with the fist"); State v. Melton, 102 Mo. 683, 15 S.W. 139 (1891) (claim of self-defense not supported by the facts); State v. Fowler, 52 Iowa 103, 2 N.W. 983 (1879) (admissibility of witness testimony in support of self-defense); State v. Yeaton, 53 Me. 125 (1865) (refused entrance to an event at a private school, defendants assaulted the school personnel with slungshots); People v. Casey, 72 N.Y. 393 (1872) (defendant convicted of assault with a sharp weapon; indictment had also mentioned "certain knife, pistol, slung-shot, billy and club"; jury conviction of sharp weapon was implausible, since evidence showed a bludgeon and not a cut, but defendant's attorney had failed to object below); People v. Emerson, 6 N.Y.Crim.R. 157, 20 N.Y.St.Rep. 155 N.Y.S. 374 (Sup. Ct. N.Y. County 1888) (defendant convicted of running an illegal lottery; prosecution was correctly allowed to

a municipality had the power to enact an ordinance.[981] Two cases involved sailors who carried slungshots, and the courts did not consider the slungshots to indicate anything nefarious about the sailors' characters.[982] In a lawsuit about a "rough and abusive" passenger who had been struck by a train employee with a slungshot and ejected from a slow-moving train for not paying the fare, an Illinois appellate court ruled that the trial court had improperly excluded evidence that the train employee had legitimate defensive purposes for carrying a "billy or slungshot" (terms that the court used interchangeably).[983]

The one case that addressed the constitutionality of slungshot laws in depth was the 1871 *English v. State*, which upheld the recently enacted Texas statute against public carry of handguns and many other arms, while allowing long gun carry.[984] As for the Second Amendment right to bear arms, the Texas Supreme Court held that arms protected were the types of arms useful in a militia:

---

introduce testimony about the nature of "a lottery policy," just as other cases allow testimony about "the nature and description of a weapon commonly known as a 'slungshot,' or, under section 508, what is an instrument adapted or commonly used for the commission of burglary, etc.").

[981] *See*, *e.g.* Collins v. Hall, 92 Ga. 411, 17 S.E. 622 (1893) (municipality did not have the power to enact on concealed carry ban on various arms, including slungshots); Ex parte Caldwell, 138 Mo. 233, 39 S.W. 761 (1897) (municipal law imposing fine for carrying concealed weapons was consistent with city charter; defendant's weapon not specified, but ordinance included slungshots).

[982] Gardner v. Bibbins, 1 Blatchf. & H. 356, 9 F.Cas. 1159 (S.D.N.Y. 1833) ("He produces the evidence of a laborer, to prove that the libellant was in possession of a slung-shot on shore, which might have been used as a dangeous weapon . . . but he does not pretend, in his own deposition, that he ever regarded those circumstances as importing any danger to him or to the vessel."); Smith v. U.S., 1 Wash. Terr. 262 (1869) ("The evidence excluded appears to have been offered for the purpose of showing that Butler . . . 'had a slung-shot on board the bark Marinus at the time of the affray.' It nowhere appears in the evidence that Butler, at the time of the affray, was making an assault upon the prisoner, or attempting or threatening to make any.").

[983] Chicago, B. & Q.R. Co. v. Boger, 1 Ill. App. 472 (1877) ("The appellant offered to prove by the witness that a short time before he had had trouble with roughs and confidence men jumping on the train as it was passing out of the city, where he had been attacked by them, and that he carried the billy for his personal protection against any future assault. We think this evidence should have been admitted to the jury.").

[984] English v. State, 35 Tex. 473 (1871).

Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives. Can it be understood that these were contemplated by the framers of our bill of rights? Most of them are the wicked devices of modern craft.

. . .

To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.

The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.[985]

The Texas State Constitution right to arms guaranteed "the right to keep and bear arms in the lawful defense of himself or the state, under such regulations as the legislature may prescribe."[986] The language authorizing regulations in the 1866 Constitution was a change from the 1845 statehood Constitution, and the 1836 Constitution of the Republic of Texas.[987] The court

---

[985] *Id.* at 474, 476–77.

[986] Tex. Const. of 1868, art. I, § 13: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the legislature may prescribe."

[987] Tex. Const. of 1845, art. I, § 13: "Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State." Tex. Const. of 1836, Declaration of Rights,

held that "arms" in the Texas Constitution meant the same thing as in the Second Amendment.

According to the court, the carry ban was a reasonable regulation: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[988] As for Texans' preferences for carrying arms, it came from the pernicious Spanish influence on the State—which had once been part of New Spain, and then part of the United States of Mexico:

> A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.[989]

The English decision did not mention the 1856 *Cockrum* case, stating that the right to keep and bear Bowie knives is protected by Texas Constitution and the Second Amendment, while misuse in violent crime is not.[990]

*2. Slingshots*

Slingshots are entirely different from slungshots. A slungshot is an impact weapon, and a slingshot is a missile weapon. The first slingshot law does not appear until 1872, the next one 1886, and the remainder in the 1890s.

---

§ 14: "Every citizen shall have the right to bear arms in defence of himself and the republic. The military shall at all times and in all cases be subordinate to the civil power."

[988] *English*, 35 Tex. at 478–79.

[989] *Id.* at 480.

[990] Text at notes____.

According to Escobar, "we don't know if 'slingshot' was a confused attempt to outlaw slungshots, but it's a good guess."[991]

Today we think of actual slingshots as children's toys, as famously carried by mischievous cartoon character Dennis the Menace. Dennis was not inclined to "malicious mischief," but if he had been, the expected result would have been a broken window or a dead bird. However, a slingshot can also be a formidable weapon.

In the legions of classical Rome, the legionnaire soldier was expected to be proficient with a sling and a rock. Every Roman soldier carried a sling. So if a soldier's sword were lost or broken in combat, he could still use the sling.[992]

The Bible story of the young shepherd David killing the giant Goliath with a sling reflects the typicality of slings as combat weapon in ancient times.[993]

To be sure, a "slingshot" is not a "sling." But a powerful slingshot hurling a rock is certainly a weapon that can be, and has been, used for hunting, for defense, and for offense.

The following statutes restricted "slingshots." Whether they were meant to apply to slungshots or to slingshots is unknown.

No concealed carry. Wisconsin (1887),[994] Mississippi (1896),[995] (1898);[996] Maryland (1872) (in Annapolis);[997] Washington (1886);[998] Colorado (1891);[999] South Carolina (1897).[1000]

No sales to minors. North Carolina (1893).[1001]

Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry);[1002] Nebraska (1895) (Lincoln, concealed carry).[1003]

---

[991] ESCOBAR, *supra* note __, at 105.

[992] Heather Pringle, *Ancient Slingshot Was as Deadly as a .44 Magnum: An excavation in Scotland shows that Roman soldiers used lead ammo with lethal accuracy*, NAT'L GEOGRAPHIC, May 23, 2017, https://www.nationalgeographic.com/history/article/ancient-slingshot-lethal-44-magnum-scotland.

[993] 1 Samuel 17.

[994] 1887 Wis. Sess. Laws 1308, ch. 4.

[995] 1896 Miss. Laws 109–10, ch. 104.

[996] 1898 Miss. Laws 86, ch 68.

[997] 1872 Md. Laws 57, ch. 43.

[998] 1885–86 Wash. Terr. Laws 81–82.

[999] 1891 Colo. Sess. Laws 129.

[1000] 1897 S.C. Acts 423, no. 251.

[1001] *See* text at note___,

[1002] *See* text at note___,

[1003] *See* text at note___,

If the laws applied to actual slingshots, they fit into the mainstream established by Bowie knife laws. There were no prohibitions on possession, open carry, or sales to adults. If the laws applied to slungshots, they add to the total of states with standard restrictions, rather than prohibitions on sales.

### 3. Sand Clubs

A sand club is a small bag of sand attached to a short handle.[1004] A sand club is also called a "sand bag" or "sandbag." If a sand club is filled with something other than sand, such as lead pellets, it might be called a "blackjack" or a "sap." All these clubs were often carried by law enforcement officers.

One advantage for either law enforcement or criminal use is that a sand club does not leave a mark on the target.[1005] The "ability here outstrips that of saps, jacks, slungshots and all their variations" because of the soft load.[1006]

The sand club "might be the only easily adjustable impact weapon known to man. . . If you want up its destructive capabilities . . . just add water. Wet sand weighs more."[1007]

The only specific state laws we found on these arms were bans on carry with intent to injure. Maryland (1882) ("sand-club");[1008] Michigan (1891) (Saginaw, concealed carry, "sand bag").[1009] The pervasive law enforcement use was perhaps an indicia that responsible citizens might choose similar arms.

---

[1004] "A long sausage-shaped bag of sand used as a weapon." ERIC PARTRIDGE, A DICTIONARY OF SLANG AND UNCONVENTIONAL ENGLISH (1971). *See also* ESCOBAR, *supra* note __, at 19 ("a sand-club, formed by filling an eel-skin with sand"), quoting 1 THE LONDON MEDICAL RECORD 576 (Ernest Abraham Hart ed., 1873) (describing an 1871 homicide in San Francisco).

Like other flexible impact weapons other than the slungshot, a sand club is sometimes called a "sap." For example, in a 1983 case,

> Officer Casey testified that at first he thought the object, which was very common in the North Park area of Pittsburgh, was a "sap." That is, a sock filled with sand that when swung, according to the officer, was "almost a stone, and [if] you hit somebody in the side of the head or temple with it, you'll kill him. It's a very effective weapon."

Commonwealth v. Hook, 313 Pa. Super. 1, 459 A.2d 379, 384 n.2 (1983) (Popovich, J., dissenting).

[1005] ESCOBAR, *supra* note __, at 19, 21.

[1006] *Id.* at 21.

[1007] *Id.*

[1008] *See* text at note___,

[1009] *See* text at note___,

### 4. Blackjacks

Blackjack laws begin to appear in the last quarter of the nineteenth century. The dating indicates that the statutes were referring to the modern blackjack.[1010]

The "classic modern blackjack" is "a coil spring body with cylindrical shaped head and a hard load. As such this focuses the impact into a small area and loses the soft sap's lower peak force distribution."[1011] The "blackjack" is distinct from the broader, earlier nineteenth century use of "jack" to refer to all sorts of flexible impact weapons.

The blackjack became "a police constant for about 100 years."[1012] "Policemen's uniforms in the U.S. had a special pocket where they were stored."[1013] Theodore Roosevelt carried one when he was Police Commissioner of New York City, and when he was President of the United States.[1014]

Blackjacks were favored by law enforcement officers for the same reasons that officers liked saps and jacks in general:

> [E]ven in the days when law enforcement had much freer rein than today, stabbing a suspect with a knife you technically should or should not have had on you was going to be a problem. Shooting him would be even more complicated. By process of elimination we can understand how saps became the go to backup tool for an officer. At least you were already officially issued a club . . . In this way saps came to straddle that unique middle ground between law and lawless that was their place for so long.[1015]

---

[1010] *Id.* at 85. But confusingly, "Later authors apparently then applied the term retroactively to all kinds of saps. . . ." *Id.* In San Francisco, "unlike elsewhere," "the term slungshot" was "applied almost universally" to blackjacks. *Id.* at 101.

[1011] *Id.* at 127. Yet "there were modern blackjacks with other methods of construction," according to very early twentieth century order forms, and some of these variants were still being made in the 1970s. *Id.*

[1012] *Id.* at 135.

[1013] *Id.* at 11.

[1014] R.L. WILSON & GREGORY C. WILSON, THEODORE ROOSEVELT: OUTDOORSMAN 138 (1971).

[1015] ESCOBAR, *supra* note __, at 105–06.

**KnifeRights MSJ App.000922**

Starting in 1881, New York banned sale or manufacture, with a police exemption that Roosevelt used.[1016] The New York law was eccentric. Other jurisdictions that specifically regulated blackjacks imposed lesser restrictions.

No concealed carry. North Carolina (Alleghany County, 1877),[1017] statewide (1879);[1018] Maryland (1886);[1019] D.C. (1892); Rhode Island (1893);[1020] Maryland (1894) (unless reasonable cause).[1021]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866);[1022] Michigan (1887).[1023]

No carry. Tennessee (1879);[1024] Oklahoma (1890),[1025] (1893).[1026]

Limiting Sales to Minors. Oklahoma (1890),[1027] (1893);[1028] New York (1889).[1029]

### 5. Billies vs. Billy clubs

A "billy" or "billie" can be confusing. They are not the same as a "billy club." "A policeman's old fashioned billy club was usually a solid piece of turned hardwood."[1030] In contrast, "the words billie and billet were used for saps and blackjacks in particular from the late nineteenth century to early in the 20th century."[1031]

Specific laws were as follows:

---

[1016] 1881 N.Y. Laws 102; 1884 N.Y. Laws 46, ch. 46, § 7; 1889 N.Y. Laws 167, ch. 140; 1899 N.Y. Laws 1341, ch. 603.

[1017] 1876-1877 N.C. Sess. Laws 162–63, ch. 104.

[1018] 1879 N.C. Sess. Laws 231, ch. 127.

[1019] 1866 Md. Laws 602, ch. 375.

[1020] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[1021] 1894 Md. Laws 834 (1894).

[1022] 1866 N.Y. Laws 1523, ch. 716.

[1023] 1887 Mich. Acts 144, No. 129.

[1024] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[1025] 1890 Okla. Terr. Laws 495.

[1026] 1893 Okla. Terr. Laws 503.

[1027] 1890 Okla. Terr. Laws 495.

[1028] 1893 Okla. Terr. Laws 503.

[1029] 1889 N.Y. Laws 167, ch. 140.

[1030] ESCOBAR, *supra* note __, at 9.

[1031] *Id.* at 226. *See id.* at 3 (Describing a 1910 hardware store catalogue: "Notice that the sap and blackjacks are just called billies." The slungshot has a separate heading.).

Ban on carry with intent to injure. Maryland (1882) (billy).[1032]
No concealed carry. Rhode Island (1893) (billy), Michigan (1897).[1033]
No carry, with some exceptions. Okla. Terr. (1890) (billy).[1034]

Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry, "billie");[1035] Nebraska (1895) (Lincoln, concealed carry, billy).[1036]

## C.  Rigid impact weapons

### 1. Knuckles

Knuckles are devices attached to one's second through fifth fingers to make the fist a more powerful weapon. They can be made of brass, other metals, or non-metallic material.[1037]

Abraham Lincoln's friend, the lawyer Ward Hill Lamon, served as his bodyguard for Lincoln's midnight train ride into Washington, D.C., to assume the presidency. Lamon carried a pair of "fine pistols, a huge bowie knife, a black-jack, and a pair of brass knuckles."[1038]

Six states banned sales, and some of them also banned manufacture. Vermont (1849);[1039] Massachusetts (1850);[1040] Kentucky ("brass knuckles" 1856);[1041] Florida ("metallic knuckles") (1868),[1042] (1893);[1043] New York ("metal

---

[1032] *See* text at note___,
[1033] 1897 Mich. Acts 1030, sec. 15.
[1034] *See* text at note___,
[1035] 1891 Mich. Acts 409, no. 257.
[1036] *See* text at note___,
[1037] Knuckles are "fashioned from a single piece of metal." ESCOBAR, *supra* note __, a 9. They are descendants of the *cestus*, a glove worn by Greek and Roman boxers, sometimes loaded with a weight. *Id.* at 199; *cf.* VIRGIL, THE AENEID, book 5 ("The gloves of death—with seven distinguished folds Of tough bulls' hides; the space within is spread With iron or heavy loads of lead."), *in* 14 THE WORKS OF JOHN DRYDEN (1808) (Dryden's translation of the Aeneid).
[1038] HAROLD HOLZER, LINCOLN PRESIDENT-ELECT: ABRAHAM LINCOLN AND THE GREAT SECESSION WINTER 1860-1861, at 391 (2008).
[1039] 1849 Vt. Acts & Resolves 26.
[1040] 1850 Mass. Acts 401, ch. 194.
[1041] 1856 Ky. Acts 96, ch. 636.
[1042] 1868 FL Laws 95, ch. 7, sec. 11.
[1043] 1893 FL Laws 52, ch. 4124.

knuckles") (1881),[1044] (1889),[1045] (1899);[1046] Arkansas (1881) ("metal knuckles").[1047]

The Kentucky ban was later repealed.[1048] Only Illinois outlawed possession for adults (1881),[1049] (1893).[1050] Kansas included knuckles in the long list of arms, other than rifles and shotguns, for which possession by minors was forbidden (1882).[1051]

The majority approach was nonprohibitory:

No concealed carry. D.C. (1871) ("brass or other metal knuckles");[1052] Maryland 1872 (for Annapolis, "brass, iron, or other metal knuckles");[1053] Wisconsin (unless with reasonable cause) ("brass knuckles") (1872);[1054] Alabama ("brass knuckles") (1873);[1055] North Carolina (1877, Alleghany County, "brass, iron or metallic knuckles") (1879, statewide);[1056] Mississippi (1878),[1057] (1896),[1058] (1898)[1059] "brass or metallic knuckles"); Washington Terr. (1886);[1060] Michigan (1887);[1061] Arizona Terr. (1893) ("brass knuckles, or other knuckles of metal");[1062] Rhode Island (1893) ("brass or metal knuckles"); South Carolina (1897).[1063]

Carrying concealed created a presumption that the weapon was being carried for use against another person. Illinois ("steel or iron knuckles")

---

[1044] 1881 N.Y. Laws 102.

[1045] 1889 N.Y. Laws 167, ch. 140.

[1046] 1899 N.Y. Laws 1341, ch. 603.

[1047] *See* text at note___,

[1048] Text at notes *supra.*

[1049] 1881 Ill. Laws 73.

[1050] 1893 Ill. Laws 477–78.

[1051] *See* text at note___,

[1052] *See* text at note___,

[1053] *See* text at note___,

[1054] 1872 Wis. Sess. Laws 17, ch.7.

[1055] 1873 Ala. Laws 130–31, no. 87.

[1056] *See* text at note___,

[1057] *See* text at note___,

[1058] 1896 Mich. Pub. Acts 109, ch. 104.

[1059] 1898 Mich. Pub. Acts 86, ch. 68.

[1060] 1885-86 Wash. Terr. Laws 82.

[1061] 1887 Mich. Pub. Acts 144, no. 129.

[1062] 1893 Ariz. Sess. Laws 3, no 2.

[1063] 1897 S.C. Acts 450–52, no. 251.

(1874),[1064] (1879);[1065] New York ("metal knuckles") (1866),[1066] (1881);[1067] South Carolina ("metal knuckles") (1880).[1068]

No carry in most circumstances. Texas (1871) ("brass-knuckles");[1069] Arizona Terr. (1889) ("brass knuckles" "within any settlement, town, village or city");[1070] Okla. Terr. (1890) ("metal knuckles").[1071]

No carry by minors. Ariz. Terr. (1883) ("brass-knuckles," ages 10–16, in towns).[1072]

No sales to minors. Indiana (1875) ("knucks");[1073] Kansas (1882) (also banning possession by minors, "brass knuckles");[1074] West Virginia (1882);[1075] Texas (1897) (parental permission, "knuckles made or any metal or hard substance").[1076] No transfer to minors. Oklahoma (1890).[1077] No sales to a minor without written consent of a police magistrate. New York (1889).[1078]

Authorizing municipal regulation. Illinois (1867) (Bloomington, concealed carry, "cross knuckles, or knuckles of brass, lead or other metal");[1079] Wisconsin (1874–91) (concealed carry, "cross knuckles, or knuckles of lead, brass or other metal");[1080] Michigan (1891) (Saginaw, concealed carry, "false knuckles" [non-metallic]);[1081] Nebraska (1895) (Lincoln, concealed carry, "metal knuckles").[1082]

---

[1064] 1874 Ill. Laws 360, ch. 38, sec. 56.

[1065] REVISED STATUTES OF THE STATE OF ILLINOIS, 1880, at 365 (Harvey B. Hurd ed., 1880).

[1066] 1866 N.Y. Laws 1523, ch. 716.

[1067] 1881 N.Y. Laws 102.

[1068] 1880 S.C. Acts 448, no. 362.

[1069] *See* text at note___,

[1070] 1889 Ariz. Terr. Laws 30.

[1071] *See* text at note___,

[1072] *See* text at note___,

[1073] *See* text at note___,

[1074] *See* text at note___,

[1075] *See* text at note___,

[1076] *See* text at note___,

[1077] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[1078] 1889 NY Laws 167, ch. 140.

1893 Fla. Laws 51, 52, ch. 4124.

Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind, usually known as slung shot, or metallic knuckles, shall be punished by imprisonment not exceeding three months, or by Penalty.

[1079] *See* text at note___,

[1080] *See* text at note___,

[1081] *See* text at note___,

[1082] *See* text at note___,

License required to sell. South Carolina ("metal knuckles") (1891).[1083]

While the statutes varied in what kind of "knuckles" were illegal, a Texas court ruled that "brass knuckles" encompassed knuckles made of steel or other materials.[1084]

Throughout this article we have focused on laws that named specific weapons. However, it should be recognized that many laws, particularly those involving public carry, had catch-all phrases such as "other deadly weapon." These laws might encompass weapons not named in the statute. Such a law against concealed carry in Missouri was held to encompass "a pair of brass knucks."[1085]

Consistent with the express text of the Missouri state constitution, the Missouri Court of Appeals said that *concealed* carry of knuckles was not part of the right to arms.[1086] Alabama's statute against concealed carry had an exception for carrying a firearm or knife with good reason to apprehend an attack. Defendant had indisputably been carrying knuckles because of danger of imminent attack, but his conviction was upheld, because the statutory exception allowing concealed carry did not include knuckles. The Alabama Supreme Court held that the trial court:

> did not err in ruling that this provision did not embrace brass knuckles, slung-shots, or weapons of like kind. . . . The carrying concealed of a barbarous weapon of this class, which is usually the instrument of an assassin, and an index of a murderous heart, is absolutely prohibited by section 3776 of the Criminal Code of

---

[1083] 1891 S.C. Acts 1101–02, no. 703.

[1084] Harris v. State, 22 Tex. App. 677, 3 S.W. 477 (1887).

[1085] State v. Hall, 20 Mo. App. 397 (1886) (statute prohibited concealed carry of "fire arms, bowie knife, dirk, dagger, slungshot, or other deadly weapon").

[1086] A St. Louis ordinance forbade concealed carry without a permit of "cross-knuckles, or knuckles of lead, brass or other metal." "In the constitution the citizen has many priceless rights guaranteed to him; but unluckily for appellant, the 'right' to carry concealed in his hip pocket knuckles of brass, a weapon of dangerous and deadly character, is not a "right' protected by any constitutional guaranty." City of St. Louis v. Vert, 84 Mo. 204, 209 (1884); Mo. Const. of 1875, art. II, § 17 ("[T]he right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons.").

this state. The law does not recognize it as a weapon of self-defense.[1087]

## 2. Loaded Canes

A loaded cane has a hollowed section filled with lead.[1088] It is a powerful impact weapon.[1089]

No concealed carry. N.C. 1877 (Alleghany County),[1090] 1879 (statewide).[1091]

No carry in most circumstances. Tennessee (1821),[1092] (1870),[1093] (1879) ("sword cane" or "loaded cane");[1094] Oklahoma Terr. (1893).[1095]

No disposing to a minor. N.C. (1879).[1096]

### D. Cannons

As detailed in Part II.F, the laws of the colonial and Founding laws presumed personally owned cannons. Under the Constitution, cannons were necessary so that Congress could "grant Letters of Marque and Reprisal."[1097] Such letters were granted during the War of 1812.[1098] Cannons were advertised for sale in an 1813 newspaper ad in Newport, Rhode Island, one of America's busiest seaports.[1099]

---

[1087] Bell v. State, 89 Ala. 61, 8 So. 133 (1890).

[1088] Harry Schenawolf, *Loaded Cane – How Revolutionary War Officers and Gentlemen Protected Themselves from Drunken Soldiers and Muggings*, REVOLUTIONARY WAR J., June 28, 2019, https://www.revolutionarywarjournal.com/loaded-cane-how-revolutionary-war-officers-and-gentlemen-dealt-with-drunken-soldiers-and-riff-raff/.

[1089] *Id.*

[1090] 1877 N.C. Sess. Laws 162–63, ch. 104.

[1091] 1879 N.C. Sess. Laws ch. 127, p. 231.

[1092] 1821 Tenn. Pub. Acts 15, ch. 13.

[1093] 1870 Tenn. Pub. Acts 55, ch. 41.

[1094] 1879 Tenn. Pub. Acts 231, ch. 86.

[1095] 1893 Okla. Sess. Laws 503, art. 45.

[1096] 1893 N.C. Sess. Laws 468–69, ch. 514.

[1097] U.S. CONST., art. I, § 8.

[1098] 2 Stat. 755 (1812). The privateers "were of incalculable benefit to us, and inflicted enormous damage" on Great Britain. THEODORE ROOSEVELT, THE NAVAL WAR OF 1812, at 416 (1882).

[1099] *The Rhode-Island Republican. [volume]* (Newport, R.I.), June 10, 1813, https://chroniclingamerica.loc.gov/lccn/sn83025561/1813-06-10/ed-1/seq-4/.

An international declaration in 1856 prohibited signatory nations from issuing letters of marque and reprisal.[1100] The United States chose not to join. During the Civil War, the Confederacy issued letters of marque and reprisal.[1101] The Spanish-American War of 1898, like previous naval wars, generated cases about the ownership of prizes.[1102]

On the land, legislation provided rules for cannon owners. The 1881 Pennsylvania legislature made it a misdemeanor to "knowingly and willfully sell" to buyers "under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon."[1103] By implication, sales of cannons to persons 16 and over was legal.

Most cannon laws nineteenth-century cannon laws prevented people from firing cannons in certain locations, typically public ones. In 1844, Ohio forbade anyone to "fire any cannon . . . upon any public street or highway, or nearer than ten rods to the same," "except in case of invasion by a foreign enemy or to suppress insurrections or mobs, or for the purpose of raising drowned human bodies, or for the purpose of blasting or removing rocks."[1104]

Other localities also prevented people from firing cannons in certain locations. Northern Liberties Township, Pennsylvania (1815),[1105] Cincinnati,

---

[1100] Paris Declaration respecting Maritime Law, art. 1 (1856) ("Privateering is and remains abolished."). Later, the United States announced it would comply with the Declaration, even the U.S. has never formally joined the Declaration.

[1101] COOPERSTEIN, *supra* note __, at 246. Congress in 1863 passed and President Lincoln signed a law authorizing privateering for three years, but no letters were granted. *See* 12 Stat. 758 (1863); Nicholas Parrillo, *The De-Privatization of American Warfare: How the U.S. Government Used, Regulated, and Ultimately Abandoned Privateering in the Nineteenth Century*, 19 YALE J.L. & HUMANITIES 1, 72–73 (2007).

[1102] The Paquete Habana, 175 U.S. 677 (1900) (applying customary international law that coastal fishing vessels may not be seized).

For contemporary arguments in favor of issuing letters of marque and reprisal against pirates around Somalia, see Todd Emerson Hutchins, Comment, *Structuring a Sustainable Letters of Marque Regime: How Commissioning Privateers Can Defeat The Somali Pirates*, 99 CALIF. L. REV. 819 (2011); Joshua Stauba, *Letters of Marque: A Short-Term Solution to an Age Old Problem*, 40 J. MAR. L. & COM. 261 (2009).

[1103] 1881 Pa. Laws 111, no. 124.

[1104] 1844 Ohio Laws 17, sec. 1.

[1105] A DIGEST OF ACTS OF ASSEMBLY, RELATING TO THE INCORPORATED DISTRICT OF THE NORTHERN LIBERTIES 94 (1847) ("within the regulated parts . . . in said township, without permission from the president of the board of commissioners").

Ohio (1828),[1106] Jersey City, New Jersey (1843),[1107] St. Louis, Missouri (1843),[1108] Detroit, Michigan (1848),[1109] Dayton, Ohio (1855),[1110] Peoria, Illinois (1856),[1111] (1869),[1112] Chicago, Illinois (1861),[1113] San Francisco, California (1869),[1114] Meriden, Connecticut (1869),[1115] Dover, New Hampshire (1870),[1116] Little Rock, Arkansas (1871),[1117] Martinsburg, West Virginia

---

[1106] ACT INCORPORATING THE CITY OF CINCINNATI, AND THE ORDINANCES OF SAID CITY NOW IN FORCE 43 (1828) ("within the limits of said city"); *id.* at 43–44 ("It shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river . . . to cause any cannon . . . to discharge its contents towards the city").

[1107] ORDINANCES OF JERSEY CITY 9 (1844) ("within this city . . . unless in defense of his property or person").

[1108] THE REVISED ORDINANCES OF THE CITY OF SAINT LOUIS, REVISED AND DIGESTED BY THE FIFTH CITY COUNCIL 304 (1843) ("within the city").

[1109] THE REVISED CHARTER AND ORDINANCES OF THE CITY OF DETROIT 199 (1855) ("within this city, unless by permission of the Mayor or two Aldermen").

[1110] LAWS AND GENERAL ORDINANCES OF THE CITY OF DAYTON 229 (1862) ("within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council").

[1111] THE CITY CHARTER, WITH THE SEVERAL LAWS AMENDATORY THERETO, AND THE REVISED ORDINANCES, OF THE CITY OF PEORIA, ILLINOIS 168 (James M. Cunningham ed., 1857) ("in said city, without permission from the mayor or city marshal").

[1112] THE CITY CHARTER AND THE REVISED ORDINANCES OF THE CITY OF PEORIA, ILLINOIS 254 (James M. Cunningham ed., 1869) ("in said city, without permission from the mayor or superintendent of police").

[1113] 1861 Ill. Private Laws 144, sec. 78 ("within the city limits . . . without permission from the mayor or common council").

[1114] THE GENERAL ORDERS OF THE BOARD OF SUPERVISORS, CITY AND COUNTY OF SAN FRANCISCO 13 (1869) ("within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission").

[1115] THE CHARTER AND BY-LAWS OF THE CITY OF MERIDEN 135 (1875) ("within the limits of said city").

[1116] THE CHARTER, WITH ITS AMENDMENTS AND THE GENERAL ORDINANCES OF THE CITY OF DOVER 32 (1870) ("within the compact part of any town").

[1117] A DIGEST OF THE LAWS AND ORDINANCES OF THE CITY OF LITTLE ROCK 231 (George E. Dodge & John H. Cherry eds, 1871) ("No person shall fire or discharge any cannon . . . without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted.").

(1875),[1118] La Crosse, Wisconsin (1881),[1119] Lynchburg, Virginia (1887),[1120] and Lincoln, Nebraska (1895).[1121]

These regulations indicate both that private citizens possessed cannons and that they were common enough to place limitations on where they could be fired.

The obvious dangers of firing a cannon in town are justifications for the discharge restrictions. The near-complete absence of any other restrictions in the nineteenth century might be explained by great rarity of use of cannons in crime. Cannons are often fixed in a single location, such as a rooftop. If wheeled, they must be slowly moved by draft animals. It would seem difficult for criminals to make use of them.[1122]

## VII. Doctrinal Analysis

This Part offers doctrinal suggestions based on the legal history above.

- Part A summarizes bans on sales or possession of particular arms.
- Part B describes the constitutional background following the adoption of the Fourteenth Amendment; notwithstanding clear congressional intent to make the Bill of Rights enforceable against the States, the Supreme Court held that States could disregard the Bill of Rights, including the Second Amendment.

---

[1118] Ordinances and By-laws of the Corporation of Martinsburg, Berkeley Co., West Virginia 25 (1875) ("within such parts of the town which are or shall be laid out into lots, or within two hundred yards of said limits").

[1119] Charter and Ordinances of the City of La Crosse 202 (1888) ("within the limits of the city of La Crosse, without having first obtained written permission from the mayor").

[1120] The Code of the City of Lynchburg, VA 116 (Thomas D. Davis ed., 1887) ("in the city" or "within one hundred yards of any dwelling-house without the consent of the owner or occupant of such house").

[1121] 1895 Neb. Laws 238, art. 26, sec. 8 ("in any street, avenue, alley, park, or place, within the corporate limits of the city").

[1122] Mortars are a different story. They are short tubes and man-portable. The rear sits on the ground and the front is elevated by legs, such as a bipod. Some of the above laws also covered mortars. The absence of legislative attention, other than discharge restrictions for inappropriate places, may, as with cannons, be the result of the rarity of criminal use. We guess that few criminals were interested in bombarding fortified buildings.

- Part C applies legal history to two core Second Amendment doctrines. First, *Heller*'s affirmation on prohibitions of "dangerous and unusual weapons." Second, the *Bruen* question of how many jurisdictions make a precedential "tradition."
- Part D applies history and doctrine to four specific issues:
  - First, the historical bans on slungshots and knuckles might be justifiable under *Heller*'s allowance of bans on arms "not typically possessed by law-abiding citizens."
  - Second, bans on modern semiautomatic firearms and magazines lack historical support.
  - As for minors, the final third of the nineteenth century provides substantial support for limitations on purchases by minors of some arms without parental consent. The tradition of restrictions on minors does not support modern long gun bans for young adults, 18–20.
  - Finally, penalties for misuse of a particular arm in a violent crime are supported by tradition. They do not involve activity that is protected by the Second Amendment.

## A.  Summary of possession or sales bans

From 1607 through 1899, American bans on possession or sale to adults of particular arms are uncommon. For firearms, the bans are:

- Georgia (1837), all handguns except horse pistols.[1123] Held unconstitutional in *Nunn v. State*.[1124]
- Tennessee (1879)[1125] and Arkansas (1881).[1126] Bans on sales of concealable handguns. Based on militia-centric interpretations of the state constitutions, the laws did not ban the largest and most powerful revolvers, namely those like the Army or Navy models.

---

[1123] *See* text at note _____.
[1124] *See* text at note _____.
[1125] *See* text at note _____.
[1126] *See* text at note _____.

- Florida (1893).[1127] Discretionary licensing and an exorbitant licensing fee for repeating rifles. The law was "never intended to be applied to the white population" and "conceded to be in contravention of the Constitution and non-enforceable if contested."[1128]

For some nonfirearms arms, several states enacted sales bans:

- Bowie knife. Sales bans Georgia, Tennessee, and later in Arkansas.[1129] Georgia ban held to violate the Second Amendment.[1130] Prohibitive transfer or occupational vendor taxes in Alabama and Florida, which were repealed.[1131] Personal property taxes at levels high enough to discourage possession by poor people in Mississippi, Alabama, and North Carolina.[1132]
- Dirk. Georgia (1837) (held to violate Second Amendment);[1133] Arkansas (1881).[1134]
- Sword cane. Georgia (1837), held to violate the Second Amendment.[1135] Arkansas (1881).[1136]
- Slungshot or "colt." Sales bans in nine states or territories.[1137] The Kentucky ban was later repealed.[1138] Illinois also banned possession.[1139]
- Metallic knuckles. Sales bans in six states, later repealed in Kentucky.[1140] Illinois also banned possession.[1141]
- Sand club or blackjack. New York (1881).[1142]

---

[1127] *See* text at note ____.
[1128] *See* text at note ____.
[1129] *See* text at note ____.
[1130] *See* text at note ____.
[1131] *See* text at note ____.
[1132] *See* text at note ____.
[1133] *See* text at note ____.
[1134] *See* text at note ____.
[1135] *See* text at note ____.
[1136] *See* text at note ____.
[1137] *See* text at note ____.
[1138] *See* text at note ____.
[1139] *See* text at note ____.
[1140] *See* text at note ____.
[1141] *See* text at note ____.
[1142] *See* text at note ____.

### B. The constitutional and racial background of possession or sales bans

The legal background of the laws discussed above was very different than it is today. The Supreme Court in *Barron v. Baltimore* had said that the Bill of Rights was not binding on the states.[1143] Some state courts, which Akhil Amar calls "the *Barron* contrarians," had taken a different view.[1144] These include the Georgia Supreme Court in *Nunn v. State*, which used the Second Amendment to overturn a statute prohibiting handguns, Bowie knives, and various other arms. [1145]

After the Civil War, the Fourteenth Amendment was ratified, with express congressional intent to make the Bill of Rights, specifically including the Second Amendment, enforceable against the States, as among the "privileges or immunities of citizens of the United States."[1146] But the U.S. Supreme Court mostly nullified the Privilege or Immunities Clause in the *Slaughterhouse Cases*.[1147] The Court's decisions in *United States v. Cruikshank*[1148] and *Presser v. Illinois*[1149] had seemed to many to affirm the *Slaughterhouse* approach specifically for Second Amendment rights.

The idea that the Fourteenth Amendment's Due Process Clause might "incorporate" individual elements in the Bill of Rights did not appear until the Court's 1897 incorporation of the Fifth Amendment Takings Clause in *Chicago, Burlington & Quincy Railroad Company v. Chicago*.[1150] It took the Court until the 1920s to begin "selective incorporation" of parts of the First Amendment, until the 1940s to begin incorporating the criminal law and procedure provisions of Amendments Four, Five, Six, and Eight, until 2010 to incorporate the Second Amendment,[1151] and 2019 to incorporate the Excessive Fines Clause of the Eighth Amendment.[1152] So in the nineteenth century, reasonable legislators might believe they had no obligation to respect anything in the U.S. Bill of Rights, including the Second Amendment.

---

[1143] 32 U.S. 2 (7 Pet.) 43 (1833)

[1144] AMAR, at __.

[1145] *See* text at note ____.

[1146] *McDonald*, 561 U.S. at 838–60 (Thomas, J., concurring).

[1147] 83 U.S. (16 Wall.) 36 (1873).

[1148] 92 U.S. (2 Otto ) 542 (1875).

[1149] 116 U.S. 252 (1886).

[1150] 166 U.S. 226 (1897).

[1151] McDonald v. City of Chicago, 561 U.S. 742 (2010).

[1152] Timbs v. Indiana, 139 S.Ct. 682 (2019).

Many states had their own state constitution guarantees of the right to keep and bear arms.[1153] But New York did not, and that is a partial explanation of its eccentric ban on the sale or manufacture of blackjacks and sand clubs.[1154] The other most prohibitive states were Tennessee and Arkansas, with their bans on sales of all handguns except the most powerful ones, the Army & Navy type revolvers.[1155] Both states also banned sales of Bowie knives, and Arkansas did the same for sword canes.[1156] In both states, the supreme courts had interpreted the state constitutional right to arms as solely applicable to militia-suitable arms.[1157]

Even with a militia-centric premise, the Tennessee and Arkansas legislatures and courts were incorrect. The Tennessee Supreme Court in *Aymette* had upheld a statute against Bowie knives on the grounds that such knives are not militia-type arms.[1158] The 1836 Texas War of Independence and the 1861–65 Civil War decisively proved the opposite. Indeed, the Tennessee legislature suspended the Bowie knife law for the duration of the Civil War.[1159] During the war, the Alabama legislature, having used property taxes to discourage Bowie ownership, had to pay for manufacturing Bowie knives of the state militia.[1160]

Overall, restrictions on the right to keep and bear arms in the nineteenth century were most frequent in slave states that later became Jim Crow states.[1161] The modern precedential value of these white supremacy laws may be limited.[1162]

---

[1153] *See* JOHNSON ET AL., *supra* note 16, at 791–804 (texts of all state guarantees, and years of enactment).

[1154] In 1909, the legislature enacted a statutory Bill of Rights, including a verbatim copy of the Second Amendment. N.Y. Civil Rights L, § 4; 1909 N.Y.L. ch. 14. As a mere statute, it could not override any other statute the legislature chose to enact.

[1155] *See* text at note ____.

[1156] *See* text at note ____.

[1157] *See* text at note ____.

[1158] *See* text at note ____.

[1159] *See* text at note ____.

[1160] *See* text at note ____.

[1161] *See* text at note ____.

[1162] *See* Justin W. Aimonetti & Christian Talley, *Race, Ramos, and the Second Amendment Standard of Review,* 107 VA. L. REV. ONLINE 193 (2021) (arguing that Jim Crow gun control laws are not valid precedents today).

This does not mean that all nineteenth century arms control laws were entirely racist. In the slave/Jim Crow states, laws that disarmed poor whites as well as blacks were enacted.[1163]

A good refutation of the notion that *every* arms control laws is necessarily racist is the law of Massachusetts. During the nineteenth century, the state Constitution right to arms was interpreted in the standard way, as an important but not unlimited right of all people.[1164] The Massachusetts right was interpreted to protect the rights of everyone to own and carry arms. Unlike some restrictive Southern cases, Massachusetts courts never claimed that only militia-type arms were protected.[1165] A person's right to bear arms could be restricted if a court found that the person had been carrying in a manner leading to a breach of the peace. If so, the person could only continue to carry if he posted a bond.

Massachusetts was always a leading anti-slavery state and was the first state in which the highest court held slavery to violate the state constitution. By the end of the nineteenth century, Massachusetts was the only state that had *not* outlawed at least some interracial marriages.[1166] In anti-racist Massachusetts, the right to own and carry arms was necessarily respected. *And* Massachusetts was an early adopter of a ban on sales of slungshots and brass knuckles.[1167]

The Massachusetts story does not prove or disprove the wisdom of sales bans on slungshots and brass knuckles. It does disprove the notion that *all* historic arms control laws were motivated by racial animus.

---

[1163] For example, the laws in some southeastern states imposed relatively high annual property taxes on owning Bowie knives or handguns. The Tennessee and Arkansas bans on sales of handguns other than the Army & Navy models favored people who could afford the largest and most powerful handguns. Many former officers of the Confederate military had retained their service handguns; then as now, military officers tend to be disproportionately from the better-educated and wealthier classes. So were cavalrymen, which is to say men who could afford to bring their own horse to military service. A former Confederate infantry private likely retained his service musket, but he would not necessarily be able to afford the most expensive type of modern handguns.

[1164] Mass. Const. of 1780, pt. 1, art. XVII.

[1165] *See*, *e.g.*, Commonwealth v. Murphy, 44 N.E. 138 (Mass. 1896) (upholding ban on armed parades without advancing permission, citing to state cases that states may regulate the mode of carry); Commonwealth v. Blanding, 3 Pick. 304 (Mass. 1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.)

[1166] Peggy Pascoe, What Comes Naturally: Miscegenation Law and the Making of Race in America (2010).

[1167] *See* text at note ____.

## C. Modern doctrines

*1. "Dangerous and unusual" versus "not typically possessed by law-abiding citizens": The distinction applied to slungshots and brass knuckles.*

*Heller* cited a litany of precedents for the prohibition of carrying certain arms. Some of the sources called such arms "dangerous and unusual" and others said "dangerous or unusual."[1168] From these precedents, *Heller*

---

[1168] *Heller* at 627, citing, in order: 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c.3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."); 3 THE WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) ("In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people."); JOHN A. DUNLAP, THE NEW-YORK JUSTICE 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people."); CHARLES HUMPHREYS, COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment. But here it should be remembered, that in this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."); 1 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271–72 (2d ed. 1831) ("as where people arm themselves with dangerous and unusual weapons; in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at common law, and is strictly prohibited by several statutes."); HENRY J. STEPHEN, SUMMARY OF THE CRIMINAL LAW 48 (1840) ("Riding or going armed with dangerous or unusual Weapons" is "[b]y statute of Northampton, 2 Edw. III, c. 3, . . . a misdemeanor, punishable with forfeiture of the arms and imprisonment during the king's pleasure."); ELLIS LEWIS, AN ABRIDGMENT OF THE CRIMINAL LAW OF THE UNITED STATES 64 (1847) ("where persons openly arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, an affray may be committed without actual violence."); FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 726 (2d ed. 1852) ("there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute [Statute of Northampton]."); *State v. Langford*, 10 N.C. 381, 383–84 (1824) ("there may be an affray when there is no actual

extrapolated a rule that the government may forbid possession (not just carrying) of arms that are dangerous *and* unusual.[1169]

*Bruen*, noting some of the many nineteenth-century laws against concealed carry, inferred the principle that governments may regulate the *manner* of carry.[1170] That is, the government may require that carry be open rather than concealed (in compliance with nineteenth century sensibilities), or the government may require that carry be concealed rather than open (in compliance with modern sensibilities in some areas). As for the jurisdictions that prohibited *all* modes of handgun carry, the Court dismissed them as outliers.[1171]

We can synthesize two subrules from *Heller*'s dangerous and unusual rule and from *Bruen*'s modes of carry rule. Subrule 1: the types of arms for which possession can be prohibited can include those for which carry in every mode was historically prohibited. Subrule 2: in applying subrule 1, outlier jurisdictions that banned all modes of handgun carry are low-value precedents. The subrules provide some additional structure for "dangerous and unusual," and reduce judicial temptation to use the phrase for epithetical jurisprudence.[1172]

---

violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute."); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("It is probable, however, that if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *English v. State*, 35 Tex. 473, 476–77 (1872) ("Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in *State* v. *Huntley*, 3 Ired. 418.").

[1169] *Heller*, 554 U.S. at 627 (emphasis added).

[1170] "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen*, 142 S. Ct. at 2150.

[1171] *See* Part VII.B.2, *infra*.

[1172] *Cf.* Joseph H. Drake, Note, *Epithetical Jurisprudence and the Annexation of Fixtures*, 18 MICH. L. REV. 405 (1919-1920) (creating the phrase); Jerome Frank, *Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act*, 18 N.Y.U. L.Q. REV. 317 (1941) (popularizing it).

Therefore, the 1871 Texas and 1890 Oklahoma Territory laws against almost all carrying of handguns are of little value in assessing the constitutional status of other arms that were also prohibited from carry in those jurisdictions.

As *Bruen* points out, just because a weapon might have been considered "dangerous and unusual" at one point in time does not prevent it from becoming "common" later; if so, it becomes protected. *Bruen* articulates the rule in response to claims that handguns had been considered dangerous and unusual in the colonial period:

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." [*Heller*] *Id*., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.[1173]

The *Bruen* argument above is *arguendo*. Handguns were never "dangerous and unusual." To the contrary, they were mandatory militia arms for officers and horsemen, who were expected to bring their own handguns to militia service.[1174]

As described in Part III.D, firearms with ammunition capacities over ten rounds were never considered "dangerous and unusual" in the nineteenth century. However, during the alcohol prohibition era of the 1920s and early 1930s, six states enacted laws that limited ammunition capacity in certain contexts, albeit less severely than prohibitory twenty-first century laws.[1175] If

---

[1173] Bruen, 142 S. Ct. at 2143.

[1174] *See* Part II.D.

[1175] 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of guns that fire more than 12 shots semi-automatically without reloading); 1927 Mich. Pub. Acts ch. 372, § 3 (prohibiting sale of firearms "which can be fired more than sixteen times without reloading"); 1933 Minn. Laws ch. 190 (prohibiting the "machine gun," and including semi-automatics "which have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers"); 1933 Ohio Laws 189, 189 (license needed for semi-

it were to be argued that these restrictions from the days of Prohibition were permissible at the time as "dangerous and unusual" laws, that argument could no longer be applied today. Today (unlike in 1690 or 1925), Americans own over one hundred million handguns and hundreds of millions of magazines with capacities over 10 rounds.[1176]

### 2. How many jurisdictions make a tradition?

*Bruen* offers some guidelines for how the government can carry its burden of proof to demonstrate a "historical tradition of firearm regulation" necessary to uphold a law.[1177] *Bruen* held that "the historical record compiled by respondents does not demonstrate a tradition" of restricting public handgun carry.[1178] Here is list of the (insufficient) sources cited by advocates of the notion that the right to "bear Arms" can be prohibited or can be limited only to persons whom the government believes have shown a "special need." For some of these sources, the Court was not convinced by the advocates' characterization of the laws, but the Court addressed them *arguendo*:[1179]

---

automatics with capacity of more than 18); 1933 Cal. Stat., ch. 450 (licensing system for machine guns, defined to include semi-automatics actually equipped with detachable magazines of more than ten rounds); 1934 Va. Acts ch. 96, §§ 1(a), 4(d) (regular sess.) (defining machine guns as anything able to fire more than 16 times without reloading, and prohibiting possession for an "offensive or aggressive purpose"; presumption of such purpose when possessed outside one's residence or place of business, or possessed by an alien; registration required for "machine gun" pistols of calibers larger than .30 or 7.62 mm).

All these laws were later repealed. See David B. Kopel, *The History of Firearms Magazines and of Magazine Prohibition*, 78 ALBANY L. REV. 849, 864–66 (2015) (Michigan repeal in 1959; R.I. limit raised to 14 and .22 caliber exempted in 1959, full repeal in 1975; Ohio limit raised to 32 and .22 caliber exempted in 1971, full repeal in 2014, statute had not applied to sale of magazines, but only to unlicensed insertion of a magazine into a firearm); 1963 Minn. Sess. L. ch. 753, at 1229 (defining "machine gun" as automatics only); 1965 Stats. of Calif., ch. 33, at 913 ("machine gun" fires more than one shot "by a single function of the trigger"); 1975 Va. Acts, ch. 14, at 67 (defining "machine gun" as automatics only); 1979 N.C. Sess. Laws 1230, ch. 895, § 1 (eliminating licensing for pump guns).

[1176] "48.0% of gun owners – about 39 million individuals – have owned magazines that hold over 10 rounds (up to 542 million such magazines in total" and "approximately 171 million handguns." William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, at 1–2 (May 13, 2022), https://bit.ly/3HaqmKv.

[1177] *Bruen*, 142 S. Ct. at 2130.

[1178] *Id.* at 2138.

[1179] *Id.* at 2144 ("even if" the government's reading were correct, the record would not justify the challenged regulation).

- Two colonial statutes against the carrying of dangerous and unusual weapons (1692 Massachusetts, 1699 New Hampshire).[1180]
- One colonial law restricting concealed carry for everyone and handgun carry for "planters," a/k/a frontiersmen (1686 East Jersey).[1181]
- Three late-18th-century and early-nineteenth-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee).[1182]
- Two nineteenth-century common-law offenses for going armed for a wicked or terrifying purpose (1843 North Carolina, 1849 Alabama).[1183]
- Four statutory prohibitions on handgun carry (1821 Tennessee,[1184] 1870 Tennessee,[1185] 1871 Texas (without reasonable cause),[1186] 1887 West Virginia (without good cause).[1187]
- One state statute against going armed to the terror of the public (1870 South Carolina).[1188]
- Eleven nineteenth-century surety statutes, requiring that a person found by a court to have threatened to breach the peace must post a bond in order to continue carrying. (1836 Massachusetts,[1189] 1870 West Virginia,[1190] and "nine other jurisdictions"[1191]).
- Two Western territory laws banning handgun carry (1869 New Mexico,[1192] 1881 Arizona).[1193]

---

[1180] *Id.* at 2142–43. Like many of the "dangerous and unusual" laws cited by *Heller*, these laws intended to prohibit "bearing arms to terrorize the people." *Id.* at 2143.

[1181] *Id.* at 2143.

[1182] *Id.* at 2144–45.

[1183] *Id.* at 2145–s46.

[1184] *Id.* at 2147.

[1185] *Id.* at 2153. This law was interpreted by courts, however, as allowing the carry of "large pistols suitable for military use." *Id.*

[1186] *Id.* at 2153.

[1187] *Id.*

[1188] Bruen at ___.

[1189] *Id.* at 2148–50.

[1190] *Id.* at 2152–53.

[1191] *Id.* at 2148. "'[U]nder surety laws . . . everyone started out with robust carrying rights' and only those reasonably accused [of creating fear of an injury or breach of the peace] were required to show a special need in order to avoid posting a bond." *Id.* at 2149 (quoting *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).

[1192] *Id.* at 2154.

[1193] *Id.*

- Two Western territory laws banning the carry of any arms in towns, cities, and villages (1875 Wyoming,[1194] 1889 Idaho.)[1195]
- One Western territory law banning all handgun carry and most long-gun carry (1890 Oklahoma).[1196]
- One Western State law instructing but not convincing large cities to ban all carry (1881 Kansas).[1197]

So the general rule seems to be: In any given time period, it is possible to find several jurisdictions that in some way prohibited the exercise of the right to bear arms. But the aggregate of jurisdictions with prohibitory laws is insufficient to overcome the mainstream approach of respecting the right to bear arms.

Let us put aside the Court's *arguendo* treatment of tendentious claims, such as assertions that laws against carrying dangerous and unusual weapons to terrify the public were actually prohibitions on peaceable defensive carry. For laws that actually did prohibit peaceable carry in many circumstances, there are:

- East Jersey, which for a few years in the late seventeenth century prohibited any form of handgun carry by "planters" (frontiersmen).
- Tennessee in 1821, but later the state supreme court and state statute acknowledged the right to open carry of Army & Navy revolvers (the best and most powerful handguns of the time). Texas 1871 and West Virginia 1887. All three state supreme courts at the relevant time interpreted their state constitutional rights to arms as militia-centric.
- Two Western Territories with general prohibitions on defensive handgun carry, and three with prohibitions on such carry in towns. All the territorial restrictions were later repudiated by statehood constitutions and jurisprudence thereunder.[1198]
- A Kansas state legislature instruction for large towns to ban handgun carry, which most towns apparently ignored.[1199]

---

[1194] *Id.*

[1195] *Id.*

[1196] *Id.*

[1197] *Id.* at 2155–56.

[1198] Johnson et al., *supra* note 16, at 517–18.

[1199] *Id.*

From this list, we might cull even further, by eliminating the state laws that were upheld only because the relevant state constitutions were interpreted as militia-centric, in contrast to *Heller*'s interpretation of the Second Amendment. We could also cull the territorial laws that were repudiated by the people of the territories as soon as they could form their own constitutions. The list of precedential carry bans is thus reduced to "half a colony" for eight years (East Jersey),[1200] and one state instruction to local governments that was ignored (Kansas). That leaves carry bans with only two feeble precedents relevant to the Second Amendment.

Our analysis indicates that *Bruen* was correctly decided, there being very few good precedents for general bans on bearing arms. However, we did not write the *Bruen* opinion. Justice Thomas's list of precedents, not ours, is legally controlling. That list shows that even substantial handfuls of restrictive minority precedents are insufficient to overcome the text of the Second Amendment.

On the other hand, some advocates suggest that *Bruen*'s long list of insufficient precedents does not provide the controlling rule. Rather, they say that one of our articles does. In discussing the use of historical analogies, Justice Thomas's opinion cited with approval a legal history article we had written about the "sensitive places" doctrine. The doctrine is based on *Heller*'s statement that bearing arms can be prohibited in "sensitive places such as schools and government buildings."[1201] Our article had surveyed the history of locational limits on bearing arms, and *Bruen* cited the article:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018) . . . . We therefore can assume it settled that these

---

[1200] *Bruen*, 142 S. Ct. at 2144 ("At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.").

[1201] 554 U.S. at 626.

locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.[1202]

The above suggests that "relatively few" precedents may be needed for "uncontested" laws. Perhaps this is particularly true for laws that simply affect the fringe of a right (putting a few places off-limits for bearing arms) as opposed to laws with broader restrictions. Certainly there was lots of litigation in the nineteenth century challenging various restrictions on keeping and bearing firearms and knives, including the cases described in Parts IV and V.[1203]

<div align="center">

D. Application of history and modern doctrine
to particular types of laws

</div>

### 1. Sales prohibitions on slungshots and knuckles

If we are going to count historical precedents as rigorously as *Bruen* did, it is not clear that even the most prohibitory laws from the nineteenth century—the bans on slungshot sales and manufacture in nine states or territories—can clear the hurdle. Nor can such laws be retroactively justified under *Heller* and *Bruen* as covering "dangerous and unusual" weapons. We do not have manufacturing data, but it seems unlikely that slungshots and knuckles were so rare as to be considered "unusual."

However, another part of *Heller* may provide reconciliation. The "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ."[1204] Based on Escobar's overview, legitimate defensive carry of slungshots was not common; carry by people who were not professional criminals was mainly for fast revenge to verbal insults,

---

[1202] *Id.* at 2133. It is correct that bans on polling places were not contested. The ban on courthouses was in fact contested, and, in our view, correctly upheld. *See* State v. Hill, 53 Ga. 472, 477–78 (1874):

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

[1203] *See* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 GEORGETOWN J.L. & PUB. POL'Y 127 (2016).

[1204] *Heller*, 554 U.S. at 625.

rather than for protection against violent attack. Some of the judicial remarks quoted in Part VI are, while not conclusive, supportive of this interpretation.[1205]

This approach distinguishes slungshots and knuckles from blackjacks, which were highly favored by law enforcement officers. Some modern courts have ruled that widespread law enforcement use is powerful evidence that a type of arm *is* "typically possessed by law-abiding citizens for lawful purposes." The principle was recognized for electric weapons, such as stun guns or tasers, in Justice Alito's concurrence in *Caetano v. Massachusetts* and by the Michigan Court of Appeals.[1206] The Connecticut Supreme Court took the same approach for "police batons."[1207]

Our analysis of nongun, nonblade arms is tentative. While the history of flexible impact weapons is told only in a single book, recently published, there is no similar scholarship of which we are aware regarding knuckles.[1208] This Article being the only post-*Heller* article to examine flexible and rigid impact weapons, we do not claim to have resolved every legal issue. We do point out that, as with Bowie knives, the mainstream historical American approach was nonprohibitory.

### 2. Modern semiautomatic firearms and magazines

Today the most controversial bans on particular arms today are possession or sales bans on semiautomatic rifles and on magazines with capacities over

---

[1205] *See* text at note ____.

[1206] Caetano v. Massachusetts, 577 U.S. 411, 419 (2016) (Alito, J., concurring) (noting that Massachusetts "allows law enforcement and correctional officers to carry stun guns and Tasers, presumably for such purposes as nonlethal crowd control. Subduing members of a mob is little different from 'suppress[ing] Insurrections,' a traditional role of the militia"); People v. Yanna, 297 Mich. App. 137, 145, 824 N.W.2d 241, 245 (2012) ("By some reports, nearly 95 percent of police departments in America use Tasers" so there is "there is 'no reason to doubt that the majority of Tasers and stun guns are used only for lawful purposes").

[1207] State v. DeCiccio, 315 Conn. 79, 105 A.3d 165, 200 (2014) ("expandable metal police batons, also known as collapsible batons, are instruments manufactured specifically for law enforcement use as nonlethal weapons. Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, "The Second Amendment in the Nineteenth Century," 1998 BYU L.Rev. 1359, 1534; demonstrates the weapon's traditional military utility"). The court also relied on military use to hold that "dirk knives" are Second Amendment arms. 105 A.3d at 192–93.

[1208] A Westlaw search for law journal articles with "knuckles" in the title yielded no results.

10 or (less often) 15 rounds. These bans are unsupported. First, "[d]rawing from America's "historical tradition," the Supreme Court has held that "the Second Amendment protects" arms that are "'in common use at the time.'"[1209] Thus, in *Heller*, the Court held that because "handguns are the most popular weapon chosen by Americans" and therefore in common use, "a complete prohibition of their use is invalid."[1210] Concurring in *Caetano*—a *per curiam* reversal of case that upheld a stun gun prohibition—Justices Alito and Thomas reasoned that because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment."[1211]

As for the ever-shifting category of so-called "assault weapons," "about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)."[1212] The best estimate for magazines over 10 rounds is 542 million, owned by 48 percent of gun owners.[1213] The firearms and magazines are unquestionably in common use; according to the Court's interpretation of legal history, they cannot be banned.

Being common arms, the firearms and magazines cannot be treated as "dangerous and unusual weapons." A weapon that is "unusual" is the antithesis of a weapon that is "common." So an arm "in common use" cannot be dangerous *and* unusual.[1214] The Supreme Court *per curiam* in *Caetano* did not address dangerousness of stun guns because the Court had already determined that the lower court's "unusual" analysis was flawed.[1215] Concurring, Justices Alito and Thomas elaborated:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion

---

[1209] *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

[1210] *Heller*, 554 U.S. at 529.

[1211] 136 S.Ct. at 1033 (Alito, J., concurring).

[1212] English, *supra* note __, at 2; David B. Kopel, *Defining "Assault Weapons"*, The Regulatory Rev (Univ. of Pennsylvania), Nov. 14, 2018 ("assault weapon" bills have encompassed almost every type of firearm, other than machine guns), https://www.theregreview.org/2018/11/14/kopel-defining-assault-weapons/.

[1213] English, *supra* note __, at 24–25.

[1214] See *Friedman v. City of Highland Park, Illinois*, 784 F.3d, 406, 409 (7th Cir. 2015) (if "the banned weapons are commonly owned … then they are not unusual.").

[1215] 136 S. Ct. at 1028.

that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."[1216]

As some of the most popular arms in America,[1217] semiautomatic rifles and magazines cannot be "dangerous and unusual."

None of the above analysis of the rules from pre-*Bruen* cases is new, nor was most of it disputed even by lower courts that upheld bans pre-*Bruen*. The courts agreed that semiautomatic firearms and standard magazines are "in common use," or they assumed commonality *arguendo*. The courts upheld the bans by applying interest-balancing, which *Bruen* forbids.[1218]

What this Article demonstrates is that such a ban cannot be rescued by historical analogy. In considering analogies, *Bruen* states that there are "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[1219] "How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."[1220] "Why" means: "whether that burden is comparably justified."[1221]

As Part IV showed, the history of nineteenth century bans on particular types of firearms is close to nil. Likewise, as described in Part II, the only colonial analogy was the New Netherland limit on flintlock quantity, and that briefly existing law disappeared when New Netherland was assimilated into the American colonies, where there were zero laws against particular types of arms.[1222]

The 1837 Georgia ban on most handguns and on "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the

---

[1216] *Id.* at 1031 (Alito, J., concurring) (emphasis in original).

[1217] The number of AR rifles (just one type of "assault weapon") is larger than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 . . . 24.3 million" for weekdays. *See Newspapers Fact Sheet,* Pew Research Center (June 29, 2021), https://pewrsr.ch/3CNXFS0.

[1218] *See, e.g.*, Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ("Heller II"); New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015); Worman v. Healey, 922 F.3d 26 (1st Cir. 2019).

[1219] *Bruen*, 142 S. Ct. at 2132–33. In *Bruen*'s analysis, *Heller* and *McDonald* declared that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citing McDonald, 561 U.S. at 767).

[1220] *Id.*

[1221] *Id.*

[1222] Part II.A (English colonies), Part II.C (New Netherland).

same as arms of offence or defence; pistols, dirks, sword-canes, spears" was held in 1846 to violate the Second Amendment in *Nunn v. State*.[1223] Being much closer to the Founding than are post-Reconstruction enactments, *Nunn* is powerful precedent. All the more so given the *Heller* Court's extollation of *Nunn,*

The 1879 Tennessee and 1881 Arkansas laws against the sale of handguns smaller than the Army & Navy models, and bans on the sale of certain blade arms, were validated under state court decisions that held the state constitution right to arms to be applicable only to militia-type arms.

Even if those precedents controlled the Second Amendment, which they do not, they did not ban guns because they were supposedly too powerful, as modern rifles and magazines are sometimes claimed to be. To the contrary, the Tennessee and Arkansas laws banned concealable firearms that were, being smaller, *less* powerful than the large, state-of-art revolvers that were recognized to be constitutionally protected. So the Tennessee and Arkansas laws against small, concealable handguns have a very different "why" than bans on modern rifles and rifles.

Indeed, modern prohibition advocates point to similarities between modern AR semiautomatic rifles and modern military automatic rifles such as the M16 and M4. The prohibitionist argument thus concedes the very strong militia suitability of AR rifles. That makes prohibition unconstitutional under every nineteenth century case precedent, including the ones that upheld bans on certain arms. The unanimous judicial view of the time was that, at the least, no government could outlaw militia-suitable arms.

The only arguable nineteenth-century statutory precedent for bans on modern rifles and magazines is Florida's 1893 licensing law for Winchesters and other repeating rifles. That law was conceded to be unconstitutional and was "never intended to be applied to the white population.[1224]

Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms. Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers.[1225] Prohibitory laws for these blades are fewer than the number of bans on carrying handguns,[1226] and *Bruen*

---

[1223] *See* text at note ____.
[1224] *See* text at note ____.
[1225] *See* text at note ____.
[1226] *See* text at note ____.

found the handgun laws insufficient to establish a tradition constricting the Second Amendment.[1227]

As for other nonblade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms "not typically possessed by law-abiding citizens for lawful purposes."[1228]

Other flexible impact arms, most notably blackjacks, were "typically possessed by law-abiding citizens for lawful purposes," especially by law enforcement officers. Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitution right to arms. As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the mere possession of modern rifles and magazines.

### 3. Minors

Restrictions on transfers of particular arms to minors were numerous in the last third of the nineteenth century. In two previous articles, we provided the legal history of age-based firearm restrictions.[1229] In the present article, we have described many age restrictions for other arms, in Parts V and VI.

Some of those restrictions listed an age, while others simply said "minor." The distinction is important today, regarding laws that prohibit arms for young adults 18–20, who today are legally recognized as adults. Similarly, if an 1870 law had limited the exercise of a civil right only to "voters," that law today

---

[1227] *See* text at note ____.

[1228] *Heller*, 554 U.S. at 625.

[1229] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __; David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018).

would not be a good precedent for restricting the civil rights of women, although it might still be a good precedent for restricting the right for non-citizens.

The following laws, in chronological order of first enactment, restricted sales of at least one type of arm based on age; some of them also restricted nonsale transfers: Alabama (1856, male minor); Tennessee (1856, minor); [1230] Kentucky (1859, minor, parental permission), Indiana (1875, age 21), Georgia (1876, minor), Illinois (parent or employer consent, age 18), West Virginia (1882, age 21), Kansas (1883, minor, also banning possession), Missouri (1885, minor parental consent), Texas (1889, minor, parental consent), Florida (1889, minor), Louisiana (1890, age 21), New York (1889, consent of police magistrate), Oklahoma Terr. (1890, age 21), Virginia (1890, "minor under sixteen years of age"), D.C. (1892, minor), North Carolina (1893, minor). A few laws limited carry based on age: Nevada (1881, no concealed carry, age 18) (1883, raised to 21), Arizona Terr. (1883, ages 10 to 16, no carry in towns).[1231]

Only Kansas criminalized possession of a regulated arm based on age.[1232] None of the age restrictions applied to rifles or shotguns [1233] Moreover, the first laws come over 60 years after the Second Amendment, and only three of them precede the Fourteenth Amendment.[1234] According to *Bruen*, "late-19th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[1235] Earlier evidence shows that in the colonial and founding eras, no age-based firearm restrictions applied to 18-to-20-year-olds, and as part of the militia, they were required to possess a wide array of firearms, edged weapons, and accoutrements.[1236] Thus, whatever may be concluded from analogies to statutory precedents, modern restrictions on long gun acquisition by young adults ages 18 to 20 are constitutionally dubious, and bans on possession appear indefensible.

### 4. Penalties for criminal misuse

---

[1230] *See* text at note ____.

[1231] *See* Kopel & Greenlee at note ____.

[1232] *See* text at note ____.

[1233] *See* text at note ____.

[1234] *See* text at note ____.

[1235] 142 S.Ct. at 2154 n.28.

[1236] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __, at 533–89.

As described in Parts V and VI, there were also many laws imposing extra penalties of use of particular arms in violent crimes,[1237] We have not surveyed the colonial criminal codes to look for analogues. There was a longstanding tradition in common law, sometimes codified in statutes, with special punishment for breaches of the peace involving weapons.[1238]

For the most part, the search of precedents is unnecessary. Perpetrating criminal homicides, armed robberies, or armed burglaries is not conduct that is protected by the Second Amendment. Violent crimes with firearms, Bowie knives, or other arms harm "the security of a free State."[1239] Likewise, the First

---

[1237] *See* text at note ____.

[1238] *See, e.g.*, David B. Kopel & George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's Young v. State of Hawaii*, 2021 U. Ill. L. Rev. Online 172, 174–83 (May 13, 2021).

[1239] U.S. Const. Amend. II. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." Cockrum v. State, 24 Tex. 394, 403 (1859) (upholding law imposing extra punishment for use of a Bowie knife in manslaughter).

Beyond the scope of this Article are extra penalties for possessing arms while committing a nonviolent crime. For example, body armor is a Second Amendment "arm." *See Heller* 554 U.S. at 581 (quoting dictionary definitions of "arms" that include "armour for defence" or "any thing a man wears for his defence"). Laws that punished arms possession in the course of a crime even if the possession had nothing to do with a crime might raise constitutional problems. A bill introduced in the U.S. Senate in 1999 would have imposed a sentence enhancement of up to 36 months for committing any crime while using body armor—for example, if the proprietor of a liquor store, who always wore body armor for protection from robbers, filled out his tax forms at work and cheated on the taxes. S. 254, § 1644, U.S. Sen., 106th Cong., 1st Sess. (1999) (Sen. Lautenberg); David B. Kopel & James Winchester, *Unfair and Unconstitutional: The New Federal Juvenile Crime and Gun Control Proposals*, Independence Institute Issue Paper no. 3-99, Part VIII (June 3, 1999).

Today's U.S. Sentencing Guidelines impose a two-step (up to 36 months) sentence enhancement for possessing a firearm during a drug trafficking crime. The only exception is if the defendant can show that any connection of the gun to the crime was "clearly improbable." U.S.S.G. § 2D1.1(b)(1) Cmt. 11. One federal district court recently held that there was "a substantial question" for appellate review as to whether the "clearly improbable" standard is consistent "with the nation's traditions of firearm regulation." United States v. Alaniz, No. 1:21-cr-00243-BLW, 2022 WL 4585896, *3 (D. Ida. Sept. 29, 2022).

Amendment freedom of speech does not protect verbal or written conspiracies in restraint of trade, in violation of antitrust laws.[1240]

---

[1240] *See, e.g.*, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949) (First Amendment does not "make it . . . impossible ever to enforce laws against agreements in restraint of trade").

**KnifeRights MSJ App.000952**

## Conclusion

According to the Supreme Court's *Bruen* decision, the Second Amendment's textual "unqualified command" about "the right to keep and bear arms" is not violated by established traditions in our legal history for regulation of the right. No bans on types of arms from English legal history are relevant to Second Amendment analysis under *Bruen*, for none were adopted in America. During the colonial period and the Founding Era, there were no bans in the English colonies or the new nation on types of arms.

Under *Bruen*, the nineteenth century is relevant to the extent that it informs the original meaning.[1241] Thus, legal history close to the Founding is most important, and the latter part of the century much less so.[1242] Based on this Article's survey of all state and territorial laws before 1900, bans on the sale or possession of any type of arm are eccentricities that do not overcome the plain text of the Second Amendment. Punitive taxation of some arms existed in three southeastern states, but these laws did not create a national tradition. Bans on concealed carry were very common, and under *Heller* and *Bruen* limitations on the mode of handgun carry have been expressly stated to be constitutional, as long as some mode of carry (open or concealed) was allowed.

The deviant jurisdictions that entirely banned carry of Bowie knives, daggers, or other arms are almost entirely the same as the few that restricted handgun carry. *Bruen* held that a few repressive jurisdictions did not establish a national tradition allowing a general ban on carrying handguns.

In contrast, many American jurisdictions limited sales to minors or imposed enhanced punishment for misuse of certain weapons. For at least some weapons, there is an established American tradition in favor of such laws.

---

[1241] *Bruen*, 142 S. Ct. at 2136 ("when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (quoting *Heller*, 554 U. S., at 634–35 (emphasis added in *Bruen*); *id.* at 2132 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it").

[1242] *Id.* at 2137 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary. . . . In other words, this 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established'" by earlier evidence. (quoting Gamble v. United States, 139 S. Ct. 1960, 1975–76 (2019)); *Heller*, 554 U.S. at 614 ("discussions [that] took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.").

As described in Part III, firearms improved more in the nineteenth century than in any century before or since. Although repeating arms had been around for centuries, during the nineteenth century they became affordable to an average consumer. The semiautomatic handgun with detachable magazines was an innovation of the nineteenth century. Despite the amazing technological progress during the nineteenth century, only one American statute—a racist Florida law from 1893—treated repeating firearms worse than other firearms. Indeed, the two most repressive handgun laws from the Jim Crow period—Tennessee (1879) and Arkansas (1881)—privileged the most powerful repeating handguns above lesser handguns. American legal history from 1606 to 1899 provides no precedent for special laws against semiautomatic firearms or against magazines.

The mainstream of American legal history supports controls on the mode of carry, limitations for minors, and punishment for misuse. The mainstream history does not support prohibitions of arms that are well-known to be kept for lawful purposes, including self-defense.

# EXHIBIT AC

KnifeRights MSJ App.000955

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)[1, 2]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 1 | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 2 | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 3 | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake.  Exempted subjects living within 12 miles of the Scottish border.  Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow | | |
| 4 | 1606 | England | 4 Jac. I, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon | | |
| 5 | 1664 | New York | The Colonial Laws of New York from the Year 1664 to the Revolution . . ., at 687 (1894) | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the presence | Gun; Pistol; Sword; Club; | Unconstitutio nal under the Thirteenth and/or Fourteenth | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 161), Defendants created this survey of statutes, laws, and regulations that Defendants have determined are relevant to this action.  Plaintiffs have indicated that, "due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

**KnifeRights MSJ App.000956**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | and at the direction of their Master or Mistress. | Other kind of weapon | Amendments to the U.S. Constitution | |
| 6 | 1686 | New Jersey | The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881) (1686) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons.  Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons | | |
| 7 | 1689 | England | English Bill of Rights of 1689, 1 Wm. & Mary ch. 2, § 7 | Provided a right for Protestants to have "Arms for their Defense . . . as allowed by law." | Arms for defense | | |
| 8 | 1750 | Massachusetts | 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling. Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon | | |
| 9 | 1769 | England | 1 Blackstone ch. 1 (1769) | Recognized the "fifth and last auxiliary right," which provided that Protestant subjects had the right to "arms for their defence" "such as are allowed by law." | Arms for defense | | |
| 10 | 1771 | New Jersey | 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | Prohibited the setting of any trap gun intended to discharge by any string, rope, or other contrivance.  Punishable by forfeiture of the firearm and fine of 6 pounds. | Trap gun | | |

2

**KnifeRights MSJ App.000957**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| 11 | 1783 | Massachusetts – City of Boston | 1783 Mass. Acts 37, § 2 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder.  Punishable by forfeiture and sale at public auction. | Gunpowder | | |
| 12 | 1784 | New York – City of New York City | 1784 Laws of N.Y. 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers.  Punishable by forfeiture and fine. | Gunpowder | | |
| 13 | 1786 | Massachusetts | An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon | | |
| 14 | 1788 | Ohio [Territory] | 1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . ., ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary. Punishable by imprisonment for up to 40 years. | Any dangerous weapon | | |
| 15 | 1792 | Virginia | Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force . . . ., at 187 (1803), §§ 8-9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |

3

KnifeRights MSJ App.000958

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 16 | 1797 | Delaware | Del. Laws 104, An Act for the Trial of Negroes, ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 17 | 1798 | Kentucky | 1798 Ky. Acts 106 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 18 | 1799 | Mississippi [Territory] | 1799 Miss. Laws 113, A Law for The Regulation of Slaves | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 19 | 1799 | New Jersey | Charles Nettleton, Laws of the State of New-Jersey, at 474 (1821), [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 20 | 1801 | Tennessee | 1801 Tenn. Act 260-61 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to | Dirk; Large knife; Pistol; | | |

KnifeRights MSJ App.000959

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | the fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Other dangerous weapon | | |
| 21 | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 22 | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 23 | 1811 | Maryland | The Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments, at 465 (1811) | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 24 | 1813 | Louisiana | 1813 La. Acts 172, An Act Against Carrying | Prohibited the carrying of any concealed weapon, including a | Dirk; Dagger; | | |

**KnifeRights MSJ App.000960**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
|  |  |  | Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 | dirk, dagger, knife, pistol, or any other deadly weapon. | Knife; Pistol; Other deadly weapon |  |  |
| 25 | 1816 | Georgia | Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions, at 599 (1821), Offences Against the Public Peace, (1816) § 19 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon |  |  |
| 26 | 1818 | Missouri [Territory] | Organic Laws:-Laws of Missouri Territory, (Alphabetically | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and | Gun; Powder; Shot; | Unconstitutional under the Thirteenth |  |

KnifeRights MSJ App.000961

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates, at 374 (1818), Slaves, § 3 | from possessing a gun or ammunition. | Club; Other weapon; Ammunition | and/or Fourteenth Amendments to the U.S. Constitution | |
| 27 | 1821 | Maine | 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 1 | Prohibited any person from possessing any gunpowder, in any quantity, unless permitted by local rules and regulations. | Gunpowder | | |
| 28 | 1835 | Arkansas [Territory] | Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 29 | 1836 | Massachusetts | Mass. Rev. Stat., ch. 134, § 16 (1836) | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 30 | 1836 | Connecticut – Cities of Hartford, New Haven, New | 1836 Conn. Acts 105, ch. 1, § 20 | Authorizing the local court of common counsel to prohibit and regulate the storage of gun powder. | Gunpowder | | |

KnifeRights MSJ App.000962

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | London, Norwich, and Middleton | | | | | |
| 31 | 1837 | Alabama | 1837 Ala. Acts 7, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife | Tax reduced in 1851. | |
| 32 | 1837 | Arkansas | Josiah Gould, A Digest of the Statutes of Arkansas Embracing All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 1856 380 381–82 (1837) | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane | | *State v. Buzzard*, 4 Ark. 18 (1842) (upholding law under the Second Amendment and state constitution); *Fife v. State*, 31 Ark. 455 (1876) |
| 33 | 1837 | Georgia | Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears. Exempted | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear | | *Nunn v. State*, 1 Ga. 243 (1846) (held unconstitutional under Second Amendment). |

8

KnifeRights MSJ App.000963

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | "such pistols as are known as horseman's pistols" from these restrictions. Punishable by a fine of up to $100-500 for the first offense and $500-1,000 for subsequent offenses. | | | |
| 34 | 1837 | Mississippi | 1837 Miss. L. 291-92 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; Bowie knife; Sword; Sword cane; Other deadly weapon | | |
| 35 | 1837 | Mississippi – Town of Sharon | 1837 Miss. L. 294 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 36 | 1837 | Tennessee | 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon. Punishable by fine of $200-500 and imprisonment for 3-6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon | | *Haynes v. Tennessee*, 24 Tenn. 120 (1844) (upheld conviction for unlawful |

9

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | carrying of a Bowie knife). |
| 37 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick.  Punishable by fine of $100-500 and imprisonment for $1-6 months. | Bowie knife; Arkansas toothpick | | |
| 38 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies.  Punishable by imprisonment for 3-15 years. | Bowie knife; Arkansas toothpick; Any knife or weapon that resembles a bowie knife | | |
| 39 | 1838 | Tennessee | Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-38, at 200-01, ch. 137 | Prohibited the sale or transfer of any Bowie knife or knives, Arkansas toothpicks, or "any knife or weapon that shall in form shape or size resemble a Bowie knife or any Arkansas toothpick." | Bowie knife; Arkansas toothpick; Any similar knife | | *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) (upheld under state constitution). |
| 40 | 1838 | Virginia | Acts of the General Assembly of Virginia, Passed at the Session of 1838, at 76-77, ch. 101 (1838) | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon | | |
| 41 | 1839 | Alabama | 1839 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire | Knife; Deadly weapon | | *State v. Reid*, 1 Ala. 612 |

10

KnifeRights MSJ App.000965

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50-100 and imprisonment not to exceed 3 months. | | | (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 42 | 1839 | Florida [Territory] | John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840, at 423 (1839), An Act to Prevent any Person in this Territory from Carrying Arms Secretly | Prohibited the concealed carrying of "any dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine of $50-500 or imprisonment for 1-6 months. | Dirk; Pistol; Other arm or weapon | | |
| 43 | 1839 | Mississippi – Town of Emery | 1839 Miss. L. 385, ch. 168 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 44 | 1840 | Mississippi – Town of Hernando | 1840 Miss. L. 181, ch. 111 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 45 | 1841 | Alabama | 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any | Knife; Pistol; Air gun; Other deadly weapon | | |

11

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50-100. | | | |
| 46 | 1841 | Maine | 1841 Me. Laws 709, ch. 169, § 16. | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to six months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 47 | 1841 | Mississippi | 1841 Miss. 52, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife | Tax reduced in 1850 | |
| 48 | 1842 | Louisiana | Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842) | Prohibited the carrying of " any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20-50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | | |
| 49 | 1845 | Illinois | Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A.D. 1844-45: Together with an Appendix | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

KnifeRights MSJ App.000967

***Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB**
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force , at 176 (1845), Criminal Jurisprudence, § 139 | | | | |
| 50 | 1846 | North Carolina | 1846 N. C. L., ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; Firearms; Other deadly weapons of offense | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 51 | 1847 | Maine | The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix, at 709 (1847), Justices of the Peace, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 52 | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive | Pistol; Gun; Knife; Dirk; | | |

KnifeRights MSJ App.000968

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | weapon with the intent to assault another person..  Punished by fine of up to $100 and imprisonment for up to 3 months. | Bludgeon; Other offensive weapon | | |
| 53 | 1850 | Mississippi | 1850 Miss. 43, ch. 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife | Tax increased to $1 in 1854 | |
| 54 | 1851 | Alabama | 1851-52 Ala. 3, ch. 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol | Additional weapons added in 1867. | |
| 55 | 1851 | Illinois – City of Chicago | Ordinances of the City of Chicago, Ill., ch. 16, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities.  Punishable by a fine of $25 per offense. | Gunpowder | | |
| 56 | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop of Philadelphia, to Convey Certain Real Estate in the Borough of York, and a Supplement to the Charter of Said Borough, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon.  Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon | | |
| 57 | 1853 | California | S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault.  Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

14

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Passed at the Sessions of 1850-51-52-53, § 127 | | | | |
| 58 | 1853 | New Mexico [Territory] | 1853 N.M. Laws 406, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, § 25 | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon. | Pistol; Bowie knife; Cuchillo de cinto (belt buckle knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon | *See also* 1859 N.M. L. 94-96 (same). | |
| 59 | 1854 | Mississippi | 1854 Miss. 50, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, Arkansas toothpick, sword cane, and dueling or pocket pistol. | Bowie knife; Arkansas toothpick; Sword cane; Dueling or pocket pistol | Amended in 1856 to exclude pocket pistols from the tax | |
| 60 | 1854 | Washington [Territory] | 1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon.  Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 61 | 1855 | California | 1855 Cal. L. 152-53, ch. 127 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; | | |

15

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | the decedent's family for liquidated damages. | Other dangerous weapon | | |
| 62 | 1855 | Indiana | 1855 Ind. Acts 153, An Act to Provide for the Punishment of Persons Interfering with Trains or Railroads, ch. 79, § 1 | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person.  Exempted any person who was a "traveler."  Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword cane; Other dangerous or deadly weapon | *See also* 1859 Ind. L. 129, ch. 78 (same); 1881 Ind. L. 191, ch. 37. | |
| 63 | 1855 | Louisiana | 1855 La. L. 148, ch. 120 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." | Pistol; Bowie knife; Dirk; Other dangerous weapon | | |
| 64 | 1856 | Mississippi | 1856-1857 Miss. L. 36, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Dirk knife; Sword cane | Modified in 1861 to preclude collection of the tax during the Civil War (1861-1862 Miss. L. 134, ch. 125) | |
| 65 | 1856 | Tennessee | 1855-56 Tenn. L. 92, ch. 81 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor.  Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife | | |

16

KnifeRights MSJ App.000971

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 66 | 1856 | Texas | Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger | | *Cockrum v. State*, 24 Tex. 394 (1859) (upheld under Second Amendment and Texas Constitution). |
| 67 | 1858 | Minnesota – City of St. Paul | Ordinances of the City of St. Paul, Minn., ch. 21, § 1 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities.  Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time.  Punishable by a fine not to exceed $50 per offense. | Gunpowder | | |
| 68 | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, An Act to Adopt and Establish a Criminal code for the Territory of Nebraska, § 135 | Prohibited the  carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to assault a person. Punishable by fine up to $100. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 69 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slingshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro." Punishable by fine of $50. | Pistol; Dirk; Bowie knife; Brass knuckles; Slingshot; Colt; Cane-gun; | Unconstitutional under the Thirteenth and/or Fourteenth Amendments | |

KnifeRights MSJ App.000972

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Other deadly weapon | to the U.S. Constitution | |
| 70 | 1859 | Ohio | 1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 71 | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 72 | 1860 | Georgia | 1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1. | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Gun; Pistol; Bowie knife; Slungshot; Sword cane; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 73 | 1861 | California | William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of | Dirk; Bowie knife; Sword; Sword cane; Pistol; | | |

KnifeRights MSJ App.000973

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., at 334 (1861) | such weapon in a fight. Punishable by a fine of $100-500 or imprisonment for 1-6 months. | Gun; Other deadly weapon | | |
| 74 | 1861 | Nevada [Territory] | 1861 Nev. L. 61 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon | | |
| 75 | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, | Pistol; Bowie knife; Dagger; | | |

19

**KnifeRights MSJ App.000974**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | dagger, or other deadly weapon. Punished by fine of $5-35. | Other deadly weapon | | |
| 76 | 1863 | Kansas – City of Leavenworth | C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix, at 45 (1863), An Ordinance Relating to Misdemeanors, § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon | | |
| 77 | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 190 (1863), Offences Affecting Public Safety: Carrying Concealed Weapons, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10-50. | Pistol; Bowie knife; Dirk; Other deadly weapon | | |
| 78 | 1864 | California | Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of | Prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30-90 days or fine of $20-200. | Dirk; Pistol; Sword cane; Slungshot; Other deadly or dangerous weapon | Repealed 1869-70 Cal. Sess. Laws, ch. 63 (provided that pending cases be heard and tried as if not repealed) | |

KnifeRights MSJ App.000975

**_Miller v. Bonta_, No. 3:19-cv-01537-BEN-JLB**
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon, at 261, § 1 (1868) | | | | |
| 79 | 1864 | Montana [Territory] | 1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1 | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory. Punishable by fine of $25-100. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 80 | 1865 | Utah [Territory] | An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866), § 102 | Prohibited the "set[ting] of any gun." Punishable by imprisonment of up to 1 year or a fine of up to $500. | Trap gun | | |

KnifeRights MSJ App.000976

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 81 | 1866 | New York | Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1 | Prohibited using, attempting to use, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun | | |
| 82 | 1866 | North Carolina | 1866 N.C. L. ch. 21, at 33-34, § 11 | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; | | |

KnifeRights MSJ App.000977

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dirk cane; Rifle cane | | |
| 83 | 1867 | Alabama | 1867 Ala. Rev. Code 169 | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description." Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife | | |
| 84 | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory. Punishable by fine of $5-35. Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 85 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, dirk, sword cane, Spanish stiletto, belt or pocket pistol, or other knife or weapon. Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon | | |

KnifeRights MSJ App.000978

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Peace, §§ 4746, 4747, 4753, 4757 | | | | |
| 86 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State. Selling Liquors or Weapons to Minors, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling.  Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 87 | 1868 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1) | Prohibited the carrying of any rifle or "shot-gun walking cane." Punishable by fine of $500-1000 and imprisonment of no less than 2 years. | Rifle; Shotgun walking cane | | |
| 88 | 1868 | Florida | Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892), at 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles.  Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot; Metallic knuckles | | |
| 89 | 1868 | Florida | 1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace. Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | | |

24

KnifeRights MSJ App.000979

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 90 | 1868 | Florida | James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, at 403 (1881), Offences Against Public Peace, § 13 (Fla. Act of Aug. 6, 1868, ch. 1637) | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Dirk; Pistol; Other arm or weapon | | |
| 91 | 1869 | Tennessee | 1869-70 Tenn. L. 23-24, ch. 22 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" | | *Andrews v. State*, 50 Tenn. 165 (1871) (upheld under state constitution) |
| 92 | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 93 | 1870 | Georgia | 1870 Ga. L. 421, ch. 285 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of | Dirk; Bowie knife; Pistol; Revolver; | Law enforcement exception added in | *Hill v. State*, 53 Ga. 472 (1874) (upheld |

KnifeRights MSJ App.000980

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | justice, or any general election ground or precinct, or any other public gathering," except for militia musters. | Any kind of deadly weapon | 1879. *See* 1879 Ga. L. 64, ch. 266 | under state constitution) |
| 94 | 1870 | Louisiana | 1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . ., § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon | | |
| 95 | 1870 | New York | "The Man Trap," The Buffalo Commercial, Nov. 1, 1870 | Referenced prohibition on the use of "infernal machines." | Trap gun; Infernal machine | | |
| 96 | 1871 | Arkansas – City of Little Rock | George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City 230-31 (1871) | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25-500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; Colt; Metal knuckles | | |
| 97 | 1871 | District of Columbia | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872) (Dist. of Col., An | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass or | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; Dirk; | | |

26

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Act to Prevent the Carrying of Concealed Weapons, 1871, ch. XXV) | other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20-50. | Razor; Sword-cane; Slungshot; Metal knuckles | | |
| 98 | 1871 | Mississippi | 1871 Miss. L. 819-20, ch. 33 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane | *See also* 1876 Miss. L. 131, 134, ch. 103; 1878 Miss. L. 27, 29, ch. 3; 1880 Miss. L. 21, ch. 6; 1892 Miss L. 194, ch. 74; 1894 Miss L. 27, ch. 32 | |
| 991 | 1871 | Missouri – City of St. Louis | Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City, at 491-92 (1871), Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10. | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor.  Punishable by fine of $10-500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |

KnifeRights MSJ App.000982

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 100 | 1871 | Tennessee | James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (Nashville, 1871) | Prohibited the carrying of a pistol, dirk, Bowie knife, Arkansas tooth pick, or other weapon in the shape of those weapons, to an election site. Punishable by fine of minimum $50 and imprisonment at the discretion of the court. | Pistol; Dirk; Bowie knife; Arkansas toothpick | | |
| 101 | 1871 | Texas | 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons. § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense. Punishable by fine of $20-100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other kind of knife used for offense or defense | | *English v. State*, 35 Tex. 473 (1872) (upheld as constitutional under Second Amendment and Texas Constitution); *State v. Duke*, 42 Tex. 455 (1875) (upheld as constitutional under Texas Constitution) |
| 102 | 1871 | Texas | Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879). Art. 163. | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day. Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; | | |

KnifeRights MSJ App.000983

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | other kind of knife used for offense or defense. Punishable by fine and forfeiture of the weapon. | Other dangerous weapon; Other knife used for offense or defense | | |
| 103 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, An Act to Add an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon. Punishable by a fine of $3-10. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Razor; Brass; Metal knuckles; Other deadly weapon | | |
| 104 | 1872 | Nebraska – City of Nebraska | Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, at 36 (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy slungshot, brass or other metallic knuckles, or any other dangerous or deadly weapons. | Musket; Rifle; Shot gun; Pistol; Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or | | |

29

KnifeRights MSJ App.000984

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | deadly weapons | | |
| 105 | 1873 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4110 (Act of Apr. 8, 1873, p. 130) | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20-200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 106 | 1873 | Georgia | R. H. Clark, The Code of the State of Georgia (1873) § 4528 | Prohibited the carrying of any dirk, Bowie knife, pistol, or other deadly weapon to a court, election site, precinct, place of worship, or other public gathering site.  Punishable by fine of $20-50 or imprisonment for 10-20 days. | Dirk; Bowie knife; Pistol; Any kind of deadly weapon | | |
| 107 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2, as codified in Mass. Gen. Stat., ch. 164 (1873) § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested  pursuant to a warrant or while committing a crime. Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon | | |
| 108 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2 as codified in Mass. Gen. Stat., ch. 164 (1873) § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles.  Punishable by fine up | Slungshot; Metallic knuckles | | |

KnifeRights MSJ App.000985

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | to $50 or imprisonment up to 6 months. | | | |
| 109 | 1873 | Minnesota | The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota, at 993 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65 | Prohibited the setting of any spring or trap gun.  Punished by imprisonment for at least 6 months or a fine of up to $500 if no injury results; imprisonment for up to 5 years if non-fatal injury results; and imprisonment for 10-15 years if death results. | Spring gun; Trap gun | | |
| 110 | 1873 | Nevada | Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small | Rifle; Shotgun; Pistol; Bowie knife; | | |

KnifeRights MSJ App.000986

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Inclusive, at 563 (Vol. 1, 1873), Of Crimes and Punishments, §§ 35-36 | sword, backsword, or other dangerous weapon. | Dirk; Small sword; Back sword; Other dangerous weapon | | |
| 111 | 1873 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871, at 125 (Vol. 2, 1873), Offences Against Public Policy and Economy, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling.  Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 112 | 1874 | Alabama | 1874 Ala. L. 41, ch. 1 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Increased tax to $50 in 1875-76. | |
| 113 | 1874 | Illinois | Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-72 and 1873-74, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874, at 360 (1874), | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron knuckles, or other deadly weapon while disturbing the peace.  Punishable by fine up to $100. | Pistol; Knife; Slungshot; Other deadly weapon | | |

KnifeRights MSJ App.000987

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Disorderly Conduct: Disturbing the Peace, § 56 | | | | |
| 114 | 1874 | New Jersey – City of Jersey City | Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto, at 41 (1874), An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: §§ 1-2 | Prohibited the carrying of a concealed slungshot, billy, sandclub or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, including a sword in a cane, or air-gun. punishable by confiscation of the weapon and a fine of up to $20. Exempted policemen of Jersey City. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon; Sword cane; Air gun | | |
| 115 | 1874 | Virginia | 1874 Va. L. 239, ch. 239 | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk | | |
| 116 | 1875 | Alabama | 1875-1876 Ala. L. 82, ch. 1 | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added pistol cartridges in 1886 and increased the tax to $300 in 1887. | |

33

KnifeRights MSJ App.000988

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 117 | 1875 | Alabama | 1875-1876 Ala. L. 46, ch. 2 | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives | Tax rate reduced to 55 cents in 1882, with additional weapons added. | |
| 118 | 1875 | Arkansas | Act of Feb. 16, 1875, 1874-75 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25-100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles | | *Wilson v. State*, 33 Ark. 557 (1878) (held unconstitutional). |
| 119 | 1875 | Idaho [Territory] | Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875), § 133. | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 120 | 1875 | Indiana | 1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon. Punishable by fine of $1-500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon | | |

34

KnifeRights MSJ App.000989

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB

**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 121 | 1875 | Michigan | 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 122 | 1876 | Alabama | 1876-77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey. Punishable by a fine of $50-300 and imprisonment or hard labor for no more than 6 months. | Bowie knife; Pistol; Air gun; Other similar weapon | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 123 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 124 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128 | Prohibited the transfer of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane | | |
| 125 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; | | |

35

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments, at 64 (1876), Misdemeanors, § 39 | weapon without written permission from the Captain of Police.  Exempted peace officers. | Dirk; Dagger; Other dangerous or deadly weapon | | |
| 126 | 1876 | Wyoming [Territory] | Wyo. Comp. Laws (1876) ch. 35, § 127, as codified in Wyo. Rev. Stat., Crimes (1887), Having possession of offensive weapons, § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 127 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife | | *Coleman v. State*, 32 Ala. 581 (1858) (affirming conviction of letting minor obtain a pistol). |
| 128 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slingshot, brass knuckles, or other deadly or dangerous weapon, unless the person was | Bowie knife; Pistol; Air gun; Slingshot; Metal knuckles; Other deadly or | | |

36

KnifeRights MSJ App.000991

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|------------------------|---------------|-----------------|
| | | | | threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50-300 and imprisonment of not more than 6 months. | dangerous weapon | | |
| 129 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, at 100, § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon. Punishable by a fine of $5-50. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 130 | 1877 | New Jersey | Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871, at 304 (1877), An Act Concerning Disorderly Persons, § 2 | Prohibited The carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." Punishable as a "disorderly person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 131 | 1877 | South Dakota [Territory] | S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 132 | 1877 | Utah – City of Provo [Territory] | Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; | | |

KnifeRights MSJ App.000992

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | 105, 106-07 (1877) (Provo, Utah). § 182: | | Dagger; Other dangerous or deadly weapon | | |
| 133 | 1878 | Alabama – City of Uniontown | 1878 Ala. L. 437, ch. 314 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added dealers of "brass knuckles" in 1884. Similar to law enacted in 1884 authorizing Tuscaloosa to regulate dealers in pistols, Bowie knives, shotguns or firearms, and knives "of like kind or description." 1884-1885 Ala. 323, ch. 197 | |
| 134 | 1878 | Mississippi | 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon. Excepted travels other than "a tramp." Punishable by fine of $5-100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon | Prohibited weapons were expanded in 1896 | |

KnifeRights MSJ App.000993

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 135 | 1879 | Alabama – City of Montgomery | J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama] (1879), § 428 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon.  Punishable by a fine of $1-100. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon | | |
| 136 | 1879 | Idaho – City of Boise [Territory] | Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894, at 118-19 (1894), Carrying Concealed Weapons, § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slungshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey. Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slungshot; Metallic knuckles; Other dangerous or deadly weapons | | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 137 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorizes the passage of laws restricting the carrying of concealed weapons. | Concealed weapons | | |
| 138 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon. Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other | | |

39

KnifeRights MSJ App.000994

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|------------------------|---------------|-----------------|
| | | | | | dangerous weapon | | |
| 139 | 1879 | North Carolina | North Carolina: N.C. Sess. Laws (1879), ch. 127, as codified in North Carolina Code, Crim. Code, ch. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal knuckles, razor, or other deadly weapon. Exemption for carrying on the owner's premises. Punishable by fine or imprisonment at the discretion of the court. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 140 | 1880 | Ohio | Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880, at 1633 (Vol. 2, 1879), Offences Against Public Peace, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon. Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 141 | 1880 | South Carolina | 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894), § 129 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon. Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 142 | 1881 | Alabama | 1880-1881 Ala. L. 38-39, ch. 44 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or | Bowie knife; Pistol; Air gun; | Amended in 2022 to remove | |

KnifeRights MSJ App.000995

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|------------------------|---------------|-----------------|
| | | | | description, pistol, or firearm of "any other kind or description," or air gun.  Punishable by fine of $50-300 and imprisonment of not more than 6 months.  Further provided that fines collected under the statute would be monetary and not in-kind payments. | Slungshot; Metal knuckles; Other deadly or dangerous weapon | prohibition on concealed carry of Bowie knives.  *See* Ala. Stat. § 13A-11-50. | |
| 143 | 1881 | Arkansas | 1881 Ark. Acts 191, ch. 96, § 1-2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol | | |
| 144 | 1881 | Colorado | Colo. Rev. Stat 1774, § 248 (1881) | Prohibited the concealed carrying of any firearms, any pistol, revolver, Bowie knife, dagger, slingshot, brass knuckles, or other deadly weapon, unless authorized by chief of police. | Pistol; Revolver; Bowie knife; Dagger; Slingshot; Metal knuckles; Other deadly weapon | | |
| 145 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors.  Punishable by a fine of $25-200 or imprisonment for 10-30 days. | Deadly weapon | | |

41

KnifeRights MSJ App.000996

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 146 | 1881 | Illinois | Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code 73 (1885), ch. 38, Possession or sale forbidden, § 1 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon. Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon | | |
| 147 | 1881 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882, at 375 (1882), Deadly Weapons: Selling or Giving to Minor, § 54b. | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25-200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon | | |
| 148 | 1881 | Indiana | The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1, at 366 (1881), Crimes, § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance | | |

42

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| 149 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon. Punishable by fine of $20-200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon | | |
| 150 | 1881 | New York | George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects, at 321 (Vol. 1, 1881), Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9 | Prohibited using, attempting to use, or concealing a slungshot, billy, sandclub or metal knuckles, and any dirk. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk | | |
| 151 | 1881 | Tennessee – City of Nashville | William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, at 340-41 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon.  Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; | | |

KnifeRights MSJ App.000998

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|----------------------|---------------|-----------------|
| | | | (1881), Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1 | | Other deadly weapon | | |
| 152 | 1881 | Washington [Territory] | 1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929 | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon | | |
| 153 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine; Other combustible; Concealed deadly weapon; Gun; Pistol; Firearm | | |
| 154 | 1881 | Washington [Territory] | William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897, at 1956 (Vol. 2, 1897) | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror. Punishable by fine up to $25. | Dangerous weapon | | |
| 155 | 1882 | Georgia | 1882-83 Gal. L. 48-49, ch. 94 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold | Pistol; Dirk; Sword cane; speak Bowie knife; | | |

44

KnifeRights MSJ App.000999

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | for the purpose of offense and defense." | Other kind of knife | | |
| 156 | 1882 | Georgia | 1882-83 Ga. L. 37, ch. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Raised to $100 in 1884. | |
| 157 | 1882 | Iowa – City of Sioux City | S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa, at 62 (1882), Ordinances of the City of Sioux City, Iowa, § 4. | Prohibited the carrying a concealed pistol, revolver, slungshot, cross-knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Pistol; Revolver; Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon | | |
| 158 | 1882 | West Virginia | 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor.  Punishable by fine of $25-200 and imprisonment of 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *State v. Workman*, 35 W. Va. 367 (1891) (upheld under the Second Amendment), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 142 |

45

KnifeRights MSJ App.001000

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | | | | S. Ct. 2111, 2153 (2022) |
| 159 | 1883 | Illinois – City of Danville | Revised Ordinances of the City of Danville [Illinois], at 66 (1883), Ordinances of the City of Danville. Concealed Weapons, § 22. | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon.  Also prohibited displaying the weapon in a threatening or boisterous manner.  Punishable by fine of $1-100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon | | |
| 160 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading Or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, §§ 1-2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind.  Also prohibited the possession of such weapons by any minor.  Punishable by fine of $5-100.  Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon.  Punishable by fine of $1-10. | Pistol; Revolver; Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons | | |

KnifeRights MSJ App.001001

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| 161 | 1883 | Missouri | 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated.  Punishable by fine of $25-200 and/or by imprisonment up to 6 months. | Fire arms; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 162 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb | | |
| 163 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon | | |

KnifeRights MSJ App.001002

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 164 | 1884 | Georgia | 1884-85 Ga. L. 23, ch. 52 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Reduced to $25 in 1888. | |
| 165 | 1884 | Maine | The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884, at 928, (1884), Prevention of Crimes, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 166 | 1884 | Minnesota – City of Saint Paul | W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289 (1884), Concealed Weapons – License, § 1 | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon | | |
| 167 | 1884 | Tennessee | Tenn. Pub. Acts (1879), ch. 186, as codified in Tenn. Code (1884) | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; | | |

48

**KnifeRights MSJ App.001003**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Spanish stiletto; Pistol; Revolver | | |
| 168 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, An Act Relating to Traps, § 1 | Prohibited the setting of any spring gun trap. Punishable by a fine of $50-500 and liability for twice the amount of any damage resulting from the trap. | Spring gun | | |
| 169 | 1884 | Wyoming [Territory] | 1884 Wyo. Sess. Laws, ch. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983 | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slungshot or other deadly weapon. Punishable by fine of $10-100 or imprisonment up to 6 months. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 170 | 1885 | Montana [Territory] | 1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight. Punishable by fine of $10-100 and/or imprisonment for 1-3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon | | |
| 171 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410 | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous knife. Punishable as a felony, and as a misdemeanor if a minor. | Slungshot; Billy; Sandclub; Metal knuckles; Dagger; Dirk; | | |

49

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dangerous knife | | |
| 172 | 1885 | New York – City of Syracuse | Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, at 215 (1885), [Offenses Against the Public Peace and Quiet,] § 7 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon.  Punishable by a fine of $25-100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon | | |
| 173 | 1885 | Oregon | 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury.  Punishable by a fine of $10-200 or imprisonment for 5-100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles | | |
| 174 | 1886 | Colorado – City of Denver | Isham White, The Laws and Ordinances of the City of Denver, Colorado, at 369, § 10 (1886) | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace.  Punishable by a fine of $25-300. | Slungshot; Colt; Metal knuckles | | |
| 175 | 1886 | Georgia | 1886 Ga. L. 17, ch. 54 | Imposed $100 occupational tax on dealers of pistols, revolvers, | Pistol; Revolver; Dirk; | | |

KnifeRights MSJ App.001005

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | | dirks, Bowie knives, and "pistol or revolver cartridges." | Bowie knife; Pistol or revolver cartridges | | |
| 176 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day. Punishable by a fine of $10-50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 177 | 1886 | Maryland – County of Calvert | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State, at 468-69 (Vol. 1, 1888), Concealed Weapons, § 30 | Prohibited the carrying of a concealed pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon. Punishable by fine of up to $500 or imprisonment of up to 6 months. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 178 | 1886 | Maryland | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day within 300 yards of the polls. Punishable by fine of $10-50. | Gun; Pistol; Dirk; Razo; Billy; Bludgeon | | |

KnifeRights MSJ App.001006

Case 3:19-cv-01537-BEN-JLB   Document 163-1   Filed 01/11/23   PageID.20926   Page 52 of
Case 4:23-cv-00547-O   Document 20-3   Filed 10/06/23   Page 458 of 462   PageID 1131

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Election in said County, Within One Mile of the Polls § 1 | | | | |
| 179 | 1887 | Alabama | 1886 Ala. L. 36, ch. 4 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 180 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa, at 206-07 (1887), Carrying Concealed Weapons Prohibited, § 105 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 181 | 1887 | Kansas – City of Independence | O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council, at 162 (1887), Weapons, § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner. Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon. Punishable by fine of $5-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon | | |

KnifeRights MSJ App.001007

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| 182 | 1887 | Michigan | 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument | | |
| 183 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, Criminal Laws, § 174 | Prohibited the carrying of a any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 184 | 1887 | New Mexico [Territory] | An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887) | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk | | |

KnifeRights MSJ App.001008

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. | | | |
| 185 | 1887 | Virginia | The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia, at 897 (1887), Offences Against the Peace, § 3780 | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind. Punishable by fine of $20-100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Any weapon of the like kind | | |
| 186 | 1888 | Maryland – County of Kent | John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein, at 1457 (Vol. 2, 1888), Election Districts–Fences, § 99 | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon.  Punishable by a fine of $5-20. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 187 | 1888 | Florida | Fla. Act of Aug. 6, 1888, ch. 1637, subch. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace.  Punishable by | Slungshot; Metallic knuckles; Billy; Firearms; Other | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | imprisonment up to 1 year and a fine up to $50. | dangerous weapon | | |
| 188 | 1888 | Georgia | 1888 Ga. L. 22, ch. 123 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | Raised to $100 in 1890. | |
| 189 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein, at 522-23 (Vol. 1, 1888), City of Baltimore, § 742 | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slingshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly.  Punishable by fine of $5-25, and confiscation of the weapon. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | | |
| 190 | 1888 | Minnesota | George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 | Prohibited manufacturing, selling, giving, or disposing of a slingshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent.  Also prohibited carrying a concealed slingshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon. | Slingshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon | | |
| 191 | 1888 | Utah – City of Salt Lake City | Dangerous and Concealed Weapon, Feb. 14, 1888, | Prohibited carrying a slingshot or any concealed deadly weapon | Slingshot; Deadly weapon | | |

KnifeRights MSJ App.001010

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | [Territory] | reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14 | without permission of the mayor. Punishable by fine up to $50. | | | |

KnifeRights MSJ App.001011