IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| KNIFE RIGHTS INC., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>MERRICK GARLAND, *et al.*,<br><br>    Defendants. | Civil Action No. 4:23-cv-547-O |

CONSOLIDATED BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................1

BACKGROUND.................................................................................................................2

STANDARD OF REVIEW.................................................................................................5

ARGUMENT.....................................................................................................................6

    I.    Plaintiffs Challenge Only § 1242 of the Switchblade Act...................................6

    II.   Plaintiffs Lack Standing......................................................................................7

        A.   Plaintiffs Fail to Show an Intent to Act Contrary to Law............................8

        B.   Plaintiffs Cannot Show a Substantial Likelihood of Future Enforcement...........10

    III.  Plaintiffs Fail to State a Claim..........................................................................14

        A.   Plaintiffs Cannot State a Claim on Their Own Behalf...............................14

        B.   Plaintiffs Fail to State a Claim on Behalf of Their Customers.................16

    IV.  The Switchblade Act Does Not Violate the Second Amendment.......................21

        A.   Switchblades are Dangerous and Unusual Weapons.................................21

        B.   The Switchblade Act is Consistent with Historical Regulation of Arms.............25

           1.   *Regulation of Bowie Knives and Other Bladed Weapons*.................26

           2.   *Historical Regulations on Commerce in Arms and Ammunition*.............31

    V.   Any Injunction Should Apply Only to Plaintiffs..............................................33

CONCLUSION.................................................................................................................34

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*,
   No. CV 22-3118 (CKK), 2023 WL 1438376 (D.D.C. Feb. 1, 2023) .................................................18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................................................................6

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022)....................................................................................................... 33, 34

*Babbitt v. Farm Workers,*
   442 U.S. 289 (1979) ...........................................................................................................................8

*Bernard Gelb v. Fed. Rsrv. Bank of New York*,
   No. 1:12-cv-4880 (ALC), 2016 WL 4532193 (S.D.N.Y. Aug. 29, 2016)........................................18

*Bevis v. City of Naperville*, Illinois,
   --- F.4th ---, 2023 WL 7273709 (7th Cir. Nov. 3, 2023) .................................................................21

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
   70 F.4th 914 (5th Cir. 2023)............................................................................................................11

*Brumback v. Ferguson*,
   No. 1:22-CV-03093-MKD, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ..................................23

*California v. Texas*,
   141 S. Ct. 2104 (2021)..........................................................................................................8, 11, 13

*Cangelosi v. Sheng*,
   Civ. A. No. 20-1989, 2020 WL 5960682 (E.D. La. Oct. 8, 2020) ...................................................10

*Carney v. Adams*,
   141 S. Ct. 493 (2020) ........................................................................................................................7

*Children's Health Def. v. Food & Drug Admin.*,
   No. 6:22-CV-00093-ADA, 2023 WL 175004 (W.D. Tex. Jan. 12, 2023) ...........................................8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...........................................................................................................................7

*Conant v. McCaffrey*,
   No. C 97-00139 WHA, 2000 WL 1281174 (N.D. Cal. Sept. 7, 2000)..............................................12

*Contractor Managing Gen. Ins. Agency, Inc. v. Greenlight Reinsurance, Ltd.*,
No. 4:20-CV-00996-O, 2020 WL 11148500 (N.D. Tex. Nov. 10, 2020) .......................................... 5

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ......................................................................................................... 7

*Crowley Cutlery Co. v. U.S*,
849 F.2d 273 (7th Cir. 1988) ....................................................................................................... 22

*Dark Storm Indus. LLC v. Cuomo*,
471 F. Supp. 3d 482 ..................................................................................................................... 16

*DHS v. New York*,
140 S. Ct. 599 (2020) ................................................................................................................... 33

*Def. Distributed v. U.S. Dep't of State*,
121 F. Supp. 3d 680 (W.D. Tex. 2015) ................................................................................... 17, 19

*Def. Distributed v. United States Dep't of State*,
838 F.3d 451 (5th Cir. 2016) ....................................................................................................... 17

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
No. CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) .................................................. 23

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...........................................................................................................21, 26, 28

*Fall v. Esso Standard Oil Co.*,
297 F.2d 411 (5th Cir. 1961) ....................................................................................................... 22

*Franciscan All., Inc. v. Becerra*,
47 F.4th 368 (5th Cir. 2022) ........................................................................................................ 13

*Gazzola v. Hochul*, No. 122CV1134BKSDJS,
645 F. Supp. 37 (N.D.N.Y. 2022) ................................................................................................. 15

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) .................................................................................................... 33

*Grambling Univ. Nat. Alumni Ass'n v. Bd. of Sup'rs for Louisiana Sys.*,
286 F. App'x 864 (5th Cir. 2008) ................................................................................................. 17

*Gray v. City of Valley Park*,
No. 4:07CV00881 ERW, 2008 WL 294294 (E.D. Mo. Jan. 31, 2008) ............................................ 18

*Haibo Jiang v. Town of Tonawanda*,
No. 15-CV-898-A, 2018 WL 3215575 (W.D.N.Y. July 2, 2018) .................................................... 19

*Hanson v. D.C.,*
    --- F. Supp. 3d ---, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) .........................................................29

*Hayden v. Fifth Third Bank, Inc.,*
    No. 3:12-CV-00824-H, 2013 WL 2242760.........................................................................................18

*Holland v. Rosen,*
    895 F.3d 272 (3d Cir. 2018) .................................................................................................................18

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) .......................................................................................... 21, 23, 24, 25

*Hotze v. Burwell,*
    784 F.3d 984 (5th Cir. 2015) ...............................................................................................................14

*Hoyt v. City of El Paso,*
    878 F. Supp. 2d 721 (W.D. Tex. 2012).............................................................................................14

*In re Compl. of RLB Contracting, Inc.,*
    773 F.3d 596 (5th Cir. 2014) .................................................................................................................5

*Joint Heirs Fellowship Church v. Akin,*
    629 F. App'x 627 (5th Cir. 2015) ......................................................................................................11

*Kareem v. Cuyahoga Cnty. Bd. of Elections,*
    No. 1:20-CV-02457, 2023 WL 2734636 (N.D. Ohio Mar. 31, 2023) ..........................................13

*Keelan v. Majesco Software, Inc.,*
    407 F.3d 332 (5th Cir. 2005)................................................................................................................6

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ..............................................................................................................................17

*Lacy v. State,*
    903 N.E.2d 486 (Ind. Ct. App. 2009)................................................................................................22

*Leo Combat, LLC v. U.S. Dep't of State,*
    No. 15-CV-02323-NYW, 2016 WL 6436653 (D. Colo. Aug. 29, 2016) ......................................15

*Little v. Strange,*
    796 F. Supp. 2d 1314 (M.D. Ala. 2011) ...........................................................................................12

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ..............................................................................................................17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .......................................................................................................................... 7, 9

*Machete Prods., LLC v. Page,*
  809 F.3d 281 (5th Cir. 2015) ............................................................................5

*Matthews v. Ahmed*, Civ. A.,
  No. 1:18-cv-9, 2021 WL 220104 (E.D. Tex. Jan. 4, 2021) ...................................17

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ............................................................................8

*Mock v. Garland,*
  No. 4:23-CV-00095-O, 2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) .................34

*Mont. Shooting Sports Ass'n v. Holder,*
  No. CV-09-147-DWM-JCL, 2010 WL 3926029 (D. Mont. Aug. 31, 2010), *report and
  recommendation adopted,* No. CV 09-147-M-DWM-JCL, 2010 WL 3909431
  (D. Mont. Sept. 29, 2010) ...............................................................................16

*N.W. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.,*
  325 F.R.D. 671 (W.D. Wash. 2016) ..................................................................19

*N.Y. State Rifle Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) ........................................................................15, 23, 25

*Nat'l Ass'n for Gun Rts., Inc. v. Garland,*
  No. 4:23-CV-00830-O, 2023 WL 6613080 (N.D. Tex. Oct. 7, 2023) ........ 13, 34

*Nat'l Press Photographers Ass'n v. McCraw,*
  84 F.4th 632 (5th Cir. 2023) ............................................................................13

*Nunn v. State,*
  1 Ga. 243 (1846) ............................................................................................28

*Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety,*
  No. 2:22-CV-01815-IM, 2023 WL 4541027 (D. Or. July 14, 2023) ........... 27, 30

*Paxton v. Restaino,*
  --- F. Supp. 3d ---, 2023 WL 4614124 (N.D. Tex. July 18, 2023) .....................13

*Planned Parenthood Gulf Coast, Inc. v. Kliebert,*
  141 F. Supp. 3d 604 (M.D. La. 2015) ...............................................................13

*Pro. Helicopter Pilots Ass'n Loc. 102 v. U.S. Dep't of The Army,*
  No. 1:13-CV-164-WKW WO, 2013 WL 6837555 (M.D. Ala. Dec. 26, 2013)...............16

*R.S.S.W., Inc. v. City of Keego Harbor,*
  56 F. Supp. 2d 798 (E.D. Mich. 1999) ..............................................................19

*Ramming v. United States,*
281 F.3d 158 (5th Cir. 2001) .......................................................................................... 5

*Second Amend. Arms v. City of Chicago,*
135 F. Supp. 3d 743 (N.D. Ill. 2015) ........................................................................... 20

*Seegars v. Gonzales,*
396 F.3d 1248 (D.C. Cir. 2005) .................................................................................... 12

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ........................................................................................................ 7

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin,*
37 F.4th 1078 (5th Cir. 2022) ....................................................................................... 16

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ........................................................................................................ 8

*Teixeira v. County of Alameda,*
873 F.3d 670 (9th Cir. 2017) .............................................................................. 15, 20, 31

*Teter v. Lopez,*
76 F.4th 938 (9th Cir. 2023) ......................................................................................... 12

*Texas State LULAC v. Elfant,*
52 F.4th 248 (5th Cir. 2022) ...................................................................................... 9, 11

*Thomas v. Anchorage Equal Rts. Comm'n,*
220 F.3d 1134 (9th Cir. 2000) ....................................................................................... 8, 9

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) .................................................................................................. 10

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) .................................................................................................. 33

*United States v. Bradley,*
No. 2:22-CR-00098, 2023 WL 2621352 (S.D.W. Va. Mar. 23, 2023) ..................... 31, 32

*United States v. Flores,*
652 F.Supp.3d 796 (S.D. Tex. 2023) ............................................................................ 16

*United States v. Kazmende,*
No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209 (N.D. Ga. May 17, 2023), *report and recommendation adopted,* No. 1:22-CR-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023) ...... 15

*United States v. Libertad,*
No. 22-CR-644 (JSR), 2023 WL 4378863 (S.D.N.Y. July 7, 2023) .............................. 31

*United States v. Sharkey,*
   No. 4:22-cr-00176-SMR-HCA1, 2023 WL 6139615 (S.D. Iowa Sept. 20, 2023) ............................32

*Virden v. City of Austin,*
   --- F. Supp. 3d ---, 2023 WL 5617803 (W.D. Tex. Aug. 30, 2023) ........................................................10

*Walmart Inc. v. U.S. Dep't of Just.,*
   21 F.4th 300 (5th Cir. 2021).............................................................................................................13

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) .................................................................................................................... 10, 11

*Williamson v. Watco Companies, Inc.,*
   No. CIV.A. 09-1255, 2010 WL 4117745 (W.D. La. Oct. 13, 2010) ....................................................6

*Zimmerman v. City of Austin,*
   881 F.3d 378 (5th Cir. 2018)............................................................................................................10

## Federal Statutes

15 U.S.C. §§ 1241-1245.................................................................................................................. 3, 6

15 U.S.C. § 1241 ....................................................................................................................... 3, 4, 12

15 U.S.C. § 1242.................................................................................................................... *passim*

15 U.S.C. § 1243................................................................................................................... 3, 4, 6

15 U.S.C. § 1244.............................................................................................................................3

15 U.S.C. § 1245................................................................................................................... 3, 4, 6

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116 ...................................................................30

Act of May 22, 1794, ch. 33, § 1, 1 Stat. 369...............................................................................31

Pub. L. No. 85-623, 72 Stat. 562 (1958) ................................................................................. 2, 3

## State Statutes

720 Ill. Comp. Stat. Ann. 5/24-1 (West 2023).......................................................................24

Act of Apr. 1, 1881, No. 96, §§ 1–3, 1881 Ark. Acts 191 ...................................................28

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ........................................................................30

Act of Dec. 25, 1837 § 1, 1837 Ga. Acts. 90...........................................................................28

Act of Feb. 10, 1838, No. 24, §§ 1–2, 1838 Fla. Laws 36 ....................................................................29

Act of Feb. 15, 1839, ch. 168, § 5, 1839 Miss. Laws 384 .................................................................29

Act of Feb. 18, 1840, ch. 11, § 5, 1840 Miss. Laws 181 ...................................................................29

Act of Feb. 26, 1856, ch. 81, § 2, 1855–1856 Tenn. Acts 92.............................................................29

Act of Feb. 28, 1878, ch. 96, §§ 1–2, 1878 Miss. Laws 175 .............................................................30

Act of Jan. 12, 1860, ch. 33, § 23, 1 Ky. Acts 241 ...........................................................................29

Act of June 30, 1837, No. 11, 1837 Ala. Laws Called Sess. 7.............................................................28

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. 159............................................................................30

An Act for the Inspection of Gunpowder, ch. 6, § 1, 1776–1777 N.J. Laws 6(1776)...........................32

Cal. Penal Code § 21510 (West 2023) .............................................................................................24

Ch. 137, 1837-1838 Tenn. Acts 200................................................................................................28

Colo. Rev. Stat. Ann. § 18-12-105 (West 2023) ................................................................................24

Conn. Gen. Stat. Ann. § 53-206 (West 2023) ...................................................................................24

D.C. Code Ann. § 22-4514 (West 2023)...........................................................................................24

Del. Code Ann. tit. 11, § 1446 (West 2023) .....................................................................................24

Fla. Stat. Ann. § 790.01 (West 2023)..............................................................................................24

Haw. Rev. Stat. Ann. § 134-52 (West 2023).....................................................................................24

Mass. Gen. Laws Ann. ch. 269 .......................................................................................................24

Md. Code Ann., Crim. Law, § 4-101 (West 2023)..............................................................................24

Minn. Stat. Ann. § 609.66 (West 2023)...........................................................................................24

Miss. Code. Ann. § 97-37-1 (West 2023).........................................................................................24

N.J. Stat. Ann. § 2C:39-3 (West 2023) ............................................................................................24

N.M. Stat. Ann. § 30-7-8 (West 2023).............................................................................................24

N.Y. Penal Law § 265.01 (McKinney 2023).......................................................................................24

Or. Rev. Stat. Ann. § 166.240 (West 2023) ........................................................24

Wash. Rev. Code Ann. § 9.41.250 (West 2023) ..................................................24

Vt. Stat. Ann. tit. 13, § 4013 (West 2023) ..........................................................24

**Local Ordinances**

Balt., Md., Balt. Cnty. Code art. 19, § 59-22 (2022) .........................................25

Denver, Colo., Code of Ordinances ch. 38, § 117 (2023 ...................................25

Detroit, Mich., City Code ch. 31, art. 13, § 83 (2023).......................................25

Mia., Fla., Code of Ordinances, ch. 21, art. 3, § 14 (2023)................................25

New Orleans, La., Code of Ordinances, ch. 54, art. 6, § 342 (2023)..................25

Phila., Pa., Phila. Code § 10-820 (2023)............................................................25

**Rules**

Fed. R. Civ. P. 12 .................................................................................................5

Fed. R. Civ. P. 56 .................................................................................................5

**Other Authorities**

2 General Laws of Massachusetts, from the Adoption of the Constitution to February 1822, (Bos., Wells & Lilly 1823)............................................................32

15 The Public Records of the Colony of Connecticut (Charles J. Hoadly ed., Hartford, Case, Lockwood & Brainard 1890) ..............................................32

CPI Inflation Calculator, *Value of $100 from 1837 to 2023*, https://perma.cc/N7PE-JBN6 ...............28

CPI Inflation Calculator, *Value of $200 from 1838 to 2023*, https://perma.cc/7LEH-WCQX ...........29

Excalibur Line- Black Rubber, Templar Knife, https://perma.cc/J7FT-GRKE................................12

Firearm Solutions, National Success Group, https://perma.cc/NM24-PUHM ................10

Firearm Solutions, National Success Group, https://perma.cc/4XVM-HKAW................10

H.R. Rep. 85–1945 (1958) .................................................................................22

John P. Murray, *Children and Television Violence, Violence Panel Keynote Address*,
4-SPG Kan. J.L. & Pub. Pol'y 7 (1995) ..................................................................2

Knife Rights, *Federal Switchblade Act*, https://perma.cc/FG6T-JUJT .............................20

Laws of the State of New-Hampshire; with the Constitutions of the United States and of the State
Prefixed (Hopkinton, Isaac Long, Jr., 1830) ...............................................32

MOD Specialties, https://perma.cc/UU29-G5NV ...................................................10

Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* (2004)..............................27

OTF 952 Dagger-Black, Cobratec Knives, https://perma.cc/G6U8-VHC8 ........................12

Paul A. Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to
Bloodshed?*, 13 Conn. Pub. Int. L.J. 219 (2014) ..............................................11

Pentagon OTF- Blackout, SOG, https://perma.cc/U5G8-AFLY .....................................12

Raymond Thorp, *Bowie Knife* (1948) ...................................................... 27, 29

*S. 2558 Before the Committee on Interstate and Foreign Commerce*, 85th Cong. (1958)
("Senate Hearing") ...............................................................2, 3, 30

S. Comm. on the Judiciary, 85th Cong., Rep. on Juvenile Delinquency (Comm. Print 1958)
("Senate Report") ...............................................................2, 3, 22

The General Laws and Liberties of the Massachusetts Colony (Cambridge, Samuel Green 1672),
*reprinted in* Colonial Laws of Massachusetts (Bos., Rockwell & Churchill 1890)................32

## INTRODUCTION

The Federal Switchblade Act of 1958, in relevant part, prohibits interstate commerce in switchblade knives.  However, to the best of Defendants' knowledge, the law has not been enforced in any manner for well over a decade.  The statute has gone unenforced even though numerous retailers publicly sell switchblades through interstate commerce.  Plaintiffs thus cannot show that the Switchblade Act has prevented them from selling switchblades or caused any other injury.  However sincere, Plaintiffs' mere subjective disagreement with this law does not entitle them to judicial review.

Indeed, Plaintiffs fail to demonstrate Article III standing for several reasons.  Plaintiffs claim injury from potential future prosecution under the Switchblade Act, but they fail to allege or substantiate an intent to undertake a single specific action that would run afoul of the law.  Further, Plaintiffs cannot point to a substantial risk of prosecution if they were to act contrary to the Switchblade Act.

Plaintiffs' suit also compels dismissal because the Complaint fails to state a claim under the Second Amendment.  The Second Amendment protects the right of individuals to keep and bear arms; it does not entitle corporations to sell weapons for profit.  Corporate Plaintiffs and their Plaintiff-owners accordingly fail to state a Second Amendment claim on their own behalf.  In addition, Plaintiffs fail to state a claim on behalf of their alleged customers, both because Plaintiffs lack third-party standing and because there is no plausible allegation that any customers are prevented from purchasing switchblades by the Switchblade Act.

In any event, the Switchblade Act does not implicate the Second Amendment because switchblades are dangerous and unusual weapons.  Moreover, an extensive history of regulation shows that specific types of bladed weapons have been regularly singled out for stringent legal controls and that the Government can properly control the transport and commerce of arms and

1

ammunition.  The Switchblade Act follows in this robust tradition and does not offend the Second Amendment.

## BACKGROUND

The Federal Switchblade Act of 1958 was the result of an extensive investigation by the then-Senate Subcommittee on Juvenile Delinquency.[1]  Established in 1953, the Subcommittee sought to address various issues purportedly contributing to an increase in juvenile crime and general juvenile "delinquency."  *See, e.g.,* S. Comm. on the Judiciary, 85th Cong., Rep. on Juvenile Delinquency 1429 (Comm. Print 1958) ("Senate Report").[2]

As relevant here, the Subcommittee was concerned about whether switchblade knives were "falling into the hands of juveniles," how they were being used, and whether existing regulation was "adequate." *Id.* at 1.  Defined variously as "pushbutton knives" or "automatic opening knives," the switchblades investigated by the Subcommittee generally included knives with quick-deploying blades, most often through pushing a button or switch, or where release of the blade was accomplished by other "automatic" means, namely other than the use of physical effort to remove the blade itself.  *Switchblade Knives: Hearing on H.R. 12850 and S. 2558 Before the Committee on Interstate and Foreign Commerce*, 85th Cong. 1-2 (1958) ("Senate Hearing"); *see also id.* at 7 (describing New York law barring knives that "operated mechanically due to spring pressure" and those used "by a flip of the wrist").

The Subcommittee conducted an extensive study into these matters, and the results were striking.  A large number of switchblades were being manufactured or imported and sold in the

---

[1] The full title of the law is "An Act to Prohibit the Introduction, or Manufacture for Introduction, into Interstate Commerce of Switchblade Knives, and for Other Purposes." Pub. L. No. 85-623, 72 Stat. 562 (1958).  Hereinafter the law is referred to as the "Federal Switchblade Act," or "Switchblade Act."
[2] John P. Murray, *Children and Television Violence, Violence Panel Keynote Address*, 4-SPG Kan. J.L. & Pub. Pol'y 7, 7-8 (1995) (noting that the Subcommittee helped "establish[] the model hearing by inviting several panels of experts or interested parties").

United States, and a significant proportion of these were being purchased by juveniles.  Senate Report at 6 (describing Subcommittee survey responses showing that 75 percent of purchasers of mail-order switchblades were under 20 years of age and "only a small portion claimed that the knives were secured for a constructive purpose").

While many states and localities had recently enacted restrictions on the possession or sale of switchblades, the Subcommittee found that such knives were being "widely distributed through the mail," effectively "circumvent[ing]" local controls.  *Id.*  Juveniles were accordingly able to regularly use switchblades in the commission of crimes.  *id.* (explaining that in 1956, New York City saw a 92.1 percent increase in those under 16 arrested for possession of dangerous weapons, "one of the most common of which is the switchblade knife"); *id.* (noting that 43.2 percent of robberies committed in 1956 were by persons under 21 years of age, and the "switchblade knife is frequently part of the perpetrator's equipment in this type of crime").

The Subcommittee surveyed "police chiefs from all sizable communities" as to proposed legislation, and with "few exceptions" they "uniformly supported the enactment of legislation prohibiting interstate traffic in [switchblades]." *Id.* at 7; *see also* Senate Hearing at 2-4 (quoting from chiefs of police in Texas, Massachusetts, California, and Minnesota).  Police departments broadly favored federal legislation that would "control such weapons getting into the hands of teenagers," given their "continual[]" experience in finding juveniles with knives "obtained . . . through mail-order advertisements." *Id.* at 4.  While some advocated for a more total ban on the possession of switchblades, *see id.*, the Subcommittee made clear that they were not proposing such a law.  *See id.* at 22 (statement of Senator Butler, noting that the bill did not "legislate on possession, that is a State and local matter").

The result of the Subcommittee's investigation and hearings was the Federal Switchblade Act of 1958.  *See* Pub. L. No. 85-623, codified at 15 U.S.C. §§ 1241-1245.  The law defines "switchblade

knives" as those which "open[] automatically," either through a "button or other device in the handle of the knife" or "by operation of inertia, gravity, or both," such as through the motion of the wrist.  *Id.* § 1241(b).

As amended, the law contains three distinct sets of prohibitions.  The first states that "[w]hoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."  *Id.* § 1242.  Put more simply, § 1242 prohibits certain transactions with switchblades only in the context of interstate commerce, and does not cover intrastate manufacture and sale of such knives.

The next prohibition states that "[w]hoever, within any Territory or possession of the United States, within Indian country . . . or within the special maritime and territorial jurisdiction of the United States . . . manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."  *Id.* § 1243.  Accordingly, unlike the preceding section, § 1243 broadly prohibits the possession, manufacture, and sale of switchblades. The prohibition applies, however, only on federal and Indian territory.

The final prohibition concerns so-called "ballistic knives," meaning a "knife with a detachable blade that is propelled by a spring-operated mechanism."  15 U.S.C. § 1245(d).  This section effectively combines the proscriptions in § 1242 and § 1243 with respect to ballistic knives, so that interstate commerce of such knives is barred, along with their manufacture, sale, and possession on federal and Indian territory.

The Switchblade Act has been in effect for 65 years, but to the best of Defendants' knowledge, the Switchblade Act has not been enforced in any manner for almost fourteen years. According to data compiled by the Executive Office for United States Attorneys, there have been no prosecutions under § 1242 since 2010, and there have been no prosecutions under § 1243 and

§ 1245 since at least 2004.  *See* Declaration of Matthew Zabkiewicz ¶ 5, attached as Exhibit 1 ("Zabkiewicz Decl.").

Plaintiffs, an advocacy organization, two corporations, and two individuals (alleged owners of the plaintiff-corporations), brought suit on June 1, 2023 challenging the Switchblade Act.  Compl. For Declaratory Judgement & Injunctive Relief, ECF No. 1 ("Compl.").  On September 22, 2023, Plaintiffs moved for summary judgment on their sole claim, under the Second Amendment.

## STANDARD OF REVIEW

Defendants cross-move to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  "[I]n examining a Rule 12(b)(1) motion, a district court is empowered to find facts as necessary to determine whether it has jurisdiction."  *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015).  Accordingly, "the district court may consider evidence outside the pleadings and resolve factual disputes." *In re Compl. of RLB Contracting, Inc.*, 773 F.3d 596, 601 (5th Cir. 2014).

"To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Contractor Managing Gen. Ins. Agency, Inc. v. Greenlight Reinsurance, Ltd.*, No. 4:20-CV-00996-O, 2020 WL 11148500, at *1 (N.D. Tex. Nov. 10, 2020) (O'Connor, J.).  While the Court should accept well-pleaded facts in the Complaint, the "Court is not bound to accept legal conclusions as true[.]"  *Id.*

Concerning Plaintiffs' Motion for Summary Judgment, summary judgment is appropriate under Rule 56 if a "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There must be

sufficient evidence that a reasonable factfinder could return a verdict for the non-movant in order to establish a given dispute as "genuine." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## ARGUMENT

### I.      Plaintiffs Challenge Only § 1242 of the Switchblade Act

While Plaintiffs purport to challenge the entirety of the Switchblade Act, 15 U.S.C. §§ 1241-1245, Pls.' Mem. of P. & A. in Supp. of Notice of Mot. & Mot. for Summ. J. at 1, ECF No. 20-1 ("Mot."), they raise no allegations or arguments as to much of the statute, forfeiting such claims. *See, e.g., Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 340 (5th Cir. 2005) (holding that, to avoid waiver, "[a]n argument must be raised 'to such a degree that the district court has an opportunity to rule on it'") (citation omitted); *Williamson v. Watco Companies, Inc.*, No. CIV.A. 09-1255, 2010 WL 4117745, at *3 (W.D. La. Oct. 13, 2010) ("[F]ailure to brief an argument in the district court waives that argument in that court.").

For instance, as noted above, § 1243 prohibits the manufacture, sale, and possession of switchblades on federal and Indian-owned territory.  But Plaintiffs do not claim that they wish to make, sell, or keep switchblades within such areas, nor do Plaintiffs make any explicit argument as to why this provision is unlawful.

So too with respect to § 1245, which prohibits certain actions regarding so-called "ballistic knives."  Again, Plaintiffs do not allege that they wish to take any action with respect to ballistic knives, and that the Switchblade Act prevents them from doing so.

The sole remaining prohibition in the Switchblade Act appears in § 1242, which bars only the "introduc[tion]" of switchblades into interstate commerce, and the transport, distribution, and manufacture of such knives in interstate commerce.  15 U.S.C. § 1242.  At most, Plaintiffs appear to

contest the restrictions in § 1242 alone.[3]  *See, e.g.,* Mot. at 10 (stating that the "actions in question" include the ability to "manufacture for sale, sell, distribute, transport, purchase, possess, and carry bladed arms in common use through interstate commerce") (emphasis added); *id.* at 13, 18, 21, 28, 31 (specifically contesting prohibition on transactions in "interstate commerce").  Thus, Plaintiffs challenge only § 1242 of the Switchblade Act, and have waived any disputes as to the remainder of the law.

## II.    Plaintiffs Lack Standing

Even liberally construing the Complaint, Plaintiffs lack standing to challenge § 1242 of the Switchblade Act.  "Article III of the Constitution limits federal courts' jurisdiction" to the adjudication of "'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs must have standing to ensure that "case[s] embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Specifically, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The standing inquiry is "especially rigorous" here, since reaching the merits would require a decision as to the constitutionality of a federal statute.  *Clapper*, 568 U.S. at 408; *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (same).

Here, Plaintiffs allege that they are refraining from certain transactions with switchblades, transactions which would purportedly be subject to prosecution under § 1242.  *See* Compl. ¶¶ 12-13,

---

[3] Even as to this provision, Plaintiffs state that they "do not challenge" restrictions regarding the "importation of 'switchblade' knives into the United States."  Mot. at 3 n. 2.

15-16 (corporate Plaintiffs and their individual owners allege that they would engage in interstate commerce with switchblades, "but for Defendants' enforcement of the laws . . . at issue in this case"). In such a pre-enforcement challenge, to establish standing Plaintiffs must (1) show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)), and (2) "show that the likelihood of future enforcement is substantial." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (citation omitted).  Plaintiffs fail to satisfy both basic requirements.

### A.  Plaintiffs Fail to Show an Intent to Act Contrary to Law

Plaintiffs lack standing first because they provide neither plausible allegations nor evidence demonstrating that they intend to act in a manner affected with a constitutional interest but proscribed by statute.

Because Plaintiffs must show a likelihood of future injury, a pre-enforcement challenge "requires something more than a hypothetical intent to violate the law."  *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139–40 (9th Cir. 2000).  Where Plaintiffs fail to point to "concrete plans or any objective evidence to demonstrate a 'serious interest'" in acting contrary to law, there is "no threat of *imminent* injury."  *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008) (explaining that "[t]he requirements of Article III are not satisfied merely because a party requests a court of the United States to declare its legal rights").

Here, Knife Rights, the organizational plaintiff, does not allege that it desires to act inconsistently with the statute—only that its members will.  Compl. ¶ 11.  Thus, Knife Rights has no standing independent of the other Plaintiffs, who are the only identified members of Knife Rights. *See Children's Health Def. v. Food & Drug Admin.*, No. 6:22-CV-00093-ADA, 2023 WL 175004, at *6 (W.D. Tex. Jan. 12, 2023) (holding that where "the only identified members" of plaintiff group

could not show standing, the group "lack[ed] associational standing").  The remaining Plaintiffs are two businesses and their respective Plaintiff-owners, who claim that they would sell switchblades but for possible prosecution under the Switchblade Act.  Yet none of these Plaintiffs claim to have made any concrete plans or undertaken any action contrary to the Switchblade Act.  Nor do they allege in any more than conclusory fashion that they intend to take such actions in the future.  They thereby fail to show a "serious interest" in violating the law.

The two proprietor-Plaintiffs Jeffrey Folloder and Russell Arnold provide largely identical declarations saying that, through their respective businesses, they "wish[] and intend[] to acquire, possess, carry, and offer for sale, transfer, sell, and distribute through interstate commerce, automatically opening knives for lawful purposes[.]"  Decl. of Pl. Russell Gordon Arnold ¶ 5, ECF No. 20-2 ("Arnold Decl."); Decl. of Pl. Jeffrey E. Folloder ¶ 4, ECF No. 20-2 (same).  Such vague and conclusory averments come nowhere close to showing a serious intent to violate the law.

As a threshold matter, simply possessing, carrying, or transferring switchblades is not barred by § 1242.  To the extent Plaintiffs wish to undertake such actions, it is unclear how they could be contrary to law.  *See Texas State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) (holding standing absent because "neither [the challenged law] nor any other law cited by Plaintiffs arguably prohibits Plaintiffs' activities").

More fundamentally, Plaintiffs' vague intention to take one or more generic actions with respect to switchblades – in some unspecified manner at some unknown future time – is insufficient to establish standing.  *See Lujan*, 504 U.S. at 564 (holding allegation that plaintiff will be injured "without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require"); *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139–40 (9th Cir. 2000) ("A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete

plan."). As the Fifth Circuit reiterated, there can be no "serious intention to engage in conduct proscribed by law" where the plaintiff does "not take steps . . . of the kind that would demonstrate a serious intent to violate the statute" *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *see also Virden v. City of Austin*, --- F. Supp. 3d ---, 2023 WL 5617803, at *6 (W.D. Tex. Aug. 30, 2023) (holding claims moot because plaintiff's "vague intentions to run for office in the future are insufficient" to show injury); *Cangelosi v. Sheng*, Civ. A. No. 20-1989, 2020 WL 5960682, at *3 (E.D. La. Oct. 8, 2020) (holding no standing for pre-enforcement challenge because plaintiff could "not name a single instance in which he has attempted" to take action arguably proscribed by regulation).[4]

In sum, Plaintiffs do not claim to have any concrete plans that would indicate a serious intention to act contrary to law. As a result, Plaintiffs fail to satisfy the first requirement to establish standing for a pre-enforcement challenge, and this Court lacks jurisdiction.

### B. Plaintiffs Cannot Show a Substantial Likelihood of Future Enforcement

Plaintiffs also fail to show standing through threatened enforcement of the Switchblade Act, because they cannot show a substantial likelihood of prosecution under § 1242. While Plaintiffs plainly disagree with the law, there is no "unqualified right to pre-enforcement review of constitutional claims in federal court." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ("Federal courts do not possess a roving commission to publicly opine on every legal question."). And a mere "chilling effect" on a plaintiff,

---

[4] Of note, while Plaintiffs claim that they sell "various forms of knives," Arnold Decl. ¶ 3, it is unclear whether their businesses offer any knives for sale at all, let alone show an intent to expand their sales into switchblades. As of September this year, Plaintiff Firearms Solutions offered a wide array of firearms on its website, but not a single knife. *Compare* Firearms Solutions, National Success Group, https://perma.cc/4XVM-HKAW (second page of results in searching for word "pistol") *with* Firearm Solutions, National Success Group, https://perma.cc/NM24-PUHM (only results in searching for word "knife", which appear to be knife lubricant). Similarly, the apparent website of Plaintiffs MOD Specialties states only that it sells "firearms, silencers, other NFA items, novelty t-shirts and related sporting goods." https://perma.cc/UU29-G5NV.

whereby he refrains from certain activity, is "insufficient to 'justify federal intervention' in a pre-enforcement suit." *Whole Woman's Health*, 595 U.S. at 50. Instead, a more "concrete injury" is required. *Id.* Specifically, "a plaintiff claiming [pre-enforcement] standing must show that the likelihood of future enforcement is *substantial.*" *California*, 141 S. Ct. at 2114 (emphasis added).

A "substantial" threat of enforcement generally requires litigants to show a recent history of enforcement by the Government, or a communicated intent to enforce the statute at issue. For instance, the Fifth Circuit recently explained that a substantial threat may arise where an agency has brought a recent enforcement action, one which serves as a "clear shot across the bow" against potential violators. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 927 (5th Cir. 2023). Similarly, courts in the Fifth Circuit may look to whether a "statute has already been enforced against a plaintiff," whether the agency has "issued an advisory opinion on the relevant statute's meaning, intended enforcement, and recently enforced the statute against another party." *Joint Heirs Fellowship Church v. Akin*, 629 F. App'x 627, 631 (5th Cir. 2015).[5] None of these circumstances are present here.

At most, Plaintiffs vaguely claim that "Defendants have been and are actively enforcing the Federal Knife Ban against the Plaintiffs and similarly situated individuals and retailers." Compl. ¶ 60. Defendants are aware of no "active" enforcement actions against Plaintiffs or any "similarly situated" entities. To the best of Defendants' knowledge, there has not been a single prosecution brought under § 1242 since 2010. *See* Zabkiewicz Decl. ¶ 5; Paul A. Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219,

---

[5] In the First Amendment context, courts may "presume a credible threat of prosecution," but it is a "mistake[]" to extend this presumption beyond the First Amendment. *See Tex. State LULAC*, 52 F.4th at 257 (explaining that this presumption does not extend beyond "pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs").

242 (2014) ("There are only a handful of recorded prosecutions, despite reports of widespread distribution."); *cf. Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023) (holding sufficient threat of prosecution for law prohibiting possession of butterfly knives because "[s]ince 2012, roughly 30 people have been arrested or issued a citation for possessing a butterfly knife. Hawaii's 'history of past enforcement' is 'good evidence' that future enforcement is likely.").

Moreover, Plaintiffs' own evidence shows that the statute has gone unenforced at a time when switchblades are regularly and publicly offered for sale via interstate commerce. For instance, Doug Ritter, Chairman of Plaintiff Knife Rights, concedes in his declaration that "there are at least 26 U.S. based manufacturers/retailers of automatically opening knives that meet 15 U.S.C. § 1241(b)'s definition of 'switchblade' which currently offer at least one model of 'switchblade' for sale." Decl. of Doug Ritter ¶ 11, ECF No. 20-2 ("Ritter Decl."). And many of the corporations cited by Plaintiffs, including at least three retailers from Texas alone, appear to offer interstate shipping.[6] Thus, Plaintiffs appear to acknowledge that switchblades are frequently sold through numerous retailers in interstate commerce, all without any recent prosecution or other enforcement.

Where, as here, a statute is "very rarely enforced, for a period of years or decades," Plaintiffs cannot plausibly show a substantial likelihood of enforcement. *See Conant v. McCaffrey*, No. C 97-00139 WHA, 2000 WL 1281174, at *9 (N.D. Cal. Sept. 7, 2000); *see also Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005) ("Evidence that the challenged law is rarely if ever enforced, for example, may be enough to defeat an assertion that a credible threat exists."); *Little v. Strange*, 796 F. Supp. 2d 1314, 1332 (M.D. Ala. 2011) (holding no credible threat of enforcement given a "the long

---

[6] Plaintiffs reference Templar Knife, Cobratec Knives, and Studies and Observations Group SOG Knives *see* Ritter Decl. ¶ 9 (Templar Knife is misspelled "Templer Knife"). All of these corporations purport to be Texas businesses, and all appear to offer switchblade models for sale through interstate shipping. *See, e.g.,* Excalibur Line- Black Rubber, Templar Knife, https://perma.cc/J7FT-GRKE (showing no restrictions on shipping switchblade); OTF 952 Dagger-Black, Cobratec Knives, https://perma.cc/G6U8-VHC8 (same); Pentagon OTF- Blackout, SOG, https://perma.cc/U5G8-AFLY (noting a small number of states where shipping is not available).

history of non-enforcement, with no inkling that history is soon to change course"); *Kareem v. Cuyahoga Cnty. Bd. of Elections*, No. 1:20-CV-02457, 2023 WL 2734636, at *5 (N.D. Ohio Mar. 31, 2023) (holding no "credible threat of prosecution," where among other things, plaintiff could only "point to one [relevant] instance that occurred several years ago"); *cf. Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at *7 (N.D. Tex. Oct. 7, 2023) (holding that fear of prosecution was not an "imaginary or speculative concern" in light of a "flurry of recent enforcement activity").

Nor do Plaintiffs point to any other circumstances that might demonstrate a substantial likelihood of future enforcement against Plaintiffs.  For instance, Plaintiffs cannot show that they were subject to any "specific threats of enforcement[.]"  *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 625 (M.D. La. 2015); *see also Paxton v. Restaino*, --- F. Supp. 3d ---, 2023 WL 4614124, at *2–3 (N.D. Tex. July 18, 2023) (holding no likelihood of enforcement where, among other things, plaintiffs did not show "that they have been threatened with prosecution or that it is likely"); *cf. Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (explaining that claim was not moot in part because agency "warned covered entities" about certain prohibited conduct).

Absent recent enforcement or even threats of enforcement of the challenged laws against Plaintiffs, or anyone else, Plaintiffs cannot show the required "substantial" likelihood that they would be prosecuted in the future.  *California*, 141 S. Ct. at 2114; *see also Nat'l Press Photographers Ass'n v. McCraw*, 84 F.4th 632, 644 (5th Cir. 2023) ("[I]n the absence of any imminent or even credible threat of prosecution . . . Plaintiffs lack standing to preemptively challenge [a statute] under the Due Process Clause").[7]  Plaintiffs' failure is even more glaring under the "especially rigorous," standing

---

[7] The speculative chance of any future enforcement action also shows Plaintiffs' claims to be unripe. *See Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 313 (5th Cir. 2021) (holding case not ripe where future enforcement is unlikely).

analysis required to reach Plaintiffs' constitutional challenge. *See Hotze v. Burwell*, 784 F.3d 984, 994 (5th Cir. 2015) (noting the court's "duty to engage in 'especially rigorous' scrutiny of a plaintiff's standing allegations before reaching the merits of a challenge to a federal statute's constitutionality") (citation omitted). Because Plaintiffs can show no substantial threat of future prosecution, this Court lacks jurisdiction. *Accord Hoyt v. City of El Paso*, 878 F. Supp. 2d 721, 738–39 (W.D. Tex. 2012) ("[T]he Court refuses to condone mere speculation about the likelihood of prosecution so as to avoid rendering an 'advisory opinion on an abstract legal issue.'")

## III.    Plaintiffs Fail to State a Claim

Plaintiffs also fail to state a claim under the Second Amendment, for at least two reasons. First, corporations and their proprietors lack a Second Amendment right to sell weapons for profit. Second, Plaintiffs fail to state a Second Amendment claim on behalf of their customers.

### A.    Plaintiffs Cannot State a Claim on Their Own Behalf

Plaintiffs fail to state a claim on their own behalf under the Second Amendment. Plaintiffs' Motion erroneously contends that all "Plaintiffs are ordinary . . . adult citizens" with Second Amendment rights. Mot. at 9. As the Complaint makes plain, however, two Plaintiffs are for-profit corporations, and one plaintiff is an advocacy organization. Moreover, the only two "adult citizen" Plaintiffs cite a desire to distribute switchblades through interstate commerce "as a part of [their] business[.]" Folloder Decl. ¶ 5 ("As a part of my business, I would acquire, possess, carry, offer for sale, transfer, sell, and distribute [switchblades] . . . through my storefront[.]"); Arnold Decl. ¶ 6 (same). Indeed, the individual Plaintiffs' allegations of a Second Amendment violation are coextensive with the allegations of their owned businesses. *See also* Folloder Decl. ¶ 4 ("As part of its business activities, MOD Specialties wishes and intends" to market switchblades); Arnold Decl. ¶ 5 (similar).

14

As the Supreme Court held in *Bruen*, "when the Second Amendment's plain text covers an *individual's* conduct, the Constitution presumptively protects that conduct[.]" *N.Y. State Rifle Ass'n v. Bruen*, 142 S. Ct. 2111, 2117, 2126, 2129 (2022) (emphasis added).  Both before and after *Bruen*, courts have uniformly agreed that the Second Amendment protects individual use of arms, rather than the ability of corporations to sell such arms.  *See, e.g., Gazzola v. Hochul*, No. 1:22-CV-1134-BKS-DJS, 645 F. Supp. 37, 65 (N.D.N.Y. 2022) (holding that corporate plaintiffs were unlikely to succeed on Second Amendment claims because they could not point to "any authority supporting a Second Amendment right for an individual or a business organization to engage in the commercial sale of firearms."); *Leo Combat, LLC v. U.S. Dep't of State*, No. 15-CV-02323-NYW, 2016 WL 6436653, at *9 (D. Colo. Aug. 29, 2016) (holding that the Second Amendment protects the "*individual* right to bear arms" such that a plaintiff "does not have standing in its corporate form to assert a Second Amendment violation").

This conclusion draws further support from the fact that "the Second Amendment does not encompass the right to sell firearms commercially with the principal objective to make a profit." *United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *6 (N.D. Ga. May 17, 2023), *report and recommendation adopted,* No. 1:22-CR-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023).  The leading case in this area is *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).  There, the Ninth Circuit exhaustively examined the historical record, and noted how early American "colonial governments substantially controlled the firearms trade," including through "restrictions on the commercial sale of firearms." *Id.* at 685.

While Plaintiffs rely on *Teixeira* for the proposition that the Second Amendment protects the "ability to freely manufacture for sale, sell, [and] distribute" arms, Mot. at 10, the Ninth Circuit concluded to the contrary in that very case: "the Second Amendment *does not* independently protect a proprietor's right to sell firearms." *Teixeria*, 873 F.3d at 690 (emphasis added); *see also id.* at 684

15

("[T]he right codified in the Second Amendment did not encompass a freestanding right to engage in firearms commerce divorced from the citizenry's ability to obtain and use guns.").

Courts have followed *Teixera* in holding that businesses may not claim a Second Amendment right to sell arms for profit. *See, e.g., Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 505 n. 15 (N.D.N.Y. 2020) (agreeing with *Teixeira* and collecting cases); *United States v. Flores*, 652 F.Supp.3d 796, 802 (S.D. Tex. 2023) ("Defendant argues that the Second Amendment implies by logical necessity a right to commercially deal in firearms. This argument is unsupported and contrary to the holding of *Teixeira* and the dicta in *Heller*, *McDonald*, and *Bruen*.") (emphasis modified); *see also Mont. Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010), *report and recommendation adopted,* No. CV 09-147-M-DWM-JCL, 2010 WL 3909431 (D. Mont. Sept. 29, 2010) ("*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers.").

Accordingly, corporate Plaintiffs and their owners cannot state a claim to relief on their own behalf, under the Second Amendment.[8]

### B.  Plaintiffs Fail to State a Claim on Behalf of Their Customers

Plaintiffs similarly fail to state a claim on behalf of their hypothetical customers.  As a threshold matter, Plaintiffs cannot even assert their customers' claims in the first instance because Plaintiffs lack third-party standing.  Moreover, the Complaint does not plausibly allege that

---

[8] Organizational Plaintiff Knife Rights similarly cannot state a claim if its only identified members cannot do so.  *See Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (explaining that associational standing only permits a group to "bring claims on behalf of its members"); *see also Pro. Helicopter Pilots Ass'n Loc. 102 v. U.S. Dep't of The Army*, No. 1:13-CV-164-WKW WO, 2013 WL 6837555, at *6 (M.D. Ala. Dec. 26, 2013) (explaining that associational standing "hinges on the standing of its individual members, the later mooting of its [identified] members' claims also moots [the organization's] claims").

Plaintiffs' customers are prevented from purchasing a switchblade knife, so that their Second Amendment rights might be implicated.

    *Third-Party Standing.*  In order to raise the legal claims of customers, Plaintiffs must establish third-party standing.  This doctrine creates a narrow exception to the general rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted).  Accordingly, third-party standing requires a litigant to (1) show that it suffers an injury-in-fact in the first instance, (2) demonstrate a "close" relationship with the third party, and (3) set forth a "hindrance" to the third party's ability to protect his own interests.  *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 697 (W.D. Tex. 2015) (applying test in Second Amendment context), *aff'd sub nom. Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  Plaintiffs fail to satisfy each of these requirements.

    As explained above, Plaintiffs are unable to show that they have incurred any injury-in-fact, and consequently they also cannot demonstrate third-party standing.  *See Grambling Univ. Nat. Alumni Ass'n v. Bd. of Sup'rs for Louisiana Sys.*, 286 F. App'x 864, 871 (5th Cir. 2008) (explaining that third-party standing requires named plaintiff to "show that it has suffered an injury in fact"); *Lopez v. Candaele*, 630 F.3d 775, 792 (9th Cir. 2010) ("Plaintiffs who have suffered no injury themselves cannot invoke federal jurisdiction by pointing to an injury incurred only by third parties."); *Matthews v. Ahmed*, Civ. A. No. 1:18-cv-9, 2021 WL 220104, at *3 (E.D. Tex. Jan. 4, 2021) (holding no third-party standing in part because named "plaintiff has not shown he has suffered any injury in fact").

    Further, Plaintiffs fail to show a close relationship with their referenced customers; in fact, Plaintiffs fail to show that any injured customers exist at all.   Plaintiffs purport to bring suit on behalf of their "customers, and would-be customers who wish to lawfully purchase, acquire, possess, carry, offer for sale, transfer, sell, and distribute [switchblades] through interstate commerce[.]"

Arnold Decl. ¶ 7.  But Plaintiffs make no effort to show that they have any customers or "would-be" customers who are currently unable to acquire switchblade knives or who would face a substantial threat of prosecution if they did so.  Indeed, Plaintiffs do not allege that their customers are subject to any state or local restrictions on switchblades, or are otherwise prevented from acquiring switchblades within their respective jurisdictions.

As one court explained, third-party standing is permitted only where there is "an actual third party who [is] the subject of the constitutional violation." *Gray v. City of Valley Park*, No. 4:07CV00881 ERW, 2008 WL 294294, at *22 (E.D. Mo. Jan. 31, 2008); *see also Hayden v. Fifth Third Bank, Inc.*, No. 3:12-CV-00824-H, 2013 WL 2242760, at *3 n. 5 (W.D. Ky. May 21, 2013) ("[T]he third parties must have standing to create [third-party] standing for the litigant.").  The availability of switchblade retailers conceded by Plaintiffs, Ritter Decl. ¶ 9, refutes any suggestion that Plaintiffs have any current or future customers who are adversely affected by the Switchblade Act, let alone that Plaintiffs have a close relationship with such hypothetical customers.

Third-party standing is accordingly absent where, as here, Plaintiffs provide no evidence or even argument that the relevant third parties actually exist, or are likely to exist in the future.  *See, e.g., Holland v. Rosen*, 895 F.3d 272, 287 (3d Cir. 2018) (rejecting standing because plaintiff "has no relationship, let alone a close relationship, with potential criminal defendant-customers"); *Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118 (CKK), 2023 WL 1438376, at *10 (D.D.C. Feb. 1, 2023) ("[T]he Court must assure itself that *some* relationship exists lest the Court veer into constitutional decision-making unnecessarily."); *Bernard Gelb v. Fed. Rsrv. Bank of New York*, No. 1:12-cv-4880 (ALC), 2016 WL 4532193, at *3 (S.D.N.Y. Aug. 29, 2016) ("Whereas an existing relationship between a vendor and a customer may support third-party standing, a 'future' or 'hypothetical' relationship does not").

Finally, Plaintiffs make no effort to show that any injured customers, if they exist, are hindered in bringing their own suit. *See Def. Distributed*, 121 F. Supp. 3d at 697 (casting doubt on third-party standing where "Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests"). Nowhere do Plaintiffs claim that their hypothetical customers are hindered from bringing a claim on their own behalf. Without even a plausible theory on this point, Plaintiffs cannot carry their burden to show that third-party standing is appropriate. *See, e.g., Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 325 F.R.D. 671, 689 (W.D. Wash. 2016) ("Organizational Plaintiffs' clients are not sufficiently hindered in their ability to protect their own interests[.]"); *R.S.S.W., Inc. v. City of Keego Harbor*, 56 F. Supp. 2d 798, 806 (E.D. Mich. 1999) ("Plaintiffs have *not* shown that customers are truly hindered from protecting their own interests"); *Haibo Jiang v. Town of Tonawanda*, No. 15-CV-898-A, 2018 WL 3215575, at *2 (W.D.N.Y. July 2, 2018) (holding no standing where "Plaintiff has not asserted that 'there is a 'hinderance'" to his customers' ability to protect their own right to equal protection").

*No Plausible Claim as to Customers.* Plaintiffs are also unable to set forth a plausible allegation that the rights of customers are being infringed. The Complaint merely repeats that unknown "customers and would-be customers" "wish to purchase, possess, and carry automatically opening knives across state lines," but are barred from doing so by the Switchblade Act. Compl. ¶¶ 15-16; *see also* Compl. ¶ 58 (alleging that customers wish to "keep and bear an automatically opening knife"). Again, however, the relevant portion of the Switchblade Act does not prohibit the purchase of switchblades, their possession, or simply carrying them across state lines. The provision at issue here, 15 U.S.C. § 1242, bars only the "knowing[]" introduction, manufacture, transportation, or distribution of switchblades "in interstate commerce."

As Plaintiff Knife Rights explains on its website, narrowly targeting certain transactions in interstate commerce "greatly limits the scope of what these laws apply to." *See* Knife Rights, *Federal*

*Switchblade Act*, https://perma.cc/FG6T-JUJT.   Plaintiff thus concedes on its website that § 1242 "has no effect on selling within the same state, *no effect on carry* and *no effect on possession alone*," and transport across state lines is only prohibited if "part of a business transaction[.]" *Id.* (emphasis added).  Because the Switchblade Act does not prohibit actions such as carrying and possessing a switchblade, Plaintiffs cannot plausibly argue that the statute is causing their customers to refrain from such activity.

If more were needed, Plaintiffs admit that there are numerous retailers currently selling switchblades, undermining any allegation that customers are somehow precluded from acquiring such knives.  *See* Ritter Decl. ¶ 9; *accord Second Amend. Arms v. City of Chicago*, 135 F. Supp. 3d 743, 754 (N.D. Ill. 2015) ("Is there anyone in the City who will be unable to purchase a firearm because of this restriction? . . . [W]ithout this information, the Court is unable to assess whether Plaintiffs have legitimate claims against these various zoning restrictions" and accordingly dismissed plaintiffs' claim).

*Teixeira*, repeatedly cited by Plaintiffs, similarly found that the firearm-retailer plaintiff in that matter failed to state a claim on behalf of his customers.  873 F.3d at 685.  Specifically, there was no plausible allegation that any potential customer was "meaningfully inhibit[ed] from acquiring firearms within their jurisdiction."  *Id.* at 680.  As the Court put it, there was no evidence that "any 'honest-to-God resident . . . cannot lawfully buy a gun nearby.'"  *Id.* at 681.[9]  Just as in that case, Plaintiffs here do not plausibly allege that their customers are unable to purchase a switchblade on account of the Switchblade Act.  Without a credible allegation that the Switchblade Act is having any

---

[9] *Teixeira* held that the plaintiff-retailer had "derivative standing" on behalf of his "potential customers."  873 F.3d at 679.  But Court reached this conclusion without analysis, which in any event was unnecessary because the plaintiff failed to state a claim on behalf of customers.  Further, because the challenged ordinance prevented the plaintiff in *Teixeira* from opening a gun store altogether, *id.*, there was no plausible dispute that the ordinance impacted the plaintiff's customers.

effect on the ability of Plaintiffs' customers to keep and bear arms, Plaintiffs fail to state a Second Amendment claim on their behalf.

## IV.     The Switchblade Act Does Not Violate the Second Amendment

Even if Plaintiffs had standing and stated a claim for relief – and they do not – the result would be the same.  The Switchblade Act does not implicate, let alone violate, the Second Amendment.  This is because the Switchblade Act regulates automatic switchblades, dangerous weapons that fall outside the protection of the Second Amendment.  Moreover, the Switchblade Act follows from numerous historical regulations that controlled bladed weapons specifically, consistent with the long tradition of controlling trade in arms and ammunition.

### A.  Switchblades are Dangerous and Unusual Weapons

The Federal Switchblade Act does not implicate the Second Amendment because there is no constitutional right to bear dangerous and unusual arms like switchblades. *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (explaining that the Second Amendment, as historically understood, does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes"); *accord Bevis v. City of Naperville*, Illinois, --- F. 4th ---, 2023 WL 7273709, at *14 (7th Cir. Nov. 3, 2023) (explaining that the "first step of the *Bruen* framework" involves determining whether the "weapons [are] among the Arms protected by the Second Amendment").

The Fifth Circuit in *Hollis v. Lynch* outlined the process for determining when a weapon (a machinegun, in that case) is not typically possessed by law-abiding citizens for lawful purposes and thus unprotected by the Second Amendment. 827 F.3d 436, 451 (5th Cir. 2016).  That analysis looks to whether the weapon has a heightened capacity for danger or is otherwise suited to criminal use, and evaluates whether the weapon is widely owned and legal in state and local jurisdictions.  827 F.3d at 448-51.  This governing framework shows that switchblades are indeed dangerous and unusual weapons.

There can be no doubt that an automatic switchblade is not typically possessed by law-abiding citizens for lawful purposes.  In a separate context the Fifth Circuit has already held that "[i]t is now settled beyond doubt that a switchblade knife is a dangerous weapon." *Fall v. Esso Standard Oil Co.* 297 F.2d 411, 416-17 (5th Cir. 1961).[10]  And other courts have long recognized the unique danger automatic opening knives pose.  *Crowley Cutlery Co. v. U.S*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Lacy v. State*, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009) ("[W]e conclude that switchblades are primarily used by criminals and are not substantially similar to a regular knife. . . .").

Indeed, it was the unique danger of these "vicious weapons" that led Congress to enact the Federal Switchblade Act in the first place.  *See* Senate Report at 6.  Congress understood that switchblades were "by design and use, almost exclusively the weapon of the thug and the delinquent."  *Id.*  The Senate Subcommittee report emphasized that "police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juvenile in the commission of robberies and assaults."  *Id.*  The House Committee report identified switchblades as "one of the favorite weapons of our juvenile and criminal element." H.R. Rep. 85–1945, at 3 (1958).  There is accordingly widespread and longstanding acknowledgement that a switchblade knife is not typically possessed by law-abiding citizens for lawful purposes.

---

[10] *Fall* involved a widow's negligence claim against her husband's employer after a fellow employee murdered her husband with a switchblade.  The case turned on whether the shipowner was negligent in fulfilling his statutory duty to prevent the carrying of any "dangerous weapon" onboard the vessel.  *Fall,* 297 F.2d at 414-15.   The Fifth Circuit reversed the district court's ruling that, as a matter of law, a switchblade was not a dangerous weapon.  *Id.* at 416-17.  Although the Fifth Circuit held that a switchblade was, at the time of decision, a dangerous weapon as a matter of law, they remanded the question of dangerousness to the jury only because the murder occurred *before* the enactment of the Federal Switchblade Act.  *Id.* at 416.

22

The actual possession of automatic switchblades confirms that they are not typically possessed for lawful purposes.  That evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of jurisdictions where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50.  Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of weapons. *Id.* at 450.

It is Plaintiffs' burden to establish that the plain text of the Second Amendment applies "to the conduct being restricted," and thus demonstrate that switchblades are in common use. *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *3 (D. Del. Mar. 27, 2023); *Brumback v. Ferguson*, No. 1:22-CV-03093-MKD, 2023 WL 6221425, at *4 (E.D. Wash. Sept. 25, 2023) ("[I]t is Plaintiffs' burden to demonstrate the plain text of the Second Amendment covers conduct prohibited" by the challenged law).  Yet Plaintiffs do not even guess as to the number of switchblades, either in total or as a percentage of other weapons currently owned by Americans.[11]  Instead, Plaintiffs offer only vague and conclusory statements.  *See* Mot. at 24 ("Today, automatically opening knives are just as popular, if not more popular, than in the early 1900s."); *id.* at 24 (asserting that switchblades "continue to be in common use today").

Perhaps recognizing this deficiency, Plaintiffs pivot and argue that switchblades are a subset of pocketknives (albeit distinct from ordinary pocketknives), and the widespread ownership of pocketknives permits this court to find that switchblades are also in common use.  Mot. at 26.  But Plaintiffs cannot show switchblades are in common use because they make up an unknown fraction of some larger number of folding knives.  *See Del. State Sportsmen's Ass'n,* No. CV 22-951-RGA, 2023 WL 2655150, at *5 (rejecting plaintiffs' assertion that "assault pistols" are in "common use" and

---

[11] Plaintiffs rely primarily on the number of switchblades purportedly sold each year when the Switchblade Act was passed, in 1958.  *See* Mot. at 21-22 (discussing the "commonality of opening knives in 1958").   Yet as *Bruen* made plain, the Second Amendment applies to arms that are "in common use *today*." 142 S. Ct. at 2143 (emphasis added); Mot. at 17.

therefore protected by the Second Amendment, since "plaintiffs do not . . . accompany this assertion with any support"). Nor can Plaintiffs properly demonstrate that switchblades are in common use because they are similar to more common "folding pocket knives." Mot. at 26. Plaintiffs cite to no case holding that a particular weapon is in common use because of the prevalence of another weapon.

Without any evidence as to the number of switchblades in use today, Plaintiffs fail to carry their burden to show that switchblades are in common use. *See, e.g., Hollis*, 827 F.3d at 450 ("[I]rrespective of the metric used, Hollis does not have the numbers to support his claims.").

If more were needed, *Hollis* also looked to the number of states where machineguns could be "lawfully possessed," including states that banned them entirely and states that banned them unless possessed legally "under federal law." *Id.* Here, eight states and the District of Columbia outright ban switchblades or other automatic opening knives.[12] Another four states ban these knives above a certain length.[13] Maryland bans the sale and concealed carry of automatic opening knives.[14] New Jersey bans their possession without an explainable lawful purpose.[15] Four other states also prohibit or restrict concealed carry of switchblades or automatic opening knives.[16] But even this does not tell the full story. Even in states without total switchblade bans, local jurisdictions often impose their own bans. For example, numerous major cities such as Denver, Miami, New Orleans,

---

[12] Del. Code Ann. tit. 11, § 1446 (West 2023); D.C. Code Ann. § 22-4514 (West 2023); Haw. Rev. Stat. Ann. § 134-52 (West 2023); 720 Ill. Comp. Stat. Ann. 5/24-1 (West 2023); Minn. Stat. Ann. § 609.66 (West 2023); N.M. Stat. Ann. § 30-7-8 (West 2023); N.Y. Penal Law § 265.01 (McKinney 2023); Wash. Rev. Code Ann. § 9.41.250 (West 2023).

[13] Cal. Penal Code § 21510 (West 2023) (2 inches); Conn. Gen. Stat. Ann. § 53-206 (West 2023) (ban on carrying switchblade over 1 ½ inches); Mass. Gen. Laws Ann. ch. 269, § 10 (West 2023) (1 ½ inches); Vt. Stat. Ann. tit. 13, § 4013 (West 2023) (3 inches).

[14] Md. Code Ann., Crim. Law, § 4-101 (West 2023); *Id.* at § 4-105.

[15] N.J. Stat. Ann. § 2C:39-3 (West 2023).

[16] Colo. Rev. Stat. Ann. § 18-12-105 (West 2023); Fla. Stat. Ann. § 790.01 (West 2023); Miss. Code. Ann. § 97-37-1 (West 2023); Or. Rev. Stat. Ann. § 166.240 (West 2023).

Detroit, and Philadelphia ban switchblade possession.[17] At the very least, automatic opening knives are banned or heavily restricted in a significant portion of the country and in many major cities. Consequently, such knives "do not receive Second Amendment protection," *Hollis*, 827 F.3d at 451, and no additional "historical inquiry," is required to reject Plaintiffs' claim.

### B. The Switchblade Act is Consistent with Historical Regulation of Arms

Even if the Court disagrees and concludes that the Switchblade Act implicates the Second Amendment, the law is amply supported by historical precedent. As the Supreme Court held, the Government may justify a regulation touching on the right to bear arms "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *Bruen* directs courts to use text, history, and tradition to discern the "constitutional *principles*" that delimit Congress's power to regulate weapons. *Id.* at 2134 (emphasis added; citation omitted). Put another way, courts must ask whether the challenged statute fits within a "historic and traditional category" of arms regulation. *Id.* at 2130 (citation omitted).

Among other historical sources, the Government can illuminate the pertinent category of regulation by pointing to "a well-established and representative historical *analogue*." *Id.* at 2133. To be analogous, historical and modern arms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by []arms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

---

[17] Denver, Colo., Code of Ordinances ch. 38, § 117 (2023); Mia., Fla., Code of Ordinances, ch. 21, art. 3, § 14 (2023); New Orleans, La., Code of Ordinances, ch. 54, art. 6, § 342 (2023); Balt., Md., Balt. Cnty. Code art. 19, § 59-22 (2022); Detroit, Mich., City Code ch. 31, art. 13, § 83 (2023) (ban on possession in public); Phila., Pa., Phila. Code § 10-820 (2023) (ban on possession in public).

Further, the Second Amendment's history plainly elucidates its meaning.  As a consequence, and contrary to Plaintiffs' argument, Mot. at 29-30, the Court can and should rely on historical analogues from before, during, and after the Founding Era.  While Plaintiffs specifically take issue with regulations from the antebellum and reconstruction periods, Mot. at 15, 30-31, *Heller* itself explained that determining "the public understanding of a legal text in the period after its enactment or ratification . . . is a critical tool of constitutional interpretation."  554 U.S. at 605 (examining Second Amendment interpretation "immediately after its ratification through the end of the 19th century").[18]

There are numerous historical arms regulations that exercised the authority of the Government to regulate where and how certain arms may be lawfully sold.  Indeed, the relevant history underscores the well-established constitutional principle whereby the government can restrict dangerous and unusual weapons not typically possessed by law-abiding citizens for lawful purposes, and the Switchblade Act is consistent with that principle, as explained above.  The relevant historical sources fall into two broad categories: (1) restrictions on the sale and use of bladed weapons, and (2) restrictions on the export and transportation of arms and ammunition.

1. *Regulation of Bowie Knives and Other Bladed Weapons*

Historical state laws regulating specific bladed weapons provide ample and specific support for the Switchblade Act, demonstrating the robust authority of the Government to prohibit and otherwise regulate commerce in such weapons.  As Plaintiffs concede, switchblades were not "suited to mass production methods" until the end of the 19th century, Mot. at 7, such that early American

---

[18] Plaintiffs also erroneously contend that the historical inquiry is irrelevant here, because the Switchblade Act constitutes a "ban" on switchblades, and a ban is only permissible if the arms at issue are dangerous and unusual.  Mot. at 3.  But as Plaintiffs concede, the challenged provision of the Switchblade Act does not ban switchblades at all: it does not prohibit their possession, carry, or transport, and only bars interstate commerce with such weapons.  *Supra* at 19-20.  Assuming *arguendo* that the law implicates the Second Amendment, restrictions on whether certain weapons may be transported over state lines is constitutional where supported by an applicable historical tradition.

colonies and states had no occasion to consider switchblade regulation.  But a different bladed

weapon was in fact widely regulated in the early and mid-19th century, for many of the same reasons

that switchblades would be restricted in the mid-20th century.   That is, in the early and mid-19th

century, so-called "Bowie knives" became infamous for their use in crime and were subject to

numerous state regulations.  Mot. at 30-31.

By way of background, the original Bowie knife generally referred to a weapon "eight to

twelve inches long, designed for close range fighting."  Raymond Thorp, *Bowie Knife* 87 (1948).  Over

time, however, manufacturers began using the term for various long knives, so "there is no one

specific knife that can be exactingly described as a Bowie knife." Norm Flayderman, *The Bowie Knife:*

*Unsheathing an American Legend* 490 (2004).  In the early 19th century, such Bowie knives were

increasingly recognized for their role in fights, duels, brawls, and other criminal activities. *Id.* at 25–

64, 495–502.  In one infamous 1837 episode, the Arkansas Speaker of the House murdered a State

Representative with a Bowie knife. *See, e.g.,* Flayderman at 52.  The role of such knives in crime led

one scholar to conclude that "[t]he most feared weapon of the 1830s was not a firearm, but the

Bowie knife."  Thorp at 87.

If the Second Amendment permits the type of regulation found in the Switchblade Act, one

would expect to see a proliferation of regulations in the early and mid-19th century designed to

suppress or otherwise strictly regulate the commercial trade in Bowie knives and other bladed

weapons.  And that is exactly what the historical record shows.  As one court recently explained,

during this time "local and state governments sought to regulate weapons viewed as being

particularly dangerous to public safety," and such resulting "laws regulating knives were often broad,

trying to capture as many kinds of fighting knives as possible, including 'daggers,' 'dirks,' 'stilettos,'

'Arkansas tooth-picks,' and others."  *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, No. 2:22-CV-

01815-IM, 2023 WL 4541027, at *20 (D. Or. July 14, 2023).

For instance, in 1837 Georgia passed a law prohibiting the manufacture, sale and wearing of pistols, Bowie knives or "any other kind of knives." Act of Dec. 25, 1837 § 1, 1837 Ga. Acts. 90. And while the law was overturned in part as unconstitutional in *Nunn v. State*, 1 Ga. 243 (1846), that decision focused on the restriction on carrying arms openly, and did not directly address the law's prohibitions on manufacture or sale of certain weapons. *See id*. at 251 (holding that "so much of [the law], as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*"); *Heller*, 554 U.S. at 612 (explaining that *Nunn* "struck down a ban on carrying pistols openly").

Georgia's prohibition on the sale of certain knives was not unique. Tennessee enacted a similar prohibition in early 1838 banning the sale of Bowie knives and comparable knives, along with bans on the concealed carry of such weapons, and increased penalties for "drawing" such blades or their violent use. Ch. 137, 1837-1838 Tenn. Acts 200. In 1881 Arkansas enacted a similar ban on the sale of these knives, barring the transfer of "any dirk or bowie knife" along with pistols, excepting those pistols "used in the army or navy of the United States," and broadly prohibited the wearing of such weapons "in any manner whatever." Act of Apr. 1, 1881, No. 96, §§ 1–3, 1881 Ark. Acts 191, 191–92.

Other states pursued a myriad of different approaches to restrict the sale of Bowie knives and other bladed weapons. As another example, in 1837 Alabama imposed a prohibitory $100 tax on individuals who "sold," gave, or "otherwise disposed" of any Bowie knives, "Arkansas Tooth-picks" or any knives that "resemble" them. Act of June 30, 1837, No. 11, 1837 Ala. Laws Called Sess. 7. The tax amounted to over $3,200 today, and was accordingly a severe restriction on the exchange of these knives. *See* CPI Inflation Calculator, *Value of $100 from 1837 to 2023*, https://perma.cc/N7PE-JBN6.

In 1838 Florida passed a law imposing a substantial occupational tax, $200 ($6,600 today) on all vendors of "dirks [or daggers], pocket pistols, sword canes, or bowie knives," and required a $10 per year tax by all individuals "carrying said weapons openly."  Act of Feb. 10, 1838, No. 24, §§ 1–2, 1838 Fla. Laws 36, 36; *see* CPI Inflation Calculator, *Value of $200 from 1838 to 2023*, https://perma.cc/7LEH-WCQX.  In a related vein, Mississippi passed multiple laws during this time incorporating towns, and in doing so specifically empowered and encouraged local officials to achieve the "total inhibition of the odious and savage practice of wearing dirks and bowie-knives or pistols[.]"  Act of Feb. 15, 1839, ch. 168, § 5, 1839 Miss. Laws 384, 385; Act of Feb. 18, 1840, ch. 11, § 5, 1840 Miss. Laws 181 (likewise seeking to "suppress[]…the orders [sic] and savage practice of wearing dirks and bowie knives or pistols…").

The fact that these laws were concentrated primarily in the South reflects that concern for knife-related violence was highest in that region.  *See* Thorp at 69 (explaining that the "[t]he Bowie-Knife was, to put it mildly, responsible for the terrorizing of a half dozen states" and the citizens therein "demanded legal protection"); *accord Hanson v. D.C.*, --- F. Supp. 3d ---, 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023) (explaining in the historical Second Amendment context that "States do not 'regulate for problems that do not exist'; instead, they 'adopt laws to address the problems that confront them.'") (citation omitted).

Further, much like the concerns surrounding youth "delinquency" that gave rise to the Switchblade Act, state governments in the mid-19th century enacted additional regulations aimed at preventing the sale of Bowie knives and other weapons to minors.  In 1856, Tennessee barred merchants from selling minors any pistols, Bowie knives, "dirks," and other knives.  Act of Feb. 26, 1856, ch. 81, § 2, 1855–1856 Tenn. Acts 92, 92.  Kentucky in 1859 passed a similar law prohibiting the sale of such weapons to minors.  Act of Jan. 12, 1860, ch. 33, § 23, 1 Ky. Acts 241, 245.  In 1878, Mississippi generally prohibited not only the concealed carry of bowie knives, pistols or similar

"deadly weapon[s]," but also banned the sale of such weapons to minors and "intoxicated" persons. Act of Feb. 28, 1878, ch. 96, §§ 1–2, 1878 Miss. Laws 175, 175.[19]  In addition, laws banning the sale of such knives to minors were also passed Kansas in 1883, and Illinois in 1885.  Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. 159, 159; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73.

Finally, large numbers of states prohibited the concealed carry of Bowie knives, dirks and other bladed weapons.  *See Kotek*, 2023 WL 4541027, at *23 (explaining that "fourteen states banned the concealed carry of Bowie knives between 1850 and 1875," and between 1875 and 1900 "twenty-two states had laws prohibiting the concealed carry of Bowie knives").  In sum, the 19th century saw numerous and widespread regulations on Bowie knives and bladed weapons, in some cases over and above restrictions imposed on firearms.

The early and mid-1950s saw the enactment of numerous similar state and local laws in this tradition, for the reasons cited by the Senate Subcommittee, *supra* at 4-5, barring the sale and restricting ownership specifically of switchblade knives.  Senate Hearing at 2 (explaining that 12 states "had specifically outlawed the sale and possession of these articles" and "[n]umerous other states have some legislation, varying in degrees of effectiveness").  The Federal Switchblade Act that followed addressed the widespread circumvention of state and local prohibitions, namely the purchase and import of switchblades by mail and other methods into states and localities where sale and possession was regulated or barred.  Section 1242 of the Switchblade Act thus sought to eliminate this loophole, giving force and effect to local restrictions on such weapons.

---

[19] A similar law was passed by Congress in 1892, governing Washington, D.C., barring the sale of "daggers . . . bowie-knives, dirk knives or dirks," to those under 21.  Act of July 13, 1892, ch. 159, § 5, 27 Stat. 116, 117.

2.   *Historical Regulations on Commerce in Arms and Ammunition*

Early American history also reveals a related, robust tradition of regulation on the sale and transport of arms and ammunition, highly analogous to the prohibition of interstate commerce of switchblades in § 1242 of the Switchblade Act.

For instance, the third U.S. Congress made it unlawful for a limited period "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, ch. 33, § 1, 1 Stat. 369, demonstrating a clear understanding that the Constitution permitted strict regulation of firearm sellers.  *See also United States v. Libertad*, No. 22-CR-644 (JSR), 2023 WL 4378863, at *6 (S.D.N.Y. July 7, 2023) ("[T]he statute provides powerful evidence that an early congress believed it could, consistent with the Second Amendment, place quite sweeping restrictions on the passage of firearms *across borders*.") (emphasis added).

Further, as the en banc Ninth Circuit recounted in detail, as early as the 1600s "colonial governments substantially controlled the firearms trade," including through "restrictions on the commercial sale of firearms."  *Teixeira*, 873 F.3d at 685.  Specifically, the colonies of "Massachusetts, Connecticut, Maryland, and Virginia all enacted laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians."  *Id.*; *see also id.* (explaining that "Connecticut banned the sale of firearms by its residents outside the colony").  And under colonial Virginia's law "straying into an Indian town or more than three miles from an English Plantation, while possessing more firearms than needed for personal use, was a crime[.]" *United States v. Bradley*, No. 2:22-CR-00098, 2023 WL 2621352, at *5 (S.D.W. Va. Mar. 23, 2023).  Such colonial history shows the authority of early American governments to restrict the sale of arms and ammunition, including the persons to whom arms could be sold, and where such sales could

take place. *See id.* at *4 ("Early legislatures and Founders did not shy away from regulating the trade and movement of firearms.").

Colonial and early state governments also enacted numerous stringent restrictions on the interstate commerce of gunpowder (akin to modern ammunition). Specifically, multiple states, such as Massachusetts (1651, 1809), Connecticut (1775), New Jersey (1776), and New Hampshire (1820), required licenses or inspection to export or sell gunpowder to other colonies or states.[20] Connecticut's 1775 law, for instance, established that no gunpowder manufactured within the colony "shall be exported out[side]" of the colony "without [an applicable] licen[s]e[.]" And Massachusetts similarly prohibited the "export" of gunpowder beyond "the limits of this Commonwealth . . . before the same has been inspected and marked" by Government officials. *Accord United States v. Sharkey*, No. 4:22-cr-00176-SMR-HCA1, 2023 WL 6139615, at *3 (S.D. Iowa Sept. 20, 2023) ("These regulations underscore the historical efforts to control the production and movement of gunpowder.").

In sum, American history reveals expansive 17th and 18th century regulation controlling the sale and export of arms generally, and numerous 19th century restrictions on the retail and transfer

---

[20] *See* The General Laws and Liberties of the Massachusetts Colony 126 (Cambridge, Samuel Green 1672), *reprinted in* Colonial Laws of Massachusetts (Bos., Rockwell & Churchill 1890) (1651 statute requiring license to export gunpowder); 2 General Laws of Massachusetts, from the Adoption of the Constitution to February 1822, at 198–200 (Bos., Wells & Lilly 1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); 15 The Public Records of the Colony of Connecticut 191 (Charles J. Hoadly ed., Hartford, Case, Lockwood & Brainard 1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence"); An Act for the Inspection of Gunpowder, ch. 6, § 1, 1776–1777 N.J. Laws 6, 6 (1776) (No person shall offer any gunpowder for sale "without being previously inspected and marked as is herein directed."); Laws of the State of New-Hampshire; with the Constitutions of the United States and of the State Prefixed 276–77 (Hopkinton, Isaac Long, Jr., 1830) (authorizing "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state" and imposing penalties for any sale or disposition of gunpowder "before the same has been inspected and marked").

of certain bladed weapons; the Switchblade Act is merely a more recent chapter in this tradition. The Switchblade Act exercises well-established authority to regulate where and how certain arms may be sold, especially bladed arms widely associated with criminality. The Switchblade Act thus does not run afoul of the Second Amendment.

## V.      Any Injunction Should Apply Only to Plaintiffs

If the Court reaches the question of remedy, Plaintiffs fail to delineate the scope of any requested relief. *See* Mot. at 32 (stating only that "Plaintiffs . . . request that the challenged aspects of the law be permanently enjoined."). They do not specifically request a nationwide injunction, or for that matter any injunction broader than Plaintiffs.

Out of an abundance of caution, Defendants note that any argument for a nationwide injunction would be meritless. Nationwide injunctions "have little basis in traditional equitable practice," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring), as they "take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). And as a practical matter, nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also DHS*, 140 S. Ct. at 599–601 (Gorsuch, J., concurring) (lamenting the "asymmetric" effects of nationwide injunctions on "the government's hope of implementing any new policy"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1305 (11th Cir. 2022) ("[N]ationwide injunctions" "cut[] off parallel lawsuits," "encourage gamesmanship, motivating plaintiffs to seek out the friendliest forum and rush to litigate important legal questions in a preliminary posture," and "disturb comity by hindering other courts from evaluating legal issues for themselves.").

Indeed, for these reasons and others, this Court has properly rejected multiple recent requests for nationwide injunctions. *See, e.g., Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 6613080, at \*21 (N.D. Tex. Oct. 7, 2023) (O'Connor, J.) (rejecting request for nationwide injunction and holding that "[p]arties beyond this lawsuit are *not* covered"); *Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at \*18 (N.D. Tex. Oct. 2, 2023) (O'Connor, J. ) (similar).

Moreover, any relief should be limited to members identified in District Court and who have agreed to be bound by the judgment; this restriction would promote the longstanding equitable principle that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

For all these reasons, any relief in this matter should be limited to the identified Plaintiffs alone.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss and deny Plaintiffs' Motion for Summary Judgment.

Dated: November 17, 2023                    Respectfully submitted,


                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            BRIGHAM J. BOWEN
                                            Assistant Branch Director

                                            */s/ Michael Drezner*
                                            MICHAEL DREZNER
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005
                                            Phone: (202) 514-4505
                                            Email: Michael.L.Drezner@usdoj.gov

                                            *Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2023, I electronically filed the foregoing document with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of this filing.

/s/ Michael Drezner
MICHAEL DREZNER
Trial Attorney
U.S. Department of Justice

36