# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

KNIFE RIGHTS, INC., et al.,

          Plaintiffs,

   v.

MERRICK B. GARLAND, Attorney
General of the United States, et al.

          Defendants.

Case No. 4:23-CV-00547-O

U.S. District Judge Reed O'Connor

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN FURTHER SUPPORT OF PLAINTIFFS' SUMMARY JUDGMENT MOTION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

II.    STANDARDS OF REVIEW ..................................................................................... 3

      A.    Review Standard for Motion to Dismiss ................................................ 3

      B.    Review Standard for Summary Judgment Motion ................................. 3

OPPOSITION TO MOTION TO DISMISS ......................................................................... 4

III.    ARGUMENT .............................................................................................................. 4

      A.    Plaintiffs Challenge Multiple Provisions of the FSA, and Not Only
            Section 1242. ......................................................................................... 4

      B.    Plaintiffs Have Article III Standing. ..................................................... 7

            (i.) Plaintiffs Have Sufficiently Alleged Standing. ................................. 7

            (ii.)  Plaintiffs Have Sufficiently Alleged Injury Fairly
                   Traceable to the Challenged Conduct of Defendants. ................. 10

            (iii.) Plaintiffs Have Sufficiently Alleged Their Injury
                   is "Likely" to be Redressed by a Favorable Judicial Decision. ..... 12

            (iv.) Plaintiffs Have Sufficiently Alleged an Intent to Act
                   Contrary to Law. .............................................................................. 12

            (v.)  Plaintiffs Have Sufficiently Pled Substantial Likelihood
                   of Future Enforcement. ................................................................... 15

      C.    Plaintiffs Have Stated a Claim under Section 1983
            and the Second Amendment. ................................................................. 17

      D.    Retailer Plaintiffs Have Stated a Claim for Violation
            of the Second Amendment on Their Own Behalf
            and on Behalf of Their Customers. ....................................................... 18

      E.    Leave to Amend Should be Granted if the Sworn Declarations
            Need to be Incorporated into the Complaint. ........................................ 21

REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT ........................................................................................ 22

      A.    Defendants Fail to Dispute Any of Plaintiffs' Claims
            and Evidence. ........................................................................................ 22

            (i.)    Defendants Incorrectly Apply the Standard Set Forth
                 in *Bruen*. ......................................................................................... 23

            (ii.)   Switchblades are Not Both "Dangerous and Unusual." ............... 24

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN FURTHER
SUPPORT OF PLAINTIFFS' SUMMARY JUDGMENT MOTION

(iii.) Defendant's Own Arguments Confirm Automatically
Opening Knives are In Common Use. ........................................... 26

(iv.) The Historical Analysis Justifies Granting Plaintiffs'
Motion for Summary Judgment in its Entirety. ........................... 30

(v.) Restrictions on the Sale and Use of Bladed Weapons. ................. 31

(vi.) Restrictions on the Export and Transportation of Arms
and Ammunition. ........................................................................ 34

(vii.) The Injunction Should Apply Nationwide. .................................... 38

IV.    CONCLUSION .................................................................................... 39

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbot Laboratories v. Gardner*, 387 U.S. 136 (1967) ................................................. 15

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ...................................................... 4

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ......................................................... 3, 17

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ........................... 15

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010) ........................................................ 17

*Bay Sanctuary Covenant v. Trump,*
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ................................................................ 38

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ................................................. 3, 17

*Boland v. Boland* No. SACV 22-01421-CJC (ADSX), 2023 WL 2588565,
   (C.D. Cal. Mar. 20, 2023) .................................................................................. 13

*Caetano v. Massachusetts,* 577 U.S. 411 (2016) ..................................... 24, 25, 28, 29

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................... 38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 4, 22

*City of Chicago v. Barr*, 513 F.Supp. 3d 828 (N.D. Ill. 2021) .................................... 38

*City of S.F. v. Sessions*, 349 F.Supp. 3d 924 (N.D. Cal. 2018) .................................. 38

*Contractor Managing Gen. Ins. Agency, Inc. v. Greenlight*
   *Reinsurance, Lt*d., No. 4:20-CV-00996-O, 2020 WL 11148500
   (N.D. Tex. Nov. 10, 2020) ................................................................................. 17

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.,*
   911 F.2d 242 (9th Cir. 1990) ............................................................................... 3

*Craig v. Boren*, 429 U.S. 190 (1976) ......................................................................... 19

*State v. Delgado*, 692 P.2d 610 (1984) ....................................................................... 29

*Department of Commerce v. United States House of Representatives*,
   525 U.S. 316 (1999) ............................................................................................. 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................... *Passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................... 12, 39

*Estate of Tucker*, 515 F.3d 1019 (9th Cir. 2008) ........................................................ 4

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................... 14, 16, 19

*Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278 (5th Cir. 1993) ..................... 8

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ..................................................... 29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................ 10

*Hedges v. Obama*, 724 F.3d 170 (2d Cir. 2013) ........................................................... 15

*Hills v. Gautreaux*, 425 U.S. 284 (1976) ...................................................................... 38

*Hollis v. Lynch,* 827 F.3d 436 (2016) ..................................................................... 24, 25

*Hunt v. Washington State Apple advertising Com'n.*, 432 U.S. 333 (1997) ..............9

*Jackson v. City and County of San Francisco,*
    746, F.3d 953 (9th Cir. 2014). ...................................................... 13, 14 19

*Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116 (9th Cir. 2008) ....................... 3

*Knife Rts., Inc., v. Vance*, 802 F.3d 377 (2d Cir. 2015) ............................................. 13

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ................................................. 24

*La Union del Pueblo Entero v. Abbott*, 614 F.Supp.3d 509 (2022) ......................... 8, 9

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992) ................................................ 7, 8, 11

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009) ............................................. 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................... 4

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2d Cir. 2007) ........................... 15

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ................................................. 39

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................... 9

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ..................... 14

*National Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002) ................... 14

*Navarro v. Block,* 250 F.3d 729 (9th Cir. 2001) ......................................................... 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1, 142 S. Ct. 2111 (2022) ......................................... *Passim*

*Nunn v. State*, 1 Ga. 243 (1846) ......................................................................... 31, 32

*Doe No. 1 v. Putnam Cnty.*, 344 F. Supp. 3d 518 (2018) ......................................... 13

*Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757 (5th Cir. 2011) ................ 17

*Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673 (5th Cir. 2007) ................ 17

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007) .............................. 4

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .............................................................. 7

*Stacy v. Rederite Otto Danielsen,* 609 F.3d 1033 (9th Cir. 2010) ............................... 3

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................. 15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ....................................................................... 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)......................................... 13, 15

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ............................. 19, 20

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023).......................................... 8, 14, 25, 26, 29

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ...................................................... 9

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).................................................... 12

*United States v. Rahimi*, 61 F.4th 443 (5th Cir.),
    *cert. granted,* 143 S. Ct. 2688 (2023).......................................................... 36

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252......................................................................................................... 8

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
    636 F.3d 874 (7th Cir. 2011) ........................................................................ 38

*Zixiang Liv. Kerry,* 710 F.3d 995 (9th Cir. 2013)................................................. 3, 17

**Code of Federal Regulations**

Section 7 of Title 18..................................................................................................... 5, 6

Section 1151 of Title 18............................................................................................... 5, 7

**Federal Rules of Civil Procedure**

Rule 12(b)(6) ................................................................................................... 1, 3, 17

Rule 15(a)(2) ....................................................................................................... 22

Rule 56(a)......................................................................................................... 4, 22

**Code**

15 U.S.C. section 1241 ............................................................................... *Passim*

15 U.S.C. section 1242 ............................................................................... *Passim*

15 U.S.C. section 1243 ............................................................................... *Passim*

15 U.S.C. section 1244 ............................................................................... *Passim*

15 U.S.C. section 1244(5) ............................................................................... 30

15 U.S.C. section 1245 ............................................................................... 5, 7

42 U.S.C. section 1983 ............................................................................... 1, 17

**U.S. Constitution**

Second Amendment...................................................................................... *Passim*

Bill of Rights .......................................................................................... 38

**State Laws**

Illinois Comp. State. Ann. 5/24-1(e)(2) (West 2023) ............................... 28

Md. Code Ann., Crim. Law, § 4-101 (West 2023) ........................................... 28

N.J. Stat. Ann. § 2C:39-3 (West 2023) ......................................................... 28

N.Y. Penal Law § 265.20(a)(6) ...................................................................... 28

**Other Authorities**

Act of Feb. 15, 1839, Ch. 168, § 5, 1839 Miss. Laws 384 ............................... 32

Act of Feb. 18, 1840, Ch. 11, § 5, 1840 Miss. Laws 181 ................................. 32

Act of Jan. 12, 1860, Ch. 33, section 23, 1 Ky. Acts 245 ................................ 33

Act of Feb. 26, 1856, Ch. 81, § 2, 1855–1856 Tenn. Acts 92 .......................... 33

Act of May 22, 1794, Ch. 33, section 5 ......................................................... 35

Federal Switchblade Act of 1958 ......................................................... *Passim*

Pub. L. 85-623 .......................................................................................... 39

Pub. L. 85–623, § 4, Aug. 12, 1958, 72 Stat. 562 .......................................... 16

Pub. L. 111–83, title V, § 562, Oct. 28, 2009, 123 Stat. 2183 ....................... 16

*Criminal Use of Switchblades: Will the Recent Trend towards
Legalization Lead to Bloodshed?,* 13 Conn. Pub. Int. L.J. 219, 242 ............... 27-28

David P. Currie, *The Constitution in Congress: The Third Congress,* .................... 35
*1793-1795,* The University of Chicago Law Review,
Vol. 63, No. 1 (Winter 1996)

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' motion to dismiss Plaintiffs' complaint (ECF No. 24) is predicated almost entirely on claims that Plaintiffs lack Article III standing by not alleging (a) an "intent" to act contrary to the Federal Switchblade Act of 1958, 15 U.S.C. §§ 1241, *et seq*. (FSA), and (b) not showing a *credible threat* of prosecution under the FSA.[1] To the contrary, Plaintiffs' complaint includes factual allegations showing an intent to act contrary to the FSA by manufacturing, acquiring, transporting, distributing, possessing, and selling automatically opening knives, or "switchblades," in interstate commerce—all of which is proscribed by the FSA with criminal fines of not more than $2,000 or imprisonment of not more than five years, or both. 15 U.S.C. §§ 1242, 1243. Moreover, Plaintiffs are prohibited from *possessing* switchblade knives within all "Indian country" and on federal land as defined by the plain language of the FSA. 15 U.S.C. § 1243. These same facts apply to the Organizational Plaintiff and its members. The injury is also directly related to Defendants' credible threat of enforcing the FSA, and will be remedied with the requested relief, namely, the Court's issuance of a permanent nationwide injunction against the challenged FSA provisions (15 U.S.C. §§ 1242, 1243, 1244). Thus, Defendants' motion to dismiss should be denied.

If, however, the Court determines that Plaintiffs have not sufficiently pled the required elements to establish Article III standing in their complaint (ECF No. 1), Plaintiffs request that the Court grant Plaintiffs leave to amend. The facts, declarations, and evidence provided in Plaintiffs' motion for summary judgment and reply herein provide ample facts and evidence to establish standing of all Plaintiffs and other similarly situated individuals. As such, the complaint can be amended in short order to further allege standing; or alternatively, the submission of Plaintiffs'

---

[1]  Defendants' Rule 12(b)(6) motion lacks merit. As shown, Plaintiffs have plausibly alleged a 42 U.S.C. section 1983 claim arising under the Second Amendment to the Constitution. Automatically opening knives are among the "arms" protected by the Second Amendment. They easily fit within the definition of protected arms under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and are not subject to ban because they are in common use and typically owned by law-abiding citizens for lawful purposes, including self-defense.

additional sworn declarations can and do provide further facts supporting Article III standing.[2]

As to Plaintiffs' motion for summary judgment, Defendants have failed to provide sufficient evidence to dispute any of Plaintiffs' evidence in support of their summary judgment motion. As such, there is no genuine dispute as to any material fact. Automatically opening knives, or switchblades, are arms under the plain text of the Second Amendment; the FSA unconstitutionally prohibits engaging in interstate commerce in such knives and the possession and carry of such knives on "Indian country" and federal land; and Defendants have failed to meet their burden to establish any historically relevant analogous tradition of regulating such arms that would justify the FSA (15 U.S.C. §§ 1242, 1243, 1244) under the *Heller* standard, affirmed in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022). Plaintiffs request that the Court grant judgment in their favor as a matter of law.

Specifically, in its response to Plaintiffs' summary judgment motion, Defendants *apply the wrong standard of review* under *Bruen*. Moreover, Defendant offers no contradictory evidence to rebut Plaintiffs arguments that automatically opening knives are "arms" protected by the plain text of the Second Amendment. Defendants also offer no evidence to contradict Plaintiffs' contention that such knives are in common use and thus are not *both* "dangerous and unusual." Finally, Defendants offer patently insufficient evidence of any historical analogous laws or regulations that would justify the outright prohibitions under the FSA. Instead, Defendants rely on a handful of outlier laws or regulations, many of which are premised on racist, immoral, and outright unconstitutional regulation of minorities. The few remaining

---

[2] Please see the following declarations filed concurrently with this combined brief: (a) Declaration of Doug Ritter (Plaintiff Knife Rights organization), establishing standing on behalf of its members and on its own right (Ritter Decl.), (b) Declarations of Adam Warden (Warden Decl.) and Evan Kaufmann (Kaufmann Decl.) (members of Knife Rights), (c) Declaration of Jeffrey E. Folloder (Folloder Decl.), and (d) Declaration of Russel Arnold (Arnold Decl.).

regulations Defendants rely on are not analogous—as they are restrictions on *international* trade and the transportation of explosives.

Accordingly, this Court is asked to grant Plaintiffs' summary judgment motion in its entirety and issue a permanent nationwide injunction against Section 1241, 1242, 1243, and 1244 of the FSA.[3]

## II.   STANDARDS OF REVIEW

### A.   Review Standard for Motion to Dismiss

A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or absence of sufficient facts to support a cognizable legal theory. *Johnson v. Riverside Healthcare Sys.,* 534 F.3d 1116, 1121 (9th Cir. 2008); *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). When considering a Rule 12(b)(6) motion, the Court must "accept as true facts alleged and draw[s] inferences from them in the light most favorable to the plaintiff." *Stacy v. Rederite Otto Danielsen,* 609 F.3d 1033, 1035 (9th Cir. 2010). A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Liv. Kerry,* 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

If a court dismisses a complaint, it may grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.,* 911 F.2d 242, 247 (9th Cir. 1990).

### B.   Review Standard for Summary Judgment Motion

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is

---

[3] Again, Plaintiffs do not challenge any importation restrictions of the FSA, nor request any relief with regard to this aspect of the FSA.

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the *burden then shifts* to the *opposing party* to establish the actual existence of a genuine dispute as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

## OPPOSITION TO MOTION TO DISMISS

### III. ARGUMENT

#### A. Plaintiffs Challenge Multiple Provisions of the FSA, and Not Only Section 1242.

Defendants assert that Plaintiffs challenge "only" Section 1242 of the FSA and have "waived" any dispute "as to the remainder of the law." ECF No., 7 (OB at 7). Not so. Despite Defendants' assertions, Plaintiffs have sufficiently challenged specified provisions of the FSA (15 U.S.C. §§ 1242, 1243, 1244).

**First**, Plaintiffs properly allege and identify the specific sections of the FSA challenged in their complaint. See ECF No. 1 (Compl. at ¶¶ 1-10, at 1-3). Section 1241 is identified as the statute that defines what constitutes a "switchblade" under the

4

Plaintiffs' Consolidated Opposition To Defendants' Motion To Dismiss And Reply In Further Support Of Plaintiffs' Summary Judgment Motion

FSA.[4] Section 1242 is identified as prohibiting interstate commerce of these knives, and section 1243 is identified as prohibiting possession of any switchblade knife "within any territory or possession of the United States, within Indian Country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18)...." *Id.* (Compl. at ¶¶ 6-7, at 2; see also ¶¶ 21-23, at 6-7). The complaint also identifies the extremely narrow exceptions to the prohibitions in both Sections 1242 and 1243. *Id.* (Compl. ¶ 8, at 3; see also ¶ 24, at 7). The section that Plaintiffs did not challenge was Section 1245 prohibiting "ballistic knives" (15 U.S.C. § 1245). Plaintiffs also made clear they were not challenging the importation prohibitions on automatically opening knives. *Id.* (Compl. ¶ 22, n. 1, at 7).

The complaint does not stop there. It also alleges that "Defendants' enforcement of the Federal Knife Ban unconstitutionally infringes on the fundamental rights [of] individuals who reside in Texas and other States within the U.S. to *keep and bear* common, constitutionally protected arms...." *Id.* (Compl. ¶ 9, at 3). Texas and the other States within the U.S. include, of course, federal land and "Indian country." 15 U.S.C. § 1243. Indeed, Defendants concede that Section 1243 "broadly prohibits the possession, manufacture, and sale of switchblades." ECF No. 26 (OB at 4).

Further, the complaint alleges that Plaintiff Knife Rights' members "wish to exercise their right to bear arms through the acquisition, possession, and carriage of automatically opening knives prohibited under Defendants' enforcement of the Federal Knife Ban." *Id.* (Compl. ¶11, at 3-4). This allegation alone encompasses member "acquisition" through interstate commerce; and the "possession" and the carry or "carriage" of such knives on and through "Indian country" and federal land (15 U.S.C. § 1243).

---

[4] Plaintiffs identify section 1241 for purposes of defining what constitutes a "switchblade" under the Federal Switchblade Act. Plaintiffs do not challenge the importation restrictions within section 1241.

The complaint also alleges that the "Federal Knife Ban unconstitutionally infringes on the fundamental right of buying, selling, trading, possessing, or carry of any switchblade knife, as defined, between any of the 50 states, Washington D.C., and any of the U.S. territories, despite that automatically opening knives are common arms protected by the Second Amendment." *Id.* (Compl. ¶ 25, at 8).

Thus, the scope and extent of Plaintiffs' challenge to the FSA was clearly alleged, there was no waiver, and their challenge is not limited "only" to Section 1242. It encompasses Sections 1241, 1242, 1243, and 1244 of the FSA.

**Second**, each Plaintiff identified the fact that they seek to exercise their right to bear arms through the acquisition, *possession*, and carriage of automatically opening knives prohibited under Defendants' enforcement of the FSA through their explicit factual allegations as to their intent to acquire, possess, and carry such knives. *See* ECF No. 1 (Compl. ¶¶ 11-16, at 3-5; see also ¶¶ 57-59, at 14-15).

**Third**, after identifying and defining the extent of the Federal Switchblade ban, Plaintiffs allege that the FSA "unconstitutionally infringes on the fundamental right of buying, selling, trading, *possessing, or carry[ing]* of any switchblade knife, as defined, between any of the 50 states, Washington D.C., and any of the U.S. territories…" *Id.* (Compl. ¶ 25, at 8).

While Defendants may desire more explanation, it's not required, the FSA's plain text prohibits possession of any "switchblade knife" "within any territory or possession of the United States, within Indian country (as defined in Title 18 U.S.C. § 1151), or within the special maritime and territorial jurisdiction of the United States (as defined in Title 18 U.S.C. § 7). See 15 U.S.C. § 1243. Federal land is defined broadly under Title 18 U.S.C. Section 7:

> "[W]ithin the special maritime *and territorial jurisdiction*," among other things is defined as '*Any lands reserved or acquired for the use of the United States*, and under the exclusive or concurrent jurisdiction thereof, or *any place purchased or otherwise acquired by the United States by consent of the legislature of the State* in which the same shall

be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

18 U.S.C. §7(3) (emphasis added).

Similarly, Title 18 U.S.C. Section 1151 defines the term, "Indian country," broadly to encompass:

> [T]he term "Indian country," as used in this chapter, means (a) all land within the limits of *any Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) *all dependent Indian communities within the borders of the United States* whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) *all Indian allotments*, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added).

Plaintiffs are not required to define every plot of land in which the federal government retains jurisdiction. Defendants should be well aware of the plain language of the FSA and their own jurisdiction.

In short, Plaintiffs have more than adequately alleged and identified the challenged provisions of the FSA (15 U.S.C. §§ 1241, 1242, 1243, and 1244), and have not waived any FSA challenge—except those statutes explicitly alleged not to be subject to challenge in this case (15 U.S.C. § 1245 [ballistic knives] and importation restrictions within § 1241).

### B.     Plaintiffs Have Article III Standing.

### (i.) Plaintiffs Have Sufficiently Alleged Standing.

Plaintiffs acknowledge their burden to allege facts sufficient to satisfy Article III standing; and they have done so. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' complaint and the accompanying sworn declarations submitted herein show that Plaintiffs have sustained (1) "an injury in fact," (2) the injury is "fairly traceable to the challenged conduct of the defendant," and (3) the injury is "likely to be redressed by a favorable judicial decision." *Id.*, at 560; *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 338 (2016); *Teter v. Lopez*, 76 F.4th 938, 943-946 (2023) (ruling Hawaii's ban on butterfly knives as unconstitutional/also addresses standing.).

For purposes of a motion to dismiss, "all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving party." *La Union del Pueblo Entero v. Abbott*, 614 F.Supp.3d 509, 516 (W.D. Texas 2022); *Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). "[G]eneral factual allegations of injury" are enough because the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and brackets omitted). Under this applicable standard, Plaintiffs' complaint is more than sufficient.

Moreover, the law is clear—the standing requirement is satisfied for *all plaintiffs* if *any plaintiff* has standing on the same complaint seeking the same relief, which is the case here. See *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 330 (1999); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 and n.9 (holding that presence of one party with standing assures that the controversy before the Court is justiciable). With that context, the complaint and sworn declarations establish standing.

For example, as to the Individual Plaintiffs, the complaint alleges their "desire and inten[t] to exercise their right to keep and bear automatically opening knives for lawful purposes, including self-defense, and would, but for the Defendants' enforcement of the Federal Knife Ban." ECF No. 1 (Compl. ¶ 59, at 15; *see also* ¶¶ 12-13, at 4 [Plaintiffs Arnold and Folloder]). The complaint further alleges that (a) "Defendants have been and are actively enforcing the Federal Knife Ban against the Plaintiffs...[and they] fear that the Defendants will continue to enforce the Federal Knife Ban against them," and (b) "Defendants' enforcement...at issue in this case against Plaintiffs...cause injury and damage actionable under federal law." *Id*. (Compl. ¶ 62, at 15).

Additionally, Plaintiff Folloder (Compl. ¶ 13, at 4) has submitted a detailed sworn declaration detailing the facts constituting his standing not only as an individual and member of Plaintiff Knife Rights, but also as a retail owner and operator of Plaintiff MOD Specialties and on behalf of his actual and prospective customers. *See* Folloder Dec. (filed concurrently herewith).

Two other Plaintiff Knife Rights' active members have submitted sworn declarations detailing the facts establishing: (a) their concrete injury, (b) that their injuries are fairly traceable to the challenged provisions of the FSA and its enforcement, and (c) that their injuries can and would be redressed by this Court's issuance of a nationwide injunction permanently enjoining Sections 1241, 1242, 1243, and 1244 of the FSA. See Warden Decl. and Kaufmann Decl. (filed concurrently herewith).

Additionally, the Organizational Plaintiff Knife Rights, Inc. (Knife Rights) has standing for itself and its members. See *Hunt v. Washington State Apple advertising Com'n.*, 432 U.S. 333, 343; *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 199, 143 S. Ct. 2141, 2157 (2023); *see also La Union del Pueblo Entero,* 614 F.Supp.3d at 516 (W.D. Tex 2022) (showing standing established for organization if "at least one member will suffer injury-in-fact"). And because Plaintiff Knife Rights challenges Defendants' conduct in this case, neither Knife Rights, nor its members need to be the current subject of Defendants' enforcement action, so long as their conduct causes injury to Plaintiff or one of its members. See *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-56 (2010) (plaintiffs had standing to challenge federal agency's failure to regulate a third party's use of genetically modified seeds); *Texas v. United States*, 809 F.3d 134, 155-60 (5th Cir. 2015) (Texas had standing to challenge federal government's failure to enforce immigration laws), aff'd 136 S. Ct. 2271 (2016).

As alleged in the complaint, Knife Rights is a member advocacy organization and serves its members "through efforts to defend and advance the right to keep and bear bladed arms." ECF No. 1 (Compl. ¶ 11, at 3). It also serves its members,

9

supporters, and the public through "litigation and advocacy and public education" and the successful repeal of numerous knife bans throughout the country. *See* Ritter Decl. ¶¶ 3-4, at 1. Knife Rights has also participated in efforts to repeal the FSA; and successfully worked to repeal the State of Texas' bans on switchblades and other bladed arms. *Id.* (¶¶ 5-6, at 2). Mr. Ritter, the Chairman and Executive Director of Knife Rights, has submitted a detailed sworn declaration describing Knife Rights' standing in its own right and on behalf of its many members. *See* Ritter Decl., (filed concurrently herewith).

The Ritter declaration establishes that Knife Rights has expended "substantial" time, effort, money, and other resources in opposing the FSA and that such efforts "have placed a real, concrete drain on" Knife Rights resources, impairing its ability to continue to implement its mission as a Second Amendment organization. See Ritter Decl. ¶ 13, at 3-4. Additionally, such expenditures are exceptional and not merely in furtherance of the Knife Rights' mission. *Id.*, at ¶4. Further, Mr. Ritter declares that by "expending substantial organizational time, effort, money, and other resources over a period of several years to challenge or repeal the FSA, Knife Rights has sustained injury, harm, and losses that could be avoided if Defendants would simply take steps to voluntarily repeal or set aside the FSA" and "[b]ut for the FSA provisions at issue, Knife Rights' organizational efforts would otherwise be expended in other ways ...." *Id.* ¶ 14, at 4. Mr. Ritter further declares that Knife Rights' "injuries as an organization could also be fully redressed if the Court were to issue the nationwide injunction that Plaintiffs have requested in this case. *Ibid*. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organization had standing to challenge policy based on allegation that organization "had to devote significant resources to identify and counteract the Defendant's" practices).

### (ii.)   Plaintiffs Have Sufficiently Alleged Injury Fairly Traceable to the Challenged Conduct of Defendants.

To establish standing, "there must be a causal connection between the injury and the conduct complained of—the injury must be 'fairly... trace[able] to the

challenged action of the defendant, and not… th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Despite Defendants' assertions, Plaintiffs have sufficiently alleged this causal connection. As a direct result of the FSA, Plaintiffs Folloder, Arnold, RGA Auction Services LLC, doing business as Firearm Solutions, MOD Specialties, Knife Rights' members, and other similarly situated individuals across the country are prohibited from acquiring, selling, distributing through interstate commerce and possessing and carrying such knives on federal territory or within "Indian country."

Specifically, for the retailer Plaintiffs, Firearms Solutions and MOD Specialties, the FSA prevents these retailers from acquiring and selling these constitutionally protected arms to their customers. ECF No. 1 (Compl. at 4-6); *see also* Folloder Decl. ¶¶ 2-9, at 1-3. While Defendants assert that these "corporate plaintiffs" "do not have a right to *sell arms*," the prohibition in question goes beyond the ability to *sell* automatically opening knives. Due to the ban, the retailer Plaintiffs cannot *acquire* these automatically opening knives; they also cannot possess and travel with these knives when attending retail opportunities like gun and knife shows when traveling through any federal land or "Indian country." Folloder Decl. ¶¶ 5-9, 2-3.

These same prohibitions apply to the individual plaintiffs (Folloder Decl. ¶ 10, at 3), Knife Rights members (Warden Decl. ¶¶ 16-19, at 3-4), and other similarly situated individuals across the country. See Folloder Decl., **Exhibit A**, which is a true and correct copy of a map of the federal lands within the United States. As shown, the FSA prohibits possession of automatically opening knives in the vast majority of the western part of the United States. *Id.* Plaintiffs regularly travel through these areas for both personal and business purposes. See, *e.g.*, Folloder, Warden, Kaufmann Decls. And as can be seen, the FSA prohibits possession and this prohibition is extremely broad, as conceded by Defendants. ECF No. 26 (OB at 4).

### (iii.)   Plaintiffs Have Sufficiently Alleged Their Injury is "Likely" to be Redressed by a Favorable Judicial Decision.

"When evaluating redressability, the key question is whether the harm alleged by the Plaintiff is *likely* to be alleviated by a ruling in its favor." *Maldonado v. Morales*, 556 F.3d 1037, 1043 (9th Cir. 2009). Here, Plaintiffs' injuries would unquestionably be redressed by the relief sought.

The FSA prohibition from acquiring automatically opening knives through interstate commerce and its prohibition against possessing and carrying these knives on all federal land and within "Indian country," if eliminated, would permit Plaintiffs and other similarly situated individuals across the country to exercise their right to acquire and possess these arms without unconstitutional federal prohibitions. Moreover, it would bring federal law in line with the vast majority of jurisdictions in the United States that do not criminalize automatically opening knives. Thus, a favorable ruling (a permanent nationwide injunction invalidating the FSA provisions at issue) would unquestionably alleviate the cognizable injuries alleged by Plaintiffs. See Ritter Decl. ¶ 14, at 4; Warden Decl. ¶ 19, at 4; Kaufmann Decl. ¶ 20, at 4; and Folloder Decl. ¶ 5, at 2.

### (iv.)   Plaintiffs Have Sufficiently Alleged an Intent to Act Contrary to Law.

Plaintiffs have alleged facts supporting their ability, readiness, and intent to purchase automatically opening knives prohibited by the FSA. Fundamentally, Plaintiffs injuries are a direct result of the switchblade ban. This ongoing harm constitutes a concrete injury because it is a traditional harm "specified by the Constitution itself." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The ban stifles Plaintiffs' opportunity to exercise their constitutional rights. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

Plaintiffs allege that the FSA has prevented them from acquiring and possessing these knives for both personal and business purposes. ECF No. 1 (Compl. at 1-6.) Thus, because the FSA blocks Plaintiffs from exercising rights guaranteed by

12

the Constitution, they have suffered a cognizable injury and have a significant "personal stake" in the issues to be resolved by this case. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Nor are Plaintiffs' intentions speculative. Thwarted intentions to acquire and possess prohibited weapons constitute sufficient injury for standing. See *Knife Rts., Inc., v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) ("[P]laintiff Copeland *would* purchase, possess, and use another 'Gerber model 05785 folding knife.'") (emphasis added). Here, Plaintiffs face a lose-lose setting where they are injured either way; they must either continue to refrain from exercising their constitutional rights, or risk criminal penalty. See *Doe No. 1 v. Putnum Cnty.*, 344 F. Supp. 3d 518, 533 (2018) ("Under either of these scenarios, the state contractor would suffer an injury in fact that is both concrete and particular."). Defendants' enforcement of the FSA causes cognizable injury to Plaintiffs by eliminating the legal market for automatically opening knives.

The FSA causes injury to Plaintiffs and those similarly situated by distorting the consumer marketplace across the country. Plaintiffs are unable to sell, purchase and carry automatically opening knives via interstate commerce as the FSA has destroyed the legal interstate market unless one of the FSA's exceptions apply under section 1244. The elimination of the market for certain goods was sufficient injury for standing in *Jackson v. City and County of San Francisco*, 746, F.3d 953, 967 (9th Cir. 2014). There, Plaintiff alleged the Second Amendment provide[d] her with a 'legally protected interest' to purchase hollow-point ammunition, and that but for [the challenged law] she would do so within San Francisco." *Id*. As in *Jackson*, Plaintiffs here are unable to purchase automatically opening knives via any form of interstate commerce because enforcement of the FSA has extinguished any legal market for such knives across state lines, unless an exception applies. *Cf. Boland v. Boland* No. SACV 22-01421-CJC (ADSX), 2023 WL 2588565, at *1, 3 (C.D. Cal. Mar. 20, 2023) ("These regulations are having a devastating impact on Californians' ability to acquire… handguns[.]").

Additionally, Plaintiff Jackson had not been threatened with prosecution under the ammunition ban, and the Ninth Circuit required no proof of such prosecution before concluding that Plaintiff had suffered a cognizable injury. *See also Teter*, 76 F.4th at 943-44 (recognizing that "a threat of prosecution is unnecessary to prove standing where the plaintiffs' injury is 'not a hypothetical risk of prosecution but rather, ongoing … harm resulting from their adherence to the challenged statute," citing *National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002).

As alleged in the complaint, Defendants' enforcement of the FSA prevents buyers and sellers from legally transferring automatically opening knives across state lines. Plaintiffs cannot acquire such knives through any means of interstate commerce. While the FSA may not limit the commerce of switchblades *within* a state or in any other state, "the harm to a constitutional right" is not "measured by the extent to which it can be exercised in another jurisdiction." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011); see also *Jackson*, 746 F.3d at 967.

Moreover, Defendants' dubiously assert that Plaintiffs can just acquire switchblades within the state of Texas. ECF No. 26 (OB at 18). However, the FSA prohibits automatically opening knives from ever being shipped into the state in the first place unless the transfer falls under an explicit exemption, which do not apply to Plaintiffs and other similarly situated individuals across the country.

Unquestionably, the FSA causes cognizable injury to Plaintiffs, and the injury will continue as long as the Switchblade ban is on the books and remains enforceable against Plaintiffs and others. See *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185, 191-92 (5th Cir. 2012) (holding "the injury of not being able to purchase handguns from FFLs" constituted a concrete, particularized injury."), abrogated on other grounds by *Bruen*, 142 S. Ct. 2111.

### (v.)   Plaintiffs Have Sufficiently Pled Substantial Likelihood of Future Enforcement.

For standing involving a pre-enforcement challenge, a plaintiff must demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony*, 573 U.S. at 159. A plaintiff need not "expose himself to actual arrest or prosecution" before "challeng[ing] the statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2d Cir. 2007) ("The dilemma posed by that coercion — putting the challenger to the choice between abandoning his rights or risking prosecution— is 'a dilemma that it was the very purpose of the Declaratory Judgement Act to ameliorate.'") (quoting *Abbot Laboratories v. Gardner*, 387 U.S. 136, 152 (1967)). There is no doubt that the FSA prescribes the course of conduct Plaintiffs intend to engage in — namely, the purchase, possession, acquisition, transfer, and carry of automatically opening knives. See 15 U.S.C. §§ 1242,1243.

"[A] Plaintiff has standing to make a pre-enforcement challenge 'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979)); *see also Babbitt*, 442 U.S. at 302 ("Appellees are thus not without some reason in fearing prosecution.").

Defendants assert that there is no substantial likelihood of future enforcement for two reasons. First, because Defendants is not aware of any "active" enforcement actions against Plaintiffs or any "similarly situated" entities; and second, "to Defendants knowledge there has not been a single prosecution brought under section 1242 since 2010. ECF No. 26 (OB at 11). But Defendants ignore that the FSA has been consistently enforced since 1958. The alleged lack of specific *prosecutions* under section 1242 alone merely states that no one has been convicted under this section in

past years. Since its enactment in 1958, Defendants have not shown that there have been no arrests, charges, prosecutions, pleas, and/or convictions under the various provisions of the FSA. Further Defendants attempt to pigeon-hole FSA enforcement by providing prosecutions under only section 1242. Defendants do not account for arrests, charges, or pleas that may have been reached while enforcing section 1242 and other provisions of the FSA.

Defendants also ignore that the FSA was most recently amended in 2009. *See* Pub. L. 85–623, § 4, Aug. 12, 1958, 72 Stat. 562; Pub. L. 111–83, title V, § 562, Oct. 28, 2009, 123 Stat. 2183. As such, it is unquestionable that the FSA is still enforced and relevant. Defendants' inability to secure a prosecution in the last 10 years under section 1242 of the FSA does not make the case that Plaintiffs are not subject to future prosecution if they were to break the law today. It merely shows Defendants have failed to secure a conviction in recent years.

Finally, Defendants have not provided any official stance from the Attorney General, Department of Justice, or any relevant authority that the relevant sections of the FSA will not be enforced. Absent a binding agreement that Defendants will not enforce the FSA against all Plaintiffs and any other similarly situated organizations and individuals, violations of the FSA still bring risk of criminal prosecution. See 15 U.S.C. 1242, 1243. In fact, the simple act of defending the FSA and asserting it is constitutional and broadly prohibits the manufacture, transport, distribution, possession, sale, and carry of allegedly "dangerous and unusual weapons" ECF No. 26 (OB at 21-25), Defendants affirmatively acknowledge that the FSA is not moribund, but actively enforced. And importantly, Plaintiffs have submitted sworn declarations stating their justifiable "fear" of prosecution under the severe criminal penalties. *See*, *e.g*., Warden Decl. ¶ 13, at 2; Kaufmann Decl. ¶ 14, at 3.

Further, it is well established that a plaintiff need not allege that a government agency ever issued a specific threat; in the pre-enforcement challenge context — the criminal statute itself supplies the "threat." *See Ezell*, 651 F.3d at 695-96. ("The very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are

16

proper, because probability of future injury counts as "injury" for the purpose of standing.'") (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010)).

### C. Plaintiffs Have Stated a Claim under Section 1983 and the Second Amendment.

As stated above, the complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*,550 U.S. at 570. "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Liv. Kerry,* 710 F.3d at 999 (quoting *Ashcroft,* 556 U.S. at 678). "In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations and internal quotation marks omitted); *Contractor Managing Gen. Ins. Agency, Inc. v. Greenlight Reinsurance, Lt*d., No. 4:20-CV-00996-O, 2020 WL 11148500, at *1 (N.D. Tex. Nov. 10, 2020).

Plaintiffs' complaint alleges a single count arising under 42 U.S.C. Section 1983 for the deprivation of Plaintiffs' Second Amendment right to keep and bear arms. ECF No. 1 (Compl. at 9). In response, Defendants assert that "Plaintiffs … fail to state a claim under the Second Amendment," asserting that "corporations and their proprietors lack a Second Amendment right to sell weapons for profit" and that "Plaintiffs fail to state a Second Amendment claim on behalf of their customers." ECF No. 26 (OB at 15). Defendants are wrong.

First, as shown above, Plaintiffs Russell Arnold and Jeffrey Folloder have alleged their individual standing in the complaint through their allegations that the FSA has prohibited each of them *as individuals* from acquiring, possessing, carrying, and offering for sale and distribution through interstate commerce, automatically

17

opening knives for self-defense and other lawful purposes. ECF No. 1 (Compl. at 4); *see also id.*, at 6-14. They have also provided sworn declarations showing they have standing on their own behalf and on behalf of their customers and why. See Folloder Decl. and Arnold Decl.

Plaintiff Knife Rights has established its own standing as an organization directly injured by Defendants' enforcement of the FSA. See Supplemental Declaration of Doug Ritter. Plaintiff Knife Rights has also established its representational standing on behalf of its members and other similarly situated individuals as Defendants' enforcement has injured Plaintiff Knife Rights' members. ECF No. 1 *E.g.*, Compl. at 3-4; 14 ("the Institutional Plaintiff's individual members and retailer members' customers desire and intend to exercise their right to keep and bear an automatically opening knife for lawful purposes, and would, but for the Defendants' enforcement of the Federal Knife Ban"); see also Declarations of Adam Warden and Evan Kaufmann.

### D. Retailer Plaintiffs Have Stated a Claim for Violation of the Second Amendment on Their Own Behalf and on Behalf of Their Customers.

Plaintiffs have stated a claim for violation of their Second Amendment rights, including the Retailer Plaintiffs See Compl. ¶ 15, at 5, and ¶ 16, at 5-6; see also Folloder Decl. and Arnold Decl.

First, Defendants do not seriously argue that the Individual Plaintiffs Russell Arnold and Jeffrey Folloder, nor the Organizational Plaintiff Knife Rights has failed to state a claim. See ECF No. 26 (OB at 14-21). And if indeed Defendants' claim encompasses the Individual Plaintiffs, the Court need only look to the complaint at pages 4 and 5, and 8-10; and their declarations filed concurrently herewith.

Second, in arguing deficiencies in the Retailer Plaintiffs' Second Amendment claim, Defendants ignore the factual allegations by Plaintiffs Russel Arnold and Jeffrey Folloder. See ECF No. 1 (Compl. ¶ 12, at 4, and ¶ 13, at 4-5). As shown, Plaintiffs Arnold and Folloder have sufficiently alleged a claim on their own behalf,

and their declarations include verified facts establishing their right to pursue a Second Amendment claim on behalf of themselves and their customers. Therefore, the only remaining legal question is whether the Retailer Plaintiffs RGA and MOD Specialties) have alleged a Second Amendment claim on behalf of their customers; and they have done so.

As to the Retailer Plaintiffs, RGA and MOD Specialties have sufficiently stated a claim on behalf of themselves and their customers. ECF No. 1 (Compl. ¶ 15, at 5, and ¶ 16, at 5-6). According to *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), in which both Plaintiffs and Defendants have relied, and which Defendants describe as "the leading case," the "right codified in the Second Amendment did not encompass a *freestanding* right to engage in firearms commerce *divorced from the citizenry's ability to obtain and use guns." Teixeira*, 873 F.3d at 684 (emphasis added). However, the court in *Teixeira did not* hold there is no right to engage in firearms commerce, as incorrectly asserted by Defendants.

In fact, the court in *Teixeira* specifically found that "[V]endors … have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," citing *Craig v. Boren*, 429 U.S. 190, 195 (1976). The *Teixeira* court explicitly held that "Teixeira, as the would-be operator of a gun store, thus has *derivative standing* to assert subsidiary right to acquire arms on behalf of his potential customers." *Id.* at 678 (emphasis added). The court in *Teixeira* correctly relied on *Ezell v. City of Chicago*, 651 F.3d 684, 693, 696 (7th Cir. 2011) (supplier of firing-range facilities had standing to challenge Chicago ordinance banning firing ranges on behalf of potential customers); and *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014), cert. denied, 135 S.Ct. 2799 (2015) (holding that the "'right to possess firearms for protection implies a corresponding right' to obtain the bullet necessary to use them").

As alleged, the FSA prohibits Retailer Plaintiffs from acquiring automatically opening knives through interstate commerce; it is an absolute ban on transactions in

interstate commerce. This prohibition applies not only to retailers, but to all individuals as well. As such, the claimed right to acquire firearms on behalf of Retailer Plaintiffs' customers is *neither* freestanding, *nor* divorced from the FSA's unconstitutional prohibition on citizens' ability to acquire, purchase, possess, and carry automatically opening knives through interstate commerce; and the prohibition extends to the possession, carry, and use of such knives on all federal land and within all "Indian country," including Indian reservations. By prohibiting retailers from acquiring automatically opening knives through interstate commerce, the FSA prohibits citizens at large from lawfully purchasing such knives through interstate commerce throughout the United States. The citizens' right to possess and carry such knives for protection and other lawful purposes implies a corresponding right to purchase them through retailers operating in interstate commerce.

As conceded by Defendants, "Teixeira held that the plaintiff-retailer had 'derivative standing' on behalf of his 'potential customers.'" ECF No. 26 (OB at 20, n 9.). Here, however, there are no "hypothetical customers" as claimed by Defendants. ECF No. 26 (OB at 16). The Retailer Plaintiffs are *established businesses* with an established clientele. See ECF No. 1 (Compl. ¶ 15, at 5, and ¶ 16, at 5-6). They are not a soon to be formed business like the Plaintiff in the *Teixeira* case. And despite Defendants' unsupported claims, the complaint more than sufficiently states that Retailer Plaintiff customers cannot acquire automatically opening knives as — quite plainly — all interstate commerce of automatically opening knives is prohibited, which in turn prohibits acquisition, purchase, possession, carry, and use throughout the United States. See also Folloder Decl. and Arnold Decl.

Moreover, Defendants wrongly assert that Retailer Plaintiffs have failed to state a claim on behalf of themselves and their customers, stating that the FSA "does not prohibit actions such as carrying and possessing a switchblade." ECF No. 26 (OB at 20). However, Section 1243, in fact, broadly prohibits the possession, carry, and use of such knives on federal land and within "Indian country." Accordingly, such knives are in fact prohibited under the FSA.

20

Defendants also over-rely on Knife Rights' website,[5] claiming that Section 1242 has no effect on possession and carry, but Plaintiffs' challenge to the FSA encompasses not only the invalidation of Section 1242, but also Sections 1243 and 1244. Together, FSA's challenged statutory scheme prohibits the acquisition, purchase, and sale of such knives through interstate commerce; and broadly prohibits their lawful possession, carry, and use on all federal land and within all "Indian country." The complaint and accompanying declarations plausibly provide facts demonstrating that the FSA statutory scheme is causing cognizable injury to the Retailer Plaintiffs' customers' Second Amendment rights.

In summary then, Plaintiffs' have plausibly alleged that automatically opening knives are "arms" under the plain text of the Second Amendment. ECF No. 1 (Compl. ¶ 2, at 1, ¶ 26, at 8). Plaintiffs have plausibly alleged that automatically opening knives are not both "dangerous and unusual"— and thus, in common use— under the standard established in *Heller* and affirmed in *Bruen. Id.* (Compl. ¶¶ 28-38, at 8-10). As such, Plaintiffs have alleged the facts demonstrating that Defendants' enforcement of the FSA unconstitutionally restricts Plaintiffs' Second Amendment right to keep and bear arms as there is no historical analogous regulations from the time of the founding that could justify the continued enforcement of the Federal Switchblade Act's prohibition on interstate commerce and possession on "Indian Country" and federal lands. *Id.* (Compl. ¶¶ 34-37). As such, Defendants' motion to dismiss should be denied.

## E.  Leave to Amend Should be Granted *if* the Sworn Declarations Need to be Incorporated into the Complaint.

As stated, Plaintiffs also request leave to amend should the Court find that the factual allegations in the complaint require more or that the sworn declarations addressing standing and the alleged Second Amendment claim should be incorporated

---

[5] Regardless, Knife Rights is not a legal resource, nor does it claim to provide legal services. The fact that Knife Rights provided a generalized interpretation to specific portions of the FSA does not discredit or eliminate the very real application of the FSA's prohibitions.

into the complaint. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### A.   Defendants Fail to Dispute Any of Plaintiffs' Claims and Evidence.

Summary judgment is appropriate when the pleadings and evidence demonstrate that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotext Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While Defendants' offer their opinion disputing Plaintiffs' motion and supporting evidence, Defendants fail to provide any evidence supporting those opinions. Defendants offer no evidence that automatically opening knives are not "arms" under the plain text of the Second Amendment.

Defendants offer no evidence contradicting Plaintiffs expert declarations establishing that automatically opening knives are merely a variation of folding pocket knife.

And Defendants offer no evidence that automatically opening knives are *both* "dangerous and unusual" weapons. ECF No. 26 (OB at 21-25). Specifically, Defendants fail to provide any contradictory evidence that automatically opening knives are no more dangerous than any other knife, nor do they dispute their lower lethality relative to handguns. Defendants also fail to provide any evidence that automatically opening knives are not in common use across the country. ECF No. 26 (OB at 21-26); *see also* ECF No. 20-1 (Motion at 21-24). Indeed, Defendants cite their own Subcommittee report showing that a "large number of switchblades were being manufactured or imported and sold in the United States" and that such knives "were being widely distributed through the mail, …." ECF No. 26 (OB at 2, 3). Yet Defendants conveniently omit that specific numbers of automatically opening knives being manufactured or imported and sold in the United States – over 1 million per year. ECF No. 20-1 (Motion at 21-24).

### (i.)   Defendants Incorrectly Apply the Standard Set Forth in *Bruen*.

At the outset, Defendants apply the wrong standard in its opposition that "the Switchblade Act does not implicate, let alone violate, the Second Amendment." ECF No. 26 (OB at 21). Defendants support this claim, stating that there is no constitutional right to bear both dangerous and unusual "weapons" like switchblades. *Id*. However, this is not the standard set forth in *Bruen*.

The Supreme Court was explicit under *Bruen*, the threshold legal question is whether the Second Amendment's plaint text covers an individual's conduct. *Bruen*, 142 S. Ct. at 2126. "[W]hen the Second Amendment's plain text covers and individual's conduct, the Constitution *presumptively protects that conduct." Id.* (emphasis added). In Defendants' eagerness to *contradict* the official position of its own office in 1958 by claiming switchblades are "dangerous and unusual weapons," Defendants skips the textual analysis required by both *Heller* and *Bruen* entirely.

However, as explicitly set forth in Plaintiffs' opening brief, Plaintiffs are "ordinary, law-abiding, adult citizens, and are therefore unequivocally part of 'the people' whom the Second Amendment protects." ECF No. 20-1 (Motion, p. 9). The action in question—the ability to freely manufacture for sale, sell, distribute, transport, purchase through interstate commerce, and possess, and carry bladed arms in common use — also unquestionably falls within the plain text of the Second Amendment's protection of the right to "keep and bear arms." Automatically opening knives are indisputably "arms" under the plain text of the Second Amendment. Defendants do not dispute these facts under the proper constitutional standard, and provide no evidence contradicting Plaintiffs' evidence. Thus, Defendants waive any opposition to these claims.

With the initial legal question answered, the burden is then placed on the government to "justify its regulation by demonstrating that it is consistent with the Nations' historical tradition of firearms regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified

23

command.'" *Bruen*, 142 S. Ct. at 2116, 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961).

Here, where Defendants bear the burden, Defendants must prove that automatically opening knives are *both* "dangerous *and* unusual" weapons, and thus are not protected by the Second Amendment. This is a conjunctive test. The arm in question must be *both* "dangerous" and "unusual." *Caetano v. Massachusetts,* 577 U.S. 411, 420 (2016). If the arm in question is in common use, or commonly possessed by the people for lawful purposes, including self-defense, then it necessarily cannot be "unusual."

In support of its motion for summary judgment, Plaintiffs submitted extensive evidence establishing that automatically opening knives are in common use. In its opposition, Defendants agree that the overall numbers of automatically opening knives in circulation and the number of jurisdictions that permit such knives determine whether an arm is "in common use." ECF No. 26 (OB at 23-25). However, Defendants provide no evidence that disputes Plaintiffs' evidence. As such, Defendants have failed to meet their burden and waives any opposition on these claims.

### (ii.)   Switchblades are Not Both "Dangerous and Unusual."

Defendants continue to misapply binding Supreme Court authority in opposition to Plaintiffs' motion claiming that the FSA does not "implicate" the Second Amendment because switchblades are "dangerous and usual" arms and "there is no constitutional right to bear dangerous and unusual arms like switchblades." ECF No. 26 (OB at 21). Defendants incorrectly *conflate* the textual analysis with the historical analysis.

To support their assertion that automatically opening knives are both "dangerous and unusual," Defendants rely on *Hollis v. Lynch,* stating that *Hollis* "outlined the process for determining when a weapon is not typically possessed by law-abiding citizens for lawful purposes." ECF No. 26 (OB at 24-25).

While *Hollis* may have properly acknowledged that the question of common use must be considered when determining whether an arm is both "dangerous and unusual," the standard applied in *Hollis* is not the standard set forth in *Bruen*. See *Hollis v. Lynch*, 827 F.3d 436 (2016). In *Hollis*, that court applied the now abrogated two-step framework and ruled that machine guns did not fall under the protection of the Second Amendment. While the Court in *Hollis* may have applied some aspects of the common use test set forth in *Heller*, it fundamentally misapplied this analysis in light of *Bruen* and this is no longer good law. As established above, under *Bruen*, switchblades are presumptively protected. Since Plaintiffs have demonstrated as much, it is the Defendants' burden to prove otherwise.

That the *Hollis* court adopted prior pre-*Bruen* rulings from other courts establishing that machineguns are "dangerous" provides neither an outline nor an analysis for this Court to follow here. In contrast, the controlling analysis is set forth in *Heller, Bruen, and Caetano*.

**First**, any argument that a switchblade is equivalent to a machinegun or a grenade in "dangerousness" is absurd. Any comparison by Defendants that an automatically opening knife is anywhere near as dangerous as a gun, let alone a machine gun, is entirely unsupported by the evidence. Plaintiffs submitted multiple declarations from several top knife designers in the world establishing that automatically opening knives are no more dangerous than any other folding pocket knife—let alone as dangerous as constitutionally protected firearms. ECF No. 20-3, (Appendix, KnifeRights MSJ App. 648; 650-651; 777-778). Defendants failed to provide any evidence to the contrary.

**Second**, mere opinions regarding criminal use (especially opinions regarding criminal use that are from 1958) are patently insufficient to justify the FSA. See *Teter v. Lopez*, 76 F.4th 938, 950 ("Hawaii cites some conclusory statements in the legislative history claiming that butterfly knives are associated with criminals. We give little weight to these statements. Common sense tells us that all portable arms are associated with criminals to some extent, and the cited conclusory statements

25

simply provide no basis for concluding that these instruments are not commonly owned for lawful purposes."). In fact, such a consideration is barred under *Heller* and *Bruen* and offers no support for Defendants' claim that switchblades "are not typically possessed for lawful purposes." ECF No. 26 (OB at 23). Defendants attempt to repackage the rejected "interest balancing" test in order to justify its ban. But the Supreme Court in *Bruen* flatly rejected that test. See *Bruen*, 142 S.Ct. at 2117-18.

### (iii.)   Defendants' Own Arguments Confirm Automatically Opening Knives are In Common Use.

Because Defendants have failed to provide any evidence that automatically opening knives are dangerous, they have failed to prove they are both "dangerous *and* unusual," and thus have failed to justify the constitutionality of the FSA. As such, the Court's analysis can end here. The FSA is unconstitutional and should be permanently enjoined.

In fact, there is no genuine issue of material fact as to whether automatically opening knives are commonly owned for lawful purposes. The Department of Justice made this clear in 1958:

> Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.[6]

See ECF No. 20-3, (Appendix, KnifeRights MSJ, app., 558-559); see also, *Teter v. Lopez*, 76 F. 4th 938, 950.

Nonetheless, Defendants' own argument supports Plaintiffs' position. First, in claiming that automatically opening are not in common use for lawful purposes, Defendants again incorrectly assert it is Plaintiffs' burden to "demonstrate that switchblades are in common use." ECF No. 26 (OB at 23). *Heller* made it clear the

---

[6] To clarify, Plaintiffs do not concede that any hypothetical state prohibitions on automatically opening knives are permissible under the Second Amendment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"dangerous and usual" or "common use test" is found within the Supreme Court's historical inquiry. *Heller*, 554 U.S. at 627. As such, it is Defendants' burden to show that switchblades are *both* "dangerous and unusual" and thus, not in common use for lawful purposes. *Bruen*, 142 S. Ct. at 2119.

Even though it is not their burden, Plaintiffs have affirmatively proven that automatically opening knives are in common use under every metric. While Defendants attempt to discount Plaintiffs' evidence supporting common use of automatically opening knives, Defendants fail to provide any evidence to meet their burden, let alone anything contradicting Plaintiffs' evidence. In any case, Defendants agree that in determining common use, the absolute number of weapons at issue and the jurisdictions where the arm may lawfully be possessed must be considered. ECF No. 26 (OB at 24-25). The only evidence before this Court, however, supports the conclusion that automatically opening knives are in common use under both of those metrics.

Specifically, the legislative history of the FSA established that more than a million automatically opening were manufactured per year by just two manufacturers in 1958 (ECF No. 20-2, 20-3 (Appendix, KnifeRights MSJ App 331. 553, 587)); moreover, monthly shipments distributed three to four thousand knives per month (*id.*, App. 455). Today, thousands of different models of automatically opening exist for sale for lawful use. ECF No. 20-1 (Motion, p. 24, fn. 6). Multiple publications as well as the top knife designers in the world (many of which have designed the automatically opening knives available today) agree that automatically opening knives are commonly possessed and used throughout the Country. *Id.* at 21-24. Defendants offered no contrary evidence.

Defendants' opinion that a definitive total number was not produced does not outweigh Plaintiffs' evidence. Defendants have failed to provide any evidence that would even *indicate* that automatically opening knives are not in common use. In fact, Defendants claim that automatically opening knives are *easily acquired* throughout the Country. ECF No. 26 (OB at 12) (citing Paul A. Clark, *Criminal Use*

27

*of Switchblades: Will the Recent Trend towards Legalization Lead to Bloodshed?,* 13 Conn. Pub. Int. L.J. 219, 242 ("There are only a handful of recorded prosecutions, despite reports of widespread distribution."); *see also id.*, ("switchblades are regularly and publicly offered for sale…").

Additionally, Defendants' inaccurate jurisdictional analysis also supports Plaintiffs position.[7] Defendants claim that "eight states and the District of Columbia outright ban switchblades or other automatically opening knives." ECF No. 26 (OB at 24). However, there are only 6 states that provide an outright ban on automatically opening. Both Illinois and New York provide exceptions to their prohibition if an individual obtains a FOID card (Illinois) or uses the switchblade while hunting, fishing, and trapping and holds a license to hunt, fish or trap (New York). See Illinois Comp. State. Ann. 5/24-1(e)(2) (West 2023); and N.Y. Penal Law § 265.20(a)(6). In other words, as Plaintiffs showed in their opening brief, at least 44 states do not have an outright prohibition on switchblades. ECF No. 20-1 (Motion at 27).

While Defendants claim Maryland bans the sale and concealed carry of automatically opening knives, it still allows their possession and open carry. *Md. Code Ann., Crim. Law, § 4-101 (West 2023).* New Jersey also allows the possession of automatically opening knives with an "explainable purpose." *N.J. Stat. Ann. § 2C:39-3 (West 2023).* While Defendants claim that "four other states also prohibit or restrict *concealed carry* of switchblades or automatically opening knives" this is just another way of saying that these jurisdictions allow for the sale, acquisition, possession, and open carry of such knives. ECF No. 26 (OB at 24) (emphasis added).

Thus, as Plaintiffs accurately contended in their summary judgment motion, the *vast majority* of states *do not* prohibit the sale or possession of switchblade knives.[8] Likewise, the court in *Caetano* found that 45 states did not prohibit stun

---

[7] Even if Defendant's claims were accurate, the small number of jurisdictions that prohibit automatically opening knives do not outweigh the vast majority of jurisdictions that do not prohibit them.

[8]  Defendants' assertion that "local jurisdictions often impose their own bans" is not supported by any evidence. See ECF No. 26 (OB at 24). Defendants cite to seven city

28

guns, establishing common use. *Caetano*, 577 U.S. 411 at 420. Thus, with 44 states allowing automatically opening knives, it is undisputed that under the jurisdictional analysis, automatically opening knives are in common use.

Finally, while Defendants opine that Plaintiffs cannot "properly demonstrate that switchblades are in common use because they are similar to more common "folding pocket knives" and "Plaintiffs cite to no case holding that a particular weapon is in common use because of the prevalence of another weapon," Defendants fail to provide any evidence to the contrary. See ECF No. 26 (OB at 24).

Moreover, despite Defendants' claim, courts *have* applied such an analysis when considering whether an arm is "dangerous and unusual" or "in common use:"

> "To determine whether a weapon is dangerous and unusual, 'we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes.' The record does not support a conclusion that the butterfly knife has uniquely dangerous propensities. *The butterfly knife is simply a pocketknife* with an extra rotating handle. The ability of an experienced user to expose the blade with one hand is not the sort of 'astonishing innovation' that "could not have been within the contemplation of the constitutional drafters."

*Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) (citing *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), abrogated on other grounds by *Bruen*, 142 S. Ct. 2111 (emphasis added); see also *State v. Delgado*, 692 P.2d 610, 614 (1984).

Notably, under the Federal Switchblade Act's definition of "switchblade," butterfly knives fall under the definition of switchblade. The Court in *Teter* found that butterfly knives are in common use. *Teter*, 76 F.4th at 950. Moreover, as further established by the Plaintiffs' evidence, automatically opening knives are merely a variation of folding pocket knife. ECF No. 20-1 (Motion, at 25). In fact, the difference

---

codes to justify this *broad assumption*. Quite plainly, seven Cities is insufficient to make the claim that local jurisdictions "often" implement bans on automatically opening knives. As such, this assertion should be rejected.

between an unrestricted assisted opening pocket knife[9] and a banned automatically opening pocket knife are *extraordinarily minute*. *Id.* Both pocket knives have a handle, spring, blade. *Id.*, at 25-26. The only difference in these two variations of pocket knife is where the user places a small amount of pressure to open the knife. *Id.* It is either opened by pressing on the blade or by pressing a button. There is no difference in speed, function, or use. ECF No. 20-3, (Appendix, KnifeRights MSJ app., 640-641, 646-652; 750; 760-761; 766-767; 771-772; and 777-778). There is also no difference in concealability, or function. *Id.*

One hand opening folding pocket knives are some of the most widely used knives in the country. They account for 80% of the current market. ECF No. 20-3 (Appendix, Knife Rights MSJ App. 739). Because Defendants have not provided any evidence that could adequately differentiate between an automatically folding pocket knife and other folding pocket knives like assisted opening knives, it cannot claim that automatically opening knives are somehow distinct from folding pocket knives. Defendants fail to provide any evidence that one hand opening folding pocket knives are not in common use throughout this country. As such, automatically opening knives are in common use — as they are merely folding pocket knives.

### (iv.) The Historical Analysis Justifies Granting Plaintiffs' Motion for Summary Judgment in its Entirety.

As stated previously, the historical analysis on arms bans was already completed by *Heller* and reiterated by *Bruen*. *Heller* established the relevant application of this historical analysis. Bearable arms are presumptively protected by the Second Amendment and cannot be banned unless they are *both* "dangerous and unusual." *Bruen* 142 S.Ct. at 2128. The Supreme Court made clear that this analysis was a historical matter. *Id.*

As shown above, automatically opening knives are no more dangerous than any other folding pocket knife—and are certainly not more dangerous than

---

[9] Note that assisted opening knives are explicitly exempt from the prohibitions under the Federal Switchblade Act. See 15 U.S.C. § 1244(5).

constitutionally protected firearms. Defendants fail to dispute this fact with any evidence. Further, applying Plaintiffs' uncontested evidence regarding the number of automatically opening knives in the United States, the jurisdictional analysis, and the categorical analysis, all of which Defendants fail to dispute with any evidence, it is clear that automatically opening knives are in common use. As such, they cannot be banned. The analysis is over.

Nonetheless, if this Court were inclined to revisit the historical analysis, the small number of historical laws regulating some bladed arms offered by the Defendants falls well short of their burden of establishing an historical tradition that would justify the Federal Switchblade Act.

### (v.)    Restrictions on the Sale and Use of Bladed Weapons.

If Plaintiffs and this Court were to blindly accept all the cited historical laws that allegedly justify the FSA, Defendants have—*at most*— cited to nine specific *state laws* from the Founding Era through 1885, and an additional 12 *state* laws enacted in the 1950s. In other words, Defendants claim that in approximately *186 years* (1837 through 2023) a total of 21 state laws that regulated various actions with certain bladed arms—*mainly restricting the manner in which said arms were carried*—justify an outright ban on all interstate commerce and possession of automatically opening knives on all "Indian country" and federal land. This is woefully insufficient to satisfy its burden under *Heller* and *Bruen*.

Most telling, Defendants have entirely failed to provide a single *federal* law that banned the sale, transfer, transportation, or possession of any bladed arm (or firearm) of any kind within the United States. The analysis need not go any further. Defendants have failed to meet their burden.

Nonetheless, this fact is even more certain after reviewing the laws relied on by Defendants. First, Defendants cite only *two laws* that were enacted before 1850 that prohibited sale and possession of knives of any kind. However, the 1837 Georgia law was held unconstitutional in *Nunn v. State* and invalidated *in its entirety*. *See Nunn v. State,* 1 Ga. 243, 251 (1846). As such, it cannot be considered as authority

1  justifying the FSA. In fact, Plaintiffs contend precisely the opposite as *Heller*
2  described the decision in *Nunn* to "perfectly capture[] the way in which the operative
3  clause of the Second Amendment furthers the purpose announced in the prefatory
4  clause, in continuity with the English right:"

> "The right of the whole people, old and young, men, women and boys,
> and not militia only, to keep and bear arms of every description, and not
> such merely as are used by the militia, shall not be infringed, curtailed,
> or broken in upon, in the smallest degree; and all this for the important
> end to be attained: the rearing up and qualifying a well-regulated
> militia, so vitally necessary to the security of a free State. Our opinion
> is, that any law, State or Federal, is repugnant to the Constitution, and
> void, which contravenes this right, originally belonging to our
> forefathers, trampled under foot by Charles I. and his two wicked sons
> and successors, re-established by the revolution of 1688, conveyed to this
> land of liberty by the colonists, and finally incorporated conspicuously
> in our own Magna Charta!"

*Heller*, 554 U.S. at 612–13.

As such, the single remaining 1838 Tennessee law is simply an outlier.

Defendants also attempt to mislead regarding the 1838 Mississippi law
allegedly banning "the odious and savage practice of wearing dirks and bowie-knives
or pistols." The law referenced *does not ban any activity whatsoever*. In fact, it merely
grants the Mayor and Alderman "the power" to pass "necessary by-laws for the good
order and government of said town, not inconsistent with the constitution and laws
in this state and the United States…" Act of Feb. 15, 1839, ch. 168, § 5, 1839 Miss.
Laws 384, 385; Act of Feb. 18, 1840, ch. 11, § 5, 1840 Miss. Laws 181. There is no
evidence that any such law regulating any kind of knife *was ever passed*. Simply,
Defendants cannot justify the prohibitions enforced by the FSA by relying on a
hypothetical law that was never passed.

Moreover, early *tax laws* also provide no justification for the challenged
prohibitions. The 1837 Alabama tax law cited by the Defendants did impose a tax on
the selling, giving or disposing of any "bowie knife or Arkansas toothpick." ECF No.
26 (OB at 28). However, this is far from an outright ban on all interstate commerce
or possession in large portions of the country. The same is true for the other tax law

referenced by Defendants in the Florida Territory in 1838. ECF No. 26 (OB at 29). The FSA does not attempt to impose a tax on the sale of automatically opening knives. It bans all interstate commerce and possession of automatically opening knives on all "Indian country" and federal land.

Defendants' reliance on the few restrictions placed on legal minors also provides no justification for the current ban. The 1856 Tennessee law prohibiting sales to minors was merely a restriction on legal minors. Any legal adult was still free to purchase, acquire, transfer, possess, and carry any kind of knife under this law. Moreover, the 1856 Tennessee law had an exception if the sale or transfer of the knife was for hunting. See Act of Feb. 26, 1856, ch. 81, § 2, 1855–1856 Tenn. Acts 92, 92. Similarly, the 1859 Kentucky law prohibiting "sale of such weapons to minors" cited by Defendants is actually a *concealed carry* restriction with a strong racist application. The full text states, "if any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, *which is carried concealed,* to any minor, or slave, or free negro, shall be fined fifty dollars." Act of Jan. 12, 1860, Ch. 33, section 23, 1 Ky. Acts 245. Aside from being entirely unconstitutional on its face, it is not an outright ban on the sale, transfer, acquisition, possession, or even open carry of certain knives. The three other bans on the sale to minors referenced by Defendants (1878 Mississippi, 1883 Kansas, and 1885 Illinois) do not provide any analogous historical support that the *federal government* can impose an outright ban on all interstate commerce and possession of a certain arm and come far too late after the relevant time period to be given any weight by this Court.[10]

Defendants claim that 14 states banned *concealed carry* of bowie knives between 1850 and 1875, and between 1875 and 1900 that number rose to 22 states. This fails to meet the standard required under *Bruen*. First, these are *state laws* prohibiting the manner of *carrying* certain bladed arms in public. There are no

---

[10]  The same is true for the 1881 Arkansas ban. Being so late after the most relevant founding era, it provides little support or justification for Defendant's ban.

restrictions on the sale, transfer, acquisition, possession, or open carrying of these knives. Second, as made clear in *Heller* and *Bruen*, the time period in which these prohibitions were enacted provides little guidance as to the original interpretation of the Second Amendment at the founding, especially when these late restrictions are contradicted by the Founding era. *Bruen*, 142 S. Ct. at 2121 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."); see also *id.*, 142 S.Ct. at 2137 ("[T]o the extent later history contradicts what the text says, the text controls."); *see also* ECF 24 (Motion at 15-16).

Moreover, as to identifying historical analogues to justify *federal law or regulations*, the *only* relevant time period to be considered is the Founding era because the discussion of the 14th Amendment ratification in *Bruen* is only relevant to the states. This fact is even more applicable to Defendants' reliance on the restrictions placed specifically on switchblades in the 1950s. ECF No. 26, (OB at 30). In fact, *Bruen* refused to consider laws enacted this far from the Founding era as any historical evidence. *Bruen*, 142 S.Ct. at 2154, n.28.

Thus, while this historical inquiry is not needed, Defendants have failed to meet its burden of establishing any kind of historical analogous regulation that could justify the bans imposed by the FSA.

### (vi.) Restrictions on the Export and Transportation of Arms and Ammunition.

Unable to identify analogous regulations on knives that justify the FSA, Defendants claim that "early American history also reveals a related, robust tradition of regulation on the sale and transport of arms and ammunition" justifies the FSA. ECF No. 26 (OB at 31). Yet, Defendants' entire argument is largely premised on either immoral, racist, and outright unconstitutional laws or laws so fundamentally distinct from the FSA they provide no justification for the continued enforcement of the FSA. As such, Defendants' historical references bear no authority in this case.

First, Defendants place great significance on the Act of May 22, 1794, which prohibited the exportation of certain arms out of the United States for a period of one year, claiming this single, limited prohibition on exportation "provide powerful evidence" that Congress believed it could place restrictions on firearms "across borders." ECF No. 26 (OB at 31). However, as made clear in *Heller*, "we would not stake our interpretation of the Second Amendment upon a single law…." *Heller*, 554 U.S. at 632. Moreover, the Act of May 22, 1794 was imposed on *international trade* in response to international tensions and concerns about the potential involvement of the United States in conflicts arising from the French Revolutionary Wars. See David P. Currie, "The Constitution in Congress: The Third Congress, 1793-1795, The University of Chicago Law Review, Vol. 63, No. 1 (Winter 1996), at 1-4, 17-21. Under President George Washington's administration, the United States pursued a policy of neutrality, and the embargo was implemented to prevent the United States from indirectly supporting one side or the other in the ongoing European conflicts, as well as to keep arms local in case of an armed conflict making its way to the United States. *Id*. The policy was expressed in the April 22, 1793 Proclamation of Neutrality given by George Washington. *Id*. The goal was to protect American interest and avoid the potential pitfalls of involvement in the conflicts between the European powers. This is precisely why the Act still "encourage[ed] the importation of the same [arms]" during this period by removing any duty on such imports. *See* Act of May 22, 1794, ch. 33, section 5. Most importantly, the Act granted no power for the federal government to prohibit or even restrict commerce of arms within the United States. This fact is clear considering Defendants have failed to provide any historical law from 1794 through 1958 that granted the federal government such power.

Defendants cite several colonial "restrictions on the commercial sale of firearms" from the colonies of Massachusetts, Connecticut, Maryland, and Virginia which made it a crime to "sell, give, or otherwise deliver firearms or ammunition to Indians." ECF No. 26 (OB at 31). However, laws of several colonies and states disarming classes of people considered to be dangerous, specifically including those

35

unwilling to take an oath of allegiance, slaves, and Native Americans, are not relatively similar historical analogues delimiting outer bounds of right to keep and bear arms, as would support constitutionality, under Second Amendment, of federal statute all interstate commerce and possession of a switchblade knife; these racists laws disarmed people by class or group.

> "Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of "the people" altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best."

*United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).

Nor can these laws be used to justify the broad category of "controlling firearms trade." Such a generalized comparison would literally justify *any* regulation of arms of any kind. And notably, none of the laws cited by Defendants restricted the commercial sale of *bladed weapons* of any kind. They restricted firearms and ammunition, not knives.

Neither are early colonial and state restrictions on gunpowder sufficiently relevant to justify the FSA. Specifically, the Massachusetts, Connecticut, New Jersey, and New Hampshire restrictions cited by Defendants merely required *licensing or inspection* of gun powder before it could be sold. ECF No. 26 (OB at 32). There is no licensing or inspection requirement in the FSA. It is a complete ban on all interstate commerce and possession within federal land. There is also a distinct and fundamental difference between early gun powder and automatically opening knives. In the Colonial era, gun powder was volatile and explosive. As such, there was a very real fire danger in its storage, use, and transportation. The laws referenced by Defendants were put in place to mitigate this danger. On the other hand, there is no inherently dangerous nature with switchblades, a fact that the federal government made clear in 1958 when William P. Rogers, then Deputy Attorney General,

submitted a letter on behalf of the Department of Justice refusing to support enactment of the FSA:

> "As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is not inherently dangerous but requires the introduction of a wrongful human element to make it so. Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

ECF No. 20-3 (Appendix, KnifeRights MSJ, App., 557-559).

This official position discredits Defendants' position today. Defendants' official position in 1958 is also reinforced by the fact that, other than the FSA's own "ballistic knife" prohibition, the federal government does not prohibit or even limit the interstate commerce or possession of any other kind of bladed weapon.[11] In fact, there are no federal restrictions of any kind on pocket knife, fixed-blade knife, bowie knife, stiletto, dirk, dagger, sword, spear, kitchen knife or other bladed instruments. The fact is that an automatically opening knife is no different from any other folding knife—a fact that Defendants have failed to provide any contrary evidence. And the historical regulations requiring *licensing or inspection* on *explosive* gun powder are irrelevant to the FSA and offer no justification for Defendants' ban.

Thus, there is no historically relevant and analogous laws or regulations that justify the outright prohibition of all interstate commerce and possession of automatically opening knives under the FSA.

---

[11] Note that the FSA was amended almost 30 years later in 1986 to prohibit knives defined as "ballistic knives." While not specifically challenged in this case, Plaintiffs do not concede such prohibition is constitutional under *Heller* and *Bruen*.

37

### (vii.)  The Injunction Should Apply Nationwide.

It is clear that Plaintiffs seek to permanently enjoin the unconstitutional prohibitions in place under the FSA. A nationwide injunction is the only relief that should be granted by this Court as the Switchblade Ban not only violates the Second Amendment protected rights of the Plaintiffs, but any other individual or organization in the country that seeks to obtain and acquire an automatic knife via interstate commerce or possess such knives in large portions of the western half of this country. These individuals include Knife Rights' members, who reside across the United States.

While there may be instances in which Courts will not grant a nationwide injunction, this is not the case here. "The scope of the remedy is dictated by the scope of the violation. Where a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *E. Bay Sanctuary Covenant v. Trump,* 349 F. Supp. 3d 838 (N.D. Cal. 2018); *see also,* *Califano v. Yamasaki*, 442 U.S. 682, 702, (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."). In fact, "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94, (1976); *see City of S.F. v. Sessions*, 349 F.Supp. 3d 924 (N.D. Cal. 2018). "When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." *City of Chicago v. Barr*, 513 F. Supp. 3d 828, 837 (N.D. Ill. 2021) (citing *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011).

Here, the right being unconstitutionally restricted is protected by the Second Amendment. "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2121. The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other

interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Bruen*, 142 S. Ct. at 2118 (citing *Heller*, 554 U.S. at 635).

Limiting relief to the individual Plaintiffs and the Plaintiff Knife Rights' members would allow the enforcement of an unconstitutional prohibition to continue across the vast majority of the United States. "[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As such, if this Court were to limit any injunction to only Plaintiffs, it would be permitting the irreparable harm imposed on the rest of the public through the FSA's unconstitutional enforcement. This Court should not permit Defendants to continue to strip any individual of their constitutional rights any longer.

Moreover, considering the nationwide context of automatic knife regulation, the large majority of states *permit* their sale, acquisition, possession, use and carry for lawful purposes including self-defense. As such, a nationwide injunction on the FSA would rightfully bring the federal government in line with the majority of state jurisdictions in this country.

In granting Plaintiffs motion for summary judgment, Plaintiffs respectfully request that this Court permanently enjoin the challenged FSA provisions through a nationwide injunction.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs request that this Court issue an order finding the Federal Switchblade Act, 15 U.S.C. §§ 1241-1244, enacted in 1958 as Pub. Law 85-623, unconstitutional.[12] Plaintiffs also request that the challenged aspects of the law be permanently enjoined through a nationwide injunction.[13]

---

[12]  Again, Plaintiffs do not challenge any importation restrictions of the FSA, nor request any relief with regard to this aspect of the FSA.

[13] This consolidated brief is in compliance with the page length requirements under Texas Local Rules, Rule 7.2 and Rule 56.5.

December 15, 2023                          Respectfully submitted,

                                          DILLON LAW GROUP, APC


                                          /s/ John W. Dillon
                                          John W. Dillon
                                          California State BAR No. 296788
                                          *Pro Hac Vice*
                                          jdillon@dillonlawgp.com
                                          **DILLON LAW GROUP APC**
                                          2647 Gateway Road
                                          Suite 105, No. 255
                                          Carlsbad, California 92009
                                          Phone: (760) 642-7150
                                          Fax: (760) 642-7151

                                          AND


                                          /s/ R. Brent Cooper
                                          R. Brent Cooper
                                          Texas Bar No. 04783250
                                          brent.cooper@cooperscully.com
                                          Benjamin D. Passey
                                          Texas Bar No. 24125681
                                          ben.passey@cooperscully.com
                                          **COOPER & SCULLY, P.C.**
                                          900 Jackson Street, Suite 100
                                          Dallas, Texas 75202
                                          Phone: (214) 712-9500
                                          Fax: (214) 712-9540

                                          Attorneys for Plaintiffs